CLEARY GOTTLIEB STEEN & HAMILTON LLP
Luke A. Barefoot
David Z. Schwartz
Richard C. Minott
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999
*Attorneys for Raízen S.A.,*
*as Petitioner and Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 26-10528 |
| Raízen S.A.,[1] | ) |
| | ) Chapter 15 |
| Debtor in a Foreign Proceeding. | ) |
| | ) |
| In re: | ) |
| | ) Case No. 26-10529 |
| Raízen Energia S.A., | ) |
| | ) Chapter 15 |
| Debtor in a Foreign Proceeding. | ) |

---

[1]      The debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Raízen S.A. (01-23–Brazil); Raízen Energia S.A. (01-78–Brazil); Raízen Centro-Sul Paulista S.A. (18-28-Brazil); Raízen Fuels Finance S.A. (0903–Luxembourg); Blueway Trading Importação e Exportação S.A. (01-57–Brazil); Raízen Caarapó Açúcar e Álcool Ltda. (01-66–Brazil); Raízen North America, Inc. (7198–U.S.); Raízen Centro-Sul S.A. (01-36–Brazil); and Raízen Trading S.A. (3.167–Switzerland).

| | |
|---|---|
| In re:<br><br>Raízen Centro-Sul Paulista S.A.,<br><br>Debtor in a Foreign Proceeding. | Case No. 26-10530<br><br>Chapter 15 |
| In re:<br><br>Raízen Fuels Finance S.A.,<br><br>Debtor in a Foreign Proceeding. | Case No. 26-10531<br><br>Chapter 15 |
| In re:<br><br>Blueway Trading Importação e Exportação S.A.,<br><br>Debtor in a Foreign Proceeding. | Case No. 26-10532<br><br>Chapter 15 |
| In re:<br><br>Raízen Caarapó Açúcar e Álcool Ltda.,<br><br>Debtor in a Foreign Proceeding. | Case No. 26-10533<br><br>Chapter 15 |
| In re:<br><br>Raízen North America Inc.,<br><br>Debtor in a Foreign Proceeding. | Case No. 26-10534<br><br>Chapter 15 |
| In re:<br><br>Raízen Centro-Sul S.A.,<br><br>Debtor in a Foreign Proceeding. | Case No. 26-10535<br><br>Chapter 15 |

| | |
|---|---|
| In re: | ) <br> ) <br> )    Case No. 26-10536 <br> ) <br> ) <br> )    Chapter 15 <br> ) <br> ) |
| Raízen Trading S.A., | |
|          Debtor in a Foreign Proceeding. | |

**DECLARATION OF LORIVAL NOGUEIRA LUZ, JUNIOR, AND
VERIFIED PETITION FOR RECOGNITION OF THE BRAZILIAN
PROCEEDING AND MOTION FOR ORDER GRANTING RELATED
RELIEF PURSUANT TO 11 U.S.C. §§ 105(A), 1515, 1517, 1520, AND 1521**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... vi

PRELIMINARY STATEMENT .................................................................................. 2

BACKGROUND ....................................................................................................... 7

I.      General Background and History ................................................................ 7

     A.     An Overview of the Company's Business ........................................ 7

     B.     Connections to the United States ................................................. 11

     C.     The Company's Financial Situation.............................................. 12

II.     Events Precipitating Commencement of the Brazilian Proceeding ..................... 17

     A.     Expansion of the Raízen Group ................................................... 17

     B.     The Climate and Commodity Crises That Affected the Biofuel Sector ......... 18

     C.     Declining Revenue and Ratings Outlook Leads to a Run on Contracts ......... 19

III.    The EJ Plan .......................................................................................... 20

JURISDICTION, ELIGIBILITY, AND VENUE ...................................................... 26

RELIEF REQUESTED ............................................................................................. 27

REQUIRED DISCLOSURES .................................................................................... 27

BASIS FOR RELIEF ............................................................................................... 28

I.      The Debtors Are Eligible to Be Debtors Under Section 109(a) of the Bankruptcy Code, and this Court is the Proper Venue for the Cases ................. 28

II.     The Requirements of Section 1517(a) of the Bankruptcy Code Are Satisfied .... 30

     A.     The Brazilian Proceeding is a "Foreign Proceeding" .................... 31

     B.     The Brazilian Proceeding Satisfies the Requirements for Recognition as a "Foreign Main Proceeding" ............................................................. 35

          a.     The Debtors are Part of the Economically and Operationally Integrated Raízen Group ....................................... 37

          b.     The COMI for the Brazilian Debtors is Brazil.................... 39

          c.     The COMI for Raízen Fuels Finance S.A., Raízen North America, and Raízen Trading S.A. is Brazil....................... 39

               i.     Raízen Fuels Finance S.A.'s COMI is in Brazil. .......... 41

               ii.    Raizen North America's COMI is in Brazil ................ 42

               iii.   Raízen Trading S.A.'s COMI is in Brazil.................... 42

        d.     Brazil as COMI for Each of the Debtors is Consistent with
Creditor Expectations ........................................................................ 43

     C.     The Petitioner is a Proper "Foreign Representative" ...................................... 44

     D.     The Petitions Were Properly Filed Under Sections 1504 and 1509 and
Meet the Requirements of Section 1515 and Bankruptcy Rule 1007(a)
(4) ................................................................................................................ 46

**III.**     **Alternatively, the Court Should Find That the Brazilian Proceeding is a
Foreign Nonmain Proceeding and Grant Discretionary Relief** ........................... 47

**NOTICE** ........................................................................................................................... 52

**NO PRIOR REQUEST** ................................................................................................. 53

**CONCLUSION** ............................................................................................................... 53

**VERIFICATION OF CHAPTER 15 PETITION** ................................................... 54

## <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

**<u>Cases</u>**

*Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B., de C.V. (In re Vitro, S.A.B. de C.V.)*,
470 B.R. 408 (Bankr. N.D. Tex. 2012), *aff'd*, 701 F.3d 1031 (5th Cir. 2012) ...................... 45, 46

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
722 F.2d 1063 (2d Cir. 1983) ...................................................................................... 34

*CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V.*,
482 B.R. 96 (Bankr. S.D.N.Y. 2012) ........................................................................... 50

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*,
737 F.3d 238 (2d Cir. 2013) ............................................................................. 26, 28, 31

*In re ABC Learning Ctrs. Ltd.*,
728 F.3d 301 (3d Cir. 2013) ................................................................................... 31, 32

*In re Agro Santino, OOD*,
653 B.R. 79 (Bankr. S.D.N.Y. 2023) ........................................................................... 44

*In re Americanas S.A.*,
No. 23-10092 (MEW) (Bankr. S.D.N.Y. Mar. 3, 2023) ................................................ 45

*In re Andrade Gutierrez Engenharia S.A.*,
645 B.R. 175 (Bankr. S.D.N.Y. 2022) ......................................................................... 44

*In re Andrade Gutierrez Engerharia S.A.*,
No. 22-11425 (MG) (Bankr. S.D.N.Y. Dec. 2, 2022) ...................................... 31, 32, 34

*In re Artimm, S.r.l.*,
335 B.R. 149 (Bankr. C.D. Cal. 2005) .......................................................................... 51

*In re Ascot Fund Ltd.*,
603 B.R. 271 (Bankr. S.D.N.Y. 2025) ......................................................................... 39

*In re Ashapura Minechem Ltd.*,
480 B.R. 129 (S.D.N.Y. 2012) ..................................................................................... 31

*In re Avanti Commc'ns Grp. PLC*,
582 B.R. 603 (Bankr. S.D.N.Y. 2018) ......................................................................... 26

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
374 B.R. 122 (Bankr. S.D.N.Y. 2007) ................................................................. 46, 48

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund*, *Ltd.*,
389 B.R. 325 (S.D.N.Y. 2008) ......................................................................... 48

*In re Berau Cap. Res. Pte Ltd.*,
540 B.R. 80 (Bankr. S.D.N.Y. 2015) ............................................................ 26, 29

*In re British Am. Ins. Co.*,
425 B.R. 884 (Bankr. S.D. Fla. 2010) ........................................................... 48, 49

*In re Cell C Proprietary Ltd.*,
571 B.R. 542 (Bankr. S.D.N.Y. 2017) ............................................................... 29

*In re Creative Fin., Ltd.*,
543 B.R. 498 (Bankr. S.D.N.Y. 2016) ........................................................... 48, 49

*In re Gerova Fin. Grp., Ltd.*,
482 B.R. 86 (Bankr. S.D.N.Y. 2012) ................................................................ 48

*In re Giftcraft Ltd.*,
No. 25-11030 (MG), 2025 WL 1583480 (Bankr. S.D.N.Y. June 4, 2025) ................. 39

*In re InterCement S.A.*,
668 B.R. 802 (Bankr. S.D.N.Y. 2025) ................................................ 35, 39, 40, 41

*In re Inversora Eléctrica de Buenos Aires S.A.*,
560 B.R. 650 (Bankr. S.D.N.Y. 2016) ............................................................... 29

*In re Iovate Health Sci. Int'l Inc.*,
673 B.R. 516 (Bankr. S.D.N.Y. 2025) ............................................................... 39

*In re Lupatech S.A.*,
No. 16-11078 (MG) (Bankr. S.D.N.Y. May 26, 2016) ....................................... 32, 35

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
458 B.R. 63 (Bankr. S.D.N.Y. 2011), *aff'd* 474 B.R. 88 (S.D.N.Y. 2012) ............ 48, 49

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
474 B.R. 88 (S.D.N.Y. 2012) ......................................................................... 37

*In re Mina Tucano Ltda.*,
No. 22-11198 (LGB) (Bankr. S.D.N.Y. Oct. 12, 2022) ........................................ 45

*In re Modern Land (China) Co.*,
641 B.R. 768 (Bankr. S.D.N.Y. 2022) ...................................................... 49

*In re Novonor S.A. - Em Recuperação Judicial*,
No. 19-12731 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2019) ............................. 35

*In re OAS S.A.*,
533 B.R. 83 (Bankr. S.D.N.Y. 2015) .................................................. *passim*

*In re OAS S.A.*,
No. 15-10937 (SMB) (Bankr. S.D.N.Y. Aug. 3, 2015) ............................... 35

*In re Odebrecht Engenharia e Construção S.A. - Em Recuperação Judicial*,
No. 25-10482 (MG) (Bankr. S.D.N.Y. Apr. 8, 2025) .................................. 35

*In re Odebrecht Engerharia e Construção S.A.*,
No. 20-12741 (Bankr. S.D.N.Y. Dec. 30, 2020) .................................. 31, 35

*In re Odebrecht Óleo E Gás S.A.*,
No. 17-13130 (JLG) (Bankr. S.D.N.Y. Dec. 13, 2017) ...................... 31, 33, 35

*In re ODN I Perfurações Ltda.*,
No. 23-10557 (DSJ) (Bankr. S.D.N.Y. May 4, 2023) ........................... 31, 34

*In re Oi Brasil Holdings Coöperatief U.A.*,
578 B.R. 169 (Bankr. S.D.N.Y. 2017) ............................................. 39, 45

*In re Olinda Star Ltd.*,
614 B.R. 28 (Bankr. S.D.N.Y. 2020) ...................................................... 36

*In re Oversight & Control Comm'n of Avánzit, S.A.*,
385 B.R. 525 (Bankr. S.D.N.Y. 2008) .................................................... 30

*In re PT Bakrie Telecom Tbk*,
601 B.R. 707 (Bankr. S.D.N.Y. 2019) .................................................... 29

*In re Rede Energia S.A.*,
No. 14-10078 (SCC) (Bankr. S.D.N.Y. Sept. 9, 2014) ............................... 35

*In re Samarco Mineracão S.A. - Em Recuperação Judicial*,
No. 21-10754 (LGB) (Bankr. S.D.N.Y. May 13, 2021) ............................... 35

*In re Serviços de Petróleo Constellation S.A.*,
600 B.R. 237 (Bankr. S.D.N.Y. 2019) ......................................... 32, 39, 45

*In re Serviços de Petróleo Constellation S.A.*,
613 B.R. 497 (Bankr. S.D.N.Y. 2019) ....................................................................... 37

*In re Serviços de Petróleo Constellation S.A.*,
No. 18-13952 (MG) (Bankr. S.D.N.Y. May 9, 2019) .................................................. 35

*In re SPhinX, Ltd.*,
351 B.R. 103 (Bankr. S.D.N.Y. 2006) ............................................................. 36, 40, 50

*In re Standing Order of Reference Re: Title 11*,
12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) ................................................................... 26

*In re Suntech Power Holdings Co., Ltd.*
520 B.R. 399 (Bankr. S.D.N.Y. 2014) ............................................................. 26, 37, 40

*In re Toft*,
453 B.R. 186 (Bankr. S.D.N.Y. 2011) ....................................................................... 50

*In re U.S.J. – Açúcar e Álcool S.A., et al.*,
No. 22-10320 (Bankr. S.D.N.Y. Apr. 14, 2022) ......................................................... 35

*In re U.S. Steel Can. Inc.*,
571 B.R. 600 (Bankr. S.D.N.Y. 2017) ....................................................................... 29

*In re Unigel Participações S.A.*,
No. 24-11982 (MG) (Bankr. S.D.N.Y. Dec. 10, 2024) ..................................... 31, 32, 34

*In re Usina de Açúcar Santa Terezinha Ltda.*,
No. 19-11199 (MEW) (Bankr. S.D.N.Y. May 16, 2019) ............................................ 35

*In re Virgolino de Oliveira, S.A. Açúcar e Álcool,*
No. 25-10696 (MG) (Bankr. S.D.N.Y. July 18, 2025) ............................................... 35

*Jaffe v. Samsung Elecs. Co.*,
737 F.3d 14 (4th Cir. 2013) .................................................................................... 51

*Lavie v. Ran (In re Ran)*,
607 F.3d 1017 (5th Cir. 2010) ................................................................................. 48

*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*,
714 F.3d 127 (2d Cir. 2013) ............................................................................. 36, 37

## Rules and Statutes

11 U.S.C. § 101 ................................................................................................................ *passim*

11 U.S.C. § 105 ................................................................................................................ 1

11 U.S.C. § 109 ................................................................................................................ 26, 29

11 U.S.C. § 362 ................................................................................................................ 47, 50, 51

11 U.S.C. § 1502 .............................................................................................................. *passim*

11 U.S.C. § 1504 .............................................................................................................. 26, 46

11 U.S.C. § 1509 .............................................................................................................. 26, 46

11 U.S.C. § 1515 .............................................................................................................. *passim*

11 U.S.C. § 1516 .............................................................................................................. 36

11 U.S.C. § 1517 .............................................................................................................. *passim*

11 U.S.C. § 1520 .............................................................................................................. 2, 52

11 U.S.C. § 1521 .............................................................................................................. 2, 47, 50

11 U.S.C. § 1522 .............................................................................................................. 50

28 U.S.C. § 157 ................................................................................................................ 26

28 U.S.C. § 1140 .............................................................................................................. 30

28 U.S.C. § 1334 .............................................................................................................. 26

28 U.S.C. § 1410 .............................................................................................................. 26, 30

28 U.S.C. § 1746 .............................................................................................................. 1

Fed. R. Bankr. P. 1007 ..................................................................................................... 27, 46, 47

Fed. R. Bankr. P. 7007 ..................................................................................................... 47

## Other Authorities

H. Rep. No. 109-31, pt. 1 (2005) ..................................................................................... 36, 50

I, Lorival Nogueira Luz, Junior, being duly authorized by each of the Debtors (as defined herein), hereby declare, under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows on behalf of the Foreign Representative (as defined herein):

Raízen S.A. (the "Petitioner" or "Foreign Representative") is the duly-authorized foreign representative of Raízen S.A.; Raízen Energia S.A.; Raízen Centro-Sul S.A.; Raízen Centro-Sul Paulista S.A.; Blueway Trading Importação e Exportação S.A. ("Blueway"); Raízen Caarapó Açúcar e Álcool Ltda. ("Raízen Caarapó"); Raízen North America, Inc. ("Raízen North America"); Raízen Fuels Finance S.A.; and Raízen Trading S.A. (collectively, the "Debtors") in the Brazilian court-supervised extrajudicial reorganization proceeding (*recuperação extrajudicial*) of the Debtors (the "Brazilian Proceeding"), which was accepted by the 3rd Bankruptcy and Judicial Reorganization Court – Central Civil Courthouse (the "Brazilian Court") on March 12, 2026, pursuant to Federal Law No. 11.101 of February 9, 2005 (as modified, the "Brazilian Bankruptcy Law"), of the laws of the Federative Republic of Brazil ("Brazil").[2]  By and through its undersigned counsel, the Foreign Representative respectfully submit this *Declaration of Lorival Nogueira Luz, Junior, and Verified Petition for Recognition of the Brazilian Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(a), 1515, 1517, 1520, and 1521* (the "Declaration and Verified Petition").  This Declaration and Verified Petition is filed in furtherance of each voluntary petition (ECF No. 1) (collectively, the "Voluntary Petition" and, together with this Declaration and Verified Petition, the "Petitions") filed on March 12, 2026, by each of the Debtors.  The Petitioner hereby requests that the Court enter an order substantially in the form attached hereto as **Exhibit A** (the "Proposed Order") pursuant to sections 105(a), 1515,

---

[2]        The case number for the Brazilian Proceeding before the Brazilian Court is 4037759-13.2026.8.26.0100/SP.

1517, 1520, and 1521 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the

"Bankruptcy Code"):[3]

    (a)    granting the Petitions in these chapter 15 cases (the "Chapter 15 Cases") and recognizing the Brazilian Proceeding as the "foreign main proceeding" for each of the Debtors pursuant to section 1517 of the Bankruptcy Code, or in the alternative, as a "foreign nonmain proceeding";

    (b)    finding that the Petitioner is the duly-appointed "foreign representative" of the Debtors within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of each of the Debtors for purposes of these proceedings; and

    (c)    granting such other and further relief as the Court deems just and proper.

In support of this Declaration and Verified Petition, the Petitioner relies upon and

incorporates by reference the *Declaration of Giuliano Colombo Pursuant to 28 U.S.C. § 1746 in*

*Support of the Declaration of Lorival Nogueira Luz, Junior, and Verified Petition for Recognition*

*of the Brazilian Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C.*

*§§ 105(A), 1509, 1515, 1517, 1520, and 1521* (the "Brazilian Counsel Declaration") filed

contemporaneously herewith.   In further support of the relief requested herein, the Petitioner

respectfully represents as follows:

## PRELIMINARY STATEMENT

1.    The Debtors and certain of their non-debtor affiliates (the "Raízen Group" or the

"Company") are Brazil's leading sugarcane processor and ethanol producer, the second largest

energy and fuel distributor, and the third largest company in terms of net revenue, excluding

financial institutions.   The Raízen Group operates as an integrated business, and its primary

business segments are the production and sale of ethanol, sugar and bioenergy and the distribution,

sale and resale of fuel products, biofuels, and lubricants.   During the 2024-2025 crop year, it carried

---

[3]    Except as otherwise indicated, section and chapter references are to the Bankruptcy Code.

out operations in every state in Brazil; employed more than 34,000 employees across the country, in addition to 2,000 apprentices, interns, and service providers; sold more than 3.4 billion liters of fuel; produced more than 5 million tons of sugar; produced more than 3 billion liters of ethanol; and generated more than 1.9 GWH of renewable energy. During the same harvest year, the Raízen Group (i) generated more than R$255 billion in net operating revenue, (ii) paid more than R$4.9 billion in payroll expenses, and (iii) paid approximately R$1.6 billion in federal taxes, R$3 billion in state taxes and R$120 million in municipal taxes in Brazil. It also operated a vast portfolio of sugar, ethanol and bioenergy production plants; supplied fuel to 8,000 Shell-branded stations in Brazil, Argentina and Paraguay; and operated 68 supply bases at airports, more than 70 fuel distribution bases, two lubricant plants (in Brazil and Argentina), one oil refinery in Argentina, and five commercial offices abroad (in the United States, Colombia, Switzerland, the Philippines and Singapore).

2.      The Raízen Group operates in industries that are critical to Brazil's economy—sugarcane and fuel distribution. Sugarcane is Brazil's largest crop by volume and accounts for around ten percent of Brazil's agricultural production value. Likewise, the Raízen Group's fuel distribution network supplies fuel for gas stations, transportation companies, airports, thermoelectric plants, hospitals, and other critical infrastructure providers that keep Brazil's national economy functioning. The Raízen Group also plays an important role in promoting sustainable development in Brazil's energy industry and is a leading player in driving renewable energy transition.

3.      Historically, the Raízen Group has been a financially stable enterprise, generating significant revenues in light of increasing customer demand across its key industries. But in recent years, it has been significantly impacted by the confluence of the deterioration of the Brazilian

3

economy, the rise in Brazilian and global interest rates, severe climate change that has significantly reduced sugarcane and corn harvests, and volatility in the commodities market related to the prices of sugar and ethanol.  All of these events have decreased the Company's liquidity and increased its degree of leverage, which has in turn led to a cycle of negative market reactions and credit ratings decreases.

4.     As a result, the Company, along with its controlling shareholders, has engaged in various strategic measures to mitigate the negative factors affecting its financial situation and engaged in discussions with certain creditors in an effort to develop a comprehensive out-of-court solution to the Company's capital structure.  Although productive, these measures have not achieved the results necessary in the timeframe required to address the Company's liquidity needs.  Accordingly, on March 11, 2026, the Company commenced the Brazilian Proceeding to prevent the accelerated maturity of certain obligations, negotiate with key financial creditors to effectuate a targeted restructuring and recapitalization, and receive a 180-day stay of creditor enforcement actions during such proceeding (the "Brazilian EJ Stay").  After numerous discussions with certain key creditors, the Debtors reached an agreement in principle regarding the terms of a restructuring plan (the "EJ Plan"), described in more detail below and attached as Document 1 to Exhibit A to the Brazilian Counsel Declaration.  The EJ Plan is currently supported by creditors holding 47% of the Debtors total indebtedness that is subject to the current EJ Plan.

5.     As explained further below, several recent events accelerated the Company's ongoing restructuring efforts and led to the commencement of the Brazilian Proceeding. *First*, the ratings of the Raízen Group and its securities were downgraded by Moody's, Standard & Poor's and Fitch at the end of 2025 and again on February 9, 2026.  These ratings downgrades pose a serious and immediate threat to the Raízen Group, particularly given that creditors may take the

position that certain of the Company's debt obligations may be accelerated as a result of these downgrades. Any early maturity of debt obligations may also give rise to cross-defaults in several other debt facilities, leading to the acceleration of more than R$66.5 billion of debt. As of the date hereof, at least one creditor in Brazil sought to accelerate the Debtors' obligations and exercise a significant setoff, another creditor rejected transfer requests by the Debtors and froze the Debtors' deposit accounts in the United States, and others delivered a letter to the Company threatening certain defaults.

6.      *Second*, over the same time period, several contract counterparties have unilaterally revised the terms of contracts that are critical to the Company's continuing operations, demanding advance payment, or otherwise revising key payment terms. Other creditors and partners have begun to adopt measures to cut, restrict or increase the cost of their respective credit and financing lines. As a result of these contract revisions, the Company's estimated cash consumption has increased by R$1.8[4] billion. Several counterparties have similarly threatened to terminate or unilaterally amend their contracts.

7.      *Third*, while the majority of the Raízen Group's debt is long-term, the Company has significant interest and debt amortization payments coming due in the near-term, with over R$13 billion due in the next 24 months for its bank debt alone. Given its current liquidity, the Company will be unable to both service its upcoming debt obligations and continue funding operations at the levels necessary to generate revenue sufficient to reverse its current downward trajectory.

8.      As a result, the Company commenced the Brazilian Proceeding to benefit from a 180-day stay of collection and enforcement actions while it engages in further discussions with its

---

[4]      "R$" denotes the Brazilian *real* or BRL.

key stakeholders with the goal of developing a restructuring solution for the Company's capital structure. To aid and support these restructuring efforts in Brazil, the Petitioner seeks recognition of the Brazilian Proceeding under Chapter 15 of the Bankruptcy Code to protect the Debtors and their property from creditor actions in the United States. To ensure the EJ Plan is fully implemented and enforceable in the United States, the EJ Plan contemplates commencement of these Chapter 15 Cases.

9.      Accordingly, pending the recognition of the Brazilian Proceeding, the Petitioner also seeks provisional relief to stay the commencement or continuation of any actions or proceedings concerning the Debtors or their assets, rights, obligations, or liabilities in the United States, as provided under the *Motion for Provisional Relief Pursuant to 11 U.S.C. §§ 1519, 105(a), and 362* (the "Provisional Relief Motion") filed contemporaneously herewith, again in an attempt to procure an immediate stay of collection and enforcement actions for the benefit of all creditors consistent with the stay provided for in the Brazilian Proceeding.

10.     The relief requested herein is imperative to the Company's restructuring objectives. The Raízen Group's value is derived in large part from its significant competitive advantages in the sugarcane, ethanol, and bioenergy sector in Brazil. These advantages are based in large part on its national platform that allows it to benefit from its substantial domestic operations across Brazil, leveraging a network of more than 7,000 suppliers across more than 416 municipalities. Those advantages must be preserved if the Raízen Group is to maximize its go-forward value in any restructuring. In spite of its recent financial difficulties, the Raízen Group's operations are sustainable and viable. Therefore, the Company is well positioned for a path to recovery if it can preserve its property and operations and eventually implement a holistic restructuring solution through the Brazilian Proceeding.

11.     Accordingly, the Petitioner respectfully requests that the Court enter the Order granting the Petition in these Chapter 15 Cases, recognizing the Brazilian Proceeding, and authorizing such other relief that the Court deems appropriate.

## **BACKGROUND**

### I.     **General Background and History**

#### A.     *An Overview of the Company's Business*

12.     Raízen S.A. is the ultimate parent company for the Raízen Group and was formed as the result of a joint venture in 2011 between Cosan S.A. ("Cosan"), which owned local Esso/ExxonMobil assets and several sugarcane mills, and Shell Brasil Holding B.V. ("Shell"), which began operating in Brazil in 1913.  Once formed, the Raízen Group became the largest sugarcane processor in the world by crushing volume and one of the largest global marketers of ethanol and sugar.  In 2021, Raízen S.A. obtained registration as a "Category A"[5] public company with the Brazilian Securities and Exchange Commission, going public and being listed on Brasil, Bolsa, Balcão ("B3"), the stock exchange market in Brazil. Its initial public offering raised more than R$6.7 billion.

13.     After consolidating its operations in Brazil for several years after forming, the Raízen Group began expanding its operations in other Latin American countries in 2018.  In Argentina, the Raízen Group has become the second largest fuel distributor in the country and operates a refinery, a lubricants plants and several terminals and refueling bases at airports.  The Raízen Group has also made several strategic acquisitions of companies in Brazil and Paraguay, among others, to strengthen its position in Latin America.

---

[5]     As a Category A company, Raízen S.A. can trade any securities, including its own shares.

14.    The Raízen Group operates in two primary segments: (i) the production and commercialization of ethanol, sugar, and bioenergy ("ESB")[6], and (ii) the distribution, sale, and resale of fuel products, biofuels, and lubricants ("Fuel Distribution").  Through the ESB segment, the Raízen Group works with approximately 1,100 sugarcane suppliers, approximately 2,600 land lessors, and numerous suppliers of agricultural products.   The ESB segment accounts for approximately 25% of the Company's net operating revenue.  In the Fuel Distribution segment, the Raízen Group transports and distributes oil products—mostly obtained from Petrobras – Petróleo Brasileiro S.A.—from refineries and ports to storage terminals and ultimately to deliver to gas stations and large consumers.  The Fuel Distribution segment accounts for approximately 75% of the Raízen Group's net operating revenue.

15.    A simplified organizational chart is set forth below.



---

6        In Portuguese, the ethanol, sugar, and bioenergy segment is referred to as "EAB" (*etanol, açúcar, e bioenergia*).

16.     Below Raízen S.A. are a number of other business units, trading companies and close to one hundred operating companies.  The entities can be grouped into two major categories:

    (a)    Companies immediately below Raízen S.A., which include companies that manage all aspects of the Fuel Distribution segment, including relationships with Shell-branded service stations, Shell Select convenience stores and logistics companies; and

    (b)    Companies that sit below Raízen Energia S.A., which include companies that manage all aspects of the ESB segment, including various bioenergy and renewable energy companies, as well as regulated electricity trading companies, the Raízen Group's international fuel distribution businesses in Argentina and Paraguay, sugar trading and commodity trading companies, and companies focused on biotechnology, research and development.

17.     Each Chapter 15 Debtor plays an indispensable role in the Company:

    (a)    Raízen S.A. is the ultimate parent company for the Raízen Group and engages in capitalization and financing activities for the Raízen Group, acts as the Company's face to the market, and is responsible for concentrating the operations and investments in the Fuel Distribution segment.  It serves as a guarantor of the Notes (as defined below).  It is responsible for business management of the group, including providing the Raízen Group with strategic direction on key business matters.  Raízen S.A. is incorporated in Brazil and has its headquarters in Rio de Janeiro.

    (b)    Blueway is an import-export company controlled by Raízen S.A. Its purpose is the importation and exportation of fuel, ethanol and petroleum products and derivatives for the benefit of the Raízen Group.  Blueway is incorporated in Brazil and has its headquarters in Rio de Janeiro.

    (c)    Raízen Energia S.A.[7] is a direct subsidiary of Raízen S.A. and serves as the holding company of the renewable segment of the Raízen Group.  As such, it is responsible for concentrating all of the Raízen Group's operations and investments in the ESB segment.  It also serves as a guarantor of the Notes. Raízen Energia S.A. is incorporated in Brazil and has its headquarters in São Paulo.

    (d)    Raízen Fuels Finance S.A. is a wholly-owned subsidiary of Raízen Energia S.A. and is a special purpose vehicle ("SPV") that was formed solely to provide access to international markets to support the Raízen Group's funding needs.  It is the issuer of the Notes.  It has no bank accounts or other property located in Luxembourg and has no employees or operations.

---

[7]     Raízen Energia S.A. is a Category B company, meaning that it can only trade non-Company securities, and trades mainly debentures.

9

Raízen Fuels Finance S.A. has three statutory directors provided by a Luxembourg trust company that live in Luxembourg and two statutory directors who reside in Brazil. The office of the same Luxembourg trust company that provides Raízen Fuels Finance S.A. its statutory directors also serves as the company's Luxembourg registered address. Raízen Fuels Finance S.A. is incorporated in Luxembourg.

(e)     Raízen Trading S.A. is another wholly-owned subsidiary of Raízen Energia S.A. and is a trading company that was formed to strengthen the Raízen Group's international trading functions. It has approximately 24 employees located in Switzerland—all of whom report to management located in Brazil. Of these 24 employees, four are Brazilian nationals and only six are Swiss. Its customers are located in Brazil, Asia and Europe, and its counterparties are largely Brazilian. Raízen Trading S.A. buys sugar in Brazil and has freight and elevator agreements in Brazil to export that sugar. In addition to sugar from Brazil, Raízen Trading S.A. receives ethanol from Brazilian suppliers and oil products from the United States, which are sold onward to the Raízen Group's Brazilian entities. Raízen Trading S.A. has an executive committee that sets and approves parameters for all of its trading activities. The executive committee is comprised of two statutory directors located in Geneva and two statutory directors located in Brazil. Of these four directors, three are Brazilian nationals and the fourth is Portuguese. Raízen Trading S.A. is incorporated in Switzerland and has its registered office in Geneva.

(f)     Raízen North America is a trading company that was formed to provide access to markets in the United States. It has ten employees located in the United States, acting as ethanol trading desk operators—all of whom report to management located in Brazil. Trading parameters that support and drive Raízen North America's largest trading transactions are set in Brazil. Raízen North America has one statutory director located in the United States who is a dual citizen of Brazil and the U.S. and who reports to one statutory director located in Brazil. Raízen North America is incorporated in Delaware and maintains an office in Houston, Texas. It does not have separately audited financials and only reports its financial results as part of the consolidated financials for Raízen S.A. and Raízen Trading S.A.

(g)     Raízen Centro-Sul S.A. is a sub-holding company controlled by Raízen Energia S.A. that controls two non-debtor entities engaged in the production, processing, distribution and commercialization of rural and agricultural products, sugarcane, energy, and petroleum. Raízen Centro-Sul S.A. is incorporated in Brazil and has its headquarters in São Paulo.

(h)     Raízen Centro-Sul Paulista S.A. is a Brazilian operating company controlled by Raízen Energia S.A. It engages in the production, processing, distribution and commercialization of rural and agricultural products, sugarcane and its derivatives, electric energy, steam, and petroleum

derivatives.  Raízen Centro-Sul Paulista S.A. is incorporated in Brazil and has its headquarters in São Paulo.

(i)    Raízen Caarapó is a Brazilian operating company controlled by Raízen Energia S.A.  Its purpose is to support the production and commercialization of sugarcane, agriculture products procured from third parties, electric and steam power, and soybeans.  Raízen Caarapó is incorporated in Brazil and has its headquarters in Mato Grosso do Sol.

A detailed organizational chart of the Raízen Group and other affiliated entities is attached hereto as **Exhibit C**.

### B.    *Connections to the United States*

18.    Although a significant portion of the Debtors' assets and interests are located in Brazil, some of their assets and obligations are also located in or connected to the United States. All of the Debtors have either debt obligations governed by New York law or cash accounts in the United States.  New York law governs all of the debt of Raízen Fuels Finance S.A.  Certain of the debt of the other eight Debtors—Raízen S.A., Raízen Energia S.A., Raízen Centro-Sul Paulista S.A., Raízen Centro-Sul S.A., Raízen Caarapó and Blueway (collectively, the "Brazilian Debtors"), as well as Raízen Trading S.A. and Raízen North America—is also governed by New York law.  All of the Debtors have bank accounts located in New York.

19.    The Indentures (as defined below) are governed by New York law and contain a forum selection clause that provides that the parties have consented to the jurisdiction of the courts in any state or federal court located in the Borough of Manhattan, New York, with respect to any action that may be brought in connection with the Indentures or the Notes (as defined below).

20.    In addition, all of the Debtors have bank accounts in the United States, with deposits collectively totaling more than US$154 million (R$0.8 billion) in cash as of March 9, 2026.

21.    One of the Debtors, Raízen North America is incorporated in Delaware, maintains an office in Houston, Texas, and its largest bank account is located in New York.

C.     *The Company's Financial Situation*

22.     As of March 10, 2026, the Debtors have approximately R$63 billion in consolidated gross debt, with R$20.4 billion (or US$3.9 billion), US$7.7 billion and EUR 506 million in principal amounts outstanding on account of their funded debt obligations, which is comprised of the following instruments:

(a)     *5.30% Notes due 2027*.  Raízen Fuels Finance S.A. issued unsecured notes in the aggregate principal amount of US$500 million at 5.30% (the "2027 Notes") pursuant to that certain indenture dated January 20, 2017 (the "2027 Notes Indenture"), attached hereto as **Exhibit D**, between Raízen S.A. and Raízen Energia S.A. as guarantors, and U.S. Bank National Association, as trustee.  The 2027 Notes Indenture is governed by New York law.  On July 7, 2020, the 2027 Notes Indenture was amended to provide for the issuance of an additional US$225 million aggregate principal amount of the 2027 Notes.  As of the date hereof, US$189 million remains outstanding, and the 2027 Notes are set to mature on January 20, 2027.

(b)     *6.25% Notes due 2032*.  Raízen Fuels Finance S.A. issued unsecured notes in the aggregate principal amount of US$750 million at 6.25% (the "2032 Notes") pursuant to that certain indenture dated July 8, 2025 (the "2032 Notes Indenture"), attached hereto as **Exhibit E**, between Raízen S.A. and Raízen Energia S.A. as guarantors, and the Bank of New York Mellon, as trustee.  The 2032 Notes Indenture is governed by New York law.  As of the date hereof, US$758 million remains outstanding, and the 2032 Notes are set to mature on July 8, 2032.

(c)     *6.45% Green Notes due 2034*.  Raízen Fuels Finance S.A. issued unsecured notes in the aggregate principal amount of US$1 billion at 6.25% (the "2034 Notes") pursuant to that certain indenture dated March 5, 2024 (the "2034 Notes Indenture"), attached hereto as **Exhibit F**, between Raízen S.A. and Raízen Energia S.A. as guarantors, and the Bank of New York Mellon, as trustee.  The 2034 Notes Indenture is governed by New York law.  As of the date hereof, US$1 billion remains outstanding, and the 2034 Notes are set to mature on March 5, 2034.

(d)     *5.70% Green Notes due 2035*.  Raízen Fuels Finance S.A. issued unsecured green notes in the aggregate principal amount of US$1 billion at 5.70% (the "2035 Notes") pursuant to that certain indenture dated September 17, 2024 (the "2035 Notes Indenture"), attached hereto as **Exhibit G**, between Raízen S.A. and Raízen Energia S.A. as guarantors, and the Bank of New York Mellon, as trustee.  The 2035 Notes Indenture is governed by New York law.  As of the date hereof, US$1 billion remains outstanding, and the 2035 Notes are set to mature on January 17, 2035.

(e)    ***6.70% Notes due 2037***.  Raízen Fuels Finance S.A. issued unsecured notes in the aggregate principal amount of US$1 billion at 6.70% (the "2037 Notes") pursuant to that certain indenture dated February 25, 2025 (the "2037 Notes Indenture"), attached hereto as **Exhibit H**, between Raízen S.A. and Raízen Energia S.A. as guarantors, and the Bank of New York Mellon, as trustee.  The 2037 Notes Indenture is governed by New York law.  As of the date hereof, US$1 billion remains outstanding, and the 2037 Notes are set to mature on February 25, 2037.

(f)    ***6.95% Green Notes due 2054***.  Raízen Fuels Finance S.A. issued unsecured green notes in the aggregate principal amount of US$500 million at 6.95% (the "2054 Notes", and together with the 2027 Notes, 2032 Notes, 2034 Notes, 2035 Notes, and 2037 Notes, the "Notes") pursuant to that certain indenture dated March 5, 2024 (the "2054 Notes Indenture", attached hereto as **Exhibit I**, and together with the 2027 Notes Indenture, 2032 Notes Indenture, 2034 Notes Indenture, 2035 Notes Indenture, and 2037 Notes Indenture, the "Indentures"), between Raízen S.A. and Raízen Energia S.A. as guarantors, and the Bank of New York Mellon, as trustee.  The 2054 Notes Indenture is governed by New York law.  On February 25, 2025, the 2054 Notes Indenture was amended to issue an additional US$750 million aggregate principal amount of the 2054 Notes.  As of the date hereof, US$1.25 billion remains outstanding, and the 2037 Notes are set to mature on March 5, 2054.

(g)    ***Raízen S.A. November 2019 Debenture***.  Raízen S.A. issued a debenture in the aggregate principal amount of approximately R$900 million (or US$243 million) (the "November 2019 Debenture") dated November 28, 2019.  The November 2019 Debenture bears an interest rate of IPCA[8] plus 3.54% per annum, is unsecured, and is guaranteed by Raízen Energia S.A.  The November 2019 Debenture is governed by Brazilian law.  The November 2019 Debenture is set to mature on November 16, 2029.

(h)    ***Raízen S.A. June 2020 Debenture***.  Raízen S.A. issued a debenture in the aggregate principal amount of approximately R$169.5 million (or US$32.2 million) (the "June 2020 Debenture") dated June 15, 2020.  The June 2020 Debenture bears an interest rate of IPCA plus 5.80%% per annum, is unsecured, and is guaranteed by Raízen Energia S.A.  The June 2020 Debenture is governed by Brazilian law.  The June 2020 Debenture is set to mature on June 15, 2030.

(i)    ***Raízen S.A. 5.96% April 2022 Debenture***.  Raízen S.A. issued a debenture in the aggregate principal amount of approximately R$429 million (or US$81.5 million) (the "5.96% April 2022 Debenture") dated April 13, 2022.  The April 2022 Debenture bears an interest rate of IPCA plus 5.96%

---

[8]    "IPCA" rate is the Extended National Consumer Price Index (*Índice Nacional de Preços ao Consumidor Amplo*) for Brazil.

per annum, is unsecured, and is guaranteed by Raízen Energia S.A.  The April 2022 Debenture is governed by Brazilian law.  The April 2022 Debenture is set to mature on March 15, 2032.

(j)   ***Raízen S.A. 5.92% April 2022 Debenture***.  Raízen S.A. issued a debenture in the aggregate principal amount of approximately R$768 million (or US$146 million) (the "5.92% April 2022 Debenture") dated April 13, 2022.  The April 2022 Debenture bears an interest rate of IPCA plus 5.92% per annum, is unsecured, and is guaranteed by Raízen Energia S.A.  The April 2022 Debenture is governed by Brazilian law.  The April 2022 Debenture is set to mature on March 15, 2029.

(k)   ***Raízen S.A. June 2024 Debenture***.  Raízen S.A. issued a debenture in the aggregate principal amount of approximately R$1.050 billion (or US$200 million) (the "June 2024 Debenture") dated June 24, 2024.  The June 2024 Debenture bears an interest rate of CDI [9] plus 0.83% per annum, is unsecured, and is guaranteed by Raízen Energia S.A.  The June 2024 Debenture is governed by Brazilian law.  The June 2024 Debenture is set to mature on June 24, 2031.

(l)   ***Raízen S.A. October 2024 Debenture***.  Raízen S.A. issued a debenture in the aggregate principal amount of approximately R$1.5 billion (or US$285 million) (the "October 2024 Debenture") dated October 8, 2024.  The October 2024 Debenture is unsecured, and is guaranteed by Raízen Energia S.A.  The October 2024 Debenture is governed by Brazilian law.  The first series of debentures under the October 2024 Debenture was issued in an aggregate amount of R$871 million (or US$165 million), bears an interest rate of IPCA plus 6.49% per annum, and is set to mature on September 15, 2034.  The second series was issued in an aggregate amount of R$629 million (or US$120 million), bears an interest rate of IPCA plus 6.48% per annum, and is set to mature on September 15, 2039.

(m)   ***Raízen S.A. July 2025 Debenture***.  Raízen S.A. issued a debenture in the aggregate principal amount of approximately R$850 million (or US$162 million) (the "July 2025 Debenture", and together with the November 2019 Debenture, June 2020 Debenture, 5.96% April 2022 Debenture, 5.92% April 2022 Debenture, June 2024 Debenture and October 2024 Debenture, the "Debentures") to a certain bank and is dated July 18, 2025.  The July 2025 Debenture bears an interest rate of CDI plus 1.30% per annum, is unsecured, and is guaranteed by Raízen Energia S.A.  The July 2025 Debenture is governed by Brazilian law.  The July 2025 Debenture is set to mature on July 15, 2030.

---

[9]   "CDI" rate is the Brazilian interbank deposit (*Certificado de Depósito Interbancário*) rate, which is an average of interbank overnight rates in Brazil.

(n)     ***2023 SACE-Covered Facility***.  Raízen Fuels Finance S.A., as borrower, entered into an unsecured SACE-covered[10] term loan agreement (the "2023 SACE-Covered Facility") with Raízen S.A. and Raízen Energia S.A. as guarantors for an aggregate principal amount of EUR 300 million.  The 2023 SACE-Covered Facility bears an interest rate of EURIBOR[11] plus 1.6% per annum and is set to mature on September 21, 2035.  The 2023 SACE-Covered Facility is governed by New York law.  As of the date hereof, EUR 305 million remains outstanding.

(o)     ***2024 SACE-Covered Facility***.  Raízen Fuels Finance S.A., as borrower, entered into an unsecured SACE-covered term loan agreement (the "2024 SACE-Covered Facility") with Raízen S.A. and Raízen Energia S.A. as guarantors for an aggregate principal amount of EUR 200 million.  The 2024 SACE-Covered Facility bears an interest rate of EURIBOR plus 1.4% per annum and is set to mature on July 23, 2036.  The 2024 SACE-Covered Facility is governed by New York law.  As of the date hereof, EUR 201 million remains outstanding.

(p)     ***Revolving Credit Facility.***  Raízen Fuels Finance, as borrower, entered into an unsecured revolving credit facility (the "RCF") in the amount of US$1 billion on November 13, 2025, with a five-year maturity.  The RCF is governed by New York law, is guaranteed by Raízen S.A. and Raízen Energia S.A., and remains undrawn as of the time hereof.

(q)     ***Other USD-Denominated Third-Party Debt.***  Raízen S.A., Raízen Energia S.A. and Raízen Centro-Sul Paulista S.A. collectively hold US$2.27 billion in unsecured third-party debt related to pre-export financing outstanding as of the date hereof.  These agreements are all governed by New York law; however, many of the agreements provide that the notes issued thereunder are governed by Brazilian law.  The maturities of this debt range from February 2026 through October 2030.

(r)     ***Other Brazilian Agricultural Debt.***  The Raízen Group has approximately R$4.0 billion in aggregate principal outstanding in *Cédula de Produto Rural Financeira* ("CPRs") and *Cédula de Produto Rural Financeira* ("CPR-F"), R$7.3 billion in aggregate principal outstanding in *Certificados de Recebíveis do Agronegócio* (Agribusiness Receivables Certificates, "CRAs"), R$274 million in aggregate principal outstanding in *Crédito Rural* (Rural Credit), and R$1.0 billion and US$83 million in aggregate principal outstanding in Net Current Exposures ("NCEs").  The majority of this agricultural debt is held by Raízen Energia S.A. and the maturities range from March 2026 through October 2033.

---

[10]     A "SACE-covered facility" is a debt facility that is guaranteed by SACE S.p.A., Italy's Export Credit Agency.

[11]     "EURIBOR" is the Euro Interbank Offered Rate.

23.     The Offering Memoranda for the Notes that were provided to investors prior to their issuance contained information about the Company's operations.  *See* Exs. J–N, Excerpts of Offering Memoranda.[12]  Notably, the Offering Memoranda all include only consolidated financial statements for the Raízen Group and four of the Offering Memoranda state that Raízen Fuels Finance S.A. does not and will not publish or furnish its own financial statements to the Notes' trustee or holders of the Notes.  *See, e.g.*, Ex. K, 2032 Notes OM at vii; Ex. L, 2034/2054 Notes OM at vii; Ex. M, 2035 Notes OM at vi; Ex. N, 2037/2054 Noes OM at vii. The Offering Memoranda focus almost exclusively on the risks associated with the Company's operations in Brazil.  *See, e.g.,* Ex. J, 2027 Notes OM at 30 (discussing seasonal trends in Centro-South Brazil affecting Raízen Energia S.A.'s business and inventory); 31 (shortages of sugarcane in Brazil); 32 (reduced sugar demand in Bazil); 35 (Brazilian regulatory environment); 37 (transportation network challenges in Brazil); 44 (challenges in the Brazilian agribusiness sector growth).   The Offering Memoranda state that the issuer, Raízen Fuels Finance S.A., is a "wholly-owned indirect subsidiary of Raízen [S.A.], on the date hereof, has no operations other than issuing and making payments on the notes and other indebtedness. "  Ex. L, 2034/2054 Notes OM at 64; *see also* Ex. K, 2032 Notes OM at 77; Ex. M, 2035 Notes OM at 63; Ex. N, 2037/2054 Notes OM at 65; Ex. J, 2027 Notes OM at 42.   The Offering Memoranda also state that all investor inquiries should be directed to the Raízen Group's "principal executive office" in Brazil.  *See, e.g.*, Ex. N, 2037/2054 Notes OM at 13.  Furthermore, the Offering Memoranda all note in similar fashion that "the ability of the Issuer to pay principal, interest and other amounts due on the notes and other indebtedness

---

[12]     Excerpts of the offering memoranda for the Notes are attached hereto as **Exhibit J**, Offering Memorandum, 5.300% Notes due 2027 the ("2027 Notes OM"); **Exhibit K**, Offering Memorandum, 6.250% Notes due 2032 ("2032 Notes OM"); **Exhibit L**, Offering Memorandum, 6.450% Green Notes due 2034 and 6.950% Green Notes due 2054 ("2034/2054 Notes OM"); **Exhibit M**, Offering Memorandum, 5.700% Green Notes due 2035 ("2035 Notes OM"); **Exhibit N**, Offering Memorandum, 6.700% Notes due 2037 and 6.950% Green Notes due 2054 ("2037/2054 Notes OM") (collectively, the "Offering Memoranda")

will depend upon the financial condition and result of operations of Raízen [S.A.] and its subsidiaries that are debtors of the Issuer." *See* Ex. L, 2034/2054 Notes OM at 64; *see also* Ex. K, 2032 Notes OM at 77; Ex. M, 2035 Notes OM at 63; Ex. N, 2037/2054 Notes OM at 65; Ex. J, 2027 Notes OM at 42.  Additionally, the Offering Memoranda state that if the Company is unable to pay amounts due under the guarantees, then "we may become subject to insolvency proceedings in Brazil." Ex. L, 2034/2054 OM at 68; *see also* Ex. K, 2032 Notes OM at 83; Ex. M, 2035 Notes OM at 67; Ex. N, 2037/2054 Notes OM at 69.  On average, Brazil is referenced more than 900 times in the Offering Memoranda.

24.    The indentures (*Escritura de Emissão*) governing the Debentures were all made available in Portuguese.[13]

## II.    Events Precipitating Commencement of the Brazilian Proceeding

### A.    *Expansion of the Raízen Group*

25.    In 2011, Cosan and Shell formed the Raízen Group as a joint venture in the fuel distribution and sugar and ethanol production chain.  After focusing on growing its operations in the Brazilian domestic market, the Company began expanding its activities across Latin America, starting with an acquisition of Shell's branded gas station network in Argentina in 2018 valued at US$916 million.  Through various strategic acquisitions since then, the Raízen Group has continued to diversify its operations and expand its portfolio of products, including making significant investments in the renewable fuels industry.  Given its diverse portfolio, the Raízen Group is subject to extensive government regulation in Brazil by agencies that oversee electricity, oil and gas, ports, and transportation, among others.

---

[13]    Copies of the indentures governing the Debentures can be made available upon request.

26.    While the Raízen Group's expansion and diversification has led to robust growth for the Company, it has also been a capital-intensive endeavor.  At the same time as it undertook these expansion efforts, the Company began to experience the impact of rising interest rates that significantly increased the cost to service its debt.  Persistently high interest rates in Brazil, where the national interest rate has hovered above 12% per annum for over 20 months, coupled with high inflation in Brazil and Argentina, one of the Raízen Group's major markets, and unfavorable exchange rates has put additional pressure on the Company's operating costs.

### B.    *The Climate and Commodity Crises That Affected the Biofuel Sector*

27.    As a result of these operational challenges and financial pressures, the Raízen Group reported an accumulated loss for the 2024-2025 crop year of nearly R$4.2 billion.  Losses for the 2025-2026 crop year were more pronounced with the Company reporting accumulated losses of approximately R$18.4 billion.  This sharp decline includes several non-cash impairments but was also the result of several factors that impacted crops and commodities simultaneously: (i) a reduction in annual rainfall and increase in water stress in Brazil, (ii) an increase in average temperatures that led to unprecedented wildfires in the Centro-Sul region of Brazil, and (iii) a drop in commodities prices on the global market.

28.    During the 2025-2026 crop year, sugarcane production dropped by 4.4% in southeast Brazil and 3.9% in Midwest Brazil—the two largest sugarcane production regions in Brazil.  The drought affected sugar and ethanol production, while rising temperatures and fires also compromised the quality of raw materials, reducing "Total Recoverable Sugar" an important quality indicator in the industry.  At the same time, there was marked volatility in the commodities market, particularly in relation to the price of sugar, which was impacted by an increase in production in Asia, and the price of ethanol, which was impacted by an oversupply of corn ethanol in Brazilian production.

18

29.     The convergence of a depressed harvest season and volatile commodities market exacerbated the Raízen Group's liquidity challenges, leading to an historic increase in the Raízen Group's leverage (5.3x).   This increased leverage garnered the attention of creditors and the market.   In October 2025, domestic and foreign credit markets began a selloff of the Company's bonds leading to precipitous price drops.   The Company's stock has also experienced extreme volatility—devaluing by more than 57% over the past six months.   By the end of 2025, Raízen S.A.'s shares were trading below R$1 for more than 30 days, leading the B3 to send a notice of non-compliance with the minimum listing price of its shares and requesting that the Company take measures to bring its share price back in line with the minimum requirements.

### C.     *Declining Revenue and Ratings Outlook Leads to a Run on Contracts*

30.     Reflecting all of the uncertainty about the Raízen Group's trajectory, in December 2025, the credit ratings of Raízen S.A. and the Notes were downgraded by Fitch, Moody's and S&P Global.   On February 9, 2026, the credit ratings of Raízen and the Notes were again downgraded to reflect the market's negative outlook on the Company.   These ratings downgrades pose a serious and immediate threat to the Raízen Group, particularly given that creditors may take the position that certain of the Company's debt obligations may be accelerated as a result of the downgrade.   Any early maturity of debt obligations may also give rise to cross-defaults in several other debt facilities, leading the acceleration of more than R$66.5 billion of debt.   This threat is not merely theoretical and crystalized after a bank creditor purported to effectuate a setoff of significant amounts it held on deposit and another creditor delivered a letter to the Company threatening additional defaults.   In fact, just two days prior to the commencement of the Brazilian EJ Proceeding, a third bank creditor refused the Debtors' request to withdraw funds from their U.S. deposit accounts maintained at the creditor entity and delivered a notice to the Debtors stating that it has blocked all accounts maintained by the Debtors at the financial institution due to the

Debtors' anticipated insolvency proceedings. While the creditor eventually released some of the funds requested from the U.S. account, it has taken the position that is entitled to hold the remaining amounts in light of the commencement of the Brazilian EJ Proceeding.[14]

31.     To prevent a rapid deterioration of its financial position that may result from spiraling cross-accelerations and cross-defaults, the Raízen Group filed a petition to commence a Brazilian EJ (the "Brazilian EJ Petition")[15] on March 11, 2026. *See* Brazilian Counsel Decl., Ex. A, Brazilian EJ Petition. On March 12, 2026, the Brazilian Court entered an order accepting the Brazilian EJ Petition (the "Initial Court Order") and granted a 180-day stay against any creditor actions or enforcement proceedings, including exercise of rights of setoff or the exercise of the early maturity clauses contained in financial and supply contracts. *See* Brazilian Counsel Decl., Ex. D, Initial Court Order. The Debtors intend to use the initial 90 days of the Brazilian EJ Stay to negotiate with their creditors to reach agreement on the terms of a confirmable EJ Plan. *See* Brazilian Counsel Decl. ¶ 79.

**III.    The EJ Plan[16]**

32.     The EJ Plan aims to improve the Debtors' financial condition by achieving the following goals: (i) enable the preservation of the business activities of the Debtors; (ii) permit establishing the terms for restructuring of the credits subject to the EJ Plan; (iii) maintain the Debtors' position in the market, as a source of generating taxes, jobs, and wealth for the Brazilian economy; and (iv) ensure equitable and advantageous conditions for all creditors.

---

[14]     The Debtors reserve all rights and defenses with regards to all purported actions taken by this creditor.

[15]     Certified translations of the Brazilian EJ Petition and Initial Court Order are attached to the Brazilian Counsel Declaration as Exhibits B and E.

[16]     Capitalized terms used but not defined in this Section III have the meaning ascribed to them in the EJ Plan.

33.     The EJ Plan establishes the terms and conditions necessary for the restructuring of the Debtors' unsecured financial debt obligations, excluding any Claims Arising from Clearing or Settlement Operations [17] and other exempted obligations under the EJ Plan and Brazilian Bankruptcy Law, and certain intercompany claims (the "Subject Claims") and the granting of new financing to the Debtors.  The EJ Plan provides the following:

| Key Terms of EJ Plan[18] | |
|---|---|
| Overview | The EJ Plan creates the conditions and framework necessary for the Debtors and the holders of Subject Claims (the "Subject Creditors") to negotiate, establish and implement the terms of restructuring the Subject Claims through the submission of a new updated version of the EJ Plan (the "Updated Plan") for confirmation by the Brazilian Court for the benefit of the Subject Creditors, the Debtors, and all of the Debtors' stakeholders.  This may be achieved through any of the following measures: (i) the issuance of new debt instruments to replace the Subject Claims (the "New Debts"); (ii) capitalization strategies, including an option to convert Subject Claims into equity in Raízen S.A., as well as capital increases of the shareholders and/or third parties; and (iii) corporate reorganizations, including spin-offs, mergers, incorporations, |

---

[17]     "Claims Arising from Clearing or Settlement Operations" is defined in the EJ Plan to mean any claims, which are expressly excluded and shall not be considered Subject Claims for the purposes of this [EJ] Plan, arising exclusively from the settlement, close-out, netting, acceleration, voluntary termination, or termination of Clearing Transactions (it being understood, for the avoidance of doubt, that any similar transactions entered into by the Debtors in the over-the-counter market and not subject to the clearing, guarantee, or settlement of a Clearing are excluded from this definition, including, without limitation, transactions entered into, processed and/or registered with B3's Unsecured OTC Segment (formerly the Central de Custódia e de Liquidação Financeira de Títulos Privados (CETIP)), NoMe, or any similar institution), including any remaining balance after netting, regardless of whether such claims arise from a settlement, close-out netting, acceleration, voluntary termination, or termination carried out before or after the ER Filing Date, as well as any claims or obligations arising from any agreements, confirmations, credit support arrangements, netting agreements, brokerage agreements, loans to maintain or purchase securities or debt instruments, or related documentation exclusively within the scope and environment of the Clearings, in each case regardless of whether governed by Brazilian law, New York law, or any other applicable law.

[18]     The following is only a summary of key terms of the EJ Plan, is provided for illustrative purposes only, and is qualified in its entirety by reference to the full text of the EJ Plan.  In the event of any inconsistency between this summary table and the EJ Plan, the EJ Plan or the relevant underlying implementation documentation will control in all respects.

| | |
|---|---|
| | equity incorporations, drop downs and other corporate reorganization structures. |
| **Adhesion** | In addition to all Subject Creditors who are signatories to the EJ Plan (the "<u>Signatory Creditors</u>"), any Subject Creditor who is not a Signatory Creditor may nonetheless adhere to the terms and conditions of the EJ Plan and the Updated Plan provided that they expressly confirm their intention to adhere to the EJ Plan in writing prior to the entry of an order approving the EJ Plan (the "<u>EJ Confirmation Order Date</u>") or the EJ Plan Termination Date (as defined below), whichever occurs first (such creditors, the "<u>Adhering Creditors</u>"). |
| **Negotiation Meetings** | The Debtors and Subject Creditors, at their discretion, will meet to (i) analyze the Raízen Group's leverage ratios and operational needs in order to establish the general parameters for addressing the Raízen Group's indebtedness and capitalization needs; and (ii) based on this assessment, negotiate the terms of the restructuring of the Subject Claims, including new amounts, interest, maturities, and other conditions and charges that impact the Debtors' revenue generating capacity. The following terms, among others, will be established during the negotiation meetings between the Debtors and Subject Creditors: (i) the terms and conditions of the New Debts that may be issued, if any; (ii) the terms and conditions of the possible Capitalization of Subject Claims, if any; (iii) the terms and conditions of any sale of assets, financing or segregation of assets; and (iv) the final terms of the Updated Plan, as well as any matters that may be necessary to implement the Brazilian Proceeding and the Updated Plan. |
| **New Debt** | Under the EJ Plan, the Debtors will issue new debt instruments and/or amend existing debt instruments pursuant to terms to be established as part of the Updated Plan. The terms and conditions of the New Debts shall include, at a minimum: (i) the total value of the New Debts issuances; (ii) subscription rules for Subject Claims; (iii) the payment dates and the respective schedules; (iv) indexation and/or interest rates; (v) non-financial obligations, representations, authorizations, covenants and additional relevant conditions for the instruments; (vi) any guarantees or collateral to support the New Debt; and (vii) the nature of the instruments to be offered, including alternative options, if applicable. |
| **Capitalization** | The Debtors and Subject Creditors will evaluate alternatives to optimize the capital structure of the Raízen Group and will consider: (i) the cash flow projections and operational revenue |

| | |
|---|---|
| | generation capacity; (ii) market conditions and industry indices; (iii) other priority liquid and illiquid payment obligations; and (iv) investment opportunities with new money and conversion of claims into equity.  No Subject Creditors will be required to provide any new money or other financing without the express consent of such Subject Creditor.  The Updated Plan will include, at minimum, (a) the form of capital increase; (b) the treatment of preemptive rights; (c) the number and nature of Raízen shares to be issued; (d) a proposed rule for establishing the issuance price; and (e) indication of any necessary authorizations. |
| **Corporate Reorganizations** | Pursuant to the Updated Plan, certain activities of the Debtors may be restructured through corporate reorganizations, including spin-offs, mergers, incorporations, equity incorporations, drop downs or any other corporate reorganizations, as well as the transfer or disposition of assets. |
| **Intercompany Claims** | The Intercompany Claims shall be restructured pursuant to the terms of the Updated Plan.  Payment of the Intercompany Claims will be fully subordinated to the full payment of all other Subject Claims, ensuring that the latter have priority in the payment hierarchy. |
| **Plan Termination** | The EJ Plan shall automatically terminate by operation of law upon the occurrence of any of the following events (the date of such occurrence, the "EJ Plan Termination Date"): |
| | (i)   The EJ Filing Date does not occur within 2 (two) Calendar Days from the Signing Date; |
| | (ii)   The date in which the Brazilian Court issues an order deciding not to grant the stay period provided for in Article 6 and 163, paragraphs 7 and 8, of the Brazilian Bankruptcy Law, unless such order is suspended, reversed or otherwise stayed within 10 (ten) Business Days from the date the order is issued; |
| | (iii)   Any of the Debtors and/or Raízen Argentina (a) declares itself bankrupt or voluntarily files for bankruptcy liquidation (*falência*); (b) is subject to a request for bankruptcy, and the bankruptcy procedure has not been contested, avoided, delayed, or released within the relevant term; or (c) file an RJ proceeding or similar proceeding; |

(iv)   The lapse of the non-extendable period of 90 (ninety) calendar days from the EJ Filing Date without consent to the Updated Plan of Subject Creditors in the quorum provided under Article 163 of the Brazilian Bankruptcy Law;

(v)   Signatory Creditors holding more than 60% of the Signatory Claims express to terminate the EJ Plan, upon the delivery of a notice to the Debtors, provided that such termination will only be effective after 3 (three) Business Days following the delivery of such notice;

(vi)   Any of the representations and warranties made by the Debtors pursuant to Section 5.2 of the EJ Plan are false, inaccurate, or misleading, upon the delivery of a notice executed by Signatory Creditors representing at least 20% (twenty percent) of the Signatory Claims;

(vii)   The Debtors breach any obligations set forth in the EJ Plan, upon the delivery of a notice executed by Signatory Creditors representing at least 20% (twenty percent) of the Signatory Claims;

(viii)   The Debtors commence any arbitral, judicial or administrative proceeding seeking to challenge, directly or indirectly, the validity, existence, or enforceability of the Subject Claims;

(ix)   The implementation of any corporate reorganization, disposition of material assets, or change of Control of the Debtors that materially compromises the Debtors' ability to perform the obligations set forth in the EJ Plan or the Updated Plan;

(x)   Any legal proceeding with the purpose to attach or otherwise seize assets of the Debtors, including cash, in an amount exceeding US$25 million is filed, unless such proceeding is reversed, suspended, or otherwise stayed within 10 (ten) Business Days, upon the delivery of a notice executed by Signatory Creditors representing at least 20% (twenty percent) of the Signatory Claims; or

24

| | |
|---|---|
| | (xi)   In the event that the Debtors incur any debtor-in-possession (DIP) financing ranking senior to, or that is secured by liens that have priority over the Subject Creditors without the prior written consent of Subject Creditors representing at least 33% (thirty-three percent) of the Subject Claims. |
| **Suspension of Payment of Subject Claims** | Under the EJ Plan, Subject Creditors shall not promote any enforcement actions seeking the satisfaction of their respective Subject Claims after the EJ Plan is filed and until the EJ Plan Termination Date, including any enforcement actions, form of collection, compensation of claims, retention, seizure, attachment, search and seizure, and/or judicial or extrajudicial constraint on the assets of the Debtors, their investees, or their Subsidiaries. |
| **Suspension of Enforcement Rights** | Subject to the terms of the EJ Plan, the Subject Creditors shall not, while the EJ Plan is in effect and until the EJ Plan Termination Date, if applicable, enforce or cause the enforcement, foreclose or cause the foreclosure of any collateral or amount related to the Subject Claims, exempting the fiduciary liens and guarantees that are preserved pursuant to Article 49, §1st of the Brazilian Bankruptcy Law, as well as the setoff of the Subject Claims with amounts that are held by the Debtors. |
| **Commitment Not to Accelerate or Terminate Contracts** | While the EJ Plan is in effect, the Signatory Creditors and Adhering Creditors undertake not to exercise any contractual prerogatives that affect the ordinary performance of other contracts entered into with the Debtors as a result of the filing of the EJ, and shall refrain from exercising, among others, the prerogatives of declaring early maturity, acceleration, termination, interruption or reduction of installments, limitation of contractual rights, and cancellation of renewal agreements. For the avoidance of doubt, the commitment undertaken does not apply to the Clearing Transactions, which may be accelerated or declared immediately due and payable, or in relation to which any other rights and prerogatives may be exercised, as applicable, in accordance with the agreements and regulations governing the Clearing Transactions or in the events of termination set forth in Section 6 of the EJ Plan, at their sole discretion. |

34.     The EJ Plan was filed with 47% of creditors with Subject Claims signing on as Signatory Creditors.  Brazilian Counsel Decl., Ex. A.  As described in the EJ Plan, the Debtors

intend to further negotiate the terms of the final Updated Plan with the Subject Creditors within the period of the stay and obtain the requisite 50% creditor support under Brazilian Bankruptcy Law for such plan to be confirmed by the Brazilian Court.  *See* Brazilian Counsel Decl. ¶ 32.

## JURISDICTION, ELIGIBILITY, AND VENUE

35.    This Court has jurisdiction to consider the Declaration and Verified Petition pursuant to 28 U.S.C. §§ 157 and 1334 as well as the Amended Standing Order of Reference dated January 31, 2012, Reference M-431*, In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.) (the "Amended Standing Order").

36.    These Chapter 15 Cases have been properly commenced with respect to the Petitioner and the Debtors in accordance with sections 1504 and 1509(a) of the Bankruptcy Code by the filing of the Petition.  This is a core proceeding pursuant to section 157(b) and (2)(P) of title 28 of the United States Code.

37.    Venue is proper in this Court pursuant to 28 U.S.C. § 1410(1), as the principal U.S. assets of the Debtors are located within New York County and thus within this District.

38.    The presence of assets within the United States renders each of the Debtors eligible to file these Chapter 15 Cases pursuant to section 109(a) of the Bankruptcy Code.  *See In re Suntech Power Holdings Co.*, *Ltd.* 520 B.R. 399, 411 (Bankr. S.D.N.Y. 2014); *Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247–51 (2d Cir. 2013) (applying the local property requirement of section 109(a) to chapter 15 cases).[19]

---

[19]    *See also In re Avanti Commc'ns Grp. PLC*, 582 B.R. 603, 611 (Bankr. S.D.N.Y. 2018) (finding that the "property in the United States" requirement of section 109(a) is satisfied by a New York law-governed indenture); *In re Berau Cap. Res. Pte Ltd.*, 540 B.R. 80, 84 (Bankr. S.D.N.Y. 2015) (same).

## RELIEF REQUESTED

39.    The Petitioner requests that this Court enter an order substantially in the form of

the Proposed Order attached hereto and pursuant to sections 105(a), 1515, 1517, 1520, and 1521

the Bankruptcy Code:

    (a)      granting the Petitions in these Chapter 15 Cases and recognizing the Brazilian Proceeding as the "foreign main proceeding" for each of the Debtors pursuant to section 1517 of the Bankruptcy Code, or in the alternative, recognizing the Brazilian Proceeding as a "foreign nonmain proceeding";

    (b)      finding that the Petitioner is the duly appointed "foreign representative" of each of the Debtors within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of each Chapter 15 Debtor; and

    (c)      granting such other and further relief as the Court deems just and proper.

## REQUIRED DISCLOSURES

40.    Appended to the Voluntary Petitions are the following certified disclosures by the

Foreign Representative in accordance with Rule 1007(a)(4) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"):

    (a)      a Corporate Ownership Statement identifying any corporation, other than a governmental unit, that directly or indirectly owns 10% or more of any class of each of the Debtors' equity interests as of the commencement of these Chapter 15 Cases;

    (b)      a list of administrators, parties to litigation in the United States to which the Debtors are a party, and entities against whom provisional relief is being sought[20]; and

    (c)      a statement pursuant to section 1515(c) of the Bankruptcy Code identifying any other foreign proceedings of the Debtors.

---

[20]    As of the date hereof, there are no parties that fall within the required disclosures of Bankruptcy Rule 1007(a)(4)(B)(iii).

**BASIS FOR RELIEF**

41.     The Court should grant the Petition and recognize the Brazilian Proceeding as the foreign main proceeding for each of the Debtors.  For the reasons stated below, each of the requirements in section 1517(a) of the Bankruptcy Code are satisfied.  As an initial matter, each of the Debtors are eligible to be a debtor under the Bankruptcy Code, and this Court is the proper venue for them to administer their Chapter 15 Cases.  Additionally, the Petitioner is the duly appointed "foreign representative" of the Brazilian Proceeding with respect to each of the Debtors, and the Brazilian Proceeding satisfies the standard to be considered a "foreign main proceeding" for the purposes of chapter 15 because the center of main interests for each of the Debtors is in Brazil, which aligns with the expectations of the Debtors' creditors.  In the alternative, if this Court declines to recognize the Brazilian Proceeding as the foreign main proceeding for any of the Debtors, those Debtors maintain an "establishment" in Brazil and thus are eligible for non-main recognition and relief to ensure a comprehensive restructuring of the Raízen Group.  Lastly, the Petitions meet the requirements of section 1515.

**I.      The Debtors Are Eligible to Be Debtors Under Section 109(a) of the Bankruptcy Code, and this Court is the Proper Venue for the Cases**

42.     Each of the Debtors has assets in the United States and is thus eligible to be a debtor under chapter 15 of the Bankruptcy Code in accordance with section 109(a) of the Bankruptcy Code.  *See In re Barnet*, 737 F.3d at 250–51.  Section 109(a) states that a debtor can be "only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality."  11 U.S.C. § 109(a).  Here, the Debtors have property located in the United States, including cash held in certain accounts and contractual rights.

43.     With respect to accounts in the United States, all of the Debtors hold at least one bank account in the United States, and collectively hold US$154 million (R$0.8 billion) in cash in

28

U.S. bank accounts as of March 5, 2026.  *See In re U.S. Steel Can. Inc.*, 571 B.R. 600, 610 (Bankr. S.D.N.Y. 2017) (finding that cash held in bank accounts in the United States satisfied the requirements of § 109(a)).

44.    With respect to contractual rights, Raízen Fuels Finance S.A., as issuer, and Raízen S.A. and Raízen Energia S.A., as guarantors, each have rights under the U.S. dollar-denominated Notes that are governed by New York law.  The Indentures also contain identical forum selection clauses that provides that parties to the Indenture have consented to the jurisdiction of courts in New York and federal courts in Manhattan, New York, with respect to any action related to the Notes or the Indentures.  This Court previously held that a chapter 15 debtor is able to meet the debtor eligibility requirement under section 109(a) of the Bankruptcy Code if it has debt instruments that are governed by New York law and contain New York forum selection provisions. *See In re Berau Cap. Res. Pte Ltd.*, 540 B.R. 80, 84 (Bankr. S.D.N.Y. 2015) ("The Court concludes that the presence of the New York choice of law and forum selection clauses in the Berau indenture satisfies the section 109(a) 'property in the United States' eligibility requirement."); *In re PT Bakrie Telecom Tbk*, 601 B.R. 707, 715 (Bankr. S.D.N.Y. 2019) ("An indenture subject to New York governing law and containing New York forum selection clauses constitutes property in the United States and thereby satisfies Section 109's eligibility requirement."); *In re Cell C Proprietary Ltd.*, 571 B.R. 542, 551 (Bankr. S.D.N.Y. 2017) (holding that presence of "debt subject to New York governing law and a New York forum selection clause constitutes property in the United States," thereby satisfying the requirement under section 109(a)); *In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016) ("[D]ollar-denominated debt subject to New York governing law and a New York forum selection clause is independently sufficient to form the basis for jurisdiction.").  Thus, even if any of the Debtors did not have cash

29

in the United States, the Notes, Indentures, and other U.S. law-governed debt documents are sufficient for each Chapter 15 Debtor to satisfy section 109(a) of the Bankruptcy Code.

45.    Moreover, "[a] case under chapter 15 of title 11 may be commenced in the district court of the United States for the district" (a) "in which the debtor has its principal place of business or principal assets in the United States," (b) "if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court," or (c) "in a case other than those specified in paragraph [(a) or (b)], in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative." 28 U.S.C. § 1140.  As discussed above, all of the Debtors have their principal assets in the United States in the Southern District of New York, including the primary assets of Raízen North America, which maintains its largest bank account in New York.  Additionally, venue in this Court is consistent with the interest of justice. Furthermore, the Debtors' undersigned counsel is in New York and close to this Court. Accordingly, venue in this District is proper.  *See* 28 U.S.C. § 1410(3).

## II.    The Requirements of Section 1517(a) of the Bankruptcy Code Are Satisfied

46.    Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if the following three requirements are met: (a) such foreign proceeding is a "foreign main proceeding" within the meaning of section 1502 of the Bankruptcy Code; (b) the foreign representative applying for recognition is a person or body; and (c) the petition meets the requirements of section 1515.  *See* 11 U.S.C. § 1517(a); *In re Oversight & Control Comm'n of Avánzit, S.A.*, 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008).  These foregoing requirements are satisfied with respect to the Brazilian Proceeding, the Petitioner, and the Declaration and Verified Petition.  Therefore, the Brazilian Proceeding should be recognized as the foreign main proceeding of the Debtors.

30

### A. The Brazilian Proceeding is a "Foreign Proceeding"

47.     The Brazilian Proceeding satisfies the general definition of "foreign proceeding" as set forth in section 101(23) of the Bankruptcy Code.  Section 101(23) requires that a "foreign proceeding" be (a) either judicial or administrative in character, (b) collective in nature, (c) pending in a foreign country and authorized or conducted under a law related to insolvency or the adjustment of debts, (d) a proceeding in which the debtor's assets and affairs are subject to the control or supervision of a foreign court, and (e) for the purpose of reorganizing or liquidating the assets and affairs of the debtor.  *See* 11 U.S.C. § 101(23); *In re Barnet*, 737 F.3d at 247; *In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012); *see also In re ABC Learning Ctrs. Ltd.*, 728 F.3d 301, 308 (3d Cir. 2013).  The Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding."  11 U.S.C. § 1502(3). As described above, the Brazilian Proceeding is a court-supervised expedited reorganization proceeding known as *recuperação extrajudicial* ("<u>Brazilian EJ</u>").  *See* Brazilian Counsel Decl. ¶ 11.  An "EJ" proceeding in Brazil is best analogized to a prearranged Chapter 11 proceeding.  *Id.* ¶ 18.  While the Portuguese translation of the proceeding could confusingly be read to refer to an "out of court" process, an EJ proceeding—like a pre-arranged Chapter 11 proceeding—does proceed under the auspices of and is subject to confirmation by the Brazilian Court.  Indeed, courts in this Circuit have long agreed that Brazilian extrajudicial reorganization proceedings satisfy these standards.  *See, e.g.*, *In re Unigel Participações S.A.*, No. 24-11982 (MG) (Bankr. S.D.N.Y. Dec. 10, 2024) (ECF No. 29) (recognizing a Brazilian EJ proceeding as a foreign main proceeding); *In re ODN I Perfurações Ltda.*, No. 23-10557 (DSJ) (Bankr. S.D.N.Y. May 4, 2023) (ECF No. 24) (same); *In re Andrade Gutierrez Engerharia S.A.*, No. 22-11425 (MG) (Bankr. S.D.N.Y. Dec. 2, 2022) (ECF No. 40) (same); *In re Odebrecht Engerharia e Construção S.A.*, No. 20-12741 (MEW) (Bankr. S.D.N.Y. Dec. 30, 2020) (ECF No. 15) (same); *In re Odebrecht Óleo E*

*Gás S.A.*, No. 17-13130 (JLG) (Bankr. S.D.N.Y. Dec. 13, 2017) (ECF No. 28) (same); *In re Lupatech S.A.*, No. 16-11078 (MG) (Bankr. S.D.N.Y. May 26, 2016) (ECF No. 15) (same).

48.     The Brazilian EJ is a judicial process provided for under Brazilian Bankruptcy Law in which the debtor seeks authorization to implement an agreement negotiated between the debtor and a subset of its creditors.  Brazilian Counsel Decl. ¶ 18.  A reorganization proceeding is judicial in character whenever a "court exercises its supervisory powers." *In re ABC Learning Ctrs. Ltd.*, 445 B.R. at 328.  The Brazilian Proceeding is "judicial" in nature as it was commenced in and is pending before the Brazilian Court.  The Brazilian Court has jurisdiction over matters relating to the claims being restructured and is instrumental to the implementation of the EJ Plan.  *See* Brazilian Counsel Decl. ¶ 84.  In order for the EJ Plan to become effective, the Brazilian Court must confirm the plan based on its determination that it complies with the relevant provisions of the Brazilian Bankruptcy Law.  *See id.* ¶¶ 32–33.

49.     A Brazilian EJ and the alternative court-supervised reorganization proceeding known as a *recuperação judicial* (a "Brazilian RJ") are "collective" in that they "consider[] the rights and obligations of creditors" in a single proceeding.[21]  *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 263 (Bankr. S.D.N.Y. 2019) ("*Constellation I*") (holding that courts in the Second Circuit have long agreed that a Brazilian RJ process satisfies the standards for a "foreign proceeding," including being a collective proceeding); *see also In re Unigel Participações S.A.*, No. 24-11982 (MG) (Bankr. S.D.N.Y. Dec. 10, 2024) (ECF No. 29) (recognizing a Brazilian EJ proceeding as a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code); *In re Andrade Gutierrez Engerharia S.A.*, No. 22-11425 (MG)

---

[21]     In a Brazilian EJ, the Company can choose what claims are subject to the prearranged plan. *See* Brazilian Counsel Decl. ¶ 18.

(Bankr. S.D.N.Y. Dec. 2, 2022) (ECF No. 40) (same); *In re Odebrecht Óleo E Gás S.A.*, No. 17-13130 (JLG) (Bankr. S.D.N.Y. Dec. 13, 2017) (ECF No. 28) (same).  Each proceeding involves the treatment of multiple creditors and claims together rather than merely the resolution of a two-party dispute.  Brazilian Counsel Decl. ¶¶ 18–19, 38, 83.  Brazilian Bankruptcy Law provides that both a Brazilian EJ and Brazilian RJ culminate in a court-sanctioned restructuring plan when the requisite number of creditors accept the proposed plan, although a "cram-down" procedure with lessened voting requirements also exists.  *See id*. ¶¶ 22, 45–47, 51–52.  Here, the Brazilian Proceeding is "collective" as all Subject Creditors have been afforded notice and the opportunity to object to the EJ Plan.  *See id.* ¶¶ 78, 81.  In addition, the EJ Plan must be approved by the Brazilian Court, which it can only do if the requisite majorities of creditors support the EJ Plan and the EJ Plan otherwise comports with the requirements of the Brazilian Bankruptcy Law.  *See id*. ¶ 32.

50.    The Brazilian Proceeding is pending before a court in a foreign country and relates to the adjustment of debt.  The Brazilian Court before which the Brazilian Proceeding is pending is located in the São Paulo District of the State of São Paulo in Brazil.  *See id.* ¶ 1.  Further, the Brazilian Proceeding is a proceeding conducted under laws relating to insolvency or adjustment of debts.  *Id.* ¶ 18.  Insolvency proceedings in Brazil are governed by the Brazilian Bankruptcy Law.  *Id.* ¶ 10.  A Brazilian EJ incorporates elements of insolvency and debt adjustment laws such as a stay of enforcement proceedings and collection actions against the debtor and equal treatment of similarly situated creditors within the same class (subject to certain narrow exceptions).  *See id*. ¶¶ 19, 25.

51.    The Debtors' assets and affairs are subject to supervision of the Brazilian Court during the pendency of the Brazilian Proceeding.  In a Brazilian EJ, creditors may seek court

intervention with respect to the Debtors' assets and affairs in certain circumstances. *See id.* ¶ 24. The Brazilian Bankruptcy Court may appoint a trustee or professional to oversee the debtor's operations during a Brazilian EJ if it deems it necessary. *Id.* Further, during the Court-ordered 180-day stay, all actions and enforcement proceedings against the debtor related to claims being restructured pursuant to the EJ plan are stayed, including without limitation exercise of setoff rights, irrespective of whether such claims are held by creditors that executed the EJ plan. *Id.* ¶ 25. Here, the Brazilian Court approved the commencement of the Brazilian Proceeding, and its approval will be required in order for the EJ Plan to become effective. *See id.* ¶ 21. Once the Debtors filed the EJ Plan with the Brazilian Court, the stay automatically commenced, *see id.* ¶ 25; however, the Brazilian Court subsequently ratified the stay when it entered the Initial Court Order. *Id.* ¶¶ 25, 76.

52.     The Brazilian Proceedings are intended to facilitate the Debtors' reorganization by providing the Debtors with the protection of the 180-day stay of enforcement and collection actions while they pursue a restructuring to modify their debts, receive new capital, and emerge pursuant to the EJ Plan. *See supra* ¶¶ 32–33; *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) ("[T]he purpose of a business reorganization is to restructure a business' finances to enable it to operate productively, provide jobs for its employees, pay its creditors and produce a return for its stockholders.") (citations omitted).

53.     For the foregoing reasons, courts in this district have routinely recognized Brazilian EJ and RJ proceedings as "foreign proceedings." *See, e.g.*, *In re Unigel Participações S.A.*, No. 24-11982 (MG) (Bankr. S.D.N.Y. Dec. 10, 2024) (ECF No. 29) (recognizing a Brazilian EJ proceeding as a foreign proceeding); *In re ODN I Perfurações Ltda.*, No. 23-10557 (DSJ) (Bankr. S.D.N.Y. May 4, 2023) (ECF No. 24) (same); *In re Andrade Gutierrez Engerharia S.A.*, No. 22-

11425 (MG) (Bankr. S.D.N.Y. Dec. 2, 2022) (ECF No. 40) (same); *In re Odebrecht Engerharia e Construção S.A.*, No. 20-12741 (MEW) (Bankr. S.D.N.Y. Dec. 30, 2020) (ECF No. 15) (same); *In re Odebrecht Óleo E Gás S.A.*, No. 17-13130 (JLG) (Bankr. S.D.N.Y. Dec. 13, 2017) (ECF No. 28) (same); *In re Lupatech S.A.*, No. 16-11078 (MG) (Bankr. S.D.N.Y. May 26, 2016) (ECF No. 15) (same); *In re U.S.J. – Açúcar e Álcool S.A., et al.*, No. 22-10320 (DSJ) (Bankr. S.D.N.Y. Apr. 14, 2022) (ECF No. 21) (recognizing as a foreign main proceeding a case filed pursuant to in-court reorganization section of the Brazilian Bankruptcy Law); *In re Samarco Mineracão S.A. - Em Recuperação Judicial*, No. 21-10754 (LGB) (Bankr. S.D.N.Y. May 13, 2021) (ECF No. 22) (same); *In re Usina de Açúcar Santa Terezinha Ltda.*, No. 19-11199 (MEW) (Bankr. S.D.N.Y. May 16, 2019) (ECF No. 30) (same); *In re Novonor S.A. – Em Recuperação Judicial*, No. 19-12731 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2019) (ECF No. 22) (same); *In re Serviços de Petróleo Constellation S.A.*, No. 18-13952 (MG) (Bankr. S.D.N.Y. May 9, 2019) (ECF No. 86) (same); *In re OAS S.A.*, No. 15-10937 (SMB) (Bankr. S.D.N.Y. Aug. 3, 2015) (ECF No. 85) (same); *In re Rede Energia S.A.*, No. 14-10078 (SCC) (Bankr. S.D.N.Y. Sept. 9, 2014) (ECF No. 36) (same); *see also In re Virgolino de Oliveira, S.A. Açúcar e Álcool,* No. 25-10696 (MG) (Bankr. S.D.N.Y. July 18, 2025) (ECF No. 25) (recognizing a Brazilian RJ proceeding as foreign main proceedings); *In re Odebrecht Engenharia e Construção S.A. – Em Recuperação Judicial*, No. 25-10482 (MG) (Bankr. S.D.N.Y. Apr. 8, 2025) (ECF No. 21) (same); *In re InterCement S.A.*, 668 B.R. 802 (Bankr. S.D.N.Y. 2025) (same).

## B.    *The Brazilian Proceeding Satisfies the Requirements for Recognition as a "Foreign Main Proceeding"*

54.    The Brazilian Proceeding is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code for the Debtors.  A "foreign main proceeding" is defined in the Bankruptcy Code as a "foreign proceeding pending in the country where the debtor has the

center of its main interests." 11 U.S.C. § 1502(4).  While the Bankruptcy Code does not define

center of main interests ("COMI"), section 1516(c) provides that, in the absence of evidence to the

contrary, a debtor's registered office or habitual residence "is presumed to be the center of the

debtor's main interests." 11 U.S.C. § 1516(c); *see also In re Olinda Star Ltd.*, 614 B.R. 28, 40

(Bankr. S.D.N.Y. 2020) ("Courts have found that a debtor's registered jurisdiction is its COMI

where no objection was raised or evidence presented rebutting the section 1516 presumption.").

The legislative history indicates that this rebuttable presumption was "designed to make

recognition as simple and expedient as possible" in cases where the COMI of a debtor is not

controversial.  H. Rep. No. 109-31, pt. 1, at 112–13 (2005).

55.     In assessing whether the statutory presumption withstands scrutiny, courts in this

Circuit have developed a non-exclusive list of factors for determining COMI.  *See In re SPhinX,

Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006); *Morning Mist Holdings Ltd. v. Krys (In re

Fairfield Sentry Ltd.)*, 714 F.3d 127, 137–38 (2d Cir. 2013) (referring to the COMI factors

developed by the court in *In re SPhinX*).  Those factors include the following: (a) "the location of

the debtor's headquarters;" (b) "the location of those who actually manage the debtor" (which,

conceivably could be the headquarters of a holding company); (c) "the location of the debtor's

primary assets;" (d) "the location of the majority of the debtor's creditors or a majority of the

creditors who would be affected by the case;" and (e) "the jurisdiction whose law would apply to

most disputes."  *See In re SPhinX*, 351 B.R. at 117; *In re Fairfield Sentry*, 714 F.3d at 137.

56.     Courts may also consider a debtor's "principal place of business" as part of their

COMI analysis, which looks at the location of a corporation's "nerve center," *i.e.*, "where a

corporation's officers direct, control, and coordinate the corporation's activities."  *See In re

Fairfield Sentry*, 714 F.3d at 138 n.10 (citing *Hertz Corp. v. Friend*, 559 U.S. 77, 91 (2010)).

Given Congress's choice to use "COMI" instead of "principal place of business" in chapter 15, the "nerve center" concept does not control, "[b]ut to the extent that the concepts are similar, a court may certainly consider a debtor's 'nerve center,' including from where the debtor's activities are directed and controlled, in determining a debtor's COMI." *Id.* In addition, courts have emphasized the need for the debtor's COMI to be readily ascertainable by third parties. *See In re Fairfield Sentry*, 714 F.3d at 130.

57.    Similarly, some courts also look to the expectations of creditors, which can be "evaluated through examination of the public documents and information available to guide creditor understanding of the nature and risks of their investments." *In re Serviços de Petróleo Constellation S.A.*, 613 B.R. 497, 508 (Bankr. S.D.N.Y. 2019) ("*Constellation II*") (citing *In re Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. 169, 228 (Bankr. S.D.N.Y. 2017)); *In re OAS S.A.*, 533 B.R. 83, 101–03 (Bankr. S.D.N.Y. 2015) (reviewing offering memorandum to establish noteholder expectations as part of a COMI analysis); *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 474 B.R. 88, 93–94 (S.D.N.Y. 2012) (same); *In re Suntech Power*, 520 B.R. at 418 (considering terms of indenture to establish creditor expectations regarding likely location of a restructuring as part of a COMI analysis).

a.    *The Debtors are Part of the Economically and Operationally Integrated Raízen Group*

58.    The Raízen Group is an economically and operationally integrated group, whose main assets are located in Brazil and whose activities are managed, directed, and monitored out of the Company's corporate headquarters in Brazil. The Raízen Group's São Paulo headquarters is the nerve center of each of the Debtors. Moreover, the Raizen Group's strategic control and business generation functions are centralized in Brazil. Investor relations for the Raízen Group is also centralized in Brazil, and the investor relations contact information on the Raízen Group's

website is an address in São Paulo as well as the contact information for individuals located in São Paulo.  Its most important contracts for the financing and development of the activities of the Company have been signed in Brazil.  Additionally, the domicile of the majority of the Debtors' directors and officers is in Brazil.  Strategic decisions regarding the Company are also made from Brazil: Raízen S.A. is responsible for business management, which includes providing the Raízen Group with direction on key matters.  And its production plants, service stations, refueling bases, and distribution centers are located throughout Brazil.  Accordingly, all of the main business decisions for each of the Debtors are made in Brazil.

59.     Indeed, all of the Debtors have the following connections to Brazil:

(a)     the Debtors' operations are centrally managed and directed from Brazil;

(b)     strategic and key operating and policy decisions for each of the Debtors are made by management located in São Paulo;

(c)     the Debtors' corporate accounting, accounts payable, insurance procurement, accounts receivable, financial planning, internal auditing, marketing, treasury, research and development, and tax services are largely provided in São Paulo;

(d)     the Debtors' taxes are all reported on a consolidated basis in Brazil;

(e)     the finance, legal, human resources, payroll, billing, and procurement for the Debtors are carried out mainly in São Paulo;

(f)     key information technology and systems used by the Debtors are provided from Brazil;

(g)     cash management functions are maintained and directed from Brazil;

(h)     management, senior staff, and/or principal decision-makers regularly attend meetings in São Paulo;

(i)     the location of the assets of the Brazilian Debtors, including their real property, is Brazil; and

(j)     the management of capital expenditure decisions affecting the Debtors is made from São Paulo.

b.    *The COMI for the Brazilian Debtors is Brazil*

60.    All of the Brazilian Debtors are incorporated in Brazil and headquartered in cities throughout Brazil, which makes each of their COMI presumptively Brazil.  This presumption cannot be rebutted in light of the deep and material connections that each of the Brazilian Debtors has with Brazil, as further discussed above, and their lack of material connections to other jurisdictions.

c.    *The COMI for Raízen Fuels Finance S.A., Raízen North America, and Raízen Trading S.A. is Brazil*

61.    With respect to Raízen Fuels Finance S.A., Raízen Trading S.A., and Raízen North America[22] (the "<u>Financing & Trading Debtors</u>"), though not registered in Brazil, each of their COMI is nevertheless in Brazil.  As an initial matter, this Court has previously found in other chapter 15 cases that a chapter 15 debtor's COMI may be different from the location of its registered offices.  *See, e.g.*, *In re InterCement*, 668 B.R. at 825–26 (finding COMI for entities incorporated in the Netherlands and Spain was Brazil); *Constellation I*, 600 B.R. at 237 (finding that the COMI for several entities incorporated outside Brazil was Brazil considering different factors and ties between such entities); *In re OAS*, 533 B.R. at 100–103 (finding that Austrian financing entities' limited Austrian activities, effected to maintain its corporate existence under Austrian law, did not detract from finding of COMI in Brazil); *In re Oi Brasil*, 578 B.R. at 234 (finding COMI for Dutch-incorporated SPV was Brazil notwithstanding its registered office in the Netherlands).  Moreover, where a subsidiary entity that is a holding company or an SPV "with no operations other than managing relationships with creditors and paying off operations on behalf of

---

[22]    Courts in this District have held that U.S. debtors may have their COMI in foreign jurisdictions when granting provisional relief.  *See In re Iovate Health Sci. Int'l Inc.*, 673 B.R. 516, 533 (Bankr. S.D.N.Y. 2025); *In re Giftcraft Ltd.*, No. 25-11030 (MG), 2025 WL 1583480, at *9–10 (Bankr. S.D.N.Y. June 4, 2025); *In re Ascot Fund Ltd.*, 603 B.R. 271, 278–83 (Bankr. S.D.N.Y. 2025).

a larger corporate parent, . . . should be determined by the location of the corporate 'nerve center.'"[23]  *See, e.g.*, *In re InterCement*, 668 B.R. at 822 (quoting *In re Oi Brasil*, 578 B.R. at 222–30); *In re OAS*, 533 B.R. at 102 (finding COMI of a foreign SPV in the jurisdiction of its corporate group largely because its "principal purpose [was] the financing of the operations of [the parent], its affiliates and direct and indirect subsidiaries"); *In re Suntech Power*, 520 B.R. at 416–17 (indicating that, at time of foreign filing, the holding company with no tangible assets or operations had its COMI in the functional nerve center of its corporate group, which was ascertainable to creditors); *see also In re SPhinX*, 351 B.R. at 117 (noting that a subsidiary's nerve center could very well sit with its parent company).

62.     The Financing & Trading Debtors are each limited in purpose and designed to support the corporate group. *See supra* ¶ 16.  Additionally, the Financing & Trading Debtors rely on their Brazilian affiliates' operations to service their debt obligations. *See id.*  As required under Brazilian law, the Debtors, including the Financing & Trading Debtors, filed the Brazilian Proceeding in the Brazilian Court, which is located in the jurisdiction where the Raízen Group's principal place of business (*principal estabelecimento*) is located. *See* Brazilian Counsel Decl. ¶ 16.  Furthermore, the Financing & Trading Debtors' profitability and the creditworthiness of their debt rises and falls with operations and economic conditions in Brazil.  Half of the directors of Raízen Trading S.A. reside in Brazil. *See supra* ¶ 16. Importantly, all of the financial statements of the Debtors are consolidated into Raízen S.A.  Furthermore, Raízen Trading S.A. also carries on business within Brazil and with Brazilian counterparties pursuant to commercial contracts.  Put simply, Brazil, as the functional nerve center for the Raízen Group, is the COMI for the Financing & Trading Debtors.  While the Financing & Trading Debtors comply with obligations under their

---

[23]     For the avoidance of doubt, only Raízen Fuels Finance S.A. is an SPV.

respective local tax and regulatory law to maintain their good standing, fulfillment of such requirements does not dictate the analysis required by governing chapter 15 precedent.[24]

>            *i.   Raízen Fuels Finance S.A.'s COMI is in Brazil.*

63.      Raízen Fuels Finance S.A. was established as an SPV to issue the Notes.  As a financing vehicle, it is wholly dependent on the Raízen Group's Brazilian operations to repay its financial obligations.  *See supra* ¶ 23.  It on lent the proceeds from the Notes to other entities within the Raízen Group to fund their Brazilian operations.  Raízen Fuels Finance S.A. does not own any real estate, has no employees and is reliant on management, accounting, and IT support from the Raízen Group's São Paulo nerve center.  Raízen Fuels Finance S.A. also maintains no bank accounts or other property in Luxembourg.  Raízen Fuels Finance S.A. does not maintain a physical office in Luxembourg—its registered office address is the address for Vistra (Luxembourg) S.à.r.l. ("Vistra"), which acts as its registered agent and provides other corporate management services for Raízen Fuels Finance S.A.  As a matter of compliance with local regulatory and tax authority, Raízen Fuels Finance S.A. has two classes of statutory directors— three who are  located in Luxembourg (Class A) and serve under an agreement with Vistra, and two who are Company employees located in Brazil (Class B).  Further, while Raízen Fuels Finance S.A.'s financial statements are prepared and audited in Luxembourg, they are sent to Brazil for review and consolidation with the Company's financial statements.  As a part of the Company's consolidated financial statements, Raízen Fuels Finance S.A.'s accounts are also audited in Brazil. Prior to commencing discussions concerning the current restructuring, the Raízen Fuels Finance

---

[24]      Furthermore, now that the Initial Court Order has been entered, creditors will be engaging in a Brazilian Court-supervised process, further underscoring that the COMI of all of the Debtors is Brazil.  *See In re InterCement*, 668 B.R. at 823 (finding that restructuring activities occurring in Brazil as part of a mediation and extrajudicial proceeding "establish[ed] conclusively" that the COMI of a Dutch entity was Brazil).

S.A. Board never held physical board meetings—either in Luxembourg or elsewhere—and corporate matters proceeded via written consent.

### ii. Raízen North America's COMI is in Brazil

64.    Raízen North America is a trading company that was formed to provide access to markets in the United States.  While Raízen North America has ten employees located in the United States—all trading ethanol desk operators—all of those employees report to management in Brazil who set trading parameters to support and drive Raízen North America's largest trading transactions.  Its trading agreements are governed by New York and U.K. law.  Like the other Financing & Trading Debtors, Raízen North America maintains a statutory director structure for compliance purposes.  It has one statutory director located in the United States who is a dual citizen of Brazil and the U.S. and who reports to one statutory director located in Brazil.  Raízen North America does not prepare separate audited financials, and its financials are reflected on the Company's and Raízen Trading S.A.'s consolidated financial statements.  Its counterparties are almost entirely entities within the Raízen Group—it purchases from Raízen Trading Netherlands B.V. and sells onwards to the Company's Brazilian entities and Raízen Asia Pte Ltd., based in Singapore, which onward sell to customers.  In addition to relying on other Raízen Group entities as contract counterparties, it also relies on the Company's central operations in São Paulo for technical and operational support.

### iii. Raízen Trading S.A.'s COMI is in Brazil

65.    Raízen Trading S.A. main purpose is to strengthen the Raízen Group's international trading functions in Europe, Asia, and Brazil.  Raízen Trading S.A. has approximately 24 employees located in Switzerland, all of whom report to management located in Brazil.  Of Raízen Trading S.A.'s employees, four are Brazilian nationals and only six are Swiss nationals.  Raízen Trading S.A.'s operations are heavily intertwined with Brazil.  It buys sugar in Brazil and has

critical freight and elevator agreements in Brazil that enable it to export that sugar.  In addition to sugar products that it buys and exports from Brazil, Raízen Trading S.A. exports ethanol from Brazilian suppliers.  It also exports oil products from the United States and sells that oil onward to the Raízen Group's Brazilian entities.  Raízen Trading S.A. has an executive committee that sets and approves parameters for all of Raízen Trading S.A.'s trading activities.  The executive committee is comprised of two statutory directors located in Geneva and two statutory directors located in Brazil.  Of the four directors on the executive committee, three are Brazilian nationals and none are Swiss nationals.  Raízen Trading S.A. maintains a total of 14 bank accounts around the world—only two of those are in Switzerland and those accounts together contain less than 0.1% of its cash.  Moreover, these Swiss accounts are maintained solely to satisfy Raízen Trading S.A.'s local salary and employee-related obligations.  As with the other Financing & Trading Debtors, Raízen Trading S.A.'s financials are prepared at the entity-level in its local jurisdiction in conformity with local requirements; however, its financial statements are reflected on the Raízen Group's consolidated financial statements that are prepared and audited in Brazil.

> d.    *Brazil as COMI for Each of the Debtors is Consistent with Creditor Expectations*

66.    Lastly, the conclusion that Brazil is COMI for each of the Debtors is consistent with creditor expectations.  As to the holders of the Notes, the Offering Memoranda made clear that Raízen Fuels Finance S.A., the issuer of each of the Notes, has no operations of its own and as such its ability to pay its obligations was dependent "upon the financial condition and results of operations of Raizen [S.A.] and its subsidiaries."  *See, e.g.*, 2034/2054 Notes OM at 64; *supra* ¶ 23.  Additionally, the Offering Memoranda made clear that if the Company was unable to pay amounts due under the guarantees, then it "may become subject to insolvency proceedings in Brazil."  *See supra* ¶ 23.  For the remaining Financing & Trading Debtors, finding Brazil as COMI

for each is consistent with creditor expectations, as those entities have limited creditors. Raízen North America's creditors are almost entirely related Raízen entities. Raízen Trading S.A.'s creditors are primarily parties to exchange-traded commodity derivatives and over-the-counter financial derivatives. Given that the trading activities of Raízen Trading S.A. are so integrally tied to Brazil and the Raízen Group's Brazilian operations, there is nothing inconsistent about finding that Brazil is Raízen Trading S.A.'s COMI.

67.    In sum, the operations and services of the Debtors are highly interdependent and effectively form a single, integrated economic unit where material aspects of the Company's operations, finances, corporate management, employee management, and short-and long-term strategic planning are based in Brazil. For the reasons set forth above, the COMI for each Chapter 15 Debtor is in Brazil, and the Brazilian Proceeding should be recognized as the foreign main proceeding for each Chapter 15 Debtor pursuant to section 1517(b)(1) of the Bankruptcy Code.

### C.    The Petitioner is a Proper "Foreign Representative"

68.    The Petitioner is the proper "foreign representative" of the Brazilian Proceeding, thereby satisfying sections 101(24) and 1517(a)(2) of the Bankruptcy Code. Section 101(24) of the Bankruptcy Code provides that "the term 'foreign representative' means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). The Bankruptcy Code does not require that the foreign representative be appointed by the foreign court. Instead, a debtor may appoint a foreign representative pursuant to corporate authorizations. *See, e.g.*, *In re Agro Santino, OOD*, 653 B.R. 79, 94 (Bankr. S.D.N.Y. 2023) ("[I]n considering whether a person may serve as a foreign representative, the Court does not look to foreign law governing appointments—it looks to section 101(24)."); *In re Andrade Gutierrez Engenharia S.A.*, 645 B.R. 175, 183 (Bankr.

S.D.N.Y. 2022) (holding that the foreign representative duly authorized by the chapter 15 debtors'

board was a foreign representative within 11 U.S.C. §101(24) and citing Collier on Bankruptcy

¶ 13.04 (16th ed. 2022.) "[w]here the debtor remains in charge of its own affairs, the debtor itself

might be able to appoint its own representative for this purpose, without express court sanction");

*Constellation I*, 600 B.R. at 270 (recognizing as proper a foreign representative authorized under

resolutions to commence a chapter 15 case on behalf of each of the debtors); *In re Oi Brasil*, 578

B.R. at 183 (recognizing appointment of foreign representative "pursuant to resolutions and

powers of attorney signed by authorized representatives of" the foreign debtors); *In re OAS*, 533

B.R. at 95 (holding that the "Bankruptcy Code does not require the judicial authorization or

appointment of the foreign representative"); *In re Americanas S.A.*, No. 23-10092 (MEW) (Bankr.

S.D.N.Y. Mar. 3, 2023) (appointing a foreign representative that the chapter 15 debtors' governing

body authorized).

69.     Here, the Petitioner is the body that has been duly appointed by the Debtors to act

as the representative of the Brazilian Proceeding in these Chapter 15 Cases in accordance with

section 101(24) of the Bankruptcy Code and has been granted authority to commence these

Chapter 15 Cases by appropriate corporate approvals under applicable law.  *See* Resolutions

attached to Voluntary Petition.  As explained in the Brazilian Counsel Declaration, the Brazilian

Bankruptcy Law authorizes the Debtors' management to continue to administer the reorganization

of their assets and affairs throughout the Brazilian Proceeding.  Brazilian Counsel Decl. ¶ 24.  This

Court has recognized that the appointment of foreign representatives in similar manners is

acceptable for purposes of commencing chapter 15 cases.[25]  *See, e.g.*, *In re Mina Tucano Ltda.*,

---

[25]     In any event, in addition to the authorization for the Petitioner to act as foreign representative in these Chapter 15 Cases provided for by each of the Debtors' resolutions, pursuant to the Initial Court Order the Brazilian Court appointed Lorival Nogueira Luz, Junior, as foreign representative with respect to each of the Debtors.  *See* Initial Court Order, Brazilian Counsel Decl., Ex. D.

No. 22-11198 (LGB) (Bankr. S.D.N.Y. Oct. 12, 2022) (ECF No. 26) (approving the verified petition where the foreign representative was authorized by chapter 15 debtors' corporate resolution); *Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B., de C.V. (In re Vitro, S.A.B. de C.V.)*, 470 B.R. 408 (Bankr. N.D. Tex. 2012), *aff'd*, 701 F.3d 1031 (5th Cir. 2012) (holding that an individual appointed as foreign representative by the debtor's board in anticipation of a Mexican *concurso* proceeding, which contemplates "self-management" during the proceeding similar to that of a debtor in possession, fit within the scope of the definition of "foreign representative," and affirming the recognition of the individual as the foreign representative).

**D.      The Petitions Were Properly Filed Under Sections 1504 and 1509 and Meet the Requirements of Section 1515 and Bankruptcy Rule 1007(a) (4)**

70.      The third and final requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the petition for recognition meet the procedural requirements of section 1515 of the Bankruptcy Code.  *See* 11 U.S.C. § 1517(a)(3).  Here, all of section 1515's procedural requirements are satisfied.

71.      *First*, the Petitioner duly and properly commenced these Chapter 15 Cases in accordance with sections 1504 and 1509(a) of the Bankruptcy Code by filing the Petitions with all the documents and information required by sections 1515(b) and 1515(c).  *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007) (*"Bear Stearns I"*) ("A case under chapter 15 is commenced by a foreign representative filing a petition for recognition of a foreign proceeding under section 1515 of the Bankruptcy Code.").

72.      *Second*, in accordance with sections 1515(b)(1)–(3) of the Bankruptcy Code, the Petitioner has submitted evidence of the existence of the Brazilian Proceeding and the appointment of the foreign representative.  *See* Brazilian Counsel Decl., Exs. A, E; *see also* Voluntary Petitions.

46

*See, e.g.*, *In re Vitro*, 470 B.R. 408; *see also In re OAS*, 533 B.R. at 93 (*citing In re Vitro*, 701 F.3d at 1046).

73.     *Third*, in accordance with section 1515(c) of the Bankruptcy Code, the Petitioner filed together with the Petitions a statement identifying all the foreign proceedings with respect to the Debtors.  As set forth in such statement, the Brazilian Proceeding is currently pending with respect to the Debtors.

74.     *Fourth*, the Foreign Representative has also satisfied the additional requirements set forth in Rule 1007(a)(4) of the Bankruptcy Rules by including the following in the Petitions: (a) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1, with respect to each of the Debtors; and (b) a list containing the names and addresses of all persons or bodies authorized to administer the foreign proceedings of the Debtors, and (c) all parties to litigation pending in the U.S. in which the Debtors are a party at the time of the filing of the Petitions.  *See supra* ¶ 40.

**III.     Alternatively, the Court Should Find That the Brazilian Proceeding is a Foreign Nonmain Proceeding and Grant Discretionary Relief**

75.     As demonstrated above, the Brazilian Proceeding should be recognized as the "foreign main proceeding" for each of the Debtors.  Should this Court conclude, however, that the Brazilian Proceeding is not qualified as the foreign main proceeding of the Financing & Trading Debtors, the Foreign Representative submits that, in the alternative, the Brazilian Proceeding should be recognized as a "foreign nonmain proceeding" within the meaning of section 1502(5) for any such Debtor pursuant to section 1517(b)(2) of the Bankruptcy Code, and that discretionary relief, including the application of a protective stay to the full extent set forth in section 362, should be granted with respect to such debtors and their U.S.-located property.  11 U.S.C. §§ 1517(b)(2), 1521(a).

76.     A "foreign nonmain proceeding" is defined as a "foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." 11 U.S.C. § 1502(5). Section 1502 of the Bankruptcy Code defines an "establishment" as "any place of operations where the debtor carries out a non-transitory economic activity." 11 U.S.C. § 1502(2). Whether a debtor has an establishment in a particular location is "essentially a factual question," *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 338 (S.D.N.Y. 2008) ("*Bear Stearns II*"), and the petitioner bears the burden of proof. *See In re British Am. Ins. Co.*, 425 B.R. 884, 915 (Bankr. S.D. Fla. 2010).

77.     The Bankruptcy Code does not define "non-transitory economic activity," and, as this Court has noted, "[t]here is relatively little U.S. authority construing the term 'establishment' as it is used in chapter 15." *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 84 (Bankr. S.D.N.Y. 2011), *aff'd* 474 B.R. 88 (S.D.N.Y. 2012). Indeed, "[n]either Chapter 15 nor its legislative history explain what it means for a debtor to have 'any place of operations' or to have 'been carrying on a non-transitory economic activity' in a location." *Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1027 (5th Cir. 2010) (citing H. Rep. No. 109-31, pt. 1, at 107).

78.     Accordingly, U.S. courts have interpreted the meaning of "establishment" in the context of the purpose of chapter 15 and the Model Law and by looking to the meaning ascribed to such term by foreign courts. *See, e.g.*, *In re Millennium Glob.*, 458 B.R. at 84 n.49; *Bear Stearns I*, 374 B.R. at 131 n.12. The limited number of U.S. courts to consider the question have determined a debtor has an "establishment" in a place where it has operations, conducts business, or otherwise carries out a non-transitory economic activity in that jurisdiction. *See, e.g.*, *In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86, 92 n.8 (Bankr. S.D.N.Y. 2012); *Bear Stearns I*, 374 B.R. at 131; *In re Creative Fin., Ltd.*, 543 B.R. 498, 520 (Bankr. S.D.N.Y. 2016); *In re British Am.*, 425

48

B.R. at 916.  Several factors "contribute to identifying an establishment: the economic impact of the debtor's operations on the market, the maintenance of a 'minimum level of organization' for a period of time, and the objective appearance to creditors whether the debtor has a local presence." *In re Millennium Glob.*, 458 B.R. at 85; *see In re Modern Land (China) Co.*, 641 B.R. 768, 784 (Bankr. S.D.N.Y. 2022).  A showing of economic impact of the debtor's activities on the local market involves a "showing of a local effect on the marketplace," *In re Creative Fin.*, 543 B.R. at 520; *British Am.*, 425 B.R. at 915 (same), evidenced by, among other things, "engagement of local counsel and commitment of capital to local banks." *In re Millennium Glob.*, 458 B.R. at 85.

79.     In this case, even if the Court were to find that Brazil is not the COMI for any of the Financing & Trading Debtors, the Court should still find that they each have an establishment in Brazil for purposes of chapter 15 recognition.  Notably, Raízen Trading S.A. also has commercial contracts within Brazil and with Brazilian counterparties pursuant to contracts, and most of Raízen North America's contract counterparties are related Raízen Group entities (Raízen S.A., Raízen Energia S.A. and Raízen Asia Pte. Ltd.).  Raízen North America and Raízen Trading S.A. buy, sell and/or export commodities in the Brazilian marketplace.  *See supra* ¶¶ 64–66. Furthermore, they all play a critical role in the Brazilian Debtors' ethanol and sugar trading activities.  Raízen Trading S.A. sells ethanol to Raízen Energia S.A., and Raízen North America sells ethanol purchased in the United States onward to the Company's Brazilian entities and Raízen Asia Pte. Ltd.  The Petitioner submits that the foregoing evidence in support of finding that the COMI of each of the Debtors is in Brazil also provides sufficient evidence that each of these Debtors has an impact on the Brazilian marketplace and therefore maintains an establishment in that jurisdiction.  *See supra* ¶¶ 61–67.  These entities play an integral but limited role in the financing of the Brazilian operations.

80.     Regardless of whether the Court finds that the Brazilian Proceeding is a main proceeding or nonmain proceeding with respect to the Financing & Trading Debtors, the Petitioner requests that the Court grant discretionary relief with respect to each Chapter 15 Debtor and their U.S.-located property pursuant to section 1521 of the Bankruptcy Code.    Specifically, the Petitioner requests that any protective relief that is the subject of the Provisional Relief Motion be extended pursuant to section 1521(a)(6) of the Bankruptcy Code, [26] including the continued application of the section 362 stay with respect to any such Debtor and its property within the territorial jurisdiction of the United States. [27]    *See* 11 U.S.C. § 1521(a)(6); Provisional Relief Mot. ¶¶ 34–40.    The Petitioner submits that the foregoing evidence concerning the Financing & Trading Debtors and their integral role within the Raízen Group justifies such discretionary relief, which is critical for the maintenance of the status quo and the preservation of the Debtors' going-concern value. *See supra* ¶¶ 58–67.

81.     To exercise its discretionary powers under section 1521, the Court must ensure that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected."    11 U.S.C. § 1522(a) (adopting Article 22 of the Model Law).    Relief under section 1521 will not be permitted if "it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors."    H. Rep. No. 109-31, Pt. 1, at 116.    A determination of sufficient

---

[26]    Section 1521(a) provides that, upon recognition of a foreign main proceeding or nonmain proceeding and at the request of the foreign representative, a court may grant (with exceptions not here relevant) "any appropriate relief" necessary to effectuate the purpose of chapter 15 and to protect the assets of the debtor or the interests of the creditors, including "extending relief granted under section 1519(a)."    11 U.S.C. § 1521(a)(6).    Even if this Court does not recognize the Brazilian Proceeding as a foreign nonmain proceeding with respect to any of the Debtors, section 1521 relief is available where "the relief relates to assets that, under the law of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding." 11 U.S.C. § 1521(c).

[27]    Notably, the Petitioner is entitled to the continued application of the protective stay even if the Court were to recognize the Brazilian Proceeding as a foreign nonmain proceeding with respect to any of the Debtors because "chapter [15] gives the bankruptcy court the ability grant substantially the same types of relief in assistance of foreign nonmain proceedings as main proceedings."    *In re SPhinX*, 351 B.R. at 116.

protection requires a balancing of the respective parties' interests. *CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012); *see In re Toft*, 453 B.R. 186, 196 n.11 (Bankr. S.D.N.Y. 2011) ("[A] court should tailor relief balancing the interest of the foreign representative and those affected by the relief.").[28]

82.     Here, the balance of interests weighs in favor of granting the relief requested. First, recognition and the application of the stay will allow for the efficient and orderly administration of the Debtors' assets and affairs in a court-supervised restructuring process (*i.e.*, the Brazilian Proceeding), thus protecting the interests of all creditors and maximizing the value of assets by preventing certain opportunistic creditors from circumventing the Brazilian Proceeding and commencing actions in the United States at the expense of the broader process.

83.     As set forth in the Brazilian Counsel Declaration, the Brazilian Proceeding provides creditors and stakeholders with many of the same procedural safeguards present in chapter 11 of the Bankruptcy Code thereby ensuring a fair and equitable process. *See* Brazilian Counsel Decl. ¶¶ 19, 25. The stay will not bar or otherwise disenfranchise parties from participating in the Brazilian Proceeding, where each creditor's right to be heard will remain unaffected. Nor will the requested stay preclude a creditor that feels unduly burdened by the Court's grant of the requested relief to seek to lift the stay for "cause." *See, generally*, 11 U.S.C. § 362(d). Instead, the Petitioner merely seeks to prevent creditors from attempting to end-run the Brazilian Proceeding at the

---

[28]     The analysis of whether the relief sought provides sufficient protection requires a balancing of the interests of the debtor and other affected parties to ensure that the relief does not "impinge excessively on any one entity's interests" and that "each entity must receive at least some protection." *See Jaffe v. Samsung Elecs. Co.*, 737 F.3d 14, 27–28 (4th Cir. 2013) ("The analysis required by § 1522(a) is . . . best done by balancing the respective interests based on the relative harms and benefits in light of the circumstances presented, thus inherently calling for application of a balancing test"). Importantly, courts recognize that interests of the various parties are often at odds with one another and "protection of one side might well come at some expense to the other." *Id*. at 27. A balancing test requires the court to consider "the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law." *In re Artimm, S.r.l.*, 335 B.R. 149, 160 (Bankr. C.D. Cal. 2005).

expense of all creditors.  Accordingly, any prejudice to creditors caused by the discretionary relief requested is extremely limited.

84.     In contrast, failure to grant the discretionary relief requested will cause tremendous harm to the Debtors and their stakeholders.  As detailed more fully in the Petitioner's Provisional Relief Motion, absent relief, the Debtors are at risk of adverse creditor action that could threaten their ability to continue as a going concern.  Provisional Relief Mot. ¶¶ 22–31.  Accordingly, the balance between the minimal harm to those seeking to bring adverse actions against the Debtors, and the significant harm to the Debtors and the orderly administration of the Debtors' assets that would be caused by such actions, weighs in favor of granting the discretionary relief requested.[29]

*        *        *

85.     For all of the reasons set forth above, the Petitioner respectfully submits that all of the requirements of section 1517(a) have been satisfied and that the Debtors are entitled to the relief provided by section 1520 of the Bankruptcy Code.  Thus, the Court should enter the Proposed Order attached hereto as **Exhibit A** recognizing the Brazilian Proceeding as the foreign main proceeding.

## NOTICE

86.     Notice of the Declaration and Verified Petition has been provided to the parties (the "Notice Parties") set forth in **Exhibit B** attached hereto (the "Notice List").  The Petitioner respectfully submits that no other or further notice is required.  *See also Application Pursuant to Federal Rules of Bankruptcy Procedure 2002 and 9007 for Order Scheduling Hearing and*

---

[29]     Further, the Petitioner demonstrates in the Provisional Relief Motion that all parties in interest will be sufficiently protected by the Court's grant of the discretionary relief requested.  *See* Provisional Relief Motion ¶¶ 54–55.

*Specifying Form and Manner of Service of Notice, and Granting Related Relief*, filed contemporaneously herewith.

### NO PRIOR REQUEST

87.    No previous request for the relief requested herein has been made by the Debtors to this or any other court.

### CONCLUSION

WHEREFORE, for the reasons set forth herein, the Petitioner respectfully requests that the Court (1) grant the Declaration and Verified Petition and enter the Proposed Order annexed hereto as **Exhibit A** recognizing the Brazilian Proceeding as the foreign main proceeding for the Debtors and granting the related relief in connection therewith and (2) grant such other and further relief as the Court deems just and proper.

Dated:  March 12, 2026
        New York, New York

                       Respectfully submitted,

                   By:    */s/ Luke A. Barefoot*

                       CLEARY GOTTLIEB STEEN & HAMILTON LLP
                       Luke A. Barefoot
                       David Z. Schwartz
                       Richard C. Minott
                       One Liberty Plaza
                       New York, New York 10006
                       Telephone: 212-225-2000
                       Facsimile: 212-225-3999

                       *Attorneys for Raízen S.A., as Petitioner and Foreign Representative*

## <u>VERIFICATION OF CHAPTER 15 PETITION</u>

Pursuant to 28 U.S.C. § 1746, I, Lorival Nogueira Luz, Junior, declare under penalty of perjury under the laws of the United States of America as follows:

I declare under penalty of perjury that the factual contents of the foregoing Declaration and Verified Petition as well as the factual contents of each of the attachments and appendices thereto are true and accurate to the best of my knowledge, information, and belief, and I respectfully represent as follows:

My business address is Av. Brigadeiro Faria Lima, 4100, Itaim Bibi, São Paulo, Brazil. I hold a degree in Business Administration from Fundação Armando Álvares Penteado ("<u>FAAP</u>") and have completed several executive education programs abroad.

I am an individual over the age of 18. I am the Chief Financial Officer ("<u>CFO</u>") and Officer of Investor Relations of the Raízen Group. I began my career at Citibank, where I held various positions in Corporate & Investment Banking and at Credicard. I subsequently held senior financial leadership roles at major national and international companies, including as Global Corporate Treasurer at Votorantim Industrial, CFO at Estácio Participações, and Global CFO at both CPFL Energia and Votorantim Cimentos. From 2017 to 2022, I served at BRF S.A., joining as CFO, becoming COO in June 2018, and serving as Global CEO from 2019 to 2022. I subsequently served as Chief Executive Officer of Giga Mais from 2023 to 2025 and as a member of the Board of Directors at Inter&Co in 2023. I have also served on the advisory boards of the Brazilian Association of Animal Protein ("<u>ABPA</u>") and the Federation of Industries of the State of Minas Gerais ("<u>FIEMG</u>"), and I am currently a member of the Business Council of Instituto Ayrton Senna ("<u>IAS</u>") and part of the Imagine Food Collective.

Each of the Debtors appointed Raízen S.A. as their foreign representative and the foreign representative of the Brazilian Proceeding and authorized Raízen S.A. to file the Declaration and Verified Petition and to act on their behalf in these Chapter 15 Cases. Accordingly, in my capacity as CFO of the Raízen Group, I am fully authorized and take related action on behalf of the Foreign Representative.

I am generally familiar with the operations and affairs of the Debtors. Unless otherwise indicated, all facts set forth in this Declaration and Verified Petition are based upon the following: (a) my personal knowledge of the Debtors' operations and finances, (b) my review of relevant information, data, and documents (including oral information) furnished to me by the Debtors and its legal advisors; (c) information supplied to me by the Debtors' officers, directors, employees, and professionals; or (d) my analyses of the information I have received on the Debtors' operations and financial condition. I have also been kept abreast of major discussions with stakeholders, including the Debtors' primary financial creditors. To the extent that the Debtors learn that any information provided in the Declaration and Verified Petition is materially inaccurate, the Foreign Representative will act promptly to notify the Court and other parties; however, I believe all information therein to be true to the best of my knowledge, information and belief. I am authorized to submit the Declaration and Verified Petition on behalf of the Debtors and Foreign Representative, and if called upon to testify, I could and would testify competently to the facts set forth therein.

Dated: March 11, 2026
Respectfully submitted,

_____

Lorival Nogueira Luz, Junior
*Chief Financial Officer and Officer of*
*Investor Relations of the Raízen Group*

**<u>EXHIBIT A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 26-10528 |
| Raízen S.A., *et al.*,[1] | ) | |
| | ) | Chapter 15 |
| Debtors in a Foreign Proceeding. | ) | (Jointly Administered) |
| | ) | |

## ORDER GRANTING RECOGNITION OF FOREIGN MAIN PROCEEDING AND CERTAIN RELATED RELIEF

Upon the *Declaration of Lorival Nogueira Luz, Junior, and Verified Petition for Recognition of the Brazilian Proceeding and Motion for Order Granting Related Relief pursuant to 11 U.S.C. §§ 105, 1515, 1517, 1520, and 1521* (the "Declaration and Verified Petition")[2] dated March 12, 2026, Raízen S.A. (the "Petitioner" or the "Foreign Representative"), in its capacity as the duly-appointed foreign representative of the above-captioned debtors (collectively, the "Debtors") in the Brazilian court-supervised extrajudicial reorganization proceeding (*recuperação extrajudicial*) of the Debtors (the "Brazilian Proceeding"), which was accepted by the 3rd Bankruptcy and Judicial Reorganization Court – Central Civil Courthouse (the "Brazilian Bankruptcy Court") on March 12, 2026, pursuant to Federal Law No. 11.101 of February 9, 2005 (the "Brazilian Bankruptcy Law") of the laws of the Federative Republic of Brazil ("Brazil"), requesting this Order (the "Order") (a) granting the Declaration and Verified Petition and recognizing the Brazilian Proceeding as the foreign main proceeding for the Debtors pursuant to

---

[1]     The debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Raízen S.A. (01-23–Brazil); Raízen Energia S.A. (01-78–Brazil); Raízen Centro-Sul Paulista S.A. (18-28–Brazil); Raízen Fuels Finance S.A. (0903–Luxembourg); Blueway Trading Importação e Exportação S.A. (01-57–Brazil); Raízen Caarapó Açúcar e Álcool Ltda. (01-66–Brazil); Raízen North America, Inc. (7198–U.S.); Raízen Centro-Sul S.A. (01-36–Brazil); and Raízen Trading S.A. (3.167–Switzerland).

[2]     Capitalized terms used but not otherwise defined shall have the meanings ascribed to them in the Declaration and Verified Petition.

section 1517 of title 11 of the United States Code (the "Bankruptcy Code"), and all relief included

therewith as provided in section 1520 of the Bankruptcy Code; (b) finding that the Petitioner is the

duly-appointed foreign representative, as defined in section 101(24) of the Bankruptcy Code, of

the Brazilian Proceeding for each of the Debtors for purposes of these proceedings; and (c)

granting such other and further relief as the Court deems just and proper; and this Court having

reviewed (i) the Forms of Voluntary Petition, (ii) the Declaration and Verified Petition, along with

the exhibits annexed thereto, (iii) the *Declaration of Giuliano Colombo Pursuant to 28 U.S.C. §*

*1746 In Support of the Declaration of Lorival Nogueira Luz, Junior, and Verified Petition for*

*Recognition of the Brazilian Proceeding and Motion for Order Granting Related Relief Pursuant*

*to 11 U.S.C. §§ 105(A), 1515, 1517, 1520, and 1521* (the "Brazilian Counsel Declaration") filed

contemporaneously therewith, and (iv) the statements of counsel with respect to the Declaration

and Verified Petition at a hearing before this Court (the "Hearing"); and appropriate and timely

notice of the filing of the Declaration and Verified Petition and the Hearing having been given in

accordance with the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2002 and 9007*

*for Order Scheduling Hearing and Specifying Form and Manner of Service of Notice, and*

*Granting Related Relief* (the "Notice Order") (ECF No. ●); and no objections having been filed or

asserted as set forth on the record of the Hearing; and no other or further notice being necessary or

required; and this Court having determined that the legal and factual bases set forth in the evidence

admitted by the Court at the Hearing including the Declaration and Verified Petition, the Brazilian

Counsel Declaration, and all other pleadings and papers in these chapter 15 cases (the "Chapter 15

Cases") establish just cause to grant the relief ordered herein; and after due deliberation thereon;

3

**THIS COURT HEREBY FINDS AND DETERMINES THAT:**

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction over this matter pursuant to sections 157 and 1334 of title 28 of the United States Code, and the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012) (Preska, C.J.).

C.      This is a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code.

D.      Venue for this proceeding is proper before this Court pursuant to section 1410 of title 28 of the United States Code.

E.      The Petitioner has been (i) duly appointed to act as the "foreign representative," within the meaning of section 101(24) of the Bankruptcy Code, of the Brazilian Proceeding with respect to the Debtors and (ii) authorized to commence and prosecute these Chapter 15 Cases.

F.      These Chapter 15 Cases were properly commenced on March 12, 2026 by the Foreign Representative pursuant to sections 1504, 1509, and 1515 of the Bankruptcy Code.

G.      The Petitioner has satisfied the requirements of section 1515 of the Bankruptcy Code, Bankruptcy Rules 1007(a)(4), 2002(q) and 7007.1, and Rules 2002-4 and 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

H.      The Brazilian Proceeding is a "foreign proceeding" pursuant to section 101(23) of the Bankruptcy Code.

I.      The Brazilian Proceeding is entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

J.      The COMI of each of the Debtors is in Brazil.  Accordingly, the Brazilian Proceeding is the "foreign main proceeding" of each of the Debtors, as that term is defined in section 1502(4) of the Bankruptcy Code, and is entitled to recognition as such pursuant to section 1517(b)(1) of the Bankruptcy Code.

K.      The relief granted hereby is necessary and appropriate to effectuate the purposes and objectives of chapter 15 and to protect the Debtors, their creditors and other parties in interest.

L.      Appropriate notice of the filing of and the Hearing on the Declaration and Verified Petition was given, which notice is deemed adequate for all purposes, and no other or further notice need be given.

For all of the foregoing reasons, and for the reasons stated by the Court at the Hearing and reflected in the record thereof, and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Declaration and Verified Petition is GRANTED as set forth herein.

2.      The Petitioner is the duly appointed foreign representative of the Brazilian Proceeding with respect to the Debtors, within the meaning of section 101(24) of the Bankruptcy Code, and is authorized to act on behalf of each of the Debtors in these Chapter 15 Cases.

3.      The Brazilian Proceeding is granted recognition as the foreign main proceeding of each of the Debtors pursuant to section 1517 of the Bankruptcy Code.

4.      All relief and protection afforded to foreign main proceedings under section 1520 of the Bankruptcy Code are hereby granted to the Brazilian Proceeding, the Petitioner, the Debtors and the property of the Debtors that is within the territorial jurisdiction of the United States, as applicable, including application of section 362 of the Bankruptcy Code with respect to each of the Debtors and the property of the Debtors that is within the territorial jurisdiction of the United States, subject to the exceptions to section 362 that are set forth in the Bankruptcy Code.

5.      Notwithstanding any provision in the Bankruptcy Rules or the Local Rules to the contrary, (a) this Order shall be effective immediately and enforceable upon entry; (b) the Petitioner is not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Petitioner is authorized and empowered and may in its discretion and without further delay take any action and perform any act necessary to implement and effectuate the terms of this Order.

6.      A copy of this Order shall be served by the Petitioner within seven business days of entry of this Order by email, first class mail, or overnight courier on the Notice Parties (as defined in the Notice Order), and such service shall be good and sufficient service and adequate notice for all purposes.

7.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, enforcement, amendment or modification of this Order.

Dated: New York, New York
_____, 2026

_____
UNITED STATES BANKRUPTCY JUDGE

6

## **EXHIBIT B**

**Notice Parties List**

**Via E-mail**

| Notice Party Name | Notice Party Address |
|---|---|
| Judge's Chambers, Bankruptcy Court, SDNY | [●] |
| **The United States Trustee** | |
| Office of the United States Trustee | Tara Tiantian<br>Tara.Tiantian@usdoj.gov<br><br>William K. Harrington,<br>USTP.Region02@usdoj.gov<br><br>Linda Rifkin,<br>Linda.Riffkin@usdoj.gov |
| **Counsel to the Chapter 15 Debtors** | |
| Cleary Gottlieb Steen & Hamilton LLP<br>(Counsel to the Raízen Group) | Attn:<br><br>Luke A. Barefoot, lbarefoot@cgsh.com<br>Richard C. Minott, rminott@cgsh.com<br>David Z. Schwartz, dschwartz@cgsh.com<br>Timothy Wolfe, twolfe@cgsh.com<br><br>One Liberty Plaza,<br>New York, NY 10006 |
| **Counsel to the Ad Hoc Group of Noteholders** | |
| White & Case LLP<br>(Counsel to Ad Hoc Group of Noteholders) | Attn: John Cunningham<br><br>1221 Avenue of the Americas,<br>New York, NY 10020 |
| **Others** | |
| Depository Trust Company | conversionsandwarrantsannouncements@dtcc.com |
| **Chapter 15 Creditors** | |
| Banco Bilbao Vizcaya Argentaria, S.A. New York Branch | andre.ferrari@bbva.com; carina.zapparoli@bbva.com |
| Banco BNP Paribas Brasil S.A. | financeiro@br.bnpparibas.com |
| Banco Bradesco S.A. | joao.manso@bradesco.com.br;<br>rodrigo.pavel@bradesco.com.br |
| Banco Citibank S.A. | contatocnpj@citi.com |
| Banco Crédit Agricole Brasil S.A. | contabil.finance@ca-cib.com |
| Banco do Brasil S.A. | secex@bb.com.br |

| | |
|---|---|
| Banco HSBC S.A. | special.ts.skm.gts.ami@hsbc.com.hk |
| Banco Itaú Unibanco S.A. | itaujudicial@itau-unibanco.com.br |
| Banco Mizuho do Brasil S.A. | roberto.veirano@mizuhogroup.com; katia.heydenreich@mizuhogroup.com |
| Banco Morgan Stanley S.A. | goreti.kafer@morganstanley.com |
| Banco Santander (Brasil) S/A | gvallone@santander.com.br; kosilva@santander.com.br |
| Banco Santander S.A. | gvallone@santander.com.br; kosilva@santander.com.br |
| Bank of America Merrill Lynch Banco Múltiplo S.A. | dg.tax_litigation@bofa.com |
| Bank of America, N.A. | dg.credit_ops_brazil@bankofamerica.com |
| Bank of China Limited, Grand Cayman Branch | xu.lei@boc-brazil.com; ricardo.mangione@bocbrasil.com.br; bai.yun@boc-brazil.com; augusto.passoni@bocbrasil.com.br; jony.brito@bocbrasil.com.br; victor.guedes@boc-brazil.com; frederico.lima@bocbrasil.com.br; daniel.baumann@boc-brazil.com |
| BNP Paribas | rodrigo.jabur@br.bnpparibas.com; juliana.mani@br.bnpparibas.com; felipe.irani@br.bnpparibas.com |
| BNP Paribas S.A. | rodrigo.jabur@br.bnpparibas.com; juliana.mani@br.bnpparibas.com; felipe.irani@br.bnpparibas.com |
| BTG Pactual S.A. | joffre.salies@btgpactual.com; daniel.vaz@btgpactual.com |
| Citibank N.A. | jorge.lima@citi.com; roberto.gastaud@citi.com; alexandre.castanheira@citi.com |
| Cooperatieve Rabobank U.A. | l.br.saopaulo.assistantsrmgccbrazil@rabobank.com |
| Crédit Agricole Corporate and Investment Bank | jean.goethals@ca-cib.com; fernando.salazar@ca-cib.com |
| Deutsche Bank S.A. | brtax@list.db.com |
| Goldman Sachs do Brasil Banco Múltiplo S.A. | gs-tax-brazil@gs.com |
| JPMorgan Chase Bank, N.A. | rodrigo.carmo@jpmorgan.com; nicolas.a.guevara@jpmorgan.com |
| Macquarie Bank LTD | feedback@macquarie.com |
| Morgan Stanley Bank NA | fernando.mello@morganstanley.com; gustavo.siqueira@morganstanley.com; joao.camarota@morganstanley.com; cristiane.quiterio@morganstanley.com |
| MUFG Bank, Ltd. | rkralik@us.mufg.jp |
| MUFG Brasil S.A. | jyung@us.mufg.jp; djesus@br.mufg.jp |

| | |
|---|---|
| OPEA Securitizadora S.A. | financeiro@opea.com.br |
| Pentágono S.A. Distribuidora de Títulos e Valores Mobiliários | assembleias@pentagonotrustee.com.br |
| Santander Corretora de Seguros, Investimentos e Servicos S.A. | homebroker@santander.com.br |
| Scotiabank Brasil S.A. Banco Múltiplo | administration.sp@br.scotiabank.com |
| Sumitomo Mitsui Banking Corporation | lilian.coutinho@smbcgroup.com; joaquim_marques@smbcgroup.com.br; rodrigo_torres@smbcgroup.com.br; caio_oliveira@smbcgroup.com.br |
| The Bank of New York Mellon | carlos.costa@bny.com; lisa.sollitto@bny.com; centralizedbillingteam@bnymellon.com; joseph.costantino@bny.com |
| The Bank of Nova Scotia | gwsloanops.intl@scotiabank.com |
| The Hongkong and Shanghai Banking Corporation Limited | special.ts.skm.gts.ami@hsbc.com.hk |
| True Securitizadora S.A. | atendimento@truesecuritizadora.com.br |
| U.S. Bank National Association | pierre.desaulniers@usbank.com; logan.gieseke@usbank.com; tuan.phan1@usbank.com; michelle.mena@usbank.com |
| XP Comercializadora de Energia S.A. | carolina.montenegro@xpi.com.br; energia.estruturadas@xpi.com.br |
| XP Investimentos Corretora de Câmbio, Títulos e Valores Mobiliários S.A. | controladoria@xpi.com.br |

**Via First Class Mail**

| Notice Party Name | Notice Party Address |
| --- | --- |
| **The United States Trustee** | |
| Office of the United States Trustee for the Southern District of New York | Attn: Linda Rifkin, Linda.Riffkin@usdoj.gov 201 Varick Street, Suite 1006, New York, NY 10014 |
| **Chapter 15 Creditors** | |
| Banco Bilbao Vizcaya Argentaria, S.A. New York Branch | Banco Bilbao Vizcaya Argentaria, S.A. New York Branch - Two, Manhattan West - 375 9th Ave - 8th Floor, New York 10001 |
| Banco BNP Paribas Brasil S.A. | Avenida Presidente Juscelino Kubitschek 1909, Conj 91 - 101 - 111, Vila Nova Conceicao, Sao Paulo, SP, Brasil, 04543011 |
| Banco Bradesco S.A. | Nucleo Cidade de Deus S/N, Vila Yara, Osasco, SP, Brazil, 06029900 |
| Banco Citibank S.A. | Avenida Paulista 1111, Andar 2 Parte, Bela Vista, Sao Paulo, SP, Brazil, 01311920 |
| Banco Crédit Agricole Brasil S.A. | Av Brig Faria Lima, 3900 - Itaim Bibi, Sao Paulo - 04538132 |
| Banco do Brasil S.A. | Quadra Saun Quadra 5 Bloco B Torre I, II, III SN, Andar T I Sl S101 a S1602 T II Sl C101 a C1602 TIII Sl N101 a N1602, Asa Norte, Brasilia, DF, Brazil, 70040912 |
| Banco HSBC S.A. | Avenida Pres Juscelino Kubitschek 1909, Bloco Norte Andar 19, Vila Nova Conceicao, Sao Paulo, SP, Brasil, 04543907 |
| Banco Itaú Unibanco S.A. | Avenida Brigadeiro Faria Lima 3500, 1 2 3 Parte; 4 e 5 Andares, Itaim Bibi, Sao Paulo, SP, Brazil, 04538132 |
| Banco Mizuho do Brasil S.A. | Avenida Presidente Juscelino Kubitschek 2041, Andar 7 Torre E, Vila Nova Conceicao, Sao Paulo, SP, Brasil, 04543011 |

| | |
|---|---|
| Banco Morgan Stanley S.A. | Avenida Brigadeiro Faria Lima 3600, Andar 6 E 8, Itaim Bibi, Sao Paulo, SP, Brasil, 04538132 |
| Banco Santander (Brasil) S/A | Av Pres Juscelino Kubitschek 2041, Vila Nova Conceicao, Sao Paulo, SP, Brazil, 04543011 |
| Banco Santander S.A. | Avenida Juscelino Kubitschek, 2235 e 2241, Vila Olímpia, São Paulo/SP, 04533085 |
| Bank of America Merrill Lynch Banco Múltiplo S.A. | Av. Brigadeiro Faria Lima, 3400, 18o Andar 04538-132, São Paulo, SP, Brazil |
| Bank of America, N.A. | 100 North Tryon Street, Charlotte, North Carolina 28255, Estados Unidos |
| Bank of China Limited, Grand Cayman Branch | Grand Pavilion Commercial Center 802 West Bay Road – P.O Box 30995, Grand Cayman KY1-1204 – Cayman Islands / Avenida Paulista, 901, 14th Floor – Zip Code: 01311-100, Sao Paulo, SP, Brazil |
| BNP Paribas | 16 Boulevard des Italiens, 75009 Paris, France / 787 Seventh Avenue, New York, NY 10019 |
| BNP Paribas S.A. | 16 Boulevard des Italiens Paris, 75009 |
| BTG Pactual S.A. | Praia Botafogo 00501, Blocoii Salao 501 Blc II Sal 601, Botafogo, Rio de Janeiro, RJ, Brasil, 22250911 |
| Citibank N.A. | Av. Paulista, Nº 1.111, (Loja 1, 3 e Sobreloja) |
| Cooperatieve Rabobank U.A. | Croeselaan 18, Utrecht, Países Baixos / Av. Doutor Chucri Zaidan, 1240, 14° e 15° Andares, Edificio Morumbi Corporate - Diamond Tower, Bairro Vila Sao Francisco, Sao Paulo, SP, Brazil |
| Crédit Agricole Corporate and Investment Bank | 1301 Avenue of the Americas, 8th Floor, New York, NY 10019-6022, United States of America |

| | |
|---|---|
| Deutsche Bank S.A. | Avenida Brig Faria Lima 3900, Andar 13, Itaim Bibi, Sao Paulo, SP, Brasil, 04538132 |
| Goldman Sachs do Brasil Banco Múltiplo S.A. | R Leopoldo Couto de Magalhaes Junior, 700 - Itaim Bibi, Sao Paulo - 04542000 |
| JPMorgan Chase Bank, N.A. | 10420 Highland Manor Drive, 4th Floor, Tampa, Florida, 33610 |
| Macquarie Bank LTD | 50 Martin Place, Sydney, NSW 2000, Australia |
| Morgan Stanley Bank NA | 201 S Main St, Floor 5, Salt Lake City, UT 84111, United States of America |
| MUFG Bank, Ltd. | 1221 Avenue of the Americas, 8th Floor, New York, NY 10020-1104 |
| MUFG Brasil S.A. | Avenida Paulista 1274, Bela Vista, Sao Paulo, SP, Brasil, 01310925 |
| OPEA Securitizadora S.A. | R. Girassol, 555, Anexo Torre C-Parte - Vila Madalena, São Paulo - SP - 05.433-001 |
| Pentágono S.A. Distribuidora de Títulos e Valores Mobiliários | Avenida das Americas 4200, Bloco 08 Sala 302 B 303 B e 304 B, Barra da Tijuca, Rio de Janeiro, RJ, Brazil, 22640102 |
| Santander Corretora de Seguros, Investimentos e Servicos S.A. | Av Presidente Juscelino Kubitschek, 2041 - Vila Nova Conceicao, Sao Paulo - SP - 04543011 |
| Scotiabank Brasil S.A. Banco Múltiplo | Avenida Brigadeiro Faria Lima 2277, 7 Andar, Jardim Paulistano, Sao Paulo, SP, Brasil, 01452000 |
| Sumitomo Mitsui Banking Corporation | 277 Park Avenue, New York, NY, 10172 |

| | |
|---|---|
| The Bank of New York Mellon | 240 Greenwich Street – 7E, New York, New York 10286, USA |
| The Bank of Nova Scotia | 720 King Street West, 2nd Floor, Toronto, Ontario, Canada, M5V 2T3 |
| The Hongkong and Shanghai Banking Corporation Limited | Level 5, HSBC Building Mongkok, 673 Nathan Road, Kowloon, Hong Kong |
| True Securitizadora S.A. | Avenida Santo Amaro 48, Andar 2 Conj 21 e 22, Vila Nova Conceicao, Sao Paulo, SP, Brazil, 04506000 |
| U.S. Bank National Association | 100 Wall Street, 16th Floor, New York, New York 10005, USA |
| XP Comercializadora de Energia S.A. | Av Pres Juscelino Kubitschek, 1909 - Vila Nova Conceicao, Sao Paulo - SP - 04543907 |
| XP Investimentos Corretora de Câmbio, Títulos e Valores Mobiliários S.A. | Praia Botafogo 00501, Blc I Sal 501, Botafogo, Rio de Janeiro, RJ, Brasil, 22250911 |
| **Indenture Trustees** | |
| The Bank of New York Mellon | Attn:<br><br>Corporate Trust Administration<br><br>240 Greenwich Street – 7E<br>New York, NY 10286 |
| U.S. Bank National Association | Attn:<br><br>Global Corporate Trust Services<br><br>100 Wall Street, 16th floor<br>New York, NY 10005 |
| **Counsel** | |
| Cleary Gottlieb Steen & Hamilton LLP (Counsel to the Raizen Group) | Attn:<br><br>Luke A. Barefoot, lbarefoot@cgsh.com<br>Richard C. Minott, rminott@cgsh.com<br>David Z. Schwartz, dschwartz@cgsh.com<br>Timothy Wolfe, twolfe@cgsh.com |

| | One Liberty Plaza,<br>New York, NY 10006 |
|---|---|
| White & Case LLP<br><br>(Counsel to Ad Hoc Group of Noteholders) | Attn:<br><br>1221 Avenue of the Americas,<br>New York, NY 10020 |
| Special Counsel,<br>Office of International Corporate Finance<br>Division of Corporation Finance<br>(Counsel to U.S. Securities and Exchange Commission) | Attn:<br><br>Corey A. Jennings, jenningsc@sec.gov<br><br>100 F Street, NE<br>Washington, D.C. 20549 |
| **Notice Party Name** | **Notice Party Address** |
| Division of Corporation Finance<br>(Counsel to U.S. Securities and Exchange Commission) | 100 F Street, NE,<br>Washington, DC 20549 |

# **EXHIBIT C**

## **Organizational Structure**



**<u>EXHIBIT D</u>**

**2027 Notes Indenture**

EXECUTION VERSION

---

**RAIZEN FUELS FINANCE S.A.**
as Issuer

**RAÍZEN COMBUSTÍVEIS S.A.**
and
**RAÍZEN ENERGIA S.A.**
as Guarantors

and

**U.S. BANK NATIONAL ASSOCIATION**
as Trustee, Principal Paying Agent, Registrar and Transfer Agent

---

**Indenture**

**Dated as of January 20, 2017**

---

**US$500,000,000 5.300% Notes Due 2027**
**Unconditionally and Irrevocably Guaranteed by**
**Raízen Combustíveis S.A. and Raízen Energia S.A.**

# TABLE OF CONTENTS

PAGE

## ARTICLE 1
DEFINITIONS AND INCORPORATION BY REFERENCE............................................1

Section 1.01.  *Definitions.* ...................................................................................1
Section 1.02.  *Rules of Construction* ..................................................................13

## ARTICLE 2
THE NOTES ...........................................................................................................14

Section 2.01.  *Form, Dating and Denominations; Legends* .................................14
Section 2.02.  *Execution and Authentication; Additional Notes* .........................15
Section 2.03.  *Registrar, Paying Agent and Authenticating Agent; Paying Agent to Hold Money in Trust* .....................................................15
Section 2.04.  *Replacement Notes* ......................................................................16
Section 2.05.  *Outstanding Notes* ......................................................................16
Section 2.06.  *Temporary Notes* ........................................................................17
Section 2.07.  *Cancellation* ...............................................................................17
Section 2.08.  *CUSIP and ISIN Numbers* ..........................................................18
Section 2.09.  *Registration, Transfer and Exchange* ..........................................18
Section 2.10.  *Restrictions on Transfer and Exchange* ......................................21
Section 2.11.  *Open Market Purchases* .............................................................22
Section 2.12.  *Trustee's Disclaimer* ..................................................................22

## ARTICLE 3
ADDITIONAL AMOUNTS; REDEMPTION ..............................................................23

Section 3.01.  *Additional Amounts* ....................................................................23
Section 3.02.  *Optional Redemption.* .................................................................25
Section 3.03.  *Redemption for Taxation Reasons.* ..............................................26
Section 3.04.  *Method and Effect of Redemption* ...............................................27
Section 3.05.  *Effect of Notice of Redemption* .......**Error! Bookmark not defined.**
Section 3.06.  *Notice of Redemption* ..................................................................27
Section 3.07.  *Deposit of Redemption or Purchase Price* ...................................28

## ARTICLE 4
COVENANTS ..........................................................................................................29

Section 4.01.  *Payment of Notes* ........................................................................29
Section 4.02.  *Maintenance of Office or Agency* ................................................30
Section 4.03.  *Existence* .....................................................................................30
Section 4.04.  *Payment of Taxes* ........................................................................31
Section 4.05.  *Maintenance of Properties* ..........................................................31
Section 4.06.  *Repurchases at the Option of the Holders Upon Change of Control.* ......................................................................................31

i

Section 4.07.   *Limitation on Liens* ........................................................34

Section 4.08.   *Financial Reports*..........................................................34

Section 4.09.   *Reports to Trustee* ........................................................35

Section 4.10.   *Disclosure of Names and Addresses of Holders* ..........................35

Section 4.11.   *Paying Agent and Transfer Agent* ................................................35

ARTICLE 5

CONSOLIDATION, MERGER OR SALE OF ASSETS ................................................38

Section 5.01.   *Consolidation, Merger or Sale of Assets* ......................................38

ARTICLE 6

DEFAULT AND REMEDIES ........................................................................40

Section 6.01.   *Events of Default*...........................................................40

Section 6.02.   *Acceleration* ...............................................................41

Section 6.03.   *Other Remedies*.............................................................41

Section 6.04.   *Waiver of Past Defaults* ...................................................42

Section 6.05.   *Control by Majority* .......................................................42

Section 6.06.   *Limitation on Suits* .......................................................42

Section 6.07.   *Rights of Holders to Receive Payment*..........................................42

Section 6.08.   *Collection Suit by Trustee* ...............................................43

Section 6.09.   *Trustee May File Proofs of Claim* .........................................43

Section 6.10.   *Priorities* ..................................................................43

Section 6.11.   *Restoration of Rights and Remedies* ...........................................44

Section 6.12.   *Undertaking for Costs* .....................................................44

Section 6.13.   *Rights and Remedies Cumulative*................................................44

Section 6.14.   *Delay or Omission Not Waiver; Prescription of Claims* .............44

Section 6.15.   *Waiver of Stay, Extension or Usury Laws* ....................................44

ARTICLE 7

THE TRUSTEE .............................................................................45

Section 7.01.   *General* ....................................................................45

Section 7.02.   *Certain Rights of Trustee.* ...............................................46

Section 7.03.   *Individual Rights of Trustee*.............................................47

Section 7.04.   *Trust Indenture Act* .......................................................48

Section 7.05.   *Trustee's Disclaimer* ......................................................48

Section 7.06.   *Notice of Default* ..........................................................48

Section 7.07.   *Compensation and Indemnity* ...............................................48

Section 7.08.   *Replacement of Trustee*....................................................49

Section 7.09.   *Successor Trustee by Merger*...............................................50

Section 7.10.   *Money Held in Trust* .......................................................50

Section 7.11.   *Force Majeure* .............................................................50

Section 7.12.   *Corporate Trustee Required; Eligibility; Conflicting Interests*.....50

Section 7.13.   *Compliance Certificates and Opinions***Error! Bookmark not defined.**

Section 7.14.   *Trustee and Others May Hold Notes* ...........................................51

ii

ARTICLE 8

DEFEASANCE AND DISCHARGE ..................................................51

Section 8.01.  *Discharge of Issuer's Obligations* .................................51
Section 8.02.  *Legal Defeasance* ...........................................................52
Section 8.03.  *Covenant Defeasance* .....................................................53
Section 8.04.  *Application of Trust Money* ............................................53
Section 8.05.  *Repayment to Issuer* .......................................................54
Section 8.06.  *Reinstatement* .................................................................54

ARTICLE 9

AMENDMENTS, SUPPLEMENTS AND WAIVERS ........................54

Section 9.01.  *Amendments Without Consent of Holders* .....................54
Section 9.02.  *Amendments With Consent of Holders* ..........................55
Section 9.03.  *Substitution of the Issuer* ...............................................56
Section 9.04.  *Effect of Consent* ............................................................57
Section 9.05.  *Trustee's Rights and Obligations* ...................................58

ARTICLE 10

GUARANTEES ..................................................................................58

Section 10.01. *Guarantees.* .....................................................................58
Section 10.02. *Limitation on Liability* ..................................................60
Section 10.03. *Successors and Assigns* ..................................................60
Section 10.04. *No Waiver* .......................................................................61
Section 10.05. *Modification* ...................................................................61
Section 10.06. *Non-Impairment* .............................................................61

ARTICLE 11

MISCELLANEOUS ..........................................................................61

Section 11.01. *Noteholder Communications; Noteholder Actions* .......61
Section 11.02. *Notices* ............................................................................62
Section 11.03. *Certificate and Opinion as to Conditions Precedent* ....64
Section 11.04. *Statements Required in Certificate or Opinion* .............64
Section 11.05. *Payment Date Other than a Business Day* .....................65
Section 11.06. *Governing Law* ...............................................................65
Section 11.07. *Submission to Jurisdiction; Agent for Service* .............65
Section 11.08. *Judgment Currency* ........................................................66
Section 11.09. *No Adverse Interpretation of Other Agreements* ..........67
Section 11.10. *Successors* .......................................................................67
Section 11.11. *Duplicate Originals* ........................................................67
Section 11.12. *Separability* .....................................................................67
Section 11.13. *Table of Contents and Headings* ....................................67
Section 11.14. *No Liability of Directors, Officers, Employees, Incorporators,*
             *Members and Stockholders* ...........................................67

Section 11.15. *Waiver of Jury Trial* ......................................................................67

Section 11.16. *Tax Matters* ................................................................................68

Section 11.17. *Contractual Recognition of Bail-in Powers* ..................................68

Section 11.18. *USA Patriot Act* ............................................................................68

<u>EXHIBITS</u>

EXHIBIT A    Form of Note.............................................................................................. A-1

EXHIBIT B    Restricted Legend................................................................................. B-1

EXHIBIT C    DTC Legend.......................................................................................... C-1

EXHIBIT D    Regulation S Certificate ....................................................................... D-1

EXHIBIT E    Rule 144A Certificate........................................................................... E-1

EXECUTION VERSION

INDENTURE, dated as of January 20, 2017, between RAIZEN FUELS FINANCE S.A., a public limited liability company (*société anonyme*) organized and established under the laws of the Grand Duchy of Luxembourg, having its registered office at 14, Rue Edward Steichen, L-2540 Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 184.033, as the Issuer, RAÍZEN COMBUSTÍVEIS S.A. and RAÍZEN ENERGIA S.A. as the Guarantors, and U.S. BANK NATIONAL ASSOCIATION as Trustee, Principal Paying Agent, Registrar and Transfer Agent.

## RECITALS

The Issuer has duly authorized the execution and delivery of the Indenture to provide for the issuance of up to US$500,000,000 aggregate principal amount of the Issuer's 5.300% Notes due 2027, and, if and when issued, any Additional Notes as provided herein (the "**Notes**"). All things necessary to make the Indenture a valid and binding agreement of the Issuer, in accordance with its terms, have been done, and the Issuer has done all things necessary to make the Notes (in the case of the Additional Notes, when duly authorized), when executed by the Issuer and authenticated and delivered by the Trustee and duly issued by the Issuer, the valid obligations of the Issuer as hereinafter provided. The Notes will be fully, irrevocably and unconditionally guaranteed by Raízen Combustíveis S.A. ("**Raízen Combustíveis**"), as a Guarantor, and Raízen Energia S.A. ("**Raízen Energia**"), as a Guarantor, on a joint and several basis as hereinafter provided in Article 10 (the "**Guarantees**"). All things necessary to make the Indenture a valid and binding agreement of the Guarantors, in accordance with its terms, have been done, and each Guarantor has done all things necessary to make the Guarantees of the Guarantor when executed by the Guarantor, the valid, legal and binding obligation of each Guarantor.

## WITNESSETH

For and in consideration of the premises and the purchase of the Notes by the Holders thereof, the parties hereto covenant and agree, for the equal and proportionate benefit of all Holders, as follows:

## ARTICLE 1
## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01. *Definitions.*

"**Additional Amounts**" has the meaning assigned to such term in Section 3.01.

"**Additional Notes**" means any Notes issued under the Indenture in addition to the Initial Notes, having the same terms in all respects as the Initial Notes except that interest will accrue on the Additional Notes from their date of issuance, *provided, however*, that such Additional Notes will either be (1) fungible with the Initial Notes for U.S. federal income tax purposes or (2) issued under a separate CUSIP or other identifying number.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" (including the terms "controlling," "controlled by" and "under common control with") as to any Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by contract or otherwise.

"**Agent**" means any Registrar, Paying Agent, Transfer Agent or Authenticating Agent, as duly appointed by the Issuer or by the Trustee in the case of the Authenticating Agent.

"**Agent Member**" means a member of, or a participant in, the Depositary.

"**Applicable GAAP**" means, with respect to the Issuer or any Guarantor either (i) generally accepted accounting principles in the jurisdiction where such Issuer or Guarantor is organized or incorporated or (ii) International Financial Reporting Standards (IFRS) issued by the International Accounting Standards Board (IASB) and related interpretations, in each case, as in effect from time to time.

"**Authenticating Agent**" refers to the Trustee's designee for authentication of the Notes.

"**Bail-in Legislation**" means in relation to a member state of the European Economic Area which has implemented, or which at any time implements, the BRRD, the relevant implementing law, regulation, rule or requirement as described in the EU Bail-in Legislation Schedule from time to time.

"**Bail-in Powers**" means any Write-down and Conversion Powers as defined in relation to the relevant Bail-in Legislation.

"**bankruptcy default**" means the Events of Default set forth in Section 6.01(d) and/or (e).

"**Board of Directors**" means the board of directors or comparable governing body of the Issuer, or any committee thereof duly authorized to act on its behalf.

"**Board Resolution**" means a resolution duly adopted by the Board of Directors and remains in full force and effect as of the date of its certification.

"**Brazil'** means the Federative Republic of Brazil.

"**BRRD**" means Directive 2014/59/EU establishing a framework for the recovery and resolution of credit institutions and investment firms.

"**BRRD Liability**" has the same meaning as in such laws, regulations, rules or requirements implementing the BRRD under the applicable Bail-in Legislation.

"**BRRD Party**" means any entity subject to Bail-in Powers.

"**Business Day**" means any day except a Saturday, Sunday or other day on which commercial banks in New York City, Luxembourg City or in the City of São Paulo or in the city where the Corporate Trust Office of the Trustee is located are authorized by law to close.

"**Capital Stock**" means, as to any Person, any and all shares, interests, participations, quotas or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person other than a corporation and any and all warrants or options to purchase any of the foregoing, but excluding any debt securities convertible into any of the foregoing.

"**Central Bank**" means the Central Bank of Brazil (*Banco Central do Brasil*).

"**Certificated Note**" means a Note in registered individual form without interest coupons.

"**Change of Control**" means that any Guarantor ceases to be Controlled either by (a) Royal Dutch Shell PLC and Cosan S/A Indústria e Comércio jointly, or (b) either Royal Dutch Shell PLC or Cosan S/A Indústria e Comércio, individually; provided, however, that it shall not be a "Change of Control" hereunder if (i) Royal Dutch Shell PLC ceases to Control Raízen Combustíveis so long as Cosan S/A Indústria e Comércio retains (x) at least the same ownership percentage of Voting Stock of Raízen Combustíveis that it possesses on the Issue Date, and (y) Control of Raízen Energia, (ii) Cosan S/A Indústria e Comércio ceases to Control Raízen Energia so long as Royal Dutch Shell PLC retains (x) at least the same ownership percentage of Voting Stock of Raízen Energia that it possesses on the Issue Date, and (y) Control of Raízen Combustíveis, or (iii) in the event of an initial public offering of the Capital Stock of any Guarantor, if, following such initial public offering, either Royal Dutch Shell PLC or Cosan S/A Indústria e Comércio, jointly or individually, retain the power, directly or indirectly, to direct or cause the direction of the management and policies of such Guarantor. For purposes of this definition "Control," with respect to any Guarantor, means the possession, directly or indirectly, beneficially and of record, of at least a majority of the outstanding shares of Voting Stock of such Guarantor or the power, directly or indirectly, to direct or cause the direction of the management and policies of such Guarantor.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Comparable Treasury Issue**" means the United States Treasury security or securities selected by an Independent Investment Banker as having an actual or interpolated maturity comparable to the remaining term of the Notes to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a comparable maturity to the remaining term of such Notes.

"**Comparable Treasury Price**" means, with respect to any redemption date (1) the average of the Reference Treasury Dealer Quotations for such redemption date, after excluding the highest and lowest such Reference Treasury Dealer Quotation or (2) if the

Independent Investment Banker obtains fewer than four such Reference Treasury Dealer Quotations, the average of all such quotations.

"**Consolidated Net Worth**" means the aggregate combined consolidated stockholders' equity of the Guarantors determined on a consolidated basis in accordance with Applicable GAAP.

"**Corporate Trust Office**" means (i) for Note transfer purposes, 111 Fillmore Avenue East, St. Paul, Minnesota, 55107-1402, Attention: Bondholder Services – EP-MN-WS2N, or (ii) for all other purposes, 100 Wall Street, 16th Floor, New York, New York 10005, Attention: Global Corporate Trust Services, or such other address as the Trustee may designate from time to time by notice to the Holders and the Issuer or the principal corporate trust office of any successor Trustee.

"**Debt**" means, with respect to any Person, without duplication:

(1)     all indebtedness of such Person for borrowed money;

(2)     all obligations of such Person evidenced by notes, bonds, debentures or other similar documents;

(3)     all obligations, contingent or otherwise, of such Person in respect of acceptances, letters of credit, financial guaranty insurance policies or similar extensions of credit (excluding trade payables);

(4)     all obligations of such Person under Hedging Agreements; and

(5)     all Debt of other Persons referred to in clauses (1) through (4) above that is Guaranteed by such Person.

The principal amount of any Debt or other obligation that is denominated in any currency other than United States dollars (after giving effect to any Hedging Agreement in respect thereof) shall be the amount thereof, as determined pursuant to the foregoing sentence, converted into United States dollars at the Spot Rate in effect on the date of determination.

"**Default**" means an event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would become an Event of Default.

"**Depositary**" means the depositary of each Global Note, which will initially be DTC.

"**Designated Affiliate**" means, at any time, one or more Persons (including, without limitation, a Guarantor) designated by the Issuer to be the purchaser of Notes under an Offer to Purchase.

"**Dollars**" means United States Dollars in immediately available funds.

"**DTC**" means The Depository Trust Company, a New York corporation, and its successors.

"**DTC Legend**" means the legend set forth in Exhibit C.

"**EU Bail-in Legislation Schedule**" means the document described as such, then in effect, and published by the Loan Market Association (or any successor person) from time to time at http://www.lma.eu.com/.

"**Event of Default**" has the meaning assigned to such term in Article 6.

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Global Note**" means a Note in registered global form without interest coupons.

"**Guarantee**" means any obligation of a Person to pay the Debt of another Person, including without limitation:

(1)      an obligation to pay or purchase such Debt;

(2)      an obligation to lend money or to purchase or subscribe shares or other securities or to purchase assets or services in order to provide funds for the payment of such Debt; or

(3)      any other agreement to be responsible for such Debt.

The term "**Guarantee**" used as a verb has a corresponding meaning.

"**Guarantor**" means, at any time, each Person guaranteeing the Issuer's obligations under this Indenture.

"**Hedging Agreement**" means, with respect to any Person, all net obligations of such Person in respect of any interest rate protection agreement, any currency or commodity swap, cap or collar agreement, any equity swap or any similar arrangement entered into by such Person providing for the transfer or mitigation of interest rate, currency, commodity price or equity risks either generally or under specific contingencies (but without regard to any notional principal amount relating thereto).

 "**Holder**" or "**Noteholder**" means the registered holder of any Note.

"**IASB**" means the International Accounting Standards Board.

"**Indenture**" means this indenture, as amended or supplemented from time to time.

"**Independent Investment Banker**" means one of the Reference Treasury Dealers appointed by the Issuer.

"**Initial Notes**" means the Notes issued on the date hereof.

5

"**Initial Purchaser**" or "**Initial Purchasers**" means any initial purchaser or initial purchasers party to a purchase agreement with the Issuer relating to the sale of the Notes or Additional Notes by the Issuer.

"**Interest Payment Date**" means each January 20 and July of each year, commencing on July 20, 2017.

"**Investment Grade**" means BBB- or higher by Standard & Poor's, Baa3 or higher by Moody's or BBB- or higher by Fitch, or the equivalent of such global ratings by Standard & Poor's, Moody's or Fitch.

"**Issue Date**" means the date on which the Notes are originally issued under this Indenture.

"**Issuer**" means the party named as such in the first paragraph of this Indenture or any successor obligor under this Indenture and the Notes pursuant to Section 5.01.

"**Lien**" means any mortgage, pledge, usufruct, fiduciary transfer (*alienação* or *cessão fiduciária*), charge or other encumbrance, lien, security interest or any preferential arrangement (including a securitization) that has the practical effect of creating a security interest.

"**Luxembourg**" means the Grand Duchy of Luxembourg.

"**Material Adverse Effect**" means (i) any material adverse effect on the condition (financial or otherwise), business, properties,  results of operations or prospects of the Guarantors and their Subsidiaries taken as a whole and (ii) any material adverse effect on the ability of the Issuer or the Guarantors to perform their respective obligations under this Indenture, the Notes or Guarantees.

"**Maturity Date**" means January 20, 2027.

"**Minimum Withholding Level**" has the meaning assigned to such term in Section 3.03.

"**Moody's**" means Moody's Investors Services.

"**Non U.S. Person**" has the meaning assigned to such term in Regulation S.

"**Notes**" has the meaning assigned to such term in the Recitals.

 "**Offering Memorandum**" means the final offering memorandum dated January 12, 2017 prepared by the Issuer in connection with the Notes.

"**Officer**" means a director, the president or chief executive officer, any vice president, the chief financial officer, the treasurer or any assistant treasurer, or the secretary or any assistant secretary, or any attorney-in-fact of each of the Issuer and the Guarantors, as applicable, or any other Person duly appointed by the shareholders of each

of the Issuer and the Guarantors, as applicable, or the Board of Directors to perform corporate duties.

"**Officer's Certificate**" means a certificate of each of the Issuer or the Guarantors, as applicable, signed in the name of (i) the Issuer, as applicable, by any director, the president or chief executive officer, any vice president, the chief financial officer, the treasurer or any assistant treasurer or the secretary or any assistant secretary or attorney-in-fact of the Issuer or (ii) each Guarantor, as applicable, by any two of a director, the president or chief executive officer, any vice president, the chief financial officer, the treasurer or any assistant treasurer or the secretary or any assistant secretary or attorney-in-fact of each Guarantor.

"**Offshore Global Note**" means a Global Note representing Notes issued and sold pursuant to Regulation S.

"**Opinion of Counsel**" means a written opinion from legal counsel who may be an employee of or counsel to the Issuer, which opinion shall be reasonably acceptable to the Trustee.

"**Outstanding**", shall have the meaning given to it in Section 2.05.

"**Paying Agent**" refers to the Principal Paying Agent and to U.S. Bank National Association in its capacity as paying agent, and such other paying agents as the Issuer shall appoint.

"**Payment Date**" means an Interest Payment Date or any other date on which payments on the Notes in respect of principal, interest or other amounts, including as a result of any acceleration of the Notes, are required to be paid pursuant to this Indenture and the Notes.

"**Permitted Liens**" means:

(1)      any Liens existing on the Issue Date;

(2)      any Lien extending, renewing or replacing (or successive extensions, renewals or replacements of), in whole or in part, any Lien existing on the Issue Date; provided that the principal amount of Debt secured thereby shall not exceed the principal amount of Debt so secured at the time of such extension, renewal or replacement, except for any increase reflecting premiums, fees and expenses in connection with such extension, renewal or replacement, and that such extension, renewal or replacement shall be limited to all or a part of the property which secured the Lien so extended, renewed or replaced;

(3)      any Liens created solely for the purpose of securing the payment of all or a part of the purchase price (or the cost of construction or improvement, and any related transaction fees and expenses) of assets or Property (including Capital Stock of any Person) acquired, constructed or improved after the date hereof; provided that (a) the aggregate principal amount of Debt secured by such Liens

shall not exceed the purchase price of the assets or Property so acquired, constructed or improved, (b) such Liens shall not encumber any assets or Property other than the assets or Property so acquired, constructed or improved and (c) other than any unimproved real property on which the Property so constructed, or the improvement, is located shall attach to such assets or Property within 365 days of the construction, acquisition or improvement of such assets or Property;

(4)      any Liens imposed by applicable law incurred in the ordinary course of business, including carriers', warehousemen's and mechanics' liens, statutory landlord's liens, customary reservations or retentions of title easements, rights-of-way, defects, zoning restrictions and other similar charges or encumbrances in respect of real property and other similar liens and encumbrances arising in the ordinary course of business, in each case that: (i) do not in the aggregate materially detract from the value of the Property subject thereto or materially impair the use thereof in the operations of the business of the Person owning such property or (ii) are being contested in good faith by appropriate proceedings promptly initiated and diligently conducted, which proceedings have  the effect of preventing the forfeiture or sale of the Property subject to such liens and/or encumbrances and for which adequate reserves have been made in required in accordance with Applicable GAAP;

(5)      any Liens securing taxes, assessments and other governmental charges or levies, in each case the payment of which is not yet due or is being contested in good faith by appropriate proceedings diligently conducted and for which such reserve or other appropriate provisions, if any, as shall be required by Applicable GAAP shall have been made;

(6)      pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other similar social security legislation;

(7)      encumbrances, security deposits or reserves maintained in the ordinary course of business and required by applicable law;

(8)      any Liens (i) granted to secure borrowings directly or indirectly from Banco Nacional de Desenvolvimento Econômico e Social-BNDES, or any other federal, regional or state Brazilian governmental development bank or credit agency (including borrowings from any Brazilian governmental bank with funds provided by Brazilian governmental regional funds (which shall include, without limitation, Financiadora de Estudos e Projetos – FINEP, Fundo de Desenvolvimento do Nordeste – FDNE and Fundo de Desenvolvimento do Centro Oeste – FCO)) or (ii) granted to secure borrowings from any international or multilateral development bank, government-sponsored agency, export- import bank or official export-import credit insurer, export-credit agency or commercial bank acting as co-lender in any of the foregoing;

(9)      any Liens in favor of issuers of surety bonds, appeal bonds, bid bonds, tender bonds, letters of credit or similar instruments issued pursuant to the request

8

of and for the account of any of the Issuer or the Guarantors or any of their Subsidiaries in the ordinary course of business (including all bonds required by law, contract or tender rules);

(10)    any Liens securing any hedge or swap agreements, so long as such hedge or swap agreements are entered into for bona fide, non-speculative purposes;

(11)    any Liens existing on any Property of any Person before that Person's acquisition (in whole or in part) by, merger into or consolidation with any of the Issuer or the Guarantors after the Issue Date; provided that the Lien is not created in contemplation of or in connection with such acquisition, merger or consolidation and such Lien does not extend to any other property of the Issuer or the Guarantors;

(12)    any Liens on inventory, receivables and related assets of any of the Issuer, the Guarantors or any of their Subsidiaries securing the obligations of the Issuer, such Guarantor or Subsidiary, as applicable, under any lines of credit or working capital or export or import trade finance facility; provided that the aggregate principal amount of Debt incurred that is secured by such receivables that shall fall due in any calendar year shall not exceed (i) with respect to transactions secured by receivables from export sales, 80% of the Issuer and the Guarantors' combined consolidated gross revenues from export sales for the most recently concluded period of four consecutive fiscal quarters, or (ii) with respect to transactions secured by receivables from domestic sales, 80% of the Issuer and the Guarantors' combined consolidated gross revenues from sales in Brazil for the most recently concluded period of four consecutive fiscal quarters; provided that advance transactions will not be deemed transactions secured by receivables, inventory or related assets for purposes of the above calculations;

(13)    any judgment Lien not giving rise to an Event of Default;

(14)    any interest or title of a lessor under any capitalized lease obligation; provided that such Liens do not extend to any property or assets which is not leased property subject to such capitalized lease obligation;

(15)    any Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of a Guarantor or any of its Subsidiaries, including rights of offset and set-off;

(16)    any Liens securing the Notes and all other monetary obligations under the Indenture and the Guarantees;

(17)    any Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(18)    any rights of set-off of any person with respect to any deposit account of the Guarantor or any Subsidiary arising in the ordinary course of business and not constituting a financing transaction; and

9

(19)    other Liens securing obligations in an aggregate amount not exceeding the greater of: (i) U.S.$2.1 billion (or the equivalent thereof at the time of determination) and (ii) 20% of the Total Consolidated Assets.

"**Person**" means any individual, corporation, company, voluntary association, partnership, limited liability company, joint venture, trust, unincorporated association, governmental authority or other entity of whatever nature.

"**Property**" of any Person means any property, rights, revenues, or interest therein, of such Person.

"**principal**" of any Debt means the principal amount of such Debt, (or if such Debt was issued with original issue discount, the face amount of such Debt less the remaining unamortized portion of the original issue discount of such Debt), together with, unless the context otherwise indicates, any premium then payable on such Debt.

"**Principal Paying Agent**" means U.S. National Bank Association, or such other principal paying agent as the Issuer shall appoint.

"**Rating Agency**" means each of (1) Standard & Poor's, (2) Moody's and (3) Fitch, or their respective successors.

"**Rating Decline**" means that at any time within 90 days (which period shall be extended so long as the rating of the Notes is under publicly announced consideration for possible downgrade by either Rating Agency) after the date of public notice of a Change of Control, or of evidence of the  Issuer's or the Guarantors' intention to effect a Change of Control (i) in the event the Notes are assigned an Investment Grade rating by at least two of the Rating Agencies prior to such public notice, the rating of the Notes by at least two of the Rating Agencies shall be below an Investment Grade rating; or (ii) in the event the Notes are rated below an Investment Grade rating by at least two of the Rating Agencies prior to such public notice, the rating of the Notes by at least two of the Rating Agencies shall be decreased by one or more categories; provided that any such Rating Decline is in whole or in part in connection with a Change of Control.

"**Reference Treasury Dealer**" means Citigroup Global Markets Inc., J.P. Morgan Securities LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated or its affiliates which are primary United States government securities dealers and three other leading primary United States government securities dealers in New York City reasonably designated by the Issuer; provided, however, that if any of the foregoing shall cease to be a primary United States government securities dealer in New York City (a "Primary Treasury Dealer"), the Issuer will substitute therefor another Primary Treasury Dealer.

"**Reference Treasury Dealer Quotation**" means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Independent Investment Banker, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the

Independent Investment Banker by such Reference Treasury Dealer at 3:30 p.m. New York time on the third Business Day preceding such redemption date.

"**Register**" has the meaning assigned to such term in Section 2.09.

"**Registrar**" means U.S. Bank National Association.

"**Regular Record Date**" for the interest or principal payable on any Payment Date means January 18 or July 18 (whether or not a Business Day) immediately preceding such Payment Date.

"**Regulation S**" means Regulation S under the Securities Act.

"**Regulation S Certificate**" means a certificate substantially in the form of Exhibit D hereto.

"**Relevant Date**" means, with respect to any payment on a Note, whichever is the later of: (i) the date on which such payment first becomes due; and (ii) if the full amount payable has not been received by the Trustee on or prior to such due date, the date on which notice is given to the Holders that the full amount has been received by the Trustee.

"**Relevant Resolution Authority**" means the resolution authority with the ability to exercise any Bail-in Powers in relation to the relevant BRRD Party.

"**Responsible Officer**" means, with respect to the Trustee, any officer of the Trustee who shall have direct responsibility for the administration of the Indenture.

"**Restricted Legend**" means the legend set forth in Exhibit B.

"**Rule 144A**" means Rule 144A under the Securities Act.

"**Rule 144A Certificate**" means (i) a certificate substantially in the form of Exhibit E hereto or (ii) a written certification addressed to the Issuer and the Trustee to the effect that the Person making such certification (x) is acquiring such Note (or beneficial interest) for its own account or one or more accounts with respect to which it exercises sole investment discretion and that it and each such account is a qualified institutional buyer within the meaning of Rule 144A, (y) is aware that the transfer to it or exchange, as applicable, is being made in reliance upon the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A, and (z) acknowledges that it has received such information regarding the Issuer as it has requested pursuant to Rule 144A(d)(4) or has determined not to request such information to the extent that the Issuer is not then subject to Section 13 or 15(d) of the Exchange Act, or is not exempt from reporting pursuant to Rule 12g3 2(b) under the Exchange Act.

"**S&P**" means Standard & Poor's.

"**SEC**" or "**Commission**" means the U.S. Securities and Exchange Commission, as from time to time constituted, created under the Securities Exchange Act of 1934, or, if at any time after execution of this instrument such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body performing such duties on such date.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Significant Subsidiary**" means, with respect to any Person, any Subsidiary of such Person which at the time of determination had assets which, as of the date of Person's most recent quarterly combined consolidated balance sheet, constituted at least 10% of the Person's total assets, determined on the basis of the combined consolidated assets of such Person and its Subsidiaries as of such date.

"**Spot Rate**" means, for any currency, the spot rate at which that currency is offered for sale against United States dollars as published in The Wall Street Journal on the Business Day immediately preceding the date of determination or, if that rate is not available in that publication, as published in any publicly available source of similar market data, as determined by the Issuer.

"**Stated Maturity**" means (i) with respect to any Debt, the date specified as the fixed date on which the final installment of principal of such Debt is due and payable or (ii) with respect to any scheduled installment of principal of or interest on any Debt, the date specified as the fixed date on which such installment is due and payable as set forth in the documentation governing such Debt.

"**Subsidiary**" means, with respect to any Person, any corporation or other entity that has more than 50% of the Voting Stock in which is owned or controlled, directly or indirectly, by such Person and/or by any Subsidiary of such Person.

"**Successor Corporation**" has the meaning assigned to such term in Section 5.01.

"**Threshold Amount**" has the meaning assigned to such term in Section 6.01(c).

"**Total Consolidated As**sets" means the total amount of combined consolidated assets of the Guarantors prepared in accordance with Applicable GAAP.

"**Transfer Agent**" refers to U.S. Bank National Association in its capacity as transfer agent and such other transfer agents as the Issuer shall appoint.

"**Treasury Rate**" means, with respect to any redemption date, the rate per annum equal to the semiannual equivalent yield to maturity or interpolated maturity (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date, as calculated by the Issuer.

"**Trust Indenture Act**" or "**TIA**" means the U.S. Trust Indenture Act of 1939, as amended and as in force at the date as of which this Indenture was executed.

"**Trustee**" means the party named as such in the first paragraph of this Indenture or any successor trustee under this Indenture pursuant to Article 7.

"**U.S. Global Note**" means a Global Note that bears the Restricted Legend representing Notes issued and sold pursuant to Rule 144A.

"**U.S. Government Obligations**" means obligations issued or directly and fully guaranteed or insured by the United States of America or by any agent or instrumentality thereof, provided that the full faith and credit of the United States of America is pledged in support thereof.

"**Voting Stock**" means  Capital Stock in such Person having power to vote for the election of directors or similar officials of such Person or otherwise voting with respect to actions of such Person (other than such Capital Stock having such power only by reason of the happening of a contingency).

Section 1.02. *Rules of Construction*.  Unless the context otherwise requires or except as otherwise expressly provided,

(i)     an accounting term not otherwise defined has the meaning assigned to it in accordance with Applicable GAAP;

(ii)     "herein," "hereof" and other words of similar import refer to the Indenture as a whole and not to any particular Section, Article or other subdivision;

(iii)     all references to "Dollars" US$ and "$" shall mean the lawful currency of the United States of America;

(iv)     all references to Sections or Articles or Exhibits refer to Sections or Articles or Exhibits of or to the Indenture unless otherwise indicated;

(v)     references to agreements or instruments, or to statutes or regulations, are to such agreements or instruments, or statutes or regulations, as amended from time to time (or to successor statutes and regulations);

(vi)     in the event that a transaction meets the criteria of more than one category of permitted transactions or listed exceptions, the Issuer may classify such transaction as it, in its sole discretion, determines;

(vii)     words in the singular include the plural, and in the plural include the singular; and

(viii)     all other terms used herein which are defined in the TIA, either directly or by reference therein, have the meanings assigned to them therein, and the terms "cash transaction" and "self-liquidating paper," as used in TIA Section 311, shall have the meanings assigned to them in the rules of the Commission adopted under the TIA.

## ARTICLE 2
## THE NOTES

Section 2.01. *Form, Dating and Denominations; Legends*.  (a) The Notes and the Trustee's certificate of authentication will be substantially in the form attached as Exhibit A.  The terms and provisions contained in the form of the Notes annexed as Exhibit A constitute, and are hereby expressly made, a part of this Indenture.  The Notes may have notations, legends or endorsements required by law, rules of or agreements with national securities exchanges to which the Issuer is subject, or usage.  Each Note will be dated the date of its authentication.  The Notes will be issuable in denominations of US$200,000 in original principal amount and any multiple of US$1,000 in excess thereof.

(b)    (i) Except as otherwise provided in paragraph (c) below or Section 2.09(b)(iv), each Initial Note or Additional Note will bear the Restricted Legend.

(ii)    Each Global Note, whether or not an Initial Note or Additional Note, will bear the DTC Legend.

(iii)    Initial Notes and Additional Notes offered and sold in reliance on Regulation S will be issued as provided herein.

(iv)    Initial Notes and Additional Notes offered and sold in reliance on any exception under the Securities Act other than Regulation S and Rule 144A will be issued, and upon the request of the Issuer to the Trustee, Initial Notes offered and sold in reliance on Rule 144A may be issued, in the form of Certificated Notes.

(c)    If the Issuer determines (upon the advice of counsel and such other certifications and evidence as the Issuer may reasonably require) that a Note is eligible for resale pursuant to Rule 144(k) under the Securities Act (or a successor provision) and that the Restricted Legend is no longer necessary or appropriate in order to ensure that subsequent transfers of the Note (or a beneficial interest therein) are effected in compliance with the Securities Act, the Issuer may instruct the Trustee in writing to cancel the Note and issue to the Holder thereof (or to its transferee) a new Note of like tenor and amount, registered in the name of the Holder thereof (or its transferee), that does not bear the Restricted Legend, and the Trustee will comply with such instruction provided that the Trustee has received an Officer's Certificate and Opinion of Counsel and such other evidence as the Trustee may require to comply with such action.

(d)    By its acceptance of any Note bearing the Restricted Legend (or any beneficial interest in such a Note), each Holder thereof and each owner of a beneficial interest therein acknowledges the restrictions on transfer of such Note (and any such beneficial interest) set forth in this Indenture and in the Restricted Legend and agrees that it will transfer such Note (and any such beneficial interest) only in accordance with this Indenture and such legend.

Section 2.02. *Execution and Authentication; Additional Notes*.  (a) An Officer or authorized representative shall execute the Notes for the Issuer by facsimile or manual signature in the name and on behalf of the Issuer.  If an Officer or authorized representative whose signature is on a Note no longer holds that office at the time the Note is authenticated, the Note will still be valid.  The original Notes will be delivered to the Trustee as custodian for the Depositary promptly after execution.

(b)     A Note will not be valid until the Trustee or the Authenticating Agent manually signs the certificate of authentication on the Note, with the signature constituting conclusive evidence that the Note has been authenticated under this Indenture.

(c)     At any time and from time to time after the execution and delivery of this Indenture, the Issuer may deliver Notes executed by the Issuer to the Trustee or the Authenticating Agent for authentication.  The Trustee or the Authenticating Agent will authenticate and deliver:

(i)     Notes for original issue in the aggregate principal amount not to exceed US$500,000,000; and

(ii)     Additional Notes from time to time for original issue in aggregate principal amounts specified by the Issuer, which Additional Notes will be treated as a single class with the Initial Notes issued under this Indenture, including, without limitation, waivers, amendments, redemptions and offers to purchase, and shall vote together for all purposes as a single class;

after receipt by the Trustee of an order of the Issuer to authenticate the Notes (the "Authentication Order") and an Officer's Certificate of the Issuer specifying:

(i)     the amount of Notes to be authenticated and the date on which the Notes are to be authenticated;

(ii)     whether the Notes are to be Initial Notes or Additional Notes;

(iii)     in the case of Additional Notes, that the issuance of such Notes does not contravene any provision of Article 4;

(iv)     whether the Notes are to be issued as one or more Global Notes or Certificated Notes; and

(v)     other information the Issuer may determine to include or the Trustee may reasonably request.

(d)     The Trustee shall be fully protected in relying upon the Authentication Order and the Officer's Certificate set forth above.

Section 2.03. *Registrar, Paying Agent and Authenticating Agent; Paying Agent to Hold Money in Trust*.  (a)   The Issuer may appoint one or more

15

Registrars and one or more Paying Agents, and the Trustee may appoint, with a copy of any such appointment to the Issuer, an Authenticating Agent, in which case each reference in this Indenture to the Trustee in respect of the obligations of the Trustee to be performed by that Agent will be deemed to be references to that Agent. The Issuer may act as Registrar or Paying Agent. In each case the Issuer and the Trustee will enter into an appropriate agreement with that Agent implementing the provisions of this Indenture relating to the obligations of the Trustee to be performed by the Agent and the related rights. The Issuer initially appoints the Trustee as Registrar and as a Paying Agent. The Registrar shall provide to the Issuer a current copy of such register from time to time upon written request of the Issuer or each time the register of Holders is amended. The Issuer hereby appoints upon the terms and subject to the conditions herein set forth (i) U.S. Bank National Association as Principal Paying Agent, where Notes may be presented for payment and (ii) Banque Internationale à Luxembourg S.A., at any time that the Notes are listed on the Official List of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market, located in Luxembourg where Notes may be presented for payment.

(b)    The Issuer will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of the Holders or the Trustee all money held by the Paying Agent for the payment of principal of and interest on the Notes and will promptly notify the Trustee of any Default by the Issuer in making any such payment. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee and account for any funds disbursed, and the Trustee may at any time during the continuance of any payment default, upon written request to a Paying Agent, require the Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed. Upon doing so, the Paying Agent will have no further liability for the money so paid over to the Trustee.

Section 2.04. *Replacement Notes*. If a mutilated Note is surrendered to the Trustee or if a Holder claims that its Note has been lost, destroyed or wrongfully taken, the Issuer will issue and the Trustee will authenticate, upon provision of evidence satisfactory to the Trustee that such Note was lost, destroyed or wrongfully taken, a replacement Note of like tenor and principal amount and bearing a number not contemporaneously Outstanding. Every replacement Note is an additional obligation of the Issuer and entitled to the benefits of this Indenture. If required by the Trustee or the Issuer, an indemnity must be furnished that is sufficient in the judgment of both the Trustee and the Issuer to protect the Issuer and the Trustee from any loss they may suffer if a Note is replaced. The Issuer and the Trustee may charge the Holder for the expenses of the Issuer and the Trustee in replacing a Note. In case the mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Issuer in its discretion may pay the Note instead of issuing a replacement Note.

Section 2.05. *Outstanding Notes*. (a) Notes Outstanding at any time are all Notes that have been authenticated by the Trustee except for:

(i)    Notes cancelled by the Trustee or delivered to it for cancellation;

(ii)    any Note which has been replaced pursuant to Section 2.04 unless and until the Trustee and the Issuer receive proof satisfactory to them that the replaced Note is held by a protected purchaser; and

(iii)    on or after the Maturity Date or any redemption date, those Notes payable or to be redeemed on that date for which the Trustee (or Paying Agent, other than the Issuer or an Affiliate of the Issuer) holds money sufficient to pay all amounts then due thereunder.

(b)    A Note does not cease to be Outstanding because the Issuer or one of its Affiliates holds the Note, provided that in determining whether the Holders of the requisite principal amount of the Outstanding Notes have given or taken any request, demand, authorization, direction, notice, consent, waiver or other action hereunder, Notes owned by the Issuer or any Affiliate of the Issuer will be disregarded and deemed not to be Outstanding (it being understood that in determining whether the Trustee is protected in relying upon any such request, demand, authorization, direction, notice, consent, waiver or other action, only Notes in respect of which a Responsible Officer of the Trustee has received written notice from the Issuer that such Notes are so owned will be so disregarded). Notes so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right to so act with respect to such Notes and that the pledgee is not the Issuer or any Affiliate of the Issuer.

Section 2.06. *Temporary Notes*. Until definitive Notes are ready for delivery, the Issuer may prepare and the Trustee will authenticate temporary Notes. Temporary Notes will be substantially in the form of definitive Notes but may have insertions, substitutions, omissions and other variations determined to be appropriate by the Officer executing the temporary Notes, as evidenced by the execution of the temporary Notes. If temporary Notes are issued, the Issuer will cause definitive Notes to be prepared without unreasonable delay. After the preparation of definitive Notes, the temporary Notes will be exchangeable for definitive Notes upon surrender of the temporary Notes at the office or agency of the Issuer designated for such purpose pursuant to Section 4.02, without charge to the Holder. Upon surrender for cancellation of any temporary Notes the Issuer will execute and the Trustee will authenticate and deliver in exchange therefor a like principal amount of definitive Notes of authorized denominations. Until so exchanged, the temporary Notes will be entitled to the same benefits under this Indenture as definitive Notes.

Section 2.07. *Cancellation*. The Issuer at any time may, but shall not be obligated to, deliver to the Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer may have acquired in any manner whatsoever, and may deliver to the Trustee for cancellation any Notes previously authenticated hereunder which the Issuer has not issued and sold. Any Registrar or Paying Agent will forward to the Trustee any Notes surrendered to it for transfer, exchange or payment. The Trustee will cancel all Notes surrendered for transfer, exchange, payment or cancellation and dispose of them in accordance with its normal procedures or the written instructions of the Issuer; provided that the Trustee shall not be required to destroy

cancelled Notes.  The Issuer may not issue new Notes to replace Notes it has paid in full or delivered to the Trustee for cancellation.

Section 2.08.  *CUSIP and ISIN Numbers*.  The Issuer in issuing the Notes may use "CUSIP" and "ISIN" numbers, and the Trustee will use CUSIP numbers or ISIN numbers in notices of redemption or exchange or in Offers to Purchase as a convenience to Holders; the notice should state that no representation is made by the Issuer or the Trustee as to the correctness of such  numbers either as printed on the Notes or as contained  in any notice of redemption or exchange.  The Issuer will promptly notify the Trustee in writing of any change in the CUSIP or ISIN numbers.

Section 2.09.  *Registration, Transfer and Exchange*.  (a)  The Notes will be issued in registered form only, without coupons, and the Issuer shall cause the Trustee to maintain a register (the "Register") of the Notes, for registering the record ownership of the Notes by the Holders and transfers and exchanges of the Notes.

(b)     (i) Each Global Note will be registered in the name of the Depositary or its nominee and, so long as DTC is serving as the Depositary thereof, will bear the DTC Legend.

(ii)     Each Global Note will be delivered to the Trustee as custodian for the Depositary.  Transfers of a Global Note (but not a beneficial interest therein) will be limited to transfers thereof in whole, but not in part, to the Depositary, its successors or their respective nominees, except (1) as set forth in Section 2.09(b)(iv) and (2) transfers of portions thereof in the form of Certificated Notes may be made upon request of an Agent Member (for itself or on behalf of a beneficial owner) by written notice given to the Trustee by or on behalf of the Depositary in accordance with customary procedures of the Depositary and in compliance with this Section and Section 2.10.

(iii)     Agent Members will have no rights under this Indenture with respect to any Global Note held on their behalf by the Depositary, and the Depositary may be treated by the Issuer, the Trustee and any agent of the Issuer or the Trustee as the absolute owner and Holder of such Global Note for all purposes whatsoever.  Notwithstanding the foregoing, the Depositary or its nominee may grant proxies and otherwise authorize any Person (including any Agent Member and any Person that holds a beneficial interest in a Global Note through an Agent Member) to take any action which a Holder is entitled to take under this Indenture or the Notes, and nothing herein will impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

(iv)     If (x) the Depositary (A) notifies the Issuer that it is unwilling or unable to continue as Depositary for a Global Note and the Depositary fails to appoint a successor depositary within 90 days of the notice or (B) has ceased to be a clearing agency registered under the Exchange Act; (y) subject to the procedures of the Depositary, the Issuer notifies the Trustee in writing that the Issuer elects to

cause the issuance of certificated Notes or (z) there has occurred and is continuing a Default or Event of Default and the Trustee has received a request from the Depositary, the Trustee will promptly exchange each beneficial interest in the Global Note for one or more Certificated Notes in authorized denominations having an equal aggregate principal amount registered in the name of the owner of such beneficial interest, as identified to the Trustee by the Depositary, and thereupon the Global Note will be deemed canceled.  If such Note does not bear the Restricted Legend, then the Certificated Notes issued in exchange therefor will not bear the Restricted Legend.  If such Note bears the Restricted Legend, then the Certificated Notes issued in exchange therefor will bear the Restricted Legend.

(c)     Each Certificated Note will be registered in the name of the Holder thereof or its nominee.

(d)     A Holder may transfer a Note (or a beneficial interest therein) to another Person or exchange a Note (or a beneficial interest therein) for another Note or Notes of any authorized denomination by presenting to the Trustee a written request therefor stating the name of the proposed transferee or requesting such an exchange, accompanied by any certification, opinion or other document required by Section 2.10.  The Trustee will promptly register any transfer or exchange that meets the requirements of this Section by noting the same in the register maintained by the Trustee for the purpose; *provided* that:

(i)     no transfer or exchange will be effective until it is registered in such register, and

(ii)     the Trustee will not be required (w) to issue, register the transfer of or exchange any Note for a period of 15 days before a selection of Notes to be redeemed, (x) to register the transfer of or exchange any Note so selected for redemption in whole or in part, except, in the case of a partial redemption, that portion of any Note not being redeemed, (y) to register any Note between a Regular Record Date and the corresponding Payment Date, or (z) if a redemption is to occur after a Regular Record Date but on or before the corresponding Payment Date, to register the transfer of or exchange any Note on or after the Regular Record Date and before the date of redemption.  Prior to the registration of any transfer, the Issuer, the Trustee and their agents will treat the Person in whose name the Note is registered as the owner and Holder thereof for all purposes (whether or not the Note is overdue), and will not be affected by notice to the contrary.

From time to time the Issuer will execute and the Trustee will authenticate additional Notes as necessary in order to permit the registration of a transfer or exchange in accordance with this Section.

No service charge will be imposed in connection with any transfer or exchange of any Note, but the Issuer and the Trustee may require payment of a sum sufficient to cover

any transfer tax or similar governmental charge payable in connection therewith (other than a transfer tax or other similar governmental charge payable upon exchange pursuant to subsection (b)(iv)).

(e)    (i) *Global Note to Global Note*.  If a beneficial interest in a Global Note is transferred or exchanged for a beneficial interest in another Global Note, the Trustee will (x) record a decrease in the principal amount of the Global Note being transferred or exchanged equal to the principal amount of such transfer or exchange and (y) record a like increase in the principal amount of the other Global Note.  Any beneficial interest in one Global Note that is transferred to a Person who takes delivery in the form of an interest in another Global Note, or exchanged for an interest in another Global Note, will, upon transfer or exchange, cease to be an interest in such Global Note and become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer and exchange restrictions, if any, and other procedures applicable to beneficial interests in such other Global Note for as long as it remains such an interest.

(ii)    *Global Note to Certificated Note*.  If a beneficial interest in a Global Note is transferred or exchanged for a Certificated Note, the Trustee will (x) record a decrease in the principal amount of such Global Note equal to the principal amount of such transfer or exchange and (y) deliver one or more new Certificated Notes in authorized denominations having an equal aggregate principal amount to the transferee (in the case of a transfer) or the owner of such beneficial interest (in the case of an exchange), registered in the name of such transferee or owner, as applicable.

(iii)    *Certificated Note to Global Note*.  If a Certificated Note is transferred or exchanged for a beneficial interest in a Global Note, the Trustee will (x) cancel such Certificated Note, (y) record an increase in the principal amount of such Global Note equal to the principal amount of such transfer or exchange and (z) in the event that such transfer or exchange involves less than the entire principal amount of the canceled Certificated Note, deliver to the Holder thereof one or more new Certificated Notes in authorized denominations having an aggregate principal amount equal to the untransferred or unexchanged portion of the canceled Certificated Note, registered in the name of the Holder thereof.

(iv)    *Certificated Note to Certificated Note*.  If a Certificated Note is transferred or exchanged for another Certificated Note, the Trustee will (x) cancel the Certificated Note being transferred or exchanged, (y) deliver one or more new Certificated Notes in authorized denominations having an aggregate principal amount equal to the principal amount of such transfer or exchange to the transferee (in the case of a transfer) or the Holder of the canceled Certificated Note (in the case of an exchange), registered in the name of such transferee or Holder, as applicable, and (z) if such transfer or exchange involves less than the entire principal amount of the canceled Certificated Note, deliver to the Holder thereof one or more Certificated Notes in authorized denominations having an aggregate principal amount equal to the untransferred or unexchanged portion of the canceled Certificated Note, registered in the name of the Holder thereof.

20

Section 2.10. *Restrictions on Transfer and Exchange.* (a) The transfer or exchange of any Note (or a beneficial interest therein) may only be made in accordance with this Section and Section 2.09 and, in the case of a Global Note (or a beneficial interest therein), the applicable rules and procedures of the Depositary. The Trustee shall refuse to register any requested transfer or exchange that does not comply with the preceding sentence.

(b)    Subject to paragraph (c), the transfer or exchange of any Note (or a beneficial interest therein) of the type set forth in column A below for a Note (or a beneficial interest therein) of the type set forth opposite column B below may only be made in compliance with the certification requirements (if any) described in the clause of this paragraph set forth opposite column C below.

| A | B | C |
|---|---|---|
| U.S. Global Note | U.S. Global Note | (1) |
| U.S. Global Note | Offshore Global Note | (2) |
| U.S. Global Note | Certificated Note | (3) |
| Offshore Global Note | U.S. Global Note | (4) |
| Offshore Global Note | Offshore Global Note | (1) |
| Offshore Global Note | Certificated Note | (3) |
| Certificated Note | U.S. Global Note | (4) |
| Certificated Note | Offshore Global Note | (2) |
| Certificated Note | Certificated Note | (3) |

(1)    No certification is required.

(2)    The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee a duly completed and executed Regulation S Certificate; provided that if the requested transfer or exchange is made by the Holder of a Certificated Note that does not bear the Restricted Legend, then no certification is required.

(3)    The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee (x) a duly completed and executed Rule 144A Certificate or (y) a duly completed and executed Regulation S

21

Certificate, and/or an Opinion of Counsel and such other certifications and evidence as the Issuer may reasonably require in order to determine that the proposed transfer or exchange is being made in compliance with the Securities Act and any applicable securities laws of any state of the United States; provided that if the requested transfer or exchange is made by the Holder of a Certificated Note that does not bear the Restricted Legend, then no certification is required.  In the event that (i) a duly completed and executed Regulation S Certificate is delivered to the Trustee or (ii) a Certificated Note that does not bear the Restricted Legend is surrendered for transfer or exchange, upon transfer or exchange the Trustee will deliver a Certificated Note that does not bear the Restricted Legend.

(4)    The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee a duly completed and executed Rule 144A Certificate.

(c)    No certification is required in connection with any transfer or exchange of any Note (or a beneficial interest therein) after such Note is eligible for resale pursuant to Rule 144(k) under the Securities Act (or a successor provision); provided that the Issuer has provided the Trustee with an Officer's Certificate and an Opinion of Counsel to that effect, and the Issuer may require from any Person requesting a transfer or exchange in reliance upon this clause an Opinion of Counsel and any other reasonable certifications and evidence in order to support such certificate.

Any Certificated Note delivered in reliance upon this paragraph will not bear the Restricted Legend.

(d)    The Trustee will retain copies of all certificates, opinions and other documents received in connection with the transfer or exchange of a Note (or a beneficial interest therein), and the Issuer will have the right to inspect and make copies thereof at any reasonable time upon written notice within a reasonable period of time to the Trustee.

(e)    No transfer or exchange of any Note shall take place during the first 40 days after the execution of the Indenture.

Section 2.11.  *Open Market Purchases*.  The Issuer or its Affiliates may at any time purchase Notes in the open market or otherwise at any price; *provided* that Notes that the Issuer or its Affiliates purchase may, in their respective discretion, be held, resold or cancelled, but will only be held or resold in compliance with applicable requirements or exemptions under the relevant securities laws.

Section 2.12.  *Trustee's Disclaimer*.  (a)  The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restriction on transfer imposed under this Indenture or under applicable law with respect to any transfer of interest in any Note (including any transfers between or among participants in DTC or beneficial owners of interest in Global Notes) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the

same to determine substantial compliance as to form with the express requirements hereof.

(b)  The Trustee shall have no responsibility or obligation to any beneficial owner of a Global Note, a member of, or a participant in, DTC or other Person with respect to the accuracy of the records of DTC or its nominee or of any participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any participant, member, beneficial owner or other Person (other than DTC) of any notice (including any notice of redemption or purchase) or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes. All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to the registered Holders (which shall be DTC or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through DTC subject to the applicable rules and procedures of DTC. The Trustee may rely and shall be fully protected in relying upon information furnished by DTC with respect to its members, participants and any beneficial owners.

## ARTICLE 3
## ADDITIONAL AMOUNTS; REDEMPTION

Section 3.01.  *Additional Amounts*.  (a) All payments by the Issuer in respect of the Notes or by a Guarantor in respect of the Guarantees will be made without withholding or deduction for or on account of any present or future taxes, duties, assessments, or other governmental charges of whatever nature imposed or levied by or on behalf of Luxembourg, Brazil or any other jurisdiction or political subdivision thereof from or through which a payment is made or in which the Issuer or a Guarantor (or any successor to the Issuer or a Guarantor) is organized or is a resident for tax purposes having power to tax (a "**Relevant Taxing Jurisdiction**"), unless the Issuer or a Guarantor, as applicable, is required by law to deduct or withhold such taxes, duties, assessments, or governmental charges.  In that event, the Issuer or a Guarantor, as applicable, will make the required deduction or withholding, make payment of the amount so withheld to the appropriate governmental authority and pay such additional amounts as may be necessary to ensure that the net amounts received by Holders of Notes after such withholding or deduction equal the amounts that would have been received in respect of the Notes in the absence of such withholding or deduction ("**Additional Amounts**"). However, no Additional Amounts shall be payable:

(i)     to, or to a third party on behalf of, a Holder where the holder or beneficial owner is liable for any present or future taxes, duties, assessments or governmental charges in respect of a Note by reason of the existence of any present or former connection between the Holder (or between a fiduciary, settlor, beneficiary, partner, member or shareholder of the Holder or beneficial owner, if the Holder or beneficial owner is an estate, a trust, a partnership, a limited liability company or a corporation) or beneficial owner and the Relevant Taxing Jurisdiction, including, without limitation, the Holder or beneficial owner (or the Holder's or beneficial owner's fiduciary, settlor, beneficiary, partner, member or

23

shareholder) being or having been a citizen or resident thereof or being or having been engaged or deemed to be engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, other than the mere holding of the Note or the enforcement of rights and the receipt of payments with respect to the Note;

(ii)    in respect of any present or future tax, assessment or other governmental charge that would not have been so imposed but for the presentation by the Holder of a Note, where presentation is required, for payment on a date more than 30 days after the date on which payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later;

(iii)    to, or to a third party on behalf of, a Holder where the Holder or beneficial owner is liable for any present or future taxes, duties, assessments or other governmental charges in respect of a Note by reason of the Holder's or beneficial owner's failure to comply with any certification, identification or other reporting requirement concerning nationality, residence, identity or connection with the Relevant Taxing Jurisdiction, if (1) compliance is required by the Relevant Taxing Jurisdiction as a precondition to relief or exemption from, or reduction in the rate of, the tax, assessment or other governmental charge and (2) the Issuer has given at least 30 days' notice that Holders or beneficial owners will be required to provide this certification, identification or other requirement;

(iv)    in relation with the application of Luxembourg law of 23 December 2005, as amended from time to time, introducing a 20% withholding tax on certain interest payments made for the immediate benefit of individuals resident in Luxembourg;

(v)    in respect of any present or future tax, assessment or other governmental charge imposed on a note presented for payment by or on behalf of a Holder where the Holder or beneficial owner would have been able to avoid the withholding or deduction by presenting the relevant Note to another paying agent;

(vi)    in respect of any estate, inheritance, gift, sales, transfer, capital gains, excise or personal property or similar tax, assessment or governmental charge;

(vii)    in respect of any tax, assessment or other governmental charge that is payable otherwise than by deduction or withholding from payments of principal of or interest on the Note or by direct payment by the Issuer or a Guarantor in respect of claims made against the Issuer or a Guarantor;

(viii)    in respect of any tax, duty, assessment or other governmental charge imposed or withheld pursuant to Sections 1471 through 1474 of the Code, as of the Issue Date (or any amended or successor version), current or future U.S. Treasury Regulations issued thereunder or any official interpretation thereof, any

agreement entered into pursuant to Section 1471(b) of the Code, or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code; or

(ix)    in respect of any combination of the above.

(b)    In addition, no Additional Amounts shall be paid with respect to any payment on a Note to a Holder who is a fiduciary, a partnership, a limited liability company or other than the sole beneficial owner of that payment to the extent that payment on the Note would be required by the laws of the Relevant Taxing Jurisdiction to be included in the income, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, a member of that partnership, an interest holder in a limited liability company or a beneficial owner who would not have been entitled to the Additional Amounts had that beneficiary, settlor, member or beneficial owner been the Holder. Except as specifically provided above, neither the Issuer nor any Guarantor shall be required to make any payment with respect to any tax, duty, assessment or governmental charge imposed by any government or political subdivision or taxing authority thereof or therein.

(c)    In the event that Additional Amounts actually paid with respect to the Notes described above are based on rates of deduction or withholding of taxes in excess of the appropriate rate applicable to the Holder of such Notes, and, as a result thereof the Holder is entitled to make a claim for a refund or credit of the excess from the authority imposing the withholding tax, then the Holder shall, by accepting the Notes, be deemed to have assigned and transferred all right, title, and interest to any such claim for a refund or credit of such excess to the Issuer or a Guarantor.

(d)    Any reference in this Indenture or the Notes to principal, interest or any other amount payable in respect of the Notes by the Issuer or the Guarantees by a Guarantor will be deemed also to refer to any Additional Amount, unless the context requires otherwise, that may be payable with respect to that amount under the obligations referred to in this Section.

(e)    The obligation described above will survive termination or discharge of this Indenture, payment of the Notes and/or the resignation or removal of the Trustee or any agent hereunder.

Section 3.02. *Optional Redemption.*

(a)    The Notes shall be redeemable at the option of the Issuer at any time or from time to time prior to their maturity, upon not more than 60 and not fewer than 30 days' notice to the Noteholders.  If the Issuer elects to redeem Notes pursuant to the optional redemption provisions of this Section 3.02, it must furnish to the Trustee, at least 30 days (or such shorter period as the Trustee shall agree) but not more than 60 days before a redemption date, an Officers' Certificate setting forth:

(1)    the clause of this Indenture pursuant to which the redemption shall occur;

(2)      the redemption date;

(3)      the principal amount of Notes to be redeemed; and

(4)      the redemption price.

The Issuer may redeem the Notes either as a whole or in part at a redemption price calculated by the Issuer equal to the greater of (i) 100% of the principal amount of the Notes being redeemed and (ii) the sum of the present values of each remaining scheduled payment of principal and interest thereon (exclusive of any such interest accrued to the date of redemption) discounted (for purposes of determining present value) to the redemption date on a semi-annual basis (assuming a 360 day year consisting of twelve 30 day months) at the Treasury Rate plus 45 basis points, plus accrued interest thereon to the date of redemption; provided that Notes in an aggregate principal amount equal to at least U.S.$100,000,000 remain Outstanding immediately after the occurrence of any partial redemption of Notes.

(b)      Notes called for redemption will become due on the date fixed for redemption. Notices of redemption will be given at least 30 but not more than 60 days before the date fixed for redemption to each Noteholder at its registered address. The notice will state the amount to be redeemed. On and after the date fixed for redemption, interest will cease to accrue on any redeemed Notes. If less than all the Notes are redeemed at any time, the Trustee will select the Notes to be redeemed by such method as the Trustee deems fair and appropriate (or, in the case of Global Notes, in accordance with the Depositary's applicable procedures).

Section 3.03. *Redemption for Taxation Reasons*.

(a)      If as a result of any change in or amendment to the laws (or any applicable treaties, or any rules or regulations promulgated thereunder) of a Relevant Taxing Jurisdiction, or any amendment to or change in official position regarding the application, interpretation or administration of such laws, treaties, rules, or regulations (including a holding by a court of competent jurisdiction), which change or amendment becomes effective or, in the case of a change in official position, is announced on or after the issue date of the Notes or, with respect to a successor, after the date a successor assumes the obligations under the Notes, (i) the Issuer has or will become obligated to pay Additional Amounts as described above under Section 3.01 in excess of the Additional Amounts the Issuer would be obligated to pay if payments were subject to withholding or deduction at a rate of 0% or (ii) either Guarantor has or will become obligated to pay Additional Amounts as described above under Section 3.01 in excess of the Additional Amounts such Guarantor would be obligated to pay if such payments were subject to withholding or deduction at a rate of 15% or, in case the Holder of the Notes is resident in a tax haven jurisdiction for Brazilian tax purposes (i.e., countries or locations which do not impose any income tax or which impose it at a maximum rate lower than 17% or where local legislation imposes restrictions on the disclosure of ownership composition or securities ownership or do not allow for the identification of the effective beneficiary of the income attributed to non-residents), at a rate of 25%, or, in either case, at the lower rate specified

26

in an applicable tax treaty between Brazil and the country where the Holder of the Notes is domiciled, as a result of the taxes, duties, assessments and other governmental charges described above (the rates in (i) and (ii), the "**Minimum Withholding Level**"), the Issuer may, at its option, redeem all, but not less than all, of the Notes, at a redemption price equal to 100% of their principal amount then Outstanding, together with interest accrued to the date fixed for redemption, upon delivery of irrevocable notice of redemption to the Holders not fewer than 30 days nor more than 90 days prior to the date fixed for redemption. No notice of such redemption may be given earlier than 90 days prior to the earliest date on which the Issuer would, but for such redemption, be obligated to pay the Additional Amounts above the Minimum Withholding Level.  Notwithstanding the foregoing, the Issuer shall not have the right so to redeem the Notes unless: (i) it has taken reasonable measures to avoid the obligation to pay Additional Amounts; and (ii) it has complied with all necessary regulations to legally effect such redemption; provided, however, that for this purpose reasonable measures shall not include any change in the Issuer's or Guarantor's or any successor's jurisdiction of incorporation or organization or location of its principal executive or registered office.

Section 3.04. *Method and Effect of Redemption*.  In the event that the Issuer elects so to redeem the Notes, it will deliver to the Trustee:  (1) a certificate, signed in the name of the Issuer by any two of its executive officers or by its attorney in fact in accordance with its bylaws, stating that the Issuer is entitled to redeem the Notes pursuant to the terms hereof and setting forth a statement of facts showing that the condition or conditions precedent to the right of the Issuer so to redeem have occurred or been satisfied; and (2) an Opinion of Counsel to that effect based on the statement of facts.

Section 3.05.  *Notice of Redemption*.  (a)  At least 30 days but not more than 60 days before a redemption date, the Issuer will deliver by electronic transmission (including "pdf" on letterhead (if applicable) and signed by an authorized  signer), deliver or cause to be delivered a notice of redemption to each Holder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is (i) issued in connection with a defeasance of the Notes or a satisfaction and discharge of this Indenture pursuant to Article 8 hereof or (ii) subject to one or more conditions precedent and such redemption date is delayed until such time as any or all such conditions precedent shall be satisfied (or waived by the Issuer in its sole discretion).  The notice will identify the Notes (including the CUSIP number) to be redeemed and will state:

(1)      the redemption date;

(2)      the redemption price;

(3)      if any Note is being redeemed in part, the portion of the principal amount of such  Note to be redeemed and that, after the redemption date upon surrender of such Note, a new  Note or Notes in principal amount equal to the unredeemed portion will be issued upon  cancellation of the original Note;

(4)      the name and address of the Paying Agent;

(5)      that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(6)      that, unless the Issuer defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(7)      the paragraph or sub-paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed;

(8)      that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes; and

(9)      any conditions precedent to such redemption.

(b)      At the Issuer's request, the Trustee will give the notice of redemption in the Issuer's name and at its expense; *provided*, *however*, that the Issuer has delivered to the Trustee, at least 30 days prior to the redemption date (or such shorter period as the Trustee shall agree), an Officers' Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

Section 3.06.  *Deposit of Redemption or Purchase Price.*  (a)  Prior to 11:00 a.m. New York Time on the Business day prior to the redemption or purchase date, the Issuer will deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption or purchase price of and accrued and unpaid interest, if any, and any premium and Additional Amounts, if any, on, all Notes to be redeemed or purchased on that date. The Trustee or the Paying Agent will promptly return to the Issuer any money deposited with the Trustee or the Paying Agent by the Issuer in excess of the amounts necessary to pay the redemption or purchase price of, and accrued and unpaid interest, if any, and any premium and Additional Amounts, if any, on, all Notes to be redeemed or purchased.

(b)  If the Issuer complies with the provisions of the preceding paragraph, on and after the redemption or purchase date, interest will cease to accrue on the Notes or the portions of Notes called for redemption or purchase. If a Note is redeemed or purchased on or after an interest record date but on or prior to the related interest payment date, then any accrued and unpaid interest to the redemption date or purchase date shall be paid to the Person in whose name such Note was registered at the close of business on such record date. If any Note called for redemption or purchase is not so paid upon surrender for redemption or purchase because of the failure of the Issuer to comply with the

preceding paragraph, interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and to the extent lawful on any interest accrued to the redemption or purchase date not paid on such unpaid principal.

ARTICLE 4

COVENANTS

Section 4.01.  *Payment of Notes*.  (a) The Issuer agrees to pay the principal of and interest (including, without limitation, any Additional Amounts, if any) on the Notes on the dates and in the manner provided in the Notes and this Indenture. Not later than 11:00 A.M. (New York City time) on the Business Day (solely in New York City) immediately prior to the due date of the payment of any principal of or interest on any Notes, or any redemption of the Notes, the Issuer will deposit with the Principal Paying Agent Dollars in immediately available funds sufficient to pay such amounts, provided that if the Issuer or any Affiliate of the Issuer is acting as a Paying Agent, it will, on or before each due date, segregate and hold in a separate trust fund for the benefit of the Holders a sum of Dollars sufficient to pay such amounts until paid to such Holders or otherwise disposed of as provided in this Indenture.  In each case the Issuer will promptly notify the Trustee in writing of its compliance with this Section 4.01.

(b)    Payments made on the Notes will be applied first to interest due and payable on the Notes and then to the reduction of the unpaid principal amount of the Notes.  An installment of principal or interest will be considered paid on the date due if the Trustee (or Paying Agent, other than the Issuer or any Affiliate of the Issuer) holds on that date Dollars designated for and sufficient to pay the installment.  If the Issuer or any Affiliate of the Issuer acts as a Paying Agent, an installment of principal or interest will be considered paid on the due date only if paid to the Holders.

(c)    Each payment in full of principal, redemption amount, Additional Amounts and/or interest payable in respect of any Note made by or on behalf of the Issuer to or to the order of the Principal Paying Agent in the manner specified in the Notes and this Indenture on the date due shall be valid and effective to satisfy and discharge the obligation of the Issuer to make payment of principal, redemption amount, Additional Amounts and/or interest payable in respect of any Note on such date, provided, however, that the liability of the Principal Paying Agent hereunder shall not exceed any amounts paid to it by the Issuer, or held by it, on behalf of the Holders under this Indenture; and provided further that, in the event that there is a default by the Principal Paying Agent in any payment of principal, redemption amount, Additional Amounts and/or interest in respect of any Note in accordance with the Notes and this Indenture, the Issuer shall pay on demand such further amounts as will result in receipt by the Holder of such amounts as would have been received by it had no such default occurred.

(d)    The Issuer agrees to pay interest on overdue principal, and to the extent lawful, overdue installments of interest at the rate per annum specified in the Notes (1% per annum in excess of the rate per annum borne by the Notes).

(e)      Payments in respect of the Notes represented by the Global Notes (including principal, interest and Additional Amounts, if any) are to be made by wire transfer of immediately available funds in such coin or currency of the United States as at the time of payment will be legal tender for the payment of public and private debts, to the accounts specified by the Holder of the Global Notes.  With respect to Certificated Notes, the Issuer will make all payments by wire transfer of immediately available funds to the accounts specified by the Holders thereof or, if no such account is specified, by mailing a check to each Holder's registered address.

(f)      In the event a Paying Agent receives from the Issuer or a Guarantor funds in Dollars for the payment of principal, redemption amount, Additional Amounts and/or interest in respect of any Note and such Paying Agent defaults in its obligation to make any such payment, such funds in Dollars shall be returned to the Issuer or Guarantor, as the case may be, promptly upon the written request by the Issuer or Guarantor, as the case may be, and all liability of the Trustee and the Paying Agents with respect to such funds will cease.

Section 4.02.  *Maintenance of Office or Agency*.  The Issuer will maintain in the Borough of Manhattan, the City of New York, an office or agency where Notes may be surrendered for registration of transfer or exchange or for presentation for payment and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served.  The Issuer hereby initially designates the Corporate Trust Office of the Trustee as such office of the Issuer.  The Issuer will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Issuer fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands (other than any presentations, surrenders, notices and demands service in accordance with Section 11.07(b)) may be made or served to the Trustee.  At any time that the Notes are listed on the Official List of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market, the Issuer will maintain an office or agent in Luxembourg to serve as Luxembourg transfer agent.

The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be surrendered or presented for any of such purposes and may from time to time rescind such designations.  The Issuer will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

Section 4.03.  *Existence*.  Each of the Guarantors shall preserve and maintain in full force and effect its existence and the existence of each of its Significant Subsidiaries in accordance with their respective organizational documents, and the rights, licenses and franchises of each of the Guarantors and each of its Significant Subsidiaries, except, in each case, where the failure to do so would not, individually or in the aggregate, result in any Material Adverse Effect, provided that neither Guarantor is required to preserve any such right, license or franchise, or the existence of any of its Significant Subsidiaries, if the maintenance or preservation thereof is no longer desirable in the conduct of the business of such Guarantor and its Subsidiaries taken as a whole in

its judgment; and provided further that this Section does not prohibit any transaction otherwise permitted by Section 5.01.

Section 4.04. *Payment of Taxes*. Each of the Guarantors will timely file all required tax returns required to be filed by it and pay and discharge at or before maturity all of its material tax obligations (except where such tax obligations are contested in good faith and by proper proceedings and against which adequate reserves are being maintained to the extent required by Applicable GAAP), except where the failure to do so would not, individually or in the aggregate, result in a Material Adverse Effect.

Section 4.05. *Maintenance of Properties*. Each of the Guarantors will cause all properties used or useful in its business or the business of any of its Significant Subsidiaries to be maintained and kept in good condition, repair and working order, ordinary wear and tear excepted, except to the extent that the failure to do so would not, individually or in the aggregate, have a Material Adverse Effect; *provided* that nothing in this Section prevents either Guarantor or any of their respective Significant Subsidiaries from discontinuing the use, operation or maintenance of any of such properties or disposing of any of them, if such discontinuance or disposal is, in the judgment of such Guarantor, desirable in the conduct of the business of such Guarantor and its Subsidiaries taken as a whole.

Section 4.06. *Repurchases at the Option of the Holders Upon Change of Control*.

(a)     If a Change of Control that results in a Rating Decline occurs, not later than 30 days following such an occurrence, the Issuer, shall make, directly or through a Designated Affiliate, an offer to purchase all of the Notes pursuant to the offer described below (the "**Offer to Purchase**") at a price in cash (the "**Offer to Purchase Payment**") equal to 101% of the principal amount thereof plus accrued and unpaid interest thereon and Additional Amounts, if any, to, but excluding, the Offer to Purchase Payment Date. Not later than 30 days after the occurrence of a Change of Control that results in a Rating Decline, the Issuer or a Designated Affiliate shall send written notice of such Offer to Purchase, together with a letter of transmittal, with a copy to the Trustee, to each Holder at the address of such Holder appearing in the Register or otherwise in accordance with the procedures of the Depositary with the following information:

(i)     a description of the transaction or transactions that constitute the Change of Control;

(ii)     that an Offer to Purchase is being made pursuant to this Section 4.06 and that all Notes properly tendered pursuant to such Offer to Purchase will be accepted for payment

(iii)     that a Holder may tender all or any portion of its Notes pursuant to such Offer to Purchase, subject to the requirement if a Holder tenders only a

portion of its Notes, the remaining Notes must be no less than U.S.$200,000 in principal amount and integral multiples of U.S.$1,000 in excess thereof;

(iv)     the purchase price, the expiration date (the "**Expiration Date**") of the Offer to Purchase, which will be no less than 30 days nor more than 60 days after the date such notice is mailed, and an indicative settlement date for the purchase, which will be no more than five Business Days after the Expiration Date (the "**Offer to Purchase Payment Date**");

(v)     any Note not properly tendered will remain outstanding and continue to accrue interest;

(vi)     unless the Issuer or its Designated Affiliate defaults in the payment of the Offer to Purchase Payment, all Notes accepted for payment pursuant to the Offer to Purchase will cease to accrue interest on the Offer to Purchase Payment Date;

(vii)     Holders electing to have any Notes purchased pursuant to an Offer to Purchase will be required to surrender the Notes, together with a duly executed letter of transmittal properly completed in accordance with the instructions thereto, to the Paying Agent specified in such notice at the address specified in such notice prior to the close of business on the Expiration Date;

(viii)     Holders shall be entitled to withdraw their tendered Notes and their election to require the Issuer or a Designated Affiliate to purchase such Notes; *provided* that such Paying Agent receives, not later than the close of business on the Expiration Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased; and

(ix)     that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered; *provided* that each such new Note will be in a principal amount of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof.

If (a) notice is mailed in a manner provided in this Section 4.06 and (b) any Holder fails to receive such notice or a Holder receives such notice but it is defective, such Holder's failure to receive such notice or such defect shall not affect the validity of the Offer to Purchase as to all other Holders that properly received such notice without defect.

(b)     On or before the Offer to Purchase Payment Date, the Issuer or a Designated Affiliate shall, to the extent lawful:

(i)     accept for payment for all Notes properly tendered and not withdrawn pursuant to the Offer to Purchase;

32

(ii)    deposit with such Paying Agent an amount equal to the aggregate Offer to Purchase Payment in respect of all Notes or portions thereof so tendered; and;

(iii)    deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate stating that such Notes or portions thereof have been tendered to and purchased by the Issuer or a Designated Affiliate.

(c)    The Paying Agent shall promptly mail to each Holder the Offer to Purchase Payment for its Notes that have been accepted for payment in the Offer to Purchase, and the Trustee shall promptly authenticate and deliver (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any; *provided* that each such new Note will be in a principal amount of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof.

(d)    Notwithstanding Section 4.06(a), the Issuer shall not be required to make an Offer to Purchase upon a Change of Control that results in a Rating Decline if (i) a third party makes an offer to purchase in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 4.06 applicable to an Offer to Purchase made by the Issuer (*provided* that the consideration in respect of such third party Offer to Purchase is at least equal to the consideration required by an Offer to Purchase made by the Issuer) and purchases all Notes properly tendered and not withdrawn under such offer, or (ii) a notice of redemption for all Outstanding Notes has been given pursuant to Section 3.02 or Section 3.03 or Paragraph 3 of the Notes, unless and until there is a default in payment of the applicable Redemption Price. Notwithstanding anything to the contrary contained herein, an Offer to Purchase may be made in advance of a Change of Control, conditioned upon the consummation of such Change of Control and the occurrence of such Rating Decline, if a definitive agreement is in place for the Change of Control at the time the Offer to Purchase is made.

(e)    The Issuer shall not purchase any of the Notes if there has occurred and is continuing on the Offer to Purchase Payment Date an Event of Default, other than an Event of Default resulting from the failure to make an Offer to Purchase Payment when due.

(f)    The Issuer and any Designated Affiliate will comply with Rule 14e-1 under the Exchange Act (to the extent applicable) and all other applicable laws in making any Offer to Purchase. To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the provisions of this Indenture and Paragraph 3 of the Notes shall be deemed to be modified to the extent necessary to permit such compliance. If the provisions of such securities laws or regulations cannot be complied with as a result of such deemed modifications, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.06 or Paragraph 3 of the Notes by virtue thereof.

(g)      In the event that the Holders of not less than 90% of the aggregate principal amount of the outstanding Notes accept an Offer to Purchase and the Issuer or a third party purchases all the Notes held by such Holders, the Issuer will have the right, on not less than 30 nor more than 60 days' prior notice to the Holders (with a copy to the Trustee), given not more than 30 days following the Purchase Date, to redeem all of the Notes that remain outstanding following such purchase at the purchase price equal to that in the Offer to Purchase plus, to the extent not included in the Offer to Purchase payment, accrued and unpaid interest and Additional Amounts, if any, on the Notes that remain outstanding, to, but excluding, the date of redemption.

Section 4.07.  *Limitation on Liens*.  The Guarantors agree that, for so long as any Note remains Outstanding, each Guarantor will not, and will not permit any Subsidiary to, directly or indirectly, incur or permit to exist any Lien of any nature whatsoever securing the payment of Debt on any of its Property, whether owned at the Issue Date or thereafter acquired, other than Permitted Liens, without effectively providing that the Notes or the Guarantees, as applicable, are secured equally and ratably with (or, if the obligation to be secured by the Lien is subordinated in right of payment to the Notes or the Guarantees, prior to) the obligations so secured for so long as such obligations are so secured.

Section 4.08.  *Financial Reports*.  (a)  The Guarantors shall furnish to the Trustee:

(i)      as soon as available and in any event no later than 120 days after the last day of the fiscal year of the Guarantors, annual audited combined consolidated financial statements in English of the Guarantors, in each case as at and for the fiscal year then ended, prepared in accordance with IFRS, as issued by the IASB together with the audit report thereon; and

(ii)      as soon as available and in any event within 60 days after the end of the first three fiscal quarters of each fiscal year, quarterly unaudited combined consolidated financial statements in English of the Guarantors prepared in accordance with IFRS, as issued by the IASB, accompanied by a "limited review" (*revisão limitada*) report thereon.

Notwithstanding the forgoing, if the Guarantors make available the information described above on its website or the website of a Subsidiary of the Guarantors, it will be deemed to have satisfied the reporting requirement set forth above. It is understood that the Trustee shall have no responsibility to determine whether any information has been posted on such website.

For so long as any Notes remain Outstanding, the Issuer will make available to any Noteholder or beneficial owner of an interest in the Notes, or to any prospective purchasers designated by such Noteholder or beneficial owner, upon request of such Noteholder or beneficial owner, information required to be delivered under paragraph (d)(4) of Rule 144A unless, at the time of such request, the Issuer is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, or is exempt from reporting pursuant to Rule 12g3 2(b) under the Exchange Act.

34

(b)      Delivery of these reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of any of those will not constitute constructive notice of any information contained in them or determinable from information contained in them, including the Issuer's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

Section 4.09.  *Reports to Trustee.*  (a) The Issuer will deliver to the Trustee within 120 days after the end of the Issuer's fiscal year, an Officer's Certificate signed by its principal executive officer, principal financial officer or principal accounting officer stating whether, to the best of his or her knowledge, a Default exists on the date of such Officer's Certificate and, if a Default exists, setting forth details thereof and the action which the Issuer or Guarantor, as applicable, is taking with respect thereto;

(b)      Promptly upon becoming aware of the occurrence of a Default, the Issuer will deliver to the Trustee an Officer's Certificate setting forth the details of the Default, and the action which the Issuer or Guarantor, as applicable, is taking with respect thereto.

Section 4.10.  *Disclosure of Names and Addresses of Holders*.  Every Holder, by receiving and holding a Note, agrees with the Issuer, the Guarantors and the Trustee that neither the Issuer, nor any Guarantor nor the Trustee nor any Authenticating Agent nor any Paying Agent nor any Registrar shall be held accountable by reason of the disclosure of any information as to the names and addresses of the Holders in accordance with TIA Section 312, regardless of the source from which such information was derived, and that the Trustee shall not be held accountable by reason of mailing any material pursuant to a request made under TIA Section 312(b).

Section 4.11.  *Paying Agent and Transfer Agent*.  (a) The Issuer agrees, for the benefit of the Holders from time to time of the Notes, that, until all of the Notes are no longer Outstanding or until funds in Dollars for the payment of all of the principal of and interest on all Notes (and Additional Amounts, if any) shall have been made available at the Corporate Trust Office, and shall have been returned to the Issuer as provided herein, whichever occurs earlier, there shall at all times be a Principal Paying Agent and Transfer Agent hereunder.  The Principal Paying Agent and the Transfer Agent shall have the powers and authority granted to and conferred upon it herein and in the Notes.

(b)      The Issuer hereby initially appoints the Paying Agents and Transfer Agent defined in this Indenture as such.  The Principal Paying Agent shall arrange with the other Paying Agents for the payment, from funds furnished by the Issuer to the Principal Paying Agent pursuant to this Indenture, of the principal of and interest on the Notes (and Additional Amounts, if any, with respect to the Notes) and of the compensation of such paying agency or agencies for their services as such.

(c)      Each Paying Agent and Transfer Agent defined in this Indenture as such accepts its respective obligations set forth herein and in the Notes upon the terms and

conditions hereof and thereof, including the following, to all of which the Issuer agrees and to all of which the rights of the Holders from time to time of the Notes shall be subject:

(i)    The Paying Agents and Transfer Agents shall each be entitled to the compensation to be agreed upon with the Issuer for all services rendered by it, and the Issuer agrees promptly to pay such compensation and to reimburse each of the Paying Agents and Transfer Agents for their reasonable and documented out of pocket expenses (including reasonable and documented fees and expenses of counsel) incurred by it in connection with the services rendered by it hereunder to the extent agreed with the Issuer.  The Issuer also agrees to indemnify each of the Paying Agents and Transfer Agents and to hold each of them harmless against, any loss, liability or expense (including, without limitation, reasonable and duly documented fees and expenses of legal counsel), incurred out of or in connection with their acting as Paying Agents or Transfer Agents of the Issuer hereunder, except to the extent such loss, liability or expense results from such Paying Agents' or Transfer Agents' own gross negligence or willful misconduct. Notwithstanding anything to the contrary in this Indenture, neither the Issuer nor the Guarantors shall be responsible or have any liability to the Paying Agents and Transfer Agents and each of their respective affiliates, officers, directors, employees, counsel, agents, advisors and attorneys-in-fact for any indirect, special or consequential damages incurred by the Issuer as a result of or in connection with their acting as Paying Agents or Transfer Agents hereunder, even if advised of the possibility thereof and regardless of the form of action. The obligations of the Issuer under this subsection (i) shall survive the payment of the Notes and the resignation or removal of the Paying Agents and Transfer Agents as the case may be;

(ii)    In acting under this Indenture and in connection with the Notes, the Paying Agents and Transfer Agents are each acting solely as agent of the Issuer and do not assume any obligation towards or relationship of agency or trust for or with any of the Holders except that all funds held by a Paying Agent for the payment of the principal of and interest on (and Additional Amounts, if any, with respect to) the Notes, shall be held in trust by it and applied as set forth herein and in the Notes, but need not be segregated from other funds held by it, except as required by law;

(iii)    Each of the Paying Agents and Transfer Agents shall be protected and shall incur no liability for or in respect of any action taken or omitted to be taken or thing suffered by it in reliance upon any Note, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper party or parties;

(iv)    Each of the Paying Agents and Transfer Agents may, in its individual capacity or any capacity, become the owner of, or acquire any interest in, any Notes or other obligations of the Issuer with the same rights that it would

have if it were not one of the Paying Agents or Transfer Agents, and may engage or be interested in any financial or other transaction with the Issuer and may act on, or as depositary, trustee or agent for, any committee or body of Holders of Notes or other obligations of the Issuer as freely as if it were not one of the Paying Agents or Transfer Agents;

      (v)    Neither the Paying Agents nor the Transfer Agents shall be under any liability for interest on any moneys received by it pursuant to any of the provisions of this Indenture or the Notes;

      (vi)    The recitals contained herein and in the Notes shall be taken as the statements of the Issuer, and the Paying Agents and Transfer Agents assume no responsibility for the correctness of the same.  Neither the Paying Agents nor the Transfer Agents make any representation as to the validity or sufficiency of this Indenture or the Notes.  Neither the Paying Agents nor the Transfer Agents shall be accountable for the use or application by the Issuer of any of the Notes or the proceeds thereof;

      (vii)    The Paying Agents and Transfer Agents shall be obligated to perform such duties and only such duties as are herein and in the Notes specifically set forth, and no implied duties or obligations shall be read into this Indenture or the Notes against the Paying Agents or Transfer Agents.  Neither the Paying Agents nor the Transfer Agents shall be under any obligation to take any action hereunder which may tend to involve it in any expense or liability, the payment of which within a reasonable time is not, in its reasonable opinion, assured to it; and

      (viii)    No provision of this Indenture shall be construed to relieve any Paying Agent or any Transfer Agent, as applicable, from liability for its own gross negligence or willful misconduct.

Anything in this Section to the contrary notwithstanding, the agreements to hold sums in trust as provided in this Section are subject to the provisions of Section 8.05.

      (d)    Any of the Paying Agents or Transfer Agents may at any time resign by giving written notice of its resignation mailed to the Issuer and the Trustee specifying the date on which its resignation shall become effective; provided that such date shall be at least 60 days after the date on which such notice is given unless the Issuer agrees to accept less notice.  Upon receiving such notice of resignation, the Issuer shall appoint a successor Paying Agent or Transfer Agent, qualified as aforesaid, by written instrument in triplicate signed on behalf of the Issuer, one copy of which shall be delivered to the resigning Paying Agent or Transfer Agent,  and one copy to the successor Paying Agent or Transfer Agent and one copy to the Trustee.  Such resignation shall become effective upon the earlier of (i) the effective date of such resignation or (ii) the acceptance of appointment by the successor Paying Agent or Transfer Agent as provided in Section 4.11(e).  Any Paying Agent or Transfer Agent shall have the right to petition a court of competent jurisdiction in the event that a successor has not been appointed within the

times specified.  The Issuer may, at any time and for any reason, and shall, upon any event set forth in the next succeeding sentence, remove a Paying Agent or Transfer Agent and appoint a successor Paying Agent or Transfer Agent, qualified as aforesaid, by written instrument in triplicate signed on behalf of the Issuer, one copy of which shall be delivered to the Paying Agent or Transfer Agent being removed,  and one copy to the successor Paying Agent or Transfer Agent and one copy to the Trustee.  A Paying Agent or Transfer Agent shall be removed as aforesaid if it shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver of the Paying Agent or Transfer Agent or of its property shall be appointed, or any public officer shall take charge or control of it or of its property or affairs for the purpose of rehabilitation, conservation or liquidation.  Any removal of a Paying Agent or Transfer Agent and any appointment of a successor Paying Agent or Transfer Agent shall become effective upon acceptance of appointment by the successor Paying Agent or Transfer Agent as provided in Section 4.11(e).

(e)     Any successor Paying Agent or Transfer Agent appointed as provided in Section 4.11(d) shall execute and deliver to its predecessor and to the Issuer and Trustee an instrument accepting such appointment hereunder, and thereupon such successor Paying Agent or Transfer Agent, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Paying Agent or Transfer Agent hereunder, and such predecessor, upon payment of its compensation and out of pocket expenses then unpaid, shall pay over to such successor agent all moneys or other property at the time held by it hereunder, if any.

(f)     Any corporation or bank into which any Paying Agent or Transfer Agent may be merged or converted, or with which any Paying Agent or Transfer Agent may be consolidated, or any corporation or bank resulting from any merger, conversion or consolidation to which any Paying Agent or Transfer Agent shall be a party, or any corporation or bank succeeding to the agency business of any Paying Agent or Transfer Agent shall be the successor to such Paying Agent or Transfer Agent hereunder (provided that such corporation or bank shall be qualified as aforesaid) without the execution or filing of any paper or any further act on the part of any of the parties hereto.

ARTICLE 5
CONSOLIDATION, MERGER OR SALE OF ASSETS

Section 5.01.  *Consolidation, Merger or Sale of Assets*.  (a) Each of the Issuer and the Guarantors shall not consolidate with or merge with or into any other Person or sell, convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all of its Property (determined on the basis of the combined consolidated assets of the Guarantors and their Subsidiaries) to any other Person, unless:

(i)     the Person (if not the Issuer or Guarantor) formed by such merger or consolidation or the Person (if not the Issuer or Guarantor) which acquired by sale, conveyance, transfer or lease all or substantially all of the Property of the

Issuer or Guarantor (the "**Successor Corporation**") shall expressly assume by amendment of this Indenture the due and punctual payment of the principal of and interest (and Additional Amounts) on all of the Notes or the Guarantees, as applicable, the performance or observance of every covenant of the Issuer or Guarantor, as applicable, and all other obligations of the Issuer or Guarantor, as applicable, under this Indenture and the Notes or the Guarantees, as applicable;

(ii)    immediately after giving effect to such transaction, no Event of Default with respect to any Note shall have occurred and be continuing; and

(iii)    the Issuer or Guarantor, as applicable, or the Successor Corporation, as the case may be, shall deliver to the Trustee an Opinion of Counsel to the effect that such consolidation, merger, sale, conveyance, transfer or lease and such amendment to this Indenture (if required) comply with these conditions, that such amendment (if required) has been duly authorized, executed and delivered and constitutes valid and binding obligations of the Successor Corporation and that all conditions precedent herein provided or relating to such transaction have been complied with.

(b)    Notwithstanding anything to the contrary in the foregoing, the following transactions shall not be subject to clauses (ii) above:

(i)    the Issuer or either Guarantor may merge with or into or consolidate with the Issuer or a Guarantor, as applicable, or any of their Subsidiaries provided that, if the surviving entity is a Subsidiary of a Guarantor other than the Issuer, such Subsidiary shall become the Issuer or a Guarantor of the Notes, as the case may be; or

(ii)    the Issuer or either Guarantor may sell, convey, transfer or lease, in one transaction or in a series of transactions, directly or indirectly, all or substantially all of its Property (determined on the basis of the combined consolidated assets of the Guarantors and their Subsidiaries) to the Guarantors or any of their respective Subsidiaries, provided that, if the Property is transferred to any Subsidiary of a Guarantor other than the Issuer, such Subsidiary shall become the Issuer or a Guarantor of the Notes, as the case may be.

Notwithstanding anything to the contrary in the foregoing, any merger or consolidation, in which the surviving entity is the Issuer or the Guarantor, or sale, conveyance, transfer or lease to the Issuer or Guarantor will not be subject to any clause above.

(c)    Upon any consolidation, merger, sale, conveyance, transfer or lease in accordance with these conditions, the Successor Corporation shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer and Guarantor, as applicable under the Notes or the Guarantees, with the same effect as if the Successor Corporation had been named as the Issuer or the Guarantor of the Notes herein. No Successor Corporation shall have the right to redeem the Notes unless the Issuer would have been entitled to redeem the Notes in similar circumstances.

# ARTICLE 6
## DEFAULT AND REMEDIES

Section 6.01. *Events of Default*. The occurrence of one or more of the following events shall constitute an "Event of Default":

(a)     the Issuer fails to pay any principal of, or any interest or any Additional Amounts due on, any Note, and, in the case of interest or Additional Amounts, such Default continues for a period of 30 Business Days;

(b)     the Issuer or a Guarantor fails to perform or observe any other covenant or obligation in the Notes or in this Indenture and such Default continues for a period of more than 60 consecutive days after written notice to the Issuer and/or Guarantor, as the case may be, by the Trustee, or to the Issuer or Guarantor and the Trustee by the Holders of 25% or more in aggregate principal amount of the Notes;

(c)     the Issuer, a Guarantor or any of their respective Significant Subsidiaries defaults in the payment when due (subject to any applicable grace period) after a grace period of five Business Days, whether by acceleration or otherwise, of any Debt in an aggregate principal amount of U.S.$150,000,000 or more (or its equivalent in any other currency or currencies) (the "**Threshold Amount**"), whether such Debt now exists or shall hereafter be created; or (B) Default shall occur in the performance or observance of any other terms and conditions relating to any such Debt in an aggregate amount in excess of the Threshold Amount if the effect of such Default is to cause such Debt to become due prior to its Stated Maturity;

(d)     the Issuer, a Guarantor or any of their respective Significant Subsidiaries shall: (i) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee, examiner, administrator, liquidator or similar Person of itself or of all or any substantial part of its Property; (ii) make a general assignment for the benefit of its creditors; (iii) file a petition seeking bankruptcy, insolvency, reorganization in an insolvency or comparable context, *recuperação judicial*, *recuperação extrajudicial,* liquidation, *falência*, dissolution or winding up; or (iv) take any corporate action for the purpose of effecting any of the foregoing;

(e)     an involuntary proceeding or case shall be commenced against the Issuer, a Guarantor or any of their respective Significant Subsidiaries without its application or consent, seeking: (i) its reorganization, liquidation, dissolution or winding up; (ii) the appointment of a receiver, custodian, trustee, examiner, administrator, liquidator or similar Person of it or of all or any substantial part of its Property; or (iii) similar relief in respect of it under any applicable law relating to bankruptcy, insolvency, reorganization, recuperação judicial, recuperação extrajudicial, liquidation, falência, dissolution or winding up, and such proceeding or case shall continue undismissed and unstayed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect, for a period of sixty (60) or more consecutive days;

40

(f)     any of this Indenture or the Notes or the Guarantees for any reason cease to be in full force and effect in accordance with its terms or the Issuer or a Guarantor shall contest the binding effect or enforceability thereof or shall deny that it has any further liability or obligation thereunder or in respect thereof;

(g)     a final non-appealable judgment(s) for the payment of money in an amount equal or in excess of U.S.$150,000,000 (or its equivalent in another currency) shall have been entered by a court or courts of competent jurisdiction against the Issuer or the Guarantor and remain unpaid or undischarged for a period (during which execution shall not be effectively stayed) of 60 consecutive days unless Shell Brazil Holdings BV and/or Cosan S/A Indústria e Comércio or any Affiliate thereof has contractually and irrevocably undertaken to indemnify the Issuer or the Guarantor, as applicable, for any potential loss or claim arising therefrom and enforcement proceedings are not being executed against any Property of the Issuer or any Guarantor; or

(h)     it is or becomes unlawful for the Issuer or Guarantor to perform or comply with any one or more of its payment obligations under this Indenture or the Notes or the Guarantees.

Section 6.02. *Acceleration*.  (a) If an Event of Default, except for a bankruptcy default with respect to the Issuer or a Guarantor, occurs and is continuing under this Indenture, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then Outstanding, by written notice to the Issuer (and to the Trustee if the notice is given by the Holders), may, and the Trustee at the request of such Holders shall, declare the unpaid principal of and accrued interest on the Notes and any other amounts due and payable by the Issuer under this Indenture to be immediately due and payable.  Upon a declaration of acceleration, such principal, interest and other amounts will become immediately due and payable.  If a bankruptcy default occurs with respect to the Issuer or a Guarantor, the unpaid principal of and accrued interest on the Notes then Outstanding and any other amounts due and payable by the Issuer under this Indenture will become immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

(b)     The Holders of a majority in principal amount of the Outstanding Notes by written notice to the Issuer or a Guarantor and to the Trustee may waive all past Defaults and  rescind and annul a declaration of acceleration and its consequences if:

(i)     all existing Events of Default, except for the nonpayment of the principal of, premium, if any, and interest on the Notes that have become due solely by the declaration of acceleration, have been cured or waived; and

(ii)     the rescission would not conflict with any judgment or decree of a court of competent jurisdiction.

Section 6.03. *Other Remedies*.  If an Event of Default occurs and is continuing, the Trustee may pursue, in its own name or as trustee of an express trust, any available remedy by proceeding at law or in equity to collect the payment of principal of

and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.  The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.

Section 6.04.  *Waiver of Past Defaults*.  Except as otherwise provided in Section 6.02, 6.07 or 9.02, the Holders of a majority in principal amount of the Outstanding Notes may, by written notice to the Trustee and to the Issuer or Guarantors, waive an existing Default and its consequences.  Upon such waiver, the Default will cease to exist, and any Event of Default arising therefrom will be deemed to have been cured, but no such waiver will extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05.  *Control by Majority*.  The Holders of a majority in aggregate principal amount of the Outstanding Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.  However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, that may involve the Trustee in personal liability, or that the Trustee determines in good faith may be unduly prejudicial to the rights of Holders not joining in the giving of such direction, and the Trustee may take any other action it deems proper that is not inconsistent with any such direction received from Holders.

Section 6.06.  *Limitation on Suits*.  A Holder may not institute any proceeding, judicial or otherwise, with respect to this Indenture or the Notes, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture or the Notes, unless:

(i)     the Holder has previously given to the Trustee written notice of a continuing Event of Default;

(ii)     Holders of at least 25% in aggregate principal amount of Outstanding Notes have made written request to the Trustee to institute such proceedings in respect of the Event of Default in its own name as Trustee under this Indenture;

(iii)     Holders have offered to the Trustee indemnity reasonably satisfactory to the Trustee against any costs, liabilities or reasonable and documented expenses to be incurred in compliance with such request;

(iv)     the Trustee within 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(v)     the Holders of a majority in aggregate principal amount of the Outstanding Notes have not given the Trustee a direction that is inconsistent with such written request.

Section 6.07.  *Rights of Holders to Receive Payment*.  Notwithstanding anything to the contrary, the contractual right of a Holder of a Note to receive payment of

42

principal of or interest on its Note on or after the Stated Maturity thereof, or to bring suit for the enforcement of any such payment on or after such dates, in each case as expressly set forth in this Indenture, may not be amended without the consent of that Holder.

Section 6.08. *Collection Suit by Trustee*.  If an Event of Default in payment of principal or interest specified in clause (a) or (b) of Article 6 occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust for the whole amount of principal and accrued interest remaining unpaid, together with interest on overdue principal and, to the extent lawful, overdue installments of interest, in each case at the rate specified in the Notes, and such further amount as is sufficient to cover the reasonable and documented costs and expenses of collection, including the reasonable and documented compensation, expenses, disbursements and advances of the Trustee, its agents and legal counsel and any other reasonably and properly incurred amounts due to the Trustee hereunder.

Section 6.09. *Trustee May File Proofs of Claim*.  The Trustee may file proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due to the Trustee hereunder) and the Holders allowed in any judicial proceedings relating to the Issuer, the Guarantors or their respective creditors or property, and is entitled and empowered to collect, receive and distribute any money, securities or other property payable or deliverable upon conversion or exchange of the Notes or upon any such claims.  Any custodian, receiver, "síndico", assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, if the Trustee consents to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable and documented compensation, expenses, disbursements and advances of the Trustee, its agent and counsel, and any other reasonably and properly incurred amounts due to the Trustee hereunder.  Nothing in this Indenture will be deemed to empower the Trustee to authorize or consent to, or accept or adopt on behalf of any Holder, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10. *Priorities*.  If the Trustee collects any money pursuant to this Article, it shall pay out the money in the following order:

First:  to the Trustee for all amounts due to it hereunder;

Second:  to Holders for amounts then due and unpaid for principal of and interest on the Notes, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and interest; and

Third:  to the Issuer or as a court of competent jurisdiction may direct.

The Trustee, upon written notice to the Issuer, may fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

Section 6.11. *Restoration of Rights and Remedies*. If the Trustee or any Holder has instituted a proceeding to enforce any right or remedy under this Indenture and the proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to the Holder, then, subject to any determination in the proceeding, the Issuer, the Trustee and the Holders will be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Issuer, the Trustee and the Holders will continue as though no such proceeding had been instituted.

Section 6.12. *Undertaking for Costs*. In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court may require any party litigant in such suit (other than the Trustee) to file an undertaking to pay the costs of the suit, and the court may assess reasonable costs, including reasonable attorney's fees, against any party litigant (other than the Trustee) in the suit having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.12 does not apply to a suit by a Holder to enforce payment of principal of or interest on any Note on the respective due dates pursuant to Section 6.12, or a suit by Holders of more than 10% in principal amount of the Outstanding Notes except for any proceeding brought before a Brazilian court, which case the Holder may be required to post a bond to cover legal fees and court expenses.

Section 6.13. *Rights and Remedies Cumulative*. No right or remedy conferred or reserved to the Trustee or to the Holders under this Indenture is intended to be exclusive of any other right or remedy, and all such rights and remedies are, to the extent permitted by law, cumulative and in addition to every other right and remedy hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or exercise of any right or remedy hereunder, or otherwise, will not prevent the concurrent assertion or exercise of any other right or remedy.

Section 6.14. *Delay or Omission Not Waiver; Prescription of Claims*. No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default will impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein and every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be; provided, that claims against the Issuer or the Guarantors for payments under any of the Notes shall be prescribed unless made within a period of ten years from the Relevant Date.

Section 6.15. *Waiver of Stay, Extension or Usury Laws*. Each of the Issuer and the Guarantors covenants, to the extent that it may lawfully do so, that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that

44

would prohibit or forgive the Issuer or a Guarantor, as the case may be, from paying all or any portion of the principal of, or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or that may affect the covenants or the performance of this Indenture.  Each of the Issuer and the Guarantors hereby expressly waives, to the extent that it may lawfully do so, all benefit or advantage of any such law and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

ARTICLE 7

THE TRUSTEE

Section 7.01.  *General*.  (a) The duties and responsibilities of the Trustee are as set forth herein.  Whether or not expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee is subject to this Article.

(b)     Except during the continuance of an Event of Default, the Trustee needs to perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations will be read into this Indenture against the Trustee.  In the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, opinions or orders furnished to the Trustee and conforming to the requirements of this Indenture. However, in the case of any such certificates or opinions which by any provisions hereof or thereof are specifically required to be furnished to the Trustee, the Trustee shall examine such certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).  In case an Event of Default has occurred and is continuing, the Trustee shall exercise those rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

(c)     No provision of this Indenture shall be construed to relieve the Trustee from liability for its own gross negligence or willful misconduct.

(d)     The Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts.

(e)     Unless otherwise specifically provided herein or in the Notes, any order, certificate, notice, request, direction or other communication from the Issuer made or given under any provision of this Indenture shall be sufficient if signed by an Officer or any duly authorized attorney-in-fact.

(f)     No provision of this Indenture, the Notes or the Guarantees shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the

45

performance of any of its duties hereunder or thereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it. The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer.

Section 7.02. *Certain Rights of Trustee*.

(a)    The Trustee may conclusively rely, and will be protected in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine.  The Trustee need not investigate any fact or matter stated in the document, but, in the case of any document which is specifically required to be furnished to the Trustee pursuant to any provision hereof, the Trustee shall examine the document to determine whether it conforms to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).  The Trustee, in its discretion, may make further inquiry or investigation into such facts or matters as it sees fit.

(b)    Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel conforming to Section 11.03 and the Trustee will not be liable for any action it takes or omits to take in good faith in reliance on such certificate or opinion.

(c)    The Trustee may act and conclusively rely and shall be fully protected in acting and relying in good faith on the opinion or advice of, or information obtained from, any counsel, accountant, appraiser or other expert or adviser, whether retained or employed by the Issuer, the Guarantors or by the Trustee, in relation to any matter arising in the administration of the trusts hereof;

(d)    The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders, unless such Holders have offered to the Trustee security, reasonably satisfactory to it, or indemnity against the reasonable and documented costs, expenses and liabilities (including, without limitation, reasonable and documented fees and expenses of legal counsel) that might be incurred by it in compliance with such request or direction.

(e)    The Trustee will not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within its rights or powers or for any action it takes or omits to take in accordance with the direction of the Holders in accordance with Section 6.05 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture.

(f)    The Trustee may appoint counsel and other advisors of its choice from time to time to provide advice and services arising out of or in connection with the performance by the Trustee of its obligations under the Indenture.  The Trustee may

consult with counsel of its choice, and the advice of such counsel or any Opinion of Counsel will be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(g)    The Trustee may act through its agents, attorneys, accountants, experts and such other professionals as the Trustee deems necessary, advisable or appropriate and shall not be responsible for the misconduct or negligence of any agent, attorney, accountant, expert or other such professional appointed with due care.

(h)    No provision of this Indenture will require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties hereunder, or in the exercise of its rights or powers, unless it receives indemnity satisfactory to it against any loss, liability or expense (including, without limitation, reasonable and documented fees and expenses of agents and attorneys).  In no event shall the Trustee be liable for special, indirect punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(i)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person authorized or employed by the Trustee to act hereunder.

(j)    The Trustee may request that each of the Issuer and the Guarantors deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture.

(k)    The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and reasonably believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Indenture.

(l)    The permissive rights of the Trustee to do things enumerated in this Indenture shall not be construed as a duty to take such action.

(m)    The Trustee shall not be deemed to have notice of any Default or Event of Default unless written notice of any event which is in fact such a Default or Event of Default is received by a Responsible Officer of the Trustee at the Corporate Trust Office of the Trustee and such notice references the Notes and this Indenture and, in the case of a notice of Default or Event of Default, details the nature of such Default or Event of Default.

        Section 7.03. *Individual Rights of Trustee*.  The Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer, the Guarantors or its Affiliates with the same rights it would have if it were not the Trustee.  Any Agent may do the same with like rights.  However, the Trustee is subject to Trust Indenture Act Sections 310(b) and 311.

Section 7.04. *Trust Indenture Act*.  Notwithstanding anything to the contrary elsewhere in this Indenture, the parties to this Indenture and the Holders of the Notes acknowledge and agree that this Indenture is not qualified under the Trust Indenture Act, Holders are not entitled to any protections thereunder and, except as expressly set forth in this Indenture, the provisions of the Trust Indenture Act are not incorporated by reference in this Indenture.

Section 7.05. *Trustee's Disclaimer*.  The Trustee (i)  makes no representation as to the validity or adequacy of this Indenture or the Notes; (ii) is not accountable for the Issuer's use or application of the proceeds from the Notes; and (iii) is not responsible for any statement in the Notes other than its certificate of authentication.

Section 7.06. *Notice of Default*.  The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default with respect to the Notes unless a Responsible Officer of the Trustee shall have received written notice thereof at the Corporate Trust Office.  If any Default or Event of Default occurs and is continuing and written notice thereof is delivered to a Responsible Officer of the Trustee, the Trustee will send notice of the Default or Event of Default to each Holder within 60 days after it occurs, unless the Default or Event of Default has been cured; provided that, except in the case of a Default in the payment of the principal of or interest on any Note, the Trustee may withhold the notice if and so long as the board of directors, the executive committee or a trust committee of directors of the Trustee in good faith determines that withholding the notice is in the interest of the Holders.

Section 7.07. *Compensation and Indemnity*.  (a) The Issuer will pay the Trustee compensation as agreed upon in writing between the Issuer and the Trustee for the Trustee's services.  The compensation of the Trustee is not limited by any law on compensation of a Trustee of an express trust.  The Issuer will reimburse the Trustee upon request for all reasonable and documented out of pocket expenses, disbursements and advances incurred or made by the Trustee, including the compensation and reasonable and documented expenses of the Trustee's agents and counsel.

(b)      The Issuer and the Guarantors shall jointly and severally indemnify the Trustee and its agents, officers, directors and employees for, and hold them harmless against, any loss, liability, or expense incurred by them arising out of or in connection with the acceptance or administration of this Indenture by it and the performance of its duties under this Indenture and the Notes, including the reasonable and documented costs and expenses (including, without limitation, reasonable and documented fees and expenses of legal counsel) of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Indenture and the Notes, except to the extent any such loss, liability or expense results from the gross negligence or willful misconduct of the Trustee, its agents, officers, directors or employees. Notwithstanding anything to the contrary in this Indenture, the Issuer and the Guarantors shall not be responsible or have any liability to the Trustee and its agents, officers, directors and employees for any indirect, special or consequential damages incurred by

the Issuer as a result of or in connection with their acting as Trustee hereunder, even if advised of the possibility thereof and regardless of the form of action.

(c)     To secure each of the Issuer's and the Guarantor's payment obligations in this Section, the Trustee will have a Lien prior to the Notes on all money or property held or collected by the Trustee, in its capacity as Trustee, except money or property held in trust to pay principal of, and interest on particular Notes.

(d)     If the Trustee incurs expenses or renders services in connection with an Event of Default as specified herein, the expenses (including, without limitation, the reasonable and documented charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable bankruptcy, reorganization, insolvency or similar law now or hereafter in effect.

(e)     The provisions of this Section 7.07 shall survive termination of this Indenture and the resignation or removal of the Trustee.

Section 7.08.  *Replacement of Trustee.*  (a) (i)  The Trustee may resign at any time by written notice to the Issuer.

(ii)     The Holders of a majority in principal amount of the Outstanding Notes may remove the Trustee by written notice to the Trustee.

(iii)     If the Trustee is no longer eligible under Section 7.12, any Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(iv)     The Issuer may remove the Trustee if:  (i) the Trustee is no longer eligible under Section 7.12; (ii) the Trustee is adjudged a bankrupt or an insolvent; (iii) a receiver or other public officer takes charge of the Trustee or its property; or (iv) the Trustee becomes incapable of acting. In addition, the Issuer may remove the Trustee at any time for any reason to the extent the Issuer has given the Trustee at least 30 days' written notice and as long as no Default or Event of Default has occurred and is continuing.

A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section.

(b)     If the Trustee has been removed by the Holders, Holders of a majority in principal amount of the Notes may appoint a successor Trustee with the consent of the Issuer.  Otherwise, if the Trustee resigns or is removed, or if a vacancy exists in the office of Trustee for any reason, the Issuer will promptly appoint a successor Trustee.  If the successor Trustee does not deliver its written acceptance within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee (at the expense of the Issuer), the Issuer or the Holders of a majority in principal amount of the Outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)      Upon delivery by the successor Trustee of a written acceptance of its appointment to the retiring Trustee and to the Issuer, (i) the retiring Trustee will transfer all property held by it as Trustee to the successor Trustee, subject to the Lien provided for in Section 7.07, (ii) the resignation or removal of the retiring Trustee will become effective, and (iii) the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture.  Upon request of any successor Trustee, the Issuer will execute any and all instruments for fully and vesting in and confirming to the successor Trustee all such rights, powers and trusts.  The Issuer will give notice of any resignation and any removal of the Trustee and each appointment of a successor Trustee to all Holders, and include in the notice the name of the successor Trustee and the address of its Corporate Trust Office.

(d)      Notwithstanding replacement of the Trustee pursuant to this Section, the Issuer's obligations under Section 7.07 will continue for the benefit of the retiring Trustee.

Section 7.09. *Successor Trustee by Merger*.  If the Trustee consolidates with, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation or national banking association, the resulting, surviving or transferee corporation or national banking association without any further act will be the successor Trustee with the same effect as if the successor Trustee had been named as the Trustee in this Indenture.

Section 7.10. *Money Held in Trust*.  The Trustee will not be liable for interest on any money received by it except as it may agree with the Issuer.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.11. *Force Majeure*.  In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 7.12. *Corporate Trustee Required; Eligibility; Conflicting Interests*.  There shall at all times be a Trustee hereunder which shall be eligible to act as Trustee under the Trust Indenture Act and shall have a combined capital and surplus of at least $25,000,000 and its Corporate Trust Office in The City of New York, New York.  If such corporation publishes reports of condition at least annually, pursuant to law or the requirements of Federal, state, territorial or District of Columbia supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Trustee shall

cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article. Neither the Issuer nor any Person directly or indirectly controlling, controlled by, or under common control with the Issuer shall serve as Trustee.

> Section 7.13. *Trustee and Others May Hold Notes*. (a) The Trustee or any Paying Agent or Principal Paying Agent or Registrar or any other authorized agent of the Trustee, or any Affiliate thereof, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer, or any other obligor on the Notes with the same rights it would have if it were not Trustee, Paying Agent, Principal Paying Agent, Registrar or such other authorized agent.

(b)      The Trustee is subject to TIA Sections 310(b) and 311.

## ARTICLE 8
## DEFEASANCE AND DISCHARGE

> Section 8.01. *Discharge of Issuer's Obligations*. (a) Subject to paragraph (b), the Issuer's obligations under the Notes and this Indenture, and the Guarantors' obligations under the Guarantees, will terminate if:

> (i)      all Notes previously authenticated and delivered (other than (A) destroyed, lost or stolen Notes that have been replaced or (B) Notes that are paid pursuant to Section 3.01 or (C) Notes for whose payment funds in Dollars or U.S. Government Obligations in Dollars have been held in trust and then repaid to the Issuer pursuant to Section 7.06) have been delivered to the Trustee for cancellation and the Issuer has paid all sums payable by it hereunder; or

> (ii)      (A) the Issuer irrevocably deposits in trust with the Trustee, as trust funds solely for the benefit of the Holders, funds in Dollars or U.S. Government Obligations in Dollars or a combination thereof sufficient, in the opinion of a nationally recognized firm of independent public accountants expressed in a written opinion delivered to the Trustee, without consideration of any reinvestment, to pay principal of and interest on the Notes to maturity or redemption, as the case may be, and to pay all other sums payable by it hereunder;

> (B)      no Default has occurred and is continuing on the date of the deposit;

> (C)      the deposit will not result in a breach or violation of, or constitute a Default under, this Indenture or any other agreement or instrument to which the Issuer is a party or by which it is bound; and

> (D)      the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel, in each case stating that all conditions precedent provided for herein relating to the satisfaction and discharge of this Indenture have been complied with.

(b)      After satisfying the conditions in clause (a)(i), only the Issuer's obligations under Section 7.07 will survive.  After satisfying the conditions in clause (a)(ii), only the Issuer's obligations in Article 2 and Section 3.01, 4.01, 4.02, 7.07, 8.05 and 8.06 will survive.  In either case, the Trustee upon request will acknowledge in writing the discharge of the Issuer's obligations under the Notes and this Indenture other than the surviving obligations.

Section 8.02.  *Legal Defeasance*.  After the 123rd day following the deposit referred to in clause (i) below, the Issuer will be deemed to have paid and will be discharged from its obligations in respect of the Notes and this Indenture, other than its obligations in Article 2 and Section 3.01, 4.01, 4.02, 7.07, 8.05 and 8.06, provided the following conditions have been satisfied:

(i)      The Issuer has irrevocably deposited in trust with the Trustee, as trust funds solely for the benefit of the Holders, funds in Dollars or U.S. Government Obligations in Dollars or a combination thereof sufficient, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certificate thereof delivered to the Trustee, without consideration of any reinvestment, to pay principal of and interest on the Notes to maturity or redemption, as the case may be, provided that any redemption before maturity has been irrevocably provided for under arrangements satisfactory to the Trustee.

(ii)      No Default has occurred and is continuing on the date of the deposit or occurs at any time during the 123 day period following the deposit.

(iii)      The deposit will not result in a breach or violation of, or constitute a Default under, this Indenture or any other agreement or instrument to which the Issuer is a party or by which it is bound.

(iv)      The Issuer has delivered to the Trustee:

(A)      either (x) a ruling received from the Internal Revenue Service to the effect that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the defeasance and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case or (y) an Opinion of Counsel, based on a change in law after the date of this Indenture, to the same effect as the ruling described in clause (x);

(B)      an Opinion of Counsel to the effect that (i) the creation of the defeasance trust does not violate the Investment Company Act of 1940, as amended, (ii) the Holders have a valid first priority Note interest in the trust funds (subject to customary exceptions), and (iii) after the passage of 123 days following the deposit, the trust funds will not be

subject to the effect of Section 547 of the United States Bankruptcy Code or Section 15 of the New York Debtor and Creditor Law; and

(C)     an Opinion of Counsel in each jurisdiction in which the Issuer is conducting business in a manner which causes the Holders of the Notes to be liable for taxes on payments under the Notes for which they would not have been so liable but for such conduct of business in such other jurisdiction, to the effect that the Holders will not recognize income, gain or loss in the relevant jurisdiction as a result of such deposit and the defeasance and will be subject to taxes in the relevant jurisdiction (including withholding taxes) (as applicable) on the same amount and in the same manner and at the same times as would otherwise have been the case if such deposit and defeasance had not occurred.

(v)     If the Notes are listed on a U.S. national securities exchange, the Issuer has delivered to the Trustee an Opinion of Counsel to the effect that the deposit and defeasance will not cause the Notes to be delisted.

(vi)     The Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, in each case stating that all conditions precedent provided for herein relating to the defeasance have been complied with.

Prior to the end of the 123 day period, none of the Issuer's obligations under this Indenture will be discharged.  Thereafter, the Trustee upon request will acknowledge in writing the discharge of the Issuer's obligations under the Notes and this Indenture except for the surviving obligations specified above.

Section 8.03. *Covenant Defeasance*.  After the 123rd day following the deposit referred to in Section 8.01(a)(ii), the Issuer's obligations set forth in Section 4.06 through 4.08, inclusive, will terminate, and clauses (d) and (g) of Section 6.01 will no longer constitute an Event of Default, provided that the following conditions have been satisfied:

(i)     The Issuer has complied with clauses (i), (ii), (iii), (iv)(B), (v) and (vi) of Section 8.02; and

(ii)     the Issuer has delivered to the Trustee an Opinion of Counsel to the effect that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the defeasance and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case.

Except as specifically stated above, none of the Issuer's obligations under this Indenture will be discharged.

Section 8.04. Application of Trust Money.  Subject to Section 8.05, the Trustee will hold in trust the funds in Dollars or U.S. Government Obligations in Dollars

53

deposited with it pursuant to Section 8.01, 8.02 or 8.03, and apply the deposited funds in Dollars and the proceeds from deposited U.S. Government Obligations in Dollars to the payment of principal of and interest on the Notes in accordance with the Notes and this Indenture.  Such Dollar funds and U.S. Government Obligations need not be segregated from other funds except to the extent required by law.

Section 8.05.  *Repayment to Issuer*.  Subject to Section 7.07, 8.01, 8.02 and 8.03, the Trustee and the Paying Agents will promptly pay to the Issuer upon request any excess funds in Dollars held by the Trustee and the Paying Agents at any time and thereupon be relieved from all liability with respect to such funds.  The Trustee or such Paying Agent will pay to the Issuer upon request any funds in Dollars held for payment with respect to the Notes that remains unclaimed for two years; provided that before making such payment the Trustee or such Paying Agent may at the expense of the Issuer publish once in a newspaper of general circulation in New York City, or send to each Holder entitled to such Dollar denominated funds, notice that the funds remains unclaimed and that after a date specified in the notice (at least 30 days after the date of the publication or notice) any remaining unclaimed balance of money will be repaid to the Issuer.  After payment to the Issuer, Holders entitled to such funds must look solely to the Issuer for payment, unless applicable law designates another Person, and all liability of the Trustee and the Paying Agents with respect to such funds will cease.

Section 8.06.  *Reinstatement*.  If and for so long as the Trustee is unable to apply any funds in Dollars or U.S. Government Obligations in Dollars held in trust pursuant to Section 8.01, 8.02 or 8.03 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's obligations under this Indenture and the Notes will be reinstated as though no such deposit in trust had been made.  If the Issuer makes any payment of principal of or interest on any Notes because of the reinstatement of its obligations, it will be subrogated to the rights of the Holders of such Notes to receive such payment from the funds in Dollars or U.S. Government Obligations in Dollars held in trust.

## ARTICLE 9
## AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 9.01.  *Amendments Without Consent of Holders*.  The Issuer, the Guarantors and the Trustee may waive, consent, amend or supplement this Indenture, the Notes or the Guarantees without notice to or the consent of any Noteholder:

(i)      to cure any ambiguity, omission, defect, inconsistency or to correct a manifest error in this Indenture, the Notes or the Guarantees;

(ii)      to comply with Section 5.01 and Section 9.03;

(iii)      to evidence and provide for the acceptance of an appointment by a successor Trustee;

(iv)     to provide for uncertificated Notes in addition to or in place of Certificated Notes provided that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code;

(v)     to provide for any additional Guarantee of the Notes or to secure the Notes or confirm and evidence the release, termination or discharge of any Guarantee or Lien securing the Notes when such release, termination or discharge is permitted by this Indenture;

(vi)     to provide for or confirm the issuance of Additional Notes;

(vii)     to add to the covenants of the Issuer or Guarantors for the benefit of the Holders of the Notes;

(viii)     to make any other change that does not materially and adversely affect the rights of any Holder; or

(ix)     to conform any provision of this Indenture to the description of the Notes in the Offering Memorandum.

Section 9.02. *Amendments With Consent of Holders.*  (a)  Except as otherwise provided in Section 6.02 through 6.07 or paragraph (b) of this Section 9.02, the Issuer, the Guarantors and the Trustee may amend this Indenture, the Notes and the Guarantees with the written consent of the Holders of a majority in aggregate principal amount of the Outstanding Notes, and the Holders of a majority in aggregate principal amount of the Outstanding Notes by written notice to the Trustee may waive future compliance by the Issuer with any provision of this Indenture, the Notes or the Guarantees.

(b)     Notwithstanding the provisions of paragraph (a), without the consent of each Holder affected, an amendment or waiver may not:

(i)     reduce the principal amount of or change the Stated Maturity of any payment of principal or any installment of interest on any Note;

(ii)     reduce the rate of interest or change the method of computing the amount of interest payable on any Note;

(iii)     reduce the amount payable upon the redemption of any Note or change the time of any mandatory redemption or, in respect of an optional redemption, the times at which any Note may be redeemed or, once notice of redemption has been given, the time at which it must thereupon be redeemed provided, however, the minimum notice period for such redemption (but not the times of redemption) may be changed with the written consent of the Holders of a majority in principal amount of the outstanding Notes;

(iv)     make any Note payable in currency other than that stated in the Note;

(v)    impair the contractual right of any Holder of Notes to receive any principal payment or interest payment on such Holder's Notes, on or after the Stated Maturity thereof, or to institute suit for the enforcement of any such payment;

(vi)    make any change in the percentage of the principal amount of the Notes required for amendments or waivers; or

(vii)    modify or change any provision of this Indenture affecting the ranking of the Notes in a manner adverse to the Holders of the Notes (it being understood that changes in provisions affecting the ability to create Liens over the assets of the Issuer shall not affect the "ranking" of the Notes as that term is used in this subsection (vii)).

(c)    It is not necessary for Noteholders to approve the particular form of any proposed amendment, supplement or waiver, but is sufficient if their consent approves the substance thereof.

(d)    Subject to Section 9.05, an amendment, supplement or waiver under this Section will become effective on receipt by the Trustee of written consents from the Holders of the requisite percentage in principal amount of the Outstanding Notes. After an amendment, supplement or waiver under this Section becomes effective, the Issuer will send to the Holders affected thereby a notice briefly describing the amendment, supplement or their written waiver. Any failure of the Issuer to send such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such supplemental Indenture or waiver.

Section 9.03. *Substitution of the Issuer.* (a) Without the consent of any Holder of Notes, the Issuer may be replaced and substituted, as principal debtor in respect of the Notes, by (x) either Guarantor or (y) any Subsidiary of a Guarantor (in each case, in that capacity, the "**Substituted Issuer**"); provided that the following conditions are satisfied:

(i)    such documents will be executed by the Substituted Issuer, the Issuer, the Guarantors and the Trustee as may be necessary to give full effect to the substitution, including a supplemental indenture under which the Substituted Issuer assumes all of the obligations of the Issuer under this Indenture and Notes and, unless a Guarantor is the Substituted Issuer or the Guarantor's then-existing Guarantee remains in full force and effect, a substitute Guarantee issued by the Guarantor in respect of the Notes (collectively, the "**Substitution Documents**");

(ii)    if the Substituted Issuer is organized in a jurisdiction other than Luxembourg, the Substitution Documents will contain covenants (i) to ensure that each Holder of Notes has the benefit of a covenant in terms corresponding to the obligations of the Issuer, in respect of the payment of Additional Amounts (but replacing references to Luxembourg with references to the jurisdiction of organization of the Substituted Issuer) and (ii) to indemnify each Holder and

beneficial owner of Notes against all taxes or duties that (a) arise by reason of a law or regulation in effect or contemplated on the effective date of the substitution that are incurred or levied against such Holder or beneficial owner of Notes as a result of the substitution and that would not have been so incurred or levied had the substitution not been made, and (b) are imposed on such Holder or beneficial owner of Notes by any political subdivision or taxing authority of any country in which such Holder or beneficial owner of the Notes resides or is subject to any such tax or duty and that would not have been so imposed had the substitution not been made;

     (iii)    the Issuer will deliver, or cause the delivery, to the Trustee opinions from internationally recognized counsel in the jurisdiction of organization of the Substituted Issuer and the State of New York to the effect that the Substitution Documents constitute valid and binding obligations of the Substituted Issuer, as well as an Officer's Certificate as to compliance with the provisions described under this section;

     (iv)    the Substituted Issuer shall appoint a process agent in the Borough of Manhattan in The City of New York to receive service of process on its behalf in relation to any legal action or proceedings arising out of or in connection with Notes, this Indenture and the Substitution Documents;

     (v)    no Event of Default has occurred or is continuing; and

     (vi)    the substitution shall comply with all applicable requirements under the laws of the jurisdiction of organization of the Substituted Issuer and Luxembourg.

     (b)    Upon the execution of the Substitution Documents, any substitute guarantee and compliance with the other conditions in this Indenture relating to the substitution, (i) the Substituted Issuer shall be deemed to be named in the Notes as the principal debtor in place of the Issuer and (ii) the Issuer (or any previous substitute) shall be released from all of its obligations under the Notes and this Indenture and any reference in this Indenture to the Issuer shall from then on be deemed to refer to the Substituted Issuer and any reference to the country in which the Issuer is domiciled or resident for taxation purposes shall from then on be deemed to refer to the country of domicile or residence for taxation purposes of the Substituted Issuer.

     (c)    Not later than 10 Business Days after the execution of the Substitution Documents, the Substituted Issuer shall give written notice thereof to the Holders of Notes.

     (d)    Notwithstanding anything to the contrary, this Section 9.03 is not applicable to the extent the Issuer complies with Section 5.01.

     Section 9.04. *Effect of Consent*.  (a)  After an amendment, supplement or waiver becomes effective, it will bind every Holder unless it is of the type requiring the consent of each Holder affected.  If the amendment, supplement or waiver is of the type

requiring the consent of each Holder affected, the amendment, supplement or waiver will bind each Holder that has consented to it and every subsequent Holder of a Note that evidences the same debt as the Note of the consenting Holder.

(b)     If an amendment, supplement or waiver changes the terms of a Note, the Trustee may require the Holder to deliver it to the Trustee so that the Trustee may place an appropriate notation of the changed terms on the Note and return it to the Holder, or exchange it for a new Note that reflects the changed terms.  The Trustee may also place an appropriate notation on any Note thereafter authenticated.  However, the effectiveness of the amendment, supplement or waiver is not affected by any failure to annotate or exchange Notes in this fashion.

Section 9.05.  *Trustee's Rights and Obligations*.  Other than Section 9.01 above (except for paragraph (vii) therein), the Trustee is entitled to receive, and will be fully protected in relying upon, in addition to the documents required by Section 11.03, an Officer's Certificate and an Opinion of Counsel each stating that the execution of any amendment, supplement or waiver authorized pursuant to this Article is authorized or permitted by this Indenture.  If the Trustee has received such an Officer's Certificate and Opinion of Counsel, it shall sign the amendment, supplement or waiver so long as the same does not adversely affect the rights of the Trustee.  The Trustee may, but is not obligated to, execute any amendment, supplement or waiver that affects the Trustee's own rights, duties or immunities under this Indenture.

ARTICLE 10
GUARANTEES

Section 10.01.          *Guarantees*.

(a)     Each Guarantor hereby jointly and severally, irrevocably and unconditionally guarantees, as a primary obligor and not merely as a surety, to each Holder and to the Trustee and its successors and assigns (i) the full and punctual payment when due, whether by acceleration, by redemption or otherwise, of all obligations of the Issuer under this Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, interest on or liquidated damages, if any, in respect of the Notes and all other monetary obligations of the Issuer under this Indenture and the Notes and (ii) the full and punctual performance within applicable grace periods of all other obligations of the Issuer whether for fees, expenses, indemnification or otherwise under this Indenture and the Notes (all the foregoing being hereinafter collectively called the "**Guaranteed Obligations**").  Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from each such Guarantor, and that each such Guarantor shall remain bound under this Article 10 notwithstanding any extension or renewal of any Guaranteed Obligation.

(b)     Each Guarantor waives, to the fullest extent permitted by law, presentation to, demand of payment from and protest to the Issuer of any of the Guaranteed Obligations and also waives notice of protest for nonpayment.  Each Guarantor waives notice of any default under the Notes or the Guaranteed Obligations.  The obligations of

each Guarantor hereunder shall not be affected by (i) the failure of any Holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Issuer or any other Person under this Indenture, the Notes or any other agreement or otherwise; (ii) any extension or renewal of any thereof; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any Holder or the Trustee for the Guaranteed Obligations or any of them; (v) the failure of any Holder or Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (vi) any change in the ownership of such Guarantor.

(c)     Each Guarantor hereby waives, to the fullest extent permitted by law, any right to which it may be entitled to have its obligations hereunder divided among the Guarantors, such that such Guarantor's obligations would be less than the full amount claimed. Each Guarantor hereby waives, to the fullest extent permitted by law, any right to which it may be entitled to have the assets of the Issuer first be used and depleted as payment of the Issuer's or such Guarantor's obligations hereunder prior to any amounts being claimed from or paid by such Guarantor hereunder. Each Guarantor hereby waives any right to which it may be entitled to require that the Issuer be sued prior to an action being initiated against such Guarantor. Each Guarantor hereby waives the benefits to which it is entitled under Articles 333, 827, 829, 830, 834, 835, 837, 838 and 839 of the Brazilian Civil Code, and Article 794 of the Brazilian Code of Civil Procedure.

(d)     Each Guarantor further agrees that its guarantee herein constitutes a guarantee of payment, performance and compliance when due (and not a guarantee of collection) and waives any right to require that any resort be had by any Holder or the Trustee to any security held for payment of the Guaranteed Obligations.

(e)     Except as expressly set forth in Section 10.02 below, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of any Holder or the Trustee to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Guarantor or would otherwise operate as a discharge of any Guarantor as a matter of law or equity.

(f)     Each Guarantor agrees that its guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations. Each Guarantor further agrees that its guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest or liquidated damages, if any, on any Guaranteed Obligation is rescinded or must otherwise be restored

by any Holder or the Trustee upon the bankruptcy or reorganization of the Issuer or otherwise.

(g)     In furtherance of the foregoing and not in limitation of any other right which any Holder or the Trustee has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Issuer to pay the principal of or interest or liquidated damages, if any, on any Guaranteed Obligation when and as the same shall become due, whether by acceleration, by redemption or otherwise, or to perform or comply with any other Guaranteed Obligation, each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the Principal Paying Agent for the benefit of Holders or the Trustee an amount equal to the sum of (i) the unpaid principal amount of such Guaranteed Obligations, (ii) accrued and unpaid interest on such Guaranteed Obligations and (iii) all other monetary obligations of the Issuer to the Holders and the Trustee.

(h)     Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any Guaranteed Obligations guaranteed hereby until payment in full of all Guaranteed Obligations.  Each Guarantor further agrees that, as between it, on the one hand, and the Holders and the Trustee, on the other hand, (i) the maturity of the Guaranteed Obligations guaranteed hereby may be accelerated as provided in Article 6 for the purposes of any guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Guaranteed Obligations as provided in Article 6, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by such Guarantor for the purposes of this Section 10.01.

(i)     Each Guarantor also agrees to pay any and all reasonable and documented costs and expenses (including reasonable and documented attorneys' fees and expenses) incurred by the Trustee  in enforcing any rights under this Section 10.01, except to the extent that any such costs or expenses arise as a result of the Trustee's own gross negligence or willful misconduct.

(j)     Upon request of the Trustee, each Guarantor shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture

Section 10.02.     *Limitation on Liability*.  Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations guaranteed hereunder by any Guarantor shall not exceed the maximum amount that can be hereby guaranteed without rendering this Indenture, as it relates to such Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

Section 10.03.     *Successors and Assigns*.  This Article 10 shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit

of the successors and assigns of the Trustee and the Holders and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Securities shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture.

Section 10.04.    *No Waiver*.  Neither a failure nor a delay on the part of either the Trustee or the Holders in exercising any right, power or privilege under this Article 10 shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege.  The rights, remedies and benefits of the Trustee and the Holders herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which either may have under this Article 10 at law, in equity, by statute or otherwise.

Section 10.05.    *Modification*.  No modification, amendment or waiver of any provision of this Article 10, nor the consent to any departure by any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Trustee, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on any Guarantor in any case shall entitle such Guarantor to any other or further notice or demand in the same, similar or other circumstances.

Section 10.06.    *Non-Impairment*.  The failure to endorse a guarantee on any Note shall not affect or impair the validity thereof.

ARTICLE 11
MISCELLANEOUS

Section 11.01.    *Noteholder Communications; Noteholder Actions*. (a) The rights of Holders to communicate with other Holders with respect to this Indenture or the Notes are as provided by the Trust Indenture Act, and the Issuer and the Trustee shall comply with the requirements of TIA Sections 312(a) and 312(b).  Neither the Issuer nor the Trustee will be held accountable by reason of any disclosure of information as to names and addresses of Holders made pursuant to the Trust Indenture Act.

(b)    (i) Any request, demand, authorization, direction, notice, consent to amendment, supplement or waiver or other action provided by this Indenture to be given or taken by a Holder (an "act") may be evidenced by an instrument signed by the Holder delivered to the Responsible Office of the Trustee.  The fact and date of the execution of the instrument, or the authority of the person executing it, may be proved in any manner that the Trustee deems sufficient.

(ii)    The Trustee may make reasonable rules for action by or at a meeting of Holders, which will be binding on all the Holders.

(c)      Any act by the Holder of any Note binds that Holder and every subsequent Holder of a Note that evidences the same debt as the Note of the acting Holder, even if no notation thereof appears on the Note.  Subject to paragraph (c), a Holder may revoke an act as to its Notes, but only if the Responsible Officer of the Trustee receives the written notice of revocation before the date the amendment or waiver or other consequence of the act becomes effective.

(d)      The Issuer may, but is not obligated to, fix a record date for the purpose of determining the Holders entitled to act with respect to any amendment or waiver or in any other regard, except that during the continuance of an Event of Default, only the Trustee may set a record date as to notices of Default, any declaration or acceleration or any other remedies or other consequences of the Event of Default.  If a record date is fixed, those Persons that were Holders at such record date and only those Persons will be entitled to act, or to revoke any previous act, whether or not those Persons continue to be Holders after the record date.

(e)      If the Issuer shall solicit from the Holders any request, demand, authorization, direction, notice, consent, waiver or other act, the Issuer may, at its option, in or pursuant to a Board Resolution, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other act, but the Issuer shall have no obligation to do so.  Such record date shall be the record date specified in or pursuant to such Board Resolution, which shall be a date not earlier than the date 30 days prior to the first solicitation of Holders generally in connection therewith and not later than the date such solicitation is completed.  If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other Act may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of Outstanding Notes have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other Act, and for that purpose the Outstanding Notes shall be computed as of such record date; provided that no such authorization, agreement or consent by the Holders on such record date shall be deemed effective unless it shall become effective pursuant to the provisions of this Indenture not later than eleven months after the record date.

Section 11.02.      *Notices*.  (a) Any notice or communication to the Issuer will be deemed given if in English and in writing (i) when delivered in person or (ii) an internationally recognized overnight courier service, or (iii) when sent by facsimile transmission, with transmission confirmed.  Any notice to the Trustee will be effective only upon receipt by the Responsible Officer of the Trustee provided such notice is in writing and in English and (i) delivered in person or (ii) an internationally recognized overnight courier service, or (iii) when sent by facsimile transmission, with transmission confirmed.  In each case the notice or communication should be addressed as follows:

*if to the Issuer or the Guarantors*:

c/o Raízen Combustíveis S.A. and Raízen Energia S.A

62

Av. Juscelino Kubitschek, 1327 – 5th Floor
04543-000
São Paulo – SP, Brazil
Attention: Celso Henrique Martins Silva and Rafael Loureiro

With a copy to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
USA
Attention: Manuel Garciadiaz, Esq.
Facsimile: (212) 701-5428

*and*

Raizen Fuels Finance S.A.
14, rue Edward Steichen, L-2540
Luxembourg, Grand Duchy of Luxembourg
Attention: Board of Directors of Raizen Fuels Finance S.A.

*if to the Trustee, Principal Paying Agent, Registrar and Transfer Agent:*

U.S. Bank National Association
100 Wall Street, 16th Floor
New York, New York 10005
USA
Attention: Global Corporate Trust Services


    The Issuer or the Trustee by notice to the other may designate additional or different addresses for subsequent notices or communications.

    (b)    Except as otherwise expressly provided with respect to published notices, any notice or communication to a Holder will be deemed given when mailed to the Holder at its address as it appears on the Register by first class mail or, as to any Global Note registered in the name of DTC or its nominee, as agreed by the Issuer, the Trustee and DTC; *provided*, that, at any time when the Notes are listed on the Official List of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market and its rules so require, the Issuer will publish any such notice of communication sent to the Holders in a newspaper having a general circulation in Luxembourg, or alternatively, notice to Holders may be published on the website of the Luxembourg Stock Exchange at www.bourse.lu.  Such notice will be deemed given on the date of its first publication. Copies of any notice or communication to a Holder, if given by the Issuer, will be mailed to the Trustee and the Transfer Agent and Paying Agents at the same time.  Defect in mailing a notice or communication to any particular Holder will not affect its sufficiency with respect to other Holders.

(c)      Where this Indenture provides for notice, the notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and the waiver will be the equivalent of the notice.  Waivers of notice by Holders must be filed with the Trustee, but such filing is not a condition precedent to the validity of any action taken in reliance upon such waivers.

The Trustee agrees to accept and act upon instructions or directions pursuant to this Indenture sent by unsecured e-mail, pdf, facsimile transmission or other similar unsecured electronic methods; *provided*, however, that the Trustee shall have received an incumbency certificate listing persons designated to give such instructions or directions and containing specimen signatures of such designated persons, which such incumbency certificate shall be amended and replaced whenever a person is to be added or deleted from the listing.  If the Issuer elects to give the Trustee e-mail or facsimile instructions (or instructions by a similar electronic method) and the Trustee in its discretion elects to act upon such instructions, the Trustee's understanding of such instructions shall be deemed controlling. The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction, except to the extent that any such losses, costs or expenses arise as a result of the Trustee's own gross negligence or willful misconduct. The Issuer agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized instructions, and the risk or interception and misuse by third parties.

Section 11.03.        *Certificate and Opinion as to Conditions Precedent*. Upon any request or application by the Issuer or the Guarantors to the Trustee to take any action under this Indenture, each of the Issuer and the Guarantors will furnish to the Trustee:

(i)      an Officer's Certificate stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(ii)      an Opinion of Counsel stating that all such conditions precedent have been complied with.

Section 11.04.        *Statements Required in Certificate or Opinion*. Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture must include:

(i)      a statement that each person signing the certificate or opinion has read the covenant or condition and the related definitions;

(ii)      a brief statement as to the nature and scope of the examination or investigation upon which the statement or opinion contained in the certificate or opinion is based;

(iii)      a statement that, in the opinion of each such person, that person has made such examination or investigation as is necessary to enable the person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(iv)      a statement as to whether or not, in the opinion of each such person, such condition or covenant has been complied with, provided that an Opinion of Counsel may rely on an Officer's Certificate or certificates of public officials with respect to matters of fact.

Section 11.05.       *Payment Date Other than a Business Day*.  If any payment with respect to a payment of any principal of, premium, if any, or interest on any Note (including any payment to be made on any date fixed for redemption of any Note) is due on a day which is not a Business Day, then the payment need not be made on such date, but may be made on the next Business Day with the same force and effect as if made on such date, and no interest will accrue for the intervening period.

Section 11.06.       *Governing Law*.  This Indenture, the Notes and the Guarantees shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to its choice of law principles. The application of the provisions set out in articles 84 to 94-8 of the Luxembourg law on commercial companies dated August 10, 1915, as amended, is excluded.

Section 11.07.       *Submission to Jurisdiction; Agent for Service*.  (a) Each of the Issuer and the Guarantors agrees that any suit, action or proceeding against it brought by any Noteholder or the Trustee arising out of or based upon this Indenture or the Notes may be instituted in any state or Federal court in the Borough of Manhattan in The City of New York, New York, and waives any objection which it may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submit to the non-exclusive jurisdiction of such courts in any suit, action or proceeding.

(b)      By the execution and delivery of this Indenture or any amendment or supplement hereto, each of the Issuer and the Guarantors (i) acknowledges that it hereby designates and appoints National Corporate Research, Ltd., currently located at 10 E. 40th Street, 10th Floor, New York, New York 10016, as its authorized agent upon which process may be served in any suit, action or proceeding with respect to, arising out of, or relating to, the Notes or this Indenture , that may be instituted in any Federal or state court in the State of New York, The City of New York, the Borough of Manhattan, or brought under Federal or state securities laws or brought by the Trustee (whether in its individual capacity or in its capacity as Trustee hereunder), and acknowledges that National Corporate Research, Ltd. has accepted such designation, (ii) submits to the non-exclusive jurisdiction of any such court in any such suit, action or proceeding, and (iii) agrees that service of process upon National Corporate Research, Ltd. shall be deemed in every respect effective service of process upon the Issuer or such Guarantor in any such suit, action or proceeding.  Each of the Issuer and the Guarantors further agrees to take any and all action, including the execution and filing of any and all such documents and instruments as may be necessary to continue such designation and appointment of

National Corporate Research, Ltd. in full force and effect so long as this Indenture shall be in full force and effect; provided that the Issuer and such Guarantor may and shall (to the extent National Corporate Research, Ltd. ceases to be able to be served on the basis contemplated herein), by written notice to the Trustee, designate such additional or alternative agents for service of process under this Section 11.07 that (i) maintains an office located in the Borough of Manhattan, The City of New York in the State of New York, (ii) are either (x) counsel for the Issuer or any Guarantor or (y) a corporate service company which acts as agent for service of process for other Persons in the ordinary course of its business and (iii) agrees to act as agent for service of process in accordance with this Section 11.07.  Such notice shall identify the name of such agent for process and the address of such agent for process in the Borough of Manhattan, The City of New York, State of New York.  Upon the request of any Noteholder, the Trustee shall deliver such information to such Noteholder.  Notwithstanding the foregoing, there shall, at all times, be at least one agent for service of process for the Issuer and each Guarantor appointed and acting in accordance with this Section 11.07.

Section 11.08.    *Judgment Currency*.  U.S. dollars are the sole currency of account and payment for all sums payable by the Issuer and the Guarantors under the Notes, the Guarantees and this Indenture. Any amount received or recovered in a currency other than U.S. dollars in respect of the Notes, the Guarantees or this Indenture (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Issuer, the Guarantors, any of their respective Significant Subsidiaries or otherwise) by the Trustee or any Holder in respect of any sum expressed to be due to it from the Issuer will constitute a discharge of the Issuer or the Guarantors only to the extent of the U.S. dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). If that U.S. dollar amount is less than the U.S. dollar amount expressed to be due to the recipient under any Note, the Issuer and the Guarantors, jointly and severally, will indemnify the recipient against the cost of making any such purchase; and if the amount of U.S. dollars so purchased is greater than the sum originally due to such recipient, such recipient, if a Holder, will, by accepting a note, and, if the Trustee, by executing the indenture, be deemed to have agreed to repay such excess. For purposes of this indemnity, it will be sufficient for the recipient to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had the actual purchase of U.S. dollars been made with the amount so received in that other currency on the date of receipt  or recovery (or, if a purchase of U.S. dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above).

The above indemnity, to the extent permitted by law:

(1) constitutes a separate and independent obligation from the other obligations of the Issuer and the Guarantors;

(2) will give rise to a separate and independent cause of action;

66

(3) will apply irrespective of any waiver or indulgence granted by the Trustee or any Holder; and

(4) will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any note or any other judgment.

Section 11.09.         *No Adverse Interpretation of Other Agreements*. This Indenture may not be used to interpret another indenture or loan or debt agreement of the Issuer, a Guarantor or any Subsidiary of a Guarantor, and no such indenture or loan or debt agreement may be used to interpret this Indenture.

Section 11.10.         *Successors*.  All agreements of the Issuer and each Guarantor in this Indenture and the Notes will bind its successors.  All agreements of the Trustee in this Indenture will bind its successor.

Section 11.11.         *Duplicate Originals*.  The parties may sign any number of copies of this Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

Section 11.12.         *Separability*.  In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 11.13.         *Table of Contents and Headings*.  The Table of Contents, Cross-Reference Table and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and in no way modify or restrict any of the terms and provisions of this Indenture.

Section 11.14.         *No Liability of Directors, Officers, Employees, Incorporators, Members and Stockholders*.  No past, present or future director, officer, employee, incorporator, member or shareholder of the Issuer or any Guarantor or their respective Subsidiaries, as such, will have any liability for any obligations of the Issuer or the Guarantors under the Notes, the Guarantees or this Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.

Section 11.15.         *Waiver of Jury Trial*.  EACH OF THE ISSUER, THE GUARANTORS AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTION CONTEMPLATED HEREBY.

Section 11.16.        *Tax Matters*.  Each of the Issuer and the Trustee agrees (i) to cooperate and to provide the other with such reasonable information as each may have in its possession to enable the determination of whether any payments pursuant to the Indenture are subject to the withholding requirements described in Section 1471(b) of the Code or otherwise imposed pursuant to Sections 1471 through 1474 of the Code and any regulations, or agreements thereunder or official interpretations thereof ("**Applicable Law**"), and (ii) that the Trustee shall be entitled to make any withholding or deduction from payments under the Indenture to the extent necessary to comply with Applicable Law, for which the Trustee shall not have any liability.

Section 11.17.        *Contractual Recognition of Bail-in Powers.* Notwithstanding any other term of this Indenture or any other agreements, arrangements, or understanding between the parties, each counterparty to a BRRD Party under this Indenture acknowledges, accepts, and agrees to be bound by:

(a)      the effect of the exercise of Bail-in Powers by the Relevant Resolution Authority in relation to any BRRD Liability of any BRRD Party to it under this Indenture, that (without limitation) may include and result in any of the following, or some combination thereof:

(i)      the reduction of all, or a portion, of the BRRD Liability or outstanding amounts due thereon;

(ii)      the conversion of all, or a portion, of the BRRD Liability into shares, other securities or other obligations of the relevant BRRD Party or another person (and the issue to or conferral on it of such shares, securities or obligations);

(iii)      the cancellation of the BRRD Liability;

(iv)      the amendment or alteration of the amounts due in relation to  the BRRD Liability, including any interest, if applicable, thereon, the maturity or the dates on which any payments are due, including by suspending payment for a temporary period; and

(b)      the variation of the terms of this Indenture, as deemed necessary by the Relevant Resolution Authority, to give effect to the exercise of Bail-in Powers by the Relevant Resolution Authority.

Section 11.18.        *USA Patriot Act.*  The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. PATRIOT Act, the Trustee is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee. The parties to the Indenture agree that they will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the U.S.A. PATRIOT Act.

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

RAIZEN FUELS FINANCE S.A.
as Issuer

By: _____

Name:  Guilherme Jose de          Celso Henrique
       Vasconcelos Cerqueira      Martins Silva
Title: Attorney in fact           Attorney in fact


RAÍZEN COMBUSTÍVEIS S.A.
as Guarantor

By: _____
Name:  Guilherme Jose de Vasconcelos Cerqueira
Title: Attorney in fact

By: _____
Name:  Celso Henrique Martins Silva
Title: Attorney in fact


RAÍZEN ENERGIA S.A.
as Guarantor

By: _____
Name:  Guilherme Jose de Vasconcelos Cerqueira
Title: Attorney in fact

By: _____
Name:  Celso Henrique Martins Silva
Title: Attorney in fact


*(Signature Page to Indenture)*

U.S. BANK NATIONAL ASSOCIATION
as Trustee, Principal Paying Agent,
Registrar and Transfer Agent

By: _____

Name: Michelle Mena-Rosado

Title: Vice President

[*Signature Page to Indenture*]

EXECUTION VERSION

**EXHIBIT A**

**[FACE OF NOTE]**

**RAIZEN FUELS FINANCE S.A.**

5.300% Note Due 2027

[CUSIP]  [ISIN] _____

No.                                     US$_____

      RAIZEN FUELS FINANCE S.A., a public limited liability company (*société anonyme*) organized and established under the laws of the Grand Duchy of Luxembourg, having its registered office at 14, Rue Edward Steichen, L-2540 Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 184.033 (the "**Issuer**", which term includes any successor under the Indenture hereinafter referred to), for value received, promises to pay to _____, or its registered assigns, the principal sum of _____ DOLLARS (US$_____).

      Interest Rate:      5.300% per annum.

      Interest Payment Dates: January 20 and July 20 of each year, commencing on July 20, 2017.

      Regular Record Dates: January 18 and July 18 of each year.

      Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which will for all purposes have the same effect as if set forth at this place.

IN WITNESS WHEREOF, the Issuer has caused this Note to be signed manually or by facsimile by its duly authorized signatory.

RAIZEN FUELS FINANCE S.A.
as Issuer

By: _____
       Name:
       Title:

Trustee's Certificate of Authentication

This is one of the 5.300% Notes Due 2027 described in the Indenture referred to in this Note.

U.S. Bank National Association, as Trustee

By: _____
       Authorized Officer

Dated:

A-2

**[REVERSE SIDE OF NOTE]**

**RAIZEN FUELS FINANCE S.A.**

**5.300% Note Due 2027**

1.      *Principal and Interest.*

The Issuer promises to pay the principal of this Note on the Maturity Date.  The Issuer promises to pay interest on the principal amount of this Note on each Interest Payment Date, as set forth on the face of this Note at the rate of 5.300% per annum. Interest will be payable semiannually (to the holders of record of the Notes at the close of business on the January 18 or July 18 immediately preceding the Interest Payment Date) on each Interest Payment Date, commencing on July 20, 2017.

Interest on this Note will accrue from the most recent date to which interest has been paid on this Note (or, if there is no existing Default in the payment of interest and if this Note is authenticated between a regular record date and the next Interest Payment Date, from such Interest Payment Date) or, if no interest has been paid, from the Issue Date.  Interest will be computed in the basis of a 360 day year of twelve 30 day months.

The Issuer will pay interest on overdue principal, premium, if any, and, to the extent lawful, interest at a rate per annum that is 1% per annum in excess of the rate per annum borne by this Note.  Interest not paid when due and any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the 2nd day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least two days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.

Additional Amounts will be paid in respect of any payments of interest or principal so that the amount a Holder receives after applicable deduction or withholding will equal the amount that the Holder would have received in the absence of such deduction or withholding, to the extent described in Section 3.01 of the Indenture.

2.      *Indentures; Note.*

This is one of the Notes issued under an Indenture dated as of January 20, 2017 (as amended or supplemented from time to time, the "**Indenture**"), among the Issuer, Raízen Combustíveis S.A. ("**Raízen Combustíveis**") and Raízen Energia S.A. ("**Raízen Energia**") as the Guarantors, and U.S. Bank National Association, as Trustee, Principal Paying Agent, Registrar and Transfer Agent.  Capitalized terms used herein are used as defined in the Indenture unless otherwise indicated.  The terms of the Notes include those stated in the Indenture, as may be amended from time to time.  The Notes are subject to all such terms, and Holders are referred to the Indenture for a statement of all such terms. To the extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture will control.

A-3

The Notes are general unsecured and unsubordinated obligations of the Issuer, being equal in right of payment with all existing and future unsecured unsubordinated obligations of the Issuer.  The Indenture limits the original aggregate principal amount of the Notes to US$500,000,000, but Additional Notes may be issued pursuant to the Indenture, and the originally issued Notes and all such Additional Notes shall vote together for all purposes as a single class.

The Guarantees are unsecured unsubordinated obligations of Raízen Combustíveis and Raízen Energia, being equal in right of payment with all existing and future unsecured unsubordinated obligations of Raízen Combustíveis and Raízen Energia.

3.      *Redemption and Repurchase; Discharge Prior to Redemption or Maturity*.

The Note is subject to redemption for taxation reasons as described in Section 3.03 of the Indenture and Optional Redemption as described in Section 3.02 of the Indenture.

The Note is subject to repurchase upon a Change of Control that results in a Rating Decline as described in Section 4.06 of the Indenture.

4.      *Registered Form; Denominations; Transfer; Exchange*.

The Notes are in registered form without coupons in denominations of US$200,000 of original principal amount and any multiple of US$1,000 in excess thereof.  A Holder may register the transfer or exchange of Notes in accordance with the Indenture.  The Trustee may require a Holder to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.  Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to issue, register the transfer of or exchange any Note or certain portions of a Note.

5.      *Defaults and Remedies*.

If an Event of Default, as defined in the Indenture, occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the Notes may declare all the Notes to be due and payable.  If a bankruptcy default with respect to the Issuer occurs and is continuing, the Notes automatically become due and payable.  Holders may not enforce the Indenture or the Notes except as provided in the Indenture.  The Trustee may require indemnity satisfactory to it before it enforces the Indenture or the Notes.  Subject to certain limitations, Holders of a majority in principal amount of the Notes then Outstanding may direct the Trustee in its exercise of remedies.

6.      *Amendment and Waiver*.

Subject to certain exceptions, the Indenture and the Notes may be amended, or Default may be waived, with the consent of the Holders of a majority in principal amount of the Outstanding Notes.  Without notice to or the consent of any Holder, the Issuer, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the

A-4

Guarantees to, among other things, cure any ambiguity, omission, defect, inconsistency or to correct a manifest error if such amendment or supplement does not adversely affect the interests of the Holders in any material respect.

7.    *Authentication*.

This Note is not valid until the Trustee (or Authenticating Agent) signs the certificate of authentication on the other side of this Note.

8.    *Governing Law*.

This Note shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to its choice of law principles.  Reference is hereby made to the further provisions of submission to jurisdiction, agent for service, waiver of immunities and judgment currency set forth in the Indenture, which will for all purposes have the same effect as if set forth herein. The application of the provisions set out in articles 84 to 94-8 of the Luxembourg law on commercial companies dated August 10, 1915, as amended, is excluded.

9.    *Abbreviations*.

Customary abbreviations may be used in the name of a Holder or an assignee, such as:  TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian) and U/G/M/A/ (= Uniform Gifts to Minors Act).

The Issuer will furnish a copy of the Indenture to any Holder upon written request and without charge.

A-5

**FORM OF NOTATION ON SECURITY RELATING TO GUARANTEE**

For value received, each of the undersigned hereby unconditionally guarantees to the Holder of this Note, the cash payments in U.S. dollars of principal and interest on this Note (and including Additional Amounts payable thereon, if any) in the amounts and at the times when due, together with interest on the overdue principal and interest, if any, on this Note, if lawful, and the payment of all other obligations of the Issuer under the Indenture or the Notes, to the Holder of this Note and the Trustee, all in accordance with and subject to the terms and conditions of this Security and the Indenture. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture, dated as of January 20, 2017 among Raizen Fuels Finance S.A., as the Issuer, Raízen Combustíveis S.A. ("**Raízen Combustíveis**") and Raízen Energia S.A. ("**Raízen Energia**") as the Guarantors, and U.S. Bank National Association, as Trustee, Principal Paying Agent, Registrar and Transfer Agent.

The obligations of the undersigned to the Holders and to the Trustee are expressly set forth in Article 10 of the Indenture. This Guarantee constitutes a direct, general and unconditional obligation of the undersigned which will at all times rank at least pari passu with all other present and future senior unsecured obligations of the undersigned, except for such obligations as may be preferred by mandatory provisions of law.

IN WITNESS WHEREOF, each of Raízen Combustíveis and Raízen Energia has caused this endorsement with respect to the U.S.$500,000,000 5.300% Notes due 2027 of Raizen Fuels Finance S.A. to be duly executed.

Dated: [        ]

RAÍZEN COMBUSTÍVEIS S.A.
as Guarantor

By: _____
    Name:
    Title:


By: _____
    Name:
    Title:


RAÍZEN ENERGIA S.A.
as Guarantor

By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

[FORM OF TRANSFER NOTICE]

FOR VALUE RECEIVED the undersigned registered Holder hereby sell(s), assign(s) and transfer(s) unto

Insert Taxpayer Identification No.

_____

_____

Please print or typewrite name and address including zip code of assignee

_____

the within Note and all rights thereunder, hereby irrevocably constituting and appointing

_____

attorney to transfer said Note on the books of the Issuer with full power of substitution in the premises.

A-8

[THE FOLLOWING PROVISION TO BE INCLUDED ON ALL CERTIFICATES
BEARING A RESTRICTED LEGEND]

In connection with any transfer of this Note occurring prior to _____, 20   , the undersigned confirms that such transfer is made without utilizing any general solicitation or general advertising and further as follows:

*Check One*

☐      (1) This Note is being transferred to a "qualified institutional buyer" in compliance with Rule 144A under the U.S. Securities Act of 1933, as amended, and certification in the form of Exhibit E to the Indenture is being furnished herewith.

☐      (2) This Note is being transferred to a Non-U.S. Person in compliance with the exemption from registration under the U.S. Securities Act of 1933, as amended, provided by Regulation S thereunder, and certification in the form of Exhibit D to the Indenture is being furnished herewith.

or

☐      (3) This Note is being transferred other than in accordance with (1) or (2) above and documents are being furnished which comply with the conditions of transfer set forth in this Note and the Indenture.

If none of the foregoing boxes is checked, the Trustee is not obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in the Indenture have been satisfied.

Date:

_____
Seller

By:   _____

NOTICE:  The signature to this assignment must correspond with the name as written upon the face of the within mentioned instrument in every particular, without alteration or any change whatsoever.

A-9

Signature Guarantee:[1]

By: _____
To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

## SCHEDULE OF EXCHANGES OF NOTES[1]

The following exchanges of a part of this Global Note for Physical Notes or a part of another Global Note have been made:

| Date of Exchange | Amount of decrease in original principal amount of this Global Note | Amount of increase in original principal amount of this Global Note | Original principal amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

---

[1] For Global Notes.

A-11

EXECUTION VERSION

**EXHIBIT B**

RESTRICTED LEGEND

THIS NOTE (OR ITS PREDECESSOR) HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND , ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE  ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS SET FORTH IN THE NEXT SENTENCE.  BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER:

(1)      REPRESENTS THAT IT IS NOT AN "AFFILIATE" (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF ANY OF THE ISSUER OR THE GUARANTORS AND (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) (A "QIB"), OR (B) IT HAS ACQUIRED THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT;

(2)      AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THIS NOTE OR ANY  BENEFICIAL INTEREST HEREIN EXCEPT (A) TO THE GUARANTORS, THE ISSUER, OR ANY OF THEIR  SUBSIDIARIES, (B) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QIB PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB IN A TRANSACTION  MEETING THE REQUIREMENTS OF RULE 144A, (C) IN AN OFFSHORE TRANSACTION MEETING THE  REQUIREMENTS OF RULE 903 OR 904 OF REGULATION S OF THE SECURITIES ACT, (D) IN A  TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT, (E) IN  ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE  SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER AND  THE TRUSTEE) OR (F) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH  CASE, IN ACCORDANCE WITH THE APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED  STATES OR ANY OTHER APPLICABLE JURISDICTION; AND

(3)      AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE OR AN INTEREST HEREIN IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.

AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTIONS" AND "UNITED STATES" HAVE THE MEANINGS GIVEN TO THEM BY RULE 902 OF REGULATION S UNDER THE SECURITIES ACT. THE INDENTURE CONTAINS A PROVISION REQUIRING THE TRUSTEE TO REFUSE TO REGISTER ANY TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING.

REGULATION S LEGEND

THIS NOTE (OR ITS PREDECESSOR) HAS NOT BEEN REGISTERED
UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES
ACT"), AND , ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR
OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR
THE  ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS SET FORTH IN
THE NEXT SENTENCE.  BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL
INTEREST HEREIN, THE HOLDER:

(1)	REPRESENTS THAT IT IS NOT AN "AFFILIATE" (AS DEFINED IN
RULE 144 UNDER THE SECURITIES ACT) OF ANY OF THE ISSUER OR THE
GUARANTORS AND (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS
DEFINED IN RULE 144A UNDER THE SECURITIES ACT) (A "QIB"), OR (B) IT
HAS ACQUIRED THIS NOTE IN AN OFFSHORE TRANSACTION IN
COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT;

(2)	AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER
THIS NOTE OR ANY  BENEFICIAL INTEREST HEREIN EXCEPT (A) TO THE
GUARANTORS, THE ISSUER, OR ANY OF THEIR  SUBSIDIARIES, (B) TO A
PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QIB
PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB IN A
TRANSACTION  MEETING THE REQUIREMENTS OF RULE 144A, (C) IN AN
OFFSHORE TRANSACTION MEETING THE  REQUIREMENTS OF RULE 903 OR
904 OF REGULATION S OF THE SECURITIES ACT, (D) IN A  TRANSACTION
MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT,
(E) IN  ACCORDANCE WITH ANOTHER EXEMPTION FROM THE
REGISTRATION REQUIREMENTS OF THE  SECURITIES ACT (AND BASED
UPON AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER AND  THE
TRUSTEE) OR (F) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT
AND, IN EACH  CASE, IN ACCORDANCE WITH THE APPLICABLE SECURITIES
LAWS OF ANY STATE OF THE UNITED  STATES OR ANY OTHER APPLICABLE
JURISDICTION; AND

(3)	AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM
THIS NOTE OR AN INTEREST HEREIN IS TRANSFERRED A NOTICE
SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.

AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTIONS" AND
"UNITED STATES" HAVE THE MEANINGS GIVEN TO THEM BY RULE 902 OF
REGULATION S UNDER THE SECURITIES ACT. THE INDENTURE CONTAINS A
PROVISION REQUIRING THE TRUSTEE TO REFUSE TO REGISTER ANY
TRANSFER OF THIS NOTE IN VIOLATION OF THE FOREGOING.

PRIOR TO THE EXPIRATION OF THE RESTRICTED PERIOD APPLICABLE
HERETO, BENEFICIAL INTERESTS HEREIN MAY NOT BE HELD BY ANY
PERSON OTHER THAN (1) A NON-U.S. PERSON OR (2) A U.S. PERSON THAT

B-2

PURCHASED SUCH INTEREST IN A TRANSACTION EXEMPT FROM
REGISTRATION UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED
(THE "**SECURITIES ACT**").  BENEFICIAL INTERESTS HEREIN ARE NOT
EXCHANGEABLE FOR CERTIFICATED NOTES OTHER THAN IN
ACCORDANCE WITH THE TERMS OF THE INDENTURE.

THIS LEGEND WILL BE REMOVED AFTER 40 CONSECUTIVE DAYS
BEGINNING ON AND INCLUDING THE DATE OF THE CLOSING OF THE
ORIGINAL OFFERING.  TERMS IN THIS LEGEND ARE USED AS USED IN
REGULATION S UNDER THE SECURITIES ACT.

EXECUTION VERSION

**EXHIBIT C**

DTC LEGEND

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS A BENEFICIAL INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE ARE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF CEDE & CO. OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL NOTE ARE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE TRANSFER PROVISIONS OF THE INDENTURE.

EXECUTION VERSION

**EXHIBIT D**

Regulation S Certificate

_____, _____

U.S. Bank National Association
100 Wall Street, 16th Floor
New York, New York 10005
USA
Attention: Global Corporate Trust Services

Re:    RAIZEN FUELS FINANCE S.A., as Issuer
       5.300% Notes due 2027 (the "**Notes**")
       Issued under the Indenture (the "**Indenture**") dated as of
       January 20, 2017 relating to the Notes

Ladies and Gentlemen:

Terms are used in this Certificate as used in Regulation S ("Regulation S") under the Securities Act of 1933, as amended (the "Securities Act"), except as otherwise stated herein.

[*CHECK A OR B AS APPLICABLE.*]

❑  A.    This Certificate relates to our proposed transfer of US$____ principal amount of Notes issued under the Indenture.  We hereby certify as follows:

1.    The offer and sale of the Notes was not and will not be made to a person in the United States (unless such person is excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(vi) or the account held by it for which it is acting is excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(i) under the circumstances described in Rule 902(h)(3)) and such offer and sale was not and will not be specifically targeted at an identifiable group of U.S. citizens abroad.

2.    Unless the circumstances described in the parenthetical in paragraph 1 above are applicable, either (a) at the time the buy order was originated, the buyer was outside the United States or we and any person acting on our behalf reasonably believed that the buyer was outside the United States or (b) the transaction was executed in, on or through the facilities of a designated offshore securities market, and neither we nor any person acting on our behalf knows that the transaction was pre-arranged with a buyer in the United States;

D-1

3.    Neither we, any of our affiliates, nor any person acting on our or their behalf, has made any directed selling efforts in the United States with respect to the Notes;

4.    The proposed transfer of Notes is not part of a plan or scheme to evade the registration requirements of the Securities Act; and

5.    If we are a dealer or a person receiving a selling concession, fee or other remuneration in respect of the Securities, and the proposed transfer takes place during the first 40 days following the execution of the Indenture, or we are an officer or director of the Issuer or an Initial Purchaser (as defined in the Indenture), we certify that the proposed transfer is being made in accordance with the provisions of Rule 904(b) of Regulation S.

❑ B.    This Certificate relates to our proposed exchange of US$_____ principal amount of Notes issued under the Indenture for an equal principal amount of Notes to be held by us.  We hereby certify as follows:

1.    At the time the offer and sale of the Notes was made to us, either (i) we were not in the United States or (ii) we were excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(vi) or the account held by us for which we were acting was excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(i) under the circumstances described in Rule 902(h)(3); and we were not a member of an identifiable group of U.S. citizens abroad;

2.    Unless the circumstances described in paragraph 1(ii) above are applicable, either (a) at the time our buy order was originated, we were outside the United States or (b) the transaction was executed in, on or through the facilities of a designated offshore securities market, and we did not pre-arrange the transaction in the United States.; and

3.    The proposed exchange of Notes is not part of a plan or scheme to evade the registration requirements of the Securities Act.

You and the Issuer are entitled to rely conclusively upon this Certificate and are irrevocably authorized to produce this Certificate or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

D-2

Very truly yours,

[NAME OF SELLER (FOR TRANSFERS)
OR OWNER (FOR EXCHANGES)]

By: _____
      Name:
      Title:
      Address

Date: _____

Signature Guarantee:[1]

By: _____
To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

D-4

EXECUTION VERSION

**EXHIBIT E**

Rule 144A Certificate

_____, _____

U.S. Bank National Association
100 Wall Street, 16th Floor
New York, New York 10005
USA
Attention: Global Corporate Trust Services

Re:    RAIZEN FUELS FINANCE S.A., as Issuer
       5.300% Notes due 2027 (the "**Notes**")
       Issued under the Indenture (the "**Indenture**") dated as of
       January 20, 2017 relating to the Notes

Ladies and Gentlemen:

This Certificate relates to:

[*CHECK A OR B AS APPLICABLE.*]

☐  A.    Our proposed purchase of US$____ principal amount of Notes issued
         under the Indenture.

☐  B.    Our proposed exchange of US$____ principal amount of Notes issued
         under the Indenture for an equal principal amount of Notes to be held by
         us.

We and, if applicable, each account for which we are acting in the aggregate
owned and invested more than US$[•] in securities of issuers that are not affiliated with
us (or such accounts, if applicable), as of _____, 200_, which is a date on or since
close of our most recent fiscal year.  We and, if applicable, each account for which we are
acting, are a qualified institutional buyer within the meaning of Rule 144A ("Rule
144A") under the Securities Act of 1933, as amended (the "Securities Act").  If we are
acting on behalf of an account, we exercise sole investment discretion with respect to
such account.  We are aware that the transfer of Notes to us, or such exchange, as
applicable, is being made in reliance upon the exemption from the provisions of Section 5
of the Securities Act provided by Rule 144A.  Prior to the date of this Certificate we have
received such information regarding the Issuer as we have requested pursuant to Rule
144A(d)(4) to the extent that the Issuer is not then subject  to Section 13 or 15(d) of the
Exchange Act, or is not exempt from reporting pursuant to Rule 12g3 2(b) under the
Exchange Act or have determined not to request such information.

You and the Issuer are entitled to conclusively rely upon this Certificate and are
irrevocably authorized to produce this Certificate or a copy hereof to any interested party

E-1

in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

Very truly yours,

[NAME OF PURCHASER (FOR TRANSFERS) OR OWNER (FOR EXCHANGES)]

By: _____
    Name:
    Title:
    Address:

Date: _____

E-2

Signature Guarantee:[1]

By: _____
To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

E-3

**<u>EXHIBIT E</u>**

**2032 Notes Indenture**

**RAIZEN FUELS FINANCE S.A.**
as Issuer

**RAÍZEN S.A.**
and
**RAÍZEN ENERGIA S.A.**
as Guarantors

and

**THE BANK OF NEW YORK MELLON**
as Trustee, Registrar, Paying Agent and Transfer Agent

––––––––––––––––––––––––

**Indenture**

**Dated as of July 8, 2025**

––––––––––––––––––––––––

**6.250% Notes Due 2032**
**Unconditionally and Irrevocably Guaranteed by**
**Raízen S.A. and Raízen Energia S.A.**

## TABLE OF CONTENTS

**PAGE**

ARTICLE 1 DEFINITIONS AND INCORPORATION BY REFERENCE ................................. 1

Section 1.01.   *Definitions* ................................................................................. *1*
Section 1.02.   *Rules of Construction* ................................................................. 15

ARTICLE 2 THE NOTES ................................................................................ 15

Section 2.01.   *Form, Dating and Denominations; Legends* ............................. 15
Section 2.02.   *Execution and Authentication; Additional Notes* ..................... 16
Section 2.03.   *Registrar, Paying Agent, Transfer Agent and Authenticating Agent;*
                *Paying Agent to Hold Money in Trust* ...................................... 17
Section 2.04.   *Replacement Notes* ..................................................................... 18
Section 2.05.   *Outstanding Notes* ...................................................................... 18
Section 2.06.   *Temporary Notes* ....................................................................... 19
Section 2.07.   *Cancellation* .............................................................................. 19
Section 2.08.   *CUSIP and ISIN Numbers* ......................................................... 19
Section 2.09.   *Registration, Transfer and Exchange* ........................................ 19
Section 2.10.   *Restrictions on Transfer and Exchange* ..................................... 22
Section 2.11.   *Open Market Purchases* ............................................................. 24
Section 2.12.   *Trustee's Disclaimer* .................................................................. 24

ARTICLE 3 ADDITIONAL AMOUNTS; REDEMPTION .......................................... 24

Section 3.01.   *Additional Amounts* ................................................................... 24
Section 3.02.   *Optional Redemption* ................................................................. 27
Section 3.03.   *Redemption for Taxation Reasons* ............................................. 28
Section 3.04.   *Redemption Following Tender Offer* .......................................... 28
Section 3.05.   *Election to Redeem; Selection of Notes* ..................................... 29
Section 3.06.   *Notice of Redemption* ................................................................ 29
Section 3.07.   *Deposit of Redemption Price* ..................................................... 31
Section 3.08.   *Effect of Notice of Redemption* ................................................. 31

ARTICLE 4 COVENANTS ............................................................................... 31

Section 4.01.   *Payment of Notes* ....................................................................... 31
Section 4.02.   *Maintenance of Office or Agency* .............................................. 32
Section 4.03.   *Existence* .................................................................................... 33
Section 4.04.   *Payment of Taxes* ....................................................................... 33
Section 4.05.   *Maintenance of Properties* ........................................................ 33
Section 4.06.   *Repurchases at the Option of the Holders Upon Change of Control* ....... 33
Section 4.07.   *Limitation on Liens* .................................................................... 36
Section 4.08.   *Reporting Requirements* ............................................................ 36
Section 4.09.   *Disclosure of Names and Addresses of Holders* ....................... 37
Section 4.10.   *Paying Agent and Transfer Agent* ............................................. 37

i

*Section 4.11.* Limitation on Issuer. ................................................................... 38

ARTICLE 5 CONSOLIDATION, MERGER OR SALE OF ASSETS ...................................... 38

*Section 5.01.* Consolidation, Merger or Sale of Assets ................................... 38

ARTICLE 6 DEFAULT AND REMEDIES ................................................................. 39

*Section 6.01.* Events of Default ........................................................................ 39
*Section 6.02.* Acceleration ............................................................................... 40
*Section 6.03.* Other Remedies .......................................................................... 41
*Section 6.04.* Waiver of Past Defaults ............................................................. 41
*Section 6.05.* Control by Majority .................................................................... 41
*Section 6.06.* Limitation on Suits ..................................................................... 42
*Section 6.07.* Rights of Holders to Receive Payment ...................................... 42
*Section 6.08.* Collection Suit by Trustee ......................................................... 42
*Section 6.09.* Trustee May File Proofs of Claim ............................................. 42
*Section 6.10.* Priorities ..................................................................................... 43
*Section 6.11.* Restoration of Rights and Remedies ......................................... 43
*Section 6.12.* Undertaking for Costs ................................................................ 43
*Section 6.13.* Rights and Remedies Cumulative ............................................. 44
*Section 6.14.* Delay or Omission Not Waiver; Prescription of Claims .......... 44
*Section 6.15.* Waiver of Stay, Extension or Usury Laws ................................ 44

ARTICLE 7 THE TRUSTEE ................................................................................ 44

*Section 7.01.* General ........................................................................................ 44
*Section 7.02.* Certain Rights of Trustee ........................................................... 45
*Section 7.03.* Individual Rights of Trustee ...................................................... 47
*Section 7.04.* Trust Indenture Act .................................................................... 47
*Section 7.05.* Trustee's Disclaimer .................................................................. 47
*Section 7.06.* Notice of Default ........................................................................ 48
*Section 7.07.* Compensation and Indemnity .................................................... 48
*Section 7.08.* Replacement of Trustee .............................................................. 49
*Section 7.09.* Successor Trustee by Merger ..................................................... 50
*Section 7.10.* Money Held in Trust .................................................................. 50
*Section 7.11.* Force Majeure ............................................................................ 50
*Section 7.12.* Corporate Trustee Required; Eligibility; Conflicting Interests ...... 50
*Section 7.13.* Trustee and Others May Hold Notes ......................................... 50
*Section 7.14.* Agents. ........................................................................................ 51

ARTICLE 8 DEFEASANCE AND DISCHARGE ....................................................... 53

*Section 8.01.* Discharge of Issuer's Obligations ............................................. 53
*Section 8.02.* Legal Defeasance ....................................................................... 54
*Section 8.03.* Covenant Defeasance ................................................................. 54
*Section 8.04.* Application of Trust Money ....................................................... 55

ii

*Section 8.05.   Repayment to Issuer* ................................................................... 55
*Section 8.06.   Reinstatement* ............................................................................. 55

ARTICLE 9 AMENDMENTS, SUPPLEMENTS AND WAIVERS ......................................... 56

*Section 9.01.   Amendments Without Consent of Holders* ................................ 56
*Section 9.02.   Amendments With Consent of Holders* ..................................... 56
*Section 9.03.   Substitution of the Issuer* .......................................................... 57
*Section 9.04.   Effect of Consent* ....................................................................... 59
*Section 9.05.   Trustee's Rights and Obligations* .............................................. 60

ARTICLE 10 NOTE GUARANTEES ................................................................................. 60

*Section 10.01. Note Guarantees* ......................................................................... 60
*Section 10.02. Limitation on Liability* ............................................................... 62
*Section 10.03. Successors and Assigns* .............................................................. 62
*Section 10.04. No Waiver* ................................................................................... 62
*Section 10.05. Modification* ............................................................................... 62
*Section 10.06. Notation of Note Guarantee; Non-Impairment* .......................... 63

ARTICLE 11 MISCELLANEOUS ..................................................................................... 63

*Section 11.01. Noteholder Communications; Noteholder Actions* ................... 63
*Section 11.02. Notices* ........................................................................................ 64
*Section 11.03. Certificate and Opinion as to Conditions Precedent* ............... 66
*Section 11.04. Statements Required in Certificate or Opinion* ......................... 67
*Section 11.05. Payment Date Other than a Business Day* .................................. 67
*Section 11.06. Governing Law* ........................................................................... 67
*Section 11.07. Submission to Jurisdiction; Agent for Service* ......................... 67
*Section 11.08. Judgment Currency* .................................................................... 68
*Section 11.09. No Adverse Interpretation of Other Agreements* ...................... 69
*Section 11.10. Successors* ................................................................................... 69
*Section 11.11. Duplicate Originals* .................................................................... 69
*Section 11.12. Separability* ................................................................................ 69
*Section 11.13. Table of Contents and Headings* ................................................ 69
*Section 11.14. No Liability of Directors, Officers, Employees, Incorporators, Members and Stockholders* ................................................................ 70
*Section 11.15. Waiver of Jury Trial* ................................................................... 70
*Section 11.16. Tax Matters* ................................................................................ 70
*Section 11.17. USA Patriot Act* .......................................................................... 70

iii

EXHIBITS

EXHIBIT A Form of Note ...................................................................................................... A-1

EXHIBIT B Restricted Legend..................................................................................................B-1

EXHIBIT C DTC Legend...........................................................................................................C-1

EXHIBIT D Regulation S Certificate ..................................................................................... D-1

EXHIBIT E Rule 144A Certificate...........................................................................................E-1

INDENTURE, dated as of July 8, 2025, between RAIZEN FUELS FINANCE S.A., a public limited liability company (*société anonyme*) organized and existing under the laws of Luxembourg, having its registered office at 16, Rue Eugène Ruppert, L-2453 Luxembourg, and registered with the Luxembourg Register of Commerce and Companies (*Registre de commerce et des sociétés, Luxembourg*) under number B184033, LEI 52990010NH26VC32Q522, as the issuer (the "**Issuer**"), RAÍZEN S.A. ("**Raízen**") and RAÍZEN ENERGIA S.A. ("**Raízen Energia**") as the Guarantors, and THE BANK OF NEW YORK MELLON as Trustee, Registrar, Paying Agent and Transfer Agent.

## RECITALS

The Issuer has duly authorized the execution and delivery of this Indenture to provide for the issuance of the Issuer's 6.250% Notes due 2032 (the "**Notes**"). All things necessary to make this Indenture a valid and binding agreement of the Issuer, in accordance with its terms, have been done, and the Issuer has done all things necessary to make the Notes (in the case of the Additional Notes, when duly authorized), when executed by the Issuer and authenticated and delivered by the Trustee and duly issued by the Issuer, the valid obligations of the Issuer as hereinafter provided.

In addition, each of the Guarantors has duly authorized the execution and delivery of this Indenture as Guarantor. All things necessary to make this Indenture a valid and binding agreement of the Guarantors, in accordance with its terms, have been done, and each Guarantor has done all things necessary to make its Note Guarantee, when the Notes are executed by the Issuer and authenticated and delivered by the Trustee and duly issued by the Issuer, the valid, legal and binding obligation of such Guarantor.

## WITNESSETH

For and in consideration of the premises and the purchase of the Notes by the Holders thereof, the parties hereto covenant and agree, for the equal and proportionate benefit of all Holders, as follows:

## ARTICLE 1
## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01.   *Definitions*.

"**Additional Amounts**" has the meaning assigned to such term in Section 3.01(a).

"**Additional Notes**" means the Issuer's 6.250% Notes due 2032 (other than the Initial Notes) issued after the Issue Date in accordance with Section 2.02 hereof, as part of the same series as the Initial Notes.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" (including the terms "controlling," "controlled by" and "under common control with") as to any Person shall mean the possession, directly or indirectly, of the power to direct or cause

the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by contract or otherwise.

"**Agent**" means any Registrar, Paying Agent, Transfer Agent, Authenticating Agent or other agent hereunder, as duly appointed by the Issuer (or by the Trustee in the case of the Authenticating Agent).

"**Agent Member**" means a member of, or a participant in, the Depositary.

"**Applicable GAAP**" means, with respect to the Issuer or any Guarantor, either (i) generally accepted accounting principles in the jurisdiction where such Issuer or Guarantor is organized or incorporated or (ii) International Financial Reporting Standards (IFRS) issued by the International Accounting Standards Board (IASB) and related interpretations, in each case, as in effect from time to time.

"**Applicable Law**" has the meaning assigned to such term in Section 11.16.

"**Authenticating Agent**" refers to the Trustee's designee for authentication of the Notes.

"**Authentication Order**" has the meaning assigned to such term in Section 2.02(c).

"**Authorized Signatories**" has the meaning assigned to such term in Section 11.02.

"**bankruptcy default**" means the Events of Default set forth in Section 6.01(a)(v) and/or (vi).

"**Board of Directors**" means the board of directors or comparable governing body of the Issuer or any Guarantor, as applicable, or any committee thereof duly authorized to act on its behalf.

"**Board Resolution**" means a resolution duly adopted by the Board of Directors, which is certified by the Secretary, Assistant Secretary, a director or another Person performing corporate secretarial functions of the Issuer or a Guarantor, as applicable, and remains in full force and effect as of the date of its certification.

"**Brazil'**" means the Federative Republic of Brazil.

"**Business Day**" means any day other than a Saturday, a Sunday or a legal holiday or a day on which banking institutions or trust companies are authorized or obligated by law to close in The City of New York, Luxembourg or São Paulo, Brazil.

"**Capital Stock**" means, as to any Person, any and all shares, interests, participations, quotas or other equivalents (however designated, whether voting or non-voting) of capital stock or equity interest in such Person, and any and all warrants or rights or options to purchase any of the foregoing, but excluding any debt securities convertible into or exchangeable for any of the foregoing.

"**Central Bank**" means the Central Bank of Brazil (*Banco Central do Brasil*).

2

"**Certificated Note**" means a Note in registered, individual, non-global form without interest coupons.

"**Change of Control**" means an event as a result of which (1) any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), other than one or more Permitted Holders or a group that includes one or more Permitted Holders in which such Permitted Holder or Permitted Holders hold and have voting power over at least a majority of the Voting Stock of Raízen held by such group, becomes the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act) of more than 50% of the total voting power of the Voting Stock of Raízen; or (2) Permitted Holders, directly or indirectly, cease to have the power to direct or cause the direction of the management and policies of Raízen, whether through the ownership of voting securities, by contract or otherwise.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Consolidated Net Worth**" means the total shareholders' equity (including both controlling and non-controlling interests) of Raízen and its Subsidiaries determined on a consolidated basis in accordance with Applicable GAAP.

"**Corporate Trust Office**" means the office of the Trustee at which the corporate trust business of the Trustee is administered, which at the date of this Indenture is located at 240 Greenwich Street, 7th Floor East, New York, New York 10286, Attention: Corporate Trust Administration, or such other address as the Trustee may designate from time to time by notice to the Holders and the Issuer, or the principal corporate trust office of any successor Trustee.

"**Debt**" means, with respect to any Person, without duplication:

(1)     all indebtedness of such Person for borrowed money;

(2)     all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (but excluding trade accounts payable or other short-term obligations to suppliers or customers payable within 360 days, in each case arising in the ordinary course of business);

(3)     all obligations, contingent or otherwise, of such Person in respect of acceptances, letters of credit, financial guaranty insurance policies or similar extensions of credit (excluding (i) trade payables and (ii) other obligations with respect to letters of credit securing obligations (other than obligations described in clauses (1) and (2) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit);

(4)     all obligations of such Person under Hedging Agreements; and

(5)     all Debt of other Persons referred to in clauses (1) through (4) above that is Guaranteed by such Person's Guarantee (other than obligations of other Persons that are customers or suppliers of such Person for which such Person is or becomes so responsible

or liable in the ordinary course of business to (but only to) the extent that such Person does not, or is not required to, make payment in respect thereof);

if and to the extent any of the preceding items (other than Guarantees, letters of credit and Hedging Agreements) would appear as a liability upon the balance sheet of the specified Person in accordance with Applicable GAAP; it being understood that leases in effect on the Issue Date that are deemed operating leases under IFRS 16 – Leases will not be deemed "Debt."

The amount of Debt of any Person will be deemed to be:

(1)   with respect to a revolving credit or similar facility, the total amounts of funds borrowed and then outstanding;

(2)   with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation;

(3)   with respect to any Debt issued with original issue discount, the face amount of such Debt less the remaining unamortized portion of the original issue discount of such Debt;

(4)   with respect to any Hedging Agreement, the net amount payable if such Hedging Agreement terminated at that time due to default by such Person reasonably determined by the Issuer on the basis of customary "marked-to-market" methodology; and

(5)   otherwise, the outstanding principal amount thereof.

The principal amount of any Debt or other obligation that is denominated in any currency other than United States dollars (after giving effect to any Hedging Agreement in respect thereof) shall be the amount thereof, as determined pursuant to the foregoing sentence, converted into United States dollars at the Spot Rate in effect on the date of determination.

"**Default**" means an event or condition which upon notice, lapse of time or both would become an Event of Default.

"**Depositary**" means the depositary of each Global Note, which will initially be DTC.

"**Designated Affiliate**" means, at any time, one or more Persons (including, without limitation, a Guarantor) designated by the Issuer to be the purchaser of Notes under an Offer to Purchase.

"**Dollars**" means United States Dollars in immediately available funds.

"**DTC**" means The Depository Trust Company, a New York corporation, and its successors.

"**DTC Legend**" means the legend set forth in Exhibit C.

4

"**Electronic Means**" has the meaning assigned to such term in Section 11.02.

"**Event of Default**" has the meaning assigned to such term in Section 6.01.

"**Excess Additional Amounts**" has the meaning assigned to such term in Section 3.03.

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Expiration Date**" has the meaning assigned to such term in Section 4.06(a)(v).

"**FATCA**" has the meaning assigned to such term in Section 3.01(a)(ix)

"**Favorable Tax Jurisdiction**" means a jurisdiction that does not impose income tax or that imposes it at a maximum rate lower than 17%, or whose laws do not allow access to information related to ownership composition or securities ownership or permit the identification of the beneficial owner of income attributed to non-residents.

"**Fitch**" means Fitch Ratings, Inc., and any successor to its rating agency business.

"**Global Note**" means a Note in registered global form without interest coupons registered in the name of the Depositary (or its nominee) as depositary for the beneficial owners thereof.

"**Guarantee**" means any obligation of a Person to pay the Debt of another Person, including without limitation:

(1)     an obligation to pay or purchase such Debt;

(2)     an obligation to lend money or to purchase or subscribe shares or other securities or to purchase assets or services in order to provide funds for the payment of such Debt; or

(3)     any other agreement to be responsible for such Debt;

*provided, however,* that the term "**Guarantee**" shall not include endorsements for collection or deposit in the ordinary course of business. The term "**Guarantee**" used as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning assigned to such term in Section 10.01(a).

"**Guarantor**" means each of (i) Raízen, (ii) Raízen Energia, and (iii) any other Person Guaranteeing the Issuer's obligations under the Notes and this Indenture.

"**Hedging Agreement**" means, with respect to any Person, all net obligations of such Person in respect of any interest rate protection agreement, any currency or commodity swap, cap or collar agreement, any equity swap or any similar arrangement entered into by such Person providing for the transfer or mitigation of interest rate, currency, commodity price or equity risks either generally or under specific contingencies (but without regard to any notional principal amount relating thereto).

5

"**Holder**" or "**Noteholder**" means the Person in whose name a Note is registered in the Register maintained by the Registrar.

"**Indenture**" means this indenture, as amended or supplemented from time to time.

"**Initial Notes**" means the US$750,000,000 aggregate principal amount of Notes issued on the date hereof.

"**Initial Purchaser**" or "**Initial Purchasers**" means any initial purchaser or initial purchasers party to a purchase agreement with the Issuer relating to the sale of the Notes or Additional Notes by the Issuer.

"**Instructions**" has the meaning assigned to such term in Section 11.02.

"**Interest Payment Date**" means each January 8 and July 8 of each year, commencing on January 8, 2026.

"**Investment Grade**" means BBB- or higher by S&P, Baa3 or higher by Moody's or BBB- or higher by Fitch, or the equivalent of such global ratings by S&P, Moody's or Fitch.

"**Issue Date**" means July 8, 2025.

"**Issuer**" means the party named as such in the first paragraph of this Indenture or any successor obligor under this Indenture and the Notes pursuant to Sections 5.01 and Section 9.03.

"**Lien**" means, with respect to any Property, any mortgage, pledge, usufruct, fiduciary transfer (*alienação* or *cessão fiduciária*), charge or other encumbrance, lien, security interest or any preferential arrangement (including a securitization) that has the practical effect of creating a security interest on or with respect to such Property; *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"**Luxembourg**" means the Grand Duchy of Luxembourg.

"**Luxembourg Companies Law**" means the Luxembourg law of 10 August 1915 on commercial companies, as amended.

"**Material Adverse Effect**" means (i) any material adverse effect on the financial condition, business, properties or results of operations of Raízen and its Subsidiaries taken as a whole and (ii) any material adverse effect on the ability of the Issuer or the Guarantors to perform their respective obligations under this Indenture, the Notes or the Note Guarantees.

"**Maturity Date**" means July 8, 2032.

"**Moody's**" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"**Non-Recourse Debt**" means Debt (or any portion thereof) of a Subsidiary of Raízen (the "**Non-Recourse Debtor**") used to finance (i) the creation, development, construction,

6

improvement or acquisition of projects, Properties or assets and any extensions, renewals or refinancings of such Debt including the cost of the refinancing or (ii) the operations of projects, Properties or assets of such Non-Recourse Debtor or its Subsidiaries; *provided* that the recourse of the lender thereof (including any agent, trustee, receiver or other Person acting on behalf of such entity) in respect of such Debt is limited (other than in respect of the Recourse Amount (as defined herein)) to the Non-Recourse Debtor, any debt securities issued by the Non-Recourse Debtor, the Capital Stock of the Non-Recourse Debtor, and any assets, receivables, inventory, equipment, chattels, contracts, intangibles, rights and any other assets of such Non-Recourse Debtor and its Subsidiaries connected with the projects, properties or assets created, developed, constructed, improved, acquired or operated, as the case may be, in respect of which such Debt has been incurred; *provided, further*, that if such lender additionally has contractual recourse to Raízen or to any Subsidiary of Raízen (other than the Non-Recourse Debtor and its Subsidiaries) for the repayment of any portion of such Debt (such portion, the "**Recourse Amount**"), then the Recourse Amount will not constitute Non-Recourse Debt and the Issuer or the relevant Guarantor, as the case may be, will be deemed to have incurred Debt in an aggregate principal amount equal to the Recourse Amount.

"**Non U.S. Person**" means a Person that is not a U.S. Person under Regulation S.

"**Notation of Note Guarantee**" has the meaning assigned to such term in Section 10.06.

"**Note Guarantee**" means each Guarantee by the Guarantors of the Guaranteed Obligations pursuant to this Indenture and the Notes.

"**Notes**" has the meaning assigned to such term in the Recitals. The Initial Notes and any Additional Notes shall be treated as a single class for all purposes under this Indenture, and unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additional Notes.

"**Offer to Purchase**" has the meaning assigned to such term in Section 4.06(a).

"**Offer to Purchase Payment**" has the meaning assigned to such term in Section 4.06(a).

"**Offer to Purchase Payment Date**" has the meaning assigned to such term in Section 4.06(a)(v).

"**Offering Memorandum**" means the final offering memorandum dated June 26, 2025 prepared by the Issuer in connection with the offering of the Initial Notes.

"**Officer**" means a director, the president or chief executive officer, any vice president, the chief financial officer, the treasurer or any assistant treasurer, or the secretary or any assistant secretary, or any attorney-in-fact of each of the Issuer and the Guarantors, as applicable, or any other Person duly appointed by the shareholders or the Board of Directors of each of the Issuer and the Guarantors, as applicable, to perform corporate duties.

"**Officer's Certificate**" means, with respect to any Person, a certificate signed by the chairman of the board (or equivalent governing body), president, vice-president, chief executive officer, chief operating officer, chief financial officer, chief accounting officer, director or

manager, as applicable, or any treasurer, secretary or authorized signatory or, to the extent applicable, general counsel of such Person.

"**Offshore Global Note**" means a Global Note that bears the Regulation S Legend representing Notes issued and sold pursuant to Regulation S.

"**Opinion of Counsel**" means a written opinion from legal counsel who may be an employee of or counsel to the Issuer, which opinion shall be reasonably acceptable to the Trustee.

"**Outstanding**" has the meaning assigned to such term in Section 2.05.

"**Par Call Date**" has the meaning assigned to such term in Section 3.02(a)

"**Paying Agent**" refers to The Bank of New York Mellon in its capacity as paying agent and its successors, and such other paying agents as the Issuer shall appoint.

"**Permitted Holders**" means each of (i) Royal Dutch Shell PLC and its Affiliates and (ii) Cosan S.A. and its Affiliates (in each case, including any successors and assigns thereof).

"**Permitted Liens**" means:

(1)      any Liens existing on the Issue Date;

(2)      any Liens extending, renewing or replacing (or successive extensions, renewals or replacements of), in whole or in part, any Lien referred to in clauses (1), (3), (4), (10) and (13) hereof; *provided* that the principal amount of Debt secured thereby shall not exceed the principal amount of Debt so secured at the time of such extension, renewal or replacement, except for any increase reflecting premiums, fees and expenses in connection with such extension, renewal or replacement;

(3)      any Liens created solely for the purpose of securing the payment of all or a part of the purchase price (or the cost of construction or improvement, and any related transaction fees and expenses) of assets or Property (including Capital Stock of any Person) acquired, constructed or improved after the Issue Date, including related transaction fees and expenses (or securing Debt incurred to refinance a bridge or other interim financing that is initially incurred for the purpose of financing such acquisition, construction or improvement of such Property or assets, including related transaction fees and expenses); *provided* that (a) the aggregate principal amount of Debt secured by such Liens shall not exceed (but may be less than) the greater of (i) the purchase price of the assets or Property so acquired, constructed or improved, or (ii) the aggregate Debt incurred solely for the acquisition, construction, or improvement of such Property or assets, as the case may be, (b) such Liens shall not encumber any assets or Property other than the assets or Property so acquired, constructed or improved and (c) other than any unimproved real property on which the Property so constructed, or the improvement, is located, such Liens shall attach to such assets or Property within 365 days of the construction, acquisition or improvement of such assets or Property; *provided, further*, that any Lien is permitted to be incurred on the Capital Stock of any Person securing any Debt of that Person that is (i) Non-Recourse

8

Debt and (ii) incurred for purposes of financing the acquisition, construction or improvement of any Property or assets of such Person;

(4)     any Liens securing Debt for the purpose of financing all or part of the cost of the acquisition, construction or development of a project; *provided* that (a) the Lien in respect of such Debt is limited to assets (including Capital Stock of the project entity) or Property of such project, (b) the aggregate principal amount of Debt secured by the Liens will not exceed (but may be less than) the greater of (i) the cost (i.e., purchase price) of the project so acquired, constructed or developed or (ii) the aggregate Debt incurred solely for the acquisition, construction, or improvement of such project, as the case may be, and (c) the Lien is incurred before, or within 365 days after the completion of, that acquisition, construction or development and does not apply to any other Property or assets of Raízen or any Significant Subsidiary;

(5)     any Liens imposed by applicable law incurred in the ordinary course of business, including carriers', warehousemen's and mechanics' liens, statutory landlord's liens, and other similar liens and encumbrances arising in the ordinary course of business, in each case for sums not yet due or being contested in good faith by appropriate proceedings;

(6)     any Liens securing taxes, duties, assessments, fees and other governmental charges or levies, in each case the payment of which is not yet due or is being contested in good faith by appropriate proceedings and for which such adequate reserves or other appropriate provisions, if any, as shall be required by Applicable GAAP shall have been made;

(7)     pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other similar social security legislation, any deposit to secure appeal bonds in proceedings being contested in good faith, good faith deposits in connection with bids, tenders, contracts (other than for the payment of Debt) or leases or deposits for the payment of rent, in each case made in the ordinary course of business;

(8)     customary reservations or retentions of title, minor defects, easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, licenses, restrictions on the use of Property or assets or minor imperfections in title that do not in the aggregate materially impair the value or use of the Property or assets affected thereby, and any leases and subleases of real property that do not in the aggregate materially interfere with the ordinary conduct of the business of the Issuer, any Guarantor or any Significant Subsidiary, and which are made on customary and usual terms applicable to similar properties;

(9)     encumbrances, security deposits or reserves maintained in the ordinary course of business and required by applicable law;

(10)     any Liens (i) granted to secure borrowings directly or indirectly from Banco Nacional de Desenvolvimento Econômico e Social-BNDES, or any other federal, regional or state Brazilian governmental development bank or credit agency (including borrowings from any Brazilian governmental bank with funds provided by Brazilian governmental

9

regional funds (which shall include, without limitation, Financiadora de Estudos e Projetos – FINEP, *Fundo de Desenvolvimento do Nordeste* – FDNE and *Fundo de Desenvolvimento do Centro Oeste* – FCO)) or (ii) granted to secure borrowings from any international or multilateral development bank, government-sponsored agency, export-import bank or official export-import credit insurer, export-credit agency or commercial bank acting as co-lender in any of the foregoing;

(11)    any Liens in favor of issuers of surety bonds, appeal bonds, bid bonds, tender bonds, letters of credit or similar instruments issued pursuant to the request of and for the account of any of the Issuer or the Guarantors or any of their Subsidiaries in the ordinary course of business (including all bonds required by law, contract or tender rules);

(12)    any Liens securing obligations under any Hedging Agreements, so long as such Hedging Agreements  are entered into for bona fide, non-speculative purposes;

(13)    any Liens existing on any Property or assets of any Person before that Person's acquisition (in whole or in part) by, merger into or consolidation with or sale of assets to any of the Issuer, the Guarantors or any Subsidiary thereof after the Issue Date; *provided* that the Lien is not created in contemplation of or in connection with such acquisition, merger or consolidation and such Lien does not extend to any other property of the Issuer, the Guarantors or any Subsidiary thereof;

(14)    any Liens on inventory, receivables and related assets of any of the Issuer, the Guarantors or any of their Subsidiaries securing the obligations of the Issuer, such Guarantor or such Subsidiary, as applicable, under any lines of credit or working capital or export or import trade finance facility or other trade transaction; *provided* that the aggregate principal amount of Debt incurred that is secured by such receivables that shall fall due in any calendar year shall not exceed 80% of Raízen's consolidated net operating revenues for the most recently concluded period of four consecutive fiscal quarters; *provided, further,* that advance transactions will not be deemed transactions secured by receivables, inventory or related assets for purposes of the above calculations;

(15)    any judgment Lien not giving rise to an Event of Default;

(16)    any interest or title of a lessor under any capitalized lease obligation; *provided* that such Liens do not extend to any Property or assets which is not leased property subject to such capitalized lease obligation;

(17)    any Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Issuer, any Guarantor or any of their Subsidiaries, including rights of offset and set-off;

(18)    any Lien or rights of set-off of any Person with respect to any cash equivalents on deposit account or securities account of the Issuer, any Guarantor or any of their Subsidiaries arising in the ordinary course of business in favor of the bank(s) or security intermediary(ies) with which such accounts are maintained, securing only amounts owing to such bank(s) with respect to cash management and operating account arrangements;

(19)    any Liens securing the Notes and the Note Guarantees and all other monetary obligations under this Indenture;

(20)    any Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(21)    any rights of set-off of any Person with respect to any deposit account of the Issuer, any Guarantor or any of their Subsidiaries arising in the ordinary course of business and not constituting a financing transaction;

(22)    Liens securing obligations owed by any Subsidiary of Raízen to Raízen or one or more Subsidiaries of Raízen and/or by Raízen to one or more such Subsidiaries; and

(23)    other Liens securing obligations in an aggregate amount not exceeding the greater of: (i) US$2.8 billion (or the equivalent thereof at the time of determination) and (ii) 20% of the Total Consolidated Assets.

For purposes of determining compliance with Section 4.07, (i) a Lien need not be incurred solely by reference to one category of Permitted Liens described above but is permitted to be incurred in part under any combination thereof and of any other available exemption and (ii) in the event that a Lien (or any portion thereof) meets the criteria of one or more of the categories of Permitted Liens, the Issuer may, in its sole discretion, classify or reclassify such Lien (or any portion thereof) in any manner that complies with the categories of Permitted Liens.

"**Person**" means any individual, corporation, company, association, partnership, limited liability company, joint venture, trust, unincorporated association, governmental authority or any agency or political subdivision thereof or any other entity of whatever nature.

"**Property**" of any Person means any property, rights, revenues, or interest therein, of such Person.

"**principal**" of any Debt means the principal amount of such Debt, (or if such Debt was issued with original issue discount, the face amount of such Debt less the remaining unamortized portion of the original issue discount of such Debt), together with, unless the context otherwise indicates, any premium then payable on such Debt.

"**Rating Agency**" means each of (1) S&P, (2) Moody's and (3) Fitch, or their respective successors.

"**Rating Decline**" means that at any time within 90 days after the date of public notice of a Change of Control, (1) in the event the Notes are assigned an Investment Grade rating by at least two of the Rating Agencies prior to such public notice, the rating assigned to the Notes by any two or more of the Rating Agencies is below an Investment Grade rating; or (2) in the event the Notes are not assigned an Investment Grade rating by at least two of the Rating Agencies prior to such public notice, the rating assigned to the Notes by at least two of the Rating Agencies is decreased by one or more categories (i.e., notches); *provided* that there shall be no Rating Decline to the extent the Notes continue to have an Investment Grade rating by at least one of the Rating

11

Agencies; and *provided, further*, that, in each case, any such Rating Decline is expressly stated by the applicable Rating Agency to have been the result of the Change of Control.

"**Register**" has the meaning assigned to such term in Section 2.09.

"**Registrar**" means The Bank of New York Mellon.

"**Regular Record Date**" for the interest payable on any Interest Payment Date means January 3 or July 3 (whether or not a Business Day) immediately preceding such Interest Payment Date.

"**Regulation S**" means Regulation S under the Securities Act.

"**Regulation S Certificate**" means a certificate substantially in the form of Exhibit D hereto.

"**Regulation S Legend**" means the legend set forth in Exhibit B-2.

"**Relevant Taxing Jurisdiction**" has the meaning assigned to such term in Section 3.01(a).

"**Responsible Officer**" means, with respect to the Trustee, any officer of the Trustee in its Corporate Trust Department who shall have direct responsibility for the administration of this Indenture.

"**Restricted Legend**" means the legend set forth in Exhibit B-1.

"**Rule 144A**" means Rule 144A under the Securities Act.

"**Rule 144A Certificate**" means a certificate substantially in the form of Exhibit E hereto.

"**S&P**" means S&P Global Ratings, a division of S&P Global Inc., and any successor to its rating agency business.

"**SEC**" or "**Commission**" means the U.S. Securities and Exchange Commission, as from time to time constituted, created under the Securities Exchange Act of 1934, or, if at any time after execution of this instrument such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body performing such duties on such date.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Significant Subsidiary**" means, with respect to any Person, any Subsidiary of such Person which at the time of determination had assets which, as of the date of such Person's most recent quarterly consolidated balance sheet, constituted at least 10% of such Person's total assets, determined on the basis of the consolidated assets of such Person and its Subsidiaries as of such date.

"**Spot Rate**" means, for any currency, the spot rate at which that currency is offered for sale against United States dollars as published in The Wall Street Journal on the Business Day

immediately preceding the date of determination or, if that rate is not available in that publication, as published in any publicly available source of similar market data, as determined by the Issuer.

"**Stated Maturity**" means (i) with respect to any Debt, the date specified as the fixed date on which the final installment of principal of such Debt is due and payable or (ii) with respect to any scheduled installment of principal of or interest on any Debt, the date specified as the fixed date on which such installment is due and payable as set forth in the documentation governing such Debt, not including any contingent obligation to repay, redeem or repurchase prior to the regularly scheduled date for payment.

"**Subsidiary**" means, with respect to any Person, any other Person more than 50% of the outstanding Voting Stock of which is owned or controlled, directly or indirectly, by such Person and/or by any one or more Subsidiaries of such Person.

"**Substituted Issuer**" has the meaning assigned to such term in Section 9.03(a).

"**Substitution Documents**" has the meaning assigned to such term in Section 9.03(a)(i).

"**Successor Corporation**" has the meaning assigned to such term in Section 5.01(a)(i).

"**Threshold Amount**" has the meaning assigned to such term in Section 6.01(a)(iv).

"**Total Consolidated As**sets" means the total amount of consolidated assets of Raízen and its Subsidiaries prepared in accordance with Applicable GAAP, calculated after giving pro forma effect to any acquisition or disposition of Persons, divisions, lines of businesses, operations or assets by Raízen and its Subsidiaries subsequent to such date and on or prior to the date of determination.

"**Transfer Agent**" refers to The Bank of New York Mellon in its capacity as transfer agent and such other transfer agents as the Issuer shall appoint.

"**Treasury Rate**" means, with respect to any redemption date, the yield determined by Raízen in accordance with the following two paragraphs:

(1)    The Treasury Rate shall be determined by Raízen after 4:15 p.m. (New York City time) (or after such time as yields on U.S. government securities are posted daily by the Board of Governors of the Federal Reserve System), on the third Business Day (solely in New York City) preceding the redemption date based upon the yield or yields for the most recent day that appear after such time on such day in the most recent statistical release published by the Board of Governors of the Federal Reserve System designated as "Selected Interest Rates (Daily) – H.15" (or any successor designation or publication) ("**H.15**") under the caption "U.S. government securities—Treasury constant maturities—Nominal" (or any successor caption or heading) ("**H.15 TCM**"). In determining the Treasury Rate, Raízen shall select, as applicable: (i) the yield for the Treasury constant maturity on H.15 exactly equal to the period from the redemption date to the Par Call Date (the "**Remaining Life**"); or (ii) if there is no such Treasury constant maturity on H.15 exactly equal to the Remaining Life, the following two yields: (x) one yield corresponding to the Treasury constant maturity on H.15 immediately shorter than, and (y) one yield

13

corresponding to the Treasury constant maturity on H.15 immediately longer than, the Remaining Life – and shall interpolate to the Par Call Date on a straight-line basis (using the actual number of days) using such yields and rounding the result to three decimal places; or (iii) if there is no such Treasury constant maturity on H.15 shorter than or longer than the Remaining Life, the yield for the single Treasury constant maturity on H.15 closest to the Remaining Life. For purposes of this paragraph, the applicable Treasury constant maturity or maturities on H.15 shall be deemed to have a maturity date equal to the relevant number of months or years, as applicable, of such Treasury constant maturity from the redemption date.

(2)    If on the third Business Day (solely in New York City) preceding the redemption date H.15 TCM or any successor designation or publication is no longer published, Raízen shall calculate the Treasury Rate based on the rate *per annum* equal to the semi-annual equivalent yield to maturity at 11:00 a.m. (New York City time) on the second Business Day (solely in New York City) preceding such redemption date of the U.S. Treasury security maturing on, or with a maturity that is closest to, the Par Call Date, as applicable. If there is no U.S. Treasury security maturing on the Par Call Date but there are two or more U.S. Treasury securities with a maturity date equally distant from the Par Call Date, one with a maturity date preceding the Par Call Date and one with a maturity date following the Par Call Date, Raízen shall select the U.S. Treasury security with a maturity date preceding the Par Call Date. If there are two or more U.S. Treasury securities maturing on the Par Call Date or two or more U.S. Treasury securities meeting the criteria of the preceding sentence, Raízen shall select from among these two or more U.S. Treasury securities the U.S. Treasury security that is trading closest to par based upon the average of the bid and asked prices for such U.S. Treasury securities at 11:00 a.m., New York City time. In determining the Treasury Rate in accordance with the terms of this paragraph, the semi-annual yield to maturity of the applicable U.S. Treasury security shall be based upon the average of the bid and asked prices (expressed as a percentage of principal amount) at 11:00 a.m., New York City time, of such U.S. Treasury security, and rounded to three decimal places.

"**Trust Indenture Act**" or "**TIA**" means the U.S. Trust Indenture Act of 1939, as amended.

"**Trustee**" means the party named as such in the first paragraph of this Indenture or any successor trustee under this Indenture pursuant to Article 7.

"**U.S. Global Note**" means a Global Note that bears the Restricted Legend representing Notes issued and sold pursuant to Rule 144A.

"**U.S. Government Obligations**" means obligations issued or directly and fully guaranteed or insured by the United States of America or by any agent or instrumentality thereof, *provided* that the full faith and credit of the United States of America is pledged in support thereof.

"**Voting Stock**" of any Person means Capital Stock in such Person having power to vote for the election of directors or similar officials of such Person or otherwise voting with respect to actions of such Person (other than such Capital Stock having such power only by reason of the happening of a contingency).

14

Section 1.02.  *Rules of Construction*.   Unless the context otherwise requires or except as otherwise expressly provided,

(i)     an accounting term not otherwise defined has the meaning assigned to it in accordance with Applicable GAAP;

(ii)     "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Section, Article or other subdivision;

(iii)     all references to "Dollars" US$ and "$" shall mean the lawful currency of the United States of America;

(iv)     all references to Sections or Articles or Exhibits refer to Sections or Articles or Exhibits of or to this Indenture unless otherwise indicated;

(v)     references to agreements or instruments, or to statutes or regulations, are to such agreements or instruments, or statutes or regulations, as amended from time to time (or to successor statutes and regulations);

(vi)     in the event that a transaction meets the criteria of more than one category of permitted transactions or listed exceptions, the Issuer may classify such transaction as it, in its sole discretion, determines;

(vii)     words in the singular include the plural, and in the plural include the singular; and

(viii)     the words "execution," "signed," "signature," and words of like import in this Indenture shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf," "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

ARTICLE 2
THE NOTES

Section 2.01.  *Form, Dating and Denominations; Legends*.  (a) The Notes and the Trustee's certificate of authentication will be substantially in the form attached as Exhibit A. The terms and provisions contained in the form of the Notes annexed as Exhibit A constitute, and are hereby expressly made, a part of this Indenture.  The Notes may have notations, legends or endorsements required by law, rules of or agreements with national securities exchanges to which the Issuer is subject, or usage.  Each Note will be dated the date of its authentication.  The

15

Notes will be issuable in minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof.

(b)     (i) Except as otherwise provided in paragraph (c) below, each Initial Note or Additional Note will bear the Restricted Legend or the Regulation S Legend, as the case may be.

(ii)     Each Global Note, whether or not an Initial Note or Additional Note, will bear the DTC Legend.

(iii)     Initial Notes and Additional Notes offered and sold in reliance on Regulation S will be issued as provided herein.

(iv)     Initial Notes and Additional Notes offered and sold in reliance on Rule 144A will be issued as provided herein.

(c)     If the Issuer determines (upon the advice of counsel and such other certifications and evidence as the Issuer may reasonably require) that a Note is eligible for resale pursuant to Rule 144(k) under the Securities Act (or a successor provision) and that the Restricted Legend or the Regulation S Legend, as the case may be, is no longer necessary or appropriate in order to ensure that subsequent transfers of the Note (or a beneficial interest therein) are effected in compliance with the Securities Act, the Issuer may instruct the Trustee in writing to cancel the Note and the Issuer may issue to the Holder thereof (or to its transferee), and the Trustee, upon receipt of an Authentication Order, shall authenticate and deliver a new Note of like tenor and amount, registered in the name of the Holder thereof (or its transferee), that does not bear the Restricted Legend or the Regulation S Legend, as the case may be, and the Trustee will comply with such instruction provided that the Trustee has received an Officer's Certificate and Opinion of Counsel and such other evidence as the Trustee may require to comply with such action.

(d)     By its acceptance of any Note bearing the Restricted Legend or the Regulation S Legend, as the case may be (or any beneficial interest in such a Note), each Holder thereof and each owner of a beneficial interest therein acknowledges the restrictions on transfer of such Note (and any such beneficial interest) set forth in this Indenture and in the Restricted Legend or the Regulation S Legend, as the case may be, and agrees that it will transfer such Note (and any such beneficial interest) only in accordance with this Indenture and such legend.

Section 2.02.  *Execution and Authentication; Additional Notes*.  (a) An Officer shall sign the Notes for the Issuer by manual, electronic or facsimile signature in the name and on behalf of the Issuer.  If an Officer whose signature is on a Note no longer holds that office at the time the Note is authenticated, the Note will still be valid.

(b)     A Note will not be valid until the Trustee or the Authenticating Agent signs the certificate of authentication on the Note by manual, electronic or facsimile signature, with the signature constituting conclusive evidence that the Note has been authenticated under this Indenture.

16

(c)     At any time and from time to time after the execution and delivery of this Indenture, the Issuer may deliver Notes executed by the Issuer to the Trustee or the Authenticating Agent for authentication. The Trustee or the Authenticating Agent will authenticate and deliver:

(i)     Initial Notes for original issue on the Issue Date in the aggregate principal amount of US$750,000,000; and

(ii)     Additional Notes from time to time for original issue in aggregate principal amounts specified by the Issuer, which Additional Notes shall have the same terms and conditions in all respects (including the maturity date) as the Initial Notes, other than the issue date, the issue price and the first Interest Payment Date; *provided* that if the Additional Notes are not fungible with the Initial Notes for U.S. federal income tax purposes, the Additional Notes will have a separate CUSIP or other identifying number. Such Additional Notes shall be treated as a single series with the Initial Notes for all purposes under this Indenture (other than tax purposes, in the case the Additional Notes are not fungible with the Initial Notes for tax purposes), including, without limitation, waivers, amendments, redemptions and offers to purchase, and shall vote together with the Initial Notes as one single series on all matters;

in the case of clauses (i) and (ii) above, after receipt by the Trustee of an order of the Issuer executed by one of its Officers directing the Trustee to authenticate the Notes (the "**Authentication Order**") and specifying:

(i)     the amount of Notes to be authenticated and the date on which the Notes are to be authenticated;

(ii)     whether the Notes are to be Initial Notes or Additional Notes;

(iii)     in the case of Additional Notes, that the issuance of such Additional Notes does not contravene any provision of this Indenture;

(iv)     whether the Notes are to be issued as one or more Global Notes or Certificated Notes; and

(v)     other information the Issuer may determine to include or the Trustee may reasonably request.

(d)     The Trustee shall be fully protected in relying upon the Authentication Order above in authenticating any Notes under this Indenture.

Section 2.03.   *Registrar, Paying Agent, Transfer Agent and Authenticating Agent; Paying Agent to Hold Money in Trust*.  (a) The Issuer may appoint one or more Registrars and one or more Paying Agents or Transfer Agents, and the Trustee may appoint, with a copy of any such appointment to the Issuer, an Authenticating Agent, in which case each reference in this Indenture to the Trustee in respect of the obligations of the Trustee to be performed by the Authenticating Agent shall be deemed to be references to the Authenticating Agent. The terms "**Transfer Agent**" and "**Paying Agent**" include any additional transfer agent or paying agent, as the case may be.

17

The term "**Registrar**" includes any co-Registrar. In each case, the Issuer and the Trustee will enter into an appropriate agreement with the Authenticating Agent implementing the provisions of this Indenture relating to the obligations of the Trustee to be performed by the Authenticating Agent and the related rights. The Registrar shall provide to the Issuer and the Trustee, if the Trustee is not the Registrar, a current copy of the Register from time to time upon written request of the Issuer or the Trustee, as the case may be. The Issuer may act as Registrar or Paying Agent. The Issuer hereby appoints, upon the terms and subject to the conditions herein set forth, The Bank of New York Mellon as Paying Agent, Registrar and Transfer Agent.

(b)    The Issuer will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of the Holders or the Trustee all money held by the Paying Agent for the payment of principal of and interest on the Notes and will promptly notify the Trustee in writing of any Default by the Issuer in making any such payment.  The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee and account for any funds disbursed, and the Trustee may at any time during the continuance of any payment default, upon written request to a Paying Agent, require the Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed.  Upon doing so, the Paying Agent will have no further liability for the money so paid over to the Trustee.

Section 2.04.    *Replacement Notes*.  If a mutilated Note is surrendered to the Trustee or if a Holder claims that its Note has been lost, destroyed or wrongfully taken, the Issuer will issue and the Trustee will authenticate, upon provision of evidence satisfactory to the Trustee that such Note was lost, destroyed or wrongfully taken, a replacement Note of like tenor and principal amount and bearing a number not contemporaneously Outstanding.  Every replacement Note is an additional obligation of the Issuer and entitled to the benefits of this Indenture.  If required by the Trustee or the Issuer, an indemnity must be furnished by the Holder that is sufficient in the judgment of both the Trustee and the Issuer to protect the Issuer and the Trustee from any loss they may suffer if a Note is replaced.  The Issuer and the Trustee may charge the Holder for the expenses of the Issuer and the Trustee in replacing a Note.  In case the mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Issuer in its discretion may pay the Note instead of issuing a replacement Note.

Section 2.05.    *Outstanding Notes*.  (a) Notes that are "**Outstanding**" at any time are all Notes that have been authenticated by the Trustee except for:

(i)    Notes cancelled by the Trustee or delivered to it for cancellation;

(ii)    any Note which has been replaced or paid pursuant to Section 2.04 unless and until the Trustee and the Issuer receive proof satisfactory to them that the replaced Note is held by a protected purchaser; and

(iii)    on or after the Maturity Date or any redemption date or Offer to Purchase Payment Date, those Notes payable or to be redeemed on that date for which the Trustee (or Paying Agent, other than the Issuer or an Affiliate of the Issuer) holds money sufficient to pay all amounts then due thereunder.

(b)     A Note does not cease to be Outstanding because the Issuer or one of its Affiliates holds the Note, *provided* that in determining whether the Holders of the requisite principal amount of the Outstanding Notes have given or taken any request, demand, authorization, direction, notice, consent, waiver or other action hereunder, Notes owned by the Issuer or any Affiliate of the Issuer will be disregarded and deemed not to be Outstanding (it being understood that in determining whether the Trustee is protected in relying upon any such request, demand, authorization, direction, notice, consent, waiver or other action, only Notes in respect of which a Responsible Officer of the Trustee has received written notice from the Issuer that such Notes are so owned will be so disregarded).  Notes so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right to so act with respect to such Notes and that the pledgee is not the Issuer or any Affiliate of the Issuer.

Section 2.06.   *Temporary Notes*.  Until definitive Notes are ready for delivery, the Issuer may prepare and the Trustee will authenticate temporary Notes.  Temporary Notes will be substantially in the form of definitive Notes but may have insertions, substitutions, omissions and other variations determined to be appropriate by the Officer executing the temporary Notes, as evidenced by the execution of the temporary Notes.  If temporary Notes are issued, the Issuer will cause definitive Notes to be prepared without unreasonable delay.   After the preparation of definitive Notes, the temporary Notes will be exchangeable for definitive Notes upon surrender of the temporary Notes at the office or agency of the Issuer designated for such purpose pursuant to Section 4.02, without charge to the Holder.  Upon surrender for cancellation of any temporary Notes the Issuer will execute and the Trustee will authenticate and deliver in exchange therefor a like principal amount of definitive Notes of authorized denominations.  Until so exchanged, the temporary Notes will be entitled to the same benefits under this Indenture as definitive Notes.

Section 2.07.   *Cancellation*.  The Issuer at any time may, but shall not be obligated to, deliver to the Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer may have acquired in any manner whatsoever, and may deliver to the Trustee for cancellation any Notes previously authenticated hereunder which the Issuer has not issued and sold.  Any Registrar, Transfer Agent or Paying Agent will forward to the Trustee any Notes surrendered to it for transfer, exchange or payment.  The Trustee will cancel all Notes surrendered for transfer, exchange, payment or cancellation and dispose of them in accordance with its then applicable procedures or the written instructions of the Issuer; *provided* that the Trustee shall not be required to destroy cancelled Notes.  The Issuer may not issue new Notes to replace Notes it has paid in full or delivered to the Trustee for cancellation.

Section 2.08.   *CUSIP and ISIN Numbers*.  The Issuer in issuing the Notes may use "CUSIP" and "ISIN" numbers, and the Trustee will use CUSIP numbers or ISIN numbers in notices of redemption or exchange or in Offers to Purchase as a convenience to Holders, which notices shall state that no representation is made by the Issuer or the Trustee as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption or exchange or Offer to Purchase.  The Issuer shall promptly notify the Trustee in writing of any change in the CUSIP or ISIN numbers.

Section 2.09.   *Registration, Transfer and Exchange*.  (a) The Notes will be issued in registered form only, without coupons, and the Issuer shall cause the Registrar to maintain a

register (the "**Register**") of the Notes, for registering the record ownership of the Notes by the Holders and transfers and exchanges of the Notes.

(b)  (i) Each Global Note will be registered in the name of the Depositary or its nominee and, so long as DTC is serving as the Depositary thereof, will bear the DTC Legend.

(ii)  Each Global Note will be delivered to the Trustee as custodian for the Depositary.  Transfers of a Global Note (but not a beneficial interest therein) will be limited to transfers thereof in whole, but not in part, to the Depositary, its successors or their respective nominees, except as set forth in Section 2.09(b)(iv).

(iii)  Agent Members will have no rights under this Indenture with respect to any Global Note held on their behalf by the Depositary, and the Depositary or its nominee, as the case may be, shall be treated by the Issuer, the Trustee, each Agent and any of their respective agents as the absolute owner and Holder of such Global Note for all purposes whatsoever. Notwithstanding the foregoing, the Depositary or its nominee may grant proxies and otherwise authorize any Person (including any Agent Member and any Person that holds a beneficial interest in a Global Note through an Agent Member) to take any action which a Holder is entitled to take under this Indenture or the Notes, and nothing herein will impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

(iv)  If (x) the Depositary (A) notifies the Issuer that it is unwilling or unable to continue as Depositary for a Global Note and the Depositary fails to appoint a successor depositary within 90 days of the notice or (B) has ceased to be a clearing agency registered under the Exchange Act; (y) subject to the procedures of the Depositary, the Issuer, at its option, notifies the Trustee in writing that the Issuer elects to cause the issuance of Certificated Notes or (z) there has occurred and is continuing a Default or Event of Default and the Issuer or the Trustee has received a request from the Depositary, the Issuer shall promptly exchange each beneficial interest in the Global Note for one or more Certificated Notes in authorized denominations having an equal aggregate principal amount registered in the name of the owner of such beneficial interest, as identified to the Issuer and the Trustee by the Depositary in writing, and the Trustee shall cancel the Global Note.  If the Global Note being exchanged does not bear the Restricted Legend or Regulation S Legend, as the case may be, then the Certificated Notes issued in exchange therefor will not bear the Restricted Legend or Regulation S Legend, as the case may be.  If such Global Note bears the Restricted Legend or Regulation S Legend, as the case may be, then the Certificated Notes issued in exchange therefor will bear the Restricted Legend or Regulation S Legend, as the case may be.

(c)  Each Certificated Note will be registered in the name of the Holder thereof.

(d)  A Holder may transfer a Note (or a beneficial interest therein) to another Person or exchange a Note (or a beneficial interest therein) for another Note or Notes of any authorized denomination by presenting to the Trustee a written request therefor stating the name of the proposed transferee or requesting such an exchange, accompanied by any certification, opinion or other document required by Section 2.10.  The Registrar shall promptly register any transfer

or exchange that meets the requirements of this Section by noting the same in the Register maintained by the Registrar for this purpose; *provided* that:

(i)    no transfer or exchange will be effective until it is registered in such Register, and

(ii)    the Trustee and the Registrar, as applicable, will not be required (w) to issue or register the transfer or exchange of any Note for a period of 15 days before a selection of Notes to be redeemed, (x) to register the transfer or exchange any Note so selected for redemption in whole or in part, except, in the case of a partial redemption, that portion of any Note not being redeemed, (y) to register any Note between a Regular Record Date and the corresponding Interest Payment Date, or (z) if a redemption is to occur after a Regular Record Date but on or before the corresponding Interest Payment Date, to register the transfer or exchange of any Note on or after the Regular Record Date and before the date of redemption.  Prior to the registration of any transfer, the Issuer, the Trustee, each Agent and each of their respective agents will treat the Person in whose name the Note is registered as the owner and Holder thereof for all purposes (whether or not the Note is overdue), and will not be affected by notice to the contrary.

From time to time the Issuer will execute and the Trustee will authenticate additional Notes as necessary in order to permit the registration of a transfer or exchange in accordance with this Section.

No service charge will be imposed in connection with any transfer or exchange of any Note, but the Issuer and the Trustee may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than a transfer tax or other similar governmental charge payable upon exchange pursuant to Section 2.09(b)(iv)).

(e)    (i) *Global Note to Global Note.*  If a beneficial interest in a Global Note is transferred or exchanged for a beneficial interest in another Global Note, the Trustee will (x) record a decrease in the principal amount of the Global Note being transferred or exchanged equal to the principal amount of such transfer or exchange and (y) record a like increase in the principal amount of the other Global Note.  Any beneficial interest in one Global Note that is transferred to a Person who takes delivery in the form of an interest in another Global Note, or exchanged for an interest in another Global Note, will, upon transfer or exchange, cease to be an interest in such Global Note and become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer and exchange restrictions, if any, and other procedures applicable to beneficial interests in such other Global Note for as long as it remains such an interest.

(ii)    *Global Note to Certificated Note.*  If a beneficial interest in a Global Note is transferred or exchanged for a Certificated Note, the Trustee will (x) record a decrease in the principal amount of such Global Note equal to the principal amount of such transfer or exchange and (y) deliver one or more new Certificated Notes in authorized denominations having an equal aggregate principal amount to the transferee (in the case of a transfer) or the owner of such beneficial interest (in the case of an exchange), registered

21

in the name of such transferee or owner, as applicable, as provided in writing by the Depositary.

(iii)    *Certificated Note to Global Note*.  If a Certificated Note is transferred or exchanged for a beneficial interest in a Global Note, the Trustee will (x) cancel such Certificated Note, (y) record an increase in the principal amount of such Global Note equal to the principal amount of such transfer or exchange and credit such increase to the account of the Agent Member at the Depositary as instructed in writing by the Holder of the Certificated Notes and (z) in the event that such transfer or exchange involves less than the entire principal amount of the canceled Certificated Note, deliver to the Holder thereof one or more new Certificated Notes in authorized denominations having an aggregate principal amount equal to the untransferred or unexchanged portion of the canceled Certificated Note, registered in the name of the Holder thereof.

(iv)    *Certificated Note to Certificated Note*.  If a Certificated Note is transferred or exchanged for another Certificated Note, the Trustee will (x) cancel the Certificated Note being transferred or exchanged, (y) deliver one or more new Certificated Notes in authorized denominations having an aggregate principal amount equal to the principal amount of such transfer or exchange to the transferee (in the case of a transfer) or the Holder of the canceled Certificated Note (in the case of an exchange), registered in the name of such transferee or Holder, as applicable, and (z) if such transfer or exchange involves less than the entire principal amount of the canceled Certificated Note, deliver to the Holder thereof one or more Certificated Notes in authorized denominations having an aggregate principal amount equal to the untransferred or unexchanged portion of the canceled Certificated Note, registered in the name of the Holder thereof.

Section 2.10.  *Restrictions on Transfer and Exchange*.  (a) The transfer or exchange of any Note (or a beneficial interest therein) may only be made in accordance with this Section and Section 2.09 and, in the case of a Global Note (or a beneficial interest therein), the applicable rules and procedures of the Depositary.  The Trustee shall refuse to register any requested transfer or exchange that does not comply with the preceding sentence.

(b)    Subject to Section 2.10(c), the transfer or exchange of any Note (or a beneficial interest therein) of the type set forth in column A below for a Note (or a beneficial interest therein) of the type set forth opposite column B below may only be made in compliance with the certification requirements (if any) described in the clause of this paragraph set forth opposite column C below.

| A | B | C |
|---|---|---|
| U.S. Global Note | U.S. Global Note | (1) |
| U.S. Global Note | Offshore Global Note | (2) |
| U.S. Global Note | Certificated Note | (3) |
| Offshore Global Note | U.S. Global Note | (4) |

22

| | | |
|---|---|---|
| Offshore Global Note | Offshore Global Note | (1) |
| Offshore Global Note | Certificated Note | (3) |
| Certificated Note | U.S. Global Note | (4) |
| Certificated Note | Offshore Global Note | (2) |
| Certificated Note | Certificated Note | (3) |

(1)    No certification is required.

(2)    The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee a duly completed and executed Regulation S Certificate; *provided* that if the requested transfer or exchange is made by the Holder of a Certificated Note that does not bear the Restricted Legend or Regulation S Legend, then no certification is required.

(3)    The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee (x) a duly completed and executed Rule 144A Certificate or (y) a duly completed and executed Regulation S Certificate, and/or an Opinion of Counsel and such other certifications and evidence as the Issuer may reasonably require in order to determine that the proposed transfer or exchange is being made in compliance with the Securities Act and any applicable securities laws of any state of the United States; *provided* that if the requested transfer or exchange is made by the Holder of a Certificated Note that does not bear the Restricted Legend or the Regulation S Legend, then no certification is required.  In the event that a Certificated Note that does not bear the Restricted Legend or the Regulation S Legend is surrendered for transfer or exchange, upon transfer or exchange the Trustee will deliver a Certificated Note that does not bear the Restricted Legend or the Regulation S Legend.

(4)    The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee a duly completed and executed Rule 144A Certificate.

(c)    No certification is required in connection with any transfer or exchange of any Note (or a beneficial interest therein) after such Note is eligible for resale pursuant to Rule 144(k) under the Securities Act (or a successor provision); *provided* that the Issuer has provided the Trustee with an Officer's Certificate and an Opinion of Counsel to that effect, and the Issuer may require from any Person requesting a transfer or exchange in reliance upon this clause an Opinion of Counsel and any other reasonable certifications and evidence in order to support such certificate.

Any Certificated Note delivered in reliance upon this paragraph will not bear the Restricted Legend or the Regulation S Legend, as the case may be.

(d)    The Trustee will retain copies of all certificates, opinions and other documents received in connection with the transfer or exchange of a Note (or a beneficial interest therein),

and the Issuer will have the right to inspect and make copies thereof at any reasonable time upon written notice within a reasonable period of time to the Trustee.

Section 2.11.    *Open Market Purchases*.  The Issuer or its Affiliates may at any time purchase Notes in the open market or otherwise at any price; *provided* that Notes that the Issuer or its Affiliates purchase may, in their respective discretion, be held, resold or cancelled, but will only be held or resold in compliance with applicable requirements or exemptions under the relevant securities laws.

Section 2.12.    *Trustee's Disclaimer*.  (a) The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restriction on transfer imposed under this Indenture or under applicable law with respect to any transfer of interest in any Note (including any transfers between or among participants in the Depositary or beneficial owners of interest in Global Notes) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(b)    The Trustee and the Agents shall have no responsibility or obligation to any beneficial owner of an interest in a Global Note, any Agent Member or other member of, or a participant in, the Depositary or other Person with respect to the accuracy of the records of the Depositary or any nominee or participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any Agent Member or other participant, member, beneficial owner or other Person (other than the Depositary) of any notice (including any notice of redemption or purchase) or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes. All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to or upon the order of the registered Holders (which shall be the Depositary or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through the Depositary, subject to its applicable rules and procedures. The Trustee and Agents may rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its Agent Members and other members, participants and any beneficial owners. The Depositary (or its nominee) may be treated by the Trustee and the Agents as the owner of the Global Note for all purposes whatsoever.

(c)    Neither the Trustee nor any Agent shall have any responsibility or liability for any actions taken or not taken by the Depositary.

ARTICLE 3
ADDITIONAL AMOUNTS; REDEMPTION

Section 3.01.    *Additional Amounts*.  (a) All payments by the Issuer in respect of the Notes or by a Guarantor in respect of its Note Guarantee will be made without withholding or deduction for or on account of any present or future taxes, duties, assessments, fees or other governmental charges of whatever nature (and any fines, penalties or interests related thereto) imposed or levied by or on behalf of Luxembourg, Brazil or any authority therein or thereof or

24

any other jurisdiction or political subdivision thereof from or through which a payment is made or in which the Issuer or a Guarantor (or any successor to the Issuer or Guarantor) is organized or is a resident for tax purposes (a "**Relevant Taxing Jurisdiction**"), unless the Issuer or Guarantor, as applicable, is required by law to deduct or withhold such taxes, duties, assessments, fees or governmental charges.  In that event, the Issuer or Guarantor, as applicable, will make the required deduction or withholding, make payment of the amount so deducted or withheld to the appropriate governmental authority and pay such additional amounts as may be necessary to ensure that the net amounts received by Holders of Notes after such withholding or deduction equal the amounts that would have been received in respect of the Notes in the absence of such withholding or deduction (the "**Additional Amounts**").  However, no Additional Amounts shall be payable:

(i)       to, or to a third party on behalf of, a Holder or beneficial owner where the Holder or beneficial owner is liable for any present or future taxes, duties, assessments, fees or other governmental charges in respect of a Note by reason of the existence of any present or former connection between the Holder or beneficial owner (or between a fiduciary, settlor, beneficiary, partner, member or shareholder of the Holder or beneficial owner, if the Holder or beneficial owner is an estate, a trust, a partnership, a limited liability company or a corporation) and the Relevant Taxing Jurisdiction, including, without limitation, the Holder or beneficial owner (or the Holder's or the beneficial owner's fiduciary, settlor, beneficiary, partner, member or shareholder) being or having been a citizen or resident thereof, being or having been engaged or deemed to be engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, other than the mere holding of the Note or the enforcement of rights and the receipt of payments with respect to the Note;

(ii)      in respect of any present or future tax, duty, assessment, fee or other governmental charge that would not have been so imposed but for the presentation by the Holder or beneficial owner of a Note, where presentation is required, for payment on a date more than 30 days after the date on which such payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later;

(iii)     in respect of any present or future tax, duty, assessment, fee or other governmental charge that would not have been so imposed but for the failure by the Holder or beneficial owner of the Note to comply with any certification, identification or other reporting requirement concerning such Holder's or beneficial owner's nationality, residence, identity or connection with the Relevant Taxing Jurisdiction, if (1) compliance is required by the Relevant Taxing Jurisdiction as a precondition to relief or exemption from, or reduction in the rate of, all or part of the tax, duty, assessment, fee or other governmental charge and (2) the Issuer or Guarantor has given at least 30 days' notice that Holders or beneficial owners will be required to comply with such requirement;

(iv)      in relation to the application of the Luxembourg law of 23 December 2005, as amended from time to time, introducing a 20% withholding tax on certain interest and similar income payments made or deemed to be made by a Luxembourg paying agent for the immediate benefit of individuals resident in Luxembourg;

(v)     in respect of any present or future registration tax, stamp duty or any other similar documentary tax or duty, fixed or ad valorem, in Luxembourg, in connection (i) with the performance by the Issuer of its obligations under the Notes or any Guarantor in respect of its Note Guarantee; or (ii) with the registration of the Notes by the Holder or beneficial owner, or by a third party on his behalf, before the Registration, Estates and VAT Department (*Administration de l'enregistrement, des domaines et de la TVA*) in Luxembourg where this registration is not required by law (including for the enforcement of rights and the receipt of payments with respect to the Notes);

(vi)    in respect of any present or future tax, duty, assessment, fee or other governmental charge imposed on a Note presented for payment by or on behalf of a Holder or beneficial owner where the Holder or beneficial owner would have been able to avoid the withholding or deduction by presenting the relevant Note to another Paying Agent;

(vii)   in respect of any estate, inheritance, gift, sales, use, transfer, capital gains, excise or personal property or similar tax, duty, assessment, fee or other governmental charge;

(viii)  in respect of any tax, duty, assessment, fee or other governmental charge that is payable otherwise than by deduction or withholding from payments of principal of, premium, if any, or interest on a Note or by direct payment by the Issuer or a Guarantor in respect of claims made against the Issuer or such Guarantor in respect of such payments on a Note;

(ix)    in respect of any tax, duty, assessment, fee or other governmental charge imposed or withheld pursuant to Sections 1471 through 1474 of the Code, as of the Issue Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), current or future U.S. treasury regulations issued thereunder or any official interpretation thereof, any agreement entered into pursuant to Section 1471(b) of the Code, or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code ("**FATCA**"); or

(x)     in respect of any combination of the above.

(b)     In addition, no Additional Amounts shall be paid with respect to any payment on a Note or Note Guarantee to a Holder who is a fiduciary, a partnership, a limited liability company or other than the sole beneficial owner of that payment to the extent that payment on the Note or Note Guarantee would be required by the laws of the Relevant Taxing Jurisdiction to be included in the income, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, a member of the partnership, an interest holder in the limited liability company or a beneficial owner who would not have been entitled to the Additional Amounts had that beneficiary, settlor, member, interest holder or beneficial owner been the Holder.  Except as specifically provided above, neither the Issuer nor any Guarantor shall be required to make any payment with respect to any tax, duty, assessment, fee or other governmental charge imposed by any government or political subdivision or taxing authority thereof or therein.

(c)     In the event that Additional Amounts actually paid with respect to the Notes, as described above, are based on rates of deduction or withholding of taxes in excess of the appropriate rate applicable to the Holder of such Notes, and, as a result thereof the Holder is entitled to make a claim for a refund or credit of the excess from the authority imposing the withholding tax, then the Holder or beneficial owner shall, by accepting the Notes, be deemed to have assigned and transferred all right, title, and interest to any such claim for a refund or credit of such excess to the Issuer or Guarantor, as the case may be. However, by making such assignment, the Holder makes no representation or warranty that the Issuer or Guarantor, as the case may be, shall be entitled to receive such claim for refund or credit and incurs no other obligation (including, for the avoidance of doubt, any filing or other action) with respect thereto.

(d)     Any reference in this Indenture or the Notes to principal, premium, if any, interest or any other amount payable in respect of the Notes by the Issuer or the Note Guarantees by the Guarantors will, unless the Additional Amounts are explicitly already named in such context, be deemed also to refer to any Additional Amounts that may be payable with respect to that amount under the obligations referred to in this Section.

(e)     The Issuer or the relevant Guarantor, as the case may be, shall use reasonable efforts to furnish to the Trustee the official receipts (or a copy of the official receipts) evidencing payment of any taxes deducted or withheld from payments in respect of the Notes or the Note Guarantees, as the case may be (or other evidence of payment reasonably satisfactory to the Trustee). Copies of such receipts or other evidence of payment shall be made available to Holders by the Trustee upon written request.

(f)     The foregoing obligations  shall survive termination or discharge of this Indenture, payment of the Notes and/or the resignation or removal of the Trustee or any agent hereunder, and shall apply *mutatis mutandis* to any jurisdiction or political subdivision thereof in which any successor to the Issuer or a Guarantor is organized or is a resident for tax purposes.

Section 3.02.  *Optional Redemption*.

(a)     At any time before May 8, 2032, which is the date that is two months prior to the maturity of the Notes (the "**Par Call Date**"), the Issuer or any Guarantor may redeem the Notes at its option, in whole or in part, at any time and from time to time, at a redemption price (expressed as a percentage of principal amount and rounded to three decimal places) equal to the greater of:  (i) (a) the sum of the present values of the remaining scheduled payments of principal and interest thereon  discounted to the redemption date (assuming the Notes matured on the Par Call Date) on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 40 basis points, less (b) interest accrued to, but excluding, the date of redemption, and (ii) 100% of the principal amount of the Notes to be redeemed, *plus*, in either case, accrued and unpaid interest thereon to, but excluding, the redemption date.

(b)     On or after the Par Call Date, the Issuer or a Guarantor may redeem the Notes, in whole or in part, at any time and from time to time, at a redemption price equal to 100% of

the principal amount of the Notes being redeemed plus accrued and unpaid interest thereon to, but excluding, the redemption date.

(c)     Raízen's actions and determinations in determining the redemption price shall be conclusive and binding for all purposes, absent manifest error. The Trustee shall have no obligation to calculate or verify any redemption price, make-whole premium or any component thereof.

Section 3.03.   *Redemption for Taxation Reasons*. If as a result of any change in or amendment to the laws or any applicable treaties (or any rules or regulations promulgated thereunder) of a Relevant Taxing Jurisdiction, or any amendment to or change in official position regarding the application, interpretation or administration of such laws, treaties, rules, or regulations (including a holding by a court of competent jurisdiction), which change or amendment becomes effective or, in the case of a change in official position, is announced on or after the Issue Date (or, if later, the date a Relevant Taxing Jurisdiction becomes a Relevant Taxing Jurisdiction), (i) the Issuer or any successor thereof has or will become obligated to pay Additional Amounts as described above in Section 3.01 with respect to the Notes or (ii) any Guarantor or any successor thereof has or will become obligated to pay Additional Amounts as described above in Section 3.01 with respect to a Note Guarantee in excess of the Additional Amounts such Guarantor or successor, as the case may be, would be obligated to pay if payments in respect of the Note Guarantee were subject to withholding or deduction at a rate of 15% (or a rate of 25% if the Holder of the Notes is resident in a Favorable Tax Jurisdiction) (the "**Excess Additional Amounts**"), the Issuer, Guarantor or any successor thereof may, at its option, redeem all, but not less than all, of the outstanding Notes, at a redemption price equal to 100% of their principal amount then Outstanding, together with interest accrued to, but excluding, the date fixed for redemption, upon delivery of irrevocable notice of redemption to the Holders not fewer than ten days nor more than 90 days prior to the date fixed for redemption.  No notice of such redemption may be given earlier than 90 days prior to the earliest date on which the Issuer, Guarantor or any successor thereof would, but for such redemption, be obligated to pay such Additional Amounts or Excess Additional Amounts.  Notwithstanding the foregoing, the Issuer, Guarantor or any successor thereof shall not have the right so to redeem the Notes unless: (i) the obligation to pay such Additional Amounts or Excess Additional Amounts cannot be avoided by the Issuer or Guarantor (or successor) taking reasonable measures and (ii) the Issuer or Guarantor (or successor) has complied with all necessary regulations to legally effect such redemption; *provided*, *however*, that for this purpose reasonable measures shall not include any change in the Issuer's or any Guarantor's or any successor's jurisdiction of incorporation or organization or location of its principal executive or registered office.

Section 3.04. *Redemption Following Tender Offer.* Notwithstanding the provisions of Sections 3.02 or 3.03, in connection with any tender offer for the Notes (including an Offer to Purchase in connection with a Change of Control that results in a Rating Decline made in accordance with the terms of this Indenture), in the event that the Holders of not less than 85% of the aggregate principal amount of the Outstanding Notes validly tender and do not validly withdraw Notes in such tender offer and the Issuer, or any other Person making such offer in lieu of the Issuer, purchases all of the outstanding Notes validly tendered and not validly withdrawn by such Holders, then the Issuer or any Guarantor shall have the right, on not less than five nor more than 60 days' prior notice to the Holders (with a copy to the Trustee), to redeem all of the Notes

28

that remain Outstanding at a redemption price equal to the purchase price paid to each other Holder in such tender offer plus, to the extent not included in the purchase price, accrued and unpaid interest and Additional Amounts, if any, on the Notes that remain Outstanding, to, but excluding, the date of redemption.

Section 3.05. *Election to Redeem; Selection of Notes*. (a) In the event that the Issuer, a Guarantor or any successor thereof elects to redeem the Notes, prior to delivery of a notice of redemption to the Holders of the Notes, it will deliver to the Trustee: (1) an Officer's Certificate stating that the Issuer, such Guarantor or such successor, as the case may be, is entitled to redeem the Notes pursuant to the terms hereof and setting forth a statement of facts showing that the condition or conditions precedent to the right of the Issuer, such Guarantor or such successor, as the case may be, so to redeem have occurred or been satisfied; and (2) in respect of a redemption pursuant to Section 3.03, an Opinion of Counsel in the applicable Relevant Taxing Jurisdiction to the effect that (i) the Issuer, such Guarantor or such successor, as applicable, has or will become obligated to pay Additional Amounts or Excess Additional Amounts, as the case may be, (ii) the Issuer, such Guarantor or such successor, as applicable, cannot avoid payment of such Additional Amounts or Excess Additional Amounts, as the case may be, by taking reasonable measures available to it and (iii) all governmental approvals necessary for the Issuer, such Guarantor or such successor, as applicable, to effect the redemption have been obtained and are in full force and effect. The Trustee shall accept such Officer's Certificate and, if required, Opinion of Counsel as sufficient evidence of satisfaction of the conditions precedent described above, in which case, it shall be conclusive and binding upon the Holders of the Notes.

(b)    If less than all the Notes are to be redeemed at any time, selection of Certificated Notes for redemption shall be made by the Trustee in compliance with the requirements governing redemptions of the principal securities exchange, if any, on which the Notes are listed or if such securities exchange has no requirement governing redemption or the Notes are not then listed on a securities exchange, on a pro rata basis by lot (or, in the case of Global Notes, selection of Notes for redemption shall be made by the Depositary in accordance with its applicable procedures). If Notes are redeemed in part, the remaining outstanding amount of any Note must be at least equal to US$200,000 and be an integral multiple of US$1,000.

Section 3.06. *Notice of Redemption*. (a) The Issuer or a Guarantor shall deliver a notice of redemption to each Holder (which, in the case of Global Notes, will be the Depositary) and the Trustee by, in the case of Certificated Notes, first-class mail, postage prepaid, to the address of each Holder as it appears on the register maintained by the Registrar or, in the case of Global Notes by electronic delivery, in each case, at least five days but not more than 60 days prior to the redemption date (or, in the case of a redemption described in Section 3.03, at least ten days but not more than 90 days prior to the redemption date). A notice of redemption pursuant to Sections 3.02 and 3.04 may, at the discretion of the Issuer or Guarantor, be conditional. If such redemption or notice is subject to satisfaction of one or more conditions precedent, such notice shall state that, in the Issuer's or Guarantor's discretion, the redemption date may be delayed until such time (but no more than 60 days after the date of the notice of redemption) as any or all such conditions shall be satisfied (or waived by the Issuer or such Guarantor in its sole discretion) and a new redemption date shall be set by the Issuer or such Guarantor in accordance with applicable Depositary procedures, or such redemption may not occur and such notice may be rescinded in the event that any or all such conditions shall not have

been satisfied (or waived by the Issuer or such Guarantor in its sole discretion) by the redemption date, or by the redemption date as so delayed. A notice of redemption pursuant to Section 3.03 shall be irrevocable.

(b)     Each notice will identify the Notes (including the CUSIP number) to be redeemed and will state:

(1)     the redemption date;

(2)     the amount to be redeemed and the redemption price;

(3)     if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the redemption date upon surrender of a Certificated Note, a new Certificated Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Certificated Note;

(4)     the name and address of the Paying Agent;

(5)     that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(6)     that, unless the Issuer or Guarantor, as applicable, defaults in the payment of the redemption price, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(7)     the paragraph or sub-paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed;

(8)     that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes; and

(9)     any conditions precedent to such redemption.

(c)     At the Issuer's request, the Trustee will give the notice of redemption in the Issuer's name and at its expense; *provided*, *however*, that the Issuer has delivered to the Trustee, at least five days prior to the date notice of redemption is to be delivered to the Holders (or such shorter period as the Trustee shall agree), an Officer's Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph. For so long as the Notes are held by the Depositary, the redemption of the Notes shall be conducted in accordance with the policies and procedures of the Depositary.

(d)     The Issuer or a Guarantor may enter into an arrangement under which a Subsidiary of Raízen may, in lieu of redemption by the Issuer or such Guarantor, redeem any Notes on the terms set forth (and pursuant to provisions described) in this Article 3.

Section 3.07.    *Deposit of Redemption Price*.  Prior to 11:00 A.M. (New York City time) on the Business Day prior to the redemption date, the Issuer, Guarantor or successor thereof will deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption price of, and accrued and unpaid interest, if any, and any premium and Additional Amounts, if any, on, all Notes to be redeemed on that date.  The Trustee or the Paying Agent will promptly return to the Issuer, Guarantor or successor thereof upon written request any money deposited with the Trustee or the Paying Agent by the Issuer, Guarantor or successor thereof in excess of the amounts necessary to pay the redemption price of, and accrued and unpaid interest, if any, and any premium and Additional Amounts, if any, on, all Notes to be redeemed.

Section 3.08.    *Effect of Notice of Redemption*.  Upon surrender of any Note for redemption in accordance with a redemption notice, such Note shall be paid by the Issuer or the Guarantor at the redemption price, together with accrued interest, if any, to (but excluding) the redemption date (subject to the satisfaction of any applicable condition or conditions precedent set forth in such notice) and from and after such date (except in the event of a Default in the payment of the redemption price) such Notes shall cease to bear interest; *provided*, *however*, that installments of interest payable on or prior to the redemption date shall be payable to the Holders of such Notes registered as such at the close of business on the relevant Regular Record Date according to their terms.  If any Note to be redeemed shall not be so paid upon surrender thereof in accordance with the Issuer's or Guarantor's instructions for redemption, the principal shall, until paid, bear interest from the redemption date at the rate borne by the Notes.

ARTICLE 4
COVENANTS

Section 4.01.    *Payment of Notes*.  (a) The Issuer agrees to pay the principal of and interest (including, without limitation, any Additional Amounts, if any) on the Notes on the dates and in the manner provided in the Notes and this Indenture.  Not later than 11:00 A.M. (New York City time) on the Business Day (solely in New York City) immediately prior to the due date of the payment of any principal of or interest on any Notes, or any redemption of the Notes, the Issuer shall deposit with the Paying Agent Dollars in immediately available funds sufficient to pay such amounts, *provided* that if the Issuer or any Affiliate of the Issuer is acting as a Paying Agent, it shall, on or before each due date, segregate and hold in a separate trust fund for the benefit of the Holders a sum of Dollars sufficient to pay such amounts until paid to such Holders or otherwise disposed of as provided in this Indenture.  In each case, the Issuer shall promptly notify the Trustee in writing of its compliance with this Section 4.01.

(b)    Payments made on the Notes will be applied first to interest due and payable on the Notes and then to the reduction of the unpaid principal amount of the Notes.  An installment of principal or interest will be considered paid on the date due if the Trustee (or Paying Agent, other than the Issuer or any Affiliate of the Issuer) holds on that date Dollars designated for and sufficient to pay the installment and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the Holders on that date pursuant to the terms of this Indenture.  If the Issuer or any Affiliate of the Issuer acts as a Paying Agent, an installment of principal or interest will be considered paid on the due date only if paid to the Holders.

31

(c)     Each payment in full of principal, redemption amount, Additional Amounts and/or interest payable in respect of any Note made by or on behalf of the Issuer to or to the order of the Paying Agent in the manner specified in the Notes and this Indenture on the date due shall be valid and effective to satisfy and discharge the obligation of the Issuer to make payment of principal, redemption amount, Additional Amounts and/or interest payable in respect of any Note on such date, *provided*, *however*, that the liability of the Paying Agent hereunder shall not exceed any amounts paid to it by the Issuer, or held by it, on behalf of the Holders under this Indenture; and *provided, further*, that, in the event that there is a default by the Paying Agent in any payment of principal, redemption amount, Additional Amounts and/or interest in respect of any Note in accordance with the Notes and this Indenture, the Issuer shall pay on demand such further amounts as will result in receipt by the Holder of such amounts as would have been received by it had no such default occurred.

(d)     The Issuer agrees to pay interest on overdue principal, and to the extent lawful, overdue installments of interest at the rate per annum specified in the Notes (1% per annum in excess of the rate per annum borne by the Notes).  Any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the second day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least two days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.

(e)     Payments in respect of the Notes represented by the Certificated Notes (including principal, interest and Additional Amounts, if any) will be made at the specified office or agency of one or more Paying Agents in New York City. At the Issuer's option, interest on Certificated Notes may be paid by Dollars check drawn on a bank in New York City and mailed to the Holder of the Certificated Notes at its registered address. Upon written notice from a Holder of at least US$1.0 million in aggregate principal amount of Certificated Notes to the specified office of any Paying Agent not less than 15 days before the due date for any payment in respect of a Certificated Note, such payment may be made by wire transfer to a Dollar account maintained by the payee with a bank in New York City.

(f)     Payments in respect of the Notes represented by the Global Notes (including principal, interest and Additional Amounts, if any) are to be made by wire transfer of immediately available funds in such coin or currency of the United States as at the time of payment will be legal tender for the payment of public and private debts, to the accounts specified by the Depositary in accordance with is applicable procedures.

Section 4.02.   *Maintenance of Office or Agency*.  The Issuer shall maintain in the Borough of Manhattan, the City of New York, an office or agency where Notes may be surrendered for registration of transfer or exchange or for presentation for payment and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture (other than the type contemplated by Section 11.07) may be served.  The Issuer hereby initially designates the Corporate Trust Office of the Trustee as such office of the Issuer.  The Issuer shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Issuer fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands

32

(other than any presentations, surrenders, notices and demands service in accordance with Section 11.07(b)) may be made or served to the Trustee.  At any time that the Notes are listed on the Official List of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market, the Issuer will maintain an office or agent in Luxembourg to serve as Luxembourg transfer agent if and to the extent required by the rules of the Official List of the Luxembourg Stock Exchange.

The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be surrendered or presented for any of such purposes and may from time to time rescind such designations.  The Issuer shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

Section 4.03.  *Existence*.  Each of the Guarantors shall preserve and maintain in full force and effect its existence and the existence of the Significant Subsidiaries in accordance with their respective organizational documents, and the rights, licenses and franchises of each of the Guarantors and the Significant Subsidiaries, except, in each case, where the failure to do so would not, individually or in the aggregate, result in any Material Adverse Effect, *provided* that neither Guarantor is required to preserve any such right, license or franchise, or the existence of the Significant Subsidiaries, if the maintenance or preservation thereof is no longer desirable in the conduct of the business of Raízen and its Subsidiaries taken as a whole in its judgment; and *provided*, *further*, that this Section does not prohibit any transaction otherwise permitted by Section 5.01.

Section 4.04.  *Payment of Taxes*.  Each of the Guarantors will timely file all required tax returns required to be filed by it and pay and discharge (including by payment in installments or through offsetting with tax credits or otherwise) at or before maturity all of its material tax obligations (except where such tax obligations are contested in good faith and by proper proceedings and against which adequate reserves are being maintained to the extent required by Applicable GAAP), except where the failure to do so would not, individually or in the aggregate, result in a Material Adverse Effect.

Section 4.05.  *Maintenance of Properties*.  Each of the Guarantors will cause all properties used or useful in its business or the business of any of the Significant Subsidiaries to be maintained and kept in good condition, repair and working order in the judgment of such Guarantor, ordinary wear and tear excepted, except to the extent that the failure to do so would not, individually or in the aggregate, have a Material Adverse Effect; *provided* that nothing in this Section prevents either Guarantor or any Significant Subsidiary from discontinuing the use, operation or maintenance of any of such properties or disposing of any of them, if such discontinuance or disposal is, in the judgment of such Guarantor, desirable in the conduct of the business of Raizen and its Subsidiaries taken as a whole.

Section 4.06.  *Repurchases at the Option of the Holders Upon Change of Control*.

(a)      If a Change of Control that results in a Rating Decline occurs, not later than 30 days following such an occurrence, the Issuer or any Guarantor, shall make, directly or through a Designated Affiliate, an offer to purchase all of the Outstanding Notes (the "**Offer to Purchase**") at a purchase price (the "**Offer to Purchase Payment**") equal to 101% of the principal amount thereof plus accrued and unpaid interest thereon and Additional Amounts, if

33

any, to, but excluding, the Offer to Purchase Payment Date (as defined below). An Offer to Purchase shall be made by written offer to the Holders of Notes (a copy of which shall be delivered to the Trustee) at the address of such Holder appearing in the Register or otherwise in accordance with the procedures of the Depositary with the following information:

(i)       a description of the transaction or transactions that constitute the Change of Control;

(ii)      the principal amount of Notes subject to the Offer to Purchase and the Offer to Purchase Payment;

(iii)     that an Offer to Purchase is being made pursuant to this Section 4.06 and that all Notes validly tendered and not validly withdrawn pursuant to such Offer to Purchase will be accepted for payment;

(iv)      that a Holder may tender all or any portion of its Notes pursuant to such Offer to Purchase, subject to the requirement that if a Holder tenders only a portion of its Notes, the remaining Notes must be no less than US$200,000 in principal amount and in integral multiples of US$1,000 in excess thereof;

(v)       an expiration date (the "**Expiration Date**") of the Offer to Purchase, which will be not less than 30 days nor more than 60 days after the date of the Offer to Purchase, and an indicative settlement date for purchase (the "**Offer to Purchase Payment Date**"), which will be not more than five Business Days after the Expiration Date;

(vi)      that any Note not properly tendered will remain Outstanding and continue to accrue interest;

(vii)     that unless the Issuer, Guarantor or Designated Affiliate, as the case may be, defaults in the payment of the Offer to Purchase Payment on the Offer to Purchase Payment Date, interest on all Notes accepted for payment pursuant to the Offer to Purchase will cease to accrue on and after the Offer to Purchase Payment Date;

(viii)    that Holders electing to have any Notes purchased pursuant to an Offer to Purchase will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the Paying Agent specified in the Offer to Purchase at the address specified in the Offer to Purchase (or, in the case of Global Notes, tender such Notes in accordance with the applicable procedures of the Depositary), in each case, on or prior to the Expiration Date;

(ix)      that Holders shall be entitled to withdraw their tendered Notes and their election to require the Issuer, Guarantor or Designated Affiliate, as the case may be, to purchase such Notes; *provided* that the Paying Agent receives, prior to the Expiration Date, a written statement setting forth the name of the Holder of the Notes, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased (or, in the case of Global Notes, a notice of withdrawal of such Notes is delivered in accordance with the applicable procedures of the Depositary); and

34

(x)    that, if any Note was purchased only in part, (x) in the case of a Global Note, appropriate adjustments to the amount and beneficial interests in a Global Note will be made, and (y) in the case of a Certificated Note, a new Certificated Note or Notes in principal amount equal to the unpurchased portion of the original Certificated Note representing the same indebtedness to the extent not purchased will be issued in the name of the Holder of such Certificated Note upon cancellation of the original Certificated Note; provided that each such new Note will be in a principal amount of US$200,000 or an integral multiple of US$1,000 in excess thereof.

The Offer to Purchase shall also contain instructions and any materials necessary to enable Holders to tender Notes pursuant thereto. If (1) notice is given in a manner provided in this Section 4.06 and (2) any Holder fails to receive such notice or a Holder receives such notice but it is defective, such Holder's failure to receive such notice or such defect shall not affect the validity of the Offer to Purchase as to all other Holders that properly received such without defect.

(b)    On the Business Day immediately preceding the Offer to Purchase Payment Date, the Issuer, a Guarantor or a Designated Affiliate shall, to the extent lawful, deposit with such Paying Agent an amount equal to the aggregate Offer to Purchase Payment in respect of all Notes or portions thereof so tendered.  On the Offer to Purchase Payment Date, the Issuer, a Guarantor or a Designated Affiliate shall, to the extent lawful,

(i)    accept for payment for all Notes properly tendered and not withdrawn pursuant to the Offer to Purchase; and;

(ii)    deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate stating that such Notes or portions thereof have been tendered to and purchased by the Issuer, Guarantor or a Designated Affiliate.

(c)    The Paying Agent shall promptly deliver to each Holder the Offer to Purchase Payment for its Notes that have been accepted for payment in the Offer to Purchase, and, in the case of Certificated Notes purchased in part, the Trustee shall promptly authenticate and deliver to each Holder a new Certificated Note equal in principal amount to any unpurchased portion of the Certificated Notes surrendered, if any; *provided* that each such new Certificated Note will be in a principal amount of US$200,000 or an integral multiple of US$1,000 in excess thereof.

(d)    Notwithstanding Section 4.06(a), the Issuer shall not be required to make an Offer to Purchase upon a Change of Control that results in a Rating Decline if (i) a third party makes an offer to purchase in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 4.06 applicable to an Offer to Purchase made by the Issuer, Guarantor or Designated Affiliate and purchases all Notes properly tendered and not withdrawn under such offer, or (ii) a notice of redemption for all Outstanding Notes has been given pursuant to Section 3.02, Section 3.03 or Section 3.04, unless and until there is a Default in payment of the applicable redemption price.  Notwithstanding anything to the contrary contained herein, an Offer to Purchase may be made in advance of a Change of Control, conditioned upon the consummation of such Change of Control and the occurrence of such

35

Rating Decline, if a definitive agreement is in place for the Change of Control at the time the Offer to Purchase is made.

(e)    The Issuer, Guarantor or Designated Affiliate, as applicable, will comply with Rule 14e-1 under the Exchange Act (to the extent applicable) and all other applicable laws in making any Offer to Purchase.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the provisions of this Indenture and paragraph 3 of the Notes shall be deemed to be modified to the extent necessary to permit such compliance.  If the provisions of such securities laws or regulations cannot be complied with as a result of such deemed modifications, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.06 or paragraph 3 of the Notes by virtue thereof.

Section 4.07.    *Limitation on Liens*.  (a) The Guarantors agree that, for so long as any Note remains Outstanding, each Guarantor will not, and will not permit any Significant Subsidiary to, directly or indirectly, incur or permit to exist any Lien of any nature whatsoever securing the payment of Debt on any of its Property, whether owned at the Issue Date or thereafter acquired, other than Permitted Liens, without effectively providing that the Notes or the Note Guarantees, as applicable, are secured equally and ratably with (or, if the obligation to be secured by the Lien is subordinated in right of payment to the Notes or the Note Guarantees, prior to) the obligations so secured for so long as such obligations are so secured.

(b)    Notwithstanding the foregoing, any Lien securing the Notes or the Note Guarantees granted pursuant to this Section 4.07 shall be automatically and unconditionally released and discharged upon the release by the holders of the Debt described in Section 4.07(a) of their Lien on the Property of the relevant Guarantor or any Significant Subsidiary (including any deemed release upon payment in full of all obligations under such Debt) at such time as the holders of all such Debt also release their Lien on the Property of such Guarantor or such Significant Subsidiary or upon any sale, exchange or transfer to any Person that is not an Affiliate of such Guarantor of the Property secured by such Lien, or of all of the Capital Stock held by such Guarantor or any Subsidiary in, or all or substantially all the assets of, any Significant Subsidiary creating such Lien.

Section 4.08.    *Reporting Requirements*.  (a) Raízen shall furnish to the Trustee for delivery to Holders of the Notes, upon their written request thereof:

(i)    as soon as available and in any event no later than 120 days after the last day of its fiscal year (commencing with the fiscal year ending March 31, 2025), its annual audited consolidated financial statements in English as at and for the fiscal year then ended, prepared in accordance with Applicable GAAP, together with the audit report thereon;

(ii)    as soon as available and in any event within 90 days after the end of the first three fiscal quarters of each fiscal year, its quarterly unaudited consolidated financial statements in English prepared in accordance with Applicable GAAP, accompanied by a "limited review" (*revisão limitada*) report thereon; and

(iii)     within ten Business Days after becoming aware of the occurrence of an Event of Default, an Officer's Certificate setting forth the details of the Event of Default, and the action which the Issuer or Guarantor, as applicable, is taking or proposes to take with respect thereto.

(b)     Notwithstanding the foregoing, if Raízen makes available the information described in clauses (i) and (ii) above on its website or the website of a Subsidiary of Raízen, it will be deemed to have satisfied the reporting requirement set forth in clauses (i) and (ii) above.  It is understood that the Trustee shall have no obligation whatsoever to determine whether such information, documents or reports have been delivered as described above or posted on any website.

(c)     For so long as any Notes remain Outstanding, the Issuer will make available to any Noteholder or beneficial owner of an interest in the Notes, or to any prospective purchasers designated by such Noteholder or beneficial owner, upon request of such Noteholder or beneficial owner, information required to be delivered under paragraph (d)(4) of Rule 144A unless, at the time of such request, the Issuer is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, or is exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act.

(d)     Delivery of any such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt thereof shall not constitute actual or constructive notice or knowledge of any information contained therein or determinable for information contained therein, including the Issuer's, any Guarantor's and/or any other Person's compliance with any of the covenants under this Indenture (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

Section 4.09.  *Disclosure of Names and Addresses of Holders*.  Every Holder, by receiving and holding a Note, agrees with the Issuer, the Guarantors and the Trustee that neither the Issuer, nor any Guarantor nor the Trustee nor any Agent shall be held accountable by reason of the disclosure of any information as to the names and addresses of the Holders in accordance with TIA Section 312, regardless of the source from which such information was derived, and that the Trustee shall not be held accountable by reason of mailing any material pursuant to a request made under TIA Section 312(b).

Section 4.10.  *Paying Agent and Transfer Agent*.  (a) The Issuer agrees, for the benefit of the Holders from time to time of the Notes, that, until all of the Notes are no longer Outstanding or until funds in Dollars for the payment of all of the principal of and interest on all Notes (and Additional Amounts, if any) shall have been made available at the Corporate Trust Office, and shall have been returned to the Issuer as provided herein, whichever occurs earlier, there shall at all times be a Paying Agent and Transfer Agent hereunder.  Each of the Paying Agent and the Transfer Agent shall have the respective powers and authority granted to and conferred upon it herein and in the Notes.

(b)     The Issuer hereby initially appoints the Paying Agent and Transfer Agent defined in this Indenture as such.  The Paying Agent shall arrange for the payment, from funds

37

furnished by the Issuer to the Paying Agent pursuant to this Indenture, of the principal of and interest on the Notes (and Additional Amounts, if any, with respect to the Notes).

Section 4.11.  *Limitation on Issuer*. The Guarantors shall own, at all times, directly or indirectly, at least 75% of the Voting Stock of the Issuer.

ARTICLE 5
CONSOLIDATION, MERGER OR SALE OF ASSETS

Section 5.01.  *Consolidation, Merger or Sale of Assets*.  (a) Each of the Issuer and the Guarantors shall not consolidate with or merge with or into any other Person or sell, convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all of its Property (determined on the basis of the consolidated assets of Raízen and its Subsidiaries) to any other Person (other than the Issuer or a Guarantor), unless:

(i)      the Person (if not the Issuer or a Guarantor) formed by such merger or consolidation or the Person (if not the Issuer or a Guarantor) which acquired by sale, conveyance, transfer or lease all or substantially all of the Property of the Issuer or a Guarantor (the "**Successor Corporation**") expressly assumes by supplemental indenture the due and punctual payment of the principal of and interest (and Additional Amounts) on all of the Notes or such Guarantor's Note Guarantee, as applicable, the performance or observance of every covenant of the Issuer or Guarantor, as applicable, and all other obligations of the Issuer or Guarantor, as applicable, under this Indenture and the Notes or such Guarantor's Note Guarantee, as applicable;

(ii)     immediately after giving effect to such transaction, no Event of Default with respect to any Note shall have occurred and be continuing; and

(iii)    the Issuer or such Guarantor, as applicable, or the Successor Corporation, as the case may be, shall deliver to the Trustee an Opinion of Counsel to the effect that such consolidation, merger, sale, conveyance, transfer or lease and such supplemental indenture (if required) comply with these conditions, that such supplemental indenture (if required) has been duly authorized, executed and delivered and constitutes valid and binding obligations of the Successor Corporation and that all conditions precedent herein provided or relating to such transaction and such supplemental indenture (if required) have been complied with.

(b)      Notwithstanding anything to the contrary in the foregoing, the following transactions shall not be subject to Section 5.01(a)(ii):

(i)      any merger or consolidation by the Issuer or any Guarantor with or into any Subsidiary of the Issuer or any Guarantor; and

(ii)     any sale, conveyance, transfer or lease by the Issuer or any Guarantor, in one transaction or in a series of transactions, directly or indirectly, of all or substantially all of its Property (determined on the basis of the consolidated assets of Raízen and its Subsidiaries) to any Subsidiaries of the Issuer or any Guarantor.

38

(c)     Notwithstanding anything to the contrary in the foregoing, any merger or consolidation, in which the surviving entity is the Issuer or a Guarantor, or sale, conveyance, transfer or lease to the Issuer or a Guarantor will not be subject to this Section 5.01.

(d)     Upon any consolidation, merger, sale, conveyance, transfer or lease in accordance with these conditions, the Successor Corporation shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer or Guarantor, as applicable, under this Indenture and the Notes or such Guarantor's Note Guarantee, as applicable, with the same effect as if the Successor Corporation had been named as the Issuer or the Guarantor of the Notes herein.  No Successor Corporation shall have the right to redeem the Notes unless the Issuer or any Guarantor would have been entitled to redeem the Notes in similar circumstances.

## ARTICLE 6
## DEFAULT AND REMEDIES

Section 6.01.  *Events of Default.*  (a) The occurrence of one or more of the following events shall constitute an "Event of Default":

(i)     the Issuer or a Guarantor fails to pay any interest (including any related Additional Amounts) on any of the Notes when the same becomes due and payable, and such Default continues for a period of 30 days;

(ii)     the Issuer or a Guarantor fails to pay the principal (including premium, if any, and any related Additional Amounts) of any of the Notes when the same becomes due and payable, upon redemption, or otherwise, and in the case of technical or administrative difficulties in the payment of principal, only if such Default persists for a period of more than five Business Days;

(iii)     the Issuer or a Guarantor fails to perform or observe any other covenant or obligation in the Notes or in this Indenture and such Default continues for a period of more than 90 consecutive days after written notice to the Issuer and/or Guarantor, as the case may be, by the Trustee, or to the Issuer or Guarantor and the Trustee by the Holders of 25% or more in aggregate principal amount of the Notes Outstanding;

(iv)     the Issuer, a Guarantor or any of their respective Significant Subsidiaries defaults (A) in the payment when it becomes due and payable (subject to any applicable grace period), whether by acceleration or otherwise, of any Debt in an aggregate principal amount of US$150,000,000 (or its equivalent in any other currency or currencies) (the "**Threshold Amount**"), whether such Debt now exists or shall hereafter be created; or (B) in the performance or observance of any other terms and conditions relating to any such Debt in an aggregate amount in excess of the Threshold Amount if the effect of such Default is to cause such Debt to become due prior to its Stated Maturity;

(v)     the Issuer, a Guarantor or any of their respective Significant Subsidiaries shall: (A) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee, examiner, administrator, liquidator or similar Person of itself or of all or any substantial part of its Property; (B) make a general assignment for the

39

benefit of its creditors; (C) file a petition seeking bankruptcy, insolvency, reorganization in an insolvency or comparable context, *recuperação judicial*, *recuperação extrajudicial,* liquidation, *falência*, dissolution or winding up; or (D) take any corporate action for the purpose of effecting any of the foregoing;

(vi)     an involuntary proceeding or case shall be commenced against the Issuer, a Guarantor or any of their respective Significant Subsidiaries without its application or consent, seeking: (A) its reorganization, liquidation, dissolution or winding up; (B) the appointment of a receiver, custodian, trustee, examiner, administrator, liquidator or similar Person of it or of all or any substantial part of its Property; or (C similar relief in respect of it under any applicable law relating to bankruptcy, insolvency, reorganization, *recuperação judicial*, *recuperação extrajudicial*, liquidation, *falência*, dissolution or winding up, and such proceeding or case shall continue not dismissed and not stayed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue not stayed and in effect, for a period of 90 or more consecutive days;

(vii)     any of this Indenture or the Notes or the Note Guarantees for any reason cease to be in full force and effect in accordance with its terms or the Issuer or a Guarantor shall judicially contest the binding effect or enforceability thereof or shall deny that it has any further liability or obligation thereunder or in respect thereof;

(viii)     a final non-appealable judgment(s) for the payment of money in an amount equal or in excess of the Threshold Amount shall have been entered by a court or courts of competent jurisdiction against the Issuer or a Guarantor and remain unpaid or undischarged for a period (during which execution shall not be effectively stayed) of 60 consecutive days unless (A) covered by an insurance policy or policies issued by reputable and credit-worthy insurance companies or (B) a Permitted Holder has contractually and irrevocably undertaken to indemnify the Issuer or a Guarantor, as applicable, for any potential loss or claim arising therefrom and enforcement proceedings are not being executed against any Property of the Issuer or such Guarantor; or

(ix)     it is or becomes unlawful for the Issuer or a Guarantor to perform or comply with any one or more of its payment obligations under this Indenture or the Notes or the Note Guarantees.

(b)     In the case of any Event of Default referred to in Section 6.01(a)(iv) above, such Event of Default shall be automatically rescinded or annulled if each of the default and/or the acceleration of the Debt referred to therein is remedied or cured by the Issuer, any Guarantor or Significant Subsidiary or waived by the holders of such Debt within 60 days after the default and/or acceleration in respect of such Debt.

Section 6.02.  *Acceleration*.  (a) If an Event of Default, except for a bankruptcy default with respect to the Issuer or any Guarantor, occurs and is continuing under this Indenture, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then Outstanding, by written notice to the Issuer (and to the Trustee if the notice is given by the Holders), may, and the Trustee at the request of such Holders shall, declare the unpaid principal of and accrued interest on the Notes and any other amounts due and payable by the Issuer under

40

this Indenture to be immediately due and payable. Upon a declaration of acceleration, such principal, interest and other amounts will become immediately due and payable. If a bankruptcy default occurs with respect to the Issuer or any Guarantor, the unpaid principal of and accrued interest on the Notes then Outstanding and any other amounts due and payable by the Issuer under this Indenture will become immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

(b)     Subject to the exceptions set forth in Section 6.04, the Holders of a majority in principal amount of the Outstanding Notes by written notice to the Issuer or a Guarantor and to the Trustee may waive all past Defaults and rescind and annul a declaration of acceleration and its consequences if:

(i)     all existing Events of Default, except for the nonpayment of the principal of, premium, if any, and interest on the Notes that have become due solely by the declaration of acceleration, have been cured or waived;

(ii)     the rescission would not conflict with any judgment or decree of a court of competent jurisdiction; and

(iii)     the Issuer or a Guarantor has paid the Trustee its reasonable compensation and reimbursed the Trustee for its reasonable and documented expenses (including the fees and expenses of its counsel), disbursements and advances.

Section 6.03.    *Other Remedies*.    If an Event of Default occurs and is continuing, the Trustee may pursue, in its own name or as trustee of an express trust, any available remedy by proceeding at law or in equity to collect the payment of principal of and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.  The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.

Section 6.04.    *Waiver of Past Defaults*.    Except a Default in the payment of principal, interest, premium, if any, and Additional Amounts, if any, and except as otherwise provided in Section 9.02, the Holders of a majority in principal amount of the Outstanding Notes may, by written notice to the Trustee and to the Issuer or the relevant Guarantor, waive an existing Default and its consequences.  Upon such waiver, the Default will cease to exist, and any Event of Default arising therefrom will be deemed to have been cured, but no such waiver will extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05.    *Control by Majority*.    Subject to the obligation to provide indemnity satisfactory to the Trustee, the Holders of a majority in aggregate principal amount of the Outstanding Notes may direct in writing the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, that may involve the Trustee in personal liability, or that the Trustee determines in good faith may be unduly prejudicial to the rights of Holders not joining in the giving of such direction (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders), and the Trustee may take any other

41

action it deems proper that is not inconsistent with any such direction received from Holders. Prior to taking any action hereunder, the Trustee shall be entitled to indemnification by the Holders satisfactory to it against any costs, losses, liabilities and expenses caused by taking or not taking such action.

Section 6.06. *Limitation on Suits*. A Holder may not institute any proceeding, judicial or otherwise, with respect to this Indenture or the Notes, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture or the Notes, unless:

(i)     the Holder has previously given to the Trustee written notice of a continuing Event of Default;

(ii)    Holders of at least 25% in aggregate principal amount of Outstanding Notes have made written request to the Trustee to institute such proceedings in respect of the Event of Default in its own name as Trustee under this Indenture;

(iii)   Holders have offered to the Trustee security or indemnity satisfactory to the Trustee against any costs, liabilities or expenses (including reasonable and documented counsel expenses) to be incurred in compliance with such request;

(iv)    the Trustee within 60 days after its receipt of such notice, request and offer of security or indemnity has failed to institute any such proceeding; and

(v)     during such 60-day period, the Holders of a majority in aggregate principal amount of the Outstanding Notes have not given the Trustee a written direction that, in the opinion of the Trustee, is inconsistent with such written request.

Section 6.07. *Rights of Holders to Receive Payment*. Notwithstanding anything to the contrary, the contractual right of a Holder of a Note to receive payment of principal of or interest on its Note on or after the Stated Maturity thereof, or to bring suit for the enforcement of any such payment on or after such dates, in each case as expressly set forth in this Indenture, may not be amended without the consent of that Holder.

Section 6.08. *Collection Suit by Trustee*. If an Event of Default in payment of principal or interest specified in clause (i) or (ii) of Section 6.01(a) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust for the whole amount of principal and accrued interest remaining unpaid, together with interest on overdue principal and, to the extent lawful, overdue installments of interest, in each case at the rate specified in the Notes, and such further amount as is sufficient to cover the reasonable and documented costs and expenses of collection, including the reasonable and documented compensation, expenses, disbursements and advances of the Trustee, its agents and legal counsel and any other reasonable and documented amounts due to the Trustee hereunder.

Section 6.09. *Trustee May File Proofs of Claim*. The Trustee may file proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due to the Trustee hereunder) and the Holders allowed in any judicial proceedings relating to the Issuer, the Guarantors or their

42

respective creditors or property, and is entitled and empowered to collect, receive and distribute any money, securities or other property payable or deliverable upon conversion or exchange of the Notes or upon any such claims.  Any custodian, receiver, "*síndico*," assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, if the Trustee consents to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable and documented compensation, expenses, disbursements and advances of the Trustee, its agent and counsel, and any other reasonable and documented amounts due to the Trustee hereunder.  Nothing in this Indenture will be deemed to empower the Trustee to authorize or consent to, or accept or adopt on behalf of any Holder, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10.   *Priorities*.  If the Trustee collects any money pursuant to this Article, it shall pay out the money in the following order:

First: to the Trustee and each of the Agents for all amounts due to it hereunder;

Second: to Holders for amounts then due and unpaid for principal of and interest on the Notes, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and interest; and

Third: to the Issuer or any Guarantor or as a court of competent jurisdiction may direct.

The Trustee, upon written notice to the Issuer, may fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

Section 6.11.   *Restoration of Rights and Remedies*.  If the Trustee or any Holder has instituted a proceeding to enforce any right or remedy under this Indenture and the proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to the Holder, then, subject to any determination in the proceeding, the Issuer, the Guarantors, the Trustee and the Holders will be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Issuer, the Guarantors, the Trustee and the Holders will continue as though no such proceeding had been instituted.

Section 6.12.   *Undertaking for Costs*.  In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court may require any party litigant in such suit (other than the Trustee) to file an undertaking to pay the costs of the suit, and the court may assess reasonable costs, including reasonable attorneys' fees, against any party litigant (other than the Trustee) in the suit having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.12 does not apply to a suit by a Holder to enforce payment of principal of or interest on any Note on the respective due dates pursuant to Section 6.07, or a suit by Holders of more than 10% in principal amount of the Outstanding Notes except for any proceeding brought before a Brazilian court, which case the Holder may be required to post a bond to cover legal fees and court expenses.

Section 6.13.   *Rights and Remedies Cumulative.*   No right or remedy conferred or reserved to the Trustee or to the Holders under this Indenture is intended to be exclusive of any other right or remedy, and all such rights and remedies are, to the extent permitted by law, cumulative and in addition to every other right and remedy hereunder or now or hereafter existing at law or in equity or otherwise.   The assertion or exercise of any right or remedy hereunder, or otherwise, will not prevent the concurrent assertion or exercise of any other right or remedy.

Section 6.14.   *Delay or Omission Not Waiver; Prescription of Claims.*   No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default will impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein and every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be; *provided*, that claims against the Issuer or the Guarantors for payments under any of the Notes shall be prescribed unless made within a period of ten years or, in the case of interest, a period of five years, from the applicable original date of payment therefor.

Section 6.15.   *Waiver of Stay, Extension or Usury Laws.*   Each of the Issuer and the Guarantors covenants, to the extent that it may lawfully do so, that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive the Issuer or a Guarantor, as the case may be, from paying all or any portion of the principal of, or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or that may affect the covenants or the performance of this Indenture.   Each of the Issuer and the Guarantors hereby expressly waives, to the extent that it may lawfully do so, all benefit or advantage of any such law and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

ARTICLE 7
THE TRUSTEE

Section 7.01.   *General.*   (a) The duties and responsibilities of the Trustee are as set forth herein.   Whether or not expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee is subject to this Article.

(b)      Except during the continuance of an Event of Default, (i) the duties of the Trustee shall be determined solely by the express provisions of this Indenture and the Trustee needs to perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations will be read into this Indenture against the Trustee; and (ii) the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, opinions or orders furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not

44

they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)     In case an Event of Default has occurred and is continuing, the Trustee shall exercise those rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(d)     No provision of this Indenture shall be construed to relieve the Trustee from liability for its own gross negligence or willful misconduct, except that:

(i)     this Section 7.01(d) shall not be construed to limit the effect of Section 7.01(b);

(ii)     the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(iii)     the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority in principal amount of the Outstanding Notes, relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture with respect to the Notes; and

(iv)     no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(e)     Unless otherwise specifically provided herein or in the Notes, any order, certificate, notice, request, direction or other communication from the Issuer or any Guarantor made or given under any provision of this Indenture shall be sufficient if signed by an Officer or any duly authorized attorney-in-fact.

(f)     Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 7.01.

Section 7.02.   *Certain Rights of Trustee.*

(a)     The Trustee may conclusively rely, and will be protected in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper Person.

(b)     Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel conforming to Section 11.03 and the Trustee will not be

liable for any action it takes or omits to take in good faith in reliance on such certificate or opinion.

(c)     The Trustee may act and conclusively rely and shall be fully protected in acting and relying in good faith on the opinion or advice of, or information obtained from, any counsel, accountant, appraiser or other expert or adviser, whether retained or employed by the Issuer, the Guarantors or by the Trustee, in relation to any matter arising in the administration of the trusts hereof.

(d)     The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders, unless such Holders have offered to the Trustee security, reasonably satisfactory to it, or indemnity against the reasonable and documented costs, expenses and liabilities (including, without limitation, reasonable and documented fees and expenses of legal counsel) that might be incurred by it in compliance with such request or direction.

(e)     The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within its rights or powers or for any action it takes or omits to take in accordance with the direction of the Holders in accordance with Section 6.05 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture.

(f)     The Trustee may appoint counsel and other advisors of its choice from time to time to provide advice and services arising out of or in connection with the performance by the Trustee of its obligations under this Indenture. The Trustee may consult with counsel of its choice, and the advice of such counsel or any Opinion of Counsel will be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(g)     The Trustee may act through its agents, attorneys, accountants, experts and such other professionals as the Trustee deems necessary, advisable or appropriate and shall not be responsible for the misconduct or negligence of any agent, attorney, accountant, expert or other such professional appointed with due care.

(h)     No provision of this Indenture will require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties hereunder, or in the exercise of its rights or powers, unless it receives indemnity satisfactory to it against any loss, liability or expense (including, without limitation, reasonable and documented fees and expenses of agents and attorneys). In no event shall the Trustee be liable for special, indirect punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(i)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be

46

enforceable by, the Trustee in each of its capacities hereunder, each Agent and each agent, custodian and other Person authorized or employed to act hereunder.

(j)       The Trustee may request that each of the Issuer and the Guarantors deliver a certificate setting forth the names of individuals and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture.

(k)       The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and reasonably believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Indenture.

(l)       The Issuer and its Affiliates may from time to time enter into normal banking and trustee relationships with the Trustee and its Affiliates.

(m)       The permissive rights of the Trustee to do things enumerated in this Indenture shall not be construed as a duty to take such action.

(n)       None of the Trustee or any Agent shall have any liability or responsibility with respect to, or obligation or duty to monitor, determine or inquire as to the Issuer's or any Guarantor's compliance with any covenant under this Indenture.

(o)       The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder.

(p)       The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note other evidence of indebtedness or other papers or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer personally or by agent or attorney at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

Section 7.03.  *Individual Rights of Trustee*.  The Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer, the Guarantors or its Affiliates with the same rights it would have if it were not the Trustee.  Any Agent may do the same with like rights.  However, the Trustee is subject to Trust Indenture Act Sections 310(b) and 311.

Section 7.04.  *Trust Indenture Act*.  Notwithstanding anything to the contrary elsewhere in this Indenture, the parties to this Indenture and the Holders of the Notes acknowledge and agree that this Indenture is not qualified under the Trust Indenture Act, Holders are not entitled to any protections thereunder and, except as expressly set forth in this Indenture, the provisions of the Trust Indenture Act are not incorporated by reference in this Indenture.

Section 7.05.  *Trustee's Disclaimer*.  The Trustee (i) makes no representation as to the validity or adequacy of this Indenture, the Notes, any Note Guarantee or any offering materials;

(ii) is not accountable for the Issuer's use or application of the proceeds from the Notes; and (iii) is not responsible for any statement in the Notes other than its certificate of authentication.

Section 7.06.  *Notice of Default*.  The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default with respect to the Notes (except a payment Default under Section 6.01(a)(i) or Section 6.01(a)(ii)) unless a Responsible Officer of the Trustee shall have received written notice thereof at the Corporate Trust Office and such notice references the Notes and this Indenture.  If any Default or Event of Default occurs and is continuing and (i) the Trustee has actual knowledge thereof (in the case of a payment Default under Section 6.01(a)(i) or Section 6.01(a)(ii)), or (ii) written notice thereof is delivered to a Responsible Officer of the Trustee, the Trustee will send notice of the Default or Event of Default to each Holder within 60 days after the Trustee is deemed to have knowledge or has received notice thereof, unless the Default or Event of Default has been cured; *provided* that, except in the case of a Default in the payment of the principal of or interest on any Note, the Trustee may withhold the notice if and so long as a committee of trust officers of the Trustee in good faith determines that withholding the notice is in the interest of the Holders.

Section 7.07.  *Compensation and Indemnity*.  (a) Each of the Issuer and the Guarantors will, jointly and severally, pay the Trustee compensation as agreed upon in writing between the Issuer, the Guarantors and the Trustee for their services. The compensation of the Trustee is not limited by any law on compensation of a trustee of an express trust. Each of the Issuer and the Guarantors will, jointly and severally, reimburse the Trustee upon request for all reasonable and documented out-of-pocket expenses, disbursements and advances incurred or made by the Trustee, including the compensation and reasonable and documented expenses of the Trustee's agents and counsel.

(b)     The Issuer and the Guarantors shall, jointly and severally, indemnify the Trustee for, and hold it harmless for, from and against, any damage, loss, claim, liability or expense (including, without limitation, the reasonable and documented fees and expenses of its legal counsel) incurred by it without gross negligence or willful misconduct on its part arising out of or in connection with the acceptance or administration of this Indenture by it and the performance of its duties under this Indenture and the Notes, including the reasonable and documented costs and expenses (legal or otherwise) of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Indenture and the Notes.

(c)     To secure the Issuer's and the Guarantors' payment obligations in this Section, the Trustee will have a lien prior to the Notes on all money or property held or collected by the Trustee, in its capacity as Trustee, except money or property held in trust to pay principal of, and interest (including Additional Amounts) on particular Notes.

(d)     If the Trustee incurs expenses or renders services in connection with an Event of Default as specified herein, the expenses (including, without limitation, the reasonable and documented charges and expenses of its legal counsel per jurisdiction) and the compensation for the services are intended to constitute expenses of administration under any applicable bankruptcy, reorganization, insolvency or similar law now or hereafter in effect.

48

(e)    The provisions of this Section 7.07 shall survive the payment of the Notes and the resignation or removal of the Trustee and/or the termination of this Indenture.

Section 7.08.    *Replacement of Trustee.*  (a) (i) The Trustee may resign at any time by providing at least 30-days written notice to the Issuer.

(ii)    The Holders of a majority in principal amount of the Outstanding Notes may remove the Trustee by providing at least 30-days written notice to the Trustee.

(iii)    If the Trustee is no longer eligible pursuant to Section 7.12, any Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(iv)    The Issuer may remove the Trustee if: (1) the Trustee is no longer eligible pursuant to Section 7.12; (2) the Trustee is adjudged a bankrupt or an insolvent; (3) a receiver or other public officer takes charge of the Trustee or its property; or (4) the Trustee becomes incapable of acting.  In addition, the Issuer may remove the Trustee at any time for any reason to the extent the Issuer has given the Trustee at least 30 days' written notice and as long as no Default or Event of Default has occurred and is continuing.

A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section.

(b)    If the Trustee has been removed by the Holders, Holders of a majority in principal amount of the Outstanding Notes may appoint a successor Trustee with the consent of the Issuer.  Otherwise, if the Trustee resigns or is removed, or if a vacancy exists in the office of Trustee for any reason, the Issuer will promptly appoint a successor Trustee.  If the successor Trustee does not deliver its written acceptance within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee (at the expense of the Issuer), the Issuer or the Holders of a majority in principal amount of the Outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)    Upon delivery by the successor Trustee of a written acceptance of its appointment to the retiring Trustee and to the Issuer, (i) the retiring Trustee will transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.07, (ii) the resignation or removal of the retiring Trustee will become effective, and (iii) the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture.  Upon request of any successor Trustee, the Issuer will execute any and all instruments for fully and vesting in and confirming to the successor Trustee all such rights, powers and trusts.  The Issuer will give notice of any resignation and any removal of the Trustee and each appointment of a successor Trustee to all Holders, and include in the notice the name of the successor Trustee and the address of its Corporate Trust Office.

(d)    Notwithstanding replacement of the Trustee pursuant to this Section, the Issuer's and the Guarantors' obligations in Section 7.07 will continue for the benefit of the retiring Trustee.

Section 7.09.  *Successor Trustee by Merger*.  If the Trustee consolidates with, merges or converts into, or transfers all or substantially all of its corporate trust business (including this transaction) to, another corporation or national banking association, the resulting, surviving or transferee corporation or national banking association without any further act will be the successor Trustee with the same effect as if the successor Trustee had been named as the Trustee in this Indenture.

Section 7.10.  *Money Held in Trust*.  The Trustee will not be liable for interest on or the investment of any money received by it except as it may agree with the Issuer or any Guarantor in writing.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.11.  *Force Majeure*.  Notwithstanding any provision herein to the contrary, in no event shall the Trustee or any Agent be liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused by forces beyond its control, including, but not limited to, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like which restrict or prohibit the providing of the services contemplated by this Indenture, inability to obtain material, equipment, or communications or computer facilities, or the failure of equipment or interruption of communications or computer facilities, it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 7.12.  *Corporate Trustee Required; Eligibility; Conflicting Interests*. There shall at all times be a Trustee hereunder which shall be eligible to act as Trustee under the Trust Indenture Act and shall have a combined capital and surplus of at least US$25,000,000 and its Corporate Trust Office in The City of New York, New York.  If such corporation publishes reports of condition at least annually, pursuant to law or the requirements of Federal, state, territorial or District of Columbia supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article.  Neither the Issuer nor any Person directly or indirectly controlling, controlled by, or under common control with the Issuer shall serve as Trustee. If the Trustee acquires any conflicting interest within the meaning of the TIA, it must (i) eliminate such conflict within 90 days, (ii) apply to the SEC for permission to continue as trustee or (iii) resign.

Section 7.13.  *Trustee and Others May Hold Notes*.  The Trustee or any Agent or any other authorized agent of the Trustee or the Issuer or any Guarantor, or any Affiliate thereof, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer or any Guarantor, or any other obligor on the Notes with the same rights it would have if it were not Trustee, Agent or such other authorized agent.

Section 7.14.  *Agents.*

(a)      Each Agent accepts its respective obligations set forth herein and in the Notes upon the terms and conditions hereof and thereof, including the following, to all of which the Issuer agrees and to all of which the rights of the Holders from time to time of the Notes shall be subject:

(i)      Each Agent shall be entitled to the compensation to be agreed upon with the Issuer and the Guarantors in writing for all services rendered by it, and the Issuer and the Guarantors, jointly and severally, agree promptly to pay such compensation and to reimburse each of the Agents for its reasonable and documented out-of-pocket expenses (including reasonable and documented fees and expenses of its counsel) incurred by it in connection with the services rendered by it hereunder.  Each of the Issuer and the Guarantors, jointly and severally, also agrees to indemnify each of the Agents for, and to hold each of them harmless against, any loss, liability or expense (including, without limitation, reasonable and documented fees and expenses of its legal counsel), incurred out of or in connection with its acting as agent of the Issuer hereunder, except to the extent such loss, liability or expense results from such Agent's own gross negligence or willful misconduct.  The obligations of the Issuer and the Guarantors under this Section 7.14(a)(i) shall survive the payment of the Notes and the resignation or removal of an Agent and/or the termination of this Indenture;

(ii)      In acting under this Indenture and in connection with the Notes, the Agents are each acting solely as agent of the Issuer and do not assume any obligation towards or relationship of agency or trust for or with any of the Holders, except that all funds held by a Paying Agent for the payment of the principal of and interest on (and Additional Amounts, if any, with respect to) the Notes, shall be held in trust by it and applied as set forth herein and in the Notes, but need not be segregated from other funds held by it, except as required by law;

(iii)      Each of the Agents shall be protected and shall incur no liability for or in respect of any action taken or omitted to be taken or thing suffered by it in reliance upon any Note, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper party or parties;

(iv)      No Agent shall be under any liability for interest on or investment of any moneys received by it pursuant to any of the provisions of this Indenture or the Notes or the Note Guarantees except as it may agree with the Issuer or any Guarantor in writing;

(v)      The recitals contained herein and in the Notes shall be taken as the statements of the Issuer, and no Agent assumes any responsibility for the correctness of the same.  No Agent makes any representation as to the validity or sufficiency of this Indenture, the Notes or the Note Guarantees or any offering materials.  No Agent shall be accountable for the use or application by the Issuer of any of the Notes or the proceeds thereof;

51

(vi)    Each Agent shall be obligated to perform such duties and only such duties as are herein and in the Notes specifically set forth, and no implied duties or obligations shall be read into this Indenture, the Notes or the Note Guarantees against such Agent.  No Agent shall be under any obligation to take any action hereunder which may tend to involve it in any expense or liability, the payment of which within a reasonable time is not, in its reasonable opinion, assured to it; and

(vii)    No provision of this Indenture shall be construed to relieve any Paying Agent or any Transfer Agent, as applicable, from liability for its own gross negligence or willful misconduct.

Anything in this Section to the contrary notwithstanding, the agreements to hold sums in trust as provided in this Section are subject to the provisions of Section 8.05.

(b)    Any Agent may at any time resign by giving written notice of its resignation mailed to the Issuer and the Trustee specifying the date on which its resignation shall become effective; *provided* that such date shall be at least 60 days after the date on which such notice is given unless the Issuer agrees to accept less notice.  Upon receiving such notice of resignation, the Issuer shall promptly appoint a successor Agent, qualified as aforesaid, by written instrument in duplicate signed on behalf of the Issuer, one copy of which shall be delivered to the resigning Agent and one copy to the successor Agent.  Such resignation shall become effective upon the earlier of (i) the effective date of such resignation or (ii) the acceptance of appointment by the successor Agent as provided in Section 7.14(c).  The Issuer may, at any time and for any reason, and shall, upon any event set forth in the next succeeding sentence, remove an Agent and appoint a successor Agent, qualified as aforesaid, by written instrument in duplicate signed on behalf of the Issuer, one copy of which shall be delivered to the Agent being removed and one copy to the successor Agent.  An Agent shall be removed as aforesaid if it shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver of such Agent or of its property shall be appointed, or any public officer shall take charge or control of such Agent or of its property or affairs for the purpose of rehabilitation, conservation or liquidation.  Any removal of an Agent and any appointment of a successor Agent shall become effective upon acceptance of appointment by the successor Agent as provided in Section 7.14(c). Upon its resignation or removal, the Agent shall be entitled to the payment by the Issuer of its compensation and reimbursement of its reasonable and documented disbursements, advances and expenses (including, without limitation, reasonable and documented fees and expenses of its legal counsel) as set forth in Section 7.14(a)(i).

(c)    Any successor Agent appointed as provided in Section 7.14(b) shall execute and deliver to its predecessor and to the Issuer an instrument accepting such appointment hereunder, and thereupon such successor Agent, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as such Agent hereunder, and such predecessor, upon payment of its compensation and reasonable and documented out-of-pocket expenses (including, without limitation, reasonable and documented fees and expenses of its legal counsel) then unpaid, shall pay over to such successor agent all moneys or other property at the time held by it hereunder, if any.

(d)     Any corporation or bank into which any Agent may be merged or converted, or with which any Paying Agent or Transfer Agent may be consolidated, or any corporation or bank resulting from any merger, conversion or consolidation to which an Agent shall be a party, or any corporation or bank succeeding to all or substantially all of the agency business of the Agent (including this transaction) shall be the successor to such Agent hereunder (*provided* that such corporation or bank shall be qualified as aforesaid) without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(e)     Notwithstanding anything to the contrary contained in this Indenture, any Paying Agent may, to the extent it is required to do so by law, deduct or withhold income or other similar taxes from principal or interest payments hereunder without any liability therefor.

ARTICLE 8
DEFEASANCE AND DISCHARGE

Section 8.01.   *Discharge of Issuer's Obligations*.  (a) Subject to paragraph (b), the Issuer's obligations under the Notes and this Indenture, and the Guarantors' obligations under the Note Guarantees, will terminate if:

(i)     either (A) all Notes previously authenticated and delivered (other than (1) destroyed, lost or stolen Notes that have been replaced or (2) Notes that are paid pursuant to Section 4.01 or (3) Notes for whose payment funds in Dollars or U.S. Government Obligations in Dollars have been held in trust and then repaid to the Issuer pursuant to Section 8.05) have been delivered to the Trustee for cancellation and the Issuer has paid all sums payable by it hereunder; or (B) (1) all Notes not theretofore delivered to the Trustee for cancellation (x) have become due and payable, (y) will become due and payable at their Stated Maturity within one year or (z) are to be called for redemption within one year under arrangements reasonably satisfactory to the Trustee, and the Issuer irrevocably deposits in trust with the Trustee, as trust funds solely for the benefit of the Holders, funds in Dollars or U.S. Government Obligations in Dollars or a combination thereof sufficient, in the opinion of an internationally recognized firm of independent public accountants to the extent such amounts consist of U.S. Government Obligations, expressed in a written opinion delivered to the Trustee, without consideration of any reinvestment, to pay principal of and interest on the Notes to maturity or redemption, as the case may be, and to pay all other sums payable by it hereunder; (2) no Default has occurred and is continuing on the date of the deposit; and (3) the deposit will not result in a breach or violation of, or constitute a Default under, this Indenture or any other agreement or instrument to which the Issuer is a party or by which it is bound; and

(ii)     the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel, in each case stating that all conditions precedent provided for herein relating to the satisfaction and discharge of this Indenture have been complied with.

(b)     After satisfying the conditions in clause (a)(i)(A), only the obligations of the Issuer and the Guarantors under Section 7.07 and Section 7.14 will survive. After satisfying the conditions in clause (a)(i)(B), only the obligations of the Issuer and the Guarantors in Article 2 and Sections 3.01, 4.01, 4.02, 7.07, 7.14, 8.05 and 8.06 will survive; *provided* that

53

upon payment of all Notes in full, only the obligations of the Issuer and the Guarantors in Section 7.07 and 7.14 will survive. In either case, the Trustee, upon request, will acknowledge in writing the discharge of the Issuer's and the Guarantors' obligations under the Notes and this Indenture other than the surviving obligations.

Section 8.02.  *Legal Defeasance*.   After the 123rd day following the deposit referred to in clause (i) below, the Issuer will be deemed to have paid and will be discharged from its obligations in respect of the Notes and this Indenture, other than its obligations in Article 2 and Sections 4.02, 7.07, 7.14, 8.05 and 8.06 (*provided* that upon payment of all Notes in full, only the Issuer's and the Guarantors' obligations in Section 7.07 and Section 7.14 will survive), if the following conditions have been satisfied:

(i)      the Issuer has irrevocably deposited in trust with the Trustee, as trust funds solely for the benefit of the Holders, funds in Dollars or U.S. Government Obligations in Dollars or a combination thereof sufficient, in the opinion of an internationally recognized firm of independent public accountants to the extent amounts consist of U.S. Government Obligations, expressed in a written certificate thereof delivered to the Trustee, without consideration of any reinvestment, to pay principal of and interest on the Notes to maturity or redemption, as the case may be, *provided* that any redemption before maturity has been irrevocably provided for under arrangements satisfactory to the Trustee;

(ii)     no Default has occurred and is continuing on the date of the deposit or at the end of the 123 day period following the deposit;

(iii)    the deposit will not result in a breach or violation of, or constitute a Default under, this Indenture or any other agreement or instrument to which the Issuer is a party or by which it is bound;

(iv)    the Issuer has delivered to the Trustee either (x) a ruling received from the Internal Revenue Service to the effect that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the legal defeasance and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case or (y) an Opinion of Counsel, based on a ruling published by the Internal Revenue Service or a change in U.S. federal income tax law after the date of this Indenture, to the same effect as the ruling described in clause (x); and

(v)     the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, in each case stating that all conditions precedent provided for herein relating to the legal defeasance (or in the case of covenant defeasance, covenant defeasance) have been complied with.

Prior to the end of the 123 day period, none of the Issuer's obligations under this Indenture will be discharged.  Thereafter, upon written request, the Trustee will acknowledge in writing the legal defeasance of the Notes.

Section 8.03.  *Covenant Defeasance*.  Following the deposit referred to in Section 8.01(a)(ii), the Issuer's obligations set forth in Section 4.03, Section 4.04, Section 4.05, Section

4.06, Section 4.07, Section 4.08(a), Section 4.08(b), and Section 5.01(a)(ii) will terminate, and the failure to comply with such obligations will no longer constitute an Event of Default under Section 6.01, provided that the following conditions have been satisfied:

(i)        the Issuer has complied with clauses (i), (iii) and (v) of Section 8.02; and

(ii)       the Issuer has delivered to the Trustee an Opinion of Counsel to the effect that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the covenant defeasance and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case.

Except as specifically stated above, none of the Issuer's obligations under this Indenture will be discharged.

Section 8.04.  *Application of Trust Money*.  Subject to Section 8.05, the Trustee will hold in trust the funds in Dollars or U.S. Government Obligations deposited with it pursuant to Section 8.01, 8.02 or 8.03, and apply the deposited funds in Dollars and the proceeds from deposited U.S. Government Obligations in Dollars to the payment of principal of and interest on the Notes in accordance with the Notes and this Indenture.  Such Dollar funds and U.S. Government Obligations need not be segregated from other funds except to the extent required by law.

Section 8.05.  *Repayment to Issuer*.  Subject to Section 7.07, 8.01, 8.02 and 8.03, the Trustee and the Paying Agents will promptly pay to the Issuer upon request any excess funds in Dollars held by the Trustee and the Paying Agents at any time and thereupon be relieved from all liability with respect to such funds.  The Trustee or such Paying Agent will pay to the Issuer upon written request any funds in Dollars held for payment with respect to the Notes that remains unclaimed for two years; *provided* that before making such payment the Trustee or such Paying Agent may at the expense of the Issuer publish once in a newspaper of general circulation in New York City, or send to each Holder entitled to such Dollar denominated funds, notice that the funds remains unclaimed and that after a date specified in the notice (at least 30 days after the date of the publication or notice) any remaining unclaimed balance of money will be repaid to the Issuer. After payment to the Issuer, Holders entitled to such funds must look solely to the Issuer for payment, unless applicable law designates another Person, and all liability of the Trustee and the Paying Agents with respect to such funds will cease.

Section 8.06.  *Reinstatement*.  If and for so long as the Trustee is unable to apply any funds in Dollars or U.S. Government Obligations in Dollars held in trust pursuant to Section 8.01, 8.02 or 8.03 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and the Guarantors' obligations under this Indenture and the Notes and the Note Guarantees will be reinstated as though no such deposit in trust had been made.  If the Issuer makes any payment of principal of or interest on any Notes because of the reinstatement of its obligations, it will be subrogated to the rights of the Holders of such Notes to receive such payment from the funds in Dollars or U.S. Government Obligations in Dollars held in trust.

ARTICLE 9
AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 9.01.  *Amendments Without Consent of Holders*.  The Issuer, the Guarantors and the Trustee may waive, consent, amend or supplement this Indenture, the Notes or the Note Guarantees without notice to or the consent of any Noteholder:

(i)    to cure any ambiguity, omission, defect, inconsistency or to correct a manifest error in this Indenture, the Notes or the Note Guarantees;

(ii)    to comply with Section 5.01 and to substitute the Issuer in accordance with Section 9.03;

(iii)    to evidence and provide for the acceptance of an appointment by a successor Trustee;

(iv)    to provide for uncertificated Notes in addition to or in place of Certificated Notes *provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code;

(v)    to provide for any additional Note Guarantee of the Notes or to secure the Notes or confirm and evidence the release, termination or discharge of any Note Guarantee of or Lien securing the Notes when such release, termination or discharge is permitted by this Indenture;

(vi)    to provide for or confirm the issuance of Additional Notes;

(vii)    to add to the covenants of the Issuer or Guarantors for the benefit of the Holders of the Notes;

(viii)    to surrender any right conferred by this Indenture upon the Issuer or the Guarantors;

(ix)    to comply with any requirements of the SEC in connection with any qualification of this Indenture under the U.S. Trust Indenture Act of 1939, as amended;

(x)    to make any other change that does not materially and adversely affect the rights of any Holder; or

(xi)    to conform any provision of this Indenture to the "Description of the Notes" in the Offering Memorandum.

Section 9.02.  *Amendments With Consent of Holders*.  (a) Except as otherwise provided in Article 6 or paragraph (b) of this Section 9.02, the Issuer, the Guarantors and the Trustee may amend this Indenture, the Notes and the Note Guarantees with the written consent of the Holders of at least a majority in aggregate principal amount of the Outstanding Notes, and the Holders of at least a majority in aggregate principal amount of the Outstanding Notes by written

56

notice to the Trustee may waive future compliance by the Issuer and the Guarantors with any provision of this Indenture, the Notes or the Note Guarantees.

(b)    Notwithstanding the provisions of paragraph (a), without the consent of each Holder of an affected Note, an amendment or waiver may not:

(i)    reduce the principal amount of or change the Stated Maturity of any payment of principal or any installment of interest on any Note;

(ii)    reduce the rate of interest or change the method of computing the amount of interest payable on any Note;

(iii)    reduce the amount payable upon the redemption of any Note or change the time at which any Note may be redeemed or, once notice of redemption has been given, the time at which it must thereupon be redeemed, subject to the conditions set forth in this Indenture, which conditions shall not be changed in any matter adverse to Holders, *provided*, *however*, the minimum notice period for such redemption may be changed with the written consent of the Holders of a majority in principal amount of the Outstanding Notes;

(iv)    make any Note payable in currency and place of payment other than that stated in the Note;

(v)    impair the contractual right of any Holder of Notes to receive any principal payment or interest payment on such Holder's Notes, on or after the Stated Maturity thereof, or to institute suit for the enforcement of any such payment;

(vi)    make any change in the percentage of the principal amount of the Notes required for amendments or waivers; or

(vii)    modify or change any provision of this Indenture affecting the ranking of the Notes in a manner adverse to the Holders of the Notes (it being understood that changes in provisions affecting the ability to create Liens over the assets of the Issuer shall not affect the "ranking" of the Notes as that term is used in this subsection (vii)).

(c)    It is not necessary for Holders to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if their consent approves the substance thereof.

(d)    (c) An amendment or waiver becomes effective upon the execution of such amendment or waiver by the Trustee.  After an amendment, supplement or waiver under this Section becomes effective, the Issuer will send to the Holders affected thereby a notice briefly describing the amendment, supplement or their written waiver.  Any failure of the Issuer to send such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amendment to this Indenture or waiver.

Section 9.03.   *Substitution of the Issuer*.  Without the consent of any Holder of Notes, the Issuer may be replaced and substituted, as principal debtor in respect of this Indenture

and the Notes, by (x) either Guarantor or (y) any Subsidiary of a Guarantor (in each case, in that capacity, the "**Substituted Issuer**"); *provided* that the following conditions are satisfied:

(i)       such documents shall be executed by the Substituted Issuer, the Issuer, the Guarantors and the Trustee as may be necessary to give full effect to the substitution, including a supplemental indenture to this Indenture under which the Substituted Issuer assumes all of the obligations of the Issuer under this Indenture and the Notes as if the Substituted Issuer had been named in the Notes and in this Indenture as the principal debtor in respect of the Notes in place of the Issuer (or any previous substitute) and each Guarantor, unless such Guarantor is the Substituted Issuer, or such Guarantor's then-existing Note Guarantee remains in full force and effect (as evidenced by an Officer's Certificate of such Guarantor), unconditionally and irrevocably reaffirms its Note Guarantee (collectively, the "**Substitution Documents**");

(ii)       if the Substituted Issuer is organized in a jurisdiction other than Luxembourg, the Substitution Documents shall contain covenants (a) to ensure that each Holder and beneficial owner of Notes has the benefit of a covenant in terms corresponding to the obligations of the Issuer pursuant to Section 3.01, in respect of the payment of Additional Amounts (but replacing references to Luxembourg with references to the jurisdiction of organization of the Substituted Issuer) and (b) to indemnify the Trustee, any Paying Agent, and each Holder and beneficial owner of Notes against all taxes or duties that (1) arise by reason of a law or regulation in effect or contemplated on the effective date of the substitution that are incurred or levied against the Trustee, such Paying Agent, or such Holder or beneficial owner of Notes, as the case may be, as a result of the substitution and that would not have been so incurred or levied had the substitution not been made, and (2) are imposed on the Trustee, such Paying Agent, or such Holder or beneficial owner of Notes, as the case may be, by any political subdivision or taxing authority of any country in which the Trustee, such Paying Agent, or such Holder or beneficial owner of Notes resides or is subject to any such tax or duty and that would not have been so imposed had the substitution not been made, in each case subject to similar exceptions as set forth in Section 3.01, *mutatis mutandis*; *provided*, that the Trustee, any Paying Agent, or any Holder or beneficial owner of Notes making a claim with respect to such tax indemnity shall provide the Substituted Issuer with notice of such claim, along with supporting documentation, within four weeks of the announcement of the substitution of the Issuer as issuer; and *provided*, *further*, that notwithstanding anything to the contrary in this Section, the Substituted Issuer shall be entitled to make any deduction or withholding, and shall not be required to indemnify the Trustee, any Paying Agent, or any Holder or beneficial owner of Notes for or on account of any taxes or duties, or pay any Additional Amounts with respect to any such deduction or withholding, imposed on or in respect of any Notes, in either case, pursuant to FATCA, any treaty, law, regulation or other official guidance enacted by any jurisdiction implementing FATCA or any intergovernmental agreement or law, regulation or other official guidance promulgated thereunder implementing FATCA;

(iii)       the Issuer will deliver, or cause the delivery, to the Trustee of (a) an Opinion of Counsel in the jurisdiction of organization of the Substituted Issuer to the effect that the Substitution Documents were duly authorized, executed and delivered by the Substituted

58

Issuer, (b) an Opinion of Counsel in the State of New York to the effect that the Substitution Documents constitute valid and binding obligations of the Substituted Issuer, and (c) an Officer's Certificate as to compliance with the provisions described in this Section 9.03;

(iv)     the Substituted Issuer shall appoint a process agent in the Borough of Manhattan in The City of New York to receive service of process on its behalf in relation to any legal action or proceedings arising out of or in connection with the Notes, this Indenture and the Substitution Documents;

(v)     no Event of Default under this Indenture has occurred or is continuing; and

(vi)     the substitution shall comply with all applicable requirements under the laws of the jurisdiction of organization of the Substituted Issuer, Luxembourg and Brazil.

(b)     Upon the execution of the Substitution Documents and compliance with the other conditions set forth in this Section, (i) the Substituted Issuer shall be deemed to be named in this Indenture and the Notes as the principal debtor in place of the Issuer and (ii) the Issuer (or any previous substitute) shall be released from all of its obligations under the Notes and this Indenture and any reference in this Indenture to the Issuer shall from then on be deemed to refer to the Substituted Issuer and any reference to the country in which the Issuer is organized or resident for tax purposes shall from then on be deemed to refer to the country in which the Substituted Issuer is organized or resident for tax purposes.

(c)     Not later than ten Business Days after the execution of the Substitution Documents, the Substituted Issuer shall give written notice thereof to the Holders of Notes.

(d)     Notwithstanding anything to the contrary, this Section 9.03 is not applicable to any consolidation or merger by the Issuer with or into any other Person or the sale, conveyance, transfer or lease by the Issuer, in one transaction or a series of transactions, directly or indirectly, of all or substantially all of its Property (determined on the basis of the consolidated assets of Raízen and its Subsidiaries), which such transaction shall be subject to the provisions of Section 5.01.

Section 9.04.   *Effect of Consent.*   (a) After an amendment, supplement or waiver becomes effective, it will bind every Holder unless it is of the type requiring the consent of each Holder affected.  If the amendment, supplement or waiver is of the type requiring the consent of each Holder affected, the amendment, supplement or waiver will bind each Holder that has consented to it and every subsequent Holder of a Note that evidences the same debt as the Note of the consenting Holder.

(b)     If an amendment, supplement or waiver changes the terms of a Note, the Trustee may require the Holder to deliver it to the Trustee so that the Trustee may place an appropriate notation of the changed terms on the Note and return it to the Holder, or exchange it for a new Note that reflects the changed terms.  The Trustee may also place an appropriate notation on any Note thereafter authenticated.  However, the effectiveness of the amendment, supplement or waiver is not affected by any failure to annotate or exchange Notes in this fashion.

Section 9.05.  *Trustee's Rights and Obligations*.   In signing any amendment, supplement or waiver, the Trustee is entitled to receive, and will be fully protected in relying upon, in addition to the documents required by Section 11.03, an Officer's Certificate and an Opinion of Counsel, each stating that the execution of any amendment, supplement or waiver is authorized or permitted by this Indenture.  If the Trustee has received such an Officer's Certificate and Opinion of Counsel, it shall sign the amendment, supplement or waiver so long as the same does not adversely affect the rights of the Trustee.  The Trustee may, but is not obligated to, execute any amendment, supplement or waiver that affects the Trustee's own rights, duties or immunities under this Indenture.

## ARTICLE 10
## NOTE GUARANTEES

Section 10.01. *Note Guarantees*.

(a)     Each Guarantor hereby jointly and severally, irrevocably and unconditionally Guarantees, as a primary obligor and not merely as a surety, to each Holder and to the Trustee and its successors and assigns (i) the full and punctual payment when due, whether by acceleration, by redemption or otherwise, of all obligations of the Issuer under this Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, interest on or liquidated damages, if any, in respect of the Notes and all other monetary obligations of the Issuer under this Indenture and the Notes and (ii) the full and punctual performance within applicable grace periods of all other obligations of the Issuer whether for fees, expenses, indemnification or otherwise under this Indenture and the Notes (all the foregoing being hereinafter collectively called the "**Guaranteed Obligations**").   Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from each such Guarantor, and that each such Guarantor shall remain bound under this Article 10 notwithstanding any extension or renewal of any Guaranteed Obligation.

(b)     Each Guarantor waives, to the fullest extent permitted by law, presentation to, demand of payment from and protest to the Issuer of any of the Guaranteed Obligations and also waives notice of protest for nonpayment.  Each Guarantor waives notice of any default under the Notes or the Guaranteed Obligations.  The obligations of each Guarantor hereunder shall not be affected by (i) the failure of any Holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Issuer or any other Person under this Indenture, the Notes or any other agreement or otherwise; (ii) any extension or renewal thereof; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any Holder or the Trustee for the Guaranteed Obligations or any of them; (v) the failure of any Holder or Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (vi) any change in the ownership of such Guarantor.

(c)     Each Guarantor hereby waives, to the fullest extent permitted by law, any right to which it may be entitled to have its obligations hereunder divided among the Guarantors, such that such Guarantor's obligations would be less than the full amount claimed.  Each Guarantor hereby waives, to the fullest extent permitted by law, any right to which it may be

60

entitled to have the assets of the Issuer first be used and depleted as payment of the Issuer's or such Guarantor's obligations hereunder prior to any amounts being claimed from or paid by such Guarantor hereunder.  Each Guarantor hereby waives any right to which it may be entitled to require that the Issuer be sued prior to an action being initiated against such Guarantor.  Each Guarantor hereby waives the benefits to which it is entitled under Articles 333, 827, 829, 830, 834, 835, 837, 838 and 839 of the Brazilian Civil Code, and Article 794 of the Brazilian Code of Civil Procedure.

(d)     Each Guarantor further agrees that its Note Guarantee herein constitutes a Guarantee of payment, performance and compliance when due (and not a Guarantee of collection) and waives any right to require that any resort be had by any Holder or the Trustee to any security held for payment of the Guaranteed Obligations.

(e)     Except as expressly set forth in Section 10.02 below, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise.  Without limiting the generality of the foregoing, the obligations of each Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of any Holder or the Trustee to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Guarantor or would otherwise operate as a discharge of any Guarantor as a matter of law or equity.

(f)     Each Guarantor agrees that its Note Guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations.  Each Guarantor further agrees that its Note Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest or liquidated damages, if any, on any Guaranteed Obligation is rescinded or must otherwise be restored by any Holder or the Trustee upon the bankruptcy or reorganization of the Issuer or otherwise.

(g)     In furtherance of the foregoing and not in limitation of any other right which any Holder or the Trustee has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Issuer to pay the principal of or interest or liquidated damages, if any, on any Guaranteed Obligation when and as the same shall become due, whether by acceleration, by redemption or otherwise, or to perform or comply with any other Guaranteed Obligation, each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the Paying Agent for the benefit of Holders or the Trustee an amount equal to the sum of (i) the unpaid principal amount of such Guaranteed Obligations, (ii) accrued and unpaid interest on such Guaranteed Obligations and (iii) all other monetary obligations of the Issuer to the Holders and the Trustee.

(h)     Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any Guaranteed Obligations Guaranteed hereby until

61

payment in full of all Guaranteed Obligations. Each Guarantor further agrees that, as between it, on the one hand, and the Holders and the Trustee, on the other hand, (i) the maturity of the Guaranteed Obligations Guaranteed hereby may be accelerated as provided in Article 6 for the purposes of any Note Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations Guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Guaranteed Obligations as provided in Article 6, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by such Guarantor for the purposes of this Section 10.01.

(i)    Each Guarantor also agrees to pay any and all reasonable and documented costs and expenses (including reasonable and documented attorneys' fees and expenses) incurred by the Trustee in enforcing any rights under this Section 10.01, except to the extent that any such costs or expenses arise as a result of the Trustee's own gross negligence or willful misconduct.

(j)    Upon request of the Trustee, each Guarantor shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture

Section 10.02. *Limitation on Liability*.  Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations Guaranteed hereunder by any Guarantor shall not exceed the maximum amount that can be hereby Guaranteed without rendering this Indenture, as it relates to such Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

Section 10.03. *Successors and Assigns*.  This Article 10 shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the successors and assigns of the Trustee and the Holders and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Notes and the Note Guarantees shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture.

Section 10.04. *No Waiver*.  Neither a failure nor a delay on the part of either the Trustee or the Holders in exercising any right, power or privilege under this Article 10 shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege.  The rights, remedies and benefits of the Trustee and the Holders herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which either may have under this Article 10 at law, in equity, by statute or otherwise.

Section 10.05. *Modification*.   No modification, amendment or waiver of any provision of this Article 10, nor the consent to any departure by any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Trustee, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on any Guarantor in any case shall entitle such Guarantor to any other or further notice or demand in the same, similar or other circumstances.

Section 10.06. *Notation of Note Guarantee; Non-Impairment*.  To evidence its Note Guarantee set forth in Section 10.01, each Guarantor agrees that a notation of such Note Guarantee (the "**Notation of Note Guarantee**") substantially in the form attached to this Indenture as Exhibit A shall be endorsed by at least one Officer of each Guarantor by manual, electronic or facsimile signature on each Note authenticated and delivered by the Trustee and this Indenture shall be executed on behalf of the Guarantors.  Each of the Guarantors hereby agrees that its Note Guarantee set forth in Section 10.01 shall remain in full force and effect notwithstanding any failure to endorse on each Note a Notation of Note Guarantee.  If an Officer whose signature is on this Indenture or on the Notation of Note Guarantee no longer holds that office at the time the Trustee authenticates the Note on which a Note Guarantee is endorsed, the Note Guarantee shall be valid nevertheless.  The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Note Guarantee set forth in this Indenture on behalf of the Guarantors.

# ARTICLE 11
# MISCELLANEOUS

Section 11.01. *Noteholder Communications; Noteholder Actions*.  (a) The rights of Holders to communicate with other Holders with respect to this Indenture or the Notes are as provided by the Trust Indenture Act, and the Issuer and the Trustee shall comply with the requirements of TIA Sections 312(a) and 312(b).  Neither the Issuer nor the Trustee will be held accountable by reason of any disclosure of information as to names and addresses of Holders made pursuant to the Trust Indenture Act.

(b)      (i)  Any request, demand, authorization, direction, notice, consent to amendment, supplement or waiver or other action provided by this Indenture to be given or taken by a Holder (an "act") may be evidenced by an instrument signed by the Holder delivered to the Responsible Office of the Trustee.  The fact and date of the execution of the instrument, or the authority of the person executing it, may be proved in any manner that the Trustee deems sufficient.

(ii)      The Trustee may make reasonable rules for action by or at a meeting of Holders, which will be binding on all the Holders.

(c)      Any act by the Holder of any Note binds that Holder and every subsequent Holder of a Note that evidences the same debt as the Note of the acting Holder, even if no notation thereof appears on the Note.  Subject to paragraph (d), a Holder may revoke an act as to its Notes, but only if the Responsible Officer of the Trustee receives the written notice of revocation before the earlier of (i) if applicable, the time the right to deliver an act expires, and (ii) the time the act becomes effective.

(d)      The Issuer may, but is not obligated to, fix a record date for the purpose of determining the Holders entitled to act with respect to any amendment or waiver or in any other regard. If a record date is fixed, those Persons that were Holders at such record date and only those Persons will be entitled to act, or to revoke any previous act, whether or not those Persons continue to be Holders after the record date.

63

(e)     If the Issuer shall solicit from the Holders any request, demand, authorization, direction, notice, consent, waiver or other act, the Issuer may, at its option, in or pursuant to a Board Resolution, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other act, but the Issuer shall have no obligation to do so.  Such record date shall be the record date specified in or pursuant to such Board Resolution, which shall be a date not earlier than the date 30 days prior to the first solicitation of Holders generally in connection therewith and not later than the date such solicitation is completed.  If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other act may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of Outstanding Notes have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other act, and for that purpose the Outstanding Notes shall be computed as of such record date; *provided* that no such authorization, agreement or consent by the Holders on such record date shall be deemed effective unless it shall become effective pursuant to the provisions of this Indenture not later than eleven months after the record date.

(f)     Any request, demand, authorization, direction, notice, consent, waiver or other act of the Holder of any Note shall bind every future Holder of a Note that evidences the same debt as the Note of the acting Holder issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

(g)     Every Holder, by receiving and holding a Note, agrees with the Issuer, the Guarantors, the Trustee and each Agent that none of the Issuer, the Guarantors, the Trustee or any Agent shall be held accountable by reason of the disclosure of any information as to the names and addresses of the Holders, regardless of the source from which such information was derived.

Section 11.02. *Notices*.  (a) Any notice or communication to the parties hereto will be deemed given if in English and in writing when delivered (i) in person, (ii) by an internationally recognized overnight courier service or (iii) by electronic mail with PDF attached and proof of receipt; provided that any notice to the Trustee will be effective only upon receipt by a Responsible Officer of the Trustee.  In each case the notice or communication should be addressed as follows:

*if to the Issuer or the Guarantors*:

Raizen Fuels Finance S.A.
16, Rue Eugène Ruppert, L-2453
Luxembourg, Grand Duchy of Luxembourg
Attention: Board of Directors of Raizen Fuels Finance S.A.
E-mail: Marina.Dalben@raizen.com / tesouraria.corp@raizen.com

*and*

Raízen S.A. and Raízen Energia S.A
Avenida Brigadeiro Faria Lima, 4100, 11th floor
04538-132
São Paulo – SP, Brazil
Attention: Marina Dalben
E-mail: Marina.Dalben@raizen.com / tesouraria.corp@raizen.com

With a copy to:

Simpson Thacher & Bartlett LLP
Av. Juscelino Kubitschek, 1455, 12th floor
São Paulo, SP 04543-011
Brazil
Attention: Grenfel G. Calheiros
E-mail: gcalheiros@stblaw.com

*if to the Trustee, Paying Agent, Registrar and Transfer Agent:*

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: Corporate Trust Administration

The Issuer, the Guarantors or the Trustee by notice to the others may designate additional or different addresses for subsequent notices or communications.

(b)    Except as otherwise expressly provided with respect to published notices, any notice or communication to a Holder of a Certificated Note will be deemed given when mailed to the Holder at its address as it appears on the Register by first class mail or, as to any Global Note registered in the name of the Depositary or its nominee, when given to the Depositary in accordance with its applicable procedures; *provided*, that, at any time when the Notes are listed on the Official List of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market and its rules so require, the Issuer will publish any such notice of communication sent to the Holders in a newspaper having a general circulation in Luxembourg, or alternatively, notice to Holders may be published on the website of the Luxembourg Stock Exchange at www.luxse.com. Such notice will be deemed given on the date of its first publication. Copies of any notice or communication to a Holder, if given by the Issuer, will be mailed to the Trustee and the Agents at the same time. Defect in mailing a notice or communication to any particular Holder will not affect its sufficiency with respect to other Holders.

(c)    Where this Indenture provides for notice, the notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and the waiver will be the equivalent of the notice. Waivers of notice by Holders must be filed with the Trustee, but such filing is not a condition precedent to the validity of any action taken in reliance upon such waivers.

(d)     The Trustee shall have the right to accept and act upon instructions, including funds transfer instructions ("**Instructions**") given pursuant to this Indenture and the Notes and delivered using the following communications methods: e-mail, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another method or system specified by the Trustee as available for use in connection with its services hereunder (collectively, "**Electronic Means**"); provided, however, that each of the Issuer and the Guarantors shall provide to the Trustee an incumbency certificate listing officers with the authority to provide such Instructions ("**Authorized Signatories**") and containing specimen signatures of such Authorized Signatories, which incumbency certificate shall be amended by the Issuer and/or such Guarantor, as applicable, whenever a person is to be added or deleted from the listing.  If the Issuer or any Guarantor, as applicable, elects to give the Trustee Instructions using Electronic Means and the Trustee in its discretion elects to act upon such Instructions, the Trustee's understanding of such Instructions shall be deemed controlling.  Each of the Issuer and the Guarantors understands and agrees that the Trustee cannot determine the identity of the actual sender of such Instructions and that the Trustee shall conclusively presume that directions that purport to have been sent by an Authorized Signatory listed on the incumbency certificate provided to the Trustee have been sent by such Authorized Signatory.  Each of the Issuer and the Guarantors shall be responsible for ensuring that only Authorized Signatories transmit such Instructions to the Trustee and that the Issuer and the Guarantors and all Authorized Signatories are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords and/or authentication keys upon receipt by the Issuer and any Guarantor, as applicable.  The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction.  Each of the Issuer and the Guarantors agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Issuer or such Guarantor, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee immediately upon learning of any compromise or unauthorized use of the security procedures.

Section 11.03. *Certificate and Opinion as to Conditions Precedent*.  Upon any request or application by the Issuer or the Guarantors to the Trustee to take any action under this Indenture, the Issuer or the applicable Guarantor, as the case may be, will furnish to the Trustee:

(i)     an Officer's Certificate stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(ii)     an Opinion of Counsel stating that all such conditions precedent have been complied with.

66

Section 11.04. *Statements Required in Certificate or Opinion*.  Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture must include:

(i)    a statement that each person signing the certificate or opinion has read the covenant or condition and the related definitions;

(ii)    a brief statement as to the nature and scope of the examination or investigation upon which the statement or opinion contained in the certificate or opinion is based;

(iii)    a statement that, in the opinion of each such person, that person has made such examination or investigation as is necessary to enable the person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(iv)    a statement as to whether or not, in the opinion of each such person, such condition or covenant has been complied with, *provided* that an Opinion of Counsel may rely on an Officer's Certificate or certificates of public officials with respect to matters of fact.

Section 11.05. *Payment Date Other than a Business Day*.  If any payment with respect to a payment of any principal of, premium, if any, or interest on any Note (including any payment to be made on any date fixed for redemption of any Note) is due on a day which is not a Business Day, then the payment need not be made on such date, but may be made on the next Business Day with the same force and effect as if made on such date, and no interest will accrue for the intervening period.

Section 11.06. *Governing Law*.  This Indenture, the Notes and the Note Guarantees shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to its choice of law principles. For the avoidance of doubt, the application of the provisions set out in articles 470-1 to 470-19 (both included) of the Luxembourg Companies Law is excluded.

Section 11.07. *Submission to Jurisdiction; Agent for Service*.  (a) Each of the Issuer and the Guarantors agrees that any suit, action or proceeding against it brought by any Noteholder or the Trustee arising out of or based upon this Indenture, the Notes or the Note Guarantees may be instituted in any state or Federal court in the Borough of Manhattan in The City of New York, New York, and irrevocably waives, to the extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submits to the non-exclusive jurisdiction of such courts in any suit, action or proceeding.

(b)    By the execution and delivery of this Indenture or any amendment or supplement hereto, each of the Issuer and the Guarantors (i) acknowledges that it has designated and appointed Cogency Global Inc., currently located at 122 East 42nd Street, 18th Floor, New York, NY, 10168, as its authorized agent upon which process may be served in any suit, action or proceeding with respect to, arising out of, or relating to, the Notes, the Note Guarantees or this Indenture, that may be instituted in any Federal or state court in the State of

New York, The City of New York, the Borough of Manhattan, or brought under Federal or state securities laws or brought by the Trustee (whether in its individual capacity or in its capacity as Trustee hereunder), and acknowledges that Cogency Global Inc. has accepted such designation, (ii) submits to the non-exclusive jurisdiction of any such court in any such suit, action or proceeding, and (iii) agrees that service of process upon Cogency Global Inc. shall be deemed in every respect effective service of process upon the Issuer or such Guarantor, as the case may be, in any such suit, action or proceeding.  Each of the Issuer and the Guarantors further agrees to take any and all action, including the execution and filing of any and all such documents and instruments as may be necessary to continue such designation and appointment of Cogency Global Inc. in full force and effect so long as this Indenture shall be in full force and effect; *provided* that the Issuer and such Guarantor may and shall (to the extent Cogency Global Inc. ceases to be able to be served on the basis contemplated herein), by written notice to the Trustee, designate such additional or alternative agents for service of process under this Section 11.07 that (1) maintains an office located in the Borough of Manhattan, The City of New York in the State of New York, (2) are either (x) counsel for the Issuer or any Guarantor or (y) a corporate service company which acts as agent for service of process for other Persons in the ordinary course of its business and (3) agrees to act as agent for service of process in accordance with this Section 11.07.  Such notice shall identify the name of such agent for process and the address of such agent for process in the Borough of Manhattan, The City of New York, State of New York.  Upon the written request of any Noteholder, the Trustee shall deliver such information to such Noteholder.  Notwithstanding the foregoing, there shall, at all times, be at least one agent for service of process for the Issuer and each Guarantor appointed and acting in accordance with this Section 11.07.

Section 11.08. *Judgment Currency*.  U.S. Dollars are the sole currency of account and payment for all sums payable by the Issuer and the Guarantors under or in connection with the Notes, the Note Guarantees and this Indenture.  Any amount received or recovered in a currency other than U.S. Dollars in respect of the Notes, the Note Guarantees or this Indenture (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Issuer, the Guarantors, any of their respective Significant Subsidiaries or otherwise) by the Trustee or any Holder in respect of any sum expressed to be due to it from the Issuer or any Guarantor will constitute a discharge of the Issuer and the Guarantors only to the extent of the U.S. Dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that U.S. Dollar amount is less than the U.S. Dollar amount expressed to be due to the recipient under any Note, any Note Guarantee or this Indenture, the Issuer and the Guarantors, jointly and severally, will indemnify the recipient against the cost of making any such purchase; and if the amount of U.S. Dollars so purchased is greater than the sum originally due to such recipient, such recipient, if a Holder, will, by accepting a Note, and, if the Trustee, by executing this Indenture, be deemed to have agreed to repay such excess.  For purposes of this indemnity, it will be sufficient for the recipient to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had the actual purchase of U.S. dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. Dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above).

68

The above indemnity, to the extent permitted by law:

       (1)     constitutes a separate and independent obligation from the other obligations of the Issuer and the Guarantors;

       (2)     will give rise to a separate and independent cause of action;

       (3)     will apply irrespective of any waiver or indulgence granted by the Trustee or any Holder; and

       (4)     will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note or any other judgment.

Section 11.09. *No Adverse Interpretation of Other Agreements*.  This Indenture may not be used to interpret another indenture or loan or debt agreement of the Issuer, a Guarantor or any Subsidiary of the Issuer or Guarantor, and no such indenture or loan or debt agreement may be used to interpret this Indenture.

Section 11.10. *Successors*.  All agreements of the Issuer and each Guarantor in this Indenture, the Notes and the Note Guarantees will bind its successors.  All agreements of the Trustee in this Indenture will bind its successors.

Section 11.11. *Duplicate Originals*.  The parties may sign any number of copies of this Indenture.  This Indenture and any related documents, certificates, directions, notices or other instruments delivered pursuant to or in connection herewith may be executed in any number of counterparts, each of which so executed shall be an original, but all of them together represent the same agreement. Counterparts may be delivered via electronic mail (including any electronic signature covered by the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act, the Electronic Signatures and Records Act or other applicable law, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and shall have the same validity, legal effect and admissibility in evidence as an original manual signature. Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any faxed, scanned, or photocopied manual signature, or other electronic signature, of any other party and shall have no duty to investigate, confirm or otherwise verify the validity or authenticity thereof. The exchange of copies of this Indenture and of signature pages in accordance with the foregoing sentence shall constitute effective execution and delivery of this Indenture as to the parties hereto.

Section 11.12. *Separability*.  In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 11.13. *Table of Contents and Headings*.  The Table of Contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and in no way modify or restrict any of the terms and provisions of this Indenture.

Section 11.14. *No Liability of Directors, Officers, Employees, Incorporators, Members and Stockholders*. No past, present or future director, officer, employee, incorporator, member, partner or shareholder of the Issuer or any Guarantor or their respective Subsidiaries, as such, will have any liability for any obligations of the Issuer or any Guarantor under the Notes, the Note Guarantees or this Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

Section 11.15. *Waiver of Jury Trial*. EACH OF THE ISSUER, THE GUARANTORS, THE HOLDERS BY ACCEPTANCE OF THE NOTES AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE NOTE GUARANTEES OR THE TRANSACTION CONTEMPLATED HEREBY.

Section 11.16. *Tax Matters*. Each of the Issuer, the Guarantors and the Trustee agrees (i) to cooperate and to provide the others with such reasonable information as each may have in its possession to enable the determination of whether any payments pursuant to this Indenture are subject to the withholding requirements described in Section 1471(b) of the Code or otherwise imposed pursuant to Sections 1471 through 1474 of the Code and any regulations, or agreements thereunder or official interpretations thereof ("**Applicable Law**"), and (ii) that the Trustee and each Paying Agent shall be entitled to make any withholding or deduction from payments under this Indenture to the extent necessary to comply with Applicable Law, for which the Trustee and such Paying Agent, as applicable, shall not have any liability.

Section 11.17. *USA Patriot Act.* The parties hereto acknowledge that in accordance with Section 326 of the USA Patriot Act, the Trustee is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee. The parties to this Indenture agree that they will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the USA Patriot Act.

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

**RAIZEN FUELS FINANCE S.A.**
as Issuer

By:
Name: Marina Daiben
Title: Managing Director

**RAÍZEN S.A.**
as Guarantor

DocuSigned by:

_Marina Dalben_

4257B36CC3F14CF...
_____

Name: Marina Dalben
Title: Authorized Representative

Assinado por:

_Rodrigo Ispe Antunes_

CD4DE9BD5C70460...

By: _____

Name: Rodrigo Antunes
Title: Authorized Representative

[*Signature Page to Indenture*]

**RAÍZEN ENERGIA S.A.**
as Guarantor

By: _____
Name: Marina Darben
Title: Authorized Representative


By: _____
Name: Rodrigo Antunes
Title: Authorized Representative

[*Signature Page to Indenture*]

**THE BANK OF NEW YORK MELLON**
as Trustee, Registrar, Paying Agent and Transfer
Agent

By: _____

    Name:  Rick J. Fierro
    Title:   Vice President

**EXHIBIT A**

**[FORM OF FACE OF NOTE]**

**RAIZEN FUELS FINANCE S.A.**

**6.250% Notes Due 2032**

[CUSIP] [ISIN] _____

No.                                                        US$  _____

RAIZEN FUELS FINANCE S.A., a public limited liability company (*société anonyme*) organized and established under the laws of the Grand Duchy of Luxembourg, having its registered office at 16, Rue Eugène Ruppert, L-2453 Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*Registre de commerce et des sociétés, Luxembourg*) under number B184033, LEI 52990010NH26VC32Q522 (the "**Issuer**," which term includes any successor under the Indenture hereinafter referred to), for value received, promises to pay to _____, or its registered assigns, the principal sum of _____ DOLLARS (US$ _____) [or such other amount as indicated on the Schedule of Increases and Decreases in Global Note attached hereto] on July 8, 2032.

Interest Rate: 6.250% per annum.

Interest Payment Dates: January 8 and July 8 of each year, commencing on January 8, 2026.

Regular Record Dates: January 3 and July 3 of each year (whether or not a Business Day).

Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which will for all purposes have the same effect as if set forth at this place.

A-1

IN WITNESS WHEREOF, the Issuer has caused this Note to be signed manually, electronically or by facsimile by its duly authorized signatory.

RAIZEN FUELS FINANCE S.A.
as Issuer

By:  _____
        Name:
        Title:

Trustee's Certificate of Authentication

This is one of the 6.250% Notes due 2032 described in the Indenture referred to in this Note.

The Bank of New York Mellon, as Trustee

By:  _____
        Authorized Officer

Dated:

A-2

[FORM OF REVERSE SIDE OF NOTE]

## RAIZEN FUELS FINANCE S.A.

### 6.250% Notes Due 2032

1.    *Principal and Interest.*

The Issuer promises to pay the principal of this Note on the Maturity Date.  The Issuer promises to pay interest on the principal amount of this Note on each Interest Payment Date, as set forth on the face of this Note at the rate of 6.250% per annum. Interest will be payable semiannually (to the Holders of record of the Notes at the close of business on the January 3 or July 3 (whether or not a Business Day) immediately preceding the Interest Payment Date) on each Interest Payment Date, commencing on January 8, 2026.

Interest on this Note will accrue from the most recent date to which interest has been paid on this Note (or, if there is no existing Default in the payment of interest and if this Note is authenticated between a Regular Record Date and the next Interest Payment Date, from such Interest Payment Date) or, if no interest has been paid, from the Issue Date.  Interest will be computed in the basis of a 360 day year of twelve 30 day months. Any payments due on a day that is not a Business Day will be due on the immediately succeeding Business Day and no interest will accrue for the intervening period.

The Issuer will pay interest on overdue principal, premium, if any, and, to the extent lawful, interest at a rate per annum that is 1% per annum in excess of the rate per annum borne by this Note. Any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the second day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least two days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.

Additional Amounts will be paid in respect of any payments of interest or principal so that the amount a Holder receives after applicable deduction or withholding will equal the amount that the Holder would have received in the absence of such deduction or withholding, to the extent described in Section 3.01 of the Indenture.

2.    *Indentures; Note.*

This is one of the Notes issued under an Indenture dated as of July 8, 2025 (as amended or supplemented from time to time, the "**Indenture**"), among the Issuer, Raízen S.A. ("**Raízen**") and Raízen Energia S.A. ("**Raízen Energia**") as the Guarantors, and The Bank of New York Mellon, as Trustee, Registrar, Paying Agent and Transfer Agent.  Capitalized terms used herein are used as defined in the Indenture unless otherwise indicated.  The terms of the Notes include those stated in the Indenture, as may be amended from time to time.  The Notes are subject to all such terms, and Holders are referred to the Indenture for a statement of all such terms.  To the extent permitted

A-3

by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture will control.

The Notes are general unsecured and unsubordinated obligations of the Issuer, ranking equally in right of payment with all existing and future unsecured unsubordinated obligations of the Issuer.  The Indenture limits the original aggregate principal amount of the Initial Notes to US$750,000,000, but Additional Notes may be issued pursuant to the Indenture, and the originally issued Notes and all such Additional Notes shall vote together for all purposes as a single series.

The Note Guarantees are unsecured unsubordinated obligations of Raízen and Raízen Energia, ranking equally in right of payment with all existing and future unsecured unsubordinated obligations of Raízen and Raízen Energia.

3.      *Redemption and Repurchase.*

The Note is subject to redemption for taxation reasons as described in Section 3.03 of the Indenture, redemption at the option of the Issuer or any Guarantor as described in Section 3.02 of the Indenture and redemption following a tender offer or Offer to Purchase as described in Section 3.04 of the Indenture.

The Note is subject to repurchase upon a Change of Control that results in a Rating Decline as described in Section 4.06 of the Indenture.

4.      *Registered Form; Denominations; Transfer; Exchange.*

The Notes are in registered form without coupons in minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof. A Holder may register the transfer or exchange of Notes in accordance with the Indenture. The Trustee may require a Holder to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.  Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to issue, register the transfer of or exchange any Note or certain portions of a Note.

5.      *Defaults and Remedies.*

If an Event of Default, as defined in the Indenture, occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the Outstanding Notes may declare all the Notes to be due and payable.  If a bankruptcy default with respect to the Issuer or a Guarantor occurs and is continuing, the Notes automatically become due and payable.  Holders may not enforce the Indenture or the Notes except as provided in the Indenture. The Trustee may require indemnity satisfactory to it before it enforces the Indenture or the Notes. Subject to certain limitations, Holders of a majority in principal amount of the Notes then Outstanding may direct the Trustee in its exercise of remedies.

6.      *Amendment and Waiver.*

Subject to certain exceptions, the Indenture and the Notes may be amended, or Default may be waived, with the consent of the Holders of a majority in principal amount of the Outstanding

A-4

Notes. Without notice to or the consent of any Holder, the Issuer, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Note Guarantees to, among other things, cure any ambiguity, omission, defect, inconsistency or to correct a manifest error if such amendment or supplement does not adversely affect the interests of the Holders in any material respect.

7.      *Authentication.*

This Note is not valid until the Trustee (or Authenticating Agent) signs the certificate of authentication on this Note.

8.      *Governing Law.*

This Note shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to its choice of law principles. Reference is hereby made to the further provisions of submission to jurisdiction, agent for service, waiver of immunities and judgment currency set forth in the Indenture, which will for all purposes have the same effect as if set forth herein. For the avoidance of doubt, the application of the provisions set out in articles out in articles 470-1 to 470-19 (both included) of the Luxembourg Companies Law is excluded.

9.      *Abbreviations.*

Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian) and U/G/M/A/ (= Uniform Gifts to Minors Act).

The Issuer will furnish a copy of the Indenture to any Holder upon written request and without charge.

A-5

## FORM OF NOTATION OF NOTE GUARANTEE

For value received, each of the undersigned hereby unconditionally Guarantees the cash payments in U.S. Dollars of principal and interest on this Note (and including Additional Amounts payable thereon, if any) in the amounts and at the times when due, together with interest on the overdue principal and interest, if any, on this Note, if lawful, and the payment of all other obligations of the Issuer under the Indenture or the Notes, to the Holder of this Note and the Trustee, all in accordance with and subject to the terms and conditions of this Note and the Indenture.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture, dated as of July 8, 2025 among Raizen Fuels Finance S.A., as the Issuer, Raízen S.A. and Raízen Energia S.A. as the Guarantors, and The Bank of New York Mellon, as Trustee, Registrar, Paying Agent and Transfer Agent.

The obligations of the undersigned to the Holders and to the Trustee are expressly set forth in Article 10 of the Indenture.  This Note Guarantee constitutes a direct, general and unconditional obligation of the undersigned which will at all times rank at least pari passu with all other present and future senior unsecured obligations of the undersigned, except for such obligations as may be preferred by mandatory provisions of law.

IN WITNESS WHEREOF, the undersigned have caused this Notation of Note Guarantee with respect to the 6.250% Notes due 2032 of Raizen Fuels Finance S.A. to be duly executed.

A-6

Dated: [        ]

RAÍZEN S.A. as Guarantor

By:     _____
        Name:
        Title:


By:     _____
        Name:
        Title:


RAÍZEN ENERGIA S.A. as Guarantor

By:     _____
        Name:
        Title:


By:     _____
        Name:
        Title:

A-7

[FORM OF TRANSFER NOTICE]

FOR VALUE RECEIVED the undersigned registered Holder hereby sell(s), assign(s) and transfer(s) unto

Insert Taxpayer Identification No.

_____

_____

Please print or typewrite name and address including zip code of assignee

_____

the within Note and all rights thereunder, hereby irrevocably constituting and appointing

_____

attorney to transfer said Note on the books of the Issuer with full power of substitution in the premises.

A-8

[THE FOLLOWING PROVISION TO BE INCLUDED ON ALL CERTIFICATES
BEARING A RESTRICTED LEGEND OR REGULATION S LEGEND]

In connection with any transfer of this Note occurring prior to the removal of the [Restricted Legend / Regulation S Legend], the undersigned confirms that such transfer is made without utilizing any general solicitation or general advertising and further as follows:

*Check One*

☐    (1) This Note is being transferred to a "qualified institutional buyer" in compliance with Rule 144A under the U.S. Securities Act of 1933, as amended, and certification in the form of Exhibit E to the Indenture is being furnished herewith.

☐    (2) This Note is being transferred to a Non-U.S. Person in compliance with the exemption from registration under the U.S. Securities Act of 1933, as amended, provided by Regulation S thereunder, and certification in the form of Exhibit D to the Indenture is being furnished herewith.

or

☐    (3) This Note is being transferred other than in accordance with (1) or (2) above and documents are being furnished which comply with the conditions of transfer set forth in this Note and the Indenture.

If none of the foregoing boxes is checked, the Trustee is not obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in the Indenture have been satisfied.

Date:

_____
Seller

By:    _____

NOTICE: The signature to this assignment must correspond with the name as written upon the face of the within mentioned instrument in every particular, without alteration or any change whatsoever.

A-9

Signature Guarantee:[1]

By: _____
To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

OPTION OF HOLDER TO ELECT PURCHASE

If you wish to have all of this Note purchased by the Issuer, a Guarantor or a Designated Affiliate, as applicable, pursuant to Section 4.06 of the Indenture, check the box: ☐

If you wish to have a portion of this Note purchased by the Issuer, a Guarantor or a Designated Affiliate, as applicable, pursuant to Section 4.06 of the Indenture, state the amount (in original principal amount) below:

US$_____.


Date:_____

Your Signature:_____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee[1]: _____

_____

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Trustee, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Trustee in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

A-11

SCHEDULE OF INCREASES AND DECREASES IN GLOBAL NOTE[1]

The following increases and decreases in the aggregate principal amount of this Global Note have been made:

| Date of Increase or Decrease | Amount of decrease in original principal amount of this Global Note | Amount of increase in original principal amount of this Global Note | Original principal amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

---

[1] For Global Notes.

A-12

**EXHIBIT B-1**

RESTRICTED LEGEND

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES FOR THE BENEFIT OF THE ISSUER AND THE GUARANTORS THAT THIS NOTE OR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (1) TO THE ISSUER OR THE GUARANTORS, (2) SO LONG AS THIS NOTE IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A) IN ACCORDANCE WITH RULE 144A, (3) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT, (4) PURSUANT TO ANOTHER APPLICABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE) OR (5) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, AND IN EACH OF SUCH CASES IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. AS A CONDITION TO THE REGISTRATION OF TRANSFER OF THIS NOTE PURSUANT TO CLAUSE (4) ABOVE, THE ISSUER, THE GUARANTORS OR THE TRUSTEE MAY REQUIRE DELIVERY OF ANY DOCUMENTATION OR OTHER EVIDENCE THAT IT, IN ITS SOLE DISCRETION, DEEMS NECESSARY OR APPROPRIATE TO EVIDENCE COMPLIANCE WITH THE EXEMPTION REFERRED TO IN SUCH CLAUSE (4) AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, REPRESENTS AND AGREES THAT IT SHALL NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO ABOVE.

THIS LEGEND MAY BE REMOVED SOLELY IN THE DISCRETION AND AT THE DIRECTION OF THE ISSUER OR THE GUARANTORS.

**EXHIBIT B-2**

REGULATION S LEGEND

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER THIS NOTE, PRIOR TO THE DATE THAT IS 40 DAYS AFTER THE LATER OF (1) THE ORIGINAL ISSUE DATE HEREOF AND (2) THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF THIS NOTE), ONLY (A) TO THE ISSUER, (B) UNDER A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE NOTES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER QUALIFIED INSTITUTIONAL BUYER AND TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) THROUGH OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES IN RELIANCE UPON REGULATION S OR (E) UNDER ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUER'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR OTHER TRANSFER PURSUANT TO CLAUSE (E) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, A CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO THE ISSUER.

**EXHIBIT C**

DTC LEGEND

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS A BENEFICIAL INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE ARE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF CEDE & CO. OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL NOTE ARE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE TRANSFER PROVISIONS OF THE INDENTURE.

**EXHIBIT D**

Regulation S Certificate

_____, ____

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: Corporate Trust Administration

Re:    RAIZEN FUELS FINANCE S.A., as issuer (the "**Issuer**")
       6.250% Notes due 2032

Ladies and Gentlemen:

Reference is hereby made to the indenture dated as of July 8, 2025 (the "**Indenture**"), among the Issuer, Raízen S.A. and Raízen Energia S.A., as guarantors, and The Bank of New York Mellon, as trustee (the "**Trustee**"), registrar, transfer agent and paying agent. Terms used in this Certificate shall have the meaning set forth in the Indenture or Regulation S ("**Regulation S**") under the Securities Act of 1933, as amended (the "**Securities Act**"), except as otherwise stated herein.

[*CHECK A OR B AS APPLICABLE.*]

☐  A.  This Certificate relates to our proposed transfer of US$_____ principal amount of the Issuer's 6.250% Notes due 2032 (the "**Notes**") represented by a U.S. Global Note (CUSIP: 75102X AF3) for an equal beneficial interest in the Offshore Global Note (CUSIP: L7909C AJ6).  We hereby certify as follows:

   1.    The offer and sale of the Notes was not and will not be made to a person in the United States (unless such person is excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(vi) or the account held by it for which it is acting is excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(i) under the circumstances described in Rule 902(h)(3)) and such offer and sale was not and will not be specifically targeted at an identifiable group of U.S. citizens abroad.

   2.    Unless the circumstances described in the parenthetical in paragraph 1 above are applicable, either (a) at the time the buy order was originated, the buyer was outside the United States or we and any person acting on our behalf reasonably believed that the buyer was outside the United States or (b) the transaction was executed in, on or through the facilities of a designated offshore securities market, and neither we nor any person acting on our behalf knows that the transaction was pre-arranged with a buyer in the United States;

D-1

3.  Neither we, any of our affiliates, nor any person acting on our or their behalf, has made any directed selling efforts in the United States with respect to the Notes;

4.  The proposed transfer of Notes is not part of a plan or scheme to evade the registration requirements of the Securities Act; and

5.  If we are a dealer or a person receiving a selling concession, fee or other remuneration in respect of the Notes, and the proposed transfer takes place during the first 40 days following the issue date of such Notes, or we are an officer or director of the Issuer or an Initial Purchaser (as defined in the Indenture), we certify that the proposed transfer is being made in accordance with the provisions of Rule 904(b) of Regulation S.

☐ B.  This Certificate relates to our proposed exchange of US$_____ principal amount of the Issuer's 6.250% Notes due 2032 (the "**Notes**") represented by a U.S. Global Note (CUSIP: 75102X AF3) for an equal beneficial interest in the Offshore Global Note (CUSIP: L7909C AJ6).  We hereby certify as follows:

1.  At the time the offer and sale of the Notes was made to us, either (i) we were not in the United States or (ii) we were excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(vi) or the account held by us for which we were acting was excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(i) under the circumstances described in Rule 902(h)(3); and we were not a member of an identifiable group of U.S. citizens abroad;

2.  Unless the circumstances described in paragraph 1(ii) above are applicable, either (a) at the time our buy order was originated, we were outside the United States or (b) the transaction was executed in, on or through the facilities of a designated offshore securities market, and we did not pre-arrange the transaction in the United States.; and

3.  The proposed exchange of Notes is not part of a plan or scheme to evade the registration requirements of the Securities Act.

You and the Issuer are entitled to rely conclusively upon this Certificate and are irrevocably authorized to produce this Certificate or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

D-2

Very truly yours,

[NAME OF SELLER (FOR TRANSFERS) OR
OWNER (FOR EXCHANGES)]

By: _____
      Name:
      Title:
      Address

Date: _____

Signature Guarantee:[1]

By: _____
        To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

D-4

EXECUTION VERSION

**EXHIBIT E**

Rule 144A Certificate

_____, _____

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: Corporate Trust Administration

Re:    RAIZEN FUELS FINANCE S.A., as issuer (the "**Issuer**")
       6.250% Notes due 2032

Ladies and Gentlemen:

Reference is hereby made to the indenture dated as of July 8, 2025 (the "**Indenture**"), among the Issuer, Raízen S.A. and Raízen Energia S.A., as guarantors, and The Bank of New York Mellon, as trustee (the "**Trustee**"), registrar, transfer agent and paying agent. Terms used in this Certificate shall have the meaning set forth in the Indenture or Rule 144A ("**Rule 144A**") under the Securities Act of 1933, as amended (the "**Securities Act**"), except as otherwise stated herein.

**[*CHECK A OR B AS APPLICABLE.*]**

☐ A.  This Certificate relates to our proposed transfer of US$____ principal amount of the Issuer's 6.250% Notes due 2032 (the "**Notes**") represented by an Offshore Global Note (CUSIP: L7909C AJ6) for an equal beneficial interest in the U.S. Global Note (CUSIP: 75102X AF3).  We hereby certify as follows:

☐ B.  This Certificate relates to our proposed exchange of US$____ principal amount of the Issuer's 6.250% Notes due 2032 (the "**Notes**") represented by an Offshore Global Note (CUSIP: L7909C AJ6) for an equal beneficial interest in the U.S. Global Note (CUSIP: 75102X AF3).  We hereby certify as follows:

We and, if applicable, each account for which we are acting in the aggregate owned and invested more than US$____ in securities of issuers that are not affiliated with us (or such accounts, if applicable), as of _____, 20__, which is a date on or since close of our most recent fiscal year.  We and, if applicable, each account for which we are acting, are a qualified institutional buyer within the meaning of Rule 144A.  If we are acting on behalf of an account, we exercise sole investment discretion with respect to such account.  We are aware that the transfer of Notes to us, or such exchange, as applicable, is being made in reliance upon the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A.  Prior to the date of this Certificate we have received such information regarding the Issuer as we have requested pursuant to Rule 144A(d)(4) to the extent that the Issuer is not then subject to Section 13 or 15(d) of the

E-1

Exchange Act, or is not exempt from reporting pursuant to Rule 12g3 2(b) under the Exchange Act or have determined not to request such information.

You and the Issuer are entitled to conclusively rely upon this Certificate and are irrevocably authorized to produce this Certificate or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

Very truly yours,

[NAME OF SELLER (FOR TRANSFERS) OR
OWNER (FOR EXCHANGES)]

By: _____
     Name:
     Title:
     Address:

Date: _____

E-2

Signature Guarantee:[1]

By:     _____
        To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

E-3

**<u>EXHIBIT F</u>**

**2034 Notes Indenture**

*EXECUTED VERSION*

**RAIZEN FUELS FINANCE S.A.**
**as Issuer**

**RAÍZEN S.A.**
**and**
**RAÍZEN ENERGIA S.A.**
**as Guarantors**

**and**

**THE BANK OF NEW YORK MELLON**
**as Trustee, Registrar, Paying Agent and Transfer Agent**

———————————————

**Indenture**

**Dated as of March 5, 2024**

———————————————

**6.450% Green Notes Due 2034**
**Unconditionally and Irrevocably Guaranteed by**
**Raízen S.A. and Raízen Energia S.A.**

## TABLE OF CONTENTS

**PAGE**

ARTICLE 1 DEFINITIONS AND INCORPORATION BY REFERENCE ................................. 1

*Section 1.01.   Definitions* ............................................................................ *1*
Section 1.02.   Rules of Construction ................................................... 15

ARTICLE 2 THE NOTES ...................................................................................... 15

Section 2.01.   Form, Dating and Denominations; Legends ........................... 15
Section 2.02.   Execution and Authentication; Additional Notes .................... 16
Section 2.03.   Registrar, Paying Agent, Transfer Agent and Authenticating Agent;
                Paying Agent to Hold Money in Trust ..................................... 17
Section 2.04.   Replacement Notes ........................................................... 18
Section 2.05.   Outstanding Notes ............................................................ 18
Section 2.06.   Temporary Notes .............................................................. 19
Section 2.07.   Cancellation ................................................................... 19
Section 2.08.   CUSIP and ISIN Numbers .................................................. 19
Section 2.09.   Registration, Transfer and Exchange .................................. 19
Section 2.10.   Restrictions on Transfer and Exchange ................................ 22
Section 2.11.   Open Market Purchases .................................................... 24
Section 2.12.   Trustee's Disclaimer ........................................................ 24

ARTICLE 3 ADDITIONAL AMOUNTS; REDEMPTION ........................................ 24

Section 3.01.   Additional Amounts ......................................................... 24
Section 3.02.   Optional Redemption ....................................................... 27
Section 3.03.   Redemption for Taxation Reasons ...................................... 28
Section 3.04.   Redemption Following Tender Offer ................................... 28
Section 3.05.   Election to Redeem; Selection of Notes .............................. 29
Section 3.06.   Notice of Redemption ...................................................... 29
Section 3.07.   Deposit of Redemption Price ............................................ 31
Section 3.08.   Effect of Notice of Redemption.. ...................................... 31

ARTICLE 4 COVENANTS ................................................................................... 31

Section 4.01.   Payment of Notes ............................................................ 31
Section 4.02.   Maintenance of Office or Agency ...................................... 32
Section 4.03.   Existence ...................................................................... 33
Section 4.04.   Payment of Taxes ............................................................ 33
Section 4.05.   Maintenance of Properties ............................................... 33
Section 4.06.   Repurchases at the Option of the Holders Upon Change of Control ....... 33
Section 4.07.   Limitation on Liens ......................................................... 36
Section 4.08.   Reporting Requirements ................................................... 36
Section 4.09.   Disclosure of Names and Addresses of Holders ..................... 37
Section 4.10.   Paying Agent and Transfer Agent ....................................... 37

i

*Section 4.11.   Limitation on Issuer.* .................................................................... *38*

ARTICLE 5 CONSOLIDATION, MERGER OR SALE OF ASSETS ...................................... 38

*Section 5.01.   Consolidation, Merger or Sale of Assets* ................................... *38*

ARTICLE 6 DEFAULT AND REMEDIES ................................................................. 39

*Section 6.01.   Events of Default* ...................................................................... *39*
*Section 6.02.   Acceleration* ............................................................................ *40*
*Section 6.03.   Other Remedies* ....................................................................... *41*
*Section 6.04.   Waiver of Past Defaults* ........................................................... *41*
*Section 6.05.   Control by Majority* ................................................................. *41*
*Section 6.06.   Limitation on Suits* ................................................................... *42*
*Section 6.07.   Rights of Holders to Receive Payment* ..................................... *42*
*Section 6.08.   Collection Suit by Trustee* ....................................................... *42*
*Section 6.09.   Trustee May File Proofs of Claim* ............................................ *42*
*Section 6.10.   Priorities* ................................................................................. *43*
*Section 6.11.   Restoration of Rights and Remedies* ........................................ *43*
*Section 6.12.   Undertaking for Costs* .............................................................. *43*
*Section 6.13.   Rights and Remedies Cumulative.* ............................................ *44*
*Section 6.14.   Delay or Omission Not Waiver; Prescription of Claims* ........... *44*
*Section 6.15.   Waiver of Stay, Extension or Usury Laws* ................................. *44*

ARTICLE 7 THE TRUSTEE ................................................................................. 44

*Section 7.01.   General* .................................................................................... *44*
*Section 7.02.   Certain Rights of Trustee* ......................................................... *45*
*Section 7.03.   Individual Rights of Trustee* ..................................................... *47*
*Section 7.04.   Trust Indenture Act* .................................................................. *47*
*Section 7.05.   Trustee's Disclaimer* ................................................................ *47*
*Section 7.06.   Notice of Default* ...................................................................... *48*
*Section 7.07.   Compensation and Indemnity* ................................................... *48*
*Section 7.08.   Replacement of Trustee* ............................................................ *49*
*Section 7.09.   Successor Trustee by Merger* .................................................... *50*
*Section 7.10.   Money Held in Trust* ................................................................. *50*
*Section 7.11.   Force Majeure* .......................................................................... *50*
*Section 7.12.   Corporate Trustee Required; Eligibility; Conflicting Interests* ... *50*
*Section 7.13.   Trustee and Others May Hold Notes* ......................................... *50*
*Section 7.14.   Agents.* ...................................................................................... *50*

ARTICLE 8 DEFEASANCE AND DISCHARGE ....................................................... 53

*Section 8.01.   Discharge of Issuer's Obligations* ........................................... *53*
*Section 8.02.   Legal Defeasance* ..................................................................... *54*
*Section 8.03.   Covenant Defeasance.* .............................................................. *54*
*Section 8.04.   Application of Trust Money* ...................................................... *55*
*Section 8.05.   Repayment to Issuer* ................................................................. *55*

ii

Section 8.06.   Reinstatement ........................................................................ 55

ARTICLE 9 AMENDMENTS, SUPPLEMENTS AND WAIVERS ........................................ 56

Section 9.01.   Amendments Without Consent of Holders ................................ 56
Section 9.02.   Amendments With Consent of Holders .................................... 56
Section 9.03.   Substitution of the Issuer ........................................................ 57
Section 9.04.   Effect of Consent .................................................................... 59
Section 9.05.   Trustee's Rights and Obligations ............................................ 60

ARTICLE 10 NOTE GUARANTEES ....................................................................... 60

Section 10.01. Note Guarantees ..................................................................... 60
Section 10.02. Limitation on Liability ............................................................ 62
Section 10.03. Successors and Assigns ........................................................... 62
Section 10.04. No Waiver ................................................................................ 62
Section 10.05. Modification ............................................................................ 62
Section 10.06. Notation of Note Guarantee; Non-Impairment ........................ 63

ARTICLE 11 MISCELLANEOUS .......................................................................... 63

Section 11.01. Noteholder Communications; Noteholder Actions ................... 63
Section 11.02. Notices ..................................................................................... 64
Section 11.03. Certificate and Opinion as to Conditions Precedent ............... 66
Section 11.04. Statements Required in Certificate or Opinion ........................ 67
Section 11.05. Payment Date Other than a Business Day ................................ 67
Section 11.06. Governing Law ......................................................................... 67
Section 11.07. Submission to Jurisdiction; Agent for Service ........................ 67
Section 11.08. Judgment Currency ................................................................. 68
Section 11.09. No Adverse Interpretation of Other Agreements ..................... 69
Section 11.10. Successors ................................................................................ 69
Section 11.11. Duplicate Originals .................................................................. 69
Section 11.12. Separability .............................................................................. 69
Section 11.13. Table of Contents and Headings .............................................. 69
Section 11.14. No Liability of Directors, Officers, Employees, Incorporators,
                Members and Stockholders ...................................................... 70
Section 11.15. Waiver of Jury Trial ................................................................. 70
Section 11.16. Tax Matters .............................................................................. 70
Section 11.17. USA Patriot Act ........................................................................ 70

<u>EXHIBITS</u>

EXHIBIT A Form of Note ....................................................................................................... A-1

EXHIBIT B Restricted Legend ................................................................................................ B-1

EXHIBIT C DTC Legend ......................................................................................................... C-1

EXHIBIT D Regulation S Certificate ..................................................................................... D-1

EXHIBIT E Rule 144A Certificate .......................................................................................... E-1

INDENTURE, dated as of March 5, 2024, between RAIZEN FUELS FINANCE S.A., a public limited liability company (*société anonyme*) organized and existing under the laws of Luxembourg, having its registered office at 16, Rue Eugène Ruppert, L-2453 Luxembourg, and registered with the Luxembourg Register of Commerce and Companies (*Registre de commerce et des sociétés, Luxembourg*) under number B184033, LEI 52990010NH26VC32Q522, as the issuer (the "**Issuer**"), RAÍZEN S.A. ("**Raízen**") and RAÍZEN ENERGIA S.A. ("**Raízen Energia**") as the Guarantors, and THE BANK OF NEW YORK MELLON as Trustee, Registrar, Paying Agent and Transfer Agent.

## RECITALS

The Issuer has duly authorized the execution and delivery of this Indenture to provide for the issuance of the Issuer's 6.450% Green Notes due 2034 (the "**Notes**"). All things necessary to make this Indenture a valid and binding agreement of the Issuer, in accordance with its terms, have been done, and the Issuer has done all things necessary to make the Notes (in the case of the Additional Notes, when duly authorized), when executed by the Issuer and authenticated and delivered by the Trustee and duly issued by the Issuer, the valid obligations of the Issuer as hereinafter provided.

In addition, each of the Guarantors has duly authorized the execution and delivery of this Indenture as Guarantor. All things necessary to make this Indenture a valid and binding agreement of the Guarantors, in accordance with its terms, have been done, and each Guarantor has done all things necessary to make its Note Guarantee, when the Notes are executed by the Issuer and authenticated and delivered by the Trustee and duly issued by the Issuer, the valid, legal and binding obligation of such Guarantor.

## WITNESSETH

For and in consideration of the premises and the purchase of the Notes by the Holders thereof, the parties hereto covenant and agree, for the equal and proportionate benefit of all Holders, as follows:

## ARTICLE 1
## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01.  *Definitions*.

"**Additional Amounts**" has the meaning assigned to such term in Section 3.01(a).

"**Additional Notes**" means the Issuer's 6.450% Green Notes due 2034 (other than the Initial Notes) issued after the Issue Date in accordance with Section 2.02 hereof, as part of the same series as the Initial Notes.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" (including the terms "controlling," "controlled by" and "under common control with") as to any Person shall mean the possession, directly or indirectly, of the power to direct or cause

the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by contract or otherwise.

"**Agent**" means any Registrar, Paying Agent, Transfer Agent, Authenticating Agent or other agent hereunder, as duly appointed by the Issuer (or by the Trustee in the case of the Authenticating Agent).

"**Agent Member**" means a member of, or a participant in, the Depositary.

"**Applicable GAAP**" means, with respect to the Issuer or any Guarantor, either (i) generally accepted accounting principles in the jurisdiction where such Issuer or Guarantor is organized or incorporated or (ii) International Financial Reporting Standards (IFRS) issued by the International Accounting Standards Board (IASB) and related interpretations, in each case, as in effect from time to time.

"**Applicable Law**" has the meaning assigned to such term in Section 11.16.

"**Authenticating Agent**" refers to the Trustee's designee for authentication of the Notes.

"**Authentication Order**" has the meaning assigned to such term in Section 2.02(c).

"**Authorized Signatories**" has the meaning assigned to such term in Section 11.02.

"**bankruptcy default**" means the Events of Default set forth in Section 6.01(a)(v) and/or (vi).

"**Board of Directors**" means the board of directors or comparable governing body of the Issuer or any Guarantor, as applicable, or any committee thereof duly authorized to act on its behalf.

"**Board Resolution**" means a resolution duly adopted by the Board of Directors, which is certified by the Secretary, Assistant Secretary, a director or another Person performing corporate secretarial functions of the Issuer or a Guarantor, as applicable, and remains in full force and effect as of the date of its certification.

"**Brazil'**" means the Federative Republic of Brazil.

"**Business Day**" means any day other than a Saturday, a Sunday or a legal holiday or a day on which banking institutions or trust companies are authorized or obligated by law to close in The City of New York, Luxembourg or São Paulo, Brazil.

"**Capital Stock**" means, as to any Person, any and all shares, interests, participations, quotas or other equivalents (however designated, whether voting or non-voting) of capital stock of or equity interest in such Person, and any and all warrants or rights or options to purchase any of the foregoing, but excluding any debt securities convertible into or exchangeable for any of the foregoing.

"**Central Bank**" means the Central Bank of Brazil (*Banco Central do Brasil*).

2

"**Certificated Note**" means a Note in registered, individual, non-global form without interest coupons.

"**Change of Control**" means an event as a result of which (1) any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), other than one or more Permitted Holders or a group that includes one or more Permitted Holders in which such Permitted Holder or Permitted Holders hold and have voting power over at least a majority of the Voting Stock of Raízen held by such group, becomes the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act) of more than 50% of the total voting power of the Voting Stock of Raízen; or (2) Permitted Holders, directly or indirectly, cease to have the power to direct or cause the direction of the management and policies of Raízen, whether through the ownership of voting securities, by contract or otherwise.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Consolidated Net Worth**" means the total shareholders' equity (including both controlling and non-controlling interests) of Raízen and its Subsidiaries determined on a consolidated basis in accordance with Applicable GAAP.

"**Corporate Trust Office**" means the office of the Trustee at which the corporate trust business of the Trustee is administered, which at the date of this Indenture is located at 240 Greenwich Street, 7th Floor East, New York, New York 10286, Attention: Corporate Trust Administration, or such other address as the Trustee may designate from time to time by notice to the Holders and the Issuer, or the principal corporate trust office of any successor Trustee.

"**Debt**" means, with respect to any Person, without duplication:

(1)     all indebtedness of such Person for borrowed money;

(2)     all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (but excluding trade accounts payable or other short-term obligations to suppliers or customers payable within 360 days, in each case arising in the ordinary course of business);

(3)     all obligations, contingent or otherwise, of such Person in respect of acceptances, letters of credit, financial guaranty insurance policies or similar extensions of credit (excluding (i) trade payables and (ii) other obligations with respect to letters of credit securing obligations (other than obligations described in clauses (1) and (2) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit);

(4)     all obligations of such Person under Hedging Agreements; and

(5)     all Debt of other Persons referred to in clauses (1) through (4) above that is Guaranteed by such Person's Guarantee (other than obligations of other Persons that are customers or suppliers of such Person for which such Person is or becomes so responsible

3

or liable in the ordinary course of business to (but only to) the extent that such Person does not, or is not required to, make payment in respect thereof);

if and to the extent any of the preceding items (other than Guarantees, letters of credit and Hedging Agreements) would appear as a liability upon the balance sheet of the specified Person in accordance with Applicable GAAP; it being understood that leases in effect on the Issue Date that are deemed operating leases under IFRS 16 – Leases will not be deemed "Debt."

The amount of Debt of any Person will be deemed to be:

(1)  with respect to a revolving credit or similar facility, the total amounts of funds borrowed and then outstanding;

(2)  with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation;

(3)  with respect to any Debt issued with original issue discount, the face amount of such Debt less the remaining unamortized portion of the original issue discount of such Debt;

(4)  with respect to any Hedging Agreement, the net amount payable if such Hedging Agreement terminated at that time due to default by such Person reasonably determined by the Issuer on the basis of customary "marked-to-market" methodology; and

(5)  otherwise, the outstanding principal amount thereof.

The principal amount of any Debt or other obligation that is denominated in any currency other than United States dollars (after giving effect to any Hedging Agreement in respect thereof) shall be the amount thereof, as determined pursuant to the foregoing sentence, converted into United States dollars at the Spot Rate in effect on the date of determination.

"**Default**" means an event or condition which upon notice, lapse of time or both would become an Event of Default.

"**Depositary**" means the depositary of each Global Note, which will initially be DTC.

"**Designated Affiliate**" means, at any time, one or more Persons (including, without limitation, a Guarantor) designated by the Issuer to be the purchaser of Notes under an Offer to Purchase.

"**Dollars**" means United States Dollars in immediately available funds.

"**DTC**" means The Depository Trust Company, a New York corporation, and its successors.

"**DTC Legend**" means the legend set forth in Exhibit C.

4

"**Electronic Means**" has the meaning assigned to such term in Section 11.02.

"**Event of Default**" has the meaning assigned to such term in Section 6.01.

"**Excess Additional Amounts**" has the meaning assigned to such term in Section 3.03.

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Expiration Date**" has the meaning assigned to such term in Section 4.06(a)(v).

"**FATCA**" has the meaning assigned to such term in Section 3.01(a)(ix)

"**Fitch**" means Fitch Ratings, Inc., and any successor to its rating agency business.

"**Global Note**" means a Note in registered global form without interest coupons registered in the name of the Depositary (or its nominee) as depositary for the beneficial owners thereof.

"**Guarantee**" means any obligation of a Person to pay the Debt of another Person, including without limitation:

(1)      an obligation to pay or purchase such Debt;

(2)      an obligation to lend money or to purchase or subscribe shares or other securities or to purchase assets or services in order to provide funds for the payment of such Debt; or

(3)      any other agreement to be responsible for such Debt;

*provided, however,* that the term "**Guarantee**" shall not include endorsements for collection or deposit in the ordinary course of business. The term "**Guarantee**" used as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning assigned to such term in Section 10.01(a).

"**Guarantor**" means each of (i) Raízen, (ii) Raízen Energia, and (iii) any other Person Guaranteeing the Issuer's obligations under the Notes and this Indenture.

"**Hedging Agreement**" means, with respect to any Person, all net obligations of such Person in respect of any interest rate protection agreement, any currency or commodity swap, cap or collar agreement, any equity swap or any similar arrangement entered into by such Person providing for the transfer or mitigation of interest rate, currency, commodity price or equity risks either generally or under specific contingencies (but without regard to any notional principal amount relating thereto).

"**Holder**" or "**Noteholder**" means the Person in whose name a Note is registered in the Register maintained by the Registrar.

"**Indenture**" means this indenture, as amended or supplemented from time to time.

5

"**Initial Notes**" means the US$1,000,000,000 aggregate principal amount of Notes issued on the date hereof.

"**Initial Purchaser**" or "**Initial Purchasers**" means any initial purchaser or initial purchasers party to a purchase agreement with the Issuer relating to the sale of the Notes or Additional Notes by the Issuer.

"**Instructions**" has the meaning assigned to such term in Section 11.02.

"**Interest Payment Date**" means each March 5 and September 5 of each year, commencing on September 5, 2024.

"**Investment Grade**" means BBB- or higher by S&P, Baa3 or higher by Moody's or BBB- or higher by Fitch, or the equivalent of such global ratings by S&P, Moody's or Fitch.

"**Issue Date**" means the date on which the Notes are originally issued under this Indenture.

"**Issuer**" means the party named as such in the first paragraph of this Indenture or any successor obligor under this Indenture and the Notes pursuant to Sections 5.01 and Section 9.03.

"**Lien**" means, with respect to any Property, any mortgage, pledge, usufruct, fiduciary transfer (*alienação* or *cessão fiduciária*), charge or other encumbrance, lien, security interest or any preferential arrangement (including a securitization) that has the practical effect of creating a security interest on or with respect to such Property; *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"**Low or Nil Tax Jurisdiction**" means a jurisdiction that does not impose income tax or that imposes it at a maximum rate lower than 17%, or whose laws do not allow access to information related to ownership composition or securities ownership or permit the identification of the beneficial owner of income attributed to non-residents.

"**Luxembourg**" means the Grand Duchy of Luxembourg.

"**Luxembourg Companies Law**" means the Luxembourg law of 10 August 1915 on commercial companies, as amended.

"**Material Adverse Effect**" means (i) any material adverse effect on the financial condition, business, properties or results of operations of Raízen and its Subsidiaries taken as a whole and (ii) any material adverse effect on the ability of the Issuer or the Guarantors to perform their respective obligations under this Indenture, the Notes or the Note Guarantees.

"**Maturity Date**" means March 5, 2034.

"**Moody's**" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"**Non-Recourse Debt**" means Debt (or any portion thereof) of a Subsidiary of Raízen (the "**Non-Recourse Debtor**") used to finance (i) the creation, development, construction,

improvement or acquisition of projects, Properties or assets and any extensions, renewals or refinancings of such Debt including the cost of the refinancing or (ii) the operations of projects, Properties or assets of such Non-Recourse Debtor or its Subsidiaries; *provided* that the recourse of the lender thereof (including any agent, trustee, receiver or other Person acting on behalf of such entity) in respect of such Debt is limited (other than in respect of the Recourse Amount (as defined herein)) to the Non-Recourse Debtor, any debt securities issued by the Non-Recourse Debtor, the Capital Stock of the Non-Recourse Debtor, and any assets, receivables, inventory, equipment, chattels, contracts, intangibles, rights and any other assets of such Non-Recourse Debtor and its Subsidiaries connected with the projects, properties or assets created, developed, constructed, improved, acquired or operated, as the case may be, in respect of which such Debt has been incurred; *provided, further*, that if such lender additionally has contractual recourse to Raízen or to any Subsidiary of Raízen (other than the Non-Recourse Debtor and its Subsidiaries) for the repayment of any portion of such Debt (such portion, the "**Recourse Amount**"), then the Recourse Amount will not constitute Non-Recourse Debt and the Issuer or the relevant Guarantor, as the case may be, will be deemed to have incurred Debt in an aggregate principal amount equal to the Recourse Amount.

"**Non U.S. Person**" means a Person that is not a U.S. Person under Regulation S.

"**Notation of Note Guarantee**" has the meaning assigned to such term in Section 10.06.

"**Note Guarantee**" means each Guarantee by the Guarantors of the Guaranteed Obligations pursuant to this Indenture and the Notes.

"**Notes**" has the meaning assigned to such term in the Recitals. The Initial Notes and any Additional Notes shall be treated as a single class for all purposes under this Indenture, and unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additional Notes.

"**Offer to Purchase**" has the meaning assigned to such term in Section 4.06(a).

"**Offer to Purchase Payment**" has the meaning assigned to such term in Section 4.06(a).

"**Offer to Purchase Payment Date**" has the meaning assigned to such term in Section 4.06(a)(v).

"**Offering Memorandum**" means the final offering memorandum dated February 28, 2024 prepared by the Issuer in connection with the offering of the Initial Notes.

"**Officer**" means a director, the president or chief executive officer, any vice president, the chief financial officer, the treasurer or any assistant treasurer, or the secretary or any assistant secretary, or any attorney-in-fact of each of the Issuer and the Guarantors, as applicable, or any other Person duly appointed by the shareholders or the Board of Directors of each of the Issuer and the Guarantors, as applicable, to perform corporate duties.

"**Officer's Certificate**" means, with respect to any Person, a certificate signed by the chairman of the board (or equivalent governing body), president, vice-president, chief executive officer, chief operating officer, chief financial officer, chief accounting officer, director or

manager, as applicable, or any treasurer, secretary or authorized signatory or, to the extent applicable, general counsel of such Person.

"**Offshore Global Note**" means a Global Note that bears the Regulation S Legend representing Notes issued and sold pursuant to Regulation S.

"**Opinion of Counsel**" means a written opinion from legal counsel who may be an employee of or counsel to the Issuer, which opinion shall be reasonably acceptable to the Trustee.

"**Outstanding**" has the meaning assigned to such term in Section 2.05.

"**Par Call Date**" has the meaning assigned to such term in Section 3.02(a)

"**Paying Agent**" refers to The Bank of New York Mellon in its capacity as paying agent and its successors, and such other paying agents as the Issuer shall appoint.

"**Permitted Holders**" means each of (i) Royal Dutch Shell PLC and its Affiliates and (ii) Cosan S.A. and its Affiliates (in each case, including any successors and assigns thereof).

"**Permitted Liens**" means:

(1)    any Liens existing on the Issue Date;

(2)    any Liens extending, renewing or replacing (or successive extensions, renewals or replacements of), in whole or in part, any Lien referred to in clauses (1), (3), (4), (10) and (13) hereof; *provided* that the principal amount of Debt secured thereby shall not exceed the principal amount of Debt so secured at the time of such extension, renewal or replacement, except for any increase reflecting premiums, fees and expenses in connection with such extension, renewal or replacement;

(3)    any Liens created solely for the purpose of securing the payment of all or a part of the purchase price (or the cost of construction or improvement, and any related transaction fees and expenses) of assets or Property (including Capital Stock of any Person) acquired, constructed or improved after the Issue Date, including related transaction fees and expenses (or securing Debt incurred to refinance a bridge or other interim financing that is initially incurred for the purpose of financing such acquisition, construction or improvement of such Property or assets, including related transaction fees and expenses); *provided* that (a) the aggregate principal amount of Debt secured by such Liens shall not exceed (but may be less than) the greater of (i) the purchase price of the assets or Property so acquired, constructed or improved, or (ii) the aggregate Debt incurred solely for the acquisition, construction, or improvement of such Property or assets, as the case may be, (b) such Liens shall not encumber any assets or Property other than the assets or Property so acquired, constructed or improved and (c) other than any unimproved real property on which the Property so constructed, or the improvement, is located, such Liens shall attach to such assets or Property within 365 days of the construction, acquisition or improvement of such assets or Property; *provided, further*, that any Lien is permitted to be incurred on the Capital Stock of any Person securing any Debt of that Person that is (i) Non-Recourse

Debt and (ii) incurred for purposes of financing the acquisition, construction or improvement of any Property or assets of such Person;

(4)     any Liens securing Debt for the purpose of financing all or part of the cost of the acquisition, construction or development of a project; *provided* that (a) the Lien in respect of such Debt is limited to assets (including Capital Stock of the project entity) or Property of such project, (b) the aggregate principal amount of Debt secured by the Liens will not exceed (but may be less than) the greater of (i) the cost (i.e., purchase price) of the project so acquired, constructed or developed or (ii) the aggregate Debt incurred solely for the acquisition, construction, or improvement of such project, as the case may be, and (c) the Lien is incurred before, or within 365 days after the completion of, that acquisition, construction or development and does not apply to any other Property or assets of Raízen or any Significant Subsidiary;

(5)     any Liens imposed by applicable law incurred in the ordinary course of business, including carriers', warehousemen's and mechanics' liens, statutory landlord's liens, and other similar liens and encumbrances arising in the ordinary course of business, in each case for sums not yet due or being contested in good faith by appropriate proceedings;

(6)     any Liens securing taxes, duties, assessments, fees and other governmental charges or levies, in each case the payment of which is not yet due or is being contested in good faith by appropriate proceedings and for which such adequate reserves or other appropriate provisions, if any, as shall be required by Applicable GAAP shall have been made;

(7)     pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other similar social security legislation, any deposit to secure appeal bonds in proceedings being contested in good faith, good faith deposits in connection with bids, tenders, contracts (other than for the payment of Debt) or leases or deposits for the payment of rent, in each case made in the ordinary course of business;

(8)     customary reservations or retentions of title, minor defects, easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, licenses, restrictions on the use of Property or assets or minor imperfections in title that do not in the aggregate materially impair the value or use of the Property or assets affected thereby, and any leases and subleases of real property that do not in the aggregate materially interfere with the ordinary conduct of the business of the Issuer, any Guarantor or any Significant Subsidiary, and which are made on customary and usual terms applicable to similar properties;

(9)     encumbrances, security deposits or reserves maintained in the ordinary course of business and required by applicable law;

(10)     any Liens (i) granted to secure borrowings directly or indirectly from Banco Nacional de Desenvolvimento Econômico e Social-BNDES, or any other federal, regional or state Brazilian governmental development bank or credit agency (including borrowings from any Brazilian governmental bank with funds provided by Brazilian governmental

regional funds (which shall include, without limitation, Financiadora de Estudos e Projetos – FINEP, *Fundo de Desenvolvimento do Nordeste* – FDNE and *Fundo de Desenvolvimento do Centro Oeste* – FCO)) or (ii) granted to secure borrowings from any international or multilateral development bank, government-sponsored agency, export-import bank or official export-import credit insurer, export-credit agency or commercial bank acting as co-lender in any of the foregoing;

(11)    any Liens in favor of issuers of surety bonds, appeal bonds, bid bonds, tender bonds, letters of credit or similar instruments issued pursuant to the request of and for the account of any of the Issuer or the Guarantors or any of their Subsidiaries in the ordinary course of business (including all bonds required by law, contract or tender rules);

(12)    any Liens securing obligations under any Hedging Agreements, so long as such Hedging Agreements  are entered into for bona fide, non-speculative purposes;

(13)    any Liens existing on any Property or assets of any Person before that Person's acquisition (in whole or in part) by, merger into or consolidation with or sale of assets to any of the Issuer, the Guarantors or any Subsidiary thereof after the Issue Date; *provided* that the Lien is not created in contemplation of or in connection with such acquisition, merger or consolidation and such Lien does not extend to any other property of the Issuer, the Guarantors or any Subsidiary thereof;

(14)    any Liens on inventory, receivables and related assets of any of the Issuer, the Guarantors or any of their Subsidiaries securing the obligations of the Issuer, such Guarantor or such Subsidiary, as applicable, under any lines of credit or working capital or export or import trade finance facility or other trade transaction; *provided* that the aggregate principal amount of Debt incurred that is secured by such receivables that shall fall due in any calendar year shall not exceed 80% of Raízen's consolidated net operating revenues for the most recently concluded period of four consecutive fiscal quarters; *provided, further,* that advance transactions will not be deemed transactions secured by receivables, inventory or related assets for purposes of the above calculations;

(15)    any judgment Lien not giving rise to an Event of Default;

(16)    any interest or title of a lessor under any capitalized lease obligation; *provided* that such Liens do not extend to any Property or assets which is not leased property subject to such capitalized lease obligation;

(17)    any Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Issuer, any Guarantor or any of their Subsidiaries, including rights of offset and set-off;

(18)    any Lien or rights of set-off of any Person with respect to any cash equivalents on deposit account or securities account of the Issuer, any Guarantor or any of their Subsidiaries arising in the ordinary course of business in favor of the bank(s) or security intermediary(ies) with which such accounts are maintained, securing only amounts owing to such bank(s) with respect to cash management and operating account arrangements;

10

(19)    any Liens securing the Notes and the Note Guarantees and all other monetary obligations under this Indenture;

(20)    any Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(21)    any rights of set-off of any Person with respect to any deposit account of the Issuer, any Guarantor or any of their Subsidiaries arising in the ordinary course of business and not constituting a financing transaction;

(22)    Liens securing obligations owed by any Subsidiary of Raízen to Raízen or one or more Subsidiaries of Raízen and/or by Raízen to one or more such Subsidiaries; and

(23)    other Liens securing obligations in an aggregate amount not exceeding the greater of: (i) US$2.8 billion (or the equivalent thereof at the time of determination) and (ii) 20% of the Total Consolidated Assets.

For purposes of determining compliance with Section 4.07, (i) a Lien need not be incurred solely by reference to one category of Permitted Liens described above but is permitted to be incurred in part under any combination thereof and of any other available exemption and (ii) in the event that a Lien (or any portion thereof) meets the criteria of one or more of the categories of Permitted Liens, the Issuer may, in its sole discretion, classify or reclassify such Lien (or any portion thereof) in any manner that complies with the categories of Permitted Liens.

"**Person**" means any individual, corporation, company, association, partnership, limited liability company, joint venture, trust, unincorporated association, governmental authority or any agency or political subdivision thereof or any other entity of whatever nature.

"**Property**" of any Person means any property, rights, revenues, or interest therein, of such Person.

"**principal**" of any Debt means the principal amount of such Debt, (or if such Debt was issued with original issue discount, the face amount of such Debt less the remaining unamortized portion of the original issue discount of such Debt), together with, unless the context otherwise indicates, any premium then payable on such Debt.

"**Rating Agency**" means each of (1) S&P, (2) Moody's and (3) Fitch, or their respective successors.

"**Rating Decline**" means that at any time within 90 days after the date of public notice of a Change of Control, (1) in the event the Notes are assigned an Investment Grade rating by at least two of the Rating Agencies prior to such public notice, the rating assigned to the Notes by any two or more of the Rating Agencies is below an Investment Grade rating; or (2) in the event the Notes are not assigned an Investment Grade rating by at least two of the Rating Agencies prior to such public notice, the rating assigned to the Notes by at least two of the Rating Agencies is decreased by one or more categories (i.e., notches); *provided* that there shall be no Rating Decline to the extent the Notes continue to have an Investment Grade rating by at least one of the Rating

Agencies; and *provided, further*, that, in each case, any such Rating Decline is expressly stated by the applicable Rating Agency to have been the result of the Change of Control.

"**Register**" has the meaning assigned to such term in Section 2.09.

"**Registrar**" means The Bank of New York Mellon.

"**Regular Record Date**" for the interest payable on any Interest Payment Date means March 1 or September 1 (whether or not a Business Day) immediately preceding such Interest Payment Date.

"**Regulation S**" means Regulation S under the Securities Act.

"**Regulation S Certificate**" means a certificate substantially in the form of Exhibit D hereto.

"**Regulation S Legend**" means the legend set forth in Exhibit B-2.

"**Relevant Taxing Jurisdiction**" has the meaning assigned to such term in Section 3.01(a).

"**Responsible Officer**" means, with respect to the Trustee, any officer of the Trustee in its Corporate Trust Department who shall have direct responsibility for the administration of this Indenture.

"**Restricted Legend**" means the legend set forth in Exhibit B-1.

"**Rule 144A**" means Rule 144A under the Securities Act.

"**Rule 144A Certificate**" means a certificate substantially in the form of Exhibit E hereto.

"**S&P**" means S&P Global Ratings, a division of S&P Global Inc., and any successor to its rating agency business.

"**SEC**" or "**Commission**" means the U.S. Securities and Exchange Commission, as from time to time constituted, created under the Securities Exchange Act of 1934, or, if at any time after execution of this instrument such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body performing such duties on such date.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Significant Subsidiary**" means, with respect to any Person, any Subsidiary of such Person which at the time of determination had assets which, as of the date of such Person's most recent quarterly consolidated balance sheet, constituted at least 10% of such Person's total assets, determined on the basis of the consolidated assets of such Person and its Subsidiaries as of such date.

"**Spot Rate**" means, for any currency, the spot rate at which that currency is offered for sale against United States dollars as published in The Wall Street Journal on the Business Day

12

immediately preceding the date of determination or, if that rate is not available in that publication, as published in any publicly available source of similar market data, as determined by the Issuer.

"**Stated Maturity**" means (i) with respect to any Debt, the date specified as the fixed date on which the final installment of principal of such Debt is due and payable or (ii) with respect to any scheduled installment of principal of or interest on any Debt, the date specified as the fixed date on which such installment is due and payable as set forth in the documentation governing such Debt, not including any contingent obligation to repay, redeem or repurchase prior to the regularly scheduled date for payment.

"**Subsidiary**" means, with respect to any Person, any other Person more than 50% of the outstanding Voting Stock of which is owned or controlled, directly or indirectly, by such Person and/or by any one or more Subsidiaries of such Person.

"**Substituted Issuer**" has the meaning assigned to such term in Section 9.03(a).

"**Substitution Documents**" has the meaning assigned to such term in Section 9.03(a)(i).

"**Successor Corporation**" has the meaning assigned to such term in Section 5.01(a)(i).

"**Threshold Amount**" has the meaning assigned to such term in Section 6.01(a)(iv).

"**Total Consolidated As**sets" means the total amount of consolidated assets of Raízen and its Subsidiaries prepared in accordance with Applicable GAAP, calculated after giving pro forma effect to any acquisition or disposition of Persons, divisions, lines of businesses, operations or assets by Raízen and its Subsidiaries subsequent to such date and on or prior to the date of determination.

"**Transfer Agent**" refers to The Bank of New York Mellon in its capacity as transfer agent and such other transfer agents as the Issuer shall appoint.

"**Treasury Rate**" means, with respect to any redemption date, the yield determined by Raízen in accordance with the following two paragraphs:

(1)     The Treasury Rate shall be determined by Raízen after 4:15 p.m. (New York City time) (or after such time as yields on U.S. government securities are posted daily by the Board of Governors of the Federal Reserve System), on the third Business Day (solely in New York City) preceding the redemption date based upon the yield or yields for the most recent day that appear after such time on such day in the most recent statistical release published by the Board of Governors of the Federal Reserve System designated as "Selected Interest Rates (Daily) – H.15" (or any successor designation or publication) ("**H.15**") under the caption "U.S. government securities—Treasury constant maturities—Nominal" (or any successor caption or heading) ("**H.15 TCM**"). In determining the Treasury Rate, Raízen shall select, as applicable: (i) the yield for the Treasury constant maturity on H.15 exactly equal to the period from the redemption date to the Par Call Date (the "**Remaining Life**"); or (ii) if there is no such Treasury constant maturity on H.15 exactly equal to the Remaining Life, the following two yields: (x) one yield corresponding to the Treasury constant maturity on H.15 immediately shorter than, and (y) one yield

13

corresponding to the Treasury constant maturity on H.15 immediately longer than, the Remaining Life – and shall interpolate to the Par Call Date on a straight-line basis (using the actual number of days) using such yields and rounding the result to three decimal places; or (iii) if there is no such Treasury constant maturity on H.15 shorter than or longer than the Remaining Life, the yield for the single Treasury constant maturity on H.15 closest to the Remaining Life. For purposes of this paragraph, the applicable Treasury constant maturity or maturities on H.15 shall be deemed to have a maturity date equal to the relevant number of months or years, as applicable, of such Treasury constant maturity from the redemption date.

(2)      If on the third Business Day (solely in New York City) preceding the redemption date H.15 TCM or any successor designation or publication is no longer published, Raízen shall calculate the Treasury Rate based on the rate *per annum* equal to the semi-annual equivalent yield to maturity at 11:00 a.m. (New York City time) on the second Business Day (solely in New York City) preceding such redemption date of the U.S. Treasury security maturing on, or with a maturity that is closest to, the Par Call Date, as applicable. If there is no U.S. Treasury security maturing on the Par Call Date but there are two or more U.S. Treasury securities with a maturity date equally distant from the Par Call Date, one with a maturity date preceding the Par Call Date and one with a maturity date following the Par Call Date, Raízen shall select the U.S. Treasury security with a maturity date preceding the Par Call Date. If there are two or more U.S. Treasury securities maturing on the Par Call Date or two or more U.S. Treasury securities meeting the criteria of the preceding sentence, Raízen shall select from among these two or more U.S. Treasury securities the U.S. Treasury security that is trading closest to par based upon the average of the bid and asked prices for such U.S. Treasury securities at 11:00 a.m., New York City time. In determining the Treasury Rate in accordance with the terms of this paragraph, the semi-annual yield to maturity of the applicable U.S. Treasury security shall be based upon the average of the bid and asked prices (expressed as a percentage of principal amount) at 11:00 a.m., New York City time, of such U.S. Treasury security, and rounded to three decimal places.

"**Trust Indenture Act**" or "**TIA**" means the U.S. Trust Indenture Act of 1939, as amended.

"**Trustee**" means the party named as such in the first paragraph of this Indenture or any successor trustee under this Indenture pursuant to Article 7.

"**U.S. Global Note**" means a Global Note that bears the Restricted Legend representing Notes issued and sold pursuant to Rule 144A.

"**U.S. Government Obligations**" means obligations issued or directly and fully guaranteed or insured by the United States of America or by any agent or instrumentality thereof, *provided* that the full faith and credit of the United States of America is pledged in support thereof.

"**Voting Stock**" of any Person means Capital Stock in such Person having power to vote for the election of directors or similar officials of such Person or otherwise voting with respect to actions of such Person (other than such Capital Stock having such power only by reason of the happening of a contingency).

14

Section 1.02.  *Rules of Construction*.  Unless the context otherwise requires or except as otherwise expressly provided,

(i)      an accounting term not otherwise defined has the meaning assigned to it in accordance with Applicable GAAP;

(ii)      "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Section, Article or other subdivision;

(iii)      all references to "Dollars" US$ and "$" shall mean the lawful currency of the United States of America;

(iv)      all references to Sections or Articles or Exhibits refer to Sections or Articles or Exhibits of or to this Indenture unless otherwise indicated;

(v)      references to agreements or instruments, or to statutes or regulations, are to such agreements or instruments, or statutes or regulations, as amended from time to time (or to successor statutes and regulations);

(vi)      in the event that a transaction meets the criteria of more than one category of permitted transactions or listed exceptions, the Issuer may classify such transaction as it, in its sole discretion, determines;

(vii)      words in the singular include the plural, and in the plural include the singular; and

(viii)      the words "execution," "signed," "signature," and words of like import in this Indenture shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf," "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

ARTICLE 2
THE NOTES

Section 2.01.  *Form, Dating and Denominations; Legends*.  (a) The Notes and the Trustee's certificate of authentication will be substantially in the form attached as Exhibit A. The terms and provisions contained in the form of the Notes annexed as Exhibit A constitute, and are hereby expressly made, a part of this Indenture.  The Notes may have notations, legends or endorsements required by law, rules of or agreements with national securities exchanges to which the Issuer is subject, or usage.  Each Note will be dated the date of its authentication.  The

15

Notes will be issuable in minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof.

(b)     (i) Except as otherwise provided in paragraph (c) below, each Initial Note or Additional Note will bear the Restricted Legend or the Regulation S Legend, as the case may be.

(ii)     Each Global Note, whether or not an Initial Note or Additional Note, will bear the DTC Legend.

(iii)     Initial Notes and Additional Notes offered and sold in reliance on Regulation S will be issued as provided herein.

(iv)     Initial Notes and Additional Notes offered and sold in reliance on Rule 144A will be issued as provided herein.

(c)     If the Issuer determines (upon the advice of counsel and such other certifications and evidence as the Issuer may reasonably require) that a Note is eligible for resale pursuant to Rule 144(k) under the Securities Act (or a successor provision) and that the Restricted Legend or the Regulation S Legend, as the case may be, is no longer necessary or appropriate in order to ensure that subsequent transfers of the Note (or a beneficial interest therein) are effected in compliance with the Securities Act, the Issuer may instruct the Trustee in writing to cancel the Note and the Issuer may issue to the Holder thereof (or to its transferee), and the Trustee, upon receipt of an Authentication Order, shall authenticate and deliver a new Note of like tenor and amount, registered in the name of the Holder thereof (or its transferee), that does not bear the Restricted Legend or the Regulation S Legend, as the case may be, and the Trustee will comply with such instruction provided that the Trustee has received an Officer's Certificate and Opinion of Counsel and such other evidence as the Trustee may require to comply with such action.

(d)     By its acceptance of any Note bearing the Restricted Legend or the Regulation S Legend, as the case may be (or any beneficial interest in such a Note), each Holder thereof and each owner of a beneficial interest therein acknowledges the restrictions on transfer of such Note (and any such beneficial interest) set forth in this Indenture and in the Restricted Legend or the Regulation S Legend, as the case may be, and agrees that it will transfer such Note (and any such beneficial interest) only in accordance with this Indenture and such legend.

Section 2.02.   *Execution and Authentication; Additional Notes*.   (a) An Officer shall sign the Notes for the Issuer by manual, electronic or facsimile signature in the name and on behalf of the Issuer.  If an Officer whose signature is on a Note no longer holds that office at the time the Note is authenticated, the Note will still be valid.

(b)     A Note will not be valid until the Trustee or the Authenticating Agent signs the certificate of authentication on the Note by manual, electronic or facsimile signature, with the signature constituting conclusive evidence that the Note has been authenticated under this Indenture.

16

(c)     At any time and from time to time after the execution and delivery of this Indenture, the Issuer may deliver Notes executed by the Issuer to the Trustee or the Authenticating Agent for authentication. The Trustee or the Authenticating Agent will authenticate and deliver:

(i)     Initial Notes for original issue on the Issue Date in the aggregate principal amount of US$1,000,000,000; and

(ii)     Additional Notes from time to time for original issue in aggregate principal amounts specified by the Issuer, which Additional Notes shall have the same terms and conditions in all respects (including the maturity date) as the Initial Notes, other than the issue date, the issue price and the first Interest Payment Date; *provided* that if the Additional Notes are not fungible with the Initial Notes for U.S. federal income tax purposes, the Additional Notes will have a separate CUSIP or other identifying number. Such Additional Notes shall be treated as a single series with the Initial Notes for all purposes under this Indenture (other than tax purposes, in the case the Additional Notes are not fungible with the Initial Notes for tax purposes), including, without limitation, waivers, amendments, redemptions and offers to purchase, and shall vote together with the Initial Notes as one single series on all matters;

in the case of clauses (i) and (ii) above, after receipt by the Trustee of an order of the Issuer executed by one of its Officers directing the Trustee to authenticate the Notes (the "**Authentication Order**") and specifying:

(i)     the amount of Notes to be authenticated and the date on which the Notes are to be authenticated;

(ii)     whether the Notes are to be Initial Notes or Additional Notes;

(iii)     in the case of Additional Notes, that the issuance of such Additional Notes does not contravene any provision of this Indenture;

(iv)     whether the Notes are to be issued as one or more Global Notes or Certificated Notes; and

(v)     other information the Issuer may determine to include or the Trustee may reasonably request.

(d)     The Trustee shall be fully protected in relying upon the Authentication Order above in authenticating any Notes under this Indenture.

Section 2.03.   *Registrar, Paying Agent, Transfer Agent and Authenticating Agent; Paying Agent to Hold Money in Trust*.  (a) The Issuer may appoint one or more Registrars and one or more Paying Agents or Transfer Agents, and the Trustee may appoint, with a copy of any such appointment to the Issuer, an Authenticating Agent, in which case each reference in this Indenture to the Trustee in respect of the obligations of the Trustee to be performed by the Authenticating Agent shall be deemed to be references to the Authenticating Agent. The terms "**Transfer Agent**" and "**Paying Agent**" include any additional transfer agent or paying agent, as the case may be.

17

The term "**Registrar**" includes any co-Registrar. In each case, the Issuer and the Trustee will enter into an appropriate agreement with the Authenticating Agent implementing the provisions of this Indenture relating to the obligations of the Trustee to be performed by the Authenticating Agent and the related rights. The Registrar shall provide to the Issuer and the Trustee, if the Trustee is not the Registrar, a current copy of the Register from time to time upon written request of the Issuer or the Trustee, as the case may be. The Issuer may act as Registrar or Paying Agent. The Issuer hereby appoints, upon the terms and subject to the conditions herein set forth, The Bank of New York Mellon as Paying Agent, Registrar and Transfer Agent.

(b)     The Issuer will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of the Holders or the Trustee all money held by the Paying Agent for the payment of principal of and interest on the Notes and will promptly notify the Trustee in writing of any Default by the Issuer in making any such payment.  The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee and account for any funds disbursed, and the Trustee may at any time during the continuance of any payment default, upon written request to a Paying Agent, require the Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed.  Upon doing so, the Paying Agent will have no further liability for the money so paid over to the Trustee.

Section 2.04.   *Replacement Notes*.  If a mutilated Note is surrendered to the Trustee or if a Holder claims that its Note has been lost, destroyed or wrongfully taken, the Issuer will issue and the Trustee will authenticate, upon provision of evidence satisfactory to the Trustee that such Note was lost, destroyed or wrongfully taken, a replacement Note of like tenor and principal amount and bearing a number not contemporaneously Outstanding.  Every replacement Note is an additional obligation of the Issuer and entitled to the benefits of this Indenture.  If required by the Trustee or the Issuer, an indemnity must be furnished by the Holder that is sufficient in the judgment of both the Trustee and the Issuer to protect the Issuer and the Trustee from any loss they may suffer if a Note is replaced.  The Issuer and the Trustee may charge the Holder for the expenses of the Issuer and the Trustee in replacing a Note.  In case the mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Issuer in its discretion may pay the Note instead of issuing a replacement Note.

Section 2.05.   *Outstanding Notes*.  (a) Notes that are "**Outstanding**" at any time are all Notes that have been authenticated by the Trustee except for:

(i)      Notes cancelled by the Trustee or delivered to it for cancellation;

(ii)     any Note which has been replaced or paid pursuant to Section 2.04 unless and until the Trustee and the Issuer receive proof satisfactory to them that the replaced Note is held by a protected purchaser; and

(iii)    on or after the Maturity Date or any redemption date or Offer to Purchase Payment Date, those Notes payable or to be redeemed on that date for which the Trustee (or Paying Agent, other than the Issuer or an Affiliate of the Issuer) holds money sufficient to pay all amounts then due thereunder.

(b)    A Note does not cease to be Outstanding because the Issuer or one of its Affiliates holds the Note, *provided* that in determining whether the Holders of the requisite principal amount of the Outstanding Notes have given or taken any request, demand, authorization, direction, notice, consent, waiver or other action hereunder, Notes owned by the Issuer or any Affiliate of the Issuer will be disregarded and deemed not to be Outstanding (it being understood that in determining whether the Trustee is protected in relying upon any such request, demand, authorization, direction, notice, consent, waiver or other action, only Notes in respect of which a Responsible Officer of the Trustee has received written notice from the Issuer that such Notes are so owned will be so disregarded).  Notes so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right to so act with respect to such Notes and that the pledgee is not the Issuer or any Affiliate of the Issuer.

Section 2.06.  *Temporary Notes*.  Until definitive Notes are ready for delivery, the Issuer may prepare and the Trustee will authenticate temporary Notes.  Temporary Notes will be substantially in the form of definitive Notes but may have insertions, substitutions, omissions and other variations determined to be appropriate by the Officer executing the temporary Notes, as evidenced by the execution of the temporary Notes.  If temporary Notes are issued, the Issuer will cause definitive Notes to be prepared without unreasonable delay.   After the preparation of definitive Notes, the temporary Notes will be exchangeable for definitive Notes upon surrender of the temporary Notes at the office or agency of the Issuer designated for such purpose pursuant to Section 4.02, without charge to the Holder.  Upon surrender for cancellation of any temporary Notes the Issuer will execute and the Trustee will authenticate and deliver in exchange therefor a like principal amount of definitive Notes of authorized denominations.  Until so exchanged, the temporary Notes will be entitled to the same benefits under this Indenture as definitive Notes.

Section 2.07.  *Cancellation*.  The Issuer at any time may, but shall not be obligated to, deliver to the Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer may have acquired in any manner whatsoever, and may deliver to the Trustee for cancellation any Notes previously authenticated hereunder which the Issuer has not issued and sold.  Any Registrar, Transfer Agent or Paying Agent will forward to the Trustee any Notes surrendered to it for transfer, exchange or payment.  The Trustee will cancel all Notes surrendered for transfer, exchange, payment or cancellation and dispose of them in accordance with its then applicable procedures or the written instructions of the Issuer; *provided* that the Trustee shall not be required to destroy cancelled Notes.  The Issuer may not issue new Notes to replace Notes it has paid in full or delivered to the Trustee for cancellation.

Section 2.08.  *CUSIP and ISIN Numbers*.  The Issuer in issuing the Notes may use "CUSIP" and "ISIN" numbers, and the Trustee will use CUSIP numbers or ISIN numbers in notices of redemption or exchange or in Offers to Purchase as a convenience to Holders, which notices shall state that no representation is made by the Issuer or the Trustee as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption or exchange or Offer to Purchase.  The Issuer shall promptly notify the Trustee in writing of any change in the CUSIP or ISIN numbers.

Section 2.09.  *Registration, Transfer and Exchange*.  (a) The Notes will be issued in registered form only, without coupons, and the Issuer shall cause the Registrar to maintain a

19

register (the "**Register**") of the Notes, for registering the record ownership of the Notes by the Holders and transfers and exchanges of the Notes.

(b)    (i) Each Global Note will be registered in the name of the Depositary or its nominee and, so long as DTC is serving as the Depositary thereof, will bear the DTC Legend.

(ii)    Each Global Note will be delivered to the Trustee as custodian for the Depositary.  Transfers of a Global Note (but not a beneficial interest therein) will be limited to transfers thereof in whole, but not in part, to the Depositary, its successors or their respective nominees, except as set forth in Section 2.09(b)(iv).

(iii)    Agent Members will have no rights under this Indenture with respect to any Global Note held on their behalf by the Depositary, and the Depositary or its nominee, as the case may be, shall be treated by the Issuer, the Trustee, each Agent and any of their respective agents as the absolute owner and Holder of such Global Note for all purposes whatsoever. Notwithstanding the foregoing, the Depositary or its nominee may grant proxies and otherwise authorize any Person (including any Agent Member and any Person that holds a beneficial interest in a Global Note through an Agent Member) to take any action which a Holder is entitled to take under this Indenture or the Notes, and nothing herein will impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

(iv)    If (x) the Depositary (A) notifies the Issuer that it is unwilling or unable to continue as Depositary for a Global Note and the Depositary fails to appoint a successor depositary within 90 days of the notice or (B) has ceased to be a clearing agency registered under the Exchange Act; (y) subject to the procedures of the Depositary, the Issuer, at its option, notifies the Trustee in writing that the Issuer elects to cause the issuance of Certificated Notes or (z) there has occurred and is continuing a Default or Event of Default and the Issuer or the Trustee has received a request from the Depositary, the Issuer shall promptly exchange each beneficial interest in the Global Note for one or more Certificated Notes in authorized denominations having an equal aggregate principal amount registered in the name of the owner of such beneficial interest, as identified to the Issuer and the Trustee by the Depositary in writing, and the Trustee shall cancel the Global Note.  If the Global Note being exchanged does not bear the Restricted Legend or Regulation S Legend, as the case may be, then the Certificated Notes issued in exchange therefor will not bear the Restricted Legend or Regulation S Legend, as the case may be.  If such Global Note bears the Restricted Legend or Regulation S Legend, as the case may be, then the Certificated Notes issued in exchange therefor will bear the Restricted Legend or Regulation S Legend, as the case may be.

(c)    Each Certificated Note will be registered in the name of the Holder thereof.

(d)    A Holder may transfer a Note (or a beneficial interest therein) to another Person or exchange a Note (or a beneficial interest therein) for another Note or Notes of any authorized denomination by presenting to the Trustee a written request therefor stating the name of the proposed transferee or requesting such an exchange, accompanied by any certification, opinion or other document required by Section 2.10.  The Registrar shall promptly register any transfer

20

or exchange that meets the requirements of this Section by noting the same in the Register maintained by the Registrar for this purpose; *provided* that:

      (i)     no transfer or exchange will be effective until it is registered in such Register, and

      (ii)    the Trustee and the Registrar, as applicable, will not be required (w) to issue or register the transfer or exchange of any Note for a period of 15 days before a selection of Notes to be redeemed, (x) to register the transfer or exchange any Note so selected for redemption in whole or in part, except, in the case of a partial redemption, that portion of any Note not being redeemed, (y) to register any Note between a Regular Record Date and the corresponding Interest Payment Date, or (z) if a redemption is to occur after a Regular Record Date but on or before the corresponding Interest Payment Date, to register the transfer or exchange of any Note on or after the Regular Record Date and before the date of redemption.  Prior to the registration of any transfer, the Issuer, the Trustee, each Agent and each of their respective agents will treat the Person in whose name the Note is registered as the owner and Holder thereof for all purposes (whether or not the Note is overdue), and will not be affected by notice to the contrary.

From time to time the Issuer will execute and the Trustee will authenticate additional Notes as necessary in order to permit the registration of a transfer or exchange in accordance with this Section.

No service charge will be imposed in connection with any transfer or exchange of any Note, but the Issuer and the Trustee may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than a transfer tax or other similar governmental charge payable upon exchange pursuant to Section 2.09(b)(iv)).

      (e)    (i) *Global Note to Global Note*.  If a beneficial interest in a Global Note is transferred or exchanged for a beneficial interest in another Global Note, the Trustee will (x) record a decrease in the principal amount of the Global Note being transferred or exchanged equal to the principal amount of such transfer or exchange and (y) record a like increase in the principal amount of the other Global Note.  Any beneficial interest in one Global Note that is transferred to a Person who takes delivery in the form of an interest in another Global Note, or exchanged for an interest in another Global Note, will, upon transfer or exchange, cease to be an interest in such Global Note and become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer and exchange restrictions, if any, and other procedures applicable to beneficial interests in such other Global Note for as long as it remains such an interest.

      (ii)    *Global Note to Certificated Note*.  If a beneficial interest in a Global Note is transferred or exchanged for a Certificated Note, the Trustee will (x) record a decrease in the principal amount of such Global Note equal to the principal amount of such transfer or exchange and (y) deliver one or more new Certificated Notes in authorized denominations having an equal aggregate principal amount to the transferee (in the case of a transfer) or the owner of such beneficial interest (in the case of an exchange), registered

in the name of such transferee or owner, as applicable, as provided in writing by the Depositary.

(iii)    *Certificated Note to Global Note*.  If a Certificated Note is transferred or exchanged for a beneficial interest in a Global Note, the Trustee will (x) cancel such Certificated Note, (y) record an increase in the principal amount of such Global Note equal to the principal amount of such transfer or exchange and credit such increase to the account of the Agent Member at the Depositary as instructed in writing by the Holder of the Certificated Notes and (z) in the event that such transfer or exchange involves less than the entire principal amount of the canceled Certificated Note, deliver to the Holder thereof one or more new Certificated Notes in authorized denominations having an aggregate principal amount equal to the untransferred or unexchanged portion of the canceled Certificated Note, registered in the name of the Holder thereof.

(iv)    *Certificated Note to Certificated Note*.  If a Certificated Note is transferred or exchanged for another Certificated Note, the Trustee will (x) cancel the Certificated Note being transferred or exchanged, (y) deliver one or more new Certificated Notes in authorized denominations having an aggregate principal amount equal to the principal amount of such transfer or exchange to the transferee (in the case of a transfer) or the Holder of the canceled Certificated Note (in the case of an exchange), registered in the name of such transferee or Holder, as applicable, and (z) if such transfer or exchange involves less than the entire principal amount of the canceled Certificated Note, deliver to the Holder thereof one or more Certificated Notes in authorized denominations having an aggregate principal amount equal to the untransferred or unexchanged portion of the canceled Certificated Note, registered in the name of the Holder thereof.

Section 2.10.  *Restrictions on Transfer and Exchange*.   (a) The transfer or exchange of any Note (or a beneficial interest therein) may only be made in accordance with this Section and Section 2.09 and, in the case of a Global Note (or a beneficial interest therein), the applicable rules and procedures of the Depositary.  The Trustee shall refuse to register any requested transfer or exchange that does not comply with the preceding sentence.

(b)    Subject to Section 2.10(c), the transfer or exchange of any Note (or a beneficial interest therein) of the type set forth in column A below for a Note (or a beneficial interest therein) of the type set forth opposite column B below may only be made in compliance with the certification requirements (if any) described in the clause of this paragraph set forth opposite column C below.

| A | B | C |
|---|---|---|
| U.S. Global Note | U.S. Global Note | (1) |
| U.S. Global Note | Offshore Global Note | (2) |
| U.S. Global Note | Certificated Note | (3) |
| Offshore Global Note | U.S. Global Note | (4) |

22

| | | |
|---|---|---|
| Offshore Global Note | Offshore Global Note | (1) |
| Offshore Global Note | Certificated Note | (3) |
| Certificated Note | U.S. Global Note | (4) |
| Certificated Note | Offshore Global Note | (2) |
| Certificated Note | Certificated Note | (3) |

(1)      No certification is required.

(2)      The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee a duly completed and executed Regulation S Certificate; *provided* that if the requested transfer or exchange is made by the Holder of a Certificated Note that does not bear the Restricted Legend or Regulation S Legend, then no certification is required.

(3)      The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee (x) a duly completed and executed Rule 144A Certificate or (y) a duly completed and executed Regulation S Certificate, and/or an Opinion of Counsel and such other certifications and evidence as the Issuer may reasonably require in order to determine that the proposed transfer or exchange is being made in compliance with the Securities Act and any applicable securities laws of any state of the United States; *provided* that if the requested transfer or exchange is made by the Holder of a Certificated Note that does not bear the Restricted Legend or the Regulation S Legend, then no certification is required.  In the event that a Certificated Note that does not bear the Restricted Legend or the Regulation S Legend is surrendered for transfer or exchange, upon transfer or exchange the Trustee will deliver a Certificated Note that does not bear the Restricted Legend or the Regulation S Legend.

(4)      The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee a duly completed and executed Rule 144A Certificate.

(c)      No certification is required in connection with any transfer or exchange of any Note (or a beneficial interest therein) after such Note is eligible for resale pursuant to Rule 144(k) under the Securities Act (or a successor provision); *provided* that the Issuer has provided the Trustee with an Officer's Certificate and an Opinion of Counsel to that effect, and the Issuer may require from any Person requesting a transfer or exchange in reliance upon this clause an Opinion of Counsel and any other reasonable certifications and evidence in order to support such certificate.

Any Certificated Note delivered in reliance upon this paragraph will not bear the Restricted Legend or the Regulation S Legend, as the case may be.

(d)      The Trustee will retain copies of all certificates, opinions and other documents received in connection with the transfer or exchange of a Note (or a beneficial interest therein),

and the Issuer will have the right to inspect and make copies thereof at any reasonable time upon written notice within a reasonable period of time to the Trustee.

Section 2.11.    *Open Market Purchases*.  The Issuer or its Affiliates may at any time purchase Notes in the open market or otherwise at any price; *provided* that Notes that the Issuer or its Affiliates purchase may, in their respective discretion, be held, resold or cancelled, but will only be held or resold in compliance with applicable requirements or exemptions under the relevant securities laws.

Section 2.12.    *Trustee's Disclaimer*.  (a) The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restriction on transfer imposed under this Indenture or under applicable law with respect to any transfer of interest in any Note (including any transfers between or among participants in the Depositary or beneficial owners of interest in Global Notes) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(b)    The Trustee and the Agents shall have no responsibility or obligation to any beneficial owner of an interest in a Global Note, any Agent Member or other member of, or a participant in, the Depositary or other Person with respect to the accuracy of the records of the Depositary or any nominee or participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any Agent Member or other participant, member, beneficial owner or other Person (other than the Depositary) of any notice (including any notice of redemption or purchase) or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes. All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to or upon the order of the registered Holders (which shall be the Depositary or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through the Depositary, subject to its applicable rules and procedures. The Trustee and Agents may rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its Agent Members and other members, participants and any beneficial owners. The Depositary (or its nominee) may be treated by the Trustee and the Agents as the owner of the Global Note for all purposes whatsoever.

(c)    Neither the Trustee nor any Agent shall have any responsibility or liability for any actions taken or not taken by the Depositary.

ARTICLE 3
ADDITIONAL AMOUNTS; REDEMPTION

Section 3.01.    *Additional Amounts*.  (a) All payments by the Issuer in respect of the Notes or by a Guarantor in respect of its Note Guarantee will be made without withholding or deduction for or on account of any present or future taxes, duties, assessments, fees or other governmental charges of whatever nature (and any fines, penalties or interests related thereto) imposed or levied by or on behalf of Luxembourg, Brazil or any authority therein or thereof or

24

any other jurisdiction or political subdivision thereof from or through which a payment is made or in which the Issuer or a Guarantor (or any successor to the Issuer or Guarantor) is organized or is a resident for tax purposes (a "**Relevant Taxing Jurisdiction**"), unless the Issuer or Guarantor, as applicable, is required by law to deduct or withhold such taxes, duties, assessments, fees or governmental charges.  In that event, the Issuer or Guarantor, as applicable, will make the required deduction or withholding, make payment of the amount so deducted or withheld to the appropriate governmental authority and pay such additional amounts as may be necessary to ensure that the net amounts received by Holders of Notes after such withholding or deduction equal the amounts that would have been received in respect of the Notes in the absence of such withholding or deduction (the "**Additional Amounts**").  However, no Additional Amounts shall be payable:

(i)      to, or to a third party on behalf of, a Holder or beneficial owner where the Holder or beneficial owner is liable for any present or future taxes, duties, assessments, fees or other governmental charges in respect of a Note by reason of the existence of any present or former connection between the Holder or beneficial owner (or between a fiduciary, settlor, beneficiary, partner, member or shareholder of the Holder or beneficial owner, if the Holder or beneficial owner is an estate, a trust, a partnership, a limited liability company or a corporation) and the Relevant Taxing Jurisdiction, including, without limitation, the Holder or beneficial owner (or the Holder's or the beneficial owner's fiduciary, settlor, beneficiary, partner, member or shareholder) being or having been a citizen or resident thereof, being or having been engaged or deemed to be engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, other than the mere holding of the Note or the enforcement of rights and the receipt of payments with respect to the Note;

(ii)      in respect of any present or future tax, duty, assessment, fee or other governmental charge that would not have been so imposed but for the presentation by the Holder or beneficial owner of a Note, where presentation is required, for payment on a date more than 30 days after the date on which such payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later;

(iii)      in respect of any present or future tax, duty, assessment, fee or other governmental charge that would not have been so imposed but for the failure by the Holder or beneficial owner of the Note to comply with any certification, identification or other reporting requirement concerning such Holder's or beneficial owner's nationality, residence, identity or connection with the Relevant Taxing Jurisdiction, if (1) compliance is required by the Relevant Taxing Jurisdiction as a precondition to relief or exemption from, or reduction in the rate of, all or part of the tax, duty, assessment, fee or other governmental charge and (2) the Issuer or Guarantor has given at least 30 days' notice that Holders or beneficial owners will be required to comply with such requirement;

(iv)      in relation to the application of the Luxembourg law of 23 December 2005, as amended from time to time, introducing a 20% withholding tax on certain interest and similar income payments made or deemed to be made for the immediate benefit of individuals resident in Luxembourg;

(v)    in respect of any registration tax, stamp duty or any other similar documentary tax or duty, fixed or ad valorem, in Luxembourg, in connection (i) with the performance by the Issuer of its obligations under the Notes or any Guarantor in respect of its Note Guarantee; or (ii) with the registration of the Notes by the Holder or beneficial owner, or by a third party on his behalf, before the Registration and Estates Department (*Administration de l'enregistrement, des domaines et de la TVA*) in Luxembourg where this registration is not required by law (including for the enforcement of rights and the receipt of payments with respect to the Notes);

(vi)    in respect of any present or future tax, duty, assessment, fee or other governmental charge imposed on a Note presented for payment by or on behalf of a Holder or beneficial owner where the Holder or beneficial owner would have been able to avoid the withholding or deduction by presenting the relevant Note to another Paying Agent;

(vii)    in respect of any estate, inheritance, gift, sales, use, transfer, capital gains, excise or personal property or similar tax, duty, assessment, fee or other governmental charge;

(viii)    in respect of any tax, duty, assessment, fee or other governmental charge that is payable otherwise than by deduction or withholding from payments of principal of, premium, if any, or interest on a Note or by direct payment by the Issuer or a Guarantor in respect of claims made against the Issuer or such Guarantor in respect of such payments on a Note;

(ix)    in respect of any tax, duty, assessment, fee or other governmental charge imposed or withheld pursuant to Sections 1471 through 1474 of the Code, as of the Issue Date (or any amended or successor version), current or future U.S. treasury regulations issued thereunder or any official interpretation thereof, any agreement entered into pursuant to Section 1471(b) of the Code, or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code ("**FATCA**"); or

(x)    in respect of any combination of the above.

(b)    In addition, no Additional Amounts shall be paid with respect to any payment on a Note or Note Guarantee to a Holder who is a fiduciary, a partnership, a limited liability company or other than the sole beneficial owner of that payment to the extent that payment on the Note or Note Guarantee would be required by the laws of the Relevant Taxing Jurisdiction to be included in the income, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, a member of the partnership, an interest holder in the limited liability company or a beneficial owner who would not have been entitled to the Additional Amounts had that beneficiary, settlor, member, interest holder or beneficial owner been the Holder.  Except as specifically provided above, neither the Issuer nor any Guarantor shall be required to make any payment with respect to any tax, duty, assessment, fee or other governmental charge imposed by any government or political subdivision or taxing authority thereof or therein.

(c)     In the event that Additional Amounts actually paid with respect to the Notes, as described above, are based on rates of deduction or withholding of taxes in excess of the appropriate rate applicable to the Holder of such Notes, and, as a result thereof the Holder is entitled to make a claim for a refund or credit of the excess from the authority imposing the withholding tax, then the Holder shall, by accepting the Notes, be deemed to have assigned and transferred all right, title, and interest to any such claim for a refund or credit of such excess to the Issuer or Guarantor, as the case may be. However, by making such assignment, the Holder or beneficial owner makes no representation or warranty that the Issuer or Guarantor, as the case may be, shall be entitled to receive such claim for refund or credit and incurs no other obligation (including, for the avoidance of doubt, any filing or other action) with respect thereto.

(d)     Any reference in this Indenture or the Notes to principal, premium, if any, interest or any other amount payable in respect of the Notes by the Issuer or the Note Guarantees by the Guarantors will, unless the Additional Amounts are explicitly already named in such context, be deemed also to refer to any Additional Amounts that may be payable with respect to that amount under the obligations referred to in this Section.

(e)     The Issuer or the relevant Guarantor, as the case may be, shall use reasonable efforts to furnish to the Trustee the official receipts (or a copy of the official receipts) evidencing payment of any taxes deducted or withheld from payments in respect of the Notes or the Note Guarantees, as the case may be (or other evidence of payment reasonably satisfactory to the Trustee). Copies of such receipts or other evidence of payment shall be made available to Holders by the Trustee upon written request.

(f)     The foregoing obligations  shall survive termination or discharge of this Indenture, payment of the Notes and/or the resignation or removal of the Trustee or any agent hereunder, and shall apply *mutatis mutandis* to any jurisdiction or political subdivision thereof in which any successor to the Issuer or a Guarantor is organized or is a resident for tax purposes.

Section 3.02.  *Optional Redemption*.

(a)     At any time before  December 5, 2033, which is the date that is three months prior to the maturity of the Notes (the "**Par Call Date**"), the Issuer or any Guarantor may redeem the Notes at its option, in whole or in part, at any time and from time to time, at a redemption price (expressed as a percentage of principal amount and rounded to three decimal places) equal to the greater of:  (i) (a) the sum of the present values of the remaining scheduled payments of principal and interest thereon  discounted to the redemption date (assuming the Notes matured on the Par Call Date) on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 35 basis points, less (b) interest accrued to, but excluding, the date of redemption, and (ii) 100% of the principal amount of the Notes to be redeemed, *plus*, in either case, accrued and unpaid interest thereon to, but excluding, the redemption date.

(b)     On or after the Par Call Date, the Issuer or a Guarantor may redeem the Notes, in whole or in part, at any time and from time to time, at a redemption price equal to 100% of

the principal amount of the Notes being redeemed plus accrued and unpaid interest thereon to, but excluding, the redemption date.

(c)     Raízen's actions and determinations in determining the redemption price shall be conclusive and binding for all purposes, absent manifest error. The Trustee shall have no obligation to calculate or verify any redemption price, make-whole premium or any component thereof.

Section 3.03.  *Redemption for Taxation Reasons*. If as a result of any change in or amendment to the laws or any applicable treaties (or any rules or regulations promulgated thereunder) of a Relevant Taxing Jurisdiction, or any amendment to or change in official position regarding the application, interpretation or administration of such laws, treaties, rules, or regulations (including a holding by a court of competent jurisdiction), which change or amendment becomes effective or, in the case of a change in official position, is announced on or after the Issue Date (or, if later, the date a Relevant Taxing Jurisdiction becomes a Relevant Taxing Jurisdiction), (i) the Issuer or any successor thereof has or will become obligated to pay Additional Amounts as described above in Section 3.01 with respect to the Notes or (ii) any Guarantor or any successor thereof has or will become obligated to pay Additional Amounts as described above in Section 3.01 with respect to a Note Guarantee in excess of the Additional Amounts such Guarantor or successor, as the case may be, would be obligated to pay if payments in respect of the Note Guarantee were subject to withholding or deduction at a rate of 15% (or a rate of 25% if the Holder of the Notes is resident in a Low or Nil Tax Jurisdiction) (the "**Excess Additional Amounts**"), the Issuer, Guarantor or any successor thereof may, at its option, redeem all, but not less than all, of the Notes, at a redemption price equal to 100% of their principal amount then Outstanding, together with interest accrued to, but excluding, the date fixed for redemption, upon delivery of irrevocable notice of redemption to the Holders not fewer than ten days nor more than 90 days prior to the date fixed for redemption.  No notice of such redemption may be given earlier than 90 days prior to the earliest date on which the Issuer, Guarantor or any successor thereof would, but for such redemption, be obligated to pay such Additional Amounts or Excess Additional Amounts. Notwithstanding the foregoing, the Issuer, Guarantor or any successor thereof shall not have the right so to redeem the Notes unless: (i) the obligation to pay such Additional Amounts or Excess Additional Amounts cannot be avoided by the Issuer or Guarantor (or successor) taking reasonable measures and (ii) the Issuer or Guarantor (or successor) has complied with all necessary regulations to legally effect such redemption; *provided*, *however*, that for this purpose reasonable measures shall not include any change in the Issuer's or any Guarantor's or any successor's jurisdiction of incorporation or organization or location of its principal executive or registered office.

Section 3.04.  *Redemption Following Tender Offer.* Notwithstanding the provisions of Sections 3.02 or 3.03, in connection with any tender offer for the Notes (including an Offer to Purchase in connection with a Change of Control that results in a Rating Decline made in accordance with the terms of this Indenture), in the event that the Holders of not less than 85% of the aggregate principal amount of the Outstanding Notes validly tender and do not validly withdraw Notes in such tender offer and the Issuer, or any other Person making such offer in lieu of the Issuer, purchases all of the Notes validly tendered and not validly withdrawn by such Holders, then the Issuer or any Guarantor shall have the right, on not less than five nor more than 60 days' prior notice to the Holders (with a copy to the Trustee), to redeem all of the Notes that

28

remain Outstanding at a redemption price equal to the purchase price paid to each other Holder in such tender offer plus, to the extent not included in the purchase price, accrued and unpaid interest and Additional Amounts, if any, on the Notes that remain Outstanding, to, but excluding, the date of redemption.

Section 3.05.  *Election to Redeem; Selection of Notes*. (a) In the event that the Issuer, a Guarantor or any successor thereof elects to redeem the Notes, prior to delivery of a notice of redemption to the Holders of the Notes, it will deliver to the Trustee: (1) an Officer's Certificate stating that the Issuer, such Guarantor or such successor, as the case may be, is entitled to redeem the Notes pursuant to the terms hereof and setting forth a statement of facts showing that the condition or conditions precedent to the right of the Issuer, such Guarantor or such successor, as the case may be, so to redeem have occurred or been satisfied; and (2) in respect of a redemption pursuant to Section 3.03, an Opinion of Counsel in the applicable Relevant Taxing Jurisdiction to the effect that (i) the Issuer, such Guarantor or such successor, as applicable, has or will become obligated to pay Additional Amounts or Excess Additional Amounts, as the case may be, (ii) the Issuer, such Guarantor or such successor, as applicable, cannot avoid payment of such Additional Amounts or Excess Additional Amounts, as the case may be, by taking reasonable measures available to it and (iii) all governmental approvals necessary for the Issuer, such Guarantor or such successor, as applicable, to effect the redemption have been obtained and are in full force and effect.  The Trustee shall accept such Officer's Certificate and, if required, Opinion of Counsel as sufficient evidence of satisfaction of the conditions precedent described above, in which case, it shall be conclusive and binding upon the Holders of the Notes.

(b)      If less than all the Notes are to be redeemed at any time, selection of Certificated Notes for redemption shall be made by the Trustee in compliance with the requirements governing redemptions of the principal securities exchange, if any, on which the Notes are listed or if such securities exchange has no requirement governing redemption or the Notes are not then listed on a securities exchange, on a pro rata basis by lot (or, in the case of Global Notes, selection of Notes for redemption shall be made by the Depositary in accordance with its applicable procedures). If Notes are redeemed in part, the remaining outstanding amount of any Note must be at least equal to US$200,000 and be an integral multiple of US$1,000.

Section 3.06.  *Notice of Redemption*.  (a) The Issuer or a Guarantor shall deliver a notice of redemption to each Holder (which, in the case of Global Notes, will be the Depositary) and the Trustee by, in the case of Certificated Notes, first-class mail, postage prepaid, to the address of each Holder as it appears on the register maintained by the Registrar or, in the case of Global Notes by electronic delivery, in each case, at least five days but not more than 60 days prior to the redemption date (or, in the case of a redemption described in Section 3.03, at least ten days but not more than 90 days prior to the redemption date).  A notice of redemption pursuant to Sections 3.02 and 3.04 may, at the discretion of the Issuer or Guarantor, be conditional. If such redemption or notice is subject to satisfaction of one or more conditions precedent, such notice shall state that, in the Issuer's or Guarantor's discretion, the redemption date may be delayed until such time (but no more than 60 days after the date of the notice of redemption) as any or all such conditions shall be satisfied (or waived by the Issuer or such Guarantor in its sole discretion) and a new redemption date shall be set by the Issuer or such Guarantor in accordance with applicable Depositary procedures, or such redemption may not occur and such notice may be rescinded in the event that any or all such conditions shall not have

29

been satisfied (or waived by the Issuer or such Guarantor in its sole discretion) by the redemption date, or by the redemption date as so delayed. A notice of redemption pursuant to Section 3.03 shall be irrevocable.

(b)    Each notice will identify the Notes (including the CUSIP number) to be redeemed and will state:

(1)    the redemption date;

(2)    the amount to be redeemed and the redemption price;

(3)    if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the redemption date upon surrender of a Certificated Note, a new Certificated Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Certificated Note;

(4)    the name and address of the Paying Agent;

(5)    that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(6)    that, unless the Issuer or Guarantor, as applicable, defaults in the payment of the redemption price, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(7)    the paragraph or sub-paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed;

(8)    that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes; and

(9)    any conditions precedent to such redemption.

(c)    At the Issuer's request, the Trustee will give the notice of redemption in the Issuer's name and at its expense; *provided*, *however*, that the Issuer has delivered to the Trustee, at least five days prior to the date notice of redemption is to be delivered to the Holders (or such shorter period as the Trustee shall agree), an Officer's Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph. For so long as the Notes are held by the Depositary, the redemption of the Notes shall be conducted in accordance with the policies and procedures of the Depositary.

(d)    The Issuer or a Guarantor may enter into an arrangement under which a Subsidiary of Raízen may, in lieu of redemption by the Issuer or such Guarantor, redeem any Notes on the terms set forth (and pursuant to provisions described) in this Article 3.

Section 3.07.  *Deposit of Redemption Price*.  Prior to 11:00 A.M. (New York City time) on the Business Day prior to the redemption date, the Issuer, Guarantor or successor thereof will deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption price of, and accrued and unpaid interest, if any, and any premium and Additional Amounts, if any, on, all Notes to be redeemed on that date.  The Trustee or the Paying Agent will promptly return to the Issuer, Guarantor or successor thereof upon written request any money deposited with the Trustee or the Paying Agent by the Issuer, Guarantor or successor thereof in excess of the amounts necessary to pay the redemption price of, and accrued and unpaid interest, if any, and any premium and Additional Amounts, if any, on, all Notes to be redeemed.

Section 3.08.  *Effect of Notice of Redemption*.  Upon surrender of any Note for redemption in accordance with a redemption notice, such Note shall be paid by the Issuer or the Guarantor at the redemption price, together with accrued interest, if any, to (but excluding) the redemption date (subject to the satisfaction of any applicable condition or conditions precedent set forth in such notice) and from and after such date (except in the event of a Default in the payment of the redemption price) such Notes shall cease to bear interest; *provided*, *however*, that installments of interest payable on or prior to the redemption date shall be payable to the Holders of such Notes registered as such at the close of business on the relevant Regular Record Date according to their terms.  If any Note to be redeemed shall not be so paid upon surrender thereof in accordance with the Issuer's or Guarantor's instructions for redemption, the principal shall, until paid, bear interest from the redemption date at the rate borne by the Notes.

ARTICLE 4
COVENANTS

Section 4.01.  *Payment of Notes*.  (a) The Issuer agrees to pay the principal of and interest (including, without limitation, any Additional Amounts, if any) on the Notes on the dates and in the manner provided in the Notes and this Indenture.  Not later than 11:00 A.M. (New York City time) on the Business Day (solely in New York City) immediately prior to the due date of the payment of any principal of or interest on any Notes, or any redemption of the Notes, the Issuer shall deposit with the Paying Agent Dollars in immediately available funds sufficient to pay such amounts, *provided* that if the Issuer or any Affiliate of the Issuer is acting as a Paying Agent, it shall, on or before each due date, segregate and hold in a separate trust fund for the benefit of the Holders a sum of Dollars sufficient to pay such amounts until paid to such Holders or otherwise disposed of as provided in this Indenture.  In each case, the Issuer shall promptly notify the Trustee in writing of its compliance with this Section 4.01.

(b)    Payments made on the Notes will be applied first to interest due and payable on the Notes and then to the reduction of the unpaid principal amount of the Notes.  An installment of principal or interest will be considered paid on the date due if the Trustee (or Paying Agent, other than the Issuer or any Affiliate of the Issuer) holds on that date Dollars designated for and sufficient to pay the installment and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the Holders on that date pursuant to the terms of this Indenture.  If the Issuer or any Affiliate of the Issuer acts as a Paying Agent, an installment of principal or interest will be considered paid on the due date only if paid to the Holders.

31

(c)     Each payment in full of principal, redemption amount, Additional Amounts and/or interest payable in respect of any Note made by or on behalf of the Issuer to or to the order of the Paying Agent in the manner specified in the Notes and this Indenture on the date due shall be valid and effective to satisfy and discharge the obligation of the Issuer to make payment of principal, redemption amount, Additional Amounts and/or interest payable in respect of any Note on such date, *provided*, *however*, that the liability of the Paying Agent hereunder shall not exceed any amounts paid to it by the Issuer, or held by it, on behalf of the Holders under this Indenture; and *provided, further*, that, in the event that there is a default by the Paying Agent in any payment of principal, redemption amount, Additional Amounts and/or interest in respect of any Note in accordance with the Notes and this Indenture, the Issuer shall pay on demand such further amounts as will result in receipt by the Holder of such amounts as would have been received by it had no such default occurred.

(d)     The Issuer agrees to pay interest on overdue principal, and to the extent lawful, overdue installments of interest at the rate per annum specified in the Notes (1% per annum in excess of the rate per annum borne by the Notes).  Any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the second day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least two days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.

(e)     Payments in respect of the Notes represented by the Certificated Notes (including principal, interest and Additional Amounts, if any) will be made at the specified office or agency of one or more Paying Agents in New York City. At the Issuer's option, interest on Certificated Notes may be paid by Dollars check drawn on a bank in New York City and mailed to the Holder of the Certificated Notes at its registered address. Upon written notice from a Holder of at least US$1.0 million in aggregate principal amount of Certificated Notes to the specified office of any Paying Agent not less than 15 days before the due date for any payment in respect of a Certificated Note, such payment may be made by wire transfer to a Dollar account maintained by the payee with a bank in New York City.

(f)     Payments in respect of the Notes represented by the Global Notes (including principal, interest and Additional Amounts, if any) are to be made by wire transfer of immediately available funds in such coin or currency of the United States as at the time of payment will be legal tender for the payment of public and private debts, to the accounts specified by the Depositary in accordance with is applicable procedures.

Section 4.02.  *Maintenance of Office or Agency*.  The Issuer shall maintain in the Borough of Manhattan, the City of New York, an office or agency where Notes may be surrendered for registration of transfer or exchange or for presentation for payment and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture (other than the type contemplated by Section 11.07) may be served.  The Issuer hereby initially designates the Corporate Trust Office of the Trustee as such office of the Issuer.  The Issuer shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Issuer fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands

32

(other than any presentations, surrenders, notices and demands service in accordance with Section 11.07(b)) may be made or served to the Trustee.  At any time that the Notes are listed on the Official List of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market, the Issuer will maintain an office or agent in Luxembourg to serve as Luxembourg transfer agent if and to the extent required by the rules of the Official List of the Luxembourg Stock Exchange.

The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be surrendered or presented for any of such purposes and may from time to time rescind such designations.  The Issuer shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

Section 4.03.  *Existence*.  Each of the Guarantors shall preserve and maintain in full force and effect its existence and the existence of the Significant Subsidiaries in accordance with their respective organizational documents, and the rights, licenses and franchises of each of the Guarantors and the Significant Subsidiaries, except, in each case, where the failure to do so would not, individually or in the aggregate, result in any Material Adverse Effect, *provided* that neither Guarantor is required to preserve any such right, license or franchise, or the existence of the Significant Subsidiaries, if the maintenance or preservation thereof is no longer desirable in the conduct of the business of Raízen and its Subsidiaries taken as a whole in its judgment; and *provided*, *further*, that this Section does not prohibit any transaction otherwise permitted by Section 5.01.

Section 4.04.  *Payment of Taxes*.  Each of the Guarantors will timely file all required tax returns required to be filed by it and pay and discharge (including by payment in installments or through offsetting with tax credits or otherwise) at or before maturity all of its material tax obligations (except where such tax obligations are contested in good faith and by proper proceedings and against which adequate reserves are being maintained to the extent required by Applicable GAAP), except where the failure to do so would not, individually or in the aggregate, result in a Material Adverse Effect.

Section 4.05.  *Maintenance of Properties*.  Each of the Guarantors will cause all properties used or useful in its business or the business of any of the Significant Subsidiaries to be maintained and kept in good condition, repair and working order in the judgment of such Guarantor, ordinary wear and tear excepted, except to the extent that the failure to do so would not, individually or in the aggregate, have a Material Adverse Effect; *provided* that nothing in this Section prevents either Guarantor or any Significant Subsidiary from discontinuing the use, operation or maintenance of any of such properties or disposing of any of them, if such discontinuance or disposal is, in the judgment of such Guarantor, desirable in the conduct of the business of Raizen and its Subsidiaries taken as a whole.

Section 4.06.  *Repurchases at the Option of the Holders Upon Change of Control*.

(a)      If a Change of Control that results in a Rating Decline occurs, not later than 30 days following such an occurrence, the Issuer or any Guarantor, shall make, directly or through a Designated Affiliate, an offer to purchase all of the Outstanding Notes (the "**Offer to Purchase**") at a purchase price (the "**Offer to Purchase Payment**") equal to 101% of the principal amount thereof plus accrued and unpaid interest thereon and Additional Amounts, if

any, to, but excluding, the Offer to Purchase Payment Date (as defined below). An Offer to Purchase shall be made by written offer to the Holders of Notes (a copy of which shall be delivered to the Trustee) at the address of such Holder appearing in the Register or otherwise in accordance with the procedures of the Depositary with the following information:

(i)      a description of the transaction or transactions that constitute the Change of Control;

(ii)      the principal amount of Notes subject to the Offer to Purchase and the Offer to Purchase Payment;

(iii)      that an Offer to Purchase is being made pursuant to this Section 4.06 and that all Notes validly tendered and not validly withdrawn pursuant to such Offer to Purchase will be accepted for payment;

(iv)      that a Holder may tender all or any portion of its Notes pursuant to such Offer to Purchase, subject to the requirement that if a Holder tenders only a portion of its Notes, the remaining Notes must be no less than US$200,000 in principal amount and in integral multiples of US$1,000 in excess thereof;

(v)      an expiration date (the "**Expiration Date**") of the Offer to Purchase, which will be not less than 30 days nor more than 60 days after the date of the Offer to Purchase, and an indicative settlement date for purchase (the "**Offer to Purchase Payment Date**"), which will be not more than five Business Days after the Expiration Date;

(vi)      that any Note not properly tendered will remain Outstanding and continue to accrue interest;

(vii)      that unless the Issuer, Guarantor or Designated Affiliate, as the case may be, defaults in the payment of the Offer to Purchase Payment on the Offer to Purchase Payment Date, interest on all Notes accepted for payment pursuant to the Offer to Purchase will cease to accrue on and after the Offer to Purchase Payment Date;

(viii)      that Holders electing to have any Notes purchased pursuant to an Offer to Purchase will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the Paying Agent specified in the Offer to Purchase at the address specified in the Offer to Purchase (or, in the case of Global Notes, tender such Notes in accordance with the applicable procedures of the Depositary), in each case, on or prior to the Expiration Date;

(ix)      that Holders shall be entitled to withdraw their tendered Notes and their election to require the Issuer, Guarantor or Designated Affiliate, as the case may be, to purchase such Notes; *provided* that the Paying Agent receives, prior to the Expiration Date, a written statement setting forth the name of the Holder of the Notes, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased (or, in the case of Global Notes, a notice of withdrawal of such Notes is delivered in accordance with the applicable procedures of the Depositary); and

(x)      that, if any Note was purchased only in part, (x) in the case of a Global Note, appropriate adjustments to the amount and beneficial interests in a Global Note will be made, and (y) in the case of a Certificated Note, a new Certificated Note or Notes in principal amount equal to the unpurchased portion of the original Certificated Note representing the same indebtedness to the extent not purchased will be issued in the name of the Holder of such Certificated Note upon cancellation of the original Certificated Note; provided that each such new Note will be in a principal amount of US$200,000 or an integral multiple of US$1,000 in excess thereof.

The Offer to Purchase shall also contain instructions and any materials necessary to enable Holders to tender Notes pursuant thereto. If (1) notice is given in a manner provided in this Section 4.06 and (2) any Holder fails to receive such notice or a Holder receives such notice but it is defective, such Holder's failure to receive such notice or such defect shall not affect the validity of the Offer to Purchase as to all other Holders that properly received such without defect.

(b)      On the Business Day immediately preceding the Offer to Purchase Payment Date, the Issuer, a Guarantor or a Designated Affiliate shall, to the extent lawful, deposit with such Paying Agent an amount equal to the aggregate Offer to Purchase Payment in respect of all Notes or portions thereof so tendered.  On the Offer to Purchase Payment Date, the Issuer, a Guarantor or a Designated Affiliate shall, to the extent lawful,

(i)      accept for payment for all Notes properly tendered and not withdrawn pursuant to the Offer to Purchase; and;

(ii)      deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate stating that such Notes or portions thereof have been tendered to and purchased by the Issuer, Guarantor or a Designated Affiliate.

(c)      The Paying Agent shall promptly deliver to each Holder the Offer to Purchase Payment for its Notes that have been accepted for payment in the Offer to Purchase, and, in the case of Certificated Notes purchased in part, the Trustee shall promptly authenticate and deliver to each Holder a new Certificated Note equal in principal amount to any unpurchased portion of the Certificated Notes surrendered, if any; *provided* that each such new Certificated Note will be in a principal amount of US$200,000 or an integral multiple of US$1,000 in excess thereof.

(d)      Notwithstanding Section 4.06(a), the Issuer shall not be required to make an Offer to Purchase upon a Change of Control that results in a Rating Decline if (i) a third party makes an offer to purchase in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 4.06 applicable to an Offer to Purchase made by the Issuer, Guarantor or Designated Affiliate and purchases all Notes properly tendered and not withdrawn under such offer, or (ii) a notice of redemption for all Outstanding Notes has been given pursuant to Section 3.02, Section 3.03 or Section 3.04, unless and until there is a Default in payment of the applicable redemption price.  Notwithstanding anything to the contrary contained herein, an Offer to Purchase may be made in advance of a Change of Control, conditioned upon the consummation of such Change of Control and the occurrence of such

35

Rating Decline, if a definitive agreement is in place for the Change of Control at the time the Offer to Purchase is made.

(e)     The Issuer, Guarantor or Designated Affiliate, as applicable, will comply with Rule 14e-1 under the Exchange Act (to the extent applicable) and all other applicable laws in making any Offer to Purchase.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the provisions of this Indenture and paragraph 3 of the Notes shall be deemed to be modified to the extent necessary to permit such compliance.  If the provisions of such securities laws or regulations cannot be complied with as a result of such deemed modifications, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.06 or paragraph 3 of the Notes by virtue thereof.

Section 4.07.   *Limitation on Liens*.  (a) The Guarantors agree that, for so long as any Note remains Outstanding, each Guarantor will not, and will not permit any Significant Subsidiary to, directly or indirectly, incur or permit to exist any Lien of any nature whatsoever securing the payment of Debt on any of its Property, whether owned at the Issue Date or thereafter acquired, other than Permitted Liens, without effectively providing that the Notes or the Note Guarantees, as applicable, are secured equally and ratably with (or, if the obligation to be secured by the Lien is subordinated in right of payment to the Notes or the Note Guarantees, prior to) the obligations so secured for so long as such obligations are so secured.

(b)     Notwithstanding the foregoing, any Lien securing the Notes or the Note Guarantees granted pursuant to this Section 4.07 shall be automatically and unconditionally released and discharged upon the release by the holders of the Debt described in Section 4.07(a) of their Lien on the Property of the relevant Guarantor or any Significant Subsidiary (including any deemed release upon payment in full of all obligations under such Debt) at such time as the holders of all such Debt also release their Lien on the Property of such Guarantor or such Significant Subsidiary or upon any sale, exchange or transfer to any Person that is not an Affiliate of such Guarantor of the Property secured by such Lien, or of all of the Capital Stock held by such Guarantor or any Subsidiary in, or all or substantially all the assets of, any Significant Subsidiary creating such Lien.

Section 4.08.   *Reporting Requirements*.  (a) Raízen shall furnish to the Trustee for delivery to Holders of the Notes, upon their written request thereof:

(i)     as soon as available and in any event no later than 120 days after the last day of its fiscal year (commencing with the fiscal year ending March 31, 2024), its annual audited consolidated financial statements in English as at and for the fiscal year then ended, prepared in accordance with Applicable GAAP, together with the audit report thereon;

(ii)     as soon as available and in any event within 90 days after the end of the first three fiscal quarters of each fiscal year, its quarterly unaudited consolidated financial statements in English prepared in accordance with Applicable GAAP, accompanied by a "limited review" (*revisão limitada*) report thereon; and

(iii)   within ten Business Days after becoming aware of the occurrence of an Event of Default, an Officer's Certificate setting forth the details of the Event of Default, and the action which the Issuer or Guarantor, as applicable, is taking or proposes to take with respect thereto.

(b)   Notwithstanding the foregoing, if Raízen makes available the information described in clauses (i) and (ii) above on its website or the website of a Subsidiary of Raízen, it will be deemed to have satisfied the reporting requirement set forth in clauses (i) and (ii) above.  It is understood that the Trustee shall have no obligation whatsoever to determine whether such information, documents or reports have been delivered as described above or posted on any website.

(c)   For so long as any Notes remain Outstanding, the Issuer will make available to any Noteholder or beneficial owner of an interest in the Notes, or to any prospective purchasers designated by such Noteholder or beneficial owner, upon request of such Noteholder or beneficial owner, information required to be delivered under paragraph (d)(4) of Rule 144A unless, at the time of such request, the Issuer is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, or is exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act.

(d)   Delivery of any such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt thereof shall not constitute actual or constructive notice or knowledge of any information contained therein or determinable for information contained therein, including the Issuer's, any Guarantor's and/or any other Person's compliance with any of the covenants under this Indenture (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

Section 4.09.   *Disclosure of Names and Addresses of Holders*.  Every Holder, by receiving and holding a Note, agrees with the Issuer, the Guarantors and the Trustee that neither the Issuer, nor any Guarantor nor the Trustee nor any Agent shall be held accountable by reason of the disclosure of any information as to the names and addresses of the Holders in accordance with TIA Section 312, regardless of the source from which such information was derived, and that the Trustee shall not be held accountable by reason of mailing any material pursuant to a request made under TIA Section 312(b).

Section 4.10.   *Paying Agent and Transfer Agent*.  (a) The Issuer agrees, for the benefit of the Holders from time to time of the Notes, that, until all of the Notes are no longer Outstanding or until funds in Dollars for the payment of all of the principal of and interest on all Notes (and Additional Amounts, if any) shall have been made available at the Corporate Trust Office, and shall have been returned to the Issuer as provided herein, whichever occurs earlier, there shall at all times be a Paying Agent and Transfer Agent hereunder.  Each of the Paying Agent and the Transfer Agent shall have the respective powers and authority granted to and conferred upon it herein and in the Notes.

(b)   The Issuer hereby initially appoints the Paying Agent and Transfer Agent defined in this Indenture as such.  The Paying Agent shall arrange for the payment, from funds

furnished by the Issuer to the Paying Agent pursuant to this Indenture, of the principal of and interest on the Notes (and Additional Amounts, if any, with respect to the Notes).

Section 4.11. *Limitation on Issuer*. The Guarantors shall own, at all times, directly or indirectly, at least 75% of the Voting Stock of the Issuer.

ARTICLE 5
CONSOLIDATION, MERGER OR SALE OF ASSETS

Section 5.01. *Consolidation, Merger or Sale of Assets*. (a) Each of the Issuer and the Guarantors shall not consolidate with or merge with or into any other Person or sell, convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all of its Property (determined on the basis of the consolidated assets of Raízen and its Subsidiaries) to any other Person (other than the Issuer or a Guarantor), unless:

(i)     the Person (if not the Issuer or a Guarantor) formed by such merger or consolidation or the Person (if not the Issuer or a Guarantor) which acquired by sale, conveyance, transfer or lease all or substantially all of the Property of the Issuer or a Guarantor (the "**Successor Corporation**") expressly assumes by supplemental indenture the due and punctual payment of the principal of and interest (and Additional Amounts) on all of the Notes or such Guarantor's Note Guarantee, as applicable, the performance or observance of every covenant of the Issuer or Guarantor, as applicable, and all other obligations of the Issuer or Guarantor, as applicable, under this Indenture and the Notes or such Guarantor's Note Guarantee, as applicable;

(ii)    immediately after giving effect to such transaction, no Event of Default with respect to any Note shall have occurred and be continuing; and

(iii)   the Issuer or such Guarantor, as applicable, or the Successor Corporation, as the case may be, shall deliver to the Trustee an Opinion of Counsel to the effect that such consolidation, merger, sale, conveyance, transfer or lease and such supplemental indenture (if required) comply with these conditions, that such supplemental indenture (if required) has been duly authorized, executed and delivered and constitutes valid and binding obligations of the Successor Corporation and that all conditions precedent herein provided or relating to such transaction and such supplemental indenture (if required) have been complied with.

(b)     Notwithstanding anything to the contrary in the foregoing, the following transactions shall not be subject to Section 5.01(a)(ii):

(i)     any merger or consolidation by the Issuer or any Guarantor with or into any Subsidiary of the Issuer or any Guarantor; and

(ii)    any sale, conveyance, transfer or lease by the Issuer or any Guarantor, in one transaction or in a series of transactions, directly or indirectly, of all or substantially all of its Property (determined on the basis of the consolidated assets of Raízen and its Subsidiaries) to any Subsidiaries of the Issuer or any Guarantor.

(c)     Notwithstanding anything to the contrary in the foregoing, any merger or consolidation, in which the surviving entity is the Issuer or a Guarantor, or sale, conveyance, transfer or lease to the Issuer or a Guarantor will not be subject to this Section 5.01.

(d)     Upon any consolidation, merger, sale, conveyance, transfer or lease in accordance with these conditions, the Successor Corporation shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer or Guarantor, as applicable, under this Indenture and the Notes or such Guarantor's Note Guarantee, as applicable, with the same effect as if the Successor Corporation had been named as the Issuer or the Guarantor of the Notes herein.  No Successor Corporation shall have the right to redeem the Notes unless the Issuer or any Guarantor would have been entitled to redeem the Notes in similar circumstances.

ARTICLE 6
DEFAULT AND REMEDIES

Section 6.01.  *Events of Default*.  (a) The occurrence of one or more of the following events shall constitute an "Event of Default":

(i)     the Issuer or a Guarantor fails to pay any interest (including any related Additional Amounts) on any of the Notes when the same becomes due and payable, and such Default continues for a period of 30 days;

(ii)     the Issuer or a Guarantor fails to pay the principal (including premium, if any, and any related Additional Amounts) of any of the Notes when the same becomes due and payable, upon redemption, or otherwise, and in the case of technical or administrative difficulties in the payment of principal, only if such Default persists for a period of more than five Business Days;

(iii)     the Issuer or a Guarantor fails to perform or observe any other covenant or obligation in the Notes or in this Indenture and such Default continues for a period of more than 90 consecutive days after written notice to the Issuer and/or Guarantor, as the case may be, by the Trustee, or to the Issuer or Guarantor and the Trustee by the Holders of 25% or more in aggregate principal amount of the Notes Outstanding;

(iv)     the Issuer, a Guarantor or any of their respective Significant Subsidiaries defaults (A) in the payment when it becomes due and payable (subject to any applicable grace period), whether by acceleration or otherwise, of any Debt in an aggregate principal amount of US$150,000,000 (or its equivalent in any other currency or currencies) (the "**Threshold Amount**"), whether such Debt now exists or shall hereafter be created; or (B) in the performance or observance of any other terms and conditions relating to any such Debt in an aggregate amount in excess of the Threshold Amount if the effect of such Default is to cause such Debt to become due prior to its Stated Maturity;

(v)     the Issuer, a Guarantor or any of their respective Significant Subsidiaries shall: (A) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee, examiner, administrator, liquidator or similar Person of itself or of all or any substantial part of its Property; (B) make a general assignment for the

39

benefit of its creditors; (C) file a petition seeking bankruptcy, insolvency, reorganization in an insolvency or comparable context, *recuperação judicial*, *recuperação extrajudicial,* liquidation, *falência*, dissolution or winding up; or (D) take any corporate action for the purpose of effecting any of the foregoing;

(vi)    an involuntary proceeding or case shall be commenced against the Issuer, a Guarantor or any of their respective Significant Subsidiaries without its application or consent, seeking: (A) its reorganization, liquidation, dissolution or winding up; (B) the appointment of a receiver, custodian, trustee, examiner, administrator, liquidator or similar Person of it or of all or any substantial part of its Property; or (C similar relief in respect of it under any applicable law relating to bankruptcy, insolvency, reorganization, *recuperação judicial*, *recuperação extrajudicial*, liquidation, *falência*, dissolution or winding up, and such proceeding or case shall continue undismissed and unstayed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect, for a period of 90 or more consecutive days;

(vii)    any of this Indenture or the Notes or the Note Guarantees for any reason cease to be in full force and effect in accordance with its terms or the Issuer or a Guarantor shall judicially contest the binding effect or enforceability thereof or shall deny that it has any further liability or obligation thereunder or in respect thereof;

(viii)    a final non-appealable judgment(s) for the payment of money in an amount equal or in excess of the Threshold Amount shall have been entered by a court or courts of competent jurisdiction against the Issuer or a Guarantor and remain unpaid or undischarged for a period (during which execution shall not be effectively stayed) of 60 consecutive days unless (A) covered by an insurance policy or policies issued by reputable and credit-worthy insurance companies or (B) a Permitted Holder has contractually and irrevocably undertaken to indemnify the Issuer or a Guarantor, as applicable, for any potential loss or claim arising therefrom and enforcement proceedings are not being executed against any Property of the Issuer or such Guarantor; or

(ix)    it is or becomes unlawful for the Issuer or a Guarantor to perform or comply with any one or more of its payment obligations under this Indenture or the Notes or the Note Guarantees.

(b)    In the case of any Event of Default referred to in Section 6.01(a)(iv) above, such Event of Default shall be automatically rescinded or annulled if each of the default and/or the acceleration of the Debt referred to therein is remedied or cured by the Issuer, any Guarantor or Significant Subsidiary or waived by the holders of such Debt within 60 days after the default and/or acceleration in respect of such Debt.

Section 6.02.  *Acceleration*.  (a) If an Event of Default, except for a bankruptcy default with respect to the Issuer or any Guarantor, occurs and is continuing under this Indenture, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then Outstanding, by written notice to the Issuer (and to the Trustee if the notice is given by the Holders), may, and the Trustee at the request of such Holders shall, declare the unpaid principal of and accrued interest on the Notes and any other amounts due and payable by the Issuer under

40

this Indenture to be immediately due and payable. Upon a declaration of acceleration, such principal, interest and other amounts will become immediately due and payable. If a bankruptcy default occurs with respect to the Issuer or any Guarantor, the unpaid principal of and accrued interest on the Notes then Outstanding and any other amounts due and payable by the Issuer under this Indenture will become immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

(b)     Subject to the exceptions set forth in Section 6.04, the Holders of a majority in principal amount of the Outstanding Notes by written notice to the Issuer or a Guarantor and to the Trustee may waive all past Defaults and rescind and annul a declaration of acceleration and its consequences if:

(i)     all existing Events of Default, except for the nonpayment of the principal of, premium, if any, and interest on the Notes that have become due solely by the declaration of acceleration, have been cured or waived;

(ii)     the rescission would not conflict with any judgment or decree of a court of competent jurisdiction; and

(iii)     the Issuer or a Guarantor has paid the Trustee its reasonable compensation and reimbursed the Trustee for its reasonable and documented expenses (including the fees and expenses of its counsel), disbursements and advances.

Section 6.03.   *Other Remedies*.   If an Event of Default occurs and is continuing, the Trustee may pursue, in its own name or as trustee of an express trust, any available remedy by proceeding at law or in equity to collect the payment of principal of and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture. The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.

Section 6.04.   *Waiver of Past Defaults*.   Except a Default in the payment of principal, interest, premium, if any, and Additional Amounts, if any, and except as otherwise provided in Section 9.02, the Holders of a majority in principal amount of the Outstanding Notes may, by written notice to the Trustee and to the Issuer or the relevant Guarantor, waive an existing Default and its consequences. Upon such waiver, the Default will cease to exist, and any Event of Default arising therefrom will be deemed to have been cured, but no such waiver will extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05.   *Control by Majority*.   Subject to the obligation to provide indemnity satisfactory to the Trustee, the Holders of a majority in aggregate principal amount of the Outstanding Notes may direct in writing the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, that may involve the Trustee in personal liability, or that the Trustee determines in good faith may be unduly prejudicial to the rights of Holders not joining in the giving of such direction (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders), and the Trustee may take any other

41

action it deems proper that is not inconsistent with any such direction received from Holders.  Prior to taking any action hereunder, the Trustee shall be entitled to indemnification by the Holders satisfactory to it against any costs, losses, liabilities and expenses caused by taking or not taking such action.

Section 6.06.    *Limitation on Suits*.  A Holder may not institute any proceeding, judicial or otherwise, with respect to this Indenture or the Notes, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture or the Notes, unless:

(i)    the Holder has previously given to the Trustee written notice of a continuing Event of Default;

(ii)    Holders of at least 25% in aggregate principal amount of Outstanding Notes have made written request to the Trustee to institute such proceedings in respect of the Event of Default in its own name as Trustee under this Indenture;

(iii)    Holders have offered to the Trustee security or indemnity satisfactory to the Trustee against any costs, liabilities or expenses (including reasonable and documented counsel expenses) to be incurred in compliance with such request;

(iv)    the Trustee within 60 days after its receipt of such notice, request and offer of security or indemnity has failed to institute any such proceeding; and

(v)    during such 60-day period, the Holders of a majority in aggregate principal amount of the Outstanding Notes have not given the Trustee a written direction that, in the opinion of the Trustee, is inconsistent with such written request.

Section 6.07.    *Rights of Holders to Receive Payment*.  Notwithstanding anything to the contrary, the contractual right of a Holder of a Note to receive payment of principal of or interest on its Note on or after the Stated Maturity thereof, or to bring suit for the enforcement of any such payment on or after such dates, in each case as expressly set forth in this Indenture, may not be amended without the consent of that Holder.

Section 6.08.    *Collection Suit by Trustee*.  If an Event of Default in payment of principal or interest specified in clause (i) or (ii) of Section 6.01(a) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust for the whole amount of principal and accrued interest remaining unpaid, together with interest on overdue principal and, to the extent lawful, overdue installments of interest, in each case at the rate specified in the Notes, and such further amount as is sufficient to cover the reasonable and documented costs and expenses of collection, including the reasonable and documented compensation, expenses, disbursements and advances of the Trustee, its agents and legal counsel and any other reasonable and documented amounts due to the Trustee hereunder.

Section 6.09.    *Trustee May File Proofs of Claim*.  The Trustee may file proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due to the Trustee hereunder) and the Holders allowed in any judicial proceedings relating to the Issuer, the Guarantors or their

42

respective creditors or property, and is entitled and empowered to collect, receive and distribute any money, securities or other property payable or deliverable upon conversion or exchange of the Notes or upon any such claims.  Any custodian, receiver, "*síndico*," assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, if the Trustee consents to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable and documented compensation, expenses, disbursements and advances of the Trustee, its agent and counsel, and any other reasonable and documented amounts due to the Trustee hereunder.  Nothing in this Indenture will be deemed to empower the Trustee to authorize or consent to, or accept or adopt on behalf of any Holder, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10.   *Priorities*.  If the Trustee collects any money pursuant to this Article, it shall pay out the money in the following order:

First: to the Trustee and each of the Agents for all amounts due to it hereunder;

Second: to Holders for amounts then due and unpaid for principal of and interest on the Notes, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and interest; and

Third: to the Issuer or any Guarantor or as a court of competent jurisdiction may direct.

The Trustee, upon written notice to the Issuer, may fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

Section 6.11.   *Restoration of Rights and Remedies*.  If the Trustee or any Holder has instituted a proceeding to enforce any right or remedy under this Indenture and the proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to the Holder, then, subject to any determination in the proceeding, the Issuer, the Guarantors, the Trustee and the Holders will be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Issuer, the Guarantors, the Trustee and the Holders will continue as though no such proceeding had been instituted.

Section 6.12.   *Undertaking for Costs*.  In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court may require any party litigant in such suit (other than the Trustee) to file an undertaking to pay the costs of the suit, and the court may assess reasonable costs, including reasonable attorneys' fees, against any party litigant (other than the Trustee) in the suit having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.12 does not apply to a suit by a Holder to enforce payment of principal of or interest on any Note on the respective due dates pursuant to Section 6.07, or a suit by Holders of more than 10% in principal amount of the Outstanding Notes except for any proceeding brought before a Brazilian court, which case the Holder may be required to post a bond to cover legal fees and court expenses.

Section 6.13.   *Rights and Remedies Cumulative*.   No right or remedy conferred or reserved to the Trustee or to the Holders under this Indenture is intended to be exclusive of any other right or remedy, and all such rights and remedies are, to the extent permitted by law, cumulative and in addition to every other right and remedy hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or exercise of any right or remedy hereunder, or otherwise, will not prevent the concurrent assertion or exercise of any other right or remedy.

Section 6.14.   *Delay or Omission Not Waiver; Prescription of Claims*.   No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default will impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein and every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be; *provided*, that claims against the Issuer or the Guarantors for payments under any of the Notes shall be prescribed unless made within a period of ten years or, in the case of interest, a period of five years, from the applicable original date of payment therefor.

Section 6.15.   *Waiver of Stay, Extension or Usury Laws*.   Each of the Issuer and the Guarantors covenants, to the extent that it may lawfully do so, that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive the Issuer or a Guarantor, as the case may be, from paying all or any portion of the principal of, or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or that may affect the covenants or the performance of this Indenture.  Each of the Issuer and the Guarantors hereby expressly waives, to the extent that it may lawfully do so, all benefit or advantage of any such law and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

ARTICLE 7
THE TRUSTEE

Section 7.01.   *General*.  (a) The duties and responsibilities of the Trustee are as set forth herein.  Whether or not expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee is subject to this Article.

(b)      Except during the continuance of an Event of Default, (i) the duties of the Trustee shall be determined solely by the express provisions of this Indenture and the Trustee needs to perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations will be read into this Indenture against the Trustee; and (ii) the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, opinions or orders furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not

44

they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)     In case an Event of Default has occurred and is continuing, the Trustee shall exercise those rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(d)     No provision of this Indenture shall be construed to relieve the Trustee from liability for its own gross negligence or willful misconduct, except that:

(i)     this Section 7.01(d) shall not be construed to limit the effect of Section 7.01(b);

(ii)     the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(iii)     the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority in principal amount of the Outstanding Notes, relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture with respect to the Notes; and

(iv)     no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(e)     Unless otherwise specifically provided herein or in the Notes, any order, certificate, notice, request, direction or other communication from the Issuer or any Guarantor made or given under any provision of this Indenture shall be sufficient if signed by an Officer or any duly authorized attorney-in-fact.

(f)     Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 7.01.

Section 7.02.  *Certain Rights of Trustee*.

(a)     The Trustee may conclusively rely, and will be protected in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper Person.

(b)     Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel conforming to Section 11.03 and the Trustee will not be

45

liable for any action it takes or omits to take in good faith in reliance on such certificate or opinion.

(c)    The Trustee may act and conclusively rely and shall be fully protected in acting and relying in good faith on the opinion or advice of, or information obtained from, any counsel, accountant, appraiser or other expert or adviser, whether retained or employed by the Issuer, the Guarantors or by the Trustee, in relation to any matter arising in the administration of the trusts hereof.

(d)    The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders, unless such Holders have offered to the Trustee security, reasonably satisfactory to it, or indemnity against the reasonable and documented costs, expenses and liabilities (including, without limitation, reasonable and documented fees and expenses of legal counsel) that might be incurred by it in compliance with such request or direction.

(e)    The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within its rights or powers or for any action it takes or omits to take in accordance with the direction of the Holders in accordance with Section 6.05 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture.

(f)    The Trustee may appoint counsel and other advisors of its choice from time to time to provide advice and services arising out of or in connection with the performance by the Trustee of its obligations under this Indenture.  The Trustee may consult with counsel of its choice, and the advice of such counsel or any Opinion of Counsel will be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(g)    The Trustee may act through its agents, attorneys, accountants, experts and such other professionals as the Trustee deems necessary, advisable or appropriate and shall not be responsible for the misconduct or negligence of any agent, attorney, accountant, expert or other such professional appointed with due care.

(h)    No provision of this Indenture will require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties hereunder, or in the exercise of its rights or powers, unless it receives indemnity satisfactory to it against any loss, liability or expense (including, without limitation, reasonable and documented fees and expenses of agents and attorneys).  In no event shall the Trustee be liable for special, indirect punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(i)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be

46

enforceable by, the Trustee in each of its capacities hereunder, each Agent and each agent, custodian and other Person authorized or employed to act hereunder.

(j)      The Trustee may request that each of the Issuer and the Guarantors deliver a certificate setting forth the names of individuals and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture.

(k)      The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and reasonably believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Indenture.

(l)      The Issuer and its Affiliates may from time to time enter into normal banking and trustee relationships with the Trustee and its Affiliates.

(m)      The permissive rights of the Trustee to do things enumerated in this Indenture shall not be construed as a duty to take such action.

(n)      None of the Trustee or any Agent shall have any liability or responsibility with respect to, or obligation or duty to monitor, determine or inquire as to the Issuer's or any Guarantor's compliance with any covenant under this Indenture.

(o)      The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder.

(p)      The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note other evidence of indebtedness or other papers or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer personally or by agent or attorney at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

Section 7.03.  *Individual Rights of Trustee*.  The Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer, the Guarantors or its Affiliates with the same rights it would have if it were not the Trustee.  Any Agent may do the same with like rights.  However, the Trustee is subject to Trust Indenture Act Sections 310(b) and 311.

Section 7.04.  *Trust Indenture Act*.  Notwithstanding anything to the contrary elsewhere in this Indenture, the parties to this Indenture and the Holders of the Notes acknowledge and agree that this Indenture is not qualified under the Trust Indenture Act, Holders are not entitled to any protections thereunder and, except as expressly set forth in this Indenture, the provisions of the Trust Indenture Act are not incorporated by reference in this Indenture.

Section 7.05.  *Trustee's Disclaimer*.  The Trustee (i) makes no representation as to the validity or adequacy of this Indenture, the Notes, any Note Guarantee or any offering materials;

47

(ii) is not accountable for the Issuer's use or application of the proceeds from the Notes; and (iii) is not responsible for any statement in the Notes other than its certificate of authentication.

Section 7.06.  *Notice of Default*.  The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default with respect to the Notes (except a payment Default under Section 6.01(a)(i) or Section 6.01(a)(ii)) unless a Responsible Officer of the Trustee shall have received written notice thereof at the Corporate Trust Office and such notice references the Notes and this Indenture.  If any Default or Event of Default occurs and is continuing and (i) the Trustee has actual knowledge thereof (in the case of a payment Default under Section 6.01(a)(i) or Section 6.01(a)(ii)), or (ii) written notice thereof is delivered to a Responsible Officer of the Trustee, the Trustee will send notice of the Default or Event of Default to each Holder within 60 days after the Trustee is deemed to have knowledge or has received notice thereof, unless the Default or Event of Default has been cured; *provided* that, except in the case of a Default in the payment of the principal of or interest on any Note, the Trustee may withhold the notice if and so long as a committee of trust officers of the Trustee in good faith determines that withholding the notice is in the interest of the Holders.

Section 7.07.  *Compensation and Indemnity*.  (a) Each of the Issuer and the Guarantors will, jointly and severally, pay the Trustee compensation as agreed upon in writing between the Issuer, the Guarantors and the Trustee for their services. The compensation of the Trustee is not limited by any law on compensation of a trustee of an express trust. Each of the Issuer and the Guarantors will, jointly and severally, reimburse the Trustee upon request for all reasonable and documented out-of-pocket expenses, disbursements and advances incurred or made by the Trustee, including the compensation and reasonable and documented expenses of the Trustee's agents and counsel.

(b)    The Issuer and the Guarantors shall, jointly and severally, indemnify the Trustee for, and hold it harmless for, from and against, any damage, loss, claim, liability or expense (including, without limitation, the reasonable and documented fees and expenses of its legal counsel) incurred by it without gross negligence or willful misconduct on its part arising out of or in connection with the acceptance or administration of this Indenture by it and the performance of its duties under this Indenture and the Notes, including the reasonable and documented costs and expenses (legal or otherwise) of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Indenture and the Notes.

(c)    To secure the Issuer's and the Guarantors' payment obligations in this Section, the Trustee will have a lien prior to the Notes on all money or property held or collected by the Trustee, in its capacity as Trustee, except money or property held in trust to pay principal of, and interest (including Additional Amounts) on particular Notes.

(d)    If the Trustee incurs expenses or renders services in connection with an Event of Default as specified herein, the expenses (including, without limitation, the reasonable and documented charges and expenses of its legal counsel per jurisdiction) and the compensation for the services are intended to constitute expenses of administration under any applicable bankruptcy, reorganization, insolvency or similar law now or hereafter in effect.

48

(e)      The provisions of this Section 7.07 shall survive the payment of the Notes and the resignation or removal of the Trustee and/or the termination of this Indenture.

Section 7.08.   *Replacement of Trustee.*  (a) (i) The Trustee may resign at any time by providing at least 30-days written notice to the Issuer.

(ii)      The Holders of a majority in principal amount of the Outstanding Notes may remove the Trustee by providing at least 30-days written notice to the Trustee.

(iii)      If the Trustee is no longer eligible pursuant to Section 7.12, any Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(iv)      The Issuer may remove the Trustee if: (1) the Trustee is no longer eligible pursuant to Section 7.12; (2) the Trustee is adjudged a bankrupt or an insolvent; (3) a receiver or other public officer takes charge of the Trustee or its property; or (4) the Trustee becomes incapable of acting.  In addition, the Issuer may remove the Trustee at any time for any reason to the extent the Issuer has given the Trustee at least 30 days' written notice and as long as no Default or Event of Default has occurred and is continuing.

A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section.

(b)      If the Trustee has been removed by the Holders, Holders of a majority in principal amount of the Outstanding Notes may appoint a successor Trustee with the consent of the Issuer.  Otherwise, if the Trustee resigns or is removed, or if a vacancy exists in the office of Trustee for any reason, the Issuer will promptly appoint a successor Trustee.  If the successor Trustee does not deliver its written acceptance within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee (at the expense of the Issuer), the Issuer or the Holders of a majority in principal amount of the Outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)      Upon delivery by the successor Trustee of a written acceptance of its appointment to the retiring Trustee and to the Issuer, (i) the retiring Trustee will transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.07, (ii) the resignation or removal of the retiring Trustee will become effective, and (iii) the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture.  Upon request of any successor Trustee, the Issuer will execute any and all instruments for fully and vesting in and confirming to the successor Trustee all such rights, powers and trusts.  The Issuer will give notice of any resignation and any removal of the Trustee and each appointment of a successor Trustee to all Holders, and include in the notice the name of the successor Trustee and the address of its Corporate Trust Office.

(d)      Notwithstanding replacement of the Trustee pursuant to this Section, the Issuer's and the Guarantors' obligations in Section 7.07 will continue for the benefit of the retiring Trustee.

49

Section 7.09.  *Successor Trustee by Merger*.  If the Trustee consolidates with, merges or converts into, or transfers all or substantially all of its corporate trust business (including this transaction) to, another corporation or national banking association, the resulting, surviving or transferee corporation or national banking association without any further act will be the successor Trustee with the same effect as if the successor Trustee had been named as the Trustee in this Indenture.

Section 7.10.  *Money Held in Trust*.  The Trustee will not be liable for interest on or the investment of any money received by it except as it may agree with the Issuer or any Guarantor in writing.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.11.  *Force Majeure*.  Notwithstanding any provision herein to the contrary, in no event shall the Trustee or any Agent be liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused by forces beyond its control, including, but not limited to, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like which restrict or prohibit the providing of the services contemplated by this Indenture, inability to obtain material, equipment, or communications or computer facilities, or the failure of equipment or interruption of communications or computer facilities, it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 7.12.  *Corporate Trustee Required; Eligibility; Conflicting Interests*. There shall at all times be a Trustee hereunder which shall be eligible to act as Trustee under the Trust Indenture Act and shall have a combined capital and surplus of at least US$25,000,000 and its Corporate Trust Office in The City of New York, New York.  If such corporation publishes reports of condition at least annually, pursuant to law or the requirements of Federal, state, territorial or District of Columbia supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article.  Neither the Issuer nor any Person directly or indirectly controlling, controlled by, or under common control with the Issuer shall serve as Trustee. If the Trustee acquires any conflicting interest within the meaning of the TIA, it must (i) eliminate such conflict within 90 days, (ii) apply to the SEC for permission to continue as trustee or (iii) resign.

Section 7.13.  *Trustee and Others May Hold Notes*.  The Trustee or any Agent or any other authorized agent of the Trustee or the Issuer or any Guarantor, or any Affiliate thereof, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer or any Guarantor, or any other obligor on the Notes with the same rights it would have if it were not Trustee, Agent or such other authorized agent.

Section 7.14.  *Agents*.

50

(a)      Each Agent accepts its respective obligations set forth herein and in the Notes upon the terms and conditions hereof and thereof, including the following, to all of which the Issuer agrees and to all of which the rights of the Holders from time to time of the Notes shall be subject:

(i)      Each Agent shall be entitled to the compensation to be agreed upon with the Issuer and the Guarantors in writing for all services rendered by it, and the Issuer and the Guarantors, jointly and severally, agree promptly to pay such compensation and to reimburse each of the Agents for its reasonable and documented out-of-pocket expenses (including reasonable and documented fees and expenses of its counsel) incurred by it in connection with the services rendered by it hereunder.  Each of the Issuer and the Guarantors, jointly and severally, also agrees to indemnify each of the Agents for, and to hold each of them harmless against, any loss, liability or expense (including, without limitation, reasonable and documented fees and expenses of its legal counsel), incurred out of or in connection with its acting as agent of the Issuer hereunder, except to the extent such loss, liability or expense results from such Agent's own gross negligence or willful misconduct.  The obligations of the Issuer and the Guarantors under this Section 7.14(a)(i) shall survive the payment of the Notes and the resignation or removal of an Agent and/or the termination of this Indenture;

(ii)      In acting under this Indenture and in connection with the Notes, the Agents are each acting solely as agent of the Issuer and do not assume any obligation towards or relationship of agency or trust for or with any of the Holders, except that all funds held by a Paying Agent for the payment of the principal of and interest on (and Additional Amounts, if any, with respect to) the Notes, shall be held in trust by it and applied as set forth herein and in the Notes, but need not be segregated from other funds held by it, except as required by law;

(iii)      Each of the Agents shall be protected and shall incur no liability for or in respect of any action taken or omitted to be taken or thing suffered by it in reliance upon any Note, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper party or parties;

(iv)      No Agent shall be under any liability for interest on or investment of any moneys received by it pursuant to any of the provisions of this Indenture or the Notes or the Note Guarantees except as it may agree with the Issuer or any Guarantor in writing;

(v)      The recitals contained herein and in the Notes shall be taken as the statements of the Issuer, and no Agent assumes any responsibility for the correctness of the same.  No Agent makes any representation as to the validity or sufficiency of this Indenture, the Notes or the Note Guarantees or any offering materials.  No Agent shall be accountable for the use or application by the Issuer of any of the Notes or the proceeds thereof;

(vi)      Each Agent shall be obligated to perform such duties and only such duties as are herein and in the Notes specifically set forth, and no implied duties or obligations shall be read into this Indenture, the Notes or the Note Guarantees against such Agent.  No

51

Agent shall be under any obligation to take any action hereunder which may tend to involve it in any expense or liability, the payment of which within a reasonable time is not, in its reasonable opinion, assured to it; and

(vii)    No provision of this Indenture shall be construed to relieve any Paying Agent or any Transfer Agent, as applicable, from liability for its own gross negligence or willful misconduct.

Anything in this Section to the contrary notwithstanding, the agreements to hold sums in trust as provided in this Section are subject to the provisions of Section 8.05.

(b)    Any Agent may at any time resign by giving written notice of its resignation mailed to the Issuer and the Trustee specifying the date on which its resignation shall become effective; *provided* that such date shall be at least 60 days after the date on which such notice is given unless the Issuer agrees to accept less notice.   Upon receiving such notice of resignation, the Issuer shall promptly appoint a successor Agent, qualified as aforesaid, by written instrument in duplicate signed on behalf of the Issuer, one copy of which shall be delivered to the resigning Agent and one copy to the successor Agent.   Such resignation shall become effective upon the earlier of (i) the effective date of such resignation or (ii) the acceptance of appointment by the successor Agent as provided in Section 7.14(c).   The Issuer may, at any time and for any reason, and shall, upon any event set forth in the next succeeding sentence, remove an Agent and appoint a successor Agent, qualified as aforesaid, by written instrument in duplicate signed on behalf of the Issuer, one copy of which shall be delivered to the Agent being removed and one copy to the successor Agent.   An Agent shall be removed as aforesaid if it shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver of such Agent or of its property shall be appointed, or any public officer shall take charge or control of it or of its property or affairs for the purpose of rehabilitation, conservation or liquidation.   Any removal of an Agent and any appointment of a successor Agent shall become effective upon acceptance of appointment by the successor Agent as provided in Section 7.14(c). Upon its resignation or removal, the Agent shall be entitled to the payment by the Issuer of its compensation and reimbursement of its reasonable and documented disbursements, advances and expenses (including, without limitation, reasonable and documented fees and expenses of its legal counsel) as set forth in Section 7.14(a)(i).

(c)    Any successor Agent appointed as provided in Section 7.14(b) shall execute and deliver to its predecessor and to the Issuer an instrument accepting such appointment hereunder, and thereupon such successor Agent, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as such Agent hereunder, and such predecessor, upon payment of its compensation and reasonable and documented out-of-pocket expenses (including, without limitation, reasonable and documented fees and expenses of its legal counsel) then unpaid, shall pay over to such successor agent all moneys or other property at the time held by it hereunder, if any.

(d)    Any corporation or bank into which any Agent may be merged or converted, or with which any Paying Agent or Transfer Agent may be consolidated, or any corporation or bank resulting from any merger, conversion or consolidation to which an Agent shall be a

52

party, or any corporation or bank succeeding to all or substantially all of the agency business of the Agent (including this transaction) shall be the successor to such Agent hereunder (*provided* that such corporation or bank shall be qualified as aforesaid) without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(e)     Notwithstanding anything to the contrary contained in this Indenture, any Paying Agent may, to the extent it is required to do so by law, deduct or withhold income or other similar taxes from principal or interest payments hereunder without any liability therefor.

ARTICLE 8
DEFEASANCE AND DISCHARGE

Section 8.01.   *Discharge of Issuer's Obligations*.   (a) Subject to paragraph (b), the Issuer's obligations under the Notes and this Indenture, and the Guarantors' obligations under the Note Guarantees, will terminate if:

(i)     either (A) all Notes previously authenticated and delivered (other than (1) destroyed, lost or stolen Notes that have been replaced or (2) Notes that are paid pursuant to Section 4.01 or (3) Notes for whose payment funds in Dollars or U.S. Government Obligations in Dollars have been held in trust and then repaid to the Issuer pursuant to Section 8.05) have been delivered to the Trustee for cancellation and the Issuer has paid all sums payable by it hereunder; or (B) (1) all Notes not theretofore delivered to the Trustee for cancellation (x) have become due and payable, (y) will become due and payable at their Stated Maturity within one year or (z) are to be called for redemption within one year under arrangements reasonably satisfactory to the Trustee, and the Issuer irrevocably deposits in trust with the Trustee, as trust funds solely for the benefit of the Holders, funds in Dollars or U.S. Government Obligations in Dollars or a combination thereof sufficient, in the opinion of an internationally recognized firm of independent public accountants to the extent such amounts consist of U.S. Government Obligations, expressed in a written opinion delivered to the Trustee, without consideration of any reinvestment, to pay principal of and interest on the Notes to maturity or redemption, as the case may be, and to pay all other sums payable by it hereunder; (2) no Default has occurred and is continuing on the date of the deposit; and (3) the deposit will not result in a breach or violation of, or constitute a Default under, this Indenture or any other agreement or instrument to which the Issuer is a party or by which it is bound; and

(ii)     the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel, in each case stating that all conditions precedent provided for herein relating to the satisfaction and discharge of this Indenture have been complied with.

(b)     After satisfying the conditions in clause (a)(i)(A), only the obligations of the Issuer and the Guarantors under Section 7.07 and Section 7.14 will survive. After satisfying the conditions in clause (a)(i)(B), only the obligations of the Issuer and the Guarantors in Article 2 and Sections 3.01, 4.01, 4.02, 7.07, 7.14, 8.05 and 8.06 will survive; *provided* that upon payment of all Notes in full, only the obligations of the Issuer and the Guarantors in Section 7.07 and 7.14 will survive. In either case, the Trustee, upon request, will acknowledge

in writing the discharge of the Issuer's and the Guarantors' obligations under the Notes and this Indenture other than the surviving obligations.

Section 8.02.  *Legal Defeasance*.  After the 123rd day following the deposit referred to in clause (i) below, the Issuer will be deemed to have paid and will be discharged from its obligations in respect of the Notes and this Indenture, other than its obligations in Article 2 and Sections 4.02, 7.07, 7.14, 8.05 and 8.06 (*provided* that upon payment of all Notes in full, only the Issuer's and the Guarantors' obligations in Section 7.07 and Section 7.14 will survive), if the following conditions have been satisfied:

(i)    the Issuer has irrevocably deposited in trust with the Trustee, as trust funds solely for the benefit of the Holders, funds in Dollars or U.S. Government Obligations in Dollars or a combination thereof sufficient, in the opinion of an internationally recognized firm of independent public accountants to the extent amounts consist of U.S. Government Obligations, expressed in a written certificate thereof delivered to the Trustee, without consideration of any reinvestment, to pay principal of and interest on the Notes to maturity or redemption, as the case may be, *provided* that any redemption before maturity has been irrevocably provided for under arrangements satisfactory to the Trustee;

(ii)    no Default has occurred and is continuing on the date of the deposit or at the end of the 123 day period following the deposit;

(iii)    the deposit will not result in a breach or violation of, or constitute a Default under, this Indenture or any other agreement or instrument to which the Issuer is a party or by which it is bound;

(iv)    the Issuer has delivered to the Trustee either (x) a ruling received from the Internal Revenue Service to the effect that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the legal defeasance and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case or (y) an Opinion of Counsel, based on a ruling published by the Internal Revenue Service or a change in U.S. federal income tax law after the date of this Indenture, to the same effect as the ruling described in clause (x); and

(v)    the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, in each case stating that all conditions precedent provided for herein relating to the legal defeasance (or in the case of covenant defeasance, covenant defeasance) have been complied with.

Prior to the end of the 123 day period, none of the Issuer's obligations under this Indenture will be discharged.  Thereafter, upon written request, the Trustee will acknowledge in writing the legal defeasance of the Notes.

Section 8.03.  *Covenant Defeasance*.  Following the deposit referred to in Section 8.01(a)(ii), the Issuer's obligations set forth in Section 4.03, Section 4.04, Section 4.05, Section 4.06, Section 4.07, Section 4.08(a), Section 4.08(b), and Section 5.01(a)(ii) will terminate, and the

failure to comply with such obligations will no longer constitute an Event of Default under Section 6.01, provided that the following conditions have been satisfied:

(i)     the Issuer has complied with clauses (i), (iii) and (v) of Section 8.02; and

(ii)    the Issuer has delivered to the Trustee an Opinion of Counsel to the effect that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the covenant defeasance and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case.

Except as specifically stated above, none of the Issuer's obligations under this Indenture will be discharged.

Section 8.04.   *Application of Trust Money*.   Subject to Section 8.05, the Trustee will hold in trust the funds in Dollars or U.S. Government Obligations in Dollars deposited with it pursuant to Section 8.01, 8.02 or 8.03, and apply the deposited funds in Dollars and the proceeds from deposited U.S. Government Obligations in Dollars to the payment of principal of and interest on the Notes in accordance with the Notes and this Indenture.   Such Dollar funds and U.S. Government Obligations need not be segregated from other funds except to the extent required by law.

Section 8.05.   *Repayment to Issuer*.   Subject to Section 7.07, 8.01, 8.02 and 8.03, the Trustee and the Paying Agents will promptly pay to the Issuer upon request any excess funds in Dollars held by the Trustee and the Paying Agents at any time and thereupon be relieved from all liability with respect to such funds.   The Trustee or such Paying Agent will pay to the Issuer upon written request any funds in Dollars held for payment with respect to the Notes that remains unclaimed for two years; *provided* that before making such payment the Trustee or such Paying Agent may at the expense of the Issuer publish once in a newspaper of general circulation in New York City, or send to each Holder entitled to such Dollar denominated funds, notice that the funds remains unclaimed and that after a date specified in the notice (at least 30 days after the date of the publication or notice) any remaining unclaimed balance of money will be repaid to the Issuer. After payment to the Issuer, Holders entitled to such funds must look solely to the Issuer for payment, unless applicable law designates another Person, and all liability of the Trustee and the Paying Agents with respect to such funds will cease.

Section 8.06.   *Reinstatement*.   If and for so long as the Trustee is unable to apply any funds in Dollars or U.S. Government Obligations in Dollars held in trust pursuant to Section 8.01, 8.02 or 8.03 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and the Guarantors' obligations under this Indenture and the Notes and the Note Guarantees will be reinstated as though no such deposit in trust had been made.   If the Issuer makes any payment of principal of or interest on any Notes because of the reinstatement of its obligations, it will be subrogated to the rights of the Holders of such Notes to receive such payment from the funds in Dollars or U.S. Government Obligations in Dollars held in trust.

ARTICLE 9
AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 9.01.  *Amendments Without Consent of Holders*.  The Issuer, the Guarantors and the Trustee may waive, consent, amend or supplement this Indenture, the Notes or the Note Guarantees without notice to or the consent of any Noteholder:

(i)      to cure any ambiguity, omission, defect, inconsistency or to correct a manifest error in this Indenture, the Notes or the Note Guarantees;

(ii)      to comply with Section 5.01 and to substitute the Issuer in accordance with Section 9.03;

(iii)      to evidence and provide for the acceptance of an appointment by a successor Trustee;

(iv)      to provide for uncertificated Notes in addition to or in place of Certificated Notes *provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code;

(v)      to provide for any additional Note Guarantee of the Notes or to secure the Notes or confirm and evidence the release, termination or discharge of any Note Guarantee of or Lien securing the Notes when such release, termination or discharge is permitted by this Indenture;

(vi)      to provide for or confirm the issuance of Additional Notes;

(vii)      to add to the covenants of the Issuer or Guarantors for the benefit of the Holders of the Notes;

(viii)      to surrender any right conferred by this Indenture upon the Issuer or the Guarantors;

(ix)      to comply with any requirements of the SEC in connection with any qualification of this Indenture under the U.S. Trust Indenture Act of 1939, as amended;

(x)      to make any other change that does not materially and adversely affect the rights of any Holder; or

(xi)      to conform any provision of this Indenture to the "Description of the Notes" in the Offering Memorandum.

Section 9.02.  *Amendments With Consent of Holders*.  (a) Except as otherwise provided in Article 6 or paragraph (b) of this Section 9.02, the Issuer, the Guarantors and the Trustee may amend this Indenture, the Notes and the Note Guarantees with the written consent of the Holders of at least a majority in aggregate principal amount of the Outstanding Notes, and the Holders of at least a majority in aggregate principal amount of the Outstanding Notes by written

56

notice to the Trustee may waive future compliance by the Issuer and the Guarantors with any provision of this Indenture, the Notes or the Note Guarantees.

(b)     Notwithstanding the provisions of paragraph (a), without the consent of each Holder of an affected Note, an amendment or waiver may not:

(i)     reduce the principal amount of or change the Stated Maturity of any payment of principal or any installment of interest on any Note;

(ii)     reduce the rate of interest or change the method of computing the amount of interest payable on any Note;

(iii)     reduce the amount payable upon the redemption of any Note or change the time at which any Note may be redeemed or, once notice of redemption has been given, the time at which it must thereupon be redeemed, subject to the conditions set forth in this Indenture, which conditions shall not be changed in any matter adverse to Holders, *provided*, *however*, the minimum notice period for such redemption may be changed with the written consent of the Holders of a majority in principal amount of the Outstanding Notes;

(iv)     make any Note payable in currency and place of payment other than that stated in the Note;

(v)     impair the contractual right of any Holder of Notes to receive any principal payment or interest payment on such Holder's Notes, on or after the Stated Maturity thereof, or to institute suit for the enforcement of any such payment;

(vi)     make any change in the percentage of the principal amount of the Notes required for amendments or waivers; or

(vii)     modify or change any provision of this Indenture affecting the ranking of the Notes in a manner adverse to the Holders of the Notes (it being understood that changes in provisions affecting the ability to create Liens over the assets of the Issuer shall not affect the "ranking" of the Notes as that term is used in this subsection (vii)).

(c)     It is not necessary for Holders to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if their consent approves the substance thereof.

(d)     (c) An amendment or waiver becomes effective upon the execution of such amendment or waiver by the Trustee.  After an amendment, supplement or waiver under this Section becomes effective, the Issuer will send to the Holders affected thereby a notice briefly describing the amendment, supplement or their written waiver.  Any failure of the Issuer to send such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amendment to this Indenture or waiver.

Section 9.03.   *Substitution of the Issuer*.  (b) Without the consent of any Holder of Notes, the Issuer may be replaced and substituted, as principal debtor in respect of this Indenture

and the Notes, by (x) either Guarantor or (y) any Subsidiary of a Guarantor (in each case, in that capacity, the "**Substituted Issuer**"); *provided* that the following conditions are satisfied:

(i)      such documents shall be executed by the Substituted Issuer, the Issuer, the Guarantors and the Trustee as may be necessary to give full effect to the substitution, including a supplemental indenture to this Indenture under which the Substituted Issuer assumes all of the obligations of the Issuer under this Indenture and the Notes as if the Substituted Issuer had been named in the Notes and in this Indenture as the principal debtor in respect of the Notes in place of the Issuer (or any previous substitute) and each Guarantor, unless such Guarantor is the Substituted Issuer, or such Guarantor's then-existing Note Guarantee remains in full force and effect (as evidenced by an Officer's Certificate of such Guarantor), unconditionally and irrevocably reaffirms its Note Guarantee (collectively, the "**Substitution Documents**");

(ii)      if the Substituted Issuer is organized in a jurisdiction other than Luxembourg, the Substitution Documents shall contain covenants (a) to ensure that each Holder and beneficial owner of Notes has the benefit of a covenant in terms corresponding to the obligations of the Issuer pursuant to Section 3.01, in respect of the payment of Additional Amounts (but replacing references to Luxembourg with references to the jurisdiction of organization of the Substituted Issuer) and (b) to indemnify the Trustee, any Paying Agent, and each Holder and beneficial owner of Notes against all taxes or duties that (1) arise by reason of a law or regulation in effect or contemplated on the effective date of the substitution that are incurred or levied against the Trustee, such Paying Agent, or such Holder or beneficial owner of Notes, as the case may be, as a result of the substitution and that would not have been so incurred or levied had the substitution not been made, and (2) are imposed on the Trustee, such Paying Agent, or such Holder or beneficial owner of Notes, as the case may be, by any political subdivision or taxing authority of any country in which the Trustee, such Paying Agent, or such Holder or beneficial owner of Notes resides or is subject to any such tax or duty and that would not have been so imposed had the substitution not been made, in each case subject to similar exceptions as set forth in Section 3.01, *mutatis mutandis*; *provided*, that the Trustee, any Paying Agent, or any Holder or beneficial owner of Notes making a claim with respect to such tax indemnity shall provide the Substituted Issuer with notice of such claim, along with supporting documentation, within four weeks of the announcement of the substitution of the Issuer as issuer; and *provided*, *further*, that notwithstanding anything to the contrary in this Section, the Substituted Issuer shall be entitled to make any deduction or withholding, and shall not be required to indemnify the Trustee, any Paying Agent, or any Holder or beneficial owner of Notes for or on account of any taxes or duties, or pay any Additional Amounts with respect to any such deduction or withholding, imposed on or in respect of any Notes, in either case, pursuant to FATCA, any treaty, law, regulation or other official guidance enacted by any jurisdiction implementing FATCA or any intergovernmental agreement or law, regulation or other official guidance promulgated thereunder implementing FATCA;

(iii)      the Issuer will deliver, or cause the delivery, to the Trustee of (a) an Opinion of Counsel in the jurisdiction of organization of the Substituted Issuer to the effect that the Substitution Documents were duly authorized, executed and delivered by the Substituted

58

Issuer, (b) an Opinion of Counsel in the State of New York to the effect that the Substitution Documents constitute valid and binding obligations of the Substituted Issuer, and (c) an Officer's Certificate as to compliance with the provisions described in this Section 9.03;

(iv)    the Substituted Issuer shall appoint a process agent in the Borough of Manhattan in The City of New York to receive service of process on its behalf in relation to any legal action or proceedings arising out of or in connection with the Notes, this Indenture and the Substitution Documents;

(v)    no Event of Default under this Indenture has occurred or is continuing; and

(vi)    the substitution shall comply with all applicable requirements under the laws of the jurisdiction of organization of the Substituted Issuer, Luxembourg and Brazil.

(c)    Upon the execution of the Substitution Documents and compliance with the other conditions set forth in this Section, (i) the Substituted Issuer shall be deemed to be named in this Indenture and the Notes as the principal debtor in place of the Issuer and (ii) the Issuer (or any previous substitute) shall be released from all of its obligations under the Notes and this Indenture and any reference in this Indenture to the Issuer shall from then on be deemed to refer to the Substituted Issuer and any reference to the country in which the Issuer is organized or resident for tax purposes shall from then on be deemed to refer to the country in which the Substituted Issuer is organized or resident for tax purposes.

(d)    Not later than ten Business Days after the execution of the Substitution Documents, the Substituted Issuer shall give written notice thereof to the Holders of Notes.

(e)    Notwithstanding anything to the contrary, this Section 9.03 is not applicable to any consolidation or merger by the Issuer with or into any other Person or the sale, conveyance, transfer or lease by the Issuer, in one transaction or a series of transactions, directly or indirectly, of all or substantially all of its Property (determined on the basis of the consolidated assets of Raízen and its Subsidiaries), which such transaction shall be subject to the provisions of Section 5.01.

Section 9.04.    *Effect of Consent.*  (a) After an amendment, supplement or waiver becomes effective, it will bind every Holder unless it is of the type requiring the consent of each Holder affected.  If the amendment, supplement or waiver is of the type requiring the consent of each Holder affected, the amendment, supplement or waiver will bind each Holder that has consented to it and every subsequent Holder of a Note that evidences the same debt as the Note of the consenting Holder.

(b)    If an amendment, supplement or waiver changes the terms of a Note, the Trustee may require the Holder to deliver it to the Trustee so that the Trustee may place an appropriate notation of the changed terms on the Note and return it to the Holder, or exchange it for a new Note that reflects the changed terms.  The Trustee may also place an appropriate notation on any Note thereafter authenticated.  However, the effectiveness of the amendment, supplement or waiver is not affected by any failure to annotate or exchange Notes in this fashion.

Section 9.05.  *Trustee's Rights and Obligations*.  In signing any amendment, supplement or waiver, the Trustee is entitled to receive, and will be fully protected in relying upon, in addition to the documents required by Section 11.03, an Officer's Certificate and an Opinion of Counsel, each stating that the execution of any amendment, supplement or waiver is authorized or permitted by this Indenture.  If the Trustee has received such an Officer's Certificate and Opinion of Counsel, it shall sign the amendment, supplement or waiver so long as the same does not adversely affect the rights of the Trustee.  The Trustee may, but is not obligated to, execute any amendment, supplement or waiver that affects the Trustee's own rights, duties or immunities under this Indenture.

## ARTICLE 10
## NOTE GUARANTEES

Section 10.01. *Note Guarantees*.

(a)     Each Guarantor hereby jointly and severally, irrevocably and unconditionally Guarantees, as a primary obligor and not merely as a surety, to each Holder and to the Trustee and its successors and assigns (i) the full and punctual payment when due, whether by acceleration, by redemption or otherwise, of all obligations of the Issuer under this Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, interest on or liquidated damages, if any, in respect of the Notes and all other monetary obligations of the Issuer under this Indenture and the Notes and (ii) the full and punctual performance within applicable grace periods of all other obligations of the Issuer whether for fees, expenses, indemnification or otherwise under this Indenture and the Notes (all the foregoing being hereinafter collectively called the "**Guaranteed Obligations**").  Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from each such Guarantor, and that each such Guarantor shall remain bound under this Article 10 notwithstanding any extension or renewal of any Guaranteed Obligation.

(b)     Each Guarantor waives, to the fullest extent permitted by law, presentation to, demand of payment from and protest to the Issuer of any of the Guaranteed Obligations and also waives notice of protest for nonpayment.  Each Guarantor waives notice of any default under the Notes or the Guaranteed Obligations.  The obligations of each Guarantor hereunder shall not be affected by (i) the failure of any Holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Issuer or any other Person under this Indenture, the Notes or any other agreement or otherwise; (ii) any extension or renewal thereof; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any Holder or the Trustee for the Guaranteed Obligations or any of them; (v) the failure of any Holder or Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (vi) any change in the ownership of such Guarantor.

(c)     Each Guarantor hereby waives, to the fullest extent permitted by law, any right to which it may be entitled to have its obligations hereunder divided among the Guarantors, such that such Guarantor's obligations would be less than the full amount claimed.  Each Guarantor hereby waives, to the fullest extent permitted by law, any right to which it may be

60

entitled to have the assets of the Issuer first be used and depleted as payment of the Issuer's or such Guarantor's obligations hereunder prior to any amounts being claimed from or paid by such Guarantor hereunder. Each Guarantor hereby waives any right to which it may be entitled to require that the Issuer be sued prior to an action being initiated against such Guarantor. Each Guarantor hereby waives the benefits to which it is entitled under Articles 333, 827, 829, 830, 834, 835, 837, 838 and 839 of the Brazilian Civil Code, and Article 794 of the Brazilian Code of Civil Procedure.

(d)    Each Guarantor further agrees that its Note Guarantee herein constitutes a Guarantee of payment, performance and compliance when due (and not a Guarantee of collection) and waives any right to require that any resort be had by any Holder or the Trustee to any security held for payment of the Guaranteed Obligations.

(e)    Except as expressly set forth in Section 10.02 below, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of any Holder or the Trustee to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Guarantor or would otherwise operate as a discharge of any Guarantor as a matter of law or equity.

(f)    Each Guarantor agrees that its Note Guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations. Each Guarantor further agrees that its Note Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest or liquidated damages, if any, on any Guaranteed Obligation is rescinded or must otherwise be restored by any Holder or the Trustee upon the bankruptcy or reorganization of the Issuer or otherwise.

(g)    In furtherance of the foregoing and not in limitation of any other right which any Holder or the Trustee has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Issuer to pay the principal of or interest or liquidated damages, if any, on any Guaranteed Obligation when and as the same shall become due, whether by acceleration, by redemption or otherwise, or to perform or comply with any other Guaranteed Obligation, each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the Paying Agent for the benefit of Holders or the Trustee an amount equal to the sum of (i) the unpaid principal amount of such Guaranteed Obligations, (ii) accrued and unpaid interest on such Guaranteed Obligations and (iii) all other monetary obligations of the Issuer to the Holders and the Trustee.

(h)    Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any Guaranteed Obligations Guaranteed hereby until

61

payment in full of all Guaranteed Obligations. Each Guarantor further agrees that, as between it, on the one hand, and the Holders and the Trustee, on the other hand, (i) the maturity of the Guaranteed Obligations Guaranteed hereby may be accelerated as provided in Article 6 for the purposes of any Note Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations Guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Guaranteed Obligations as provided in Article 6, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by such Guarantor for the purposes of this Section 10.01.

(i)      Each Guarantor also agrees to pay any and all reasonable and documented costs and expenses (including reasonable and documented attorneys' fees and expenses) incurred by the Trustee in enforcing any rights under this Section 10.01, except to the extent that any such costs or expenses arise as a result of the Trustee's own gross negligence or willful misconduct.

(j)      Upon request of the Trustee, each Guarantor shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture

Section 10.02. *Limitation on Liability*.  Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations Guaranteed hereunder by any Guarantor shall not exceed the maximum amount that can be hereby Guaranteed without rendering this Indenture, as it relates to such Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

Section 10.03. *Successors and Assigns*.  This Article 10 shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the successors and assigns of the Trustee and the Holders and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Notes and the Note Guarantees shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture.

Section 10.04. *No Waiver*.  Neither a failure nor a delay on the part of either the Trustee or the Holders in exercising any right, power or privilege under this Article 10 shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege.  The rights, remedies and benefits of the Trustee and the Holders herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which either may have under this Article 10 at law, in equity, by statute or otherwise.

Section 10.05. *Modification*.   No modification, amendment or waiver of any provision of this Article 10, nor the consent to any departure by any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Trustee, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on any Guarantor in any case shall entitle such Guarantor to any other or further notice or demand in the same, similar or other circumstances.

Section 10.06. *Notation of Note Guarantee; Non-Impairment*.  To evidence its Note Guarantee set forth in Section 10.01, each Guarantor agrees that a notation of such Note Guarantee (the "**Notation of Note Guarantee**") substantially in the form attached to this Indenture as Exhibit A shall be endorsed by at least one Officer of each Guarantor by manual, electronic or facsimile signature on each Note authenticated and delivered by the Trustee and this Indenture shall be executed on behalf of the Guarantors.  Each of the Guarantors hereby agrees that its Note Guarantee set forth in Section 10.01 shall remain in full force and effect notwithstanding any failure to endorse on each Note a Notation of Note Guarantee.  If an Officer whose signature is on this Indenture or on the Notation of Note Guarantee no longer holds that office at the time the Trustee authenticates the Note on which a Note Guarantee is endorsed, the Note Guarantee shall be valid nevertheless.  The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Note Guarantee set forth in this Indenture on behalf of the Guarantors.

ARTICLE 11
MISCELLANEOUS

Section 11.01. *Noteholder Communications; Noteholder Actions*.  (a) The rights of Holders to communicate with other Holders with respect to this Indenture or the Notes are as provided by the Trust Indenture Act, and the Issuer and the Trustee shall comply with the requirements of TIA Sections 312(a) and 312(b).  Neither the Issuer nor the Trustee will be held accountable by reason of any disclosure of information as to names and addresses of Holders made pursuant to the Trust Indenture Act.

(b)    (i)  Any request, demand, authorization, direction, notice, consent to amendment, supplement or waiver or other action provided by this Indenture to be given or taken by a Holder (an "act") may be evidenced by an instrument signed by the Holder delivered to the Responsible Office of the Trustee.  The fact and date of the execution of the instrument, or the authority of the person executing it, may be proved in any manner that the Trustee deems sufficient.

(ii)    The Trustee may make reasonable rules for action by or at a meeting of Holders, which will be binding on all the Holders.

(c)    Any act by the Holder of any Note binds that Holder and every subsequent Holder of a Note that evidences the same debt as the Note of the acting Holder, even if no notation thereof appears on the Note.  Subject to paragraph (d), a Holder may revoke an act as to its Notes, but only if the Responsible Officer of the Trustee receives the written notice of revocation before the earlier of (i) if applicable, the time the right to deliver an act expires, and (ii) the time the act becomes effective.

(d)    The Issuer may, but is not obligated to, fix a record date for the purpose of determining the Holders entitled to act with respect to any amendment or waiver or in any other regard. If a record date is fixed, those Persons that were Holders at such record date and only those Persons will be entitled to act, or to revoke any previous act, whether or not those Persons continue to be Holders after the record date.

63

(e)    If the Issuer shall solicit from the Holders any request, demand, authorization, direction, notice, consent, waiver or other act, the Issuer may, at its option, in or pursuant to a Board Resolution, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other act, but the Issuer shall have no obligation to do so.  Such record date shall be the record date specified in or pursuant to such Board Resolution, which shall be a date not earlier than the date 30 days prior to the first solicitation of Holders generally in connection therewith and not later than the date such solicitation is completed.  If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other act may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of Outstanding Notes have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other act, and for that purpose the Outstanding Notes shall be computed as of such record date; *provided* that no such authorization, agreement or consent by the Holders on such record date shall be deemed effective unless it shall become effective pursuant to the provisions of this Indenture not later than eleven months after the record date.

(f)    Any request, demand, authorization, direction, notice, consent, waiver or other act of the Holder of any Note shall bind every future Holder of a Note that evidences the same debt as the Note of the acting Holder issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

(g)    Every Holder, by receiving and holding a Note, agrees with the Issuer, the Guarantors, the Trustee and each Agent that none of the Issuer, the Guarantors, the Trustee or any Agent shall be held accountable by reason of the disclosure of any information as to the names and addresses of the Holders, regardless of the source from which such information was derived.

Section 11.02. *Notices*.  (a) Any notice or communication to the parties hereto will be deemed given if in English and in writing when delivered (i) in person, (ii) by an internationally recognized overnight courier service or (iii) by electronic mail with PDF attached and proof of receipt; provided that any notice to the Trustee will be effective only upon receipt by a Responsible Officer of the Trustee.  In each case the notice or communication should be addressed as follows:

*if to the Issuer or the Guarantors*:

Raizen Fuels Finance S.A.
16, Rue Eugène Ruppert, L-2453
Luxembourg, Grand Duchy of Luxembourg
Attention: Board of Directors of Raizen Fuels Finance S.A.
E-mail: Marina.Dalben@raizen.com / tesouraria.corp@raizen.com

*and*

Raízen S.A. and Raízen Energia S.A
Avenida Brigadeiro Faria Lima, 4100, 11th floor
04538-132
São Paulo – SP, Brazil
Attention: Marina Dalben
E-mail: Marina.Dalben@raizen.com / tesouraria.corp@raizen.com

With a copy to:

Simpson Thacher & Bartlett LLP
Av. Juscelino Kubitschek, 1455, 12th floor
São Paulo, SP 04543-011
Brazil
Attention: Grenfel G. Calheiros
E-mail: gcalheiros@stblaw.com

*if to the Trustee, Paying Agent, Registrar and Transfer Agent:*

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: Corporate Trust Administration

The Issuer, the Guarantors or the Trustee by notice to the others may designate additional or different addresses for subsequent notices or communications.

(b)     Except as otherwise expressly provided with respect to published notices, any notice or communication to a Holder of a Certificated Note will be deemed given when mailed to the Holder at its address as it appears on the Register by first class mail or, as to any Global Note registered in the name of the Depositary or its nominee, when given to the Depositary in accordance with its applicable procedures; *provided*, that, at any time when the Notes are listed on the Official List of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market and its rules so require, the Issuer will publish any such notice of communication sent to the Holders in a newspaper having a general circulation in Luxembourg, or alternatively, notice to Holders may be published on the website of the Luxembourg Stock Exchange at www.bourse.lu.  Such notice will be deemed given on the date of its first publication.  Copies of any notice or communication to a Holder, if given by the Issuer, will be mailed to the Trustee and the Agents at the same time.  Defect in mailing a notice or communication to any particular Holder will not affect its sufficiency with respect to other Holders.

(c)     Where this Indenture provides for notice, the notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and the waiver will be the equivalent of the notice.  Waivers of notice by Holders must be filed with the Trustee, but such filing is not a condition precedent to the validity of any action taken in reliance upon such waivers.

(d)     The Trustee shall have the right to accept and act upon instructions, including funds transfer instructions ("**Instructions**") given pursuant to this Indenture and the Notes and delivered using the following communications methods: e-mail, facsimile transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another method or system specified by the Trustee as available for use in connection with its services hereunder (collectively, "**Electronic Means**"); provided, however, that each of the Issuer and the Guarantors shall provide to the Trustee an incumbency certificate listing officers with the authority to provide such Instructions ("**Authorized Signatories**") and containing specimen signatures of such Authorized Signatories, which incumbency certificate shall be amended by the Issuer and/or such Guarantor, as applicable, whenever a person is to be added or deleted from the listing.  If the Issuer or any Guarantor, as applicable, elects to give the Trustee Instructions using Electronic Means and the Trustee in its discretion elects to act upon such Instructions, the Trustee's understanding of such Instructions shall be deemed controlling.  Each of the Issuer and the Guarantors understands and agrees that the Trustee cannot determine the identity of the actual sender of such Instructions and that the Trustee shall conclusively presume that directions that purport to have been sent by an Authorized Signatory listed on the incumbency certificate provided to the Trustee have been sent by such Authorized Signatory.  Each of the Issuer and the Guarantors shall be responsible for ensuring that only Authorized Signatories transmit such Instructions to the Trustee and that the Issuer and the Guarantors and all Authorized Signatories are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords and/or authentication keys upon receipt by the Issuer and any Guarantor, as applicable.  The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction.  Each of the Issuer and the Guarantors agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Issuer or such Guarantor, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee immediately upon learning of any compromise or unauthorized use of the security procedures.

Section 11.03. *Certificate and Opinion as to Conditions Precedent*.  Upon any request or application by the Issuer or the Guarantors to the Trustee to take any action under this Indenture, the Issuer or the applicable Guarantor, as the case may be, will furnish to the Trustee:

(i)     an Officer's Certificate stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(ii)     an Opinion of Counsel stating that all such conditions precedent have been complied with.

Section 11.04. *Statements Required in Certificate or Opinion*.  Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture must include:

(i)     a statement that each person signing the certificate or opinion has read the covenant or condition and the related definitions;

(ii)     a brief statement as to the nature and scope of the examination or investigation upon which the statement or opinion contained in the certificate or opinion is based;

(iii)     a statement that, in the opinion of each such person, that person has made such examination or investigation as is necessary to enable the person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(iv)     a statement as to whether or not, in the opinion of each such person, such condition or covenant has been complied with, *provided* that an Opinion of Counsel may rely on an Officer's Certificate or certificates of public officials with respect to matters of fact.

Section 11.05. *Payment Date Other than a Business Day*.  If any payment with respect to a payment of any principal of, premium, if any, or interest on any Note (including any payment to be made on any date fixed for redemption of any Note) is due on a day which is not a Business Day, then the payment need not be made on such date, but may be made on the next Business Day with the same force and effect as if made on such date, and no interest will accrue for the intervening period.

Section 11.06. *Governing Law*.  This Indenture, the Notes and the Note Guarantees shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to its choice of law principles. For the avoidance of doubt, the application of the provisions set out in articles 470-1 to 470-19 (both included) of the Luxembourg Companies Law is excluded.

Section 11.07. *Submission to Jurisdiction; Agent for Service*.  (a) Each of the Issuer and the Guarantors agrees that any suit, action or proceeding against it brought by any Noteholder or the Trustee arising out of or based upon this Indenture, the Notes or the Note Guarantees may be instituted in any state or Federal court in the Borough of Manhattan in The City of New York, New York, and irrevocably waives, to the extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submits to the non-exclusive jurisdiction of such courts in any suit, action or proceeding.

(b)     By the execution and delivery of this Indenture or any amendment or supplement hereto, each of the Issuer and the Guarantors (i) acknowledges that it has designated and appointed Cogency Global Inc., currently located at 122 East 42nd Street, 18th Floor, New York, NY, 10168, as its authorized agent upon which process may be served in any suit, action or proceeding with respect to, arising out of, or relating to, the Notes, the Note Guarantees or this Indenture, that may be instituted in any Federal or state court in the State of

67

New York, The City of New York, the Borough of Manhattan, or brought under Federal or state securities laws or brought by the Trustee (whether in its individual capacity or in its capacity as Trustee hereunder), and acknowledges that Cogency Global Inc. has accepted such designation, (ii) submits to the non-exclusive jurisdiction of any such court in any such suit, action or proceeding, and (iii) agrees that service of process upon Cogency Global Inc. shall be deemed in every respect effective service of process upon the Issuer or such Guarantor, as the case may be, in any such suit, action or proceeding.  Each of the Issuer and the Guarantors further agrees to take any and all action, including the execution and filing of any and all such documents and instruments as may be necessary to continue such designation and appointment of Cogency Global Inc. in full force and effect so long as this Indenture shall be in full force and effect; *provided* that the Issuer and such Guarantor may and shall (to the extent Cogency Global Inc. ceases to be able to be served on the basis contemplated herein), by written notice to the Trustee, designate such additional or alternative agents for service of process under this Section 11.07 that (1) maintains an office located in the Borough of Manhattan, The City of New York in the State of New York, (2) are either (x) counsel for the Issuer or any Guarantor or (y) a corporate service company which acts as agent for service of process for other Persons in the ordinary course of its business and (3) agrees to act as agent for service of process in accordance with this Section 11.07.  Such notice shall identify the name of such agent for process and the address of such agent for process in the Borough of Manhattan, The City of New York, State of New York.  Upon the written request of any Noteholder, the Trustee shall deliver such information to such Noteholder.  Notwithstanding the foregoing, there shall, at all times, be at least one agent for service of process for the Issuer and each Guarantor appointed and acting in accordance with this Section 11.07.

Section 11.08. *Judgment Currency*.  U.S. Dollars are the sole currency of account and payment for all sums payable by the Issuer and the Guarantors under or in connection with the Notes, the Note Guarantees and this Indenture.  Any amount received or recovered in a currency other than U.S. Dollars in respect of the Notes, the Note Guarantees or this Indenture (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Issuer, the Guarantors, any of their respective Significant Subsidiaries or otherwise) by the Trustee or any Holder in respect of any sum expressed to be due to it from the Issuer or any Guarantor will constitute a discharge of the Issuer and the Guarantors only to the extent of the U.S. Dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that U.S. Dollar amount is less than the U.S. Dollar amount expressed to be due to the recipient under any Note, any Note Guarantee or this Indenture, the Issuer and the Guarantors, jointly and severally, will indemnify the recipient against the cost of making any such purchase; and if the amount of U.S. Dollars so purchased is greater than the sum originally due to such recipient, such recipient, if a Holder, will, by accepting a Note, and, if the Trustee, by executing this Indenture, be deemed to have agreed to repay such excess.  For purposes of this indemnity, it will be sufficient for the recipient to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had the actual purchase of U.S. dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. Dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above).

The above indemnity, to the extent permitted by law:

>        (1)      constitutes a separate and independent obligation from the other obligations of the Issuer and the Guarantors;

>        (2)      will give rise to a separate and independent cause of action;

>        (3)      will apply irrespective of any waiver or indulgence granted by the Trustee or any Holder; and

>        (4)      will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note or any other judgment.

Section 11.09. *No Adverse Interpretation of Other Agreements*.  This Indenture may not be used to interpret another indenture or loan or debt agreement of the Issuer, a Guarantor or any Subsidiary of the Issuer or Guarantor, and no such indenture or loan or debt agreement may be used to interpret this Indenture.

Section 11.10. *Successors*.  All agreements of the Issuer and each Guarantor in this Indenture, the Notes and the Note Guarantees will bind its successors.  All agreements of the Trustee in this Indenture will bind its successor.

Section 11.11. *Duplicate Originals*.  The parties may sign any number of copies of this Indenture.  This Indenture and any related documents, certificates, directions, notices or other instruments delivered pursuant to or in connection herewith may be executed in any number of counterparts, each of which so executed shall be an original, but all of them together represent the same agreement. Counterparts may be delivered via facsimile, electronic mail (including any electronic signature covered by the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act, the Electronic Signatures and Records Act or other applicable law, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and shall have the same validity, legal effect and admissibility in evidence as an original manual signature. Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any faxed, scanned, or photocopied manual signature, or other electronic signature, of any other party and shall have no duty to investigate, confirm or otherwise verify the validity or authenticity thereof. The exchange of copies of this Indenture and of signature pages in accordance with the foregoing sentence shall constitute effective execution and delivery of this Indenture as to the parties hereto.

Section 11.12. *Separability*.  In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 11.13. *Table of Contents and Headings*.  The Table of Contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and in no way modify or restrict any of the terms and provisions of this Indenture.

Section 11.14. *No Liability of Directors, Officers, Employees, Incorporators, Members and Stockholders*.  No past, present or future director, officer, employee, incorporator, member, partner or shareholder of the Issuer or any Guarantor or their respective Subsidiaries, as such, will have any liability for any obligations of the Issuer or any Guarantor under the Notes, the Note Guarantees or this Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.

Section 11.15. *Waiver of Jury Trial*.    EACH OF THE ISSUER, THE GUARANTORS, THE HOLDERS BY ACCEPTANCE OF THE NOTES AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE NOTE GUARANTEES OR THE TRANSACTION CONTEMPLATED HEREBY.

Section 11.16. *Tax Matters*.  Each of the Issuer, the Guarantors and the Trustee agrees (i) to cooperate and to provide the others with such reasonable information as each may have in its possession to enable the determination of whether any payments pursuant to this Indenture are subject to the withholding requirements described in Section 1471(b) of the Code or otherwise imposed pursuant to Sections 1471 through 1474 of the Code and any regulations, or agreements thereunder or official interpretations thereof ("**Applicable Law**"), and (ii) that the Trustee and each Paying Agent shall be entitled to make any withholding or deduction from payments under this Indenture to the extent necessary to comply with Applicable Law, for which the Trustee and such Paying Agent, as applicable, shall not have any liability.

Section 11.17. *USA Patriot Act.*  The parties hereto acknowledge that in accordance with Section 326 of the USA Patriot Act, the Trustee is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee.  The parties to this Indenture agree that they will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the USA Patriot Act.

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

**RAIZEN FUELS FINANCE S.A.**
as Issuer

By: _____
Name: MARINA DAZBEN
Title: MANAGING DIRECTOR

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

**RAÍZEN S.A**
as Guarantor

By: _____
Name: *Carlos Alberto bejar de hare*
Title: *CFO*

By: _____
Name: *RICARDO DELL AQUILA MUSSA*
Title: *CEO*

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

**RAÍZEN ENERGIA S.A**
as Guarantor

By: _____

Name: Carlos Alberto Bezerra de Moura

Title: CFO

By: _____

Name: Dodrilo Gross

Title: General Counsel

**THE BANK OF NEW YORK MELLON**
as Trustee, Registrar, Paying Agent and Transfer
Agent

By: _____

Name:  Francine Kincaid

Title:  Vice President

*[Signature Page to the Green Notes due 2034 Indenture]*

**EXHIBIT A**

**[FORM OF FACE OF NOTE]**

**RAIZEN FUELS FINANCE S.A.**

**6.450% Green Notes Due 2034**

[CUSIP] [ISIN] _____

No.                                                          US$ _____

      RAIZEN FUELS FINANCE S.A., a public limited liability company (*société anonyme*) organized and established under the laws of the Grand Duchy of Luxembourg, having its registered office at 16, Rue Eugène Ruppert, L-2453 Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*Registre de commerce et des sociétés*, *Luxembourg*) under number B184033, LEI 52990010NH26VC32Q522 (the "**Issuer**," which term includes any successor under the Indenture hereinafter referred to), for value received, promises to pay to _____, or its registered assigns, the principal sum of _____ DOLLARS (US$ _____) [or such other amount as indicated on the Schedule of Increases and Decreases in Global Note attached hereto] on March 5, 2034.

      Interest Rate: 6.450% per annum.

      Interest Payment Dates: March 5 and September 5 of each year, commencing on September 5, 2024.

      Regular Record Dates: March 1 and September 1 of each year (whether or not a Business Day).

      Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which will for all purposes have the same effect as if set forth at this place.

A-1

IN WITNESS WHEREOF, the Issuer has caused this Note to be signed manually, electronically or by facsimile by its duly authorized signatory.

RAIZEN FUELS FINANCE S.A.
as Issuer

By:   _____
          Name:
          Title:

Trustee's Certificate of Authentication

This is one of the 6.450% Green Notes due 2034 described in the Indenture referred to in this Note.

The Bank of New York Mellon, as Trustee

By:   _____
          Authorized Officer

Dated:

A-2

[FORM OF REVERSE SIDE OF NOTE]

**RAIZEN FUELS FINANCE S.A.**

**6.450% Green Notes Due 2034**

1.      *Principal and Interest.*

The Issuer promises to pay the principal of this Note on the Maturity Date.  The Issuer promises to pay interest on the principal amount of this Note on each Interest Payment Date, as set forth on the face of this Note at the rate of 6.450% per annum.  Interest will be payable semiannually (to the Holders of record of the Notes at the close of business on the March 1 or September 1 (whether or not a Business Day) immediately preceding the Interest Payment Date) on each Interest Payment Date, commencing on September 5, 2024.

Interest on this Note will accrue from the most recent date to which interest has been paid on this Note (or, if there is no existing Default in the payment of interest and if this Note is authenticated between a Regular Record Date and the next Interest Payment Date, from such Interest Payment Date) or, if no interest has been paid, from the Issue Date.  Interest will be computed in the basis of a 360 day year of twelve 30 day months. Any payments due on a day that is not a Business Day will be due on the immediately succeeding Business Day and no interest will accrue for the intervening period.

The Issuer will pay interest on overdue principal, premium, if any, and, to the extent lawful, interest at a rate per annum that is 1% per annum in excess of the rate per annum borne by this Note. Any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the second day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least two days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.

Additional Amounts will be paid in respect of any payments of interest or principal so that the amount a Holder receives after applicable deduction or withholding will equal the amount that the Holder would have received in the absence of such deduction or withholding, to the extent described in Section 3.01 of the Indenture.

2.      *Indentures; Note.*

This is one of the Notes issued under an Indenture dated as of March 5, 2024 (as amended or supplemented from time to time, the "**Indenture**"), among the Issuer, Raízen S.A. ("**Raízen**") and Raízen Energia S.A. ("**Raízen Energia**") as the Guarantors, and The Bank of New York Mellon, as Trustee, Registrar, Paying Agent and Transfer Agent.  Capitalized terms used herein are used as defined in the Indenture unless otherwise indicated.  The terms of the Notes include those stated in the Indenture, as may be amended from time to time.  The Notes are subject to all such terms, and Holders are referred to the Indenture for a statement of all such terms.  To the

A-3

extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture will control.

The Notes are general unsecured and unsubordinated obligations of the Issuer, ranking equally in right of payment with all existing and future unsecured unsubordinated obligations of the Issuer.  The Indenture limits the original aggregate principal amount of the Initial Notes to US$1,000,000,000, but Additional Notes may be issued pursuant to the Indenture, and the originally issued Notes and all such Additional Notes shall vote together for all purposes as a single series.

The Note Guarantees are unsecured unsubordinated obligations of Raízen and Raízen Energia, ranking equally in right of payment with all existing and future unsecured unsubordinated obligations of Raízen and Raízen Energia.

3.      *Redemption and Repurchase.*

The Note is subject to redemption for taxation reasons as described in Section 3.03 of the Indenture, redemption at the option of the Issuer or any Guarantor as described in Section 3.02 of the Indenture and redemption following a tender offer or Offer to Purchase as described in Section 3.04 of the Indenture.

The Note is subject to repurchase upon a Change of Control that results in a Rating Decline as described in Section 4.06 of the Indenture.

4.      *Registered Form; Denominations; Transfer; Exchange.*

The Notes are in registered form without coupons in minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof. A Holder may register the transfer or exchange of Notes in accordance with the Indenture. The Trustee may require a Holder to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.  Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to issue, register the transfer of or exchange any Note or certain portions of a Note.

5.      *Defaults and Remedies.*

If an Event of Default, as defined in the Indenture, occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the Outstanding Notes may declare all the Notes to be due and payable.  If a bankruptcy default with respect to the Issuer or a Guarantor occurs and is continuing, the Notes automatically become due and payable.  Holders may not enforce the Indenture or the Notes except as provided in the Indenture. The Trustee may require indemnity satisfactory to it before it enforces the Indenture or the Notes. Subject to certain limitations, Holders of a majority in principal amount of the Notes then Outstanding may direct the Trustee in its exercise of remedies.

6.      *Amendment and Waiver.*

A-4

Subject to certain exceptions, the Indenture and the Notes may be amended, or Default may be waived, with the consent of the Holders of a majority in principal amount of the Outstanding Notes.  Without notice to or the consent of any Holder, the Issuer, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Note Guarantees to, among other things, cure any ambiguity, omission, defect, inconsistency or to correct a manifest error if such amendment or supplement does not adversely affect the interests of the Holders in any material respect.

7.      *Authentication.*

This Note is not valid until the Trustee (or Authenticating Agent) signs the certificate of authentication on this Note.

8.      *Governing Law.*

This Note shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to its choice of law principles. Reference is hereby made to the further provisions of submission to jurisdiction, agent for service, waiver of immunities and judgment currency set forth in the Indenture, which will for all purposes have the same effect as if set forth herein.  For the avoidance of doubt, the application of the provisions set out in articles out in articles 470-1 to 470-19 (both included) of the Luxembourg Companies Law is excluded.

9.      *Abbreviations.*

Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian) and U/G/M/A/ (= Uniform Gifts to Minors Act).

The Issuer will furnish a copy of the Indenture to any Holder upon written request and without charge.

## FORM OF NOTATION OF NOTE GUARANTEE

For value received, each of the undersigned hereby unconditionally Guarantees the cash payments in U.S. Dollars of principal and interest on this Note (and including Additional Amounts payable thereon, if any) in the amounts and at the times when due, together with interest on the overdue principal and interest, if any, on this Note, if lawful, and the payment of all other obligations of the Issuer under the Indenture or the Notes, to the Holder of this Note and the Trustee, all in accordance with and subject to the terms and conditions of this Note and the Indenture. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture, dated as of March 5, 2024 among Raizen Fuels Finance S.A., as the Issuer, Raízen S.A. and Raízen Energia S.A. as the Guarantors, and The Bank of New York Mellon, as Trustee, Registrar, Paying Agent and Transfer Agent.

The obligations of the undersigned to the Holders and to the Trustee are expressly set forth in Article 10 of the Indenture. This Note Guarantee constitutes a direct, general and unconditional obligation of the undersigned which will at all times rank at least pari passu with all other present and future senior unsecured obligations of the undersigned, except for such obligations as may be preferred by mandatory provisions of law.

IN WITNESS WHEREOF, the undersigned have caused this Notation of Note Guarantee with respect to the 6.450% Green Notes due 2034 of Raizen Fuels Finance S.A. to be duly executed.

Dated: [          ]

RAÍZEN S.A. as Guarantor

By:     _____
        Name:
        Title:

By:     _____
        Name:
        Title:

RAÍZEN ENERGIA S.A. as Guarantor

By:     _____
        Name:
        Title:

By:     _____
        Name:
        Title:

A-7

[FORM OF TRANSFER NOTICE]

FOR VALUE RECEIVED the undersigned registered Holder hereby sell(s), assign(s) and transfer(s) unto

Insert Taxpayer Identification No.

_____

_____
Please print or typewrite name and address including zip code of assignee

_____

the within Note and all rights thereunder, hereby irrevocably constituting and appointing

_____

attorney to transfer said Note on the books of the Issuer with full power of substitution in the premises.

A-8

[THE FOLLOWING PROVISION TO BE INCLUDED ON ALL CERTIFICATES
BEARING A RESTRICTED LEGEND OR REGULATION S LEGEND]

In connection with any transfer of this Note occurring prior to the removal of the [Restricted Legend / Regulation S Legend], the undersigned confirms that such transfer is made without utilizing any general solicitation or general advertising and further as follows:

*Check One*

☐    (1) This Note is being transferred to a "qualified institutional buyer" in compliance with Rule 144A under the U.S. Securities Act of 1933, as amended, and certification in the form of Exhibit E to the Indenture is being furnished herewith.

☐    (2) This Note is being transferred to a Non-U.S. Person in compliance with the exemption from registration under the U.S. Securities Act of 1933, as amended, provided by Regulation S thereunder, and certification in the form of Exhibit D to the Indenture is being furnished herewith.

or

☐    (3) This Note is being transferred other than in accordance with (1) or (2) above and documents are being furnished which comply with the conditions of transfer set forth in this Note and the Indenture.

If none of the foregoing boxes is checked, the Trustee is not obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in the Indenture have been satisfied.

Date:

_____
Seller

By:    _____

NOTICE: The signature to this assignment must correspond with the name as written upon the face of the within mentioned instrument in every particular, without alteration or any change whatsoever.

A-9

Signature Guarantee:[1]

By: _____

To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

## OPTION OF HOLDER TO ELECT PURCHASE

If you wish to have all of this Note purchased by the Issuer, a Guarantor or a Designated Affiliate, as applicable, pursuant to Section 4.06 of the Indenture, check the box: ☐

If you wish to have a portion of this Note purchased by the Issuer, a Guarantor or a Designated Affiliate, as applicable, pursuant to Section 4.06 of the Indenture, state the amount (in original principal amount) below:

US$_____.

Date:_____

Your Signature:_____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee[1]: _____

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Trustee, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Trustee in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

A-11

SCHEDULE OF INCREASES AND DECREASES IN GLOBAL NOTE[1]

The following increases and decreases in the aggregate principal amount of this Global Note have been made:

| Date of Increase or Decrease | Amount of decrease in original principal amount of this Global Note | Amount of increase in original principal amount of this Global Note | Original principal amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

---

[1] For Global Notes.

A-12

**EXHIBIT B-1**

RESTRICTED LEGEND

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES FOR THE BENEFIT OF THE ISSUER AND THE GUARANTORS THAT THIS NOTE OR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (1) TO THE ISSUER OR THE GUARANTORS, (2) SO LONG AS THIS NOTE IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A) IN ACCORDANCE WITH RULE 144A, (3) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT, (4) PURSUANT TO ANOTHER APPLICABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE) OR (5) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, AND IN EACH OF SUCH CASES IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. AS A CONDITION TO THE REGISTRATION OF TRANSFER OF THIS NOTE PURSUANT TO CLAUSE (4) ABOVE, THE ISSUER, THE GUARANTORS OR THE TRUSTEE MAY REQUIRE DELIVERY OF ANY DOCUMENTATION OR OTHER EVIDENCE THAT IT, IN ITS SOLE DISCRETION, DEEMS NECESSARY OR APPROPRIATE TO EVIDENCE COMPLIANCE WITH THE EXEMPTION REFERRED TO IN SUCH CLAUSE (4) AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, REPRESENTS AND AGREES THAT IT SHALL NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO ABOVE.

THIS LEGEND MAY BE REMOVED SOLELY IN THE DISCRETION AND AT THE DIRECTION OF THE ISSUER OR THE GUARANTORS.

**EXHIBIT B-2**

REGULATION S LEGEND

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER THIS NOTE, PRIOR TO THE DATE THAT IS 40 DAYS AFTER THE LATER OF (1) THE ORIGINAL ISSUE DATE HEREOF AND (2) THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF THIS NOTE), ONLY (A) TO THE ISSUER, (B) UNDER A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE NOTES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER QUALIFIED INSTITUTIONAL BUYER AND TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) THROUGH OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES IN RELIANCE UPON REGULATION S OR (E) UNDER ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUER'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR OTHER TRANSFER PURSUANT TO CLAUSE (E) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, A CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO THE ISSUER.

**EXHIBIT C**

DTC LEGEND

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS A BENEFICIAL INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE ARE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF CEDE & CO. OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL NOTE ARE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE TRANSFER PROVISIONS OF THE INDENTURE.

**EXHIBIT D**

Regulation S Certificate

_____, ____

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: Corporate Trust Administration

Re:    RAIZEN FUELS FINANCE S.A., as issuer (the "**Issuer**")
       6.450% Green Notes due 2034

Ladies and Gentlemen:

Reference is hereby made to the indenture dated as of March 5, 2024 (the "**Indenture**"), among the Issuer, Raízen S.A. and Raízen Energia S.A., as guarantors, and The Bank of New York Mellon, as trustee (the "**Trustee**"), registrar, transfer agent and paying agent. Terms used in this Certificate shall have the meaning set forth in the Indenture or Regulation S ("**Regulation S**") under the Securities Act of 1933, as amended (the "**Securities Act**"), except as otherwise stated herein.

[*CHECK A OR B AS APPLICABLE*.]

☐ A.  This Certificate relates to our proposed transfer of US$____ principal amount of the Issuer's 6.450% Green Notes due 2034 (the "**Notes**") represented by a U.S. Global Note (CUSIP: [  ]) for an equal beneficial interest in the Offshore Global Note (CUSIP: [  ]).  We hereby certify as follows:

1.    The offer and sale of the Notes was not and will not be made to a person in the United States (unless such person is excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(vi) or the account held by it for which it is acting is excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(i) under the circumstances described in Rule 902(h)(3)) and such offer and sale was not and will not be specifically targeted at an identifiable group of U.S. citizens abroad.

2.    Unless the circumstances described in the parenthetical in paragraph 1 above are applicable, either (a) at the time the buy order was originated, the buyer was outside the United States or we and any person acting on our behalf reasonably believed that the buyer was outside the United States or (b) the transaction was executed in, on or through the facilities of a designated offshore securities market, and neither we nor any person acting on our behalf knows that the transaction was pre-arranged with a buyer in the United States;

3.      Neither we, any of our affiliates, nor any person acting on our or their behalf, has made any directed selling efforts in the United States with respect to the Notes;

4.      The proposed transfer of Notes is not part of a plan or scheme to evade the registration requirements of the Securities Act; and

5.      If we are a dealer or a person receiving a selling concession, fee or other remuneration in respect of the Notes, and the proposed transfer takes place during the first 40 days following the issue date of such Notes, or we are an officer or director of the Issuer or an Initial Purchaser (as defined in the Indenture), we certify that the proposed transfer is being made in accordance with the provisions of Rule 904(b) of Regulation S.

☐ B.   This Certificate relates to our proposed exchange of US$____ principal amount of the Issuer's 6.450% Green Notes due 2034 (the "**Notes**") represented by a U.S. Global Note (CUSIP: [ ]) for an equal beneficial interest in the Offshore Global Note (CUSIP: [ ]). We hereby certify as follows:

1.      At the time the offer and sale of the Notes was made to us, either (i) we were not in the United States or (ii) we were excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(vi) or the account held by us for which we were acting was excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(i) under the circumstances described in Rule 902(h)(3); and we were not a member of an identifiable group of U.S. citizens abroad;

2.      Unless the circumstances described in paragraph 1(ii) above are applicable, either (a) at the time our buy order was originated, we were outside the United States or (b) the transaction was executed in, on or through the facilities of a designated offshore securities market, and we did not pre-arrange the transaction in the United States.; and

3.      The proposed exchange of Notes is not part of a plan or scheme to evade the registration requirements of the Securities Act.

You and the Issuer are entitled to rely conclusively upon this Certificate and are irrevocably authorized to produce this Certificate or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

D-2

Very truly yours,

[NAME OF SELLER (FOR TRANSFERS) OR
OWNER (FOR EXCHANGES)]

By:    _____
       Name:
       Title:
       Address

Date:    _____

Signature Guarantee:[1]

By: _____
       To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

EXECUTION VERSION

**EXHIBIT E**

Rule 144A Certificate

_____, _____

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: Corporate Trust Administration

Re:    RAIZEN FUELS FINANCE S.A., as issuer (the "**Issuer**")
       6.450% Green Notes due 2034

Ladies and Gentlemen:

Reference is hereby made to the indenture dated as of March 5, 2024 (the "**Indenture**"), among the Issuer, Raízen S.A. and Raízen Energia S.A., as guarantors, and The Bank of New York Mellon, as trustee (the "**Trustee**"), registrar, transfer agent and paying agent. Terms used in this Certificate shall have the meaning set forth in the Indenture or Rule 144A ("**Rule 144A**") under the Securities Act of 1933, as amended (the "**Securities Act**"), except as otherwise stated herein.

**[*CHECK A OR B AS APPLICABLE.*]**

☐ A.   This Certificate relates to our proposed transfer of US$____ principal amount of the Issuer's 6.450% Green Notes due 2034 (the "**Notes**") represented by an Offshore Global Note (CUSIP: [ ]) for an equal beneficial interest in the U.S. Global Note (CUSIP: [ ]). We hereby certify as follows:

☐ B.   This Certificate relates to our proposed exchange of US$____ principal amount of the Issuer's 6.450% Green Notes due 2034 (the "**Notes**") represented by an Offshore Global Note (CUSIP: [ ]) for an equal beneficial interest in the U.S. Global Note (CUSIP: [ ]). We hereby certify as follows:

We and, if applicable, each account for which we are acting in the aggregate owned and invested more than US$____ in securities of issuers that are not affiliated with us (or such accounts, if applicable), as of _____, 20__, which is a date on or since close of our most recent fiscal year. We and, if applicable, each account for which we are acting, are a qualified institutional buyer within the meaning of Rule 144A. If we are acting on behalf of an account, we exercise sole investment discretion with respect to such account. We are aware that the transfer of Notes to us, or such exchange, as applicable, is being made in reliance upon the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. Prior to the date of this Certificate we have received such information regarding the Issuer as we have requested pursuant to Rule 144A(d)(4) to the extent that the Issuer is not then subject to Section 13 or 15(d) of the

E-1

Exchange Act, or is not exempt from reporting pursuant to Rule 12g3 2(b) under the Exchange Act or have determined not to request such information.

You and the Issuer are entitled to conclusively rely upon this Certificate and are irrevocably authorized to produce this Certificate or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

Very truly yours,

[NAME OF SELLER (FOR TRANSFERS) OR OWNER (FOR EXCHANGES)]

By: _____
     Name:
     Title:
     Address:

Date: _____

E-2

Signature Guarantee:[1]

By:    _____
      To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

# EXHIBIT G

**2035 Notes Indenture**

*EXECUTION VERSION*

**RAIZEN FUELS FINANCE S.A.**
**as Issuer**

**RAÍZEN S.A.**
**and**
**RAÍZEN ENERGIA S.A.**
**as Guarantors**

**and**

**THE BANK OF NEW YORK MELLON**
**as Trustee, Registrar, Paying Agent and Transfer Agent**

_____

**Indenture**

**Dated as of September 17, 2024**

_____

**5.700% Green Notes Due 2035**
**Unconditionally and Irrevocably Guaranteed by**
**Raízen S.A. and Raízen Energia S.A.**

**TABLE OF CONTENTS**

<u>**PAGE**</u>

ARTICLE 1 DEFINITIONS AND INCORPORATION BY REFERENCE ................................ 1

*Section 1.01.   Definitions* ................................................................................. *1*
*Section 1.02.   Rules of Construction* ............................................................... 15

ARTICLE 2 THE NOTES ....................................................................................... 15

*Section 2.01.   Form, Dating and Denominations; Legends* ............................ 15
*Section 2.02.   Execution and Authentication; Additional Notes* .................... 16
*Section 2.03.   Registrar, Paying Agent, Transfer Agent and Authenticating Agent;
                 Paying Agent to Hold Money in Trust* ................................... 17
*Section 2.04.   Replacement Notes* .................................................................. 18
*Section 2.05.   Outstanding Notes* ................................................................... 18
*Section 2.06.   Temporary Notes* ..................................................................... 19
*Section 2.07.   Cancellation* ............................................................................ 19
*Section 2.08.   CUSIP and ISIN Numbers* ....................................................... 19
*Section 2.09.   Registration, Transfer and Exchange* ..................................... 19
*Section 2.10.   Restrictions on Transfer and Exchange* ................................... 22
*Section 2.11.   Open Market Purchases* ........................................................... 24
*Section 2.12.   Trustee's Disclaimer* ............................................................... 24

ARTICLE 3 ADDITIONAL AMOUNTS; REDEMPTION ......................................... 24

*Section 3.01.   Additional Amounts* ................................................................. 24
*Section 3.02.   Optional Redemption* ............................................................... 27
*Section 3.03.   Redemption for Taxation Reasons* ........................................... 28
*Section 3.04.   Redemption Following Tender Offer* ........................................ 28
*Section 3.05.   Election to Redeem; Selection of Notes* ................................... 29
*Section 3.06.   Notice of Redemption* ............................................................... 29
*Section 3.07.   Deposit of Redemption Price* ................................................... 31
*Section 3.08.   Effect of Notice of Redemption.* ............................................... 31

ARTICLE 4 COVENANTS ...................................................................................... 31

*Section 4.01.   Payment of Notes* ..................................................................... 31
*Section 4.02.   Maintenance of Office or Agency* ............................................ 32
*Section 4.03.   Existence* .................................................................................. 33
*Section 4.04.   Payment of Taxes* ..................................................................... 33
*Section 4.05.   Maintenance of Properties* ...................................................... 33
*Section 4.06.   Repurchases at the Option of the Holders Upon Change of Control* ....... 33
*Section 4.07.   Limitation on Liens* ................................................................. 36
*Section 4.08.   Reporting Requirements* .......................................................... 36
*Section 4.09.   Disclosure of Names and Addresses of Holders* ...................... 37
*Section 4.10.   Paying Agent and Transfer Agent* ........................................... 37

i

*Section 4.11.  Limitation on Issuer.* .................................................................... 38

ARTICLE 5 CONSOLIDATION, MERGER OR SALE OF ASSETS ...................................... 38

*Section 5.01.  Consolidation, Merger or Sale of Assets* .................................... 38

ARTICLE 6 DEFAULT AND REMEDIES ................................................................... 39

*Section 6.01.  Events of Default* ........................................................................ 39
*Section 6.02.  Acceleration* ............................................................................... 40
*Section 6.03.  Other Remedies* .......................................................................... 41
*Section 6.04.  Waiver of Past Defaults* ............................................................. 41
*Section 6.05.  Control by Majority* .................................................................... 41
*Section 6.06.  Limitation on Suits* ..................................................................... 42
*Section 6.07.  Rights of Holders to Receive Payment* ....................................... 42
*Section 6.08.  Collection Suit by Trustee* .......................................................... 42
*Section 6.09.  Trustee May File Proofs of Claim* .............................................. 42
*Section 6.10.  Priorities* ..................................................................................... 43
*Section 6.11.  Restoration of Rights and Remedies* .......................................... 43
*Section 6.12.  Undertaking for Costs* ................................................................ 43
*Section 6.13.  Rights and Remedies Cumulative.* .............................................. 44
*Section 6.14.  Delay or Omission Not Waiver; Prescription of Claims* ............ 44
*Section 6.15.  Waiver of Stay, Extension or Usury Laws* .................................. 44

ARTICLE 7 THE TRUSTEE ...................................................................................... 44

*Section 7.01.  General* ........................................................................................ 44
*Section 7.02.  Certain Rights of Trustee* ........................................................... 45
*Section 7.03.  Individual Rights of Trustee* ....................................................... 47
*Section 7.04.  Trust Indenture Act* ..................................................................... 47
*Section 7.05.  Trustee's Disclaimer* ................................................................... 47
*Section 7.06.  Notice of Default* ......................................................................... 48
*Section 7.07.  Compensation and Indemnity* ..................................................... 48
*Section 7.08.  Replacement of Trustee* .............................................................. 49
*Section 7.09.  Successor Trustee by Merger* ...................................................... 50
*Section 7.10.  Money Held in Trust* ................................................................... 50
*Section 7.11.  Force Majeure* ............................................................................. 50
*Section 7.12.  Corporate Trustee Required; Eligibility; Conflicting Interests* ... 50
*Section 7.13.  Trustee and Others May Hold Notes* ........................................... 50
*Section 7.14.  Agents.* ......................................................................................... 50

ARTICLE 8 DEFEASANCE AND DISCHARGE ........................................................... 53

*Section 8.01.  Discharge of Issuer's Obligations* .............................................. 53
*Section 8.02.  Legal Defeasance* ........................................................................ 54
*Section 8.03.  Covenant Defeasance* .................................................................. 54
*Section 8.04.  Application of Trust Money* ......................................................... 55
*Section 8.05.  Repayment to Issuer* .................................................................... 55

ii

*Section 8.06.    Reinstatement* ................................................................. *55*

ARTICLE 9 AMENDMENTS, SUPPLEMENTS AND WAIVERS ............................ 56

*Section 9.01.    Amendments Without Consent of Holders* ............................ *56*
*Section 9.02.    Amendments With Consent of Holders* ................................ *56*
*Section 9.03.    Substitution of the Issuer* ................................................ *57*
*Section 9.04.    Effect of Consent* ............................................................ *59*
*Section 9.05.    Trustee's Rights and Obligations* ...................................... *60*

ARTICLE 10 NOTE GUARANTEES ........................................................ 60

*Section 10.01. Note Guarantees* ................................................................ *60*
*Section 10.02. Limitation on Liability* ...................................................... *62*
*Section 10.03. Successors and Assigns* ...................................................... *62*
*Section 10.04. No Waiver* ........................................................................ *62*
*Section 10.05. Modification* ...................................................................... *62*
*Section 10.06. Notation of Note Guarantee; Non-Impairment* ...................... *63*

ARTICLE 11 MISCELLANEOUS ........................................................... 63

*Section 11.01. Noteholder Communications; Noteholder Actions* .................. *63*
*Section 11.02. Notices* .............................................................................. *64*
*Section 11.03. Certificate and Opinion as to Conditions Precedent* ............... *66*
*Section 11.04. Statements Required in Certificate or Opinion* ...................... *67*
*Section 11.05. Payment Date Other than a Business Day* ............................. *67*
*Section 11.06. Governing Law* ................................................................... *67*
*Section 11.07. Submission to Jurisdiction; Agent for Service* ....................... *67*
*Section 11.08. Judgment Currency* ............................................................ *68*
*Section 11.09. No Adverse Interpretation of Other Agreements* .................... *69*
*Section 11.10. Successors* .......................................................................... *69*
*Section 11.11. Duplicate Originals* ............................................................ *69*
*Section 11.12. Separability* ....................................................................... *69*
*Section 11.13. Table of Contents and Headings* .......................................... *69*
*Section 11.14. No Liability of Directors, Officers, Employees, Incorporators,
                Members and Stockholders* .................................................. *70*
*Section 11.15. Waiver of Jury Trial* ........................................................... *70*
*Section 11.16. Tax Matters* ....................................................................... *70*
*Section 11.17. USA Patriot Act* ................................................................. *70*

<u>EXHIBITS</u>

EXHIBIT A Form of Note ................................................................................................. A-1

EXHIBIT B Restricted Legend......................................................................................B-1

EXHIBIT C DTC Legend...............................................................................................C-1

EXHIBIT D Regulation S Certificate .................................................................. D-1

EXHIBIT E Rule 144A Certificate........................................................................E-1

INDENTURE, dated as of September 17, 2024, between RAIZEN FUELS FINANCE S.A., a public limited liability company (*société anonyme*) organized and existing under the laws of Luxembourg, having its registered office at 16, Rue Eugène Ruppert, L-2453 Luxembourg, and registered with the Luxembourg Register of Commerce and Companies (*Registre de commerce et des sociétés, Luxembourg*) under number B184033, LEI 52990010NH26VC32Q522, as the issuer (the "**Issuer**"), RAÍZEN S.A. ("**Raízen**") and RAÍZEN ENERGIA S.A. ("**Raízen Energia**") as the Guarantors, and THE BANK OF NEW YORK MELLON as Trustee, Registrar, Paying Agent and Transfer Agent.

## RECITALS

The Issuer has duly authorized the execution and delivery of this Indenture to provide for the issuance of the Issuer's 5.700% Green Notes due 2035 (the "**Notes**"). All things necessary to make this Indenture a valid and binding agreement of the Issuer, in accordance with its terms, have been done, and the Issuer has done all things necessary to make the Notes (in the case of the Additional Notes, when duly authorized), when executed by the Issuer and authenticated and delivered by the Trustee and duly issued by the Issuer, the valid obligations of the Issuer as hereinafter provided.

In addition, each of the Guarantors has duly authorized the execution and delivery of this Indenture as Guarantor. All things necessary to make this Indenture a valid and binding agreement of the Guarantors, in accordance with its terms, have been done, and each Guarantor has done all things necessary to make its Note Guarantee, when the Notes are executed by the Issuer and authenticated and delivered by the Trustee and duly issued by the Issuer, the valid, legal and binding obligation of such Guarantor.

## WITNESSETH

For and in consideration of the premises and the purchase of the Notes by the Holders thereof, the parties hereto covenant and agree, for the equal and proportionate benefit of all Holders, as follows:

## ARTICLE 1
## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01.  *Definitions*.

"**Additional Amounts**" has the meaning assigned to such term in Section 3.01(a).

"**Additional Notes**" means the Issuer's 5.700% Green Notes due 2035 (other than the Initial Notes) issued after the Issue Date in accordance with Section 2.02 hereof, as part of the same series as the Initial Notes.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" (including the terms "controlling," "controlled by" and "under common control with") as to any Person shall mean the possession, directly or indirectly, of the power to direct or cause

the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by contract or otherwise.

"**Agent**" means any Registrar, Paying Agent, Transfer Agent, Authenticating Agent or other agent hereunder, as duly appointed by the Issuer (or by the Trustee in the case of the Authenticating Agent).

"**Agent Member**" means a member of, or a participant in, the Depositary.

"**Applicable GAAP**" means, with respect to the Issuer or any Guarantor, either (i) generally accepted accounting principles in the jurisdiction where such Issuer or Guarantor is organized or incorporated or (ii) International Financial Reporting Standards (IFRS) issued by the International Accounting Standards Board (IASB) and related interpretations, in each case, as in effect from time to time.

"**Applicable Law**" has the meaning assigned to such term in Section 11.16.

"**Authenticating Agent**" refers to the Trustee's designee for authentication of the Notes.

"**Authentication Order**" has the meaning assigned to such term in Section 2.02(c).

"**Authorized Signatories**" has the meaning assigned to such term in Section 11.02.

"**bankruptcy default**" means the Events of Default set forth in Section 6.01(a)(v) and/or (vi).

"**Board of Directors**" means the board of directors or comparable governing body of the Issuer or any Guarantor, as applicable, or any committee thereof duly authorized to act on its behalf.

"**Board Resolution**" means a resolution duly adopted by the Board of Directors, which is certified by the Secretary, Assistant Secretary, a director or another Person performing corporate secretarial functions of the Issuer or a Guarantor, as applicable, and remains in full force and effect as of the date of its certification.

"**Brazil'**" means the Federative Republic of Brazil.

"**Business Day**" means any day other than a Saturday, a Sunday or a legal holiday or a day on which banking institutions or trust companies are authorized or obligated by law to close in The City of New York, Luxembourg or São Paulo, Brazil.

"**Capital Stock**" means, as to any Person, any and all shares, interests, participations, quotas or other equivalents (however designated, whether voting or non-voting) of capital stock or equity interest in such Person, and any and all warrants or rights or options to purchase any of the foregoing, but excluding any debt securities convertible into or exchangeable for any of the foregoing.

"**Central Bank**" means the Central Bank of Brazil (*Banco Central do Brasil*).

2

"**Certificated Note**" means a Note in registered, individual, non-global form without interest coupons.

"**Change of Control**" means an event as a result of which (1) any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), other than one or more Permitted Holders or a group that includes one or more Permitted Holders in which such Permitted Holder or Permitted Holders hold and have voting power over at least a majority of the Voting Stock of Raízen held by such group, becomes the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act) of more than 50% of the total voting power of the Voting Stock of Raízen; or (2) Permitted Holders, directly or indirectly, cease to have the power to direct or cause the direction of the management and policies of Raízen, whether through the ownership of voting securities, by contract or otherwise.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Consolidated Net Worth**" means the total shareholders' equity (including both controlling and non-controlling interests) of Raízen and its Subsidiaries determined on a consolidated basis in accordance with Applicable GAAP.

"**Corporate Trust Office**" means the office of the Trustee at which the corporate trust business of the Trustee is administered, which at the date of this Indenture is located at 240 Greenwich Street, 7th Floor East, New York, New York 10286, Attention: Corporate Trust Administration, or such other address as the Trustee may designate from time to time by notice to the Holders and the Issuer, or the principal corporate trust office of any successor Trustee.

"**Debt**" means, with respect to any Person, without duplication:

(1)    all indebtedness of such Person for borrowed money;

(2)    all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (but excluding trade accounts payable or other short-term obligations to suppliers or customers payable within 360 days, in each case arising in the ordinary course of business);

(3)    all obligations, contingent or otherwise, of such Person in respect of acceptances, letters of credit, financial guaranty insurance policies or similar extensions of credit (excluding (i) trade payables and (ii) other obligations with respect to letters of credit securing obligations (other than obligations described in clauses (1) and (2) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit);

(4)    all obligations of such Person under Hedging Agreements; and

(5)    all Debt of other Persons referred to in clauses (1) through (4) above that is Guaranteed by such Person's Guarantee (other than obligations of other Persons that are customers or suppliers of such Person for which such Person is or becomes so responsible

3

or liable in the ordinary course of business to (but only to) the extent that such Person does not, or is not required to, make payment in respect thereof);

if and to the extent any of the preceding items (other than Guarantees, letters of credit and Hedging Agreements) would appear as a liability upon the balance sheet of the specified Person in accordance with Applicable GAAP; it being understood that leases in effect on the Issue Date that are deemed operating leases under IFRS 16 – Leases will not be deemed "Debt."

The amount of Debt of any Person will be deemed to be:

(1) with respect to a revolving credit or similar facility, the total amounts of funds borrowed and then outstanding;

(2) with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation;

(3) with respect to any Debt issued with original issue discount, the face amount of such Debt less the remaining unamortized portion of the original issue discount of such Debt;

(4) with respect to any Hedging Agreement, the net amount payable if such Hedging Agreement terminated at that time due to default by such Person reasonably determined by the Issuer on the basis of customary "marked-to-market" methodology; and

(5) otherwise, the outstanding principal amount thereof.

The principal amount of any Debt or other obligation that is denominated in any currency other than United States dollars (after giving effect to any Hedging Agreement in respect thereof) shall be the amount thereof, as determined pursuant to the foregoing sentence, converted into United States dollars at the Spot Rate in effect on the date of determination.

"**Default**" means an event or condition which upon notice, lapse of time or both would become an Event of Default.

"**Depositary**" means the depositary of each Global Note, which will initially be DTC.

"**Designated Affiliate**" means, at any time, one or more Persons (including, without limitation, a Guarantor) designated by the Issuer to be the purchaser of Notes under an Offer to Purchase.

"**Dollars**" means United States Dollars in immediately available funds.

"**DTC**" means The Depository Trust Company, a New York corporation, and its successors.

"**DTC Legend**" means the legend set forth in Exhibit C.

4

"**Electronic Means**" has the meaning assigned to such term in Section 11.02.

"**Event of Default**" has the meaning assigned to such term in Section 6.01.

"**Excess Additional Amounts**" has the meaning assigned to such term in Section 3.03.

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Expiration Date**" has the meaning assigned to such term in Section 4.06(a)(v).

"**FATCA**" has the meaning assigned to such term in Section 3.01(a)(ix)

"**Fitch**" means Fitch Ratings, Inc., and any successor to its rating agency business.

"**Global Note**" means a Note in registered global form without interest coupons registered in the name of the Depositary (or its nominee) as depositary for the beneficial owners thereof.

"**Guarantee**" means any obligation of a Person to pay the Debt of another Person, including without limitation:

(1)     an obligation to pay or purchase such Debt;

(2)     an obligation to lend money or to purchase or subscribe shares or other securities or to purchase assets or services in order to provide funds for the payment of such Debt; or

(3)     any other agreement to be responsible for such Debt;

*provided, however,* that the term "**Guarantee**" shall not include endorsements for collection or deposit in the ordinary course of business. The term "**Guarantee**" used as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning assigned to such term in Section 10.01(a).

"**Guarantor**" means each of (i) Raízen, (ii) Raízen Energia, and (iii) any other Person Guaranteeing the Issuer's obligations under the Notes and this Indenture.

"**Hedging Agreement**" means, with respect to any Person, all net obligations of such Person in respect of any interest rate protection agreement, any currency or commodity swap, cap or collar agreement, any equity swap or any similar arrangement entered into by such Person providing for the transfer or mitigation of interest rate, currency, commodity price or equity risks either generally or under specific contingencies (but without regard to any notional principal amount relating thereto).

"**Holder**" or "**Noteholder**" means the Person in whose name a Note is registered in the Register maintained by the Registrar.

"**Indenture**" means this indenture, as amended or supplemented from time to time.

5

"**Initial Notes**" means the US$1,000,000,000 aggregate principal amount of Notes issued on the date hereof.

"**Initial Purchaser**" or "**Initial Purchasers**" means any initial purchaser or initial purchasers party to a purchase agreement with the Issuer relating to the sale of the Notes or Additional Notes by the Issuer.

"**Instructions**" has the meaning assigned to such term in Section 11.02.

"**Interest Payment Date**" means each January 17 and July 17 of each year, commencing on January 17, 2025.

"**Investment Grade**" means BBB- or higher by S&P, Baa3 or higher by Moody's or BBB- or higher by Fitch, or the equivalent of such global ratings by S&P, Moody's or Fitch.

"**Issue Date**" means September 17, 2024.

"**Issuer**" means the party named as such in the first paragraph of this Indenture or any successor obligor under this Indenture and the Notes pursuant to Sections 5.01 and Section 9.03.

"**Lien**" means, with respect to any Property, any mortgage, pledge, usufruct, fiduciary transfer (*alienação* or *cessão fiduciária*), charge or other encumbrance, lien, security interest or any preferential arrangement (including a securitization) that has the practical effect of creating a security interest on or with respect to such Property; *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"**Low or Nil Tax Jurisdiction**" means a jurisdiction that does not impose income tax or that imposes it at a maximum rate lower than 17%, or whose laws do not allow access to information related to ownership composition or securities ownership or permit the identification of the beneficial owner of income attributed to non-residents.

"**Luxembourg**" means the Grand Duchy of Luxembourg.

"**Luxembourg Companies Law**" means the Luxembourg law of 10 August 1915 on commercial companies, as amended.

"**Material Adverse Effect**" means (i) any material adverse effect on the financial condition, business, properties or results of operations of Raízen and its Subsidiaries taken as a whole and (ii) any material adverse effect on the ability of the Issuer or the Guarantors to perform their respective obligations under this Indenture, the Notes or the Note Guarantees.

"**Maturity Date**" means January 17, 2035.

"**Moody's**" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"**Non-Recourse Debt**" means Debt (or any portion thereof) of a Subsidiary of Raízen (the "**Non-Recourse Debtor**") used to finance (i) the creation, development, construction,

improvement or acquisition of projects, Properties or assets and any extensions, renewals or refinancings of such Debt including the cost of the refinancing or (ii) the operations of projects, Properties or assets of such Non-Recourse Debtor or its Subsidiaries; *provided* that the recourse of the lender thereof (including any agent, trustee, receiver or other Person acting on behalf of such entity) in respect of such Debt is limited (other than in respect of the Recourse Amount (as defined herein)) to the Non-Recourse Debtor, any debt securities issued by the Non-Recourse Debtor, the Capital Stock of the Non-Recourse Debtor, and any assets, receivables, inventory, equipment, chattels, contracts, intangibles, rights and any other assets of such Non-Recourse Debtor and its Subsidiaries connected with the projects, properties or assets created, developed, constructed, improved, acquired or operated, as the case may be, in respect of which such Debt has been incurred; *provided, further*, that if such lender additionally has contractual recourse to Raízen or to any Subsidiary of Raízen (other than the Non-Recourse Debtor and its Subsidiaries) for the repayment of any portion of such Debt (such portion, the "**Recourse Amount**"), then the Recourse Amount will not constitute Non-Recourse Debt and the Issuer or the relevant Guarantor, as the case may be, will be deemed to have incurred Debt in an aggregate principal amount equal to the Recourse Amount.

"**Non U.S. Person**" means a Person that is not a U.S. Person under Regulation S.

"**Notation of Note Guarantee**" has the meaning assigned to such term in Section 10.06.

"**Note Guarantee**" means each Guarantee by the Guarantors of the Guaranteed Obligations pursuant to this Indenture and the Notes.

"**Notes**" has the meaning assigned to such term in the Recitals. The Initial Notes and any Additional Notes shall be treated as a single class for all purposes under this Indenture, and unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additional Notes.

"**Offer to Purchase**" has the meaning assigned to such term in Section 4.06(a).

"**Offer to Purchase Payment**" has the meaning assigned to such term in Section 4.06(a).

"**Offer to Purchase Payment Date**" has the meaning assigned to such term in Section 4.06(a)(v).

"**Offering Memorandum**" means the final offering memorandum dated September 12, 2024 prepared by the Issuer in connection with the offering of the Initial Notes.

"**Officer**" means a director, the president or chief executive officer, any vice president, the chief financial officer, the treasurer or any assistant treasurer, or the secretary or any assistant secretary, or any attorney-in-fact of each of the Issuer and the Guarantors, as applicable, or any other Person duly appointed by the shareholders or the Board of Directors of each of the Issuer and the Guarantors, as applicable, to perform corporate duties.

"**Officer's Certificate**" means, with respect to any Person, a certificate signed by the chairman of the board (or equivalent governing body), president, vice-president, chief executive officer, chief operating officer, chief financial officer, chief accounting officer, director or

manager, as applicable, or any treasurer, secretary or authorized signatory or, to the extent applicable, general counsel of such Person.

"**Offshore Global Note**" means a Global Note that bears the Regulation S Legend representing Notes issued and sold pursuant to Regulation S.

"**Opinion of Counsel**" means a written opinion from legal counsel who may be an employee of or counsel to the Issuer, which opinion shall be reasonably acceptable to the Trustee.

"**Outstanding**" has the meaning assigned to such term in Section 2.05.

"**Par Call Date**" has the meaning assigned to such term in Section 3.02(a)

"**Paying Agent**" refers to The Bank of New York Mellon in its capacity as paying agent and its successors, and such other paying agents as the Issuer shall appoint.

"**Permitted Holders**" means each of (i) Royal Dutch Shell PLC and its Affiliates and (ii) Cosan S.A. and its Affiliates (in each case, including any successors and assigns thereof).

"**Permitted Liens**" means:

(1)     any Liens existing on the Issue Date;

(2)     any Liens extending, renewing or replacing (or successive extensions, renewals or replacements of), in whole or in part, any Lien referred to in clauses (1), (3), (4), (10) and (13) hereof; *provided* that the principal amount of Debt secured thereby shall not exceed the principal amount of Debt so secured at the time of such extension, renewal or replacement, except for any increase reflecting premiums, fees and expenses in connection with such extension, renewal or replacement;

(3)     any Liens created solely for the purpose of securing the payment of all or a part of the purchase price (or the cost of construction or improvement, and any related transaction fees and expenses) of assets or Property (including Capital Stock of any Person) acquired, constructed or improved after the Issue Date, including related transaction fees and expenses (or securing Debt incurred to refinance a bridge or other interim financing that is initially incurred for the purpose of financing such acquisition, construction or improvement of such Property or assets, including related transaction fees and expenses); *provided* that (a) the aggregate principal amount of Debt secured by such Liens shall not exceed (but may be less than) the greater of (i) the purchase price of the assets or Property so acquired, constructed or improved, or (ii) the aggregate Debt incurred solely for the acquisition, construction, or improvement of such Property or assets, as the case may be, (b) such Liens shall not encumber any assets or Property other than the assets or Property so acquired, constructed or improved and (c) other than any unimproved real property on which the Property so constructed, or the improvement, is located, such Liens shall attach to such assets or Property within 365 days of the construction, acquisition or improvement of such assets or Property; *provided, further*, that any Lien is permitted to be incurred on the Capital Stock of any Person securing any Debt of that Person that is (i) Non-Recourse

8

Debt and (ii) incurred for purposes of financing the acquisition, construction or improvement of any Property or assets of such Person;

(4)      any Liens securing Debt for the purpose of financing all or part of the cost of the acquisition, construction or development of a project; *provided* that (a) the Lien in respect of such Debt is limited to assets (including Capital Stock of the project entity) or Property of such project, (b) the aggregate principal amount of Debt secured by the Liens will not exceed (but may be less than) the greater of (i) the cost (i.e., purchase price) of the project so acquired, constructed or developed or (ii) the aggregate Debt incurred solely for the acquisition, construction, or improvement of such project, as the case may be, and (c) the Lien is incurred before, or within 365 days after the completion of, that acquisition, construction or development and does not apply to any other Property or assets of Raízen or any Significant Subsidiary;

(5)      any Liens imposed by applicable law incurred in the ordinary course of business, including carriers', warehousemen's and mechanics' liens, statutory landlord's liens, and other similar liens and encumbrances arising in the ordinary course of business, in each case for sums not yet due or being contested in good faith by appropriate proceedings;

(6)      any Liens securing taxes, duties, assessments, fees and other governmental charges or levies, in each case the payment of which is not yet due or is being contested in good faith by appropriate proceedings and for which such adequate reserves or other appropriate provisions, if any, as shall be required by Applicable GAAP shall have been made;

(7)      pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other similar social security legislation, any deposit to secure appeal bonds in proceedings being contested in good faith, good faith deposits in connection with bids, tenders, contracts (other than for the payment of Debt) or leases or deposits for the payment of rent, in each case made in the ordinary course of business;

(8)      customary reservations or retentions of title, minor defects, easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, licenses, restrictions on the use of Property or assets or minor imperfections in title that do not in the aggregate materially impair the value or use of the Property or assets affected thereby, and any leases and subleases of real property that do not in the aggregate materially interfere with the ordinary conduct of the business of the Issuer, any Guarantor or any Significant Subsidiary, and which are made on customary and usual terms applicable to similar properties;

(9)      encumbrances, security deposits or reserves maintained in the ordinary course of business and required by applicable law;

(10)    any Liens (i) granted to secure borrowings directly or indirectly from Banco Nacional de Desenvolvimento Econômico e Social-BNDES, or any other federal, regional or state Brazilian governmental development bank or credit agency (including borrowings from any Brazilian governmental bank with funds provided by Brazilian governmental

regional funds (which shall include, without limitation, Financiadora de Estudos e Projetos – FINEP, *Fundo de Desenvolvimento do Nordeste* – FDNE and *Fundo de Desenvolvimento do Centro Oeste* – FCO)) or (ii) granted to secure borrowings from any international or multilateral development bank, government-sponsored agency, export-import bank or official export-import credit insurer, export-credit agency or commercial bank acting as co-lender in any of the foregoing;

(11)    any Liens in favor of issuers of surety bonds, appeal bonds, bid bonds, tender bonds, letters of credit or similar instruments issued pursuant to the request of and for the account of any of the Issuer or the Guarantors or any of their Subsidiaries in the ordinary course of business (including all bonds required by law, contract or tender rules);

(12)    any Liens securing obligations under any Hedging Agreements, so long as such Hedging Agreements  are entered into for bona fide, non-speculative purposes;

(13)    any Liens existing on any Property or assets of any Person before that Person's acquisition (in whole or in part) by, merger into or consolidation with or sale of assets to any of the Issuer, the Guarantors or any Subsidiary thereof after the Issue Date; *provided* that the Lien is not created in contemplation of or in connection with such acquisition, merger or consolidation and such Lien does not extend to any other property of the Issuer, the Guarantors or any Subsidiary thereof;

(14)    any Liens on inventory, receivables and related assets of any of the Issuer, the Guarantors or any of their Subsidiaries securing the obligations of the Issuer, such Guarantor or such Subsidiary, as applicable, under any lines of credit or working capital or export or import trade finance facility or other trade transaction; *provided* that the aggregate principal amount of Debt incurred that is secured by such receivables that shall fall due in any calendar year shall not exceed 80% of Raízen's consolidated net operating revenues for the most recently concluded period of four consecutive fiscal quarters; *provided, further,* that advance transactions will not be deemed transactions secured by receivables, inventory or related assets for purposes of the above calculations;

(15)    any judgment Lien not giving rise to an Event of Default;

(16)    any interest or title of a lessor under any capitalized lease obligation; *provided* that such Liens do not extend to any Property or assets which is not leased property subject to such capitalized lease obligation;

(17)    any Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Issuer, any Guarantor or any of their Subsidiaries, including rights of offset and set-off;

(18)    any Lien or rights of set-off of any Person with respect to any cash equivalents on deposit account or securities account of the Issuer, any Guarantor or any of their Subsidiaries arising in the ordinary course of business in favor of the bank(s) or security intermediary(ies) with which such accounts are maintained, securing only amounts owing to such bank(s) with respect to cash management and operating account arrangements;

10

(19)    any Liens securing the Notes and the Note Guarantees and all other monetary obligations under this Indenture;

(20)    any Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(21)    any rights of set-off of any Person with respect to any deposit account of the Issuer, any Guarantor or any of their Subsidiaries arising in the ordinary course of business and not constituting a financing transaction;

(22)    Liens securing obligations owed by any Subsidiary of Raízen to Raízen or one or more Subsidiaries of Raízen and/or by Raízen to one or more such Subsidiaries; and

(23)    other Liens securing obligations in an aggregate amount not exceeding the greater of: (i) US$2.8 billion (or the equivalent thereof at the time of determination) and (ii) 20% of the Total Consolidated Assets.

For purposes of determining compliance with Section 4.07, (i) a Lien need not be incurred solely by reference to one category of Permitted Liens described above but is permitted to be incurred in part under any combination thereof and of any other available exemption and (ii) in the event that a Lien (or any portion thereof) meets the criteria of one or more of the categories of Permitted Liens, the Issuer may, in its sole discretion, classify or reclassify such Lien (or any portion thereof) in any manner that complies with the categories of Permitted Liens.

"**Person**" means any individual, corporation, company, association, partnership, limited liability company, joint venture, trust, unincorporated association, governmental authority or any agency or political subdivision thereof or any other entity of whatever nature.

"**Property**" of any Person means any property, rights, revenues, or interest therein, of such Person.

"**principal**" of any Debt means the principal amount of such Debt, (or if such Debt was issued with original issue discount, the face amount of such Debt less the remaining unamortized portion of the original issue discount of such Debt), together with, unless the context otherwise indicates, any premium then payable on such Debt.

"**Rating Agency**" means each of (1) S&P, (2) Moody's and (3) Fitch, or their respective successors.

"**Rating Decline**" means that at any time within 90 days after the date of public notice of a Change of Control, (1) in the event the Notes are assigned an Investment Grade rating by at least two of the Rating Agencies prior to such public notice, the rating assigned to the Notes by any two or more of the Rating Agencies is below an Investment Grade rating; or (2) in the event the Notes are not assigned an Investment Grade rating by at least two of the Rating Agencies prior to such public notice, the rating assigned to the Notes by at least two of the Rating Agencies is decreased by one or more categories (i.e., notches); *provided* that there shall be no Rating Decline to the extent the Notes continue to have an Investment Grade rating by at least one of the Rating

Agencies; and *provided, further*, that, in each case, any such Rating Decline is expressly stated by the applicable Rating Agency to have been the result of the Change of Control.

"**Register**" has the meaning assigned to such term in Section 2.09.

"**Registrar**" means The Bank of New York Mellon.

"**Regular Record Date**" for the interest payable on any Interest Payment Date means January 12 or July 12 (whether or not a Business Day) immediately preceding such Interest Payment Date.

"**Regulation S**" means Regulation S under the Securities Act.

"**Regulation S Certificate**" means a certificate substantially in the form of Exhibit D hereto.

"**Regulation S Legend**" means the legend set forth in Exhibit B-2.

"**Relevant Taxing Jurisdiction**" has the meaning assigned to such term in Section 3.01(a).

"**Responsible Officer**" means, with respect to the Trustee, any officer of the Trustee in its Corporate Trust Department who shall have direct responsibility for the administration of this Indenture.

"**Restricted Legend**" means the legend set forth in Exhibit B-1.

"**Rule 144A**" means Rule 144A under the Securities Act.

"**Rule 144A Certificate**" means a certificate substantially in the form of Exhibit E hereto.

"**S&P**" means S&P Global Ratings, a division of S&P Global Inc., and any successor to its rating agency business.

"**SEC**" or "**Commission**" means the U.S. Securities and Exchange Commission, as from time to time constituted, created under the Securities Exchange Act of 1934, or, if at any time after execution of this instrument such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body performing such duties on such date.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Significant Subsidiary**" means, with respect to any Person, any Subsidiary of such Person which at the time of determination had assets which, as of the date of such Person's most recent quarterly consolidated balance sheet, constituted at least 10% of such Person's total assets, determined on the basis of the consolidated assets of such Person and its Subsidiaries as of such date.

"**Spot Rate**" means, for any currency, the spot rate at which that currency is offered for sale against United States dollars as published in The Wall Street Journal on the Business Day

immediately preceding the date of determination or, if that rate is not available in that publication, as published in any publicly available source of similar market data, as determined by the Issuer.

"**Stated Maturity**" means (i) with respect to any Debt, the date specified as the fixed date on which the final installment of principal of such Debt is due and payable or (ii) with respect to any scheduled installment of principal of or interest on any Debt, the date specified as the fixed date on which such installment is due and payable as set forth in the documentation governing such Debt, not including any contingent obligation to repay, redeem or repurchase prior to the regularly scheduled date for payment.

"**Subsidiary**" means, with respect to any Person, any other Person more than 50% of the outstanding Voting Stock of which is owned or controlled, directly or indirectly, by such Person and/or by any one or more Subsidiaries of such Person.

"**Substituted Issuer**" has the meaning assigned to such term in Section 9.03(a).

"**Substitution Documents**" has the meaning assigned to such term in Section 9.03(a)(i).

"**Successor Corporation**" has the meaning assigned to such term in Section 5.01(a)(i).

"**Threshold Amount**" has the meaning assigned to such term in Section 6.01(a)(iv).

"**Total Consolidated As**sets" means the total amount of consolidated assets of Raízen and its Subsidiaries prepared in accordance with Applicable GAAP, calculated after giving pro forma effect to any acquisition or disposition of Persons, divisions, lines of businesses, operations or assets by Raízen and its Subsidiaries subsequent to such date and on or prior to the date of determination.

"**Transfer Agent**" refers to The Bank of New York Mellon in its capacity as transfer agent and such other transfer agents as the Issuer shall appoint.

"**Treasury Rate**" means, with respect to any redemption date, the yield determined by Raízen in accordance with the following two paragraphs:

(1)      The Treasury Rate shall be determined by Raízen after 4:15 p.m. (New York City time) (or after such time as yields on U.S. government securities are posted daily by the Board of Governors of the Federal Reserve System), on the third Business Day (solely in New York City) preceding the redemption date based upon the yield or yields for the most recent day that appear after such time on such day in the most recent statistical release published by the Board of Governors of the Federal Reserve System designated as "Selected Interest Rates (Daily) – H.15" (or any successor designation or publication) ("**H.15**") under the caption "U.S. government securities—Treasury constant maturities—Nominal" (or any successor caption or heading) ("**H.15 TCM**"). In determining the Treasury Rate, Raízen shall select, as applicable: (i) the yield for the Treasury constant maturity on H.15 exactly equal to the period from the redemption date to the Par Call Date (the "**Remaining Life**"); or (ii) if there is no such Treasury constant maturity on H.15 exactly equal to the Remaining Life, the following two yields: (x) one yield corresponding to the Treasury constant maturity on H.15 immediately shorter than, and (y) one yield

13

corresponding to the Treasury constant maturity on H.15 immediately longer than, the Remaining Life – and shall interpolate to the Par Call Date on a straight-line basis (using the actual number of days) using such yields and rounding the result to three decimal places; or (iii) if there is no such Treasury constant maturity on H.15 shorter than or longer than the Remaining Life, the yield for the single Treasury constant maturity on H.15 closest to the Remaining Life. For purposes of this paragraph, the applicable Treasury constant maturity or maturities on H.15 shall be deemed to have a maturity date equal to the relevant number of months or years, as applicable, of such Treasury constant maturity from the redemption date.

(2)      If on the third Business Day (solely in New York City) preceding the redemption date H.15 TCM or any successor designation or publication is no longer published, Raízen shall calculate the Treasury Rate based on the rate *per annum* equal to the semi-annual equivalent yield to maturity at 11:00 a.m. (New York City time) on the second Business Day (solely in New York City) preceding such redemption date of the U.S. Treasury security maturing on, or with a maturity that is closest to, the Par Call Date, as applicable. If there is no U.S. Treasury security maturing on the Par Call Date but there are two or more U.S. Treasury securities with a maturity date equally distant from the Par Call Date, one with a maturity date preceding the Par Call Date and one with a maturity date following the Par Call Date, Raízen shall select the U.S. Treasury security with a maturity date preceding the Par Call Date. If there are two or more U.S. Treasury securities maturing on the Par Call Date or two or more U.S. Treasury securities meeting the criteria of the preceding sentence, Raízen shall select from among these two or more U.S. Treasury securities the U.S. Treasury security that is trading closest to par based upon the average of the bid and asked prices for such U.S. Treasury securities at 11:00 a.m., New York City time. In determining the Treasury Rate in accordance with the terms of this paragraph, the semi-annual yield to maturity of the applicable U.S. Treasury security shall be based upon the average of the bid and asked prices (expressed as a percentage of principal amount) at 11:00 a.m., New York City time, of such U.S. Treasury security, and rounded to three decimal places.

"**Trust Indenture Act**" or "**TIA**" means the U.S. Trust Indenture Act of 1939, as amended.

"**Trustee**" means the party named as such in the first paragraph of this Indenture or any successor trustee under this Indenture pursuant to Article 7.

"**U.S. Global Note**" means a Global Note that bears the Restricted Legend representing Notes issued and sold pursuant to Rule 144A.

"**U.S. Government Obligations**" means obligations issued or directly and fully guaranteed or insured by the United States of America or by any agent or instrumentality thereof, *provided* that the full faith and credit of the United States of America is pledged in support thereof.

"**Voting Stock**" of any Person means Capital Stock in such Person having power to vote for the election of directors or similar officials of such Person or otherwise voting with respect to actions of such Person (other than such Capital Stock having such power only by reason of the happening of a contingency).

14

Section 1.02.  *Rules of Construction*.  Unless the context otherwise requires or except as otherwise expressly provided,

(i)    an accounting term not otherwise defined has the meaning assigned to it in accordance with Applicable GAAP;

(ii)    "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Section, Article or other subdivision;

(iii)    all references to "Dollars" US$ and "$" shall mean the lawful currency of the United States of America;

(iv)    all references to Sections or Articles or Exhibits refer to Sections or Articles or Exhibits of or to this Indenture unless otherwise indicated;

(v)    references to agreements or instruments, or to statutes or regulations, are to such agreements or instruments, or statutes or regulations, as amended from time to time (or to successor statutes and regulations);

(vi)    in the event that a transaction meets the criteria of more than one category of permitted transactions or listed exceptions, the Issuer may classify such transaction as it, in its sole discretion, determines;

(vii)    words in the singular include the plural, and in the plural include the singular; and

(viii)    the words "execution," "signed," "signature," and words of like import in this Indenture shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf," "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

ARTICLE 2
THE NOTES

Section 2.01.  *Form, Dating and Denominations; Legends*.  (a) The Notes and the Trustee's certificate of authentication will be substantially in the form attached as Exhibit A. The terms and provisions contained in the form of the Notes annexed as Exhibit A constitute, and are hereby expressly made, a part of this Indenture.  The Notes may have notations, legends or endorsements required by law, rules of or agreements with national securities exchanges to which the Issuer is subject, or usage.  Each Note will be dated the date of its authentication.  The

15

Notes will be issuable in minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof.

(b)      (i) Except as otherwise provided in paragraph (c) below, each Initial Note or Additional Note will bear the Restricted Legend or the Regulation S Legend, as the case may be.

(ii)      Each Global Note, whether or not an Initial Note or Additional Note, will bear the DTC Legend.

(iii)      Initial Notes and Additional Notes offered and sold in reliance on Regulation S will be issued as provided herein.

(iv)      Initial Notes and Additional Notes offered and sold in reliance on Rule 144A will be issued as provided herein.

(c)      If the Issuer determines (upon the advice of counsel and such other certifications and evidence as the Issuer may reasonably require) that a Note is eligible for resale pursuant to Rule 144(k) under the Securities Act (or a successor provision) and that the Restricted Legend or the Regulation S Legend, as the case may be, is no longer necessary or appropriate in order to ensure that subsequent transfers of the Note (or a beneficial interest therein) are effected in compliance with the Securities Act, the Issuer may instruct the Trustee in writing to cancel the Note and the Issuer may issue to the Holder thereof (or to its transferee), and the Trustee, upon receipt of an Authentication Order, shall authenticate and deliver a new Note of like tenor and amount, registered in the name of the Holder thereof (or its transferee), that does not bear the Restricted Legend or the Regulation S Legend, as the case may be, and the Trustee will comply with such instruction provided that the Trustee has received an Officer's Certificate and Opinion of Counsel and such other evidence as the Trustee may require to comply with such action.

(d)      By its acceptance of any Note bearing the Restricted Legend or the Regulation S Legend, as the case may be (or any beneficial interest in such a Note), each Holder thereof and each owner of a beneficial interest therein acknowledges the restrictions on transfer of such Note (and any such beneficial interest) set forth in this Indenture and in the Restricted Legend or the Regulation S Legend, as the case may be, and agrees that it will transfer such Note (and any such beneficial interest) only in accordance with this Indenture and such legend.

Section 2.02.   *Execution and Authentication; Additional Notes*.   (a) An Officer shall sign the Notes for the Issuer by manual, electronic or facsimile signature in the name and on behalf of the Issuer.  If an Officer whose signature is on a Note no longer holds that office at the time the Note is authenticated, the Note will still be valid.

(b)      A Note will not be valid until the Trustee or the Authenticating Agent signs the certificate of authentication on the Note by manual, electronic or facsimile signature, with the signature constituting conclusive evidence that the Note has been authenticated under this Indenture.

16

(c)      At any time and from time to time after the execution and delivery of this Indenture, the Issuer may deliver Notes executed by the Issuer to the Trustee or the Authenticating Agent for authentication. The Trustee or the Authenticating Agent will authenticate and deliver:

(i)      Initial Notes for original issue on the Issue Date in the aggregate principal amount of US$1,000,000,000; and

(ii)      Additional Notes from time to time for original issue in aggregate principal amounts specified by the Issuer, which Additional Notes shall have the same terms and conditions in all respects (including the maturity date) as the Initial Notes, other than the issue date, the issue price and the first Interest Payment Date; *provided* that if the Additional Notes are not fungible with the Initial Notes for U.S. federal income tax purposes, the Additional Notes will have a separate CUSIP or other identifying number. Such Additional Notes shall be treated as a single series with the Initial Notes for all purposes under this Indenture (other than tax purposes, in the case the Additional Notes are not fungible with the Initial Notes for tax purposes), including, without limitation, waivers, amendments, redemptions and offers to purchase, and shall vote together with the Initial Notes as one single series on all matters;

in the case of clauses (i) and (ii) above, after receipt by the Trustee of an order of the Issuer executed by one of its Officers directing the Trustee to authenticate the Notes (the "**Authentication Order**") and specifying:

(i)      the amount of Notes to be authenticated and the date on which the Notes are to be authenticated;

(ii)      whether the Notes are to be Initial Notes or Additional Notes;

(iii)      in the case of Additional Notes, that the issuance of such Additional Notes does not contravene any provision of this Indenture;

(iv)      whether the Notes are to be issued as one or more Global Notes or Certificated Notes; and

(v)      other information the Issuer may determine to include or the Trustee may reasonably request.

(d)      The Trustee shall be fully protected in relying upon the Authentication Order above in authenticating any Notes under this Indenture.

Section 2.03.   *Registrar, Paying Agent, Transfer Agent and Authenticating Agent; Paying Agent to Hold Money in Trust.*  (a) The Issuer may appoint one or more Registrars and one or more Paying Agents or Transfer Agents, and the Trustee may appoint, with a copy of any such appointment to the Issuer, an Authenticating Agent, in which case each reference in this Indenture to the Trustee in respect of the obligations of the Trustee to be performed by the Authenticating Agent shall be deemed to be references to the Authenticating Agent. The terms "**Transfer Agent**" and "**Paying Agent**" include any additional transfer agent or paying agent, as the case may be.

17

The term "**Registrar**" includes any co-Registrar. In each case, the Issuer and the Trustee will enter into an appropriate agreement with the Authenticating Agent implementing the provisions of this Indenture relating to the obligations of the Trustee to be performed by the Authenticating Agent and the related rights. The Registrar shall provide to the Issuer and the Trustee, if the Trustee is not the Registrar, a current copy of the Register from time to time upon written request of the Issuer or the Trustee, as the case may be. The Issuer may act as Registrar or Paying Agent. The Issuer hereby appoints, upon the terms and subject to the conditions herein set forth, The Bank of New York Mellon as Paying Agent, Registrar and Transfer Agent.

(b)     The Issuer will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of the Holders or the Trustee all money held by the Paying Agent for the payment of principal of and interest on the Notes and will promptly notify the Trustee in writing of any Default by the Issuer in making any such payment. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee and account for any funds disbursed, and the Trustee may at any time during the continuance of any payment default, upon written request to a Paying Agent, require the Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed. Upon doing so, the Paying Agent will have no further liability for the money so paid over to the Trustee.

Section 2.04.   *Replacement Notes*.  If a mutilated Note is surrendered to the Trustee or if a Holder claims that its Note has been lost, destroyed or wrongfully taken, the Issuer will issue and the Trustee will authenticate, upon provision of evidence satisfactory to the Trustee that such Note was lost, destroyed or wrongfully taken, a replacement Note of like tenor and principal amount and bearing a number not contemporaneously Outstanding. Every replacement Note is an additional obligation of the Issuer and entitled to the benefits of this Indenture. If required by the Trustee or the Issuer, an indemnity must be furnished by the Holder that is sufficient in the judgment of both the Trustee and the Issuer to protect the Issuer and the Trustee from any loss they may suffer if a Note is replaced. The Issuer and the Trustee may charge the Holder for the expenses of the Issuer and the Trustee in replacing a Note. In case the mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Issuer in its discretion may pay the Note instead of issuing a replacement Note.

Section 2.05.   *Outstanding Notes*.  (a) Notes that are "**Outstanding**" at any time are all Notes that have been authenticated by the Trustee except for:

(i)     Notes cancelled by the Trustee or delivered to it for cancellation;

(ii)     any Note which has been replaced or paid pursuant to Section 2.04 unless and until the Trustee and the Issuer receive proof satisfactory to them that the replaced Note is held by a protected purchaser; and

(iii)     on or after the Maturity Date or any redemption date or Offer to Purchase Payment Date, those Notes payable or to be redeemed on that date for which the Trustee (or Paying Agent, other than the Issuer or an Affiliate of the Issuer) holds money sufficient to pay all amounts then due thereunder.

(b)    A Note does not cease to be Outstanding because the Issuer or one of its Affiliates holds the Note, *provided* that in determining whether the Holders of the requisite principal amount of the Outstanding Notes have given or taken any request, demand, authorization, direction, notice, consent, waiver or other action hereunder, Notes owned by the Issuer or any Affiliate of the Issuer will be disregarded and deemed not to be Outstanding (it being understood that in determining whether the Trustee is protected in relying upon any such request, demand, authorization, direction, notice, consent, waiver or other action, only Notes in respect of which a Responsible Officer of the Trustee has received written notice from the Issuer that such Notes are so owned will be so disregarded).  Notes so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right to so act with respect to such Notes and that the pledgee is not the Issuer or any Affiliate of the Issuer.

Section 2.06.   *Temporary Notes*.  Until definitive Notes are ready for delivery, the Issuer may prepare and the Trustee will authenticate temporary Notes.  Temporary Notes will be substantially in the form of definitive Notes but may have insertions, substitutions, omissions and other variations determined to be appropriate by the Officer executing the temporary Notes, as evidenced by the execution of the temporary Notes.  If temporary Notes are issued, the Issuer will cause definitive Notes to be prepared without unreasonable delay.  After the preparation of definitive Notes, the temporary Notes will be exchangeable for definitive Notes upon surrender of the temporary Notes at the office or agency of the Issuer designated for such purpose pursuant to Section 4.02, without charge to the Holder.  Upon surrender for cancellation of any temporary Notes the Issuer will execute and the Trustee will authenticate and deliver in exchange therefor a like principal amount of definitive Notes of authorized denominations.  Until so exchanged, the temporary Notes will be entitled to the same benefits under this Indenture as definitive Notes.

Section 2.07.   *Cancellation*.  The Issuer at any time may, but shall not be obligated to, deliver to the Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer may have acquired in any manner whatsoever, and may deliver to the Trustee for cancellation any Notes previously authenticated hereunder which the Issuer has not issued and sold.  Any Registrar, Transfer Agent or Paying Agent will forward to the Trustee any Notes surrendered to it for transfer, exchange or payment.  The Trustee will cancel all Notes surrendered for transfer, exchange, payment or cancellation and dispose of them in accordance with its then applicable procedures or the written instructions of the Issuer; *provided* that the Trustee shall not be required to destroy cancelled Notes.  The Issuer may not issue new Notes to replace Notes it has paid in full or delivered to the Trustee for cancellation.

Section 2.08.   *CUSIP and ISIN Numbers*.  The Issuer in issuing the Notes may use "CUSIP" and "ISIN" numbers, and the Trustee will use CUSIP numbers or ISIN numbers in notices of redemption or exchange or in Offers to Purchase as a convenience to Holders, which notices shall state that no representation is made by the Issuer or the Trustee as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption or exchange or Offer to Purchase.  The Issuer shall promptly notify the Trustee in writing of any change in the CUSIP or ISIN numbers.

Section 2.09.   *Registration, Transfer and Exchange*.  (a) The Notes will be issued in registered form only, without coupons, and the Issuer shall cause the Registrar to maintain a

register (the "**Register**") of the Notes, for registering the record ownership of the Notes by the Holders and transfers and exchanges of the Notes.

(b)    (i) Each Global Note will be registered in the name of the Depositary or its nominee and, so long as DTC is serving as the Depositary thereof, will bear the DTC Legend.

(ii)    Each Global Note will be delivered to the Trustee as custodian for the Depositary.  Transfers of a Global Note (but not a beneficial interest therein) will be limited to transfers thereof in whole, but not in part, to the Depositary, its successors or their respective nominees, except as set forth in Section 2.09(b)(iv).

(iii)    Agent Members will have no rights under this Indenture with respect to any Global Note held on their behalf by the Depositary, and the Depositary or its nominee, as the case may be, shall be treated by the Issuer, the Trustee, each Agent and any of their respective agents as the absolute owner and Holder of such Global Note for all purposes whatsoever. Notwithstanding the foregoing, the Depositary or its nominee may grant proxies and otherwise authorize any Person (including any Agent Member and any Person that holds a beneficial interest in a Global Note through an Agent Member) to take any action which a Holder is entitled to take under this Indenture or the Notes, and nothing herein will impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

(iv)    If (x) the Depositary (A) notifies the Issuer that it is unwilling or unable to continue as Depositary for a Global Note and the Depositary fails to appoint a successor depositary within 90 days of the notice or (B) has ceased to be a clearing agency registered under the Exchange Act; (y) subject to the procedures of the Depositary, the Issuer, at its option, notifies the Trustee in writing that the Issuer elects to cause the issuance of Certificated Notes or (z) there has occurred and is continuing a Default or Event of Default and the Issuer or the Trustee has received a request from the Depositary, the Issuer shall promptly exchange each beneficial interest in the Global Note for one or more Certificated Notes in authorized denominations having an equal aggregate principal amount registered in the name of the owner of such beneficial interest, as identified to the Issuer and the Trustee by the Depositary in writing, and the Trustee shall cancel the Global Note.  If the Global Note being exchanged does not bear the Restricted Legend or Regulation S Legend, as the case may be, then the Certificated Notes issued in exchange therefor will not bear the Restricted Legend or Regulation S Legend, as the case may be.  If such Global Note bears the Restricted Legend or Regulation S Legend, as the case may be, then the Certificated Notes issued in exchange therefor will bear the Restricted Legend or Regulation S Legend, as the case may be.

(c)    Each Certificated Note will be registered in the name of the Holder thereof.

(d)    A Holder may transfer a Note (or a beneficial interest therein) to another Person or exchange a Note (or a beneficial interest therein) for another Note or Notes of any authorized denomination by presenting to the Trustee a written request therefor stating the name of the proposed transferee or requesting such an exchange, accompanied by any certification, opinion or other document required by Section 2.10.  The Registrar shall promptly register any transfer

20

or exchange that meets the requirements of this Section by noting the same in the Register maintained by the Registrar for this purpose; *provided* that:

(i)     no transfer or exchange will be effective until it is registered in such Register, and

(ii)     the Trustee and the Registrar, as applicable, will not be required (w) to issue or register the transfer or exchange of any Note for a period of 15 days before a selection of Notes to be redeemed, (x) to register the transfer or exchange any Note so selected for redemption in whole or in part, except, in the case of a partial redemption, that portion of any Note not being redeemed, (y) to register any Note between a Regular Record Date and the corresponding Interest Payment Date, or (z) if a redemption is to occur after a Regular Record Date but on or before the corresponding Interest Payment Date, to register the transfer or exchange of any Note on or after the Regular Record Date and before the date of redemption.  Prior to the registration of any transfer, the Issuer, the Trustee, each Agent and each of their respective agents will treat the Person in whose name the Note is registered as the owner and Holder thereof for all purposes (whether or not the Note is overdue), and will not be affected by notice to the contrary.

From time to time the Issuer will execute and the Trustee will authenticate additional Notes as necessary in order to permit the registration of a transfer or exchange in accordance with this Section.

No service charge will be imposed in connection with any transfer or exchange of any Note, but the Issuer and the Trustee may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than a transfer tax or other similar governmental charge payable upon exchange pursuant to Section 2.09(b)(iv)).

(e)     (i) *Global Note to Global Note*.  If a beneficial interest in a Global Note is transferred or exchanged for a beneficial interest in another Global Note, the Trustee will (x) record a decrease in the principal amount of the Global Note being transferred or exchanged equal to the principal amount of such transfer or exchange and (y) record a like increase in the principal amount of the other Global Note.  Any beneficial interest in one Global Note that is transferred to a Person who takes delivery in the form of an interest in another Global Note, or exchanged for an interest in another Global Note, will, upon transfer or exchange, cease to be an interest in such Global Note and become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer and exchange restrictions, if any, and other procedures applicable to beneficial interests in such other Global Note for as long as it remains such an interest.

(ii)     *Global Note to Certificated Note*.  If a beneficial interest in a Global Note is transferred or exchanged for a Certificated Note, the Trustee will (x) record a decrease in the principal amount of such Global Note equal to the principal amount of such transfer or exchange and (y) deliver one or more new Certificated Notes in authorized denominations having an equal aggregate principal amount to the transferee (in the case of a transfer) or the owner of such beneficial interest (in the case of an exchange), registered

21

in the name of such transferee or owner, as applicable, as provided in writing by the Depositary.

(iii)    *Certificated Note to Global Note*.  If a Certificated Note is transferred or exchanged for a beneficial interest in a Global Note, the Trustee will (x) cancel such Certificated Note, (y) record an increase in the principal amount of such Global Note equal to the principal amount of such transfer or exchange and credit such increase to the account of the Agent Member at the Depositary as instructed in writing by the Holder of the Certificated Notes and (z) in the event that such transfer or exchange involves less than the entire principal amount of the canceled Certificated Note, deliver to the Holder thereof one or more new Certificated Notes in authorized denominations having an aggregate principal amount equal to the untransferred or unexchanged portion of the canceled Certificated Note, registered in the name of the Holder thereof.

(iv)    *Certificated Note to Certificated Note*.  If a Certificated Note is transferred or exchanged for another Certificated Note, the Trustee will (x) cancel the Certificated Note being transferred or exchanged, (y) deliver one or more new Certificated Notes in authorized denominations having an aggregate principal amount equal to the principal amount of such transfer or exchange to the transferee (in the case of a transfer) or the Holder of the canceled Certificated Note (in the case of an exchange), registered in the name of such transferee or Holder, as applicable, and (z) if such transfer or exchange involves less than the entire principal amount of the canceled Certificated Note, deliver to the Holder thereof one or more Certificated Notes in authorized denominations having an aggregate principal amount equal to the untransferred or unexchanged portion of the canceled Certificated Note, registered in the name of the Holder thereof.

Section 2.10.  *Restrictions on Transfer and Exchange*.  (a) The transfer or exchange of any Note (or a beneficial interest therein) may only be made in accordance with this Section and Section 2.09 and, in the case of a Global Note (or a beneficial interest therein), the applicable rules and procedures of the Depositary.  The Trustee shall refuse to register any requested transfer or exchange that does not comply with the preceding sentence.

(b)    Subject to Section 2.10(c), the transfer or exchange of any Note (or a beneficial interest therein) of the type set forth in column A below for a Note (or a beneficial interest therein) of the type set forth opposite column B below may only be made in compliance with the certification requirements (if any) described in the clause of this paragraph set forth opposite column C below.

| A | B | C |
|---|---|---|
| U.S. Global Note | U.S. Global Note | (1) |
| U.S. Global Note | Offshore Global Note | (2) |
| U.S. Global Note | Certificated Note | (3) |
| Offshore Global Note | U.S. Global Note | (4) |

22

| Offshore Global Note | Offshore Global Note | (1) |
| Offshore Global Note | Certificated Note | (3) |
| Certificated Note | U.S. Global Note | (4) |
| Certificated Note | Offshore Global Note | (2) |
| Certificated Note | Certificated Note | (3) |

(1)    No certification is required.

(2)    The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee a duly completed and executed Regulation S Certificate; *provided* that if the requested transfer or exchange is made by the Holder of a Certificated Note that does not bear the Restricted Legend or Regulation S Legend, then no certification is required.

(3)    The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee (x) a duly completed and executed Rule 144A Certificate or (y) a duly completed and executed Regulation S Certificate, and/or an Opinion of Counsel and such other certifications and evidence as the Issuer may reasonably require in order to determine that the proposed transfer or exchange is being made in compliance with the Securities Act and any applicable securities laws of any state of the United States; *provided* that if the requested transfer or exchange is made by the Holder of a Certificated Note that does not bear the Restricted Legend or the Regulation S Legend, then no certification is required.  In the event that a Certificated Note that does not bear the Restricted Legend or the Regulation S Legend is surrendered for transfer or exchange, upon transfer or exchange the Trustee will deliver a Certificated Note that does not bear the Restricted Legend or the Regulation S Legend.

(4)    The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee a duly completed and executed Rule 144A Certificate.

(c)    No certification is required in connection with any transfer or exchange of any Note (or a beneficial interest therein) after such Note is eligible for resale pursuant to Rule 144(k) under the Securities Act (or a successor provision); *provided* that the Issuer has provided the Trustee with an Officer's Certificate and an Opinion of Counsel to that effect, and the Issuer may require from any Person requesting a transfer or exchange in reliance upon this clause an Opinion of Counsel and any other reasonable certifications and evidence in order to support such certificate.

Any Certificated Note delivered in reliance upon this paragraph will not bear the Restricted Legend or the Regulation S Legend, as the case may be.

(d)    The Trustee will retain copies of all certificates, opinions and other documents received in connection with the transfer or exchange of a Note (or a beneficial interest therein),

23

and the Issuer will have the right to inspect and make copies thereof at any reasonable time upon written notice within a reasonable period of time to the Trustee.

Section 2.11.   *Open Market Purchases*.  The Issuer or its Affiliates may at any time purchase Notes in the open market or otherwise at any price; *provided* that Notes that the Issuer or its Affiliates purchase may, in their respective discretion, be held, resold or cancelled, but will only be held or resold in compliance with applicable requirements or exemptions under the relevant securities laws.

Section 2.12.   *Trustee's Disclaimer*.  (a) The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restriction on transfer imposed under this Indenture or under applicable law with respect to any transfer of interest in any Note (including any transfers between or among participants in the Depositary or beneficial owners of interest in Global Notes) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(b)    The Trustee and the Agents shall have no responsibility or obligation to any beneficial owner of an interest in a Global Note, any Agent Member or other member of, or a participant in, the Depositary or other Person with respect to the accuracy of the records of the Depositary or any nominee or participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any Agent Member or other participant, member, beneficial owner or other Person (other than the Depositary) of any notice (including any notice of redemption or purchase) or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes. All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to or upon the order of the registered Holders (which shall be the Depositary or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through the Depositary, subject to its applicable rules and procedures. The Trustee and Agents may rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its Agent Members and other members, participants and any beneficial owners. The Depositary (or its nominee) may be treated by the Trustee and the Agents as the owner of the Global Note for all purposes whatsoever.

(c)    Neither the Trustee nor any Agent shall have any responsibility or liability for any actions taken or not taken by the Depositary.

ARTICLE 3
ADDITIONAL AMOUNTS; REDEMPTION

Section 3.01.   *Additional Amounts*.  (a) All payments by the Issuer in respect of the Notes or by a Guarantor in respect of its Note Guarantee will be made without withholding or deduction for or on account of any present or future taxes, duties, assessments, fees or other governmental charges of whatever nature (and any fines, penalties or interests related thereto) imposed or levied by or on behalf of Luxembourg, Brazil or any authority therein or thereof or

24

any other jurisdiction or political subdivision thereof from or through which a payment is made or in which the Issuer or a Guarantor (or any successor to the Issuer or Guarantor) is organized or is a resident for tax purposes (a "**Relevant Taxing Jurisdiction**"), unless the Issuer or Guarantor, as applicable, is required by law to deduct or withhold such taxes, duties, assessments, fees or governmental charges.  In that event, the Issuer or Guarantor, as applicable, will make the required deduction or withholding, make payment of the amount so deducted or withheld to the appropriate governmental authority and pay such additional amounts as may be necessary to ensure that the net amounts received by Holders of Notes after such withholding or deduction equal the amounts that would have been received in respect of the Notes in the absence of such withholding or deduction (the "**Additional Amounts**").  However, no Additional Amounts shall be payable:

(i)       to, or to a third party on behalf of, a Holder or beneficial owner where the Holder or beneficial owner is liable for any present or future taxes, duties, assessments, fees or other governmental charges in respect of a Note by reason of the existence of any present or former connection between the Holder or beneficial owner (or between a fiduciary, settlor, beneficiary, partner, member or shareholder of the Holder or beneficial owner, if the Holder or beneficial owner is an estate, a trust, a partnership, a limited liability company or a corporation) and the Relevant Taxing Jurisdiction, including, without limitation, the Holder or beneficial owner (or the Holder's or the beneficial owner's fiduciary, settlor, beneficiary, partner, member or shareholder) being or having been a citizen or resident thereof, being or having been engaged or deemed to be engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, other than the mere holding of the Note or the enforcement of rights and the receipt of payments with respect to the Note;

(ii)      in respect of any present or future tax, duty, assessment, fee or other governmental charge that would not have been so imposed but for the presentation by the Holder or beneficial owner of a Note, where presentation is required, for payment on a date more than 30 days after the date on which such payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later;

(iii)     in respect of any present or future tax, duty, assessment, fee or other governmental charge that would not have been so imposed but for the failure by the Holder or beneficial owner of the Note to comply with any certification, identification or other reporting requirement concerning such Holder's or beneficial owner's nationality, residence, identity or connection with the Relevant Taxing Jurisdiction, if (1) compliance is required by the Relevant Taxing Jurisdiction as a precondition to relief or exemption from, or reduction in the rate of, all or part of the tax, duty, assessment, fee or other governmental charge and (2) the Issuer or Guarantor has given at least 30 days' notice that Holders or beneficial owners will be required to comply with such requirement;

(iv)      in relation to the application of the Luxembourg law of 23 December 2005, as amended from time to time, introducing a 20% withholding tax on certain interest and similar income payments made or deemed to be made by a Luxembourg paying agent for the immediate benefit of individuals resident in Luxembourg;

(v)      in respect of any registration tax, stamp duty or any other similar documentary tax or duty, fixed or ad valorem, in Luxembourg, in connection (i) with the performance by the Issuer of its obligations under the Notes or any Guarantor in respect of its Note Guarantee; or (ii) with the registration of the Notes by the Holder or beneficial owner, or by a third party on his behalf, before the Registration, Estates and VAT Department (*Administration de l'enregistrement, des domaines et de la TVA*) in Luxembourg where this registration is not required by law (including for the enforcement of rights and the receipt of payments with respect to the Notes);

(vi)     in respect of any present or future tax, duty, assessment, fee or other governmental charge imposed on a Note presented for payment by or on behalf of a Holder or beneficial owner where the Holder or beneficial owner would have been able to avoid the withholding or deduction by presenting the relevant Note to another Paying Agent;

(vii)    in respect of any estate, inheritance, gift, sales, use, transfer, capital gains, excise or personal property or similar tax, duty, assessment, fee or other governmental charge;

(viii)   in respect of any tax, duty, assessment, fee or other governmental charge that is payable otherwise than by deduction or withholding from payments of principal of, premium, if any, or interest on a Note or by direct payment by the Issuer or a Guarantor in respect of claims made against the Issuer or such Guarantor in respect of such payments on a Note;

(ix)     in respect of any tax, duty, assessment, fee or other governmental charge imposed or withheld pursuant to Sections 1471 through 1474 of the Code, as of the Issue Date (or any amended or successor version), current or future U.S. treasury regulations issued thereunder or any official interpretation thereof, any agreement entered into pursuant to Section 1471(b) of the Code, or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code ("**FATCA**"); or

(x)      in respect of any combination of the above.

(b)      In addition, no Additional Amounts shall be paid with respect to any payment on a Note or Note Guarantee to a Holder who is a fiduciary, a partnership, a limited liability company or other than the sole beneficial owner of that payment to the extent that payment on the Note or Note Guarantee would be required by the laws of the Relevant Taxing Jurisdiction to be included in the income, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, a member of the partnership, an interest holder in the limited liability company or a beneficial owner who would not have been entitled to the Additional Amounts had that beneficiary, settlor, member, interest holder or beneficial owner been the Holder.  Except as specifically provided above, neither the Issuer nor any Guarantor shall be required to make any payment with respect to any tax, duty, assessment, fee or other governmental charge imposed by any government or political subdivision or taxing authority thereof or therein.

(c)     In the event that Additional Amounts actually paid with respect to the Notes, as described above, are based on rates of deduction or withholding of taxes in excess of the appropriate rate applicable to the Holder of such Notes, and, as a result thereof the Holder is entitled to make a claim for a refund or credit of the excess from the authority imposing the withholding tax, then the Holder shall, by accepting the Notes, be deemed to have assigned and transferred all right, title, and interest to any such claim for a refund or credit of such excess to the Issuer or Guarantor, as the case may be. However, by making such assignment, the Holder or beneficial owner makes no representation or warranty that the Issuer or Guarantor, as the case may be, shall be entitled to receive such claim for refund or credit and incurs no other obligation (including, for the avoidance of doubt, any filing or other action) with respect thereto.

(d)     Any reference in this Indenture or the Notes to principal, premium, if any, interest or any other amount payable in respect of the Notes by the Issuer or the Note Guarantees by the Guarantors will, unless the Additional Amounts are explicitly already named in such context, be deemed also to refer to any Additional Amounts that may be payable with respect to that amount under the obligations referred to in this Section.

(e)     The Issuer or the relevant Guarantor, as the case may be, shall use reasonable efforts to furnish to the Trustee the official receipts (or a copy of the official receipts) evidencing payment of any taxes deducted or withheld from payments in respect of the Notes or the Note Guarantees, as the case may be (or other evidence of payment reasonably satisfactory to the Trustee). Copies of such receipts or other evidence of payment shall be made available to Holders by the Trustee upon written request.

(f)     The foregoing obligations  shall survive termination or discharge of this Indenture, payment of the Notes and/or the resignation or removal of the Trustee or any agent hereunder, and shall apply *mutatis mutandis* to any jurisdiction or political subdivision thereof in which any successor to the Issuer or a Guarantor is organized or is a resident for tax purposes.

Section 3.02.  *Optional Redemption*.

(a)     At any time before  October 17, 2034, which is the date that is three months prior to the maturity of the Notes (the "**Par Call Date**"), the Issuer or any Guarantor may redeem the Notes at its option, in whole or in part, at any time and from time to time, at a redemption price (expressed as a percentage of principal amount and rounded to three decimal places) equal to the greater of:  (i) (a) the sum of the present values of the remaining scheduled payments of principal and interest thereon  discounted to the redemption date (assuming the Notes matured on the Par Call Date) on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 35 basis points, less (b) interest accrued to, but excluding, the date of redemption, and (ii) 100% of the principal amount of the Notes to be redeemed, *plus*, in either case, accrued and unpaid interest thereon to, but excluding, the redemption date.

(b)     On or after the Par Call Date, the Issuer or a Guarantor may redeem the Notes, in whole or in part, at any time and from time to time, at a redemption price equal to 100% of

the principal amount of the Notes being redeemed plus accrued and unpaid interest thereon to, but excluding, the redemption date.

(c)     Raízen's actions and determinations in determining the redemption price shall be conclusive and binding for all purposes, absent manifest error. The Trustee shall have no obligation to calculate or verify any redemption price, make-whole premium or any component thereof.

Section 3.03.   *Redemption for Taxation Reasons*. If as a result of any change in or amendment to the laws or any applicable treaties (or any rules or regulations promulgated thereunder) of a Relevant Taxing Jurisdiction, or any amendment to or change in official position regarding the application, interpretation or administration of such laws, treaties, rules, or regulations (including a holding by a court of competent jurisdiction), which change or amendment becomes effective or, in the case of a change in official position, is announced on or after the Issue Date (or, if later, the date a Relevant Taxing Jurisdiction becomes a Relevant Taxing Jurisdiction), (i) the Issuer or any successor thereof has or will become obligated to pay Additional Amounts as described above in Section 3.01 with respect to the Notes or (ii) any Guarantor or any successor thereof has or will become obligated to pay Additional Amounts as described above in Section 3.01 with respect to a Note Guarantee in excess of the Additional Amounts such Guarantor or successor, as the case may be, would be obligated to pay if payments in respect of the Note Guarantee were subject to withholding or deduction at a rate of 15% (or a rate of 25% if the Holder of the Notes is resident in a Low or Nil Tax Jurisdiction) (the "**Excess Additional Amounts**"), the Issuer, Guarantor or any successor thereof may, at its option, redeem all, but not less than all, of the Notes, at a redemption price equal to 100% of their principal amount then Outstanding, together with interest accrued to, but excluding, the date fixed for redemption, upon delivery of irrevocable notice of redemption to the Holders not fewer than ten days nor more than 90 days prior to the date fixed for redemption.  No notice of such redemption may be given earlier than 90 days prior to the earliest date on which the Issuer, Guarantor or any successor thereof would, but for such redemption, be obligated to pay such Additional Amounts or Excess Additional Amounts. Notwithstanding the foregoing, the Issuer, Guarantor or any successor thereof shall not have the right so to redeem the Notes unless: (i) the obligation to pay such Additional Amounts or Excess Additional Amounts cannot be avoided by the Issuer or Guarantor (or successor) taking reasonable measures and (ii) the Issuer or Guarantor (or successor) has complied with all necessary regulations to legally effect such redemption; *provided*, *however*, that for this purpose reasonable measures shall not include any change in the Issuer's or any Guarantor's or any successor's jurisdiction of incorporation or organization or location of its principal executive or registered office.

Section 3.04.   *Redemption Following Tender Offer.* Notwithstanding the provisions of Sections 3.02 or 3.03, in connection with any tender offer for the Notes (including an Offer to Purchase in connection with a Change of Control that results in a Rating Decline made in accordance with the terms of this Indenture), in the event that the Holders of not less than 85% of the aggregate principal amount of the Outstanding Notes validly tender and do not validly withdraw Notes in such tender offer and the Issuer, or any other Person making such offer in lieu of the Issuer, purchases all of the Notes validly tendered and not validly withdrawn by such Holders, then the Issuer or any Guarantor shall have the right, on not less than five nor more than 60 days' prior notice to the Holders (with a copy to the Trustee), to redeem all of the Notes that

28

remain Outstanding at a redemption price equal to the purchase price paid to each other Holder in such tender offer plus, to the extent not included in the purchase price, accrued and unpaid interest and Additional Amounts, if any, on the Notes that remain Outstanding, to, but excluding, the date of redemption.

Section 3.05.  *Election to Redeem; Selection of Notes*.  (a) In the event that the Issuer, a Guarantor or any successor thereof elects to redeem the Notes, prior to delivery of a notice of redemption to the Holders of the Notes, it will deliver to the Trustee: (1) an Officer's Certificate stating that the Issuer, such Guarantor or such successor, as the case may be, is entitled to redeem the Notes pursuant to the terms hereof and setting forth a statement of facts showing that the condition or conditions precedent to the right of the Issuer, such Guarantor or such successor, as the case may be, so to redeem have occurred or been satisfied; and (2) in respect of a redemption pursuant to Section 3.03, an Opinion of Counsel in the applicable Relevant Taxing Jurisdiction to the effect that (i) the Issuer, such Guarantor or such successor, as applicable, has or will become obligated to pay Additional Amounts or Excess Additional Amounts, as the case may be, (ii) the Issuer, such Guarantor or such successor, as applicable, cannot avoid payment of such Additional Amounts or Excess Additional Amounts, as the case may be, by taking reasonable measures available to it and (iii) all governmental approvals necessary for the Issuer, such Guarantor or such successor, as applicable, to effect the redemption have been obtained and are in full force and effect.  The Trustee shall accept such Officer's Certificate and, if required, Opinion of Counsel as sufficient evidence of satisfaction of the conditions precedent described above, in which case, it shall be conclusive and binding upon the Holders of the Notes.

(b)      If less than all the Notes are to be redeemed at any time, selection of Certificated Notes for redemption shall be made by the Trustee in compliance with the requirements governing redemptions of the principal securities exchange, if any, on which the Notes are listed or if such securities exchange has no requirement governing redemption or the Notes are not then listed on a securities exchange, on a pro rata basis by lot (or, in the case of Global Notes, selection of Notes for redemption shall be made by the Depositary in accordance with its applicable procedures). If Notes are redeemed in part, the remaining outstanding amount of any Note must be at least equal to US$200,000 and be an integral multiple of US$1,000.

Section 3.06.  *Notice of Redemption*.  (a) The Issuer or a Guarantor shall deliver a notice of redemption to each Holder (which, in the case of Global Notes, will be the Depositary) and the Trustee by, in the case of Certificated Notes, first-class mail, postage prepaid, to the address of each Holder as it appears on the register maintained by the Registrar or, in the case of Global Notes by electronic delivery, in each case, at least five days but not more than 60 days prior to the redemption date (or, in the case of a redemption described in Section 3.03, at least ten days but not more than 90 days prior to the redemption date).  A notice of redemption pursuant to Sections 3.02 and 3.04 may, at the discretion of the Issuer or Guarantor, be conditional. If such redemption or notice is subject to satisfaction of one or more conditions precedent, such notice shall state that, in the Issuer's or Guarantor's discretion, the redemption date may be delayed until such time (but no more than 60 days after the date of the notice of redemption) as any or all such conditions shall be satisfied (or waived by the Issuer or such Guarantor in its sole discretion) and a new redemption date shall be set by the Issuer or such Guarantor in accordance with applicable Depositary procedures, or such redemption may not occur and such notice may be rescinded in the event that any or all such conditions shall not have

been satisfied (or waived by the Issuer or such Guarantor in its sole discretion) by the redemption date, or by the redemption date as so delayed. A notice of redemption pursuant to Section 3.03 shall be irrevocable.

(b)    Each notice will identify the Notes (including the CUSIP number) to be redeemed and will state:

(1)    the redemption date;

(2)    the amount to be redeemed and the redemption price;

(3)    if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the redemption date upon surrender of a Certificated Note, a new Certificated Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Certificated Note;

(4)    the name and address of the Paying Agent;

(5)    that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(6)    that, unless the Issuer or Guarantor, as applicable, defaults in the payment of the redemption price, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(7)    the paragraph or sub-paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed;

(8)    that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes; and

(9)    any conditions precedent to such redemption.

(c)    At the Issuer's request, the Trustee will give the notice of redemption in the Issuer's name and at its expense; *provided*, *however*, that the Issuer has delivered to the Trustee, at least five days prior to the date notice of redemption is to be delivered to the Holders (or such shorter period as the Trustee shall agree), an Officer's Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph. For so long as the Notes are held by the Depositary, the redemption of the Notes shall be conducted in accordance with the policies and procedures of the Depositary.

(d)    The Issuer or a Guarantor may enter into an arrangement under which a Subsidiary of Raízen may, in lieu of redemption by the Issuer or such Guarantor, redeem any Notes on the terms set forth (and pursuant to provisions described) in this Article 3.

30

Section 3.07.   *Deposit of Redemption Price*.   Prior to 11:00 A.M. (New York City time) on the Business Day prior to the redemption date, the Issuer, Guarantor or successor thereof will deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption price of, and accrued and unpaid interest, if any, and any premium and Additional Amounts, if any, on, all Notes to be redeemed on that date.   The Trustee or the Paying Agent will promptly return to the Issuer, Guarantor or successor thereof upon written request any money deposited with the Trustee or the Paying Agent by the Issuer, Guarantor or successor thereof in excess of the amounts necessary to pay the redemption price of, and accrued and unpaid interest, if any, and any premium and Additional Amounts, if any, on, all Notes to be redeemed.

Section 3.08.   *Effect of Notice of Redemption*.   Upon surrender of any Note for redemption in accordance with a redemption notice, such Note shall be paid by the Issuer or the Guarantor at the redemption price, together with accrued interest, if any, to (but excluding) the redemption date (subject to the satisfaction of any applicable condition or conditions precedent set forth in such notice) and from and after such date (except in the event of a Default in the payment of the redemption price) such Notes shall cease to bear interest; *provided*, *however*, that installments of interest payable on or prior to the redemption date shall be payable to the Holders of such Notes registered as such at the close of business on the relevant Regular Record Date according to their terms.   If any Note to be redeemed shall not be so paid upon surrender thereof in accordance with the Issuer's or Guarantor's instructions for redemption, the principal shall, until paid, bear interest from the redemption date at the rate borne by the Notes.

ARTICLE 4
COVENANTS

Section 4.01.   *Payment of Notes*.   (a) The Issuer agrees to pay the principal of and interest (including, without limitation, any Additional Amounts, if any) on the Notes on the dates and in the manner provided in the Notes and this Indenture.   Not later than 11:00 A.M. (New York City time) on the Business Day (solely in New York City) immediately prior to the due date of the payment of any principal of or interest on any Notes, or any redemption of the Notes, the Issuer shall deposit with the Paying Agent Dollars in immediately available funds sufficient to pay such amounts, *provided* that if the Issuer or any Affiliate of the Issuer is acting as a Paying Agent, it shall, on or before each due date, segregate and hold in a separate trust fund for the benefit of the Holders a sum of Dollars sufficient to pay such amounts until paid to such Holders or otherwise disposed of as provided in this Indenture.   In each case, the Issuer shall promptly notify the Trustee in writing of its compliance with this Section 4.01.

(b)      Payments made on the Notes will be applied first to interest due and payable on the Notes and then to the reduction of the unpaid principal amount of the Notes.   An installment of principal or interest will be considered paid on the date due if the Trustee (or Paying Agent, other than the Issuer or any Affiliate of the Issuer) holds on that date Dollars designated for and sufficient to pay the installment and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the Holders on that date pursuant to the terms of this Indenture.   If the Issuer or any Affiliate of the Issuer acts as a Paying Agent, an installment of principal or interest will be considered paid on the due date only if paid to the Holders.

31

(c)    Each payment in full of principal, redemption amount, Additional Amounts and/or interest payable in respect of any Note made by or on behalf of the Issuer to or to the order of the Paying Agent in the manner specified in the Notes and this Indenture on the date due shall be valid and effective to satisfy and discharge the obligation of the Issuer to make payment of principal, redemption amount, Additional Amounts and/or interest payable in respect of any Note on such date, *provided*, *however*, that the liability of the Paying Agent hereunder shall not exceed any amounts paid to it by the Issuer, or held by it, on behalf of the Holders under this Indenture; and *provided, further*, that, in the event that there is a default by the Paying Agent in any payment of principal, redemption amount, Additional Amounts and/or interest in respect of any Note in accordance with the Notes and this Indenture, the Issuer shall pay on demand such further amounts as will result in receipt by the Holder of such amounts as would have been received by it had no such default occurred.

(d)    The Issuer agrees to pay interest on overdue principal, and to the extent lawful, overdue installments of interest at the rate per annum specified in the Notes (1% per annum in excess of the rate per annum borne by the Notes).  Any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the second day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least two days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.

(e)    Payments in respect of the Notes represented by the Certificated Notes (including principal, interest and Additional Amounts, if any) will be made at the specified office or agency of one or more Paying Agents in New York City. At the Issuer's option, interest on Certificated Notes may be paid by Dollars check drawn on a bank in New York City and mailed to the Holder of the Certificated Notes at its registered address. Upon written notice from a Holder of at least US$1.0 million in aggregate principal amount of Certificated Notes to the specified office of any Paying Agent not less than 15 days before the due date for any payment in respect of a Certificated Note, such payment may be made by wire transfer to a Dollar account maintained by the payee with a bank in New York City.

(f)    Payments in respect of the Notes represented by the Global Notes (including principal, interest and Additional Amounts, if any) are to be made by wire transfer of immediately available funds in such coin or currency of the United States as at the time of payment will be legal tender for the payment of public and private debts, to the accounts specified by the Depositary in accordance with is applicable procedures.

Section 4.02.   *Maintenance of Office or Agency*.  The Issuer shall maintain in the Borough of Manhattan, the City of New York, an office or agency where Notes may be surrendered for registration of transfer or exchange or for presentation for payment and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture (other than the type contemplated by Section 11.07) may be served.  The Issuer hereby initially designates the Corporate Trust Office of the Trustee as such office of the Issuer.  The Issuer shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Issuer fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands

(other than any presentations, surrenders, notices and demands service in accordance with Section 11.07(b)) may be made or served to the Trustee.  At any time that the Notes are listed on the Official List of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market, the Issuer will maintain an office or agent in Luxembourg to serve as Luxembourg transfer agent if and to the extent required by the rules of the Official List of the Luxembourg Stock Exchange.

The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be surrendered or presented for any of such purposes and may from time to time rescind such designations.  The Issuer shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

Section 4.03.  *Existence*.  Each of the Guarantors shall preserve and maintain in full force and effect its existence and the existence of the Significant Subsidiaries in accordance with their respective organizational documents, and the rights, licenses and franchises of each of the Guarantors and the Significant Subsidiaries, except, in each case, where the failure to do so would not, individually or in the aggregate, result in any Material Adverse Effect, *provided* that neither Guarantor is required to preserve any such right, license or franchise, or the existence of the Significant Subsidiaries, if the maintenance or preservation thereof is no longer desirable in the conduct of the business of Raízen and its Subsidiaries taken as a whole in its judgment; and *provided*, *further*, that this Section does not prohibit any transaction otherwise permitted by Section 5.01.

Section 4.04.  *Payment of Taxes*.  Each of the Guarantors will timely file all required tax returns required to be filed by it and pay and discharge (including by payment in installments or through offsetting with tax credits or otherwise) at or before maturity all of its material tax obligations (except where such tax obligations are contested in good faith and by proper proceedings and against which adequate reserves are being maintained to the extent required by Applicable GAAP), except where the failure to do so would not, individually or in the aggregate, result in a Material Adverse Effect.

Section 4.05.  *Maintenance of Properties*.  Each of the Guarantors will cause all properties used or useful in its business or the business of any of the Significant Subsidiaries to be maintained and kept in good condition, repair and working order in the judgment of such Guarantor, ordinary wear and tear excepted, except to the extent that the failure to do so would not, individually or in the aggregate, have a Material Adverse Effect; *provided* that nothing in this Section prevents either Guarantor or any Significant Subsidiary from discontinuing the use, operation or maintenance of any of such properties or disposing of any of them, if such discontinuance or disposal is, in the judgment of such Guarantor, desirable in the conduct of the business of Raizen and its Subsidiaries taken as a whole.

Section 4.06.  *Repurchases at the Option of the Holders Upon Change of Control*.

(a)     If a Change of Control that results in a Rating Decline occurs, not later than 30 days following such an occurrence, the Issuer or any Guarantor, shall make, directly or through a Designated Affiliate, an offer to purchase all of the Outstanding Notes (the "**Offer to Purchase**") at a purchase price (the "**Offer to Purchase Payment**") equal to 101% of the principal amount thereof plus accrued and unpaid interest thereon and Additional Amounts, if

33

any, to, but excluding, the Offer to Purchase Payment Date (as defined below). An Offer to Purchase shall be made by written offer to the Holders of Notes (a copy of which shall be delivered to the Trustee) at the address of such Holder appearing in the Register or otherwise in accordance with the procedures of the Depositary with the following information:

(i)    a description of the transaction or transactions that constitute the Change of Control;

(ii)    the principal amount of Notes subject to the Offer to Purchase and the Offer to Purchase Payment;

(iii)    that an Offer to Purchase is being made pursuant to this Section 4.06 and that all Notes validly tendered and not validly withdrawn pursuant to such Offer to Purchase will be accepted for payment;

(iv)    that a Holder may tender all or any portion of its Notes pursuant to such Offer to Purchase, subject to the requirement that if a Holder tenders only a portion of its Notes, the remaining Notes must be no less than US$200,000 in principal amount and in integral multiples of US$1,000 in excess thereof;

(v)    an expiration date (the "**Expiration Date**") of the Offer to Purchase, which will be not less than 30 days nor more than 60 days after the date of the Offer to Purchase, and an indicative settlement date for purchase (the "**Offer to Purchase Payment Date**"), which will be not more than five Business Days after the Expiration Date;

(vi)    that any Note not properly tendered will remain Outstanding and continue to accrue interest;

(vii)    that unless the Issuer, Guarantor or Designated Affiliate, as the case may be, defaults in the payment of the Offer to Purchase Payment on the Offer to Purchase Payment Date, interest on all Notes accepted for payment pursuant to the Offer to Purchase will cease to accrue on and after the Offer to Purchase Payment Date;

(viii)    that Holders electing to have any Notes purchased pursuant to an Offer to Purchase will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the Paying Agent specified in the Offer to Purchase at the address specified in the Offer to Purchase (or, in the case of Global Notes, tender such Notes in accordance with the applicable procedures of the Depositary), in each case, on or prior to the Expiration Date;

(ix)    that Holders shall be entitled to withdraw their tendered Notes and their election to require the Issuer, Guarantor or Designated Affiliate, as the case may be, to purchase such Notes; *provided* that the Paying Agent receives, prior to the Expiration Date, a written statement setting forth the name of the Holder of the Notes, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased (or, in the case of Global Notes, a notice of withdrawal of such Notes is delivered in accordance with the applicable procedures of the Depositary); and

(x)     that, if any Note was purchased only in part, (x) in the case of a Global Note, appropriate adjustments to the amount and beneficial interests in a Global Note will be made, and (y) in the case of a Certificated Note, a new Certificated Note or Notes in principal amount equal to the unpurchased portion of the original Certificated Note representing the same indebtedness to the extent not purchased will be issued in the name of the Holder of such Certificated Note upon cancellation of the original Certificated Note; provided that each such new Note will be in a principal amount of US$200,000 or an integral multiple of US$1,000 in excess thereof.

The Offer to Purchase shall also contain instructions and any materials necessary to enable Holders to tender Notes pursuant thereto. If (1) notice is given in a manner provided in this Section 4.06 and (2) any Holder fails to receive such notice or a Holder receives such notice but it is defective, such Holder's failure to receive such notice or such defect shall not affect the validity of the Offer to Purchase as to all other Holders that properly received such without defect.

(b)     On the Business Day immediately preceding the Offer to Purchase Payment Date, the Issuer, a Guarantor or a Designated Affiliate shall, to the extent lawful, deposit with such Paying Agent an amount equal to the aggregate Offer to Purchase Payment in respect of all Notes or portions thereof so tendered.  On the Offer to Purchase Payment Date, the Issuer, a Guarantor or a Designated Affiliate shall, to the extent lawful,

(i)     accept for payment for all Notes properly tendered and not withdrawn pursuant to the Offer to Purchase; and;

(ii)     deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate stating that such Notes or portions thereof have been tendered to and purchased by the Issuer, Guarantor or a Designated Affiliate.

(c)     The Paying Agent shall promptly deliver to each Holder the Offer to Purchase Payment for its Notes that have been accepted for payment in the Offer to Purchase, and, in the case of Certificated Notes purchased in part, the Trustee shall promptly authenticate and deliver to each Holder a new Certificated Note equal in principal amount to any unpurchased portion of the Certificated Notes surrendered, if any; *provided* that each such new Certificated Note will be in a principal amount of US$200,000 or an integral multiple of US$1,000 in excess thereof.

(d)     Notwithstanding Section 4.06(a), the Issuer shall not be required to make an Offer to Purchase upon a Change of Control that results in a Rating Decline if (i) a third party makes an offer to purchase in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 4.06 applicable to an Offer to Purchase made by the Issuer, Guarantor or Designated Affiliate and purchases all Notes properly tendered and not withdrawn under such offer, or (ii) a notice of redemption for all Outstanding Notes has been given pursuant to Section 3.02, Section 3.03 or Section 3.04, unless and until there is a Default in payment of the applicable redemption price.  Notwithstanding anything to the contrary contained herein, an Offer to Purchase may be made in advance of a Change of Control, conditioned upon the consummation of such Change of Control and the occurrence of such

35

Rating Decline, if a definitive agreement is in place for the Change of Control at the time the Offer to Purchase is made.

(e)     The Issuer, Guarantor or Designated Affiliate, as applicable, will comply with Rule 14e-1 under the Exchange Act (to the extent applicable) and all other applicable laws in making any Offer to Purchase.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the provisions of this Indenture and paragraph 3 of the Notes shall be deemed to be modified to the extent necessary to permit such compliance.  If the provisions of such securities laws or regulations cannot be complied with as a result of such deemed modifications, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.06 or paragraph 3 of the Notes by virtue thereof.

Section 4.07.   *Limitation on Liens*.  (a) The Guarantors agree that, for so long as any Note remains Outstanding, each Guarantor will not, and will not permit any Significant Subsidiary to, directly or indirectly, incur or permit to exist any Lien of any nature whatsoever securing the payment of Debt on any of its Property, whether owned at the Issue Date or thereafter acquired, other than Permitted Liens, without effectively providing that the Notes or the Note Guarantees, as applicable, are secured equally and ratably with (or, if the obligation to be secured by the Lien is subordinated in right of payment to the Notes or the Note Guarantees, prior to) the obligations so secured for so long as such obligations are so secured.

(b)     Notwithstanding the foregoing, any Lien securing the Notes or the Note Guarantees granted pursuant to this Section 4.07 shall be automatically and unconditionally released and discharged upon the release by the holders of the Debt described in Section 4.07(a) of their Lien on the Property of the relevant Guarantor or any Significant Subsidiary (including any deemed release upon payment in full of all obligations under such Debt) at such time as the holders of all such Debt also release their Lien on the Property of such Guarantor or such Significant Subsidiary or upon any sale, exchange or transfer to any Person that is not an Affiliate of such Guarantor of the Property secured by such Lien, or of all of the Capital Stock held by such Guarantor or any Subsidiary in, or all or substantially all the assets of, any Significant Subsidiary creating such Lien.

Section 4.08.   *Reporting Requirements*.  (a) Raízen shall furnish to the Trustee for delivery to Holders of the Notes, upon their written request thereof:

(i)     as soon as available and in any event no later than 120 days after the last day of its fiscal year (commencing with the fiscal year ending March 31, 2025), its annual audited consolidated financial statements in English as at and for the fiscal year then ended, prepared in accordance with Applicable GAAP, together with the audit report thereon;

(ii)     as soon as available and in any event within 90 days after the end of the first three fiscal quarters of each fiscal year, its quarterly unaudited consolidated financial statements in English prepared in accordance with Applicable GAAP, accompanied by a "limited review" (*revisão limitada*) report thereon; and

(iii)    within ten Business Days after becoming aware of the occurrence of an Event of Default, an Officer's Certificate setting forth the details of the Event of Default, and the action which the Issuer or Guarantor, as applicable, is taking or proposes to take with respect thereto.

(b)    Notwithstanding the foregoing, if Raízen makes available the information described in clauses (i) and (ii) above on its website or the website of a Subsidiary of Raízen, it will be deemed to have satisfied the reporting requirement set forth in clauses (i) and (ii) above.  It is understood that the Trustee shall have no obligation whatsoever to determine whether such information, documents or reports have been delivered as described above or posted on any website.

(c)    For so long as any Notes remain Outstanding, the Issuer will make available to any Noteholder or beneficial owner of an interest in the Notes, or to any prospective purchasers designated by such Noteholder or beneficial owner, upon request of such Noteholder or beneficial owner, information required to be delivered under paragraph (d)(4) of Rule 144A unless, at the time of such request, the Issuer is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, or is exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act.

(d)    Delivery of any such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt thereof shall not constitute actual or constructive notice or knowledge of any information contained therein or determinable for information contained therein, including the Issuer's, any Guarantor's and/or any other Person's compliance with any of the covenants under this Indenture (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

Section 4.09.  *Disclosure of Names and Addresses of Holders*.  Every Holder, by receiving and holding a Note, agrees with the Issuer, the Guarantors and the Trustee that neither the Issuer, nor any Guarantor nor the Trustee nor any Agent shall be held accountable by reason of the disclosure of any information as to the names and addresses of the Holders in accordance with TIA Section 312, regardless of the source from which such information was derived, and that the Trustee shall not be held accountable by reason of mailing any material pursuant to a request made under TIA Section 312(b).

Section 4.10.  *Paying Agent and Transfer Agent*.  (a) The Issuer agrees, for the benefit of the Holders from time to time of the Notes, that, until all of the Notes are no longer Outstanding or until funds in Dollars for the payment of all of the principal of and interest on all Notes (and Additional Amounts, if any) shall have been made available at the Corporate Trust Office, and shall have been returned to the Issuer as provided herein, whichever occurs earlier, there shall at all times be a Paying Agent and Transfer Agent hereunder.  Each of the Paying Agent and the Transfer Agent shall have the respective powers and authority granted to and conferred upon it herein and in the Notes.

(b)    The Issuer hereby initially appoints the Paying Agent and Transfer Agent defined in this Indenture as such.  The Paying Agent shall arrange for the payment, from funds

furnished by the Issuer to the Paying Agent pursuant to this Indenture, of the principal of and interest on the Notes (and Additional Amounts, if any, with respect to the Notes).

Section 4.11.  *Limitation on Issuer*. The Guarantors shall own, at all times, directly or indirectly, at least 75% of the Voting Stock of the Issuer.

ARTICLE 5
CONSOLIDATION, MERGER OR SALE OF ASSETS

Section 5.01.  *Consolidation, Merger or Sale of Assets*.  (a) Each of the Issuer and the Guarantors shall not consolidate with or merge with or into any other Person or sell, convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all of its Property (determined on the basis of the consolidated assets of Raízen and its Subsidiaries) to any other Person (other than the Issuer or a Guarantor), unless:

(i)      the Person (if not the Issuer or a Guarantor) formed by such merger or consolidation or the Person (if not the Issuer or a Guarantor) which acquired by sale, conveyance, transfer or lease all or substantially all of the Property of the Issuer or a Guarantor (the "**Successor Corporation**") expressly assumes by supplemental indenture the due and punctual payment of the principal of and interest (and Additional Amounts) on all of the Notes or such Guarantor's Note Guarantee, as applicable, the performance or observance of every covenant of the Issuer or Guarantor, as applicable, and all other obligations of the Issuer or Guarantor, as applicable, under this Indenture and the Notes or such Guarantor's Note Guarantee, as applicable;

(ii)      immediately after giving effect to such transaction, no Event of Default with respect to any Note shall have occurred and be continuing; and

(iii)      the Issuer or such Guarantor, as applicable, or the Successor Corporation, as the case may be, shall deliver to the Trustee an Opinion of Counsel to the effect that such consolidation, merger, sale, conveyance, transfer or lease and such supplemental indenture (if required) comply with these conditions, that such supplemental indenture (if required) has been duly authorized, executed and delivered and constitutes valid and binding obligations of the Successor Corporation and that all conditions precedent herein provided or relating to such transaction and such supplemental indenture (if required) have been complied with.

(b)      Notwithstanding anything to the contrary in the foregoing, the following transactions shall not be subject to Section 5.01(a)(ii):

(i)      any merger or consolidation by the Issuer or any Guarantor with or into any Subsidiary of the Issuer or any Guarantor; and

(ii)      any sale, conveyance, transfer or lease by the Issuer or any Guarantor, in one transaction or in a series of transactions, directly or indirectly, of all or substantially all of its Property (determined on the basis of the consolidated assets of Raízen and its Subsidiaries) to any Subsidiaries of the Issuer or any Guarantor.

38

(c)     Notwithstanding anything to the contrary in the foregoing, any merger or consolidation, in which the surviving entity is the Issuer or a Guarantor, or sale, conveyance, transfer or lease to the Issuer or a Guarantor will not be subject to this Section 5.01.

(d)     Upon any consolidation, merger, sale, conveyance, transfer or lease in accordance with these conditions, the Successor Corporation shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer or Guarantor, as applicable, under this Indenture and the Notes or such Guarantor's Note Guarantee, as applicable, with the same effect as if the Successor Corporation had been named as the Issuer or the Guarantor of the Notes herein.  No Successor Corporation shall have the right to redeem the Notes unless the Issuer or any Guarantor would have been entitled to redeem the Notes in similar circumstances.

ARTICLE 6
DEFAULT AND REMEDIES

Section 6.01.  *Events of Default.*  (a) The occurrence of one or more of the following events shall constitute an "Event of Default":

(i)     the Issuer or a Guarantor fails to pay any interest (including any related Additional Amounts) on any of the Notes when the same becomes due and payable, and such Default continues for a period of 30 days;

(ii)     the Issuer or a Guarantor fails to pay the principal (including premium, if any, and any related Additional Amounts) of any of the Notes when the same becomes due and payable, upon redemption, or otherwise, and in the case of technical or administrative difficulties in the payment of principal, only if such Default persists for a period of more than five Business Days;

(iii)     the Issuer or a Guarantor fails to perform or observe any other covenant or obligation in the Notes or in this Indenture and such Default continues for a period of more than 90 consecutive days after written notice to the Issuer and/or Guarantor, as the case may be, by the Trustee, or to the Issuer or Guarantor and the Trustee by the Holders of 25% or more in aggregate principal amount of the Notes Outstanding;

(iv)     the Issuer, a Guarantor or any of their respective Significant Subsidiaries defaults (A) in the payment when it becomes due and payable (subject to any applicable grace period), whether by acceleration or otherwise, of any Debt in an aggregate principal amount of US$150,000,000 (or its equivalent in any other currency or currencies) (the "**Threshold Amount**"), whether such Debt now exists or shall hereafter be created; or (B) in the performance or observance of any other terms and conditions relating to any such Debt in an aggregate amount in excess of the Threshold Amount if the effect of such Default is to cause such Debt to become due prior to its Stated Maturity;

(v)     the Issuer, a Guarantor or any of their respective Significant Subsidiaries shall: (A) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee, examiner, administrator, liquidator or similar Person of itself or of all or any substantial part of its Property; (B) make a general assignment for the

39

benefit of its creditors; (C) file a petition seeking bankruptcy, insolvency, reorganization in an insolvency or comparable context, *recuperação judicial*, *recuperação extrajudicial,* liquidation, *falência*, dissolution or winding up; or (D) take any corporate action for the purpose of effecting any of the foregoing;

(vi)    an involuntary proceeding or case shall be commenced against the Issuer, a Guarantor or any of their respective Significant Subsidiaries without its application or consent, seeking: (A) its reorganization, liquidation, dissolution or winding up; (B) the appointment of a receiver, custodian, trustee, examiner, administrator, liquidator or similar Person of it or of all or any substantial part of its Property; or (C similar relief in respect of it under any applicable law relating to bankruptcy, insolvency, reorganization, *recuperação judicial*, *recuperação extrajudicial*, liquidation, *falência*, dissolution or winding up, and such proceeding or case shall continue undismissed and unstayed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect, for a period of 90 or more consecutive days;

(vii)    any of this Indenture or the Notes or the Note Guarantees for any reason cease to be in full force and effect in accordance with its terms or the Issuer or a Guarantor shall judicially contest the binding effect or enforceability thereof or shall deny that it has any further liability or obligation thereunder or in respect thereof;

(viii)    a final non-appealable judgment(s) for the payment of money in an amount equal or in excess of the Threshold Amount shall have been entered by a court or courts of competent jurisdiction against the Issuer or a Guarantor and remain unpaid or undischarged for a period (during which execution shall not be effectively stayed) of 60 consecutive days unless (A) covered by an insurance policy or policies issued by reputable and credit-worthy insurance companies or (B) a Permitted Holder has contractually and irrevocably undertaken to indemnify the Issuer or a Guarantor, as applicable, for any potential loss or claim arising therefrom and enforcement proceedings are not being executed against any Property of the Issuer or such Guarantor; or

(ix)    it is or becomes unlawful for the Issuer or a Guarantor to perform or comply with any one or more of its payment obligations under this Indenture or the Notes or the Note Guarantees.

(b)    In the case of any Event of Default referred to in Section 6.01(a)(iv) above, such Event of Default shall be automatically rescinded or annulled if each of the default and/or the acceleration of the Debt referred to therein is remedied or cured by the Issuer, any Guarantor or Significant Subsidiary or waived by the holders of such Debt within 60 days after the default and/or acceleration in respect of such Debt.

Section 6.02.    *Acceleration*.  (a) If an Event of Default, except for a bankruptcy default with respect to the Issuer or any Guarantor, occurs and is continuing under this Indenture, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then Outstanding, by written notice to the Issuer (and to the Trustee if the notice is given by the Holders), may, and the Trustee at the request of such Holders shall, declare the unpaid principal of and accrued interest on the Notes and any other amounts due and payable by the Issuer under

40

this Indenture to be immediately due and payable. Upon a declaration of acceleration, such principal, interest and other amounts will become immediately due and payable. If a bankruptcy default occurs with respect to the Issuer or any Guarantor, the unpaid principal of and accrued interest on the Notes then Outstanding and any other amounts due and payable by the Issuer under this Indenture will become immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

(b)      Subject to the exceptions set forth in Section 6.04, the Holders of a majority in principal amount of the Outstanding Notes by written notice to the Issuer or a Guarantor and to the Trustee may waive all past Defaults and rescind and annul a declaration of acceleration and its consequences if:

(i)      all existing Events of Default, except for the nonpayment of the principal of, premium, if any, and interest on the Notes that have become due solely by the declaration of acceleration, have been cured or waived;

(ii)      the rescission would not conflict with any judgment or decree of a court of competent jurisdiction; and

(iii)      the Issuer or a Guarantor has paid the Trustee its reasonable compensation and reimbursed the Trustee for its reasonable and documented expenses (including the fees and expenses of its counsel), disbursements and advances.

Section 6.03.   *Other Remedies*.   If an Event of Default occurs and is continuing, the Trustee may pursue, in its own name or as trustee of an express trust, any available remedy by proceeding at law or in equity to collect the payment of principal of and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.  The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.

Section 6.04.   *Waiver of Past Defaults*.   Except a Default in the payment of principal, interest, premium, if any, and Additional Amounts, if any, and except as otherwise provided in Section 9.02, the Holders of a majority in principal amount of the Outstanding Notes may, by written notice to the Trustee and to the Issuer or the relevant Guarantor, waive an existing Default and its consequences.  Upon such waiver, the Default will cease to exist, and any Event of Default arising therefrom will be deemed to have been cured, but no such waiver will extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05.   *Control by Majority*.   Subject to the obligation to provide indemnity satisfactory to the Trustee, the Holders of a majority in aggregate principal amount of the Outstanding Notes may direct in writing the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, that may involve the Trustee in personal liability, or that the Trustee determines in good faith may be unduly prejudicial to the rights of Holders not joining in the giving of such direction (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders), and the Trustee may take any other

41

action it deems proper that is not inconsistent with any such direction received from Holders.  Prior to taking any action hereunder, the Trustee shall be entitled to indemnification by the Holders satisfactory to it against any costs, losses, liabilities and expenses caused by taking or not taking such action.

Section 6.06.  *Limitation on Suits*.  A Holder may not institute any proceeding, judicial or otherwise, with respect to this Indenture or the Notes, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture or the Notes, unless:

(i)       the Holder has previously given to the Trustee written notice of a continuing Event of Default;

(ii)      Holders of at least 25% in aggregate principal amount of Outstanding Notes have made written request to the Trustee to institute such proceedings in respect of the Event of Default in its own name as Trustee under this Indenture;

(iii)     Holders have offered to the Trustee security or indemnity satisfactory to the Trustee against any costs, liabilities or expenses (including reasonable and documented counsel expenses) to be incurred in compliance with such request;

(iv)     the Trustee within 60 days after its receipt of such notice, request and offer of security or indemnity has failed to institute any such proceeding; and

(v)      during such 60-day period, the Holders of a majority in aggregate principal amount of the Outstanding Notes have not given the Trustee a written direction that, in the opinion of the Trustee, is inconsistent with such written request.

Section 6.07.  *Rights of Holders to Receive Payment*.  Notwithstanding anything to the contrary, the contractual right of a Holder of a Note to receive payment of principal of or interest on its Note on or after the Stated Maturity thereof, or to bring suit for the enforcement of any such payment on or after such dates, in each case as expressly set forth in this Indenture, may not be amended without the consent of that Holder.

Section 6.08.  *Collection Suit by Trustee*.  If an Event of Default in payment of principal or interest specified in clause (i) or (ii) of Section 6.01(a) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust for the whole amount of principal and accrued interest remaining unpaid, together with interest on overdue principal and, to the extent lawful, overdue installments of interest, in each case at the rate specified in the Notes, and such further amount as is sufficient to cover the reasonable and documented costs and expenses of collection, including the reasonable and documented compensation, expenses, disbursements and advances of the Trustee, its agents and legal counsel and any other reasonable and documented amounts due to the Trustee hereunder.

Section 6.09.  *Trustee May File Proofs of Claim*.  The Trustee may file proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due to the Trustee hereunder) and the Holders allowed in any judicial proceedings relating to the Issuer, the Guarantors or their

42

respective creditors or property, and is entitled and empowered to collect, receive and distribute any money, securities or other property payable or deliverable upon conversion or exchange of the Notes or upon any such claims. Any custodian, receiver, "*síndico*," assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, if the Trustee consents to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable and documented compensation, expenses, disbursements and advances of the Trustee, its agent and counsel, and any other reasonable and documented amounts due to the Trustee hereunder. Nothing in this Indenture will be deemed to empower the Trustee to authorize or consent to, or accept or adopt on behalf of any Holder, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10.   *Priorities*.  If the Trustee collects any money pursuant to this Article, it shall pay out the money in the following order:

First: to the Trustee and each of the Agents for all amounts due to it hereunder;

Second: to Holders for amounts then due and unpaid for principal of and interest on the Notes, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and interest; and

Third: to the Issuer or any Guarantor or as a court of competent jurisdiction may direct.

The Trustee, upon written notice to the Issuer, may fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

Section 6.11.   *Restoration of Rights and Remedies*.  If the Trustee or any Holder has instituted a proceeding to enforce any right or remedy under this Indenture and the proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to the Holder, then, subject to any determination in the proceeding, the Issuer, the Guarantors, the Trustee and the Holders will be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Issuer, the Guarantors, the Trustee and the Holders will continue as though no such proceeding had been instituted.

Section 6.12.   *Undertaking for Costs*.  In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court may require any party litigant in such suit (other than the Trustee) to file an undertaking to pay the costs of the suit, and the court may assess reasonable costs, including reasonable attorneys' fees, against any party litigant (other than the Trustee) in the suit having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.12 does not apply to a suit by a Holder to enforce payment of principal of or interest on any Note on the respective due dates pursuant to Section 6.07, or a suit by Holders of more than 10% in principal amount of the Outstanding Notes except for any proceeding brought before a Brazilian court, which case the Holder may be required to post a bond to cover legal fees and court expenses.

Section 6.13.  *Rights and Remedies Cumulative*.  No right or remedy conferred or reserved to the Trustee or to the Holders under this Indenture is intended to be exclusive of any other right or remedy, and all such rights and remedies are, to the extent permitted by law, cumulative and in addition to every other right and remedy hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or exercise of any right or remedy hereunder, or otherwise, will not prevent the concurrent assertion or exercise of any other right or remedy.

Section 6.14.  *Delay or Omission Not Waiver; Prescription of Claims*.  No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default will impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein and every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be; *provided*, that claims against the Issuer or the Guarantors for payments under any of the Notes shall be prescribed unless made within a period of ten years or, in the case of interest, a period of five years, from the applicable original date of payment therefor.

Section 6.15.  *Waiver of Stay, Extension or Usury Laws*.  Each of the Issuer and the Guarantors covenants, to the extent that it may lawfully do so, that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive the Issuer or a Guarantor, as the case may be, from paying all or any portion of the principal of, or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or that may affect the covenants or the performance of this Indenture.  Each of the Issuer and the Guarantors hereby expressly waives, to the extent that it may lawfully do so, all benefit or advantage of any such law and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

ARTICLE 7
THE TRUSTEE

Section 7.01.  *General*.  (a) The duties and responsibilities of the Trustee are as set forth herein.  Whether or not expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee is subject to this Article.

(b)      Except during the continuance of an Event of Default, (i) the duties of the Trustee shall be determined solely by the express provisions of this Indenture and the Trustee needs to perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations will be read into this Indenture against the Trustee; and (ii) the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, opinions or orders furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not

44

they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)     In case an Event of Default has occurred and is continuing, the Trustee shall exercise those rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(d)     No provision of this Indenture shall be construed to relieve the Trustee from liability for its own gross negligence or willful misconduct, except that:

(i)     this Section 7.01(d) shall not be construed to limit the effect of Section 7.01(b);

(ii)     the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(iii)     the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority in principal amount of the Outstanding Notes, relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture with respect to the Notes; and

(iv)     no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(e)     Unless otherwise specifically provided herein or in the Notes, any order, certificate, notice, request, direction or other communication from the Issuer or any Guarantor made or given under any provision of this Indenture shall be sufficient if signed by an Officer or any duly authorized attorney-in-fact.

(f)     Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 7.01.

Section 7.02.   *Certain Rights of Trustee*.

(a)     The Trustee may conclusively rely, and will be protected in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper Person.

(b)     Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel conforming to Section 11.03 and the Trustee will not be

liable for any action it takes or omits to take in good faith in reliance on such certificate or opinion.

(c)    The Trustee may act and conclusively rely and shall be fully protected in acting and relying in good faith on the opinion or advice of, or information obtained from, any counsel, accountant, appraiser or other expert or adviser, whether retained or employed by the Issuer, the Guarantors or by the Trustee, in relation to any matter arising in the administration of the trusts hereof.

(d)    The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders, unless such Holders have offered to the Trustee security, reasonably satisfactory to it, or indemnity against the reasonable and documented costs, expenses and liabilities (including, without limitation, reasonable and documented fees and expenses of legal counsel) that might be incurred by it in compliance with such request or direction.

(e)    The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within its rights or powers or for any action it takes or omits to take in accordance with the direction of the Holders in accordance with Section 6.05 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture.

(f)    The Trustee may appoint counsel and other advisors of its choice from time to time to provide advice and services arising out of or in connection with the performance by the Trustee of its obligations under this Indenture.  The Trustee may consult with counsel of its choice, and the advice of such counsel or any Opinion of Counsel will be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(g)    The Trustee may act through its agents, attorneys, accountants, experts and such other professionals as the Trustee deems necessary, advisable or appropriate and shall not be responsible for the misconduct or negligence of any agent, attorney, accountant, expert or other such professional appointed with due care.

(h)    No provision of this Indenture will require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties hereunder, or in the exercise of its rights or powers, unless it receives indemnity satisfactory to it against any loss, liability or expense (including, without limitation, reasonable and documented fees and expenses of agents and attorneys).  In no event shall the Trustee be liable for special, indirect punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(i)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be

46

enforceable by, the Trustee in each of its capacities hereunder, each Agent and each agent, custodian and other Person authorized or employed to act hereunder.

(j)      The Trustee may request that each of the Issuer and the Guarantors deliver a certificate setting forth the names of individuals and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture.

(k)      The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and reasonably believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Indenture.

(l)      The Issuer and its Affiliates may from time to time enter into normal banking and trustee relationships with the Trustee and its Affiliates.

(m)     The permissive rights of the Trustee to do things enumerated in this Indenture shall not be construed as a duty to take such action.

(n)      None of the Trustee or any Agent shall have any liability or responsibility with respect to, or obligation or duty to monitor, determine or inquire as to the Issuer's or any Guarantor's compliance with any covenant under this Indenture.

(o)      The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder.

(p)      The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note other evidence of indebtedness or other papers or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer personally or by agent or attorney at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

Section 7.03.   *Individual Rights of Trustee*.   The Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer, the Guarantors or its Affiliates with the same rights it would have if it were not the Trustee.  Any Agent may do the same with like rights.  However, the Trustee is subject to Trust Indenture Act Sections 310(b) and 311.

Section 7.04.   *Trust Indenture Act*.   Notwithstanding anything to the contrary elsewhere in this Indenture, the parties to this Indenture and the Holders of the Notes acknowledge and agree that this Indenture is not qualified under the Trust Indenture Act, Holders are not entitled to any protections thereunder and, except as expressly set forth in this Indenture, the provisions of the Trust Indenture Act are not incorporated by reference in this Indenture.

Section 7.05.   *Trustee's Disclaimer*.   The Trustee (i) makes no representation as to the validity or adequacy of this Indenture, the Notes, any Note Guarantee or any offering materials;

(ii) is not accountable for the Issuer's use or application of the proceeds from the Notes; and (iii) is not responsible for any statement in the Notes other than its certificate of authentication.

Section 7.06. *Notice of Default*. The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default with respect to the Notes (except a payment Default under Section 6.01(a)(i) or Section 6.01(a)(ii)) unless a Responsible Officer of the Trustee shall have received written notice thereof at the Corporate Trust Office and such notice references the Notes and this Indenture. If any Default or Event of Default occurs and is continuing and (i) the Trustee has actual knowledge thereof (in the case of a payment Default under Section 6.01(a)(i) or Section 6.01(a)(ii)), or (ii) written notice thereof is delivered to a Responsible Officer of the Trustee, the Trustee will send notice of the Default or Event of Default to each Holder within 60 days after the Trustee is deemed to have knowledge or has received notice thereof, unless the Default or Event of Default has been cured; *provided* that, except in the case of a Default in the payment of the principal of or interest on any Note, the Trustee may withhold the notice if and so long as a committee of trust officers of the Trustee in good faith determines that withholding the notice is in the interest of the Holders.

Section 7.07. *Compensation and Indemnity*. (a) Each of the Issuer and the Guarantors will, jointly and severally, pay the Trustee compensation as agreed upon in writing between the Issuer, the Guarantors and the Trustee for their services. The compensation of the Trustee is not limited by any law on compensation of a trustee of an express trust. Each of the Issuer and the Guarantors will, jointly and severally, reimburse the Trustee upon request for all reasonable and documented out-of-pocket expenses, disbursements and advances incurred or made by the Trustee, including the compensation and reasonable and documented expenses of the Trustee's agents and counsel.

(b)    The Issuer and the Guarantors shall, jointly and severally, indemnify the Trustee for, and hold it harmless for, from and against, any damage, loss, claim, liability or expense (including, without limitation, the reasonable and documented fees and expenses of its legal counsel) incurred by it without gross negligence or willful misconduct on its part arising out of or in connection with the acceptance or administration of this Indenture by it and the performance of its duties under this Indenture and the Notes, including the reasonable and documented costs and expenses (legal or otherwise) of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Indenture and the Notes.

(c)    To secure the Issuer's and the Guarantors' payment obligations in this Section, the Trustee will have a lien prior to the Notes on all money or property held or collected by the Trustee, in its capacity as Trustee, except money or property held in trust to pay principal of, and interest (including Additional Amounts) on particular Notes.

(d)    If the Trustee incurs expenses or renders services in connection with an Event of Default as specified herein, the expenses (including, without limitation, the reasonable and documented charges and expenses of its legal counsel per jurisdiction) and the compensation for the services are intended to constitute expenses of administration under any applicable bankruptcy, reorganization, insolvency or similar law now or hereafter in effect.

48

(e)      The provisions of this Section 7.07 shall survive the payment of the Notes and the resignation or removal of the Trustee and/or the termination of this Indenture.

Section 7.08.   *Replacement of Trustee.*  (a) (i) The Trustee may resign at any time by providing at least 30-days written notice to the Issuer.

(ii)      The Holders of a majority in principal amount of the Outstanding Notes may remove the Trustee by providing at least 30-days written notice to the Trustee.

(iii)      If the Trustee is no longer eligible pursuant to Section 7.12, any Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(iv)      The Issuer may remove the Trustee if: (1) the Trustee is no longer eligible pursuant to Section 7.12; (2) the Trustee is adjudged a bankrupt or an insolvent; (3) a receiver or other public officer takes charge of the Trustee or its property; or (4) the Trustee becomes incapable of acting.  In addition, the Issuer may remove the Trustee at any time for any reason to the extent the Issuer has given the Trustee at least 30 days' written notice and as long as no Default or Event of Default has occurred and is continuing.

A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section.

(b)      If the Trustee has been removed by the Holders, Holders of a majority in principal amount of the Outstanding Notes may appoint a successor Trustee with the consent of the Issuer.  Otherwise, if the Trustee resigns or is removed, or if a vacancy exists in the office of Trustee for any reason, the Issuer will promptly appoint a successor Trustee.  If the successor Trustee does not deliver its written acceptance within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee (at the expense of the Issuer), the Issuer or the Holders of a majority in principal amount of the Outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)      Upon delivery by the successor Trustee of a written acceptance of its appointment to the retiring Trustee and to the Issuer, (i) the retiring Trustee will transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.07, (ii) the resignation or removal of the retiring Trustee will become effective, and (iii) the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture.  Upon request of any successor Trustee, the Issuer will execute any and all instruments for fully and vesting in and confirming to the successor Trustee all such rights, powers and trusts.  The Issuer will give notice of any resignation and any removal of the Trustee and each appointment of a successor Trustee to all Holders, and include in the notice the name of the successor Trustee and the address of its Corporate Trust Office.

(d)      Notwithstanding replacement of the Trustee pursuant to this Section, the Issuer's and the Guarantors' obligations in Section 7.07 will continue for the benefit of the retiring Trustee.

Section 7.09.  *Successor Trustee by Merger*.  If the Trustee consolidates with, merges or converts into, or transfers all or substantially all of its corporate trust business (including this transaction) to, another corporation or national banking association, the resulting, surviving or transferee corporation or national banking association without any further act will be the successor Trustee with the same effect as if the successor Trustee had been named as the Trustee in this Indenture.

Section 7.10.  *Money Held in Trust*.  The Trustee will not be liable for interest on or the investment of any money received by it except as it may agree with the Issuer or any Guarantor in writing.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.11.  *Force Majeure*.  Notwithstanding any provision herein to the contrary, in no event shall the Trustee or any Agent be liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused by forces beyond its control, including, but not limited to, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like which restrict or prohibit the providing of the services contemplated by this Indenture, inability to obtain material, equipment, or communications or computer facilities, or the failure of equipment or interruption of communications or computer facilities, it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 7.12.  *Corporate Trustee Required; Eligibility; Conflicting Interests*. There shall at all times be a Trustee hereunder which shall be eligible to act as Trustee under the Trust Indenture Act and shall have a combined capital and surplus of at least US$25,000,000 and its Corporate Trust Office in The City of New York, New York.  If such corporation publishes reports of condition at least annually, pursuant to law or the requirements of Federal, state, territorial or District of Columbia supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article.  Neither the Issuer nor any Person directly or indirectly controlling, controlled by, or under common control with the Issuer shall serve as Trustee. If the Trustee acquires any conflicting interest within the meaning of the TIA, it must (i) eliminate such conflict within 90 days, (ii) apply to the SEC for permission to continue as trustee or (iii) resign.

Section 7.13.  *Trustee and Others May Hold Notes*.  The Trustee or any Agent or any other authorized agent of the Trustee or the Issuer or any Guarantor, or any Affiliate thereof, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer or any Guarantor, or any other obligor on the Notes with the same rights it would have if it were not Trustee, Agent or such other authorized agent.

Section 7.14.  *Agents*.

50

(a)     Each Agent accepts its respective obligations set forth herein and in the Notes upon the terms and conditions hereof and thereof, including the following, to all of which the Issuer agrees and to all of which the rights of the Holders from time to time of the Notes shall be subject:

(i)     Each Agent shall be entitled to the compensation to be agreed upon with the Issuer and the Guarantors in writing for all services rendered by it, and the Issuer and the Guarantors, jointly and severally, agree promptly to pay such compensation and to reimburse each of the Agents for its reasonable and documented out-of-pocket expenses (including reasonable and documented fees and expenses of its counsel) incurred by it in connection with the services rendered by it hereunder.  Each of the Issuer and the Guarantors, jointly and severally, also agrees to indemnify each of the Agents for, and to hold each of them harmless against, any loss, liability or expense (including, without limitation, reasonable and documented fees and expenses of its legal counsel), incurred out of or in connection with its acting as agent of the Issuer hereunder, except to the extent such loss, liability or expense results from such Agent's own gross negligence or willful misconduct.  The obligations of the Issuer and the Guarantors under this Section 7.14(a)(i) shall survive the payment of the Notes and the resignation or removal of an Agent and/or the termination of this Indenture;

(ii)     In acting under this Indenture and in connection with the Notes, the Agents are each acting solely as agent of the Issuer and do not assume any obligation towards or relationship of agency or trust for or with any of the Holders, except that all funds held by a Paying Agent for the payment of the principal of and interest on (and Additional Amounts, if any, with respect to) the Notes, shall be held in trust by it and applied as set forth herein and in the Notes, but need not be segregated from other funds held by it, except as required by law;

(iii)     Each of the Agents shall be protected and shall incur no liability for or in respect of any action taken or omitted to be taken or thing suffered by it in reliance upon any Note, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper party or parties;

(iv)     No Agent shall be under any liability for interest on or investment of any moneys received by it pursuant to any of the provisions of this Indenture or the Notes or the Note Guarantees except as it may agree with the Issuer or any Guarantor in writing;

(v)     The recitals contained herein and in the Notes shall be taken as the statements of the Issuer, and no Agent assumes any responsibility for the correctness of the same.  No Agent makes any representation as to the validity or sufficiency of this Indenture, the Notes or the Note Guarantees or any offering materials.  No Agent shall be accountable for the use or application by the Issuer of any of the Notes or the proceeds thereof;

(vi)     Each Agent shall be obligated to perform such duties and only such duties as are herein and in the Notes specifically set forth, and no implied duties or obligations shall be read into this Indenture, the Notes or the Note Guarantees against such Agent.  No

51

Agent shall be under any obligation to take any action hereunder which may tend to involve it in any expense or liability, the payment of which within a reasonable time is not, in its reasonable opinion, assured to it; and

(vii)    No provision of this Indenture shall be construed to relieve any Paying Agent or any Transfer Agent, as applicable, from liability for its own gross negligence or willful misconduct.

Anything in this Section to the contrary notwithstanding, the agreements to hold sums in trust as provided in this Section are subject to the provisions of Section 8.05.

(b)    Any Agent may at any time resign by giving written notice of its resignation mailed to the Issuer and the Trustee specifying the date on which its resignation shall become effective; *provided* that such date shall be at least 60 days after the date on which such notice is given unless the Issuer agrees to accept less notice.   Upon receiving such notice of resignation, the Issuer shall promptly appoint a successor Agent, qualified as aforesaid, by written instrument in duplicate signed on behalf of the Issuer, one copy of which shall be delivered to the resigning Agent and one copy to the successor Agent.   Such resignation shall become effective upon the earlier of (i) the effective date of such resignation or (ii) the acceptance of appointment by the successor Agent as provided in Section 7.14(c).   The Issuer may, at any time and for any reason, and shall, upon any event set forth in the next succeeding sentence, remove an Agent and appoint a successor Agent, qualified as aforesaid, by written instrument in duplicate signed on behalf of the Issuer, one copy of which shall be delivered to the Agent being removed and one copy to the successor Agent.   An Agent shall be removed as aforesaid if it shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver of such Agent or of its property shall be appointed, or any public officer shall take charge or control of it or of its property or affairs for the purpose of rehabilitation, conservation or liquidation.   Any removal of an Agent and any appointment of a successor Agent shall become effective upon acceptance of appointment by the successor Agent as provided in Section 7.14(c). Upon its resignation or removal, the Agent shall be entitled to the payment by the Issuer of its compensation and reimbursement of its reasonable and documented disbursements, advances and expenses (including, without limitation, reasonable and documented fees and expenses of its legal counsel) as set forth in Section 7.14(a)(i).

(c)    Any successor Agent appointed as provided in Section 7.14(b) shall execute and deliver to its predecessor and to the Issuer an instrument accepting such appointment hereunder, and thereupon such successor Agent, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as such Agent hereunder, and such predecessor, upon payment of its compensation and reasonable and documented out-of-pocket expenses (including, without limitation, reasonable and documented fees and expenses of its legal counsel) then unpaid, shall pay over to such successor agent all moneys or other property at the time held by it hereunder, if any.

(d)    Any corporation or bank into which any Agent may be merged or converted, or with which any Paying Agent or Transfer Agent may be consolidated, or any corporation or bank resulting from any merger, conversion or consolidation to which an Agent shall be a

52

party, or any corporation or bank succeeding to all or substantially all of the agency business of the Agent (including this transaction) shall be the successor to such Agent hereunder (*provided* that such corporation or bank shall be qualified as aforesaid) without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(e)     Notwithstanding anything to the contrary contained in this Indenture, any Paying Agent may, to the extent it is required to do so by law, deduct or withhold income or other similar taxes from principal or interest payments hereunder without any liability therefor.

ARTICLE 8
DEFEASANCE AND DISCHARGE

Section 8.01.   *Discharge of Issuer's Obligations*.  (a) Subject to paragraph (b), the Issuer's obligations under the Notes and this Indenture, and the Guarantors' obligations under the Note Guarantees, will terminate if:

(i)     either (A) all Notes previously authenticated and delivered (other than (1) destroyed, lost or stolen Notes that have been replaced or (2) Notes that are paid pursuant to Section 4.01 or (3) Notes for whose payment funds in Dollars or U.S. Government Obligations in Dollars have been held in trust and then repaid to the Issuer pursuant to Section 8.05) have been delivered to the Trustee for cancellation and the Issuer has paid all sums payable by it hereunder; or (B) (1) all Notes not theretofore delivered to the Trustee for cancellation (x) have become due and payable, (y) will become due and payable at their Stated Maturity within one year or (z) are to be called for redemption within one year under arrangements reasonably satisfactory to the Trustee, and the Issuer irrevocably deposits in trust with the Trustee, as trust funds solely for the benefit of the Holders, funds in Dollars or U.S. Government Obligations in Dollars or a combination thereof sufficient, in the opinion of an internationally recognized firm of independent public accountants to the extent such amounts consist of U.S. Government Obligations, expressed in a written opinion delivered to the Trustee, without consideration of any reinvestment, to pay principal of and interest on the Notes to maturity or redemption, as the case may be, and to pay all other sums payable by it hereunder; (2) no Default has occurred and is continuing on the date of the deposit; and (3) the deposit will not result in a breach or violation of, or constitute a Default under, this Indenture or any other agreement or instrument to which the Issuer is a party or by which it is bound; and

(ii)     the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel, in each case stating that all conditions precedent provided for herein relating to the satisfaction and discharge of this Indenture have been complied with.

(b)     After satisfying the conditions in clause (a)(i)(A), only the obligations of the Issuer and the Guarantors under Section 7.07 and Section 7.14 will survive. After satisfying the conditions in clause (a)(i)(B), only the obligations of the Issuer and the Guarantors in Article 2 and Sections 3.01, 4.01, 4.02, 7.07, 7.14, 8.05 and 8.06 will survive; *provided* that upon payment of all Notes in full, only the obligations of the Issuer and the Guarantors in Section 7.07 and 7.14 will survive. In either case, the Trustee, upon request, will acknowledge

53

in writing the discharge of the Issuer's and the Guarantors' obligations under the Notes and this Indenture other than the surviving obligations.

Section 8.02.  *Legal Defeasance*.  After the 123rd day following the deposit referred to in clause (i) below, the Issuer will be deemed to have paid and will be discharged from its obligations in respect of the Notes and this Indenture, other than its obligations in Article 2 and Sections 4.02, 7.07, 7.14, 8.05 and 8.06 (*provided* that upon payment of all Notes in full, only the Issuer's and the Guarantors' obligations in Section 7.07 and Section 7.14 will survive), if the following conditions have been satisfied:

(i)   the Issuer has irrevocably deposited in trust with the Trustee, as trust funds solely for the benefit of the Holders, funds in Dollars or U.S. Government Obligations in Dollars or a combination thereof sufficient, in the opinion of an internationally recognized firm of independent public accountants to the extent amounts consist of U.S. Government Obligations, expressed in a written certificate thereof delivered to the Trustee, without consideration of any reinvestment, to pay principal of and interest on the Notes to maturity or redemption, as the case may be, *provided* that any redemption before maturity has been irrevocably provided for under arrangements satisfactory to the Trustee;

(ii)   no Default has occurred and is continuing on the date of the deposit or at the end of the 123 day period following the deposit;

(iii)   the deposit will not result in a breach or violation of, or constitute a Default under, this Indenture or any other agreement or instrument to which the Issuer is a party or by which it is bound;

(iv)   the Issuer has delivered to the Trustee either (x) a ruling received from the Internal Revenue Service to the effect that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the legal defeasance and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case or (y) an Opinion of Counsel, based on a ruling published by the Internal Revenue Service or a change in U.S. federal income tax law after the date of this Indenture, to the same effect as the ruling described in clause (x); and

(v)   the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, in each case stating that all conditions precedent provided for herein relating to the legal defeasance (or in the case of covenant defeasance, covenant defeasance) have been complied with.

Prior to the end of the 123 day period, none of the Issuer's obligations under this Indenture will be discharged.  Thereafter, upon written request, the Trustee will acknowledge in writing the legal defeasance of the Notes.

Section 8.03.  *Covenant Defeasance*.  Following the deposit referred to in Section 8.01(a)(ii), the Issuer's obligations set forth in Section 4.03, Section 4.04, Section 4.05, Section 4.06, Section 4.07, Section 4.08(a), Section 4.08(b), and Section 5.01(a)(ii) will terminate, and the

failure to comply with such obligations will no longer constitute an Event of Default under Section 6.01, provided that the following conditions have been satisfied:

(i)  the Issuer has complied with clauses (i), (iii) and (v) of Section 8.02; and

(ii)  the Issuer has delivered to the Trustee an Opinion of Counsel to the effect that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the covenant defeasance and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case.

Except as specifically stated above, none of the Issuer's obligations under this Indenture will be discharged.

Section 8.04. *Application of Trust Money*. Subject to Section 8.05, the Trustee will hold in trust the funds in Dollars or U.S. Government Obligations in Dollars deposited with it pursuant to Section 8.01, 8.02 or 8.03, and apply the deposited funds in Dollars and the proceeds from deposited U.S. Government Obligations in Dollars to the payment of principal of and interest on the Notes in accordance with the Notes and this Indenture. Such Dollar funds and U.S. Government Obligations need not be segregated from other funds except to the extent required by law.

Section 8.05. *Repayment to Issuer*. Subject to Section 7.07, 8.01, 8.02 and 8.03, the Trustee and the Paying Agents will promptly pay to the Issuer upon request any excess funds in Dollars held by the Trustee and the Paying Agents at any time and thereupon be relieved from all liability with respect to such funds. The Trustee or such Paying Agent will pay to the Issuer upon written request any funds in Dollars held for payment with respect to the Notes that remains unclaimed for two years; *provided* that before making such payment the Trustee or such Paying Agent may at the expense of the Issuer publish once in a newspaper of general circulation in New York City, or send to each Holder entitled to such Dollar denominated funds, notice that the funds remains unclaimed and that after a date specified in the notice (at least 30 days after the date of the publication or notice) any remaining unclaimed balance of money will be repaid to the Issuer. After payment to the Issuer, Holders entitled to such funds must look solely to the Issuer for payment, unless applicable law designates another Person, and all liability of the Trustee and the Paying Agents with respect to such funds will cease.

Section 8.06. *Reinstatement*. If and for so long as the Trustee is unable to apply any funds in Dollars or U.S. Government Obligations in Dollars held in trust pursuant to Section 8.01, 8.02 or 8.03 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and the Guarantors' obligations under this Indenture and the Notes and the Note Guarantees will be reinstated as though no such deposit in trust had been made. If the Issuer makes any payment of principal of or interest on any Notes because of the reinstatement of its obligations, it will be subrogated to the rights of the Holders of such Notes to receive such payment from the funds in Dollars or U.S. Government Obligations in Dollars held in trust.

ARTICLE 9
AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 9.01.  *Amendments Without Consent of Holders*.  The Issuer, the Guarantors and the Trustee may waive, consent, amend or supplement this Indenture, the Notes or the Note Guarantees without notice to or the consent of any Noteholder:

(i)      to cure any ambiguity, omission, defect, inconsistency or to correct a manifest error in this Indenture, the Notes or the Note Guarantees;

(ii)      to comply with Section 5.01 and to substitute the Issuer in accordance with Section 9.03;

(iii)      to evidence and provide for the acceptance of an appointment by a successor Trustee;

(iv)      to provide for uncertificated Notes in addition to or in place of Certificated Notes *provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code;

(v)      to provide for any additional Note Guarantee of the Notes or to secure the Notes or confirm and evidence the release, termination or discharge of any Note Guarantee of or Lien securing the Notes when such release, termination or discharge is permitted by this Indenture;

(vi)      to provide for or confirm the issuance of Additional Notes;

(vii)      to add to the covenants of the Issuer or Guarantors for the benefit of the Holders of the Notes;

(viii)      to surrender any right conferred by this Indenture upon the Issuer or the Guarantors;

(ix)      to comply with any requirements of the SEC in connection with any qualification of this Indenture under the U.S. Trust Indenture Act of 1939, as amended;

(x)      to make any other change that does not materially and adversely affect the rights of any Holder; or

(xi)      to conform any provision of this Indenture to the "Description of the Notes" in the Offering Memorandum.

Section 9.02.  *Amendments With Consent of Holders*.  (a) Except as otherwise provided in Article 6 or paragraph (b) of this Section 9.02, the Issuer, the Guarantors and the Trustee may amend this Indenture, the Notes and the Note Guarantees with the written consent of the Holders of at least a majority in aggregate principal amount of the Outstanding Notes, and the Holders of at least a majority in aggregate principal amount of the Outstanding Notes by written

56

notice to the Trustee may waive future compliance by the Issuer and the Guarantors with any provision of this Indenture, the Notes or the Note Guarantees.

(b)      Notwithstanding the provisions of paragraph (a), without the consent of each Holder of an affected Note, an amendment or waiver may not:

(i)      reduce the principal amount of or change the Stated Maturity of any payment of principal or any installment of interest on any Note;

(ii)      reduce the rate of interest or change the method of computing the amount of interest payable on any Note;

(iii)      reduce the amount payable upon the redemption of any Note or change the time at which any Note may be redeemed or, once notice of redemption has been given, the time at which it must thereupon be redeemed, subject to the conditions set forth in this Indenture, which conditions shall not be changed in any matter adverse to Holders, *provided*, *however*, the minimum notice period for such redemption may be changed with the written consent of the Holders of a majority in principal amount of the Outstanding Notes;

(iv)      make any Note payable in currency and place of payment other than that stated in the Note;

(v)      impair the contractual right of any Holder of Notes to receive any principal payment or interest payment on such Holder's Notes, on or after the Stated Maturity thereof, or to institute suit for the enforcement of any such payment;

(vi)      make any change in the percentage of the principal amount of the Notes required for amendments or waivers; or

(vii)      modify or change any provision of this Indenture affecting the ranking of the Notes in a manner adverse to the Holders of the Notes (it being understood that changes in provisions affecting the ability to create Liens over the assets of the Issuer shall not affect the "ranking" of the Notes as that term is used in this subsection (vii)).

(c)      It is not necessary for Holders to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if their consent approves the substance thereof.

(d)      (c) An amendment or waiver becomes effective upon the execution of such amendment or waiver by the Trustee.  After an amendment, supplement or waiver under this Section becomes effective, the Issuer will send to the Holders affected thereby a notice briefly describing the amendment, supplement or their written waiver.  Any failure of the Issuer to send such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amendment to this Indenture or waiver.

Section 9.03.   *Substitution of the Issuer*.   Without the consent of any Holder of Notes, the Issuer may be replaced and substituted, as principal debtor in respect of this Indenture

and the Notes, by (x) either Guarantor or (y) any Subsidiary of a Guarantor (in each case, in that capacity, the "**Substituted Issuer**"); *provided* that the following conditions are satisfied:

      (i)      such documents shall be executed by the Substituted Issuer, the Issuer, the Guarantors and the Trustee as may be necessary to give full effect to the substitution, including a supplemental indenture to this Indenture under which the Substituted Issuer assumes all of the obligations of the Issuer under this Indenture and the Notes as if the Substituted Issuer had been named in the Notes and in this Indenture as the principal debtor in respect of the Notes in place of the Issuer (or any previous substitute) and each Guarantor, unless such Guarantor is the Substituted Issuer, or such Guarantor's then-existing Note Guarantee remains in full force and effect (as evidenced by an Officer's Certificate of such Guarantor), unconditionally and irrevocably reaffirms its Note Guarantee (collectively, the "**Substitution Documents**");

      (ii)      if the Substituted Issuer is organized in a jurisdiction other than Luxembourg, the Substitution Documents shall contain covenants (a) to ensure that each Holder and beneficial owner of Notes has the benefit of a covenant in terms corresponding to the obligations of the Issuer pursuant to Section 3.01, in respect of the payment of Additional Amounts (but replacing references to Luxembourg with references to the jurisdiction of organization of the Substituted Issuer) and (b) to indemnify the Trustee, any Paying Agent, and each Holder and beneficial owner of Notes against all taxes or duties that (1) arise by reason of a law or regulation in effect or contemplated on the effective date of the substitution that are incurred or levied against the Trustee, such Paying Agent, or such Holder or beneficial owner of Notes, as the case may be, as a result of the substitution and that would not have been so incurred or levied had the substitution not been made, and (2) are imposed on the Trustee, such Paying Agent, or such Holder or beneficial owner of Notes, as the case may be, by any political subdivision or taxing authority of any country in which the Trustee, such Paying Agent, or such Holder or beneficial owner of Notes resides or is subject to any such tax or duty and that would not have been so imposed had the substitution not been made, in each case subject to similar exceptions as set forth in Section 3.01, *mutatis mutandis*; *provided*, that the Trustee, any Paying Agent, or any Holder or beneficial owner of Notes making a claim with respect to such tax indemnity shall provide the Substituted Issuer with notice of such claim, along with supporting documentation, within four weeks of the announcement of the substitution of the Issuer as issuer; and *provided*, *further*, that notwithstanding anything to the contrary in this Section, the Substituted Issuer shall be entitled to make any deduction or withholding, and shall not be required to indemnify the Trustee, any Paying Agent, or any Holder or beneficial owner of Notes for or on account of any taxes or duties, or pay any Additional Amounts with respect to any such deduction or withholding, imposed on or in respect of any Notes, in either case, pursuant to FATCA, any treaty, law, regulation or other official guidance enacted by any jurisdiction implementing FATCA or any intergovernmental agreement or law, regulation or other official guidance promulgated thereunder implementing FATCA;

      (iii)      the Issuer will deliver, or cause the delivery, to the Trustee of (a) an Opinion of Counsel in the jurisdiction of organization of the Substituted Issuer to the effect that the Substitution Documents were duly authorized, executed and delivered by the Substituted

Issuer, (b) an Opinion of Counsel in the State of New York to the effect that the Substitution Documents constitute valid and binding obligations of the Substituted Issuer, and (c) an Officer's Certificate as to compliance with the provisions described in this Section 9.03;

(iv)    the Substituted Issuer shall appoint a process agent in the Borough of Manhattan in The City of New York to receive service of process on its behalf in relation to any legal action or proceedings arising out of or in connection with the Notes, this Indenture and the Substitution Documents;

(v)    no Event of Default under this Indenture has occurred or is continuing; and

(vi)    the substitution shall comply with all applicable requirements under the laws of the jurisdiction of organization of the Substituted Issuer, Luxembourg and Brazil.

(b)    Upon the execution of the Substitution Documents and compliance with the other conditions set forth in this Section, (i) the Substituted Issuer shall be deemed to be named in this Indenture and the Notes as the principal debtor in place of the Issuer and (ii) the Issuer (or any previous substitute) shall be released from all of its obligations under the Notes and this Indenture and any reference in this Indenture to the Issuer shall from then on be deemed to refer to the Substituted Issuer and any reference to the country in which the Issuer is organized or resident for tax purposes shall from then on be deemed to refer to the country in which the Substituted Issuer is organized or resident for tax purposes.

(c)    Not later than ten Business Days after the execution of the Substitution Documents, the Substituted Issuer shall give written notice thereof to the Holders of Notes.

(d)    Notwithstanding anything to the contrary, this Section 9.03 is not applicable to any consolidation or merger by the Issuer with or into any other Person or the sale, conveyance, transfer or lease by the Issuer, in one transaction or a series of transactions, directly or indirectly, of all or substantially all of its Property (determined on the basis of the consolidated assets of Raízen and its Subsidiaries), which such transaction shall be subject to the provisions of Section 5.01.

Section 9.04.   *Effect of Consent*.   (a) After an amendment, supplement or waiver becomes effective, it will bind every Holder unless it is of the type requiring the consent of each Holder affected.  If the amendment, supplement or waiver is of the type requiring the consent of each Holder affected, the amendment, supplement or waiver will bind each Holder that has consented to it and every subsequent Holder of a Note that evidences the same debt as the Note of the consenting Holder.

(b)    If an amendment, supplement or waiver changes the terms of a Note, the Trustee may require the Holder to deliver it to the Trustee so that the Trustee may place an appropriate notation of the changed terms on the Note and return it to the Holder, or exchange it for a new Note that reflects the changed terms.  The Trustee may also place an appropriate notation on any Note thereafter authenticated.  However, the effectiveness of the amendment, supplement or waiver is not affected by any failure to annotate or exchange Notes in this fashion.

Section 9.05.  *Trustee's Rights and Obligations*.   In signing any amendment, supplement or waiver, the Trustee is entitled to receive, and will be fully protected in relying upon, in addition to the documents required by Section 11.03, an Officer's Certificate and an Opinion of Counsel, each stating that the execution of any amendment, supplement or waiver is authorized or permitted by this Indenture.  If the Trustee has received such an Officer's Certificate and Opinion of Counsel, it shall sign the amendment, supplement or waiver so long as the same does not adversely affect the rights of the Trustee.  The Trustee may, but is not obligated to, execute any amendment, supplement or waiver that affects the Trustee's own rights, duties or immunities under this Indenture.

# ARTICLE 10
# NOTE GUARANTEES

Section 10.01. *Note Guarantees*.

(a)      Each Guarantor hereby jointly and severally, irrevocably and unconditionally Guarantees, as a primary obligor and not merely as a surety, to each Holder and to the Trustee and its successors and assigns (i) the full and punctual payment when due, whether by acceleration, by redemption or otherwise, of all obligations of the Issuer under this Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, interest on or liquidated damages, if any, in respect of the Notes and all other monetary obligations of the Issuer under this Indenture and the Notes and (ii) the full and punctual performance within applicable grace periods of all other obligations of the Issuer whether for fees, expenses, indemnification or otherwise under this Indenture and the Notes (all the foregoing being hereinafter collectively called the "**Guaranteed Obligations**").   Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from each such Guarantor, and that each such Guarantor shall remain bound under this Article 10 notwithstanding any extension or renewal of any Guaranteed Obligation.

(b)      Each Guarantor waives, to the fullest extent permitted by law, presentation to, demand of payment from and protest to the Issuer of any of the Guaranteed Obligations and also waives notice of protest for nonpayment.  Each Guarantor waives notice of any default under the Notes or the Guaranteed Obligations.  The obligations of each Guarantor hereunder shall not be affected by (i) the failure of any Holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Issuer or any other Person under this Indenture, the Notes or any other agreement or otherwise; (ii) any extension or renewal thereof; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any Holder or the Trustee for the Guaranteed Obligations or any of them; (v) the failure of any Holder or Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (vi) any change in the ownership of such Guarantor.

(c)      Each Guarantor hereby waives, to the fullest extent permitted by law, any right to which it may be entitled to have its obligations hereunder divided among the Guarantors, such that such Guarantor's obligations would be less than the full amount claimed.  Each Guarantor hereby waives, to the fullest extent permitted by law, any right to which it may be

entitled to have the assets of the Issuer first be used and depleted as payment of the Issuer's or such Guarantor's obligations hereunder prior to any amounts being claimed from or paid by such Guarantor hereunder.  Each Guarantor hereby waives any right to which it may be entitled to require that the Issuer be sued prior to an action being initiated against such Guarantor.  Each Guarantor hereby waives the benefits to which it is entitled under Articles 333, 827, 829, 830, 834, 835, 837, 838 and 839 of the Brazilian Civil Code, and Article 794 of the Brazilian Code of Civil Procedure.

(d)     Each Guarantor further agrees that its Note Guarantee herein constitutes a Guarantee of payment, performance and compliance when due (and not a Guarantee of collection) and waives any right to require that any resort be had by any Holder or the Trustee to any security held for payment of the Guaranteed Obligations.

(e)     Except as expressly set forth in Section 10.02 below, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise.  Without limiting the generality of the foregoing, the obligations of each Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of any Holder or the Trustee to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Guarantor or would otherwise operate as a discharge of any Guarantor as a matter of law or equity.

(f)     Each Guarantor agrees that its Note Guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations.  Each Guarantor further agrees that its Note Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest or liquidated damages, if any, on any Guaranteed Obligation is rescinded or must otherwise be restored by any Holder or the Trustee upon the bankruptcy or reorganization of the Issuer or otherwise.

(g)     In furtherance of the foregoing and not in limitation of any other right which any Holder or the Trustee has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Issuer to pay the principal of or interest or liquidated damages, if any, on any Guaranteed Obligation when and as the same shall become due, whether by acceleration, by redemption or otherwise, or to perform or comply with any other Guaranteed Obligation, each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the Paying Agent for the benefit of Holders or the Trustee an amount equal to the sum of (i) the unpaid principal amount of such Guaranteed Obligations, (ii) accrued and unpaid interest on such Guaranteed Obligations and (iii) all other monetary obligations of the Issuer to the Holders and the Trustee.

(h)     Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any Guaranteed Obligations Guaranteed hereby until

61

payment in full of all Guaranteed Obligations. Each Guarantor further agrees that, as between it, on the one hand, and the Holders and the Trustee, on the other hand, (i) the maturity of the Guaranteed Obligations Guaranteed hereby may be accelerated as provided in Article 6 for the purposes of any Note Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations Guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Guaranteed Obligations as provided in Article 6, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by such Guarantor for the purposes of this Section 10.01.

(i)    Each Guarantor also agrees to pay any and all reasonable and documented costs and expenses (including reasonable and documented attorneys' fees and expenses) incurred by the Trustee in enforcing any rights under this Section 10.01, except to the extent that any such costs or expenses arise as a result of the Trustee's own gross negligence or willful misconduct.

(j)    Upon request of the Trustee, each Guarantor shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture

Section 10.02. *Limitation on Liability*. Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations Guaranteed hereunder by any Guarantor shall not exceed the maximum amount that can be hereby Guaranteed without rendering this Indenture, as it relates to such Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

Section 10.03. *Successors and Assigns*. This Article 10 shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the successors and assigns of the Trustee and the Holders and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Notes and the Note Guarantees shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture.

Section 10.04. *No Waiver*. Neither a failure nor a delay on the part of either the Trustee or the Holders in exercising any right, power or privilege under this Article 10 shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege. The rights, remedies and benefits of the Trustee and the Holders herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which either may have under this Article 10 at law, in equity, by statute or otherwise.

Section 10.05. *Modification*. No modification, amendment or waiver of any provision of this Article 10, nor the consent to any departure by any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Trustee, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on any Guarantor in any case shall entitle such Guarantor to any other or further notice or demand in the same, similar or other circumstances.

Section 10.06. *Notation of Note Guarantee; Non-Impairment*.  To evidence its Note Guarantee set forth in Section 10.01, each Guarantor agrees that a notation of such Note Guarantee (the "**Notation of Note Guarantee**") substantially in the form attached to this Indenture as Exhibit A shall be endorsed by at least one Officer of each Guarantor by manual, electronic or facsimile signature on each Note authenticated and delivered by the Trustee and this Indenture shall be executed on behalf of the Guarantors.  Each of the Guarantors hereby agrees that its Note Guarantee set forth in Section 10.01 shall remain in full force and effect notwithstanding any failure to endorse on each Note a Notation of Note Guarantee.  If an Officer whose signature is on this Indenture or on the Notation of Note Guarantee no longer holds that office at the time the Trustee authenticates the Note on which a Note Guarantee is endorsed, the Note Guarantee shall be valid nevertheless.  The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Note Guarantee set forth in this Indenture on behalf of the Guarantors.

# ARTICLE 11
## MISCELLANEOUS

Section 11.01. *Noteholder Communications; Noteholder Actions*.  (a) The rights of Holders to communicate with other Holders with respect to this Indenture or the Notes are as provided by the Trust Indenture Act, and the Issuer and the Trustee shall comply with the requirements of TIA Sections 312(a) and 312(b).  Neither the Issuer nor the Trustee will be held accountable by reason of any disclosure of information as to names and addresses of Holders made pursuant to the Trust Indenture Act.

(b)     (i)  Any request, demand, authorization, direction, notice, consent to amendment, supplement or waiver or other action provided by this Indenture to be given or taken by a Holder (an "act") may be evidenced by an instrument signed by the Holder delivered to the Responsible Office of the Trustee.  The fact and date of the execution of the instrument, or the authority of the person executing it, may be proved in any manner that the Trustee deems sufficient.

(ii)    The Trustee may make reasonable rules for action by or at a meeting of Holders, which will be binding on all the Holders.

(c)     Any act by the Holder of any Note binds that Holder and every subsequent Holder of a Note that evidences the same debt as the Note of the acting Holder, even if no notation thereof appears on the Note.  Subject to paragraph (d), a Holder may revoke an act as to its Notes, but only if the Responsible Officer of the Trustee receives the written notice of revocation before the earlier of (i) if applicable, the time the right to deliver an act expires, and (ii) the time the act becomes effective.

(d)     The Issuer may, but is not obligated to, fix a record date for the purpose of determining the Holders entitled to act with respect to any amendment or waiver or in any other regard. If a record date is fixed, those Persons that were Holders at such record date and only those Persons will be entitled to act, or to revoke any previous act, whether or not those Persons continue to be Holders after the record date.

63

(e)      If the Issuer shall solicit from the Holders any request, demand, authorization, direction, notice, consent, waiver or other act, the Issuer may, at its option, in or pursuant to a Board Resolution, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other act, but the Issuer shall have no obligation to do so.  Such record date shall be the record date specified in or pursuant to such Board Resolution, which shall be a date not earlier than the date 30 days prior to the first solicitation of Holders generally in connection therewith and not later than the date such solicitation is completed.  If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other act may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of Outstanding Notes have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other act, and for that purpose the Outstanding Notes shall be computed as of such record date; *provided* that no such authorization, agreement or consent by the Holders on such record date shall be deemed effective unless it shall become effective pursuant to the provisions of this Indenture not later than eleven months after the record date.

(f)      Any request, demand, authorization, direction, notice, consent, waiver or other act of the Holder of any Note shall bind every future Holder of a Note that evidences the same debt as the Note of the acting Holder issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

(g)      Every Holder, by receiving and holding a Note, agrees with the Issuer, the Guarantors, the Trustee and each Agent that none of the Issuer, the Guarantors, the Trustee or any Agent shall be held accountable by reason of the disclosure of any information as to the names and addresses of the Holders, regardless of the source from which such information was derived.

Section 11.02. *Notices*.  (a) Any notice or communication to the parties hereto will be deemed given if in English and in writing when delivered (i) in person, (ii) by an internationally recognized overnight courier service or (iii) by electronic mail with PDF attached and proof of receipt; provided that any notice to the Trustee will be effective only upon receipt by a Responsible Officer of the Trustee.  In each case the notice or communication should be addressed as follows:

*if to the Issuer or the Guarantors*:

Raizen Fuels Finance S.A.
16, Rue Eugène Ruppert, L-2453
Luxembourg, Grand Duchy of Luxembourg
Attention: Board of Directors of Raizen Fuels Finance S.A.
E-mail: Marina.Dalben@raizen.com / tesouraria.corp@raizen.com

*and*

Raízen S.A. and Raízen Energia S.A
Avenida Brigadeiro Faria Lima, 4100, 11th floor
04538-132
São Paulo – SP, Brazil
Attention: Marina Dalben
E-mail: Marina.Dalben@raizen.com / tesouraria.corp@raizen.com

With a copy to:

Simpson Thacher & Bartlett LLP
Av. Juscelino Kubitschek, 1455, 12th floor
São Paulo, SP 04543-011
Brazil
Attention: Grenfel G. Calheiros
E-mail: gcalheiros@stblaw.com

*if to the Trustee, Paying Agent, Registrar and Transfer Agent:*

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: Corporate Trust Administration

The Issuer, the Guarantors or the Trustee by notice to the others may designate additional or different addresses for subsequent notices or communications.

(b)     Except as otherwise expressly provided with respect to published notices, any notice or communication to a Holder of a Certificated Note will be deemed given when mailed to the Holder at its address as it appears on the Register by first class mail or, as to any Global Note registered in the name of the Depositary or its nominee, when given to the Depositary in accordance with its applicable procedures; *provided*, that, at any time when the Notes are listed on the Official List of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market and its rules so require, the Issuer will publish any such notice of communication sent to the Holders in a newspaper having a general circulation in Luxembourg, or alternatively, notice to Holders may be published on the website of the Luxembourg Stock Exchange at www.luxse.com..   Such notice will be deemed given on the date of its first publication.  Copies of any notice or communication to a Holder, if given by the Issuer, will be mailed to the Trustee and the Agents at the same time.  Defect in mailing a notice or communication to any particular Holder will not affect its sufficiency with respect to other Holders.

(c)     Where this Indenture provides for notice, the notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and the waiver will be the equivalent of the notice.  Waivers of notice by Holders must be filed with the Trustee, but such filing is not a condition precedent to the validity of any action taken in reliance upon such waivers.

65

(d)      The Trustee shall have the right to accept and act upon instructions, including funds transfer instructions ("**Instructions**") given pursuant to this Indenture and the Notes and delivered using the following communications methods: e-mail, facsimile transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another method or system specified by the Trustee as available for use in connection with its services hereunder (collectively, "**Electronic Means**"); provided, however, that each of the Issuer and the Guarantors shall provide to the Trustee an incumbency certificate listing officers with the authority to provide such Instructions ("**Authorized Signatories**") and containing specimen signatures of such Authorized Signatories, which incumbency certificate shall be amended by the Issuer and/or such Guarantor, as applicable, whenever a person is to be added or deleted from the listing. If the Issuer or any Guarantor, as applicable, elects to give the Trustee Instructions using Electronic Means and the Trustee in its discretion elects to act upon such Instructions, the Trustee's understanding of such Instructions shall be deemed controlling. Each of the Issuer and the Guarantors understands and agrees that the Trustee cannot determine the identity of the actual sender of such Instructions and that the Trustee shall conclusively presume that directions that purport to have been sent by an Authorized Signatory listed on the incumbency certificate provided to the Trustee have been sent by such Authorized Signatory. Each of the Issuer and the Guarantors shall be responsible for ensuring that only Authorized Signatories transmit such Instructions to the Trustee and that the Issuer and the Guarantors and all Authorized Signatories are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords and/or authentication keys upon receipt by the Issuer and any Guarantor, as applicable. The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction. Each of the Issuer and the Guarantors agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Issuer or such Guarantor, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee immediately upon learning of any compromise or unauthorized use of the security procedures.

Section 11.03. *Certificate and Opinion as to Conditions Precedent*. Upon any request or application by the Issuer or the Guarantors to the Trustee to take any action under this Indenture, the Issuer or the applicable Guarantor, as the case may be, will furnish to the Trustee:

(i)      an Officer's Certificate stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(ii)      an Opinion of Counsel stating that all such conditions precedent have been complied with.

66

Section 11.04. *Statements Required in Certificate or Opinion*.  Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture must include:

(i)    a statement that each person signing the certificate or opinion has read the covenant or condition and the related definitions;

(ii)    a brief statement as to the nature and scope of the examination or investigation upon which the statement or opinion contained in the certificate or opinion is based;

(iii)    a statement that, in the opinion of each such person, that person has made such examination or investigation as is necessary to enable the person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(iv)    a statement as to whether or not, in the opinion of each such person, such condition or covenant has been complied with, *provided* that an Opinion of Counsel may rely on an Officer's Certificate or certificates of public officials with respect to matters of fact.

Section 11.05. *Payment Date Other than a Business Day*.  If any payment with respect to a payment of any principal of, premium, if any, or interest on any Note (including any payment to be made on any date fixed for redemption of any Note) is due on a day which is not a Business Day, then the payment need not be made on such date, but may be made on the next Business Day with the same force and effect as if made on such date, and no interest will accrue for the intervening period.

Section 11.06. *Governing Law*.  This Indenture, the Notes and the Note Guarantees shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to its choice of law principles. For the avoidance of doubt, the application of the provisions set out in articles 470-1 to 470-19 (both included) of the Luxembourg Companies Law is excluded.

Section 11.07. *Submission to Jurisdiction; Agent for Service*.  (a) Each of the Issuer and the Guarantors agrees that any suit, action or proceeding against it brought by any Noteholder or the Trustee arising out of or based upon this Indenture, the Notes or the Note Guarantees may be instituted in any state or Federal court in the Borough of Manhattan in The City of New York, New York, and irrevocably waives, to the extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submits to the non-exclusive jurisdiction of such courts in any suit, action or proceeding.

(b)    By the execution and delivery of this Indenture or any amendment or supplement hereto, each of the Issuer and the Guarantors (i) acknowledges that it has designated and appointed Cogency Global Inc., currently located at 122 East 42nd Street, 18th Floor, New York, NY, 10168, as its authorized agent upon which process may be served in any suit, action or proceeding with respect to, arising out of, or relating to, the Notes, the Note Guarantees or this Indenture, that may be instituted in any Federal or state court in the State of

New York, The City of New York, the Borough of Manhattan, or brought under Federal or state securities laws or brought by the Trustee (whether in its individual capacity or in its capacity as Trustee hereunder), and acknowledges that Cogency Global Inc. has accepted such designation, (ii) submits to the non-exclusive jurisdiction of any such court in any such suit, action or proceeding, and (iii) agrees that service of process upon Cogency Global Inc. shall be deemed in every respect effective service of process upon the Issuer or such Guarantor, as the case may be, in any such suit, action or proceeding.  Each of the Issuer and the Guarantors further agrees to take any and all action, including the execution and filing of any and all such documents and instruments as may be necessary to continue such designation and appointment of Cogency Global Inc. in full force and effect so long as this Indenture shall be in full force and effect; *provided* that the Issuer and such Guarantor may and shall (to the extent Cogency Global Inc. ceases to be able to be served on the basis contemplated herein), by written notice to the Trustee, designate such additional or alternative agents for service of process under this Section 11.07 that (1) maintains an office located in the Borough of Manhattan, The City of New York in the State of New York, (2) are either (x) counsel for the Issuer or any Guarantor or (y) a corporate service company which acts as agent for service of process for other Persons in the ordinary course of its business and (3) agrees to act as agent for service of process in accordance with this Section 11.07.  Such notice shall identify the name of such agent for process and the address of such agent for process in the Borough of Manhattan, The City of New York, State of New York.  Upon the written request of any Noteholder, the Trustee shall deliver such information to such Noteholder.  Notwithstanding the foregoing, there shall, at all times, be at least one agent for service of process for the Issuer and each Guarantor appointed and acting in accordance with this Section 11.07.

Section 11.08. *Judgment Currency*.  U.S. Dollars are the sole currency of account and payment for all sums payable by the Issuer and the Guarantors under or in connection with the Notes, the Note Guarantees and this Indenture.  Any amount received or recovered in a currency other than U.S. Dollars in respect of the Notes, the Note Guarantees or this Indenture (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Issuer, the Guarantors, any of their respective Significant Subsidiaries or otherwise) by the Trustee or any Holder in respect of any sum expressed to be due to it from the Issuer or any Guarantor will constitute a discharge of the Issuer and the Guarantors only to the extent of the U.S. Dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that U.S. Dollar amount is less than the U.S. Dollar amount expressed to be due to the recipient under any Note, any Note Guarantee or this Indenture, the Issuer and the Guarantors, jointly and severally, will indemnify the recipient against the cost of making any such purchase; and if the amount of U.S. Dollars so purchased is greater than the sum originally due to such recipient, such recipient, if a Holder, will, by accepting a Note, and, if the Trustee, by executing this Indenture, be deemed to have agreed to repay such excess.  For purposes of this indemnity, it will be sufficient for the recipient to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had the actual purchase of U.S. dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. Dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above).

68

The above indemnity, to the extent permitted by law:

(1)     constitutes a separate and independent obligation from the other obligations of the Issuer and the Guarantors;

(2)     will give rise to a separate and independent cause of action;

(3)     will apply irrespective of any waiver or indulgence granted by the Trustee or any Holder; and

(4)     will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note or any other judgment.

Section 11.09. *No Adverse Interpretation of Other Agreements*.   This Indenture may not be used to interpret another indenture or loan or debt agreement of the Issuer, a Guarantor or any Subsidiary of the Issuer or Guarantor, and no such indenture or loan or debt agreement may be used to interpret this Indenture.

Section 11.10. *Successors*.   All agreements of the Issuer and each Guarantor in this Indenture, the Notes and the Note Guarantees will bind its successors.  All agreements of the Trustee in this Indenture will bind its successor.

Section 11.11. *Duplicate Originals*.   The parties may sign any number of copies of this Indenture.  This Indenture and any related documents, certificates, directions, notices or other instruments delivered pursuant to or in connection herewith may be executed in any number of counterparts, each of which so executed shall be an original, but all of them together represent the same agreement. Counterparts may be delivered via facsimile, electronic mail (including any electronic signature covered by the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act, the Electronic Signatures and Records Act or other applicable law, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and shall have the same validity, legal effect and admissibility in evidence as an original manual signature. Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any faxed, scanned, or photocopied manual signature, or other electronic signature, of any other party and shall have no duty to investigate, confirm or otherwise verify the validity or authenticity thereof. The exchange of copies of this Indenture and of signature pages in accordance with the foregoing sentence shall constitute effective execution and delivery of this Indenture as to the parties hereto.

Section 11.12. *Separability*.   In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 11.13. *Table of Contents and Headings*.   The Table of Contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and in no way modify or restrict any of the terms and provisions of this Indenture.

Section 11.14. *No Liability of Directors, Officers, Employees, Incorporators, Members and Stockholders*. No past, present or future director, officer, employee, incorporator, member, partner or shareholder of the Issuer or any Guarantor or their respective Subsidiaries, as such, will have any liability for any obligations of the Issuer or any Guarantor under the Notes, the Note Guarantees or this Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

Section 11.15. *Waiver of Jury Trial*. EACH OF THE ISSUER, THE GUARANTORS, THE HOLDERS BY ACCEPTANCE OF THE NOTES AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE NOTE GUARANTEES OR THE TRANSACTION CONTEMPLATED HEREBY.

Section 11.16. *Tax Matters*. Each of the Issuer, the Guarantors and the Trustee agrees (i) to cooperate and to provide the others with such reasonable information as each may have in its possession to enable the determination of whether any payments pursuant to this Indenture are subject to the withholding requirements described in Section 1471(b) of the Code or otherwise imposed pursuant to Sections 1471 through 1474 of the Code and any regulations, or agreements thereunder or official interpretations thereof ("**Applicable Law**"), and (ii) that the Trustee and each Paying Agent shall be entitled to make any withholding or deduction from payments under this Indenture to the extent necessary to comply with Applicable Law, for which the Trustee and such Paying Agent, as applicable, shall not have any liability.

Section 11.17. *USA Patriot Act.* The parties hereto acknowledge that in accordance with Section 326 of the USA Patriot Act, the Trustee is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee. The parties to this Indenture agree that they will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the USA Patriot Act.

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

**RAIZEN FUELS FINANCE S.A.**
as Issuer

By: _____

Name: Marina Dalben

Title: Managing Director

**RAÍZEN S.A**
as Guarantor

By: _____

Name:  Marina Dalben

Title:  Authorized Representative

By: _____

Name:  Mariana de Oliveira

Title:  Authorized Representative

[Signature Page to the Notes due 2035 Indenture]

**RAÍZEN ENER    A S.A.**
as Guarantor

By:    _____
       Name:  Marina Dalben
       Title:  Authorized Representative


By:    _____
       Name:  Mariana de Oliveira
       Title:  Authorized Representative

[Signature Page to the Notes due 2035 Indenture]

**THE BANK OF NEW YORK MELLON**
as Trustee, Registrar, Paying Agent and Transfer
Agent

By:    _____

          Name:   Francine Kincaid
          Title:    Vice President

**EXHIBIT A**

**[FORM OF FACE OF NOTE]**

**RAIZEN FUELS FINANCE S.A.**

**5.700% Green Notes Due 2035**

[CUSIP] [ISIN] _____

No.                                                                    US$  _____

     RAIZEN FUELS FINANCE S.A., a public limited liability company (*société anonyme*) organized and established under the laws of the Grand Duchy of Luxembourg, having its registered office at 16, Rue Eugène Ruppert, L-2453 Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*Registre de commerce et des sociétés, Luxembourg*) under number B184033, LEI 52990010NH26VC32Q522 (the "**Issuer**," which term includes any successor under the Indenture hereinafter referred to), for value received, promises to pay to _____, or its registered assigns, the principal sum of _____ DOLLARS (US$_____) [or such other amount as indicated on the Schedule of Increases and Decreases in Global Note attached hereto] on January 17, 2035.

     Interest Rate: 5.700% per annum.

     Interest Payment Dates: January 17 and July 17 of each year, commencing on January 17, 2025.

     Regular Record Dates: January 12 and July 12 of each year (whether or not a Business Day).

     Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which will for all purposes have the same effect as if set forth at this place.

A-1

IN WITNESS WHEREOF, the Issuer has caused this Note to be signed manually, electronically or by facsimile by its duly authorized signatory.

RAIZEN FUELS FINANCE S.A.
as Issuer

By:    _____
        Name:
        Title:

Trustee's Certificate of Authentication

This is one of the 5.700% Green Notes due 2035 described in the Indenture referred to in this Note.

The Bank of New York Mellon, as Trustee

By:    _____
        Authorized Officer

Dated:

A-2

[FORM OF REVERSE SIDE OF NOTE]

**RAIZEN FUELS FINANCE S.A.**

**5.700% Green Notes Due 2035**

1.      *Principal and Interest.*

The Issuer promises to pay the principal of this Note on the Maturity Date.  The Issuer promises to pay interest on the principal amount of this Note on each Interest Payment Date, as set forth on the face of this Note at the rate of 5.700% per annum.   Interest will be payable semiannually (to the Holders of record of the Notes at the close of business on the January 12 or July 12 (whether or not a Business Day) immediately preceding the Interest Payment Date) on each Interest Payment Date, commencing on January 17, 2025.

Interest on this Note will accrue from the most recent date to which interest has been paid on this Note (or, if there is no existing Default in the payment of interest and if this Note is authenticated between a Regular Record Date and the next Interest Payment Date, from such Interest Payment Date) or, if no interest has been paid, from the Issue Date.  Interest will be computed in the basis of a 360 day year of twelve 30 day months. Any payments due on a day that is not a Business Day will be due on the immediately succeeding Business Day and no interest will accrue for the intervening period.

The Issuer will pay interest on overdue principal, premium, if any, and, to the extent lawful, interest at a rate per annum that is 1% per annum in excess of the rate per annum borne by this Note. Any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the second day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least two days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.

Additional Amounts will be paid in respect of any payments of interest or principal so that the amount a Holder receives after applicable deduction or withholding will equal the amount that the Holder would have received in the absence of such deduction or withholding, to the extent described in Section 3.01 of the Indenture.

2.      *Indentures; Note.*

This is one of the Notes issued under an Indenture dated as of September 17, 2024 (as amended or supplemented from time to time, the "**Indenture**"), among the Issuer, Raízen S.A. ("**Raízen**") and Raízen Energia S.A. ("**Raízen Energia**") as the Guarantors, and The Bank of New York Mellon, as Trustee, Registrar, Paying Agent and Transfer Agent.  Capitalized terms used herein are used as defined in the Indenture unless otherwise indicated.  The terms of the Notes include those stated in the Indenture, as may be amended from time to time.  The Notes are subject to all such terms, and Holders are referred to the Indenture for a statement of all such terms.  To

A-3

the extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture will control.

The Notes are general unsecured and unsubordinated obligations of the Issuer, ranking equally in right of payment with all existing and future unsecured unsubordinated obligations of the Issuer.  The Indenture limits the original aggregate principal amount of the Initial Notes to US$1,000,000,000, but Additional Notes may be issued pursuant to the Indenture, and the originally issued Notes and all such Additional Notes shall vote together for all purposes as a single series.

The Note Guarantees are unsecured unsubordinated obligations of Raízen and Raízen Energia, ranking equally in right of payment with all existing and future unsecured unsubordinated obligations of Raízen and Raízen Energia.

3.      *Redemption and Repurchase.*

The Note is subject to redemption for taxation reasons as described in Section 3.03 of the Indenture, redemption at the option of the Issuer or any Guarantor as described in Section 3.02 of the Indenture and redemption following a tender offer or Offer to Purchase as described in Section 3.04 of the Indenture.

The Note is subject to repurchase upon a Change of Control that results in a Rating Decline as described in Section 4.06 of the Indenture.

4.      *Registered Form; Denominations; Transfer; Exchange.*

The Notes are in registered form without coupons in minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof. A Holder may register the transfer or exchange of Notes in accordance with the Indenture. The Trustee may require a Holder to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.  Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to issue, register the transfer of or exchange any Note or certain portions of a Note.

5.      *Defaults and Remedies.*

If an Event of Default, as defined in the Indenture, occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the Outstanding Notes may declare all the Notes to be due and payable.  If a bankruptcy default with respect to the Issuer or a Guarantor occurs and is continuing, the Notes automatically become due and payable.  Holders may not enforce the Indenture or the Notes except as provided in the Indenture. The Trustee may require indemnity satisfactory to it before it enforces the Indenture or the Notes. Subject to certain limitations, Holders of a majority in principal amount of the Notes then Outstanding may direct the Trustee in its exercise of remedies.

A-4

6.      *Amendment and Waiver.*

Subject to certain exceptions, the Indenture and the Notes may be amended, or Default may be waived, with the consent of the Holders of a majority in principal amount of the Outstanding Notes.  Without notice to or the consent of any Holder, the Issuer, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Note Guarantees to, among other things, cure any ambiguity, omission, defect, inconsistency or to correct a manifest error if such amendment or supplement does not adversely affect the interests of the Holders in any material respect.

7.      *Authentication.*

This Note is not valid until the Trustee (or Authenticating Agent) signs the certificate of authentication on this Note.

8.      *Governing Law.*

This Note shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to its choice of law principles. Reference is hereby made to the further provisions of submission to jurisdiction, agent for service, waiver of immunities and judgment currency set forth in the Indenture, which will for all purposes have the same effect as if set forth herein.  For the avoidance of doubt, the application of the provisions set out in articles out in articles 470-1 to 470-19 (both included) of the Luxembourg Companies Law is excluded.

9.      *Abbreviations.*

Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian) and U/G/M/A/ (= Uniform Gifts to Minors Act).

The Issuer will furnish a copy of the Indenture to any Holder upon written request and without charge.

A-5

## FORM OF NOTATION OF NOTE GUARANTEE

For value received, each of the undersigned hereby unconditionally Guarantees the cash payments in U.S. Dollars of principal and interest on this Note (and including Additional Amounts payable thereon, if any) in the amounts and at the times when due, together with interest on the overdue principal and interest, if any, on this Note, if lawful, and the payment of all other obligations of the Issuer under the Indenture or the Notes, to the Holder of this Note and the Trustee, all in accordance with and subject to the terms and conditions of this Note and the Indenture. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture, dated as of September 17, 2024 among Raizen Fuels Finance S.A., as the Issuer, Raízen S.A. and Raízen Energia S.A. as the Guarantors, and The Bank of New York Mellon, as Trustee, Registrar, Paying Agent and Transfer Agent.

The obligations of the undersigned to the Holders and to the Trustee are expressly set forth in Article 10 of the Indenture. This Note Guarantee constitutes a direct, general and unconditional obligation of the undersigned which will at all times rank at least pari passu with all other present and future senior unsecured obligations of the undersigned, except for such obligations as may be preferred by mandatory provisions of law.

IN WITNESS WHEREOF, the undersigned have caused this Notation of Note Guarantee with respect to the 5.700% Green Notes due 2035 of Raizen Fuels Finance S.A. to be duly executed.

Dated: [          ]

RAÍZEN S.A. as Guarantor

By:    _____
       Name:
       Title:

By:    _____
       Name:
       Title:

RAÍZEN ENERGIA S.A. as Guarantor

By:    _____
       Name:
       Title:

By:    _____
       Name:
       Title:

A-7

[FORM OF TRANSFER NOTICE]

FOR VALUE RECEIVED the undersigned registered Holder hereby sell(s), assign(s) and transfer(s) unto

Insert Taxpayer Identification No.

_____

_____
Please print or typewrite name and address including zip code of assignee

_____

the within Note and all rights thereunder, hereby irrevocably constituting and appointing

_____

attorney to transfer said Note on the books of the Issuer with full power of substitution in the premises.

A-8

[THE FOLLOWING PROVISION TO BE INCLUDED ON ALL CERTIFICATES
BEARING A RESTRICTED LEGEND OR REGULATION S LEGEND]

In connection with any transfer of this Note occurring prior to the removal of the [Restricted Legend / Regulation S Legend], the undersigned confirms that such transfer is made without utilizing any general solicitation or general advertising and further as follows:

*Check One*

☐      (1) This Note is being transferred to a "qualified institutional buyer" in compliance with Rule 144A under the U.S. Securities Act of 1933, as amended, and certification in the form of Exhibit E to the Indenture is being furnished herewith.

☐      (2) This Note is being transferred to a Non-U.S. Person in compliance with the exemption from registration under the U.S. Securities Act of 1933, as amended, provided by Regulation S thereunder, and certification in the form of Exhibit D to the Indenture is being furnished herewith.

or

☐      (3) This Note is being transferred other than in accordance with (1) or (2) above and documents are being furnished which comply with the conditions of transfer set forth in this Note and the Indenture.

If none of the foregoing boxes is checked, the Trustee is not obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in the Indenture have been satisfied.

Date:

_____
Seller

By:      _____

NOTICE: The signature to this assignment must correspond with the name as written upon the face of the within mentioned instrument in every particular, without alteration or any change whatsoever.

A-9

Signature Guarantee:[1]

By: _____
To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

A-10

## OPTION OF HOLDER TO ELECT PURCHASE

If you wish to have all of this Note purchased by the Issuer, a Guarantor or a Designated Affiliate, as applicable, pursuant to Section 4.06 of the Indenture, check the box: ☐

If you wish to have a portion of this Note purchased by the Issuer, a Guarantor or a Designated Affiliate, as applicable, pursuant to Section 4.06 of the Indenture, state the amount (in original principal amount) below:

US$_____.

Date:_____

Your Signature:_____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee[1]: _____

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Trustee, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Trustee in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

A-11

SCHEDULE OF INCREASES AND DECREASES IN GLOBAL NOTE[1]

    The following increases and decreases in the aggregate principal amount of this Global Note have been made:

| Date of Increase or Decrease | Amount of decrease in original principal amount of this Global Note | Amount of increase in original principal amount of this Global Note | Original principal amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

---

[1] For Global Notes.

A-12

**EXHIBIT B-1**

RESTRICTED LEGEND

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES FOR THE BENEFIT OF THE ISSUER AND THE GUARANTORS THAT THIS NOTE OR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (1) TO THE ISSUER OR THE GUARANTORS, (2) SO LONG AS THIS NOTE IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A) IN ACCORDANCE WITH RULE 144A, (3) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT, (4) PURSUANT TO ANOTHER APPLICABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE) OR (5) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, AND IN EACH OF SUCH CASES IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. AS A CONDITION TO THE REGISTRATION OF TRANSFER OF THIS NOTE PURSUANT TO CLAUSE (4) ABOVE, THE ISSUER, THE GUARANTORS OR THE TRUSTEE MAY REQUIRE DELIVERY OF ANY DOCUMENTATION OR OTHER EVIDENCE THAT IT, IN ITS SOLE DISCRETION, DEEMS NECESSARY OR APPROPRIATE TO EVIDENCE COMPLIANCE WITH THE EXEMPTION REFERRED TO IN SUCH CLAUSE (4) AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, REPRESENTS AND AGREES THAT IT SHALL NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO ABOVE.

THIS LEGEND MAY BE REMOVED SOLELY IN THE DISCRETION AND AT THE DIRECTION OF THE ISSUER OR THE GUARANTORS.

**EXHIBIT B-2**

REGULATION S LEGEND

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER THIS NOTE, PRIOR TO THE DATE THAT IS 40 DAYS AFTER THE LATER OF (1) THE ORIGINAL ISSUE DATE HEREOF AND (2) THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF THIS NOTE), ONLY (A) TO THE ISSUER, (B) UNDER A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE NOTES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER QUALIFIED INSTITUTIONAL BUYER AND TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) THROUGH OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES IN RELIANCE UPON REGULATION S OR (E) UNDER ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUER'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR OTHER TRANSFER PURSUANT TO CLAUSE (E) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, A CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO THE ISSUER.

**EXHIBIT C**

DTC LEGEND

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS A BENEFICIAL INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE ARE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF CEDE & CO. OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL NOTE ARE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE TRANSFER PROVISIONS OF THE INDENTURE.

**EXHIBIT D**

Regulation S Certificate

_____, _____

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: Corporate Trust Administration

Re:    RAIZEN FUELS FINANCE S.A., as issuer (the "**Issuer**")
       5.700% Green Notes due 2035

Ladies and Gentlemen:

Reference is hereby made to the indenture dated as of September 17, 2024 (the "**Indenture**"), among the Issuer, Raízen S.A. and Raízen Energia S.A., as guarantors, and The Bank of New York Mellon, as trustee (the "**Trustee**"), registrar, transfer agent and paying agent. Terms used in this Certificate shall have the meaning set forth in the Indenture or Regulation S ("**Regulation S**") under the Securities Act of 1933, as amended (the "**Securities Act**"), except as otherwise stated herein.

[*CHECK A OR B AS APPLICABLE*.]

☐ A.  This Certificate relates to our proposed transfer of US$____ principal amount of the Issuer's 5.700% Green Notes due 2035 (the "**Notes**") represented by a U.S. Global Note (CUSIP: 75102XAD8) for an equal beneficial interest in the Offshore Global Note (CUSIP: L7909CAE7).  We hereby certify as follows:

1.   The offer and sale of the Notes was not and will not be made to a person in the United States (unless such person is excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(vi) or the account held by it for which it is acting is excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(i) under the circumstances described in Rule 902(h)(3)) and such offer and sale was not and will not be specifically targeted at an identifiable group of U.S. citizens abroad.

2.   Unless the circumstances described in the parenthetical in paragraph 1 above are applicable, either (a) at the time the buy order was originated, the buyer was outside the United States or we and any person acting on our behalf reasonably believed that the buyer was outside the United States or (b) the transaction was executed in, on or through the facilities of a designated offshore securities market, and neither we nor any person acting on our behalf knows that the transaction was pre-arranged with a buyer in the United States;

D-1

3.    Neither we, any of our affiliates, nor any person acting on our or their behalf, has made any directed selling efforts in the United States with respect to the Notes;

4.    The proposed transfer of Notes is not part of a plan or scheme to evade the registration requirements of the Securities Act; and

5.    If we are a dealer or a person receiving a selling concession, fee or other remuneration in respect of the Notes, and the proposed transfer takes place during the first 40 days following the issue date of such Notes, or we are an officer or director of the Issuer or an Initial Purchaser (as defined in the Indenture), we certify that the proposed transfer is being made in accordance with the provisions of Rule 904(b) of Regulation S.

☐ B.    This Certificate relates to our proposed exchange of US$____ principal amount of the Issuer's 5.700% Green Notes due 2035 (the "**Notes**") represented by a U.S. Global Note (CUSIP: 75102XAD8) for an equal beneficial interest in the Offshore Global Note (CUSIP: L7909CAE7).  We hereby certify as follows:

1.    At the time the offer and sale of the Notes was made to us, either (i) we were not in the United States or (ii) we were excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(vi) or the account held by us for which we were acting was excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(i) under the circumstances described in Rule 902(h)(3); and we were not a member of an identifiable group of U.S. citizens abroad;

2.    Unless the circumstances described in paragraph 1(ii) above are applicable, either (a) at the time our buy order was originated, we were outside the United States or (b) the transaction was executed in, on or through the facilities of a designated offshore securities market, and we did not pre-arrange the transaction in the United States.; and

3.    The proposed exchange of Notes is not part of a plan or scheme to evade the registration requirements of the Securities Act.

You and the Issuer are entitled to rely conclusively upon this Certificate and are irrevocably authorized to produce this Certificate or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

Very truly yours,

[NAME OF SELLER (FOR TRANSFERS) OR
OWNER (FOR EXCHANGES)]

By:   _____
      Name:
      Title:
      Address

Date:   _____

Signature Guarantee:[1]

By:    _____
      To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

EXECUTION VERSION

**EXHIBIT E**

Rule 144A Certificate

_____, _____

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: Corporate Trust Administration

Re:    RAIZEN FUELS FINANCE S.A., as issuer (the "**Issuer**")
       5.700% Green Notes due 2035

Ladies and Gentlemen:

Reference is hereby made to the indenture dated as of September 17, 2024 (the "**Indenture**"), among the Issuer, Raízen S.A. and Raízen Energia S.A., as guarantors, and The Bank of New York Mellon, as trustee (the "**Trustee**"), registrar, transfer agent and paying agent. Terms used in this Certificate shall have the meaning set forth in the Indenture or Rule 144A ("**Rule 144A**") under the Securities Act of 1933, as amended (the "**Securities Act**"), except as otherwise stated herein.

**[*CHECK A OR B AS APPLICABLE.*]**

☐ A.   This Certificate relates to our proposed transfer of US$____ principal amount of the Issuer's 5.700% Green Notes due 2035 (the "**Notes**") represented by an Offshore Global Note (CUSIP: L7909CAE7) for an equal beneficial interest in the U.S. Global Note (CUSIP: 75102XAD8).  We hereby certify as follows:

☐ B.   This Certificate relates to our proposed exchange of US$____ principal amount of the Issuer's 5.700% Green Notes due 2035 (the "**Notes**") represented by an Offshore Global Note (CUSIP: L7909CAE7) for an equal beneficial interest in the U.S. Global Note (CUSIP: 75102XAD8).  We hereby certify as follows:

We and, if applicable, each account for which we are acting in the aggregate owned and invested more than US$____ in securities of issuers that are not affiliated with us (or such accounts, if applicable), as of _____, 20__, which is a date on or since close of our most recent fiscal year.  We and, if applicable, each account for which we are acting, are a qualified institutional buyer within the meaning of Rule 144A.  If we are acting on behalf of an account, we exercise sole investment discretion with respect to such account.  We are aware that the transfer of Notes to us, or such exchange, as applicable, is being made in reliance upon the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A.  Prior to the date of this Certificate we have received such information regarding the Issuer as we have requested pursuant to Rule 144A(d)(4) to the extent that the Issuer is not then subject to Section 13 or 15(d) of the

E-1

Exchange Act, or is not exempt from reporting pursuant to Rule 12g3 2(b) under the Exchange Act or have determined not to request such information.

You and the Issuer are entitled to conclusively rely upon this Certificate and are irrevocably authorized to produce this Certificate or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

Very truly yours,

[NAME OF SELLER (FOR TRANSFERS) OR OWNER (FOR EXCHANGES)]

By: _____
      Name:
      Title:
      Address:

Date: _____

Signature Guarantee:[1]

By: _____
       To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

# EXHIBIT H

**2037 Notes Indenture**

**RAIZEN FUELS FINANCE S.A.**
as Issuer

**RAÍZEN S.A.**
and
**RAÍZEN ENERGIA S.A.**
as Guarantors

and

**THE BANK OF NEW YORK MELLON**
as Trustee, Registrar, Paying Agent and Transfer Agent

_____

**Indenture**

**Dated as of February 25, 2025**

_____

**6.700%Notes Due 2037**
**Unconditionally and Irrevocably Guaranteed by**
**Raízen S.A. and Raízen Energia S.A.**

# TABLE OF CONTENTS

**PAGE**

ARTICLE 1 DEFINITIONS AND INCORPORATION BY REFERENCE ............................... 1

Section 1.01.  *Definitions* ........................................................................................... *1*
Section 1.02.  *Rules of Construction* ........................................................................ *15*

ARTICLE 2 THE NOTES ..................................................................................................... 15

Section 2.01.  *Form, Dating and Denominations; Legends* .......................................... *15*
Section 2.02.  *Execution and Authentication; Additional Notes* .................................... *16*
Section 2.03.  *Registrar, Paying Agent, Transfer Agent and Authenticating Agent;
Paying Agent to Hold Money in Trust* ................................................... *17*
Section 2.04.  *Replacement Notes* .............................................................................. *18*
Section 2.05.  *Outstanding Notes* ............................................................................... *18*
Section 2.06.  *Temporary Notes* ................................................................................ *19*
Section 2.07.  *Cancellation* ....................................................................................... *19*
Section 2.08.  *CUSIP and ISIN Numbers* ................................................................. *19*
Section 2.09.  *Registration, Transfer and Exchange* .................................................... *19*
Section 2.10.  *Restrictions on Transfer and Exchange* ................................................. *22*
Section 2.11.  *Open Market Purchases* ...................................................................... *24*
Section 2.12.  *Trustee's Disclaimer* ........................................................................... *24*

ARTICLE 3 ADDITIONAL AMOUNTS; REDEMPTION ................................................. 24

Section 3.01.  *Additional Amounts* ............................................................................. *24*
Section 3.02.  *Optional Redemption* ........................................................................... *27*
Section 3.03.  *Redemption for Taxation Reasons* ......................................................... *28*
Section 3.04.  *Redemption Following Tender Offer* ....................................................... *28*
Section 3.05.  *Election to Redeem; Selection of Notes* .................................................. *29*
Section 3.06.  *Notice of Redemption* ........................................................................... *29*
Section 3.07.  *Deposit of Redemption Price* ................................................................ *31*
Section 3.08.  *Effect of Notice of Redemption* .............................................................. *31*

ARTICLE 4 COVENANTS .................................................................................................. 31

Section 4.01.  *Payment of Notes* ................................................................................. *31*
Section 4.02.  *Maintenance of Office or Agency* .......................................................... *32*
Section 4.03.  *Existence* ............................................................................................ *33*
Section 4.04.  *Payment of Taxes* ................................................................................ *33*
Section 4.05.  *Maintenance of Properties* .................................................................... *33*
Section 4.06.  *Repurchases at the Option of the Holders Upon Change of Control* ....... *33*
Section 4.07.  *Limitation on Liens* ............................................................................. *36*
Section 4.08.  *Reporting Requirements* ....................................................................... *36*
Section 4.09.  *Disclosure of Names and Addresses of Holders* ..................................... *37*
Section 4.10.  *Paying Agent and Transfer Agent* .......................................................... *37*

i

*Section 4.11.    Limitation on Issuer.* ..................................................................... 38

ARTICLE 5 CONSOLIDATION, MERGER OR SALE OF ASSETS ...................................... 38

*Section 5.01.    Consolidation, Merger or Sale of Assets* ................................... 38

ARTICLE 6 DEFAULT AND REMEDIES .......................................................................... 39

*Section 6.01.    Events of Default* .................................................................... 39
*Section 6.02.    Acceleration* ......................................................................... 40
*Section 6.03.    Other Remedies* ..................................................................... 41
*Section 6.04.    Waiver of Past Defaults* ......................................................... 41
*Section 6.05.    Control by Majority* ............................................................... 41
*Section 6.06.    Limitation on Suits* ................................................................ 42
*Section 6.07.    Rights of Holders to Receive Payment* ..................................... 42
*Section 6.08.    Collection Suit by Trustee* ...................................................... 42
*Section 6.09.    Trustee May File Proofs of Claim* ............................................ 42
*Section 6.10.    Priorities* .............................................................................. 43
*Section 6.11.    Restoration of Rights and Remedies* ......................................... 43
*Section 6.12.    Undertaking for Costs* ............................................................ 43
*Section 6.13.    Rights and Remedies Cumulative.* ............................................ 44
*Section 6.14.    Delay or Omission Not Waiver; Prescription of Claims* ........... 44
*Section 6.15.    Waiver of Stay, Extension or Usury Laws* ................................ 44

ARTICLE 7 THE TRUSTEE ............................................................................................ 44

*Section 7.01.    General* ................................................................................ 44
*Section 7.02.    Certain Rights of Trustee* ....................................................... 45
*Section 7.03.    Individual Rights of Trustee* ................................................... 47
*Section 7.04.    Trust Indenture Act* ................................................................ 47
*Section 7.05.    Trustee's Disclaimer* ............................................................... 47
*Section 7.06.    Notice of Default* ................................................................... 48
*Section 7.07.    Compensation and Indemnity* ................................................. 48
*Section 7.08.    Replacement of Trustee* .......................................................... 49
*Section 7.09.    Successor Trustee by Merger* ................................................... 50
*Section 7.10.    Money Held in Trust* ............................................................... 50
*Section 7.11.    Force Majeure* ...................................................................... 50
*Section 7.12.    Corporate Trustee Required; Eligibility; Conflicting Interests* .............. 50
*Section 7.13.    Trustee and Others May Hold Notes* ......................................... 50
*Section 7.14.    Agents.* ................................................................................. 51

ARTICLE 8 DEFEASANCE AND DISCHARGE ................................................................. 53

*Section 8.01.    Discharge of Issuer's Obligations* ........................................... 53
*Section 8.02.    Legal Defeasance* .................................................................. 54
*Section 8.03.    Covenant Defeasance.* ............................................................ 54
*Section 8.04.    Application of Trust Money* ..................................................... 55

ii

Section 8.05.    Repayment to Issuer ................................................................. 55
Section 8.06.    Reinstatement ........................................................................... 55

ARTICLE 9 AMENDMENTS, SUPPLEMENTS AND WAIVERS ......................................... 56

Section 9.01.    Amendments Without Consent of Holders ............................... 56
Section 9.02.    Amendments With Consent of Holders ..................................... 56
Section 9.03.    Substitution of the Issuer ......................................................... 57
Section 9.04.    Effect of Consent ...................................................................... 59
Section 9.05.    Trustee's Rights and Obligations .............................................. 60

ARTICLE 10 NOTE GUARANTEES ..................................................................... 60

Section 10.01. Note Guarantees ....................................................................... 60
Section 10.02. Limitation on Liability ............................................................. 62
Section 10.03. Successors and Assigns ............................................................ 62
Section 10.04. No Waiver ................................................................................ 62
Section 10.05. Modification ............................................................................. 62
Section 10.06. Notation of Note Guarantee; Non-Impairment ........................ 63

ARTICLE 11 MISCELLANEOUS ........................................................................ 63

Section 11.01. Noteholder Communications; Noteholder Actions ................... 63
Section 11.02. Notices ..................................................................................... 64
Section 11.03. Certificate and Opinion as to Conditions Precedent ............... 66
Section 11.04. Statements Required in Certificate or Opinion ........................ 67
Section 11.05. Payment Date Other than a Business Day ................................ 67
Section 11.06. Governing Law ......................................................................... 67
Section 11.07. Submission to Jurisdiction; Agent for Service ......................... 67
Section 11.08. Judgment Currency ................................................................. 68
Section 11.09. No Adverse Interpretation of Other Agreements ..................... 69
Section 11.10. Successors ................................................................................ 69
Section 11.11. Duplicate Originals .................................................................. 69
Section 11.12. Separability .............................................................................. 69
Section 11.13. Table of Contents and Headings .............................................. 69
Section 11.14. No Liability of Directors, Officers, Employees, Incorporators,
                Members and Stockholders ....................................................... 70
Section 11.15. Waiver of Jury Trial ................................................................ 70
Section 11.16. Tax Matters ............................................................................. 70
Section 11.17. USA Patriot Act ....................................................................... 70

iii

EXHIBITS

EXHIBIT A Form of Note .................................................................................................. A-1

EXHIBIT B Restricted Legend ........................................................................................... B-1

EXHIBIT C DTC Legend .................................................................................................. C-1

EXHIBIT D Regulation S Certificate ................................................................................ D-1

EXHIBIT E Rule 144A Certificate .................................................................................... E-1

INDENTURE, dated as of February 25, 2025, between RAIZEN FUELS FINANCE S.A., a public limited liability company (*société anonyme*) organized and existing under the laws of Luxembourg, having its registered office at 16, Rue Eugène Ruppert, L-2453 Luxembourg, and registered with the Luxembourg Register of Commerce and Companies (*Registre de commerce et des sociétés, Luxembourg*) under number B184033, LEI 52990010NH26VC32Q522, as the issuer (the "**Issuer**"), RAÍZEN S.A. ("**Raízen**") and RAÍZEN ENERGIA S.A. ("**Raízen Energia**") as the Guarantors, and THE BANK OF NEW YORK MELLON as Trustee, Registrar, Paying Agent and Transfer Agent.

## RECITALS

The Issuer has duly authorized the execution and delivery of this Indenture to provide for the issuance of the Issuer's 6.700% Notes due 2037 (the "**Notes**"). All things necessary to make this Indenture a valid and binding agreement of the Issuer, in accordance with its terms, have been done, and the Issuer has done all things necessary to make the Notes (in the case of the Additional Notes, when duly authorized), when executed by the Issuer and authenticated and delivered by the Trustee and duly issued by the Issuer, the valid obligations of the Issuer as hereinafter provided.

In addition, each of the Guarantors has duly authorized the execution and delivery of this Indenture as Guarantor. All things necessary to make this Indenture a valid and binding agreement of the Guarantors, in accordance with its terms, have been done, and each Guarantor has done all things necessary to make its Note Guarantee, when the Notes are executed by the Issuer and authenticated and delivered by the Trustee and duly issued by the Issuer, the valid, legal and binding obligation of such Guarantor.

## WITNESSETH

For and in consideration of the premises and the purchase of the Notes by the Holders thereof, the parties hereto covenant and agree, for the equal and proportionate benefit of all Holders, as follows:

## ARTICLE 1
## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01.  *Definitions*.

"**Additional Amounts**" has the meaning assigned to such term in Section 3.01(a).

"**Additional Notes**" means the Issuer's 6.700% Notes due 2037 (other than the Initial Notes) issued after the Issue Date in accordance with Section 2.02 hereof, as part of the same series as the Initial Notes.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" (including the terms "controlling," "controlled by" and "under common control with") as to any Person shall mean the possession, directly or indirectly, of the power to direct or cause

the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by contract or otherwise.

"**Agent**" means any Registrar, Paying Agent, Transfer Agent, Authenticating Agent or other agent hereunder, as duly appointed by the Issuer (or by the Trustee in the case of the Authenticating Agent).

"**Agent Member**" means a member of, or a participant in, the Depositary.

"**Applicable GAAP**" means, with respect to the Issuer or any Guarantor, either (i) generally accepted accounting principles in the jurisdiction where such Issuer or Guarantor is organized or incorporated or (ii) International Financial Reporting Standards (IFRS) issued by the International Accounting Standards Board (IASB) and related interpretations, in each case, as in effect from time to time.

"**Applicable Law**" has the meaning assigned to such term in Section 11.16.

"**Authenticating Agent**" refers to the Trustee's designee for authentication of the Notes.

"**Authentication Order**" has the meaning assigned to such term in Section 2.02(c).

"**Authorized Signatories**" has the meaning assigned to such term in Section 11.02.

"**bankruptcy default**" means the Events of Default set forth in Section 6.01(a)(v) and/or (vi).

"**Board of Directors**" means the board of directors or comparable governing body of the Issuer or any Guarantor, as applicable, or any committee thereof duly authorized to act on its behalf.

"**Board Resolution**" means a resolution duly adopted by the Board of Directors, which is certified by the Secretary, Assistant Secretary, a director or another Person performing corporate secretarial functions of the Issuer or a Guarantor, as applicable, and remains in full force and effect as of the date of its certification.

"**Brazil'**" means the Federative Republic of Brazil.

"**Business Day**" means any day other than a Saturday, a Sunday or a legal holiday or a day on which banking institutions or trust companies are authorized or obligated by law to close in The City of New York, Luxembourg or São Paulo, Brazil.

"**Capital Stock**" means, as to any Person, any and all shares, interests, participations, quotas or other equivalents (however designated, whether voting or non-voting) of capital stock or equity interest in such Person, and any and all warrants or rights or options to purchase any of the foregoing, but excluding any debt securities convertible into or exchangeable for any of the foregoing.

"**Central Bank**" means the Central Bank of Brazil (*Banco Central do Brasil*).

2

"**Certificated Note**" means a Note in registered, individual, non-global form without interest coupons.

"**Change of Control**" means an event as a result of which (1) any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), other than one or more Permitted Holders or a group that includes one or more Permitted Holders in which such Permitted Holder or Permitted Holders hold and have voting power over at least a majority of the Voting Stock of Raízen held by such group, becomes the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act) of more than 50% of the total voting power of the Voting Stock of Raízen; or (2) Permitted Holders, directly or indirectly, cease to have the power to direct or cause the direction of the management and policies of Raízen, whether through the ownership of voting securities, by contract or otherwise.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Consolidated Net Worth**" means the total shareholders' equity (including both controlling and non-controlling interests) of Raízen and its Subsidiaries determined on a consolidated basis in accordance with Applicable GAAP.

"**Corporate Trust Office**" means the office of the Trustee at which the corporate trust business of the Trustee is administered, which at the date of this Indenture is located at 240 Greenwich Street, 7th Floor East, New York, New York 10286, Attention: Corporate Trust Administration, or such other address as the Trustee may designate from time to time by notice to the Holders and the Issuer, or the principal corporate trust office of any successor Trustee.

"**Debt**" means, with respect to any Person, without duplication:

(1)    all indebtedness of such Person for borrowed money;

(2)    all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (but excluding trade accounts payable or other short-term obligations to suppliers or customers payable within 360 days, in each case arising in the ordinary course of business);

(3)    all obligations, contingent or otherwise, of such Person in respect of acceptances, letters of credit, financial guaranty insurance policies or similar extensions of credit (excluding (i) trade payables and (ii) other obligations with respect to letters of credit securing obligations (other than obligations described in clauses (1) and (2) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit);

(4)    all obligations of such Person under Hedging Agreements; and

(5)    all Debt of other Persons referred to in clauses (1) through (4) above that is Guaranteed by such Person's Guarantee (other than obligations of other Persons that are customers or suppliers of such Person for which such Person is or becomes so responsible

3

or liable in the ordinary course of business to (but only to) the extent that such Person does not, or is not required to, make payment in respect thereof);

if and to the extent any of the preceding items (other than Guarantees, letters of credit and Hedging Agreements) would appear as a liability upon the balance sheet of the specified Person in accordance with Applicable GAAP; it being understood that leases in effect on the Issue Date that are deemed operating leases under IFRS 16 – Leases will not be deemed "Debt."

The amount of Debt of any Person will be deemed to be:

(1)   with respect to a revolving credit or similar facility, the total amounts of funds borrowed and then outstanding;

(2)   with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation;

(3)   with respect to any Debt issued with original issue discount, the face amount of such Debt less the remaining unamortized portion of the original issue discount of such Debt;

(4)   with respect to any Hedging Agreement, the net amount payable if such Hedging Agreement terminated at that time due to default by such Person reasonably determined by the Issuer on the basis of customary "marked-to-market" methodology; and

(5)   otherwise, the outstanding principal amount thereof.

The principal amount of any Debt or other obligation that is denominated in any currency other than United States dollars (after giving effect to any Hedging Agreement in respect thereof) shall be the amount thereof, as determined pursuant to the foregoing sentence, converted into United States dollars at the Spot Rate in effect on the date of determination.

"**Default**" means an event or condition which upon notice, lapse of time or both would become an Event of Default.

"**Depositary**" means the depositary of each Global Note, which will initially be DTC.

"**Designated Affiliate**" means, at any time, one or more Persons (including, without limitation, a Guarantor) designated by the Issuer to be the purchaser of Notes under an Offer to Purchase.

"**Dollars**" means United States Dollars in immediately available funds.

"**DTC**" means The Depository Trust Company, a New York corporation, and its successors.

"**DTC Legend**" means the legend set forth in Exhibit C.

4

"**Electronic Means**" has the meaning assigned to such term in Section 11.02.

"**Event of Default**" has the meaning assigned to such term in Section 6.01.

"**Excess Additional Amounts**" has the meaning assigned to such term in Section 3.03.

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Expiration Date**" has the meaning assigned to such term in Section 4.06(a)(v).

"**FATCA**" has the meaning assigned to such term in Section 3.01(a)(ix)

"**Fitch**" means Fitch Ratings, Inc., and any successor to its rating agency business.

"**Global Note**" means a Note in registered global form without interest coupons registered in the name of the Depositary (or its nominee) as depositary for the beneficial owners thereof.

"**Guarantee**" means any obligation of a Person to pay the Debt of another Person, including without limitation:

(1)    an obligation to pay or purchase such Debt;

(2)    an obligation to lend money or to purchase or subscribe shares or other securities or to purchase assets or services in order to provide funds for the payment of such Debt; or

(3)    any other agreement to be responsible for such Debt;

*provided, however,* that the term "**Guarantee**" shall not include endorsements for collection or deposit in the ordinary course of business. The term "**Guarantee**" used as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning assigned to such term in Section 10.01(a).

"**Guarantor**" means each of (i) Raízen, (ii) Raízen Energia, and (iii) any other Person Guaranteeing the Issuer's obligations under the Notes and this Indenture.

"**Hedging Agreement**" means, with respect to any Person, all net obligations of such Person in respect of any interest rate protection agreement, any currency or commodity swap, cap or collar agreement, any equity swap or any similar arrangement entered into by such Person providing for the transfer or mitigation of interest rate, currency, commodity price or equity risks either generally or under specific contingencies (but without regard to any notional principal amount relating thereto).

"**Holder**" or "**Noteholder**" means the Person in whose name a Note is registered in the Register maintained by the Registrar.

"**Indenture**" means this indenture, as amended or supplemented from time to time.

5

"**Initial Notes**" means the US$1,000,000,000 aggregate principal amount of Notes issued on the date hereof.

"**Initial Purchaser**" or "**Initial Purchasers**" means any initial purchaser or initial purchasers party to a purchase agreement with the Issuer relating to the sale of the Notes or Additional Notes by the Issuer.

"**Instructions**" has the meaning assigned to such term in Section 11.02.

"**Interest Payment Date**" means each February 25 and August 25 of each year, commencing on August 25, 2025.

"**Investment Grade**" means BBB- or higher by S&P, Baa3 or higher by Moody's or BBB- or higher by Fitch, or the equivalent of such global ratings by S&P, Moody's or Fitch.

"**Issue Date**" means February 25, 2025.

"**Issuer**" means the party named as such in the first paragraph of this Indenture or any successor obligor under this Indenture and the Notes pursuant to Sections 5.01 and Section 9.03.

"**Lien**" means, with respect to any Property, any mortgage, pledge, usufruct, fiduciary transfer (*alienação* or *cessão fiduciária*), charge or other encumbrance, lien, security interest or any preferential arrangement (including a securitization) that has the practical effect of creating a security interest on or with respect to such Property; *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"**Low or Nil Tax Jurisdiction**" means a jurisdiction that does not impose income tax or that imposes it at a maximum rate lower than 17%, or whose laws do not allow access to information related to ownership composition or securities ownership or permit the identification of the beneficial owner of income attributed to non-residents.

"**Luxembourg**" means the Grand Duchy of Luxembourg.

"**Luxembourg Companies Law**" means the Luxembourg law of 10 August 1915 on commercial companies, as amended.

"**Material Adverse Effect**" means (i) any material adverse effect on the financial condition, business, properties or results of operations of Raízen and its Subsidiaries taken as a whole and (ii) any material adverse effect on the ability of the Issuer or the Guarantors to perform their respective obligations under this Indenture, the Notes or the Note Guarantees.

"**Maturity Date**" means February 25, 2037.

"**Moody's**" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"**Non-Recourse Debt**" means Debt (or any portion thereof) of a Subsidiary of Raízen (the "**Non-Recourse Debtor**") used to finance (i) the creation, development, construction,

improvement or acquisition of projects, Properties or assets and any extensions, renewals or refinancings of such Debt including the cost of the refinancing or (ii) the operations of projects, Properties or assets of such Non-Recourse Debtor or its Subsidiaries; *provided* that the recourse of the lender thereof (including any agent, trustee, receiver or other Person acting on behalf of such entity) in respect of such Debt is limited (other than in respect of the Recourse Amount (as defined herein)) to the Non-Recourse Debtor, any debt securities issued by the Non-Recourse Debtor, the Capital Stock of the Non-Recourse Debtor, and any assets, receivables, inventory, equipment, chattels, contracts, intangibles, rights and any other assets of such Non-Recourse Debtor and its Subsidiaries connected with the projects, properties or assets created, developed, constructed, improved, acquired or operated, as the case may be, in respect of which such Debt has been incurred; *provided, further*, that if such lender additionally has contractual recourse to Raízen or to any Subsidiary of Raízen (other than the Non-Recourse Debtor and its Subsidiaries) for the repayment of any portion of such Debt (such portion, the "**Recourse Amount**"), then the Recourse Amount will not constitute Non-Recourse Debt and the Issuer or the relevant Guarantor, as the case may be, will be deemed to have incurred Debt in an aggregate principal amount equal to the Recourse Amount.

"**Non U.S. Person**" means a Person that is not a U.S. Person under Regulation S.

"**Notation of Note Guarantee**" has the meaning assigned to such term in Section 10.06.

"**Note Guarantee**" means each Guarantee by the Guarantors of the Guaranteed Obligations pursuant to this Indenture and the Notes.

"**Notes**" has the meaning assigned to such term in the Recitals. The Initial Notes and any Additional Notes shall be treated as a single class for all purposes under this Indenture, and unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additional Notes.

"**Offer to Purchase**" has the meaning assigned to such term in Section 4.06(a).

"**Offer to Purchase Payment**" has the meaning assigned to such term in Section 4.06(a).

"**Offer to Purchase Payment Date**" has the meaning assigned to such term in Section 4.06(a)(v).

"**Offering Memorandum**" means the final offering memorandum dated February 20, 2025 prepared by the Issuer in connection with the offering of the Initial Notes.

"**Officer**" means a director, the president or chief executive officer, any vice president, the chief financial officer, the treasurer or any assistant treasurer, or the secretary or any assistant secretary, or any attorney-in-fact of each of the Issuer and the Guarantors, as applicable, or any other Person duly appointed by the shareholders or the Board of Directors of each of the Issuer and the Guarantors, as applicable, to perform corporate duties.

"**Officer's Certificate**" means, with respect to any Person, a certificate signed by the chairman of the board (or equivalent governing body), president, vice-president, chief executive officer, chief operating officer, chief financial officer, chief accounting officer, director or

manager, as applicable, or any treasurer, secretary or authorized signatory or, to the extent applicable, general counsel of such Person.

"**Offshore Global Note**" means a Global Note that bears the Regulation S Legend representing Notes issued and sold pursuant to Regulation S.

"**Opinion of Counsel**" means a written opinion from legal counsel who may be an employee of or counsel to the Issuer, which opinion shall be reasonably acceptable to the Trustee.

"**Outstanding**" has the meaning assigned to such term in Section 2.05.

"**Par Call Date**" has the meaning assigned to such term in Section 3.02(a)

"**Paying Agent**" refers to The Bank of New York Mellon in its capacity as paying agent and its successors, and such other paying agents as the Issuer shall appoint.

"**Permitted Holders**" means each of (i) Royal Dutch Shell PLC and its Affiliates and (ii) Cosan S.A. and its Affiliates (in each case, including any successors and assigns thereof).

"**Permitted Liens**" means:

(1)     any Liens existing on the Issue Date;

(2)     any Liens extending, renewing or replacing (or successive extensions, renewals or replacements of), in whole or in part, any Lien referred to in clauses (1), (3), (4), (10) and (13) hereof; *provided* that the principal amount of Debt secured thereby shall not exceed the principal amount of Debt so secured at the time of such extension, renewal or replacement, except for any increase reflecting premiums, fees and expenses in connection with such extension, renewal or replacement;

(3)     any Liens created solely for the purpose of securing the payment of all or a part of the purchase price (or the cost of construction or improvement, and any related transaction fees and expenses) of assets or Property (including Capital Stock of any Person) acquired, constructed or improved after the Issue Date, including related transaction fees and expenses (or securing Debt incurred to refinance a bridge or other interim financing that is initially incurred for the purpose of financing such acquisition, construction or improvement of such Property or assets, including related transaction fees and expenses); *provided* that (a) the aggregate principal amount of Debt secured by such Liens shall not exceed (but may be less than) the greater of (i) the purchase price of the assets or Property so acquired, constructed or improved, or (ii) the aggregate Debt incurred solely for the acquisition, construction, or improvement of such Property or assets, as the case may be, (b) such Liens shall not encumber any assets or Property other than the assets or Property so acquired, constructed or improved and (c) other than any unimproved real property on which the Property so constructed, or the improvement, is located, such Liens shall attach to such assets or Property within 365 days of the construction, acquisition or improvement of such assets or Property; *provided, further*, that any Lien is permitted to be incurred on the Capital Stock of any Person securing any Debt of that Person that is (i) Non-Recourse

Debt and (ii) incurred for purposes of financing the acquisition, construction or improvement of any Property or assets of such Person;

(4)      any Liens securing Debt for the purpose of financing all or part of the cost of the acquisition, construction or development of a project; *provided* that (a) the Lien in respect of such Debt is limited to assets (including Capital Stock of the project entity) or Property of such project, (b) the aggregate principal amount of Debt secured by the Liens will not exceed (but may be less than) the greater of (i) the cost (i.e., purchase price) of the project so acquired, constructed or developed or (ii) the aggregate Debt incurred solely for the acquisition, construction, or improvement of such project, as the case may be, and (c) the Lien is incurred before, or within 365 days after the completion of, that acquisition, construction or development and does not apply to any other Property or assets of Raízen or any Significant Subsidiary;

(5)      any Liens imposed by applicable law incurred in the ordinary course of business, including carriers', warehousemen's and mechanics' liens, statutory landlord's liens, and other similar liens and encumbrances arising in the ordinary course of business, in each case for sums not yet due or being contested in good faith by appropriate proceedings;

(6)      any Liens securing taxes, duties, assessments, fees and other governmental charges or levies, in each case the payment of which is not yet due or is being contested in good faith by appropriate proceedings and for which such adequate reserves or other appropriate provisions, if any, as shall be required by Applicable GAAP shall have been made;

(7)      pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other similar social security legislation, any deposit to secure appeal bonds in proceedings being contested in good faith, good faith deposits in connection with bids, tenders, contracts (other than for the payment of Debt) or leases or deposits for the payment of rent, in each case made in the ordinary course of business;

(8)      customary reservations or retentions of title, minor defects, easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, licenses, restrictions on the use of Property or assets or minor imperfections in title that do not in the aggregate materially impair the value or use of the Property or assets affected thereby, and any leases and subleases of real property that do not in the aggregate materially interfere with the ordinary conduct of the business of the Issuer, any Guarantor or any Significant Subsidiary, and which are made on customary and usual terms applicable to similar properties;

(9)      encumbrances, security deposits or reserves maintained in the ordinary course of business and required by applicable law;

(10)     any Liens (i) granted to secure borrowings directly or indirectly from Banco Nacional de Desenvolvimento Econômico e Social-BNDES, or any other federal, regional or state Brazilian governmental development bank or credit agency (including borrowings from any Brazilian governmental bank with funds provided by Brazilian governmental

regional funds (which shall include, without limitation, Financiadora de Estudos e Projetos – FINEP, *Fundo de Desenvolvimento do Nordeste* – FDNE and *Fundo de Desenvolvimento do Centro Oeste* – FCO)) or (ii) granted to secure borrowings from any international or multilateral development bank, government-sponsored agency, export-import bank or official export-import credit insurer, export-credit agency or commercial bank acting as co-lender in any of the foregoing;

(11)    any Liens in favor of issuers of surety bonds, appeal bonds, bid bonds, tender bonds, letters of credit or similar instruments issued pursuant to the request of and for the account of any of the Issuer or the Guarantors or any of their Subsidiaries in the ordinary course of business (including all bonds required by law, contract or tender rules);

(12)    any Liens securing obligations under any Hedging Agreements, so long as such Hedging Agreements  are entered into for bona fide, non-speculative purposes;

(13)    any Liens existing on any Property or assets of any Person before that Person's acquisition (in whole or in part) by, merger into or consolidation with or sale of assets to any of the Issuer, the Guarantors or any Subsidiary thereof after the Issue Date; *provided* that the Lien is not created in contemplation of or in connection with such acquisition, merger or consolidation and such Lien does not extend to any other property of the Issuer, the Guarantors or any Subsidiary thereof;

(14)    any Liens on inventory, receivables and related assets of any of the Issuer, the Guarantors or any of their Subsidiaries securing the obligations of the Issuer, such Guarantor or such Subsidiary, as applicable, under any lines of credit or working capital or export or import trade finance facility or other trade transaction; *provided* that the aggregate principal amount of Debt incurred that is secured by such receivables that shall fall due in any calendar year shall not exceed 80% of Raízen's consolidated net operating revenues for the most recently concluded period of four consecutive fiscal quarters; *provided, further,* that advance transactions will not be deemed transactions secured by receivables, inventory or related assets for purposes of the above calculations;

(15)    any judgment Lien not giving rise to an Event of Default;

(16)    any interest or title of a lessor under any capitalized lease obligation; *provided* that such Liens do not extend to any Property or assets which is not leased property subject to such capitalized lease obligation;

(17)    any Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Issuer, any Guarantor or any of their Subsidiaries, including rights of offset and set-off;

(18)    any Lien or rights of set-off of any Person with respect to any cash equivalents on deposit account or securities account of the Issuer, any Guarantor or any of their Subsidiaries arising in the ordinary course of business in favor of the bank(s) or security intermediary(ies) with which such accounts are maintained, securing only amounts owing to such bank(s) with respect to cash management and operating account arrangements;

(19)    any Liens securing the Notes and the Note Guarantees and all other monetary obligations under this Indenture;

(20)    any Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(21)    any rights of set-off of any Person with respect to any deposit account of the Issuer, any Guarantor or any of their Subsidiaries arising in the ordinary course of business and not constituting a financing transaction;

(22)    Liens securing obligations owed by any Subsidiary of Raízen to Raízen or one or more Subsidiaries of Raízen and/or by Raízen to one or more such Subsidiaries; and

(23)    other Liens securing obligations in an aggregate amount not exceeding the greater of: (i) US$2.8 billion (or the equivalent thereof at the time of determination) and (ii) 20% of the Total Consolidated Assets.

For purposes of determining compliance with Section 4.07, (i) a Lien need not be incurred solely by reference to one category of Permitted Liens described above but is permitted to be incurred in part under any combination thereof and of any other available exemption and (ii) in the event that a Lien (or any portion thereof) meets the criteria of one or more of the categories of Permitted Liens, the Issuer may, in its sole discretion, classify or reclassify such Lien (or any portion thereof) in any manner that complies with the categories of Permitted Liens.

"**Person**" means any individual, corporation, company, association, partnership, limited liability company, joint venture, trust, unincorporated association, governmental authority or any agency or political subdivision thereof or any other entity of whatever nature.

"**Property**" of any Person means any property, rights, revenues, or interest therein, of such Person.

"**principal**" of any Debt means the principal amount of such Debt, (or if such Debt was issued with original issue discount, the face amount of such Debt less the remaining unamortized portion of the original issue discount of such Debt), together with, unless the context otherwise indicates, any premium then payable on such Debt.

"**Rating Agency**" means each of (1) S&P, (2) Moody's and (3) Fitch, or their respective successors.

"**Rating Decline**" means that at any time within 90 days after the date of public notice of a Change of Control, (1) in the event the Notes are assigned an Investment Grade rating by at least two of the Rating Agencies prior to such public notice, the rating assigned to the Notes by any two or more of the Rating Agencies is below an Investment Grade rating; or (2) in the event the Notes are not assigned an Investment Grade rating by at least two of the Rating Agencies prior to such public notice, the rating assigned to the Notes by at least two of the Rating Agencies is decreased by one or more categories (i.e., notches); *provided* that there shall be no Rating Decline to the extent the Notes continue to have an Investment Grade rating by at least one of the Rating

Agencies; and *provided, further*, that, in each case, any such Rating Decline is expressly stated by the applicable Rating Agency to have been the result of the Change of Control.

"**Register**" has the meaning assigned to such term in Section 2.09.

"**Registrar**" means The Bank of New York Mellon.

"**Regular Record Date**" for the interest payable on any Interest Payment Date means February 20 or August 20 (whether or not a Business Day) immediately preceding such Interest Payment Date.

"**Regulation S**" means Regulation S under the Securities Act.

"**Regulation S Certificate**" means a certificate substantially in the form of Exhibit D hereto.

"**Regulation S Legend**" means the legend set forth in Exhibit B-2.

"**Relevant Taxing Jurisdiction**" has the meaning assigned to such term in Section 3.01(a).

"**Responsible Officer**" means, with respect to the Trustee, any officer of the Trustee in its Corporate Trust Department who shall have direct responsibility for the administration of this Indenture.

"**Restricted Legend**" means the legend set forth in Exhibit B-1.

"**Rule 144A**" means Rule 144A under the Securities Act.

"**Rule 144A Certificate**" means a certificate substantially in the form of Exhibit E hereto.

"**S&P**" means S&P Global Ratings, a division of S&P Global Inc., and any successor to its rating agency business.

"**SEC**" or "**Commission**" means the U.S. Securities and Exchange Commission, as from time to time constituted, created under the Securities Exchange Act of 1934, or, if at any time after execution of this instrument such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body performing such duties on such date.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Significant Subsidiary**" means, with respect to any Person, any Subsidiary of such Person which at the time of determination had assets which, as of the date of such Person's most recent quarterly consolidated balance sheet, constituted at least 10% of such Person's total assets, determined on the basis of the consolidated assets of such Person and its Subsidiaries as of such date.

"**Spot Rate**" means, for any currency, the spot rate at which that currency is offered for sale against United States dollars as published in The Wall Street Journal on the Business Day

immediately preceding the date of determination or, if that rate is not available in that publication, as published in any publicly available source of similar market data, as determined by the Issuer.

"**Stated Maturity**" means (i) with respect to any Debt, the date specified as the fixed date on which the final installment of principal of such Debt is due and payable or (ii) with respect to any scheduled installment of principal of or interest on any Debt, the date specified as the fixed date on which such installment is due and payable as set forth in the documentation governing such Debt, not including any contingent obligation to repay, redeem or repurchase prior to the regularly scheduled date for payment.

"**Subsidiary**" means, with respect to any Person, any other Person more than 50% of the outstanding Voting Stock of which is owned or controlled, directly or indirectly, by such Person and/or by any one or more Subsidiaries of such Person.

"**Substituted Issuer**" has the meaning assigned to such term in Section 9.03(a).

"**Substitution Documents**" has the meaning assigned to such term in Section 9.03(a)(i).

"**Successor Corporation**" has the meaning assigned to such term in Section 5.01(a)(i).

"**Threshold Amount**" has the meaning assigned to such term in Section 6.01(a)(iv).

"**Total Consolidated As**sets" means the total amount of consolidated assets of Raízen and its Subsidiaries prepared in accordance with Applicable GAAP, calculated after giving pro forma effect to any acquisition or disposition of Persons, divisions, lines of businesses, operations or assets by Raízen and its Subsidiaries subsequent to such date and on or prior to the date of determination.

"**Transfer Agent**" refers to The Bank of New York Mellon in its capacity as transfer agent and such other transfer agents as the Issuer shall appoint.

"**Treasury Rate**" means, with respect to any redemption date, the yield determined by Raízen in accordance with the following two paragraphs:

(1)    The Treasury Rate shall be determined by Raízen after 4:15 p.m. (New York City time) (or after such time as yields on U.S. government securities are posted daily by the Board of Governors of the Federal Reserve System), on the third Business Day (solely in New York City) preceding the redemption date based upon the yield or yields for the most recent day that appear after such time on such day in the most recent statistical release published by the Board of Governors of the Federal Reserve System designated as "Selected Interest Rates (Daily) – H.15" (or any successor designation or publication) ("**H.15**") under the caption "U.S. government securities—Treasury constant maturities—Nominal" (or any successor caption or heading) ("**H.15 TCM**"). In determining the Treasury Rate, Raízen shall select, as applicable: (i) the yield for the Treasury constant maturity on H.15 exactly equal to the period from the redemption date to the Par Call Date (the "**Remaining Life**"); or (ii) if there is no such Treasury constant maturity on H.15 exactly equal to the Remaining Life, the following two yields: (x) one yield corresponding to the Treasury constant maturity on H.15 immediately shorter than, and (y) one yield

13

corresponding to the Treasury constant maturity on H.15 immediately longer than, the Remaining Life – and shall interpolate to the Par Call Date on a straight-line basis (using the actual number of days) using such yields and rounding the result to three decimal places; or (iii) if there is no such Treasury constant maturity on H.15 shorter than or longer than the Remaining Life, the yield for the single Treasury constant maturity on H.15 closest to the Remaining Life. For purposes of this paragraph, the applicable Treasury constant maturity or maturities on H.15 shall be deemed to have a maturity date equal to the relevant number of months or years, as applicable, of such Treasury constant maturity from the redemption date.

(2)      If on the third Business Day (solely in New York City) preceding the redemption date H.15 TCM or any successor designation or publication is no longer published, Raízen shall calculate the Treasury Rate based on the rate *per annum* equal to the semi-annual equivalent yield to maturity at 11:00 a.m. (New York City time) on the second Business Day (solely in New York City) preceding such redemption date of the U.S. Treasury security maturing on, or with a maturity that is closest to, the Par Call Date, as applicable. If there is no U.S. Treasury security maturing on the Par Call Date but there are two or more U.S. Treasury securities with a maturity date equally distant from the Par Call Date, one with a maturity date preceding the Par Call Date and one with a maturity date following the Par Call Date, Raízen shall select the U.S. Treasury security with a maturity date preceding the Par Call Date. If there are two or more U.S. Treasury securities maturing on the Par Call Date or two or more U.S. Treasury securities meeting the criteria of the preceding sentence, Raízen shall select from among these two or more U.S. Treasury securities the U.S. Treasury security that is trading closest to par based upon the average of the bid and asked prices for such U.S. Treasury securities at 11:00 a.m., New York City time. In determining the Treasury Rate in accordance with the terms of this paragraph, the semi-annual yield to maturity of the applicable U.S. Treasury security shall be based upon the average of the bid and asked prices (expressed as a percentage of principal amount) at 11:00 a.m., New York City time, of such U.S. Treasury security, and rounded to three decimal places.

"**Trust Indenture Act**" or "**TIA**" means the U.S. Trust Indenture Act of 1939, as amended.

"**Trustee**" means the party named as such in the first paragraph of this Indenture or any successor trustee under this Indenture pursuant to Article 7.

"**U.S. Global Note**" means a Global Note that bears the Restricted Legend representing Notes issued and sold pursuant to Rule 144A.

"**U.S. Government Obligations**" means obligations issued or directly and fully guaranteed or insured by the United States of America or by any agent or instrumentality thereof, *provided* that the full faith and credit of the United States of America is pledged in support thereof.

"**Voting Stock**" of any Person means Capital Stock in such Person having power to vote for the election of directors or similar officials of such Person or otherwise voting with respect to actions of such Person (other than such Capital Stock having such power only by reason of the happening of a contingency).

Section 1.02.  *Rules of Construction*.  Unless the context otherwise requires or except as otherwise expressly provided,

(i)      an accounting term not otherwise defined has the meaning assigned to it in accordance with Applicable GAAP;

(ii)     "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Section, Article or other subdivision;

(iii)    all references to "Dollars" US$ and "$" shall mean the lawful currency of the United States of America;

(iv)     all references to Sections or Articles or Exhibits refer to Sections or Articles or Exhibits of or to this Indenture unless otherwise indicated;

(v)      references to agreements or instruments, or to statutes or regulations, are to such agreements or instruments, or statutes or regulations, as amended from time to time (or to successor statutes and regulations);

(vi)     in the event that a transaction meets the criteria of more than one category of permitted transactions or listed exceptions, the Issuer may classify such transaction as it, in its sole discretion, determines;

(vii)    words in the singular include the plural, and in the plural include the singular; and

(viii)   the words "execution," "signed," "signature," and words of like import in this Indenture shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf," "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

ARTICLE 2
THE NOTES

Section 2.01.  *Form, Dating and Denominations; Legends*.  (a) The Notes and the Trustee's certificate of authentication will be substantially in the form attached as Exhibit A. The terms and provisions contained in the form of the Notes annexed as Exhibit A constitute, and are hereby expressly made, a part of this Indenture.  The Notes may have notations, legends or endorsements required by law, rules of or agreements with national securities exchanges to which the Issuer is subject, or usage.  Each Note will be dated the date of its authentication.  The

15

Notes will be issuable in minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof.

(b)    (i) Except as otherwise provided in paragraph (c) below, each Initial Note or Additional Note will bear the Restricted Legend or the Regulation S Legend, as the case may be.

(ii)    Each Global Note, whether or not an Initial Note or Additional Note, will bear the DTC Legend.

(iii)    Initial Notes and Additional Notes offered and sold in reliance on Regulation S will be issued as provided herein.

(iv)    Initial Notes and Additional Notes offered and sold in reliance on Rule 144A will be issued as provided herein.

(c)    If the Issuer determines (upon the advice of counsel and such other certifications and evidence as the Issuer may reasonably require) that a Note is eligible for resale pursuant to Rule 144(k) under the Securities Act (or a successor provision) and that the Restricted Legend or the Regulation S Legend, as the case may be, is no longer necessary or appropriate in order to ensure that subsequent transfers of the Note (or a beneficial interest therein) are effected in compliance with the Securities Act, the Issuer may instruct the Trustee in writing to cancel the Note and the Issuer may issue to the Holder thereof (or to its transferee), and the Trustee, upon receipt of an Authentication Order, shall authenticate and deliver a new Note of like tenor and amount, registered in the name of the Holder thereof (or its transferee), that does not bear the Restricted Legend or the Regulation S Legend, as the case may be, and the Trustee will comply with such instruction provided that the Trustee has received an Officer's Certificate and Opinion of Counsel and such other evidence as the Trustee may require to comply with such action.

(d)    By its acceptance of any Note bearing the Restricted Legend or the Regulation S Legend, as the case may be (or any beneficial interest in such a Note), each Holder thereof and each owner of a beneficial interest therein acknowledges the restrictions on transfer of such Note (and any such beneficial interest) set forth in this Indenture and in the Restricted Legend or the Regulation S Legend, as the case may be, and agrees that it will transfer such Note (and any such beneficial interest) only in accordance with this Indenture and such legend.

Section 2.02.  *Execution and Authentication; Additional Notes*.  (a) An Officer shall sign the Notes for the Issuer by manual, electronic or facsimile signature in the name and on behalf of the Issuer.  If an Officer whose signature is on a Note no longer holds that office at the time the Note is authenticated, the Note will still be valid.

(b)    A Note will not be valid until the Trustee or the Authenticating Agent signs the certificate of authentication on the Note by manual, electronic or facsimile signature, with the signature constituting conclusive evidence that the Note has been authenticated under this Indenture.

16

(c)     At any time and from time to time after the execution and delivery of this Indenture, the Issuer may deliver Notes executed by the Issuer to the Trustee or the Authenticating Agent for authentication. The Trustee or the Authenticating Agent will authenticate and deliver:

(i)     Initial Notes for original issue on the Issue Date in the aggregate principal amount of US$1,000,000,000; and

(ii)     Additional Notes from time to time for original issue in aggregate principal amounts specified by the Issuer, which Additional Notes shall have the same terms and conditions in all respects (including the maturity date) as the Initial Notes, other than the issue date, the issue price and the first Interest Payment Date; *provided* that if the Additional Notes are not fungible with the Initial Notes for U.S. federal income tax purposes, the Additional Notes will have a separate CUSIP or other identifying number. Such Additional Notes shall be treated as a single series with the Initial Notes for all purposes under this Indenture (other than tax purposes, in the case the Additional Notes are not fungible with the Initial Notes for tax purposes), including, without limitation, waivers, amendments, redemptions and offers to purchase, and shall vote together with the Initial Notes as one single series on all matters;

in the case of clauses (i) and (ii) above, after receipt by the Trustee of an order of the Issuer executed by one of its Officers directing the Trustee to authenticate the Notes (the "**Authentication Order**") and specifying:

(i)     the amount of Notes to be authenticated and the date on which the Notes are to be authenticated;

(ii)     whether the Notes are to be Initial Notes or Additional Notes;

(iii)     in the case of Additional Notes, that the issuance of such Additional Notes does not contravene any provision of this Indenture;

(iv)     whether the Notes are to be issued as one or more Global Notes or Certificated Notes; and

(v)     other information the Issuer may determine to include or the Trustee may reasonably request.

(d)     The Trustee shall be fully protected in relying upon the Authentication Order above in authenticating any Notes under this Indenture.

Section 2.03.   *Registrar, Paying Agent, Transfer Agent and Authenticating Agent; Paying Agent to Hold Money in Trust*.  (a) The Issuer may appoint one or more Registrars and one or more Paying Agents or Transfer Agents, and the Trustee may appoint, with a copy of any such appointment to the Issuer, an Authenticating Agent, in which case each reference in this Indenture to the Trustee in respect of the obligations of the Trustee to be performed by the Authenticating Agent shall be deemed to be references to the Authenticating Agent. The terms "**Transfer Agent**" and "**Paying Agent**" include any additional transfer agent or paying agent, as the case may be.

17

The term "**Registrar**" includes any co-Registrar. In each case, the Issuer and the Trustee will enter into an appropriate agreement with the Authenticating Agent implementing the provisions of this Indenture relating to the obligations of the Trustee to be performed by the Authenticating Agent and the related rights. The Registrar shall provide to the Issuer and the Trustee, if the Trustee is not the Registrar, a current copy of the Register from time to time upon written request of the Issuer or the Trustee, as the case may be. The Issuer may act as Registrar or Paying Agent. The Issuer hereby appoints, upon the terms and subject to the conditions herein set forth, The Bank of New York Mellon as Paying Agent, Registrar and Transfer Agent.

(b)      The Issuer will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of the Holders or the Trustee all money held by the Paying Agent for the payment of principal of and interest on the Notes and will promptly notify the Trustee in writing of any Default by the Issuer in making any such payment. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee and account for any funds disbursed, and the Trustee may at any time during the continuance of any payment default, upon written request to a Paying Agent, require the Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed. Upon doing so, the Paying Agent will have no further liability for the money so paid over to the Trustee.

Section 2.04.    *Replacement Notes*.  If a mutilated Note is surrendered to the Trustee or if a Holder claims that its Note has been lost, destroyed or wrongfully taken, the Issuer will issue and the Trustee will authenticate, upon provision of evidence satisfactory to the Trustee that such Note was lost, destroyed or wrongfully taken, a replacement Note of like tenor and principal amount and bearing a number not contemporaneously Outstanding. Every replacement Note is an additional obligation of the Issuer and entitled to the benefits of this Indenture. If required by the Trustee or the Issuer, an indemnity must be furnished by the Holder that is sufficient in the judgment of both the Trustee and the Issuer to protect the Issuer and the Trustee from any loss they may suffer if a Note is replaced. The Issuer and the Trustee may charge the Holder for the expenses of the Issuer and the Trustee in replacing a Note. In case the mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Issuer in its discretion may pay the Note instead of issuing a replacement Note.

Section 2.05.    *Outstanding Notes*.  (a) Notes that are "**Outstanding**" at any time are all Notes that have been authenticated by the Trustee except for:

(i)      Notes cancelled by the Trustee or delivered to it for cancellation;

(ii)      any Note which has been replaced or paid pursuant to Section 2.04 unless and until the Trustee and the Issuer receive proof satisfactory to them that the replaced Note is held by a protected purchaser; and

(iii)      on or after the Maturity Date or any redemption date or Offer to Purchase Payment Date, those Notes payable or to be redeemed on that date for which the Trustee (or Paying Agent, other than the Issuer or an Affiliate of the Issuer) holds money sufficient to pay all amounts then due thereunder.

18

(b)    A Note does not cease to be Outstanding because the Issuer or one of its Affiliates holds the Note, *provided* that in determining whether the Holders of the requisite principal amount of the Outstanding Notes have given or taken any request, demand, authorization, direction, notice, consent, waiver or other action hereunder, Notes owned by the Issuer or any Affiliate of the Issuer will be disregarded and deemed not to be Outstanding (it being understood that in determining whether the Trustee is protected in relying upon any such request, demand, authorization, direction, notice, consent, waiver or other action, only Notes in respect of which a Responsible Officer of the Trustee has received written notice from the Issuer that such Notes are so owned will be so disregarded).  Notes so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right to so act with respect to such Notes and that the pledgee is not the Issuer or any Affiliate of the Issuer.

Section 2.06.    *Temporary Notes*.  Until definitive Notes are ready for delivery, the Issuer may prepare and the Trustee will authenticate temporary Notes.  Temporary Notes will be substantially in the form of definitive Notes but may have insertions, substitutions, omissions and other variations determined to be appropriate by the Officer executing the temporary Notes, as evidenced by the execution of the temporary Notes.  If temporary Notes are issued, the Issuer will cause definitive Notes to be prepared without unreasonable delay.  After the preparation of definitive Notes, the temporary Notes will be exchangeable for definitive Notes upon surrender of the temporary Notes at the office or agency of the Issuer designated for such purpose pursuant to Section 4.02, without charge to the Holder.  Upon surrender for cancellation of any temporary Notes the Issuer will execute and the Trustee will authenticate and deliver in exchange therefor a like principal amount of definitive Notes of authorized denominations.  Until so exchanged, the temporary Notes will be entitled to the same benefits under this Indenture as definitive Notes.

Section 2.07.    *Cancellation*.  The Issuer at any time may, but shall not be obligated to, deliver to the Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer may have acquired in any manner whatsoever, and may deliver to the Trustee for cancellation any Notes previously authenticated hereunder which the Issuer has not issued and sold.  Any Registrar, Transfer Agent or Paying Agent will forward to the Trustee any Notes surrendered to it for transfer, exchange or payment.  The Trustee will cancel all Notes surrendered for transfer, exchange, payment or cancellation and dispose of them in accordance with its then applicable procedures or the written instructions of the Issuer; *provided* that the Trustee shall not be required to destroy cancelled Notes.  The Issuer may not issue new Notes to replace Notes it has paid in full or delivered to the Trustee for cancellation.

Section 2.08.    *CUSIP and ISIN Numbers*.  The Issuer in issuing the Notes may use "CUSIP" and "ISIN" numbers, and the Trustee will use CUSIP numbers or ISIN numbers in notices of redemption or exchange or in Offers to Purchase as a convenience to Holders, which notices shall state that no representation is made by the Issuer or the Trustee as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption or exchange or Offer to Purchase.  The Issuer shall promptly notify the Trustee in writing of any change in the CUSIP or ISIN numbers.

Section 2.09.    *Registration, Transfer and Exchange*.  (a) The Notes will be issued in registered form only, without coupons, and the Issuer shall cause the Registrar to maintain a

19

register (the "**Register**") of the Notes, for registering the record ownership of the Notes by the Holders and transfers and exchanges of the Notes.

(b)    (i) Each Global Note will be registered in the name of the Depositary or its nominee and, so long as DTC is serving as the Depositary thereof, will bear the DTC Legend.

(ii)    Each Global Note will be delivered to the Trustee as custodian for the Depositary.  Transfers of a Global Note (but not a beneficial interest therein) will be limited to transfers thereof in whole, but not in part, to the Depositary, its successors or their respective nominees, except as set forth in Section 2.09(b)(iv).

(iii)    Agent Members will have no rights under this Indenture with respect to any Global Note held on their behalf by the Depositary, and the Depositary or its nominee, as the case may be, shall be treated by the Issuer, the Trustee, each Agent and any of their respective agents as the absolute owner and Holder of such Global Note for all purposes whatsoever. Notwithstanding the foregoing, the Depositary or its nominee may grant proxies and otherwise authorize any Person (including any Agent Member and any Person that holds a beneficial interest in a Global Note through an Agent Member) to take any action which a Holder is entitled to take under this Indenture or the Notes, and nothing herein will impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

(iv)    If (x) the Depositary (A) notifies the Issuer that it is unwilling or unable to continue as Depositary for a Global Note and the Depositary fails to appoint a successor depositary within 90 days of the notice or (B) has ceased to be a clearing agency registered under the Exchange Act; (y) subject to the procedures of the Depositary, the Issuer, at its option, notifies the Trustee in writing that the Issuer elects to cause the issuance of Certificated Notes or (z) there has occurred and is continuing a Default or Event of Default and the Issuer or the Trustee has received a request from the Depositary, the Issuer shall promptly exchange each beneficial interest in the Global Note for one or more Certificated Notes in authorized denominations having an equal aggregate principal amount registered in the name of the owner of such beneficial interest, as identified to the Issuer and the Trustee by the Depositary in writing, and the Trustee shall cancel the Global Note.  If the Global Note being exchanged does not bear the Restricted Legend or Regulation S Legend, as the case may be, then the Certificated Notes issued in exchange therefor will not bear the Restricted Legend or Regulation S Legend, as the case may be.  If such Global Note bears the Restricted Legend or Regulation S Legend, as the case may be, then the Certificated Notes issued in exchange therefor will bear the Restricted Legend or Regulation S Legend, as the case may be.

(c)    Each Certificated Note will be registered in the name of the Holder thereof.

(d)    A Holder may transfer a Note (or a beneficial interest therein) to another Person or exchange a Note (or a beneficial interest therein) for another Note or Notes of any authorized denomination by presenting to the Trustee a written request therefor stating the name of the proposed transferee or requesting such an exchange, accompanied by any certification, opinion or other document required by Section 2.10.  The Registrar shall promptly register any transfer

or exchange that meets the requirements of this Section by noting the same in the Register maintained by the Registrar for this purpose; *provided* that:

(i)     no transfer or exchange will be effective until it is registered in such Register, and

(ii)    the Trustee and the Registrar, as applicable, will not be required (w) to issue or register the transfer or exchange of any Note for a period of 15 days before a selection of Notes to be redeemed, (x) to register the transfer or exchange any Note so selected for redemption in whole or in part, except, in the case of a partial redemption, that portion of any Note not being redeemed, (y) to register any Note between a Regular Record Date and the corresponding Interest Payment Date, or (z) if a redemption is to occur after a Regular Record Date but on or before the corresponding Interest Payment Date, to register the transfer or exchange of any Note on or after the Regular Record Date and before the date of redemption.  Prior to the registration of any transfer, the Issuer, the Trustee, each Agent and each of their respective agents will treat the Person in whose name the Note is registered as the owner and Holder thereof for all purposes (whether or not the Note is overdue), and will not be affected by notice to the contrary.

From time to time the Issuer will execute and the Trustee will authenticate additional Notes as necessary in order to permit the registration of a transfer or exchange in accordance with this Section.

No service charge will be imposed in connection with any transfer or exchange of any Note, but the Issuer and the Trustee may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than a transfer tax or other similar governmental charge payable upon exchange pursuant to Section 2.09(b)(iv)).

(e)     (i) *Global Note to Global Note*.  If a beneficial interest in a Global Note is transferred or exchanged for a beneficial interest in another Global Note, the Trustee will (x) record a decrease in the principal amount of the Global Note being transferred or exchanged equal to the principal amount of such transfer or exchange and (y) record a like increase in the principal amount of the other Global Note.  Any beneficial interest in one Global Note that is transferred to a Person who takes delivery in the form of an interest in another Global Note, or exchanged for an interest in another Global Note, will, upon transfer or exchange, cease to be an interest in such Global Note and become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer and exchange restrictions, if any, and other procedures applicable to beneficial interests in such other Global Note for as long as it remains such an interest.

(ii)    *Global Note to Certificated Note*.  If a beneficial interest in a Global Note is transferred or exchanged for a Certificated Note, the Trustee will (x) record a decrease in the principal amount of such Global Note equal to the principal amount of such transfer or exchange and (y) deliver one or more new Certificated Notes in authorized denominations having an equal aggregate principal amount to the transferee (in the case of a transfer) or the owner of such beneficial interest (in the case of an exchange), registered

21

in the name of such transferee or owner, as applicable, as provided in writing by the Depositary.

(iii)   *Certificated Note to Global Note*.  If a Certificated Note is transferred or exchanged for a beneficial interest in a Global Note, the Trustee will (x) cancel such Certificated Note, (y) record an increase in the principal amount of such Global Note equal to the principal amount of such transfer or exchange and credit such increase to the account of the Agent Member at the Depositary as instructed in writing by the Holder of the Certificated Notes and (z) in the event that such transfer or exchange involves less than the entire principal amount of the canceled Certificated Note, deliver to the Holder thereof one or more new Certificated Notes in authorized denominations having an aggregate principal amount equal to the untransferred or unexchanged portion of the canceled Certificated Note, registered in the name of the Holder thereof.

(iv)   *Certificated Note to Certificated Note*.  If a Certificated Note is transferred or exchanged for another Certificated Note, the Trustee will (x) cancel the Certificated Note being transferred or exchanged, (y) deliver one or more new Certificated Notes in authorized denominations having an aggregate principal amount equal to the principal amount of such transfer or exchange to the transferee (in the case of a transfer) or the Holder of the canceled Certificated Note (in the case of an exchange), registered in the name of such transferee or Holder, as applicable, and (z) if such transfer or exchange involves less than the entire principal amount of the canceled Certificated Note, deliver to the Holder thereof one or more Certificated Notes in authorized denominations having an aggregate principal amount equal to the untransferred or unexchanged portion of the canceled Certificated Note, registered in the name of the Holder thereof.

Section 2.10.   *Restrictions on Transfer and Exchange*.   (a) The transfer or exchange of any Note (or a beneficial interest therein) may only be made in accordance with this Section and Section 2.09 and, in the case of a Global Note (or a beneficial interest therein), the applicable rules and procedures of the Depositary.  The Trustee shall refuse to register any requested transfer or exchange that does not comply with the preceding sentence.

(b)   Subject to Section 2.10(c), the transfer or exchange of any Note (or a beneficial interest therein) of the type set forth in column A below for a Note (or a beneficial interest therein) of the type set forth opposite column B below may only be made in compliance with the certification requirements (if any) described in the clause of this paragraph set forth opposite column C below.

| A | B | C |
|---|---|---|
| U.S. Global Note | U.S. Global Note | (1) |
| U.S. Global Note | Offshore Global Note | (2) |
| U.S. Global Note | Certificated Note | (3) |
| Offshore Global Note | U.S. Global Note | (4) |

22

| | | |
|---|---|---|
| Offshore Global Note | Offshore Global Note | (1) |
| Offshore Global Note | Certificated Note | (3) |
| Certificated Note | U.S. Global Note | (4) |
| Certificated Note | Offshore Global Note | (2) |
| Certificated Note | Certificated Note | (3) |

(1)     No certification is required.

(2)     The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee a duly completed and executed Regulation S Certificate; *provided* that if the requested transfer or exchange is made by the Holder of a Certificated Note that does not bear the Restricted Legend or Regulation S Legend, then no certification is required.

(3)     The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee (x) a duly completed and executed Rule 144A Certificate or (y) a duly completed and executed Regulation S Certificate, and/or an Opinion of Counsel and such other certifications and evidence as the Issuer may reasonably require in order to determine that the proposed transfer or exchange is being made in compliance with the Securities Act and any applicable securities laws of any state of the United States; *provided* that if the requested transfer or exchange is made by the Holder of a Certificated Note that does not bear the Restricted Legend or the Regulation S Legend, then no certification is required.  In the event that a Certificated Note that does not bear the Restricted Legend or the Regulation S Legend is surrendered for transfer or exchange, upon transfer or exchange the Trustee will deliver a Certificated Note that does not bear the Restricted Legend or the Regulation S Legend.

(4)     The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee a duly completed and executed Rule 144A Certificate.

(c)     No certification is required in connection with any transfer or exchange of any Note (or a beneficial interest therein) after such Note is eligible for resale pursuant to Rule 144(k) under the Securities Act (or a successor provision); *provided* that the Issuer has provided the Trustee with an Officer's Certificate and an Opinion of Counsel to that effect, and the Issuer may require from any Person requesting a transfer or exchange in reliance upon this clause an Opinion of Counsel and any other reasonable certifications and evidence in order to support such certificate.

Any Certificated Note delivered in reliance upon this paragraph will not bear the Restricted Legend or the Regulation S Legend, as the case may be.

(d)     The Trustee will retain copies of all certificates, opinions and other documents received in connection with the transfer or exchange of a Note (or a beneficial interest therein),

and the Issuer will have the right to inspect and make copies thereof at any reasonable time upon written notice within a reasonable period of time to the Trustee.

Section 2.11.    *Open Market Purchases*.  The Issuer or its Affiliates may at any time purchase Notes in the open market or otherwise at any price; *provided* that Notes that the Issuer or its Affiliates purchase may, in their respective discretion, be held, resold or cancelled, but will only be held or resold in compliance with applicable requirements or exemptions under the relevant securities laws.

Section 2.12.    *Trustee's Disclaimer*.  (a) The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restriction on transfer imposed under this Indenture or under applicable law with respect to any transfer of interest in any Note (including any transfers between or among participants in the Depositary or beneficial owners of interest in Global Notes) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(b)    The Trustee and the Agents shall have no responsibility or obligation to any beneficial owner of an interest in a Global Note, any Agent Member or other member of, or a participant in, the Depositary or other Person with respect to the accuracy of the records of the Depositary or any nominee or participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any Agent Member or other participant, member, beneficial owner or other Person (other than the Depositary) of any notice (including any notice of redemption or purchase) or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes. All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to or upon the order of the registered Holders (which shall be the Depositary or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through the Depositary, subject to its applicable rules and procedures. The Trustee and Agents may rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its Agent Members and other members, participants and any beneficial owners. The Depositary (or its nominee) may be treated by the Trustee and the Agents as the owner of the Global Note for all purposes whatsoever.

(c)    Neither the Trustee nor any Agent shall have any responsibility or liability for any actions taken or not taken by the Depositary.

ARTICLE 3
ADDITIONAL AMOUNTS; REDEMPTION

Section 3.01.    *Additional Amounts*.  (a) All payments by the Issuer in respect of the Notes or by a Guarantor in respect of its Note Guarantee will be made without withholding or deduction for or on account of any present or future taxes, duties, assessments, fees or other governmental charges of whatever nature (and any fines, penalties or interests related thereto) imposed or levied by or on behalf of Luxembourg, Brazil or any authority therein or thereof or

24

any other jurisdiction or political subdivision thereof from or through which a payment is made or in which the Issuer or a Guarantor (or any successor to the Issuer or Guarantor) is organized or is a resident for tax purposes (a "**Relevant Taxing Jurisdiction**"), unless the Issuer or Guarantor, as applicable, is required by law to deduct or withhold such taxes, duties, assessments, fees or governmental charges.  In that event, the Issuer or Guarantor, as applicable, will make the required deduction or withholding, make payment of the amount so deducted or withheld to the appropriate governmental authority and pay such additional amounts as may be necessary to ensure that the net amounts received by Holders of Notes after such withholding or deduction equal the amounts that would have been received in respect of the Notes in the absence of such withholding or deduction (the "**Additional Amounts**").  However, no Additional Amounts shall be payable:

(i)    to, or to a third party on behalf of, a Holder or beneficial owner where the Holder or beneficial owner is liable for any present or future taxes, duties, assessments, fees or other governmental charges in respect of a Note by reason of the existence of any present or former connection between the Holder or beneficial owner (or between a fiduciary, settlor, beneficiary, partner, member or shareholder of the Holder or beneficial owner, if the Holder or beneficial owner is an estate, a trust, a partnership, a limited liability company or a corporation) and the Relevant Taxing Jurisdiction, including, without limitation, the Holder or beneficial owner (or the Holder's or the beneficial owner's fiduciary, settlor, beneficiary, partner, member or shareholder) being or having been a citizen or resident thereof, being or having been engaged or deemed to be engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, other than the mere holding of the Note or the enforcement of rights and the receipt of payments with respect to the Note;

(ii)    in respect of any present or future tax, duty, assessment, fee or other governmental charge that would not have been so imposed but for the presentation by the Holder or beneficial owner of a Note, where presentation is required, for payment on a date more than 30 days after the date on which such payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later;

(iii)    in respect of any present or future tax, duty, assessment, fee or other governmental charge that would not have been so imposed but for the failure by the Holder or beneficial owner of the Note to comply with any certification, identification or other reporting requirement concerning such Holder's or beneficial owner's nationality, residence, identity or connection with the Relevant Taxing Jurisdiction, if (1) compliance is required by the Relevant Taxing Jurisdiction as a precondition to relief or exemption from, or reduction in the rate of, all or part of the tax, duty, assessment, fee or other governmental charge and (2) the Issuer or Guarantor has given at least 30 days' notice that Holders or beneficial owners will be required to comply with such requirement;

(iv)    in relation to the application of the Luxembourg law of 23 December 2005, as amended from time to time, introducing a 20% withholding tax on certain interest and similar income payments made or deemed to be made by a Luxembourg paying agent for the immediate benefit of individuals resident in Luxembourg;

(v)    in respect of any present or future registration tax, stamp duty or any other similar documentary tax or duty, fixed or ad valorem, in Luxembourg, in connection (i) with the performance by the Issuer of its obligations under the Notes or any Guarantor in respect of its Note Guarantee; or (ii) with the registration of the Notes by the Holder or beneficial owner, or by a third party on his behalf, before the Registration, Estates and VAT Department (*Administration de l'enregistrement, des domaines et de la TVA*) in Luxembourg where this registration is not required by law (including for the enforcement of rights and the receipt of payments with respect to the Notes);

(vi)    in respect of any present or future tax, duty, assessment, fee or other governmental charge imposed on a Note presented for payment by or on behalf of a Holder or beneficial owner where the Holder or beneficial owner would have been able to avoid the withholding or deduction by presenting the relevant Note to another Paying Agent;

(vii)    in respect of any estate, inheritance, gift, sales, use, transfer, capital gains, excise or personal property or similar tax, duty, assessment, fee or other governmental charge;

(viii)    in respect of any tax, duty, assessment, fee or other governmental charge that is payable otherwise than by deduction or withholding from payments of principal of, premium, if any, or interest on a Note or by direct payment by the Issuer or a Guarantor in respect of claims made against the Issuer or such Guarantor in respect of such payments on a Note;

(ix)    in respect of any tax, duty, assessment, fee or other governmental charge imposed or withheld pursuant to Sections 1471 through 1474 of the Code, as of the Issue Date (or any amended or successor version), current or future U.S. treasury regulations issued thereunder or any official interpretation thereof, any agreement entered into pursuant to Section 1471(b) of the Code, or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code ("**FATCA**"); or

(x)    in respect of any combination of the above.

(b)    In addition, no Additional Amounts shall be paid with respect to any payment on a Note or Note Guarantee to a Holder who is a fiduciary, a partnership, a limited liability company or other than the sole beneficial owner of that payment to the extent that payment on the Note or Note Guarantee would be required by the laws of the Relevant Taxing Jurisdiction to be included in the income, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, a member of the partnership, an interest holder in the limited liability company or a beneficial owner who would not have been entitled to the Additional Amounts had that beneficiary, settlor, member, interest holder or beneficial owner been the Holder.  Except as specifically provided above, neither the Issuer nor any Guarantor shall be required to make any payment with respect to any tax, duty, assessment, fee or other governmental charge imposed by any government or political subdivision or taxing authority thereof or therein.

26

(c)      In the event that Additional Amounts actually paid with respect to the Notes, as described above, are based on rates of deduction or withholding of taxes in excess of the appropriate rate applicable to the Holder of such Notes, and, as a result thereof the Holder is entitled to make a claim for a refund or credit of the excess from the authority imposing the withholding tax, then the Holder or beneficial owner shall, by accepting the Notes, be deemed to have assigned and transferred all right, title, and interest to any such claim for a refund or credit of such excess to the Issuer or Guarantor, as the case may be. However, by making such assignment, the Holder makes no representation or warranty that the Issuer or Guarantor, as the case may be, shall be entitled to receive such claim for refund or credit and incurs no other obligation (including, for the avoidance of doubt, any filing or other action) with respect thereto.

(d)      Any reference in this Indenture or the Notes to principal, premium, if any, interest or any other amount payable in respect of the Notes by the Issuer or the Note Guarantees by the Guarantors will, unless the Additional Amounts are explicitly already named in such context, be deemed also to refer to any Additional Amounts that may be payable with respect to that amount under the obligations referred to in this Section.

(e)      The Issuer or the relevant Guarantor, as the case may be, shall use reasonable efforts to furnish to the Trustee the official receipts (or a copy of the official receipts) evidencing payment of any taxes deducted or withheld from payments in respect of the Notes or the Note Guarantees, as the case may be (or other evidence of payment reasonably satisfactory to the Trustee). Copies of such receipts or other evidence of payment shall be made available to Holders by the Trustee upon written request.

(f)      The foregoing obligations  shall survive termination or discharge of this Indenture, payment of the Notes and/or the resignation or removal of the Trustee or any agent hereunder, and shall apply *mutatis mutandis* to any jurisdiction or political subdivision thereof in which any successor to the Issuer or a Guarantor is organized or is a resident for tax purposes.

Section 3.02.  *Optional Redemption*.

(a)      At any time before  November 25, 2037, which is the date that is three months prior to the maturity of the Notes (the "**Par Call Date**"), the Issuer or any Guarantor may redeem the Notes at its option, in whole or in part, at any time and from time to time, at a redemption price (expressed as a percentage of principal amount and rounded to three decimal places) equal to the greater of:  (i) (a) the sum of the present values of the remaining scheduled payments of principal and interest thereon  discounted to the redemption date (assuming the Notes matured on the Par Call Date) on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 35 basis points, less (b) interest accrued to, but excluding, the date of redemption, and (ii) 100% of the principal amount of the Notes to be redeemed, *plus*, in either case, accrued and unpaid interest thereon to, but excluding, the redemption date.

(b)      On or after the Par Call Date, the Issuer or a Guarantor may redeem the Notes, in whole or in part, at any time and from time to time, at a redemption price equal to 100% of

the principal amount of the Notes being redeemed plus accrued and unpaid interest thereon to, but excluding, the redemption date.

(c)     Raízen's actions and determinations in determining the redemption price shall be conclusive and binding for all purposes, absent manifest error. The Trustee shall have no obligation to calculate or verify any redemption price, make-whole premium or any component thereof.

Section 3.03.  *Redemption for Taxation Reasons*. If as a result of any change in or amendment to the laws or any applicable treaties (or any rules or regulations promulgated thereunder) of a Relevant Taxing Jurisdiction, or any amendment to or change in official position regarding the application, interpretation or administration of such laws, treaties, rules, or regulations (including a holding by a court of competent jurisdiction), which change or amendment becomes effective or, in the case of a change in official position, is announced on or after the Issue Date (or, if later, the date a Relevant Taxing Jurisdiction becomes a Relevant Taxing Jurisdiction), (i) the Issuer or any successor thereof has or will become obligated to pay Additional Amounts as described above in Section 3.01 with respect to the Notes or (ii) any Guarantor or any successor thereof has or will become obligated to pay Additional Amounts as described above in Section 3.01 with respect to a Note Guarantee in excess of the Additional Amounts such Guarantor or successor, as the case may be, would be obligated to pay if payments in respect of the Note Guarantee were subject to withholding or deduction at a rate of 15% (or a rate of 25% if the Holder of the Notes is resident in a Low or Nil Tax Jurisdiction) (the "**Excess Additional Amounts**"), the Issuer, Guarantor or any successor thereof may, at its option, redeem all, but not less than all, of the outstanding Notes, at a redemption price equal to 100% of their principal amount then Outstanding, together with interest accrued to, but excluding, the date fixed for redemption, upon delivery of irrevocable notice of redemption to the Holders not fewer than ten days nor more than 90 days prior to the date fixed for redemption.  No notice of such redemption may be given earlier than 90 days prior to the earliest date on which the Issuer, Guarantor or any successor thereof would, but for such redemption, be obligated to pay such Additional Amounts or Excess Additional Amounts.  Notwithstanding the foregoing, the Issuer, Guarantor or any successor thereof shall not have the right so to redeem the Notes unless: (i) the obligation to pay such Additional Amounts or Excess Additional Amounts cannot be avoided by the Issuer or Guarantor (or successor) taking reasonable measures and (ii) the Issuer or Guarantor (or successor) has complied with all necessary regulations to legally effect such redemption; *provided*, *however*, that for this purpose reasonable measures shall not include any change in the Issuer's or any Guarantor's or any successor's jurisdiction of incorporation or organization or location of its principal executive or registered office.

Section 3.04. *Redemption Following Tender Offer.* Notwithstanding the provisions of Sections 3.02 or 3.03, in connection with any tender offer for the Notes (including an Offer to Purchase in connection with a Change of Control that results in a Rating Decline made in accordance with the terms of this Indenture), in the event that the Holders of not less than 85% of the aggregate principal amount of the Outstanding Notes validly tender and do not validly withdraw Notes in such tender offer and the Issuer, or any other Person making such offer in lieu of the Issuer, purchases all of the outstanding Notes validly tendered and not validly withdrawn by such Holders, then the Issuer or any Guarantor shall have the right, on not less than five nor more than 60 days' prior notice to the Holders (with a copy to the Trustee), to redeem all of the Notes

28

that remain Outstanding at a redemption price equal to the purchase price paid to each other Holder in such tender offer plus, to the extent not included in the purchase price, accrued and unpaid interest and Additional Amounts, if any, on the Notes that remain Outstanding, to, but excluding, the date of redemption.

Section 3.05. *Election to Redeem; Selection of Notes*. (a) In the event that the Issuer, a Guarantor or any successor thereof elects to redeem the Notes, prior to delivery of a notice of redemption to the Holders of the Notes, it will deliver to the Trustee: (1) an Officer's Certificate stating that the Issuer, such Guarantor or such successor, as the case may be, is entitled to redeem the Notes pursuant to the terms hereof and setting forth a statement of facts showing that the condition or conditions precedent to the right of the Issuer, such Guarantor or such successor, as the case may be, so to redeem have occurred or been satisfied; and (2) in respect of a redemption pursuant to Section 3.03, an Opinion of Counsel in the applicable Relevant Taxing Jurisdiction to the effect that (i) the Issuer, such Guarantor or such successor, as applicable, has or will become obligated to pay Additional Amounts or Excess Additional Amounts, as the case may be, (ii) the Issuer, such Guarantor or such successor, as applicable, cannot avoid payment of such Additional Amounts or Excess Additional Amounts, as the case may be, by taking reasonable measures available to it and (iii) all governmental approvals necessary for the Issuer, such Guarantor or such successor, as applicable, to effect the redemption have been obtained and are in full force and effect. The Trustee shall accept such Officer's Certificate and, if required, Opinion of Counsel as sufficient evidence of satisfaction of the conditions precedent described above, in which case, it shall be conclusive and binding upon the Holders of the Notes.

(b)     If less than all the Notes are to be redeemed at any time, selection of Certificated Notes for redemption shall be made by the Trustee in compliance with the requirements governing redemptions of the principal securities exchange, if any, on which the Notes are listed or if such securities exchange has no requirement governing redemption or the Notes are not then listed on a securities exchange, on a pro rata basis by lot (or, in the case of Global Notes, selection of Notes for redemption shall be made by the Depositary in accordance with its applicable procedures). If Notes are redeemed in part, the remaining outstanding amount of any Note must be at least equal to US$200,000 and be an integral multiple of US$1,000.

Section 3.06. *Notice of Redemption*. (a) The Issuer or a Guarantor shall deliver a notice of redemption to each Holder (which, in the case of Global Notes, will be the Depositary) and the Trustee by, in the case of Certificated Notes, first-class mail, postage prepaid, to the address of each Holder as it appears on the register maintained by the Registrar or, in the case of Global Notes by electronic delivery, in each case, at least five days but not more than 60 days prior to the redemption date (or, in the case of a redemption described in Section 3.03, at least ten days but not more than 90 days prior to the redemption date). A notice of redemption pursuant to Sections 3.02 and 3.04 may, at the discretion of the Issuer or Guarantor, be conditional. If such redemption or notice is subject to satisfaction of one or more conditions precedent, such notice shall state that, in the Issuer's or Guarantor's discretion, the redemption date may be delayed until such time (but no more than 60 days after the date of the notice of redemption) as any or all such conditions shall be satisfied (or waived by the Issuer or such Guarantor in its sole discretion) and a new redemption date shall be set by the Issuer or such Guarantor in accordance with applicable Depositary procedures, or such redemption may not occur and such notice may be rescinded in the event that any or all such conditions shall not have

29

been satisfied (or waived by the Issuer or such Guarantor in its sole discretion) by the redemption date, or by the redemption date as so delayed. A notice of redemption pursuant to Section 3.03 shall be irrevocable.

(b)    Each notice will identify the Notes (including the CUSIP number) to be redeemed and will state:

(1)    the redemption date;

(2)    the amount to be redeemed and the redemption price;

(3)    if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the redemption date upon surrender of a Certificated Note, a new Certificated Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Certificated Note;

(4)    the name and address of the Paying Agent;

(5)    that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(6)    that, unless the Issuer or Guarantor, as applicable, defaults in the payment of the redemption price, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(7)    the paragraph or sub-paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed;

(8)    that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes; and

(9)    any conditions precedent to such redemption.

(c)    At the Issuer's request, the Trustee will give the notice of redemption in the Issuer's name and at its expense; *provided*, *however*, that the Issuer has delivered to the Trustee, at least five days prior to the date notice of redemption is to be delivered to the Holders (or such shorter period as the Trustee shall agree), an Officer's Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph. For so long as the Notes are held by the Depositary, the redemption of the Notes shall be conducted in accordance with the policies and procedures of the Depositary.

(d)    The Issuer or a Guarantor may enter into an arrangement under which a Subsidiary of Raízen may, in lieu of redemption by the Issuer or such Guarantor, redeem any Notes on the terms set forth (and pursuant to provisions described) in this Article 3.

Section 3.07.   *Deposit of Redemption Price*.   Prior to 11:00 A.M. (New York City time) on the Business Day prior to the redemption date, the Issuer, Guarantor or successor thereof will deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption price of, and accrued and unpaid interest, if any, and any premium and Additional Amounts, if any, on, all Notes to be redeemed on that date.  The Trustee or the Paying Agent will promptly return to the Issuer, Guarantor or successor thereof upon written request any money deposited with the Trustee or the Paying Agent by the Issuer, Guarantor or successor thereof in excess of the amounts necessary to pay the redemption price of, and accrued and unpaid interest, if any, and any premium and Additional Amounts, if any, on, all Notes to be redeemed.

Section 3.08.   *Effect of Notice of Redemption*.   Upon surrender of any Note for redemption in accordance with a redemption notice, such Note shall be paid by the Issuer or the Guarantor at the redemption price, together with accrued interest, if any, to (but excluding) the redemption date (subject to the satisfaction of any applicable condition or conditions precedent set forth in such notice) and from and after such date (except in the event of a Default in the payment of the redemption price) such Notes shall cease to bear interest; *provided*, *however*, that installments of interest payable on or prior to the redemption date shall be payable to the Holders of such Notes registered as such at the close of business on the relevant Regular Record Date according to their terms.  If any Note to be redeemed shall not be so paid upon surrender thereof in accordance with the Issuer's or Guarantor's instructions for redemption, the principal shall, until paid, bear interest from the redemption date at the rate borne by the Notes.

ARTICLE 4
COVENANTS

Section 4.01.   *Payment of Notes*.  (a) The Issuer agrees to pay the principal of and interest (including, without limitation, any Additional Amounts, if any) on the Notes on the dates and in the manner provided in the Notes and this Indenture.  Not later than 11:00 A.M. (New York City time) on the Business Day (solely in New York City) immediately prior to the due date of the payment of any principal of or interest on any Notes, or any redemption of the Notes, the Issuer shall deposit with the Paying Agent Dollars in immediately available funds sufficient to pay such amounts, *provided* that if the Issuer or any Affiliate of the Issuer is acting as a Paying Agent, it shall, on or before each due date, segregate and hold in a separate trust fund for the benefit of the Holders a sum of Dollars sufficient to pay such amounts until paid to such Holders or otherwise disposed of as provided in this Indenture.  In each case, the Issuer shall promptly notify the Trustee in writing of its compliance with this Section 4.01.

(b)      Payments made on the Notes will be applied first to interest due and payable on the Notes and then to the reduction of the unpaid principal amount of the Notes.  An installment of principal or interest will be considered paid on the date due if the Trustee (or Paying Agent, other than the Issuer or any Affiliate of the Issuer) holds on that date Dollars designated for and sufficient to pay the installment and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the Holders on that date pursuant to the terms of this Indenture.  If the Issuer or any Affiliate of the Issuer acts as a Paying Agent, an installment of principal or interest will be considered paid on the due date only if paid to the Holders.

31

(c)    Each payment in full of principal, redemption amount, Additional Amounts and/or interest payable in respect of any Note made by or on behalf of the Issuer to or to the order of the Paying Agent in the manner specified in the Notes and this Indenture on the date due shall be valid and effective to satisfy and discharge the obligation of the Issuer to make payment of principal, redemption amount, Additional Amounts and/or interest payable in respect of any Note on such date, *provided*, *however*, that the liability of the Paying Agent hereunder shall not exceed any amounts paid to it by the Issuer, or held by it, on behalf of the Holders under this Indenture; and *provided, further*, that, in the event that there is a default by the Paying Agent in any payment of principal, redemption amount, Additional Amounts and/or interest in respect of any Note in accordance with the Notes and this Indenture, the Issuer shall pay on demand such further amounts as will result in receipt by the Holder of such amounts as would have been received by it had no such default occurred.

(d)    The Issuer agrees to pay interest on overdue principal, and to the extent lawful, overdue installments of interest at the rate per annum specified in the Notes (1% per annum in excess of the rate per annum borne by the Notes).  Any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the second day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least two days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.

(e)    Payments in respect of the Notes represented by the Certificated Notes (including principal, interest and Additional Amounts, if any) will be made at the specified office or agency of one or more Paying Agents in New York City. At the Issuer's option, interest on Certificated Notes may be paid by Dollars check drawn on a bank in New York City and mailed to the Holder of the Certificated Notes at its registered address. Upon written notice from a Holder of at least US$1.0 million in aggregate principal amount of Certificated Notes to the specified office of any Paying Agent not less than 15 days before the due date for any payment in respect of a Certificated Note, such payment may be made by wire transfer to a Dollar account maintained by the payee with a bank in New York City.

(f)    Payments in respect of the Notes represented by the Global Notes (including principal, interest and Additional Amounts, if any) are to be made by wire transfer of immediately available funds in such coin or currency of the United States as at the time of payment will be legal tender for the payment of public and private debts, to the accounts specified by the Depositary in accordance with is applicable procedures.

Section 4.02.    *Maintenance of Office or Agency*.  The Issuer shall maintain in the Borough of Manhattan, the City of New York, an office or agency where Notes may be surrendered for registration of transfer or exchange or for presentation for payment and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture (other than the type contemplated by Section 11.07) may be served.  The Issuer hereby initially designates the Corporate Trust Office of the Trustee as such office of the Issuer.  The Issuer shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Issuer fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands

32

(other than any presentations, surrenders, notices and demands service in accordance with Section 11.07(b)) may be made or served to the Trustee.  At any time that the Notes are listed on the Official List of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market, the Issuer will maintain an office or agent in Luxembourg to serve as Luxembourg transfer agent if and to the extent required by the rules of the Official List of the Luxembourg Stock Exchange.

The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be surrendered or presented for any of such purposes and may from time to time rescind such designations.  The Issuer shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

Section 4.03.  *Existence*.  Each of the Guarantors shall preserve and maintain in full force and effect its existence and the existence of the Significant Subsidiaries in accordance with their respective organizational documents, and the rights, licenses and franchises of each of the Guarantors and the Significant Subsidiaries, except, in each case, where the failure to do so would not, individually or in the aggregate, result in any Material Adverse Effect, *provided* that neither Guarantor is required to preserve any such right, license or franchise, or the existence of the Significant Subsidiaries, if the maintenance or preservation thereof is no longer desirable in the conduct of the business of Raízen and its Subsidiaries taken as a whole in its judgment; and *provided*, *further*, that this Section does not prohibit any transaction otherwise permitted by Section 5.01.

Section 4.04.  *Payment of Taxes*.  Each of the Guarantors will timely file all required tax returns required to be filed by it and pay and discharge (including by payment in installments or through offsetting with tax credits or otherwise) at or before maturity all of its material tax obligations (except where such tax obligations are contested in good faith and by proper proceedings and against which adequate reserves are being maintained to the extent required by Applicable GAAP), except where the failure to do so would not, individually or in the aggregate, result in a Material Adverse Effect.

Section 4.05.  *Maintenance of Properties*.  Each of the Guarantors will cause all properties used or useful in its business or the business of any of the Significant Subsidiaries to be maintained and kept in good condition, repair and working order in the judgment of such Guarantor, ordinary wear and tear excepted, except to the extent that the failure to do so would not, individually or in the aggregate, have a Material Adverse Effect; *provided* that nothing in this Section prevents either Guarantor or any Significant Subsidiary from discontinuing the use, operation or maintenance of any of such properties or disposing of any of them, if such discontinuance or disposal is, in the judgment of such Guarantor, desirable in the conduct of the business of Raizen and its Subsidiaries taken as a whole.

Section 4.06.  *Repurchases at the Option of the Holders Upon Change of Control*.

(a)      If a Change of Control that results in a Rating Decline occurs, not later than 30 days following such an occurrence, the Issuer or any Guarantor, shall make, directly or through a Designated Affiliate, an offer to purchase all of the Outstanding Notes (the "**Offer to Purchase**") at a purchase price (the "**Offer to Purchase Payment**") equal to 101% of the principal amount thereof plus accrued and unpaid interest thereon and Additional Amounts, if

33

any, to, but excluding, the Offer to Purchase Payment Date (as defined below). An Offer to Purchase shall be made by written offer to the Holders of Notes (a copy of which shall be delivered to the Trustee) at the address of such Holder appearing in the Register or otherwise in accordance with the procedures of the Depositary with the following information:

(i)        a description of the transaction or transactions that constitute the Change of Control;

(ii)        the principal amount of Notes subject to the Offer to Purchase and the Offer to Purchase Payment;

(iii)        that an Offer to Purchase is being made pursuant to this Section 4.06 and that all Notes validly tendered and not validly withdrawn pursuant to such Offer to Purchase will be accepted for payment;

(iv)        that a Holder may tender all or any portion of its Notes pursuant to such Offer to Purchase, subject to the requirement that if a Holder tenders only a portion of its Notes, the remaining Notes must be no less than US$200,000 in principal amount and in integral multiples of US$1,000 in excess thereof;

(v)        an expiration date (the "**Expiration Date**") of the Offer to Purchase, which will be not less than 30 days nor more than 60 days after the date of the Offer to Purchase, and an indicative settlement date for purchase (the "**Offer to Purchase Payment Date**"), which will be not more than five Business Days after the Expiration Date;

(vi)        that any Note not properly tendered will remain Outstanding and continue to accrue interest;

(vii)        that unless the Issuer, Guarantor or Designated Affiliate, as the case may be, defaults in the payment of the Offer to Purchase Payment on the Offer to Purchase Payment Date, interest on all Notes accepted for payment pursuant to the Offer to Purchase will cease to accrue on and after the Offer to Purchase Payment Date;

(viii)        that Holders electing to have any Notes purchased pursuant to an Offer to Purchase will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the Paying Agent specified in the Offer to Purchase at the address specified in the Offer to Purchase (or, in the case of Global Notes, tender such Notes in accordance with the applicable procedures of the Depositary), in each case, on or prior to the Expiration Date;

(ix)        that Holders shall be entitled to withdraw their tendered Notes and their election to require the Issuer, Guarantor or Designated Affiliate, as the case may be, to purchase such Notes; *provided* that the Paying Agent receives, prior to the Expiration Date, a written statement setting forth the name of the Holder of the Notes, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased (or, in the case of Global Notes, a notice of withdrawal of such Notes is delivered in accordance with the applicable procedures of the Depositary); and

34

(x)      that, if any Note was purchased only in part, (x) in the case of a Global Note, appropriate adjustments to the amount and beneficial interests in a Global Note will be made, and (y) in the case of a Certificated Note, a new Certificated Note or Notes in principal amount equal to the unpurchased portion of the original Certificated Note representing the same indebtedness to the extent not purchased will be issued in the name of the Holder of such Certificated Note upon cancellation of the original Certificated Note; provided that each such new Note will be in a principal amount of US$200,000 or an integral multiple of US$1,000 in excess thereof.

The Offer to Purchase shall also contain instructions and any materials necessary to enable Holders to tender Notes pursuant thereto. If (1) notice is given in a manner provided in this Section 4.06 and (2) any Holder fails to receive such notice or a Holder receives such notice but it is defective, such Holder's failure to receive such notice or such defect shall not affect the validity of the Offer to Purchase as to all other Holders that properly received such without defect.

(b)      On the Business Day immediately preceding the Offer to Purchase Payment Date, the Issuer, a Guarantor or a Designated Affiliate shall, to the extent lawful, deposit with such Paying Agent an amount equal to the aggregate Offer to Purchase Payment in respect of all Notes or portions thereof so tendered.  On the Offer to Purchase Payment Date, the Issuer, a Guarantor or a Designated Affiliate shall, to the extent lawful,

(i)      accept for payment for all Notes properly tendered and not withdrawn pursuant to the Offer to Purchase; and;

(ii)      deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate stating that such Notes or portions thereof have been tendered to and purchased by the Issuer, Guarantor or a Designated Affiliate.

(c)      The Paying Agent shall promptly deliver to each Holder the Offer to Purchase Payment for its Notes that have been accepted for payment in the Offer to Purchase, and, in the case of Certificated Notes purchased in part, the Trustee shall promptly authenticate and deliver to each Holder a new Certificated Note equal in principal amount to any unpurchased portion of the Certificated Notes surrendered, if any; *provided* that each such new Certificated Note will be in a principal amount of US$200,000 or an integral multiple of US$1,000 in excess thereof.

(d)      Notwithstanding Section 4.06(a), the Issuer shall not be required to make an Offer to Purchase upon a Change of Control that results in a Rating Decline if (i) a third party makes an offer to purchase in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 4.06 applicable to an Offer to Purchase made by the Issuer, Guarantor or Designated Affiliate and purchases all Notes properly tendered and not withdrawn under such offer, or (ii) a notice of redemption for all Outstanding Notes has been given pursuant to Section 3.02, Section 3.03 or Section 3.04, unless and until there is a Default in payment of the applicable redemption price.  Notwithstanding anything to the contrary contained herein, an Offer to Purchase may be made in advance of a Change of Control, conditioned upon the consummation of such Change of Control and the occurrence of such

35

Rating Decline, if a definitive agreement is in place for the Change of Control at the time the Offer to Purchase is made.

(e)     The Issuer, Guarantor or Designated Affiliate, as applicable, will comply with Rule 14e-1 under the Exchange Act (to the extent applicable) and all other applicable laws in making any Offer to Purchase.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the provisions of this Indenture and paragraph 3 of the Notes shall be deemed to be modified to the extent necessary to permit such compliance.  If the provisions of such securities laws or regulations cannot be complied with as a result of such deemed modifications, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.06 or paragraph 3 of the Notes by virtue thereof.

Section 4.07.   *Limitation on Liens*.  (a) The Guarantors agree that, for so long as any Note remains Outstanding, each Guarantor will not, and will not permit any Significant Subsidiary to, directly or indirectly, incur or permit to exist any Lien of any nature whatsoever securing the payment of Debt on any of its Property, whether owned at the Issue Date or thereafter acquired, other than Permitted Liens, without effectively providing that the Notes or the Note Guarantees, as applicable, are secured equally and ratably with (or, if the obligation to be secured by the Lien is subordinated in right of payment to the Notes or the Note Guarantees, prior to) the obligations so secured for so long as such obligations are so secured.

(b)     Notwithstanding the foregoing, any Lien securing the Notes or the Note Guarantees granted pursuant to this Section 4.07 shall be automatically and unconditionally released and discharged upon the release by the holders of the Debt described in Section 4.07(a) of their Lien on the Property of the relevant Guarantor or any Significant Subsidiary (including any deemed release upon payment in full of all obligations under such Debt) at such time as the holders of all such Debt also release their Lien on the Property of such Guarantor or such Significant Subsidiary or upon any sale, exchange or transfer to any Person that is not an Affiliate of such Guarantor of the Property secured by such Lien, or of all of the Capital Stock held by such Guarantor or any Subsidiary in, or all or substantially all the assets of, any Significant Subsidiary creating such Lien.

Section 4.08.   *Reporting Requirements*.  (a) Raízen shall furnish to the Trustee for delivery to Holders of the Notes, upon their written request thereof:

(i)     as soon as available and in any event no later than 120 days after the last day of its fiscal year (commencing with the fiscal year ending March 31, 2025), its annual audited consolidated financial statements in English as at and for the fiscal year then ended, prepared in accordance with Applicable GAAP, together with the audit report thereon;

(ii)     as soon as available and in any event within 90 days after the end of the first three fiscal quarters of each fiscal year, its quarterly unaudited consolidated financial statements in English prepared in accordance with Applicable GAAP, accompanied by a "limited review" (*revisão limitada*) report thereon; and

(iii)    within ten Business Days after becoming aware of the occurrence of an Event of Default, an Officer's Certificate setting forth the details of the Event of Default, and the action which the Issuer or Guarantor, as applicable, is taking or proposes to take with respect thereto.

(b)    Notwithstanding the foregoing, if Raízen makes available the information described in clauses (i) and (ii) above on its website or the website of a Subsidiary of Raízen, it will be deemed to have satisfied the reporting requirement set forth in clauses (i) and (ii) above.  It is understood that the Trustee shall have no obligation whatsoever to determine whether such information, documents or reports have been delivered as described above or posted on any website.

(c)    For so long as any Notes remain Outstanding, the Issuer will make available to any Noteholder or beneficial owner of an interest in the Notes, or to any prospective purchasers designated by such Noteholder or beneficial owner, upon request of such Noteholder or beneficial owner, information required to be delivered under paragraph (d)(4) of Rule 144A unless, at the time of such request, the Issuer is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, or is exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act.

(d)    Delivery of any such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt thereof shall not constitute actual or constructive notice or knowledge of any information contained therein or determinable for information contained therein, including the Issuer's, any Guarantor's and/or any other Person's compliance with any of the covenants under this Indenture (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

Section 4.09.  *Disclosure of Names and Addresses of Holders*.  Every Holder, by receiving and holding a Note, agrees with the Issuer, the Guarantors and the Trustee that neither the Issuer, nor any Guarantor nor the Trustee nor any Agent shall be held accountable by reason of the disclosure of any information as to the names and addresses of the Holders in accordance with TIA Section 312, regardless of the source from which such information was derived, and that the Trustee shall not be held accountable by reason of mailing any material pursuant to a request made under TIA Section 312(b).

Section 4.10.  *Paying Agent and Transfer Agent*.  (a) The Issuer agrees, for the benefit of the Holders from time to time of the Notes, that, until all of the Notes are no longer Outstanding or until funds in Dollars for the payment of all of the principal of and interest on all Notes (and Additional Amounts, if any) shall have been made available at the Corporate Trust Office, and shall have been returned to the Issuer as provided herein, whichever occurs earlier, there shall at all times be a Paying Agent and Transfer Agent hereunder.  Each of the Paying Agent and the Transfer Agent shall have the respective powers and authority granted to and conferred upon it herein and in the Notes.

(b)    The Issuer hereby initially appoints the Paying Agent and Transfer Agent defined in this Indenture as such.  The Paying Agent shall arrange for the payment, from funds

37

furnished by the Issuer to the Paying Agent pursuant to this Indenture, of the principal of and interest on the Notes (and Additional Amounts, if any, with respect to the Notes).

Section 4.11.  *Limitation on Issuer*. The Guarantors shall own, at all times, directly or indirectly, at least 75% of the Voting Stock of the Issuer.

ARTICLE 5
CONSOLIDATION, MERGER OR SALE OF ASSETS

Section 5.01.  *Consolidation, Merger or Sale of Assets*.  (a) Each of the Issuer and the Guarantors shall not consolidate with or merge with or into any other Person or sell, convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all of its Property (determined on the basis of the consolidated assets of Raízen and its Subsidiaries) to any other Person (other than the Issuer or a Guarantor), unless:

(i)       the Person (if not the Issuer or a Guarantor) formed by such merger or consolidation or the Person (if not the Issuer or a Guarantor) which acquired by sale, conveyance, transfer or lease all or substantially all of the Property of the Issuer or a Guarantor (the "**Successor Corporation**") expressly assumes by supplemental indenture the due and punctual payment of the principal of and interest (and Additional Amounts) on all of the Notes or such Guarantor's Note Guarantee, as applicable, the performance or observance of every covenant of the Issuer or Guarantor, as applicable, and all other obligations of the Issuer or Guarantor, as applicable, under this Indenture and the Notes or such Guarantor's Note Guarantee, as applicable;

(ii)      immediately after giving effect to such transaction, no Event of Default with respect to any Note shall have occurred and be continuing; and

(iii)     the Issuer or such Guarantor, as applicable, or the Successor Corporation, as the case may be, shall deliver to the Trustee an Opinion of Counsel to the effect that such consolidation, merger, sale, conveyance, transfer or lease and such supplemental indenture (if required) comply with these conditions, that such supplemental indenture (if required) has been duly authorized, executed and delivered and constitutes valid and binding obligations of the Successor Corporation and that all conditions precedent herein provided or relating to such transaction and such supplemental indenture (if required) have been complied with.

(b)       Notwithstanding anything to the contrary in the foregoing, the following transactions shall not be subject to Section 5.01(a)(ii):

(i)       any merger or consolidation by the Issuer or any Guarantor with or into any Subsidiary of the Issuer or any Guarantor; and

(ii)      any sale, conveyance, transfer or lease by the Issuer or any Guarantor, in one transaction or in a series of transactions, directly or indirectly, of all or substantially all of its Property (determined on the basis of the consolidated assets of Raízen and its Subsidiaries) to any Subsidiaries of the Issuer or any Guarantor.

(c)    Notwithstanding anything to the contrary in the foregoing, any merger or consolidation, in which the surviving entity is the Issuer or a Guarantor, or sale, conveyance, transfer or lease to the Issuer or a Guarantor will not be subject to this Section 5.01.

(d)    Upon any consolidation, merger, sale, conveyance, transfer or lease in accordance with these conditions, the Successor Corporation shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer or Guarantor, as applicable, under this Indenture and the Notes or such Guarantor's Note Guarantee, as applicable, with the same effect as if the Successor Corporation had been named as the Issuer or the Guarantor of the Notes herein.  No Successor Corporation shall have the right to redeem the Notes unless the Issuer or any Guarantor would have been entitled to redeem the Notes in similar circumstances.

ARTICLE 6
DEFAULT AND REMEDIES

Section 6.01.   *Events of Default.*   (a) The occurrence of one or more of the following events shall constitute an "Event of Default":

(i)    the Issuer or a Guarantor fails to pay any interest (including any related Additional Amounts) on any of the Notes when the same becomes due and payable, and such Default continues for a period of 30 days;

(ii)    the Issuer or a Guarantor fails to pay the principal (including premium, if any, and any related Additional Amounts) of any of the Notes when the same becomes due and payable, upon redemption, or otherwise, and in the case of technical or administrative difficulties in the payment of principal, only if such Default persists for a period of more than five Business Days;

(iii)    the Issuer or a Guarantor fails to perform or observe any other covenant or obligation in the Notes or in this Indenture and such Default continues for a period of more than 90 consecutive days after written notice to the Issuer and/or Guarantor, as the case may be, by the Trustee, or to the Issuer or Guarantor and the Trustee by the Holders of 25% or more in aggregate principal amount of the Notes Outstanding;

(iv)    the Issuer, a Guarantor or any of their respective Significant Subsidiaries defaults (A) in the payment when it becomes due and payable (subject to any applicable grace period), whether by acceleration or otherwise, of any Debt in an aggregate principal amount of US$150,000,000 (or its equivalent in any other currency or currencies) (the "**Threshold Amount**"), whether such Debt now exists or shall hereafter be created; or (B) in the performance or observance of any other terms and conditions relating to any such Debt in an aggregate amount in excess of the Threshold Amount if the effect of such Default is to cause such Debt to become due prior to its Stated Maturity;

(v)    the Issuer, a Guarantor or any of their respective Significant Subsidiaries shall: (A) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee, examiner, administrator, liquidator or similar Person of itself or of all or any substantial part of its Property; (B) make a general assignment for the

39

benefit of its creditors; (C) file a petition seeking bankruptcy, insolvency, reorganization in an insolvency or comparable context, *recuperação judicial*, *recuperação extrajudicial,* liquidation, *falência*, dissolution or winding up; or (D) take any corporate action for the purpose of effecting any of the foregoing;

(vi)    an involuntary proceeding or case shall be commenced against the Issuer, a Guarantor or any of their respective Significant Subsidiaries without its application or consent, seeking: (A) its reorganization, liquidation, dissolution or winding up; (B) the appointment of a receiver, custodian, trustee, examiner, administrator, liquidator or similar Person of it or of all or any substantial part of its Property; or (C similar relief in respect of it under any applicable law relating to bankruptcy, insolvency, reorganization, *recuperação judicial*, *recuperação extrajudicial*, liquidation, *falência*, dissolution or winding up, and such proceeding or case shall continue not dismissed and not stayed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue not stayed and in effect, for a period of 90 or more consecutive days;

(vii)    any of this Indenture or the Notes or the Note Guarantees for any reason cease to be in full force and effect in accordance with its terms or the Issuer or a Guarantor shall judicially contest the binding effect or enforceability thereof or shall deny that it has any further liability or obligation thereunder or in respect thereof;

(viii)    a final non-appealable judgment(s) for the payment of money in an amount equal or in excess of the Threshold Amount shall have been entered by a court or courts of competent jurisdiction against the Issuer or a Guarantor and remain unpaid or undischarged for a period (during which execution shall not be effectively stayed) of 60 consecutive days unless (A) covered by an insurance policy or policies issued by reputable and credit-worthy insurance companies or (B) a Permitted Holder has contractually and irrevocably undertaken to indemnify the Issuer or a Guarantor, as applicable, for any potential loss or claim arising therefrom and enforcement proceedings are not being executed against any Property of the Issuer or such Guarantor; or

(ix)    it is or becomes unlawful for the Issuer or a Guarantor to perform or comply with any one or more of its payment obligations under this Indenture or the Notes or the Note Guarantees.

(b)    In the case of any Event of Default referred to in Section 6.01(a)(iv) above, such Event of Default shall be automatically rescinded or annulled if each of the default and/or the acceleration of the Debt referred to therein is remedied or cured by the Issuer, any Guarantor or Significant Subsidiary or waived by the holders of such Debt within 60 days after the default and/or acceleration in respect of such Debt.

Section 6.02.  *Acceleration*.  (a) If an Event of Default, except for a bankruptcy default with respect to the Issuer or any Guarantor, occurs and is continuing under this Indenture, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then Outstanding, by written notice to the Issuer (and to the Trustee if the notice is given by the Holders), may, and the Trustee at the request of such Holders shall, declare the unpaid principal of and accrued interest on the Notes and any other amounts due and payable by the Issuer under

40

this Indenture to be immediately due and payable. Upon a declaration of acceleration, such principal, interest and other amounts will become immediately due and payable. If a bankruptcy default occurs with respect to the Issuer or any Guarantor, the unpaid principal of and accrued interest on the Notes then Outstanding and any other amounts due and payable by the Issuer under this Indenture will become immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

(b)    Subject to the exceptions set forth in Section 6.04, the Holders of a majority in principal amount of the Outstanding Notes by written notice to the Issuer or a Guarantor and to the Trustee may waive all past Defaults and rescind and annul a declaration of acceleration and its consequences if:

(i)    all existing Events of Default, except for the nonpayment of the principal of, premium, if any, and interest on the Notes that have become due solely by the declaration of acceleration, have been cured or waived;

(ii)    the rescission would not conflict with any judgment or decree of a court of competent jurisdiction; and

(iii)    the Issuer or a Guarantor has paid the Trustee its reasonable compensation and reimbursed the Trustee for its reasonable and documented expenses (including the fees and expenses of its counsel), disbursements and advances.

Section 6.03.  *Other Remedies*.  If an Event of Default occurs and is continuing, the Trustee may pursue, in its own name or as trustee of an express trust, any available remedy by proceeding at law or in equity to collect the payment of principal of and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.  The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.

Section 6.04.  *Waiver of Past Defaults*.  Except a Default in the payment of principal, interest, premium, if any, and Additional Amounts, if any, and except as otherwise provided in Section 9.02, the Holders of a majority in principal amount of the Outstanding Notes may, by written notice to the Trustee and to the Issuer or the relevant Guarantor, waive an existing Default and its consequences.  Upon such waiver, the Default will cease to exist, and any Event of Default arising therefrom will be deemed to have been cured, but no such waiver will extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05.  *Control by Majority*.  Subject to the obligation to provide indemnity satisfactory to the Trustee, the Holders of a majority in aggregate principal amount of the Outstanding Notes may direct in writing the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, that may involve the Trustee in personal liability, or that the Trustee determines in good faith may be unduly prejudicial to the rights of Holders not joining in the giving of such direction (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders), and the Trustee may take any other

41

action it deems proper that is not inconsistent with any such direction received from Holders. Prior to taking any action hereunder, the Trustee shall be entitled to indemnification by the Holders satisfactory to it against any costs, losses, liabilities and expenses caused by taking or not taking such action.

Section 6.06.   *Limitation on Suits*.   A Holder may not institute any proceeding, judicial or otherwise, with respect to this Indenture or the Notes, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture or the Notes, unless:

(i)      the Holder has previously given to the Trustee written notice of a continuing Event of Default;

(ii)     Holders of at least 25% in aggregate principal amount of Outstanding Notes have made written request to the Trustee to institute such proceedings in respect of the Event of Default in its own name as Trustee under this Indenture;

(iii)    Holders have offered to the Trustee security or indemnity satisfactory to the Trustee against any costs, liabilities or expenses (including reasonable and documented counsel expenses) to be incurred in compliance with such request;

(iv)     the Trustee within 60 days after its receipt of such notice, request and offer of security or indemnity has failed to institute any such proceeding; and

(v)      during such 60-day period, the Holders of a majority in aggregate principal amount of the Outstanding Notes have not given the Trustee a written direction that, in the opinion of the Trustee, is inconsistent with such written request.

Section 6.07.   *Rights of Holders to Receive Payment*.   Notwithstanding anything to the contrary, the contractual right of a Holder of a Note to receive payment of principal of or interest on its Note on or after the Stated Maturity thereof, or to bring suit for the enforcement of any such payment on or after such dates, in each case as expressly set forth in this Indenture, may not be amended without the consent of that Holder.

Section 6.08.   *Collection Suit by Trustee*.   If an Event of Default in payment of principal or interest specified in clause (i) or (ii) of Section 6.01(a) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust for the whole amount of principal and accrued interest remaining unpaid, together with interest on overdue principal and, to the extent lawful, overdue installments of interest, in each case at the rate specified in the Notes, and such further amount as is sufficient to cover the reasonable and documented costs and expenses of collection, including the reasonable and documented compensation, expenses, disbursements and advances of the Trustee, its agents and legal counsel and any other reasonable and documented amounts due to the Trustee hereunder.

Section 6.09.   *Trustee May File Proofs of Claim*.   The Trustee may file proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due to the Trustee hereunder) and the Holders allowed in any judicial proceedings relating to the Issuer, the Guarantors or their

42

respective creditors or property, and is entitled and empowered to collect, receive and distribute any money, securities or other property payable or deliverable upon conversion or exchange of the Notes or upon any such claims. Any custodian, receiver, "*síndico*," assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, if the Trustee consents to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable and documented compensation, expenses, disbursements and advances of the Trustee, its agent and counsel, and any other reasonable and documented amounts due to the Trustee hereunder. Nothing in this Indenture will be deemed to empower the Trustee to authorize or consent to, or accept or adopt on behalf of any Holder, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10. *Priorities*. If the Trustee collects any money pursuant to this Article, it shall pay out the money in the following order:

First: to the Trustee and each of the Agents for all amounts due to it hereunder;

Second: to Holders for amounts then due and unpaid for principal of and interest on the Notes, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and interest; and

Third: to the Issuer or any Guarantor or as a court of competent jurisdiction may direct.

The Trustee, upon written notice to the Issuer, may fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

Section 6.11. *Restoration of Rights and Remedies*. If the Trustee or any Holder has instituted a proceeding to enforce any right or remedy under this Indenture and the proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to the Holder, then, subject to any determination in the proceeding, the Issuer, the Guarantors, the Trustee and the Holders will be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Issuer, the Guarantors, the Trustee and the Holders will continue as though no such proceeding had been instituted.

Section 6.12. *Undertaking for Costs*. In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court may require any party litigant in such suit (other than the Trustee) to file an undertaking to pay the costs of the suit, and the court may assess reasonable costs, including reasonable attorneys' fees, against any party litigant (other than the Trustee) in the suit having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.12 does not apply to a suit by a Holder to enforce payment of principal of or interest on any Note on the respective due dates pursuant to Section 6.07, or a suit by Holders of more than 10% in principal amount of the Outstanding Notes except for any proceeding brought before a Brazilian court, which case the Holder may be required to post a bond to cover legal fees and court expenses.

Section 6.13.   *Rights and Remedies Cumulative*.   No right or remedy conferred or reserved to the Trustee or to the Holders under this Indenture is intended to be exclusive of any other right or remedy, and all such rights and remedies are, to the extent permitted by law, cumulative and in addition to every other right and remedy hereunder or now or hereafter existing at law or in equity or otherwise.   The assertion or exercise of any right or remedy hereunder, or otherwise, will not prevent the concurrent assertion or exercise of any other right or remedy.

Section 6.14.   *Delay or Omission Not Waiver; Prescription of Claims*.   No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default will impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein and every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be; *provided*, that claims against the Issuer or the Guarantors for payments under any of the Notes shall be prescribed unless made within a period of ten years or, in the case of interest, a period of five years, from the applicable original date of payment therefor.

Section 6.15.   *Waiver of Stay, Extension or Usury Laws*.   Each of the Issuer and the Guarantors covenants, to the extent that it may lawfully do so, that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive the Issuer or a Guarantor, as the case may be, from paying all or any portion of the principal of, or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or that may affect the covenants or the performance of this Indenture.   Each of the Issuer and the Guarantors hereby expressly waives, to the extent that it may lawfully do so, all benefit or advantage of any such law and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

ARTICLE 7
THE TRUSTEE

Section 7.01.   *General*.   (a) The duties and responsibilities of the Trustee are as set forth herein.   Whether or not expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee is subject to this Article.

(b)      Except during the continuance of an Event of Default, (i) the duties of the Trustee shall be determined solely by the express provisions of this Indenture and the Trustee needs to perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations will be read into this Indenture against the Trustee; and (ii) the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, opinions or orders furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not

44

they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)     In case an Event of Default has occurred and is continuing, the Trustee shall exercise those rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(d)     No provision of this Indenture shall be construed to relieve the Trustee from liability for its own gross negligence or willful misconduct, except that:

(i)     this Section 7.01(d) shall not be construed to limit the effect of Section 7.01(b);

(ii)     the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(iii)     the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority in principal amount of the Outstanding Notes, relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture with respect to the Notes; and

(iv)     no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(e)     Unless otherwise specifically provided herein or in the Notes, any order, certificate, notice, request, direction or other communication from the Issuer or any Guarantor made or given under any provision of this Indenture shall be sufficient if signed by an Officer or any duly authorized attorney-in-fact.

(f)     Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 7.01.

Section 7.02.   *Certain Rights of Trustee.*

(a)     The Trustee may conclusively rely, and will be protected in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper Person.

(b)     Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel conforming to Section 11.03 and the Trustee will not be

45

liable for any action it takes or omits to take in good faith in reliance on such certificate or opinion.

(c)    The Trustee may act and conclusively rely and shall be fully protected in acting and relying in good faith on the opinion or advice of, or information obtained from, any counsel, accountant, appraiser or other expert or adviser, whether retained or employed by the Issuer, the Guarantors or by the Trustee, in relation to any matter arising in the administration of the trusts hereof.

(d)    The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders, unless such Holders have offered to the Trustee security, reasonably satisfactory to it, or indemnity against the reasonable and documented costs, expenses and liabilities (including, without limitation, reasonable and documented fees and expenses of legal counsel) that might be incurred by it in compliance with such request or direction.

(e)    The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within its rights or powers or for any action it takes or omits to take in accordance with the direction of the Holders in accordance with Section 6.05 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture.

(f)    The Trustee may appoint counsel and other advisors of its choice from time to time to provide advice and services arising out of or in connection with the performance by the Trustee of its obligations under this Indenture. The Trustee may consult with counsel of its choice, and the advice of such counsel or any Opinion of Counsel will be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(g)    The Trustee may act through its agents, attorneys, accountants, experts and such other professionals as the Trustee deems necessary, advisable or appropriate and shall not be responsible for the misconduct or negligence of any agent, attorney, accountant, expert or other such professional appointed with due care.

(h)    No provision of this Indenture will require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties hereunder, or in the exercise of its rights or powers, unless it receives indemnity satisfactory to it against any loss, liability or expense (including, without limitation, reasonable and documented fees and expenses of agents and attorneys). In no event shall the Trustee be liable for special, indirect punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(i)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be

46

enforceable by, the Trustee in each of its capacities hereunder, each Agent and each agent, custodian and other Person authorized or employed to act hereunder.

(j)     The Trustee may request that each of the Issuer and the Guarantors deliver a certificate setting forth the names of individuals and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture.

(k)     The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and reasonably believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Indenture.

(l)     The Issuer and its Affiliates may from time to time enter into normal banking and trustee relationships with the Trustee and its Affiliates.

(m)     The permissive rights of the Trustee to do things enumerated in this Indenture shall not be construed as a duty to take such action.

(n)     None of the Trustee or any Agent shall have any liability or responsibility with respect to, or obligation or duty to monitor, determine or inquire as to the Issuer's or any Guarantor's compliance with any covenant under this Indenture.

(o)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder.

(p)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note other evidence of indebtedness or other papers or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer personally or by agent or attorney at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

Section 7.03.   *Individual Rights of Trustee*.   The Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer, the Guarantors or its Affiliates with the same rights it would have if it were not the Trustee.  Any Agent may do the same with like rights.  However, the Trustee is subject to Trust Indenture Act Sections 310(b) and 311.

Section 7.04.   *Trust Indenture Act*.   Notwithstanding anything to the contrary elsewhere in this Indenture, the parties to this Indenture and the Holders of the Notes acknowledge and agree that this Indenture is not qualified under the Trust Indenture Act, Holders are not entitled to any protections thereunder and, except as expressly set forth in this Indenture, the provisions of the Trust Indenture Act are not incorporated by reference in this Indenture.

Section 7.05.   *Trustee's Disclaimer*.   The Trustee (i) makes no representation as to the validity or adequacy of this Indenture, the Notes, any Note Guarantee or any offering materials;

47

(ii) is not accountable for the Issuer's use or application of the proceeds from the Notes; and (iii) is not responsible for any statement in the Notes other than its certificate of authentication.

Section 7.06.   *Notice of Default*.   The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default with respect to the Notes (except a payment Default under Section 6.01(a)(i) or Section 6.01(a)(ii)) unless a Responsible Officer of the Trustee shall have received written notice thereof at the Corporate Trust Office and such notice references the Notes and this Indenture.  If any Default or Event of Default occurs and is continuing and (i) the Trustee has actual knowledge thereof (in the case of a payment Default under Section 6.01(a)(i) or Section 6.01(a)(ii)), or (ii) written notice thereof is delivered to a Responsible Officer of the Trustee, the Trustee will send notice of the Default or Event of Default to each Holder within 60 days after the Trustee is deemed to have knowledge or has received notice thereof, unless the Default or Event of Default has been cured; *provided* that, except in the case of a Default in the payment of the principal of or interest on any Note, the Trustee may withhold the notice if and so long as a committee of trust officers of the Trustee in good faith determines that withholding the notice is in the interest of the Holders.

Section 7.07.   *Compensation and Indemnity*.   (a) Each of the Issuer and the Guarantors will, jointly and severally, pay the Trustee compensation as agreed upon in writing between the Issuer, the Guarantors and the Trustee for their services. The compensation of the Trustee is not limited by any law on compensation of a trustee of an express trust. Each of the Issuer and the Guarantors will, jointly and severally, reimburse the Trustee upon request for all reasonable and documented out-of-pocket expenses, disbursements and advances incurred or made by the Trustee, including the compensation and reasonable and documented expenses of the Trustee's agents and counsel.

(b)     The Issuer and the Guarantors shall, jointly and severally, indemnify the Trustee for, and hold it harmless for, from and against, any damage, loss, claim, liability or expense (including, without limitation, the reasonable and documented fees and expenses of its legal counsel) incurred by it without gross negligence or willful misconduct on its part arising out of or in connection with the acceptance or administration of this Indenture by it and the performance of its duties under this Indenture and the Notes, including the reasonable and documented costs and expenses (legal or otherwise) of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Indenture and the Notes.

(c)     To secure the Issuer's and the Guarantors' payment obligations in this Section, the Trustee will have a lien prior to the Notes on all money or property held or collected by the Trustee, in its capacity as Trustee, except money or property held in trust to pay principal of, and interest (including Additional Amounts) on particular Notes.

(d)     If the Trustee incurs expenses or renders services in connection with an Event of Default as specified herein, the expenses (including, without limitation, the reasonable and documented charges and expenses of its legal counsel per jurisdiction) and the compensation for the services are intended to constitute expenses of administration under any applicable bankruptcy, reorganization, insolvency or similar law now or hereafter in effect.

48

(e)      The provisions of this Section 7.07 shall survive the payment of the Notes and the resignation or removal of the Trustee and/or the termination of this Indenture.

Section 7.08.    *Replacement of Trustee.*  (a) (i) The Trustee may resign at any time by providing at least 30-days written notice to the Issuer.

(ii)      The Holders of a majority in principal amount of the Outstanding Notes may remove the Trustee by providing at least 30-days written notice to the Trustee.

(iii)      If the Trustee is no longer eligible pursuant to Section 7.12, any Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(iv)      The Issuer may remove the Trustee if: (1) the Trustee is no longer eligible pursuant to Section 7.12; (2) the Trustee is adjudged a bankrupt or an insolvent; (3) a receiver or other public officer takes charge of the Trustee or its property; or (4) the Trustee becomes incapable of acting.  In addition, the Issuer may remove the Trustee at any time for any reason to the extent the Issuer has given the Trustee at least 30 days' written notice and as long as no Default or Event of Default has occurred and is continuing.

A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section.

(b)      If the Trustee has been removed by the Holders, Holders of a majority in principal amount of the Outstanding Notes may appoint a successor Trustee with the consent of the Issuer.  Otherwise, if the Trustee resigns or is removed, or if a vacancy exists in the office of Trustee for any reason, the Issuer will promptly appoint a successor Trustee.  If the successor Trustee does not deliver its written acceptance within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee (at the expense of the Issuer), the Issuer or the Holders of a majority in principal amount of the Outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)      Upon delivery by the successor Trustee of a written acceptance of its appointment to the retiring Trustee and to the Issuer, (i) the retiring Trustee will transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.07, (ii) the resignation or removal of the retiring Trustee will become effective, and (iii) the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture.  Upon request of any successor Trustee, the Issuer will execute any and all instruments for fully and vesting in and confirming to the successor Trustee all such rights, powers and trusts.  The Issuer will give notice of any resignation and any removal of the Trustee and each appointment of a successor Trustee to all Holders, and include in the notice the name of the successor Trustee and the address of its Corporate Trust Office.

(d)      Notwithstanding replacement of the Trustee pursuant to this Section, the Issuer's and the Guarantors' obligations in Section 7.07 will continue for the benefit of the retiring Trustee.

Section 7.09.  *Successor Trustee by Merger*.  If the Trustee consolidates with, merges or converts into, or transfers all or substantially all of its corporate trust business (including this transaction) to, another corporation or national banking association, the resulting, surviving or transferee corporation or national banking association without any further act will be the successor Trustee with the same effect as if the successor Trustee had been named as the Trustee in this Indenture.

Section 7.10.  *Money Held in Trust*.  The Trustee will not be liable for interest on or the investment of any money received by it except as it may agree with the Issuer or any Guarantor in writing.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.11.  *Force Majeure*.  Notwithstanding any provision herein to the contrary, in no event shall the Trustee or any Agent be liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused by forces beyond its control, including, but not limited to, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like which restrict or prohibit the providing of the services contemplated by this Indenture, inability to obtain material, equipment, or communications or computer facilities, or the failure of equipment or interruption of communications or computer facilities, it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 7.12.  *Corporate Trustee Required; Eligibility; Conflicting Interests*. There shall at all times be a Trustee hereunder which shall be eligible to act as Trustee under the Trust Indenture Act and shall have a combined capital and surplus of at least US$25,000,000 and its Corporate Trust Office in The City of New York, New York.  If such corporation publishes reports of condition at least annually, pursuant to law or the requirements of Federal, state, territorial or District of Columbia supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article.  Neither the Issuer nor any Person directly or indirectly controlling, controlled by, or under common control with the Issuer shall serve as Trustee. If the Trustee acquires any conflicting interest within the meaning of the TIA, it must (i) eliminate such conflict within 90 days, (ii) apply to the SEC for permission to continue as trustee or (iii) resign.

Section 7.13.  *Trustee and Others May Hold Notes*.  The Trustee or any Agent or any other authorized agent of the Trustee or the Issuer or any Guarantor, or any Affiliate thereof, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer or any Guarantor, or any other obligor on the Notes with the same rights it would have if it were not Trustee, Agent or such other authorized agent.

Section 7.14.  *Agents.*

(a)    Each Agent accepts its respective obligations set forth herein and in the Notes upon the terms and conditions hereof and thereof, including the following, to all of which the Issuer agrees and to all of which the rights of the Holders from time to time of the Notes shall be subject:

(i)    Each Agent shall be entitled to the compensation to be agreed upon with the Issuer and the Guarantors in writing for all services rendered by it, and the Issuer and the Guarantors, jointly and severally, agree promptly to pay such compensation and to reimburse each of the Agents for its reasonable and documented out-of-pocket expenses (including reasonable and documented fees and expenses of its counsel) incurred by it in connection with the services rendered by it hereunder.  Each of the Issuer and the Guarantors, jointly and severally, also agrees to indemnify each of the Agents for, and to hold each of them harmless against, any loss, liability or expense (including, without limitation, reasonable and documented fees and expenses of its legal counsel), incurred out of or in connection with its acting as agent of the Issuer hereunder, except to the extent such loss, liability or expense results from such Agent's own gross negligence or willful misconduct.  The obligations of the Issuer and the Guarantors under this Section 7.14(a)(i) shall survive the payment of the Notes and the resignation or removal of an Agent and/or the termination of this Indenture;

(ii)    In acting under this Indenture and in connection with the Notes, the Agents are each acting solely as agent of the Issuer and do not assume any obligation towards or relationship of agency or trust for or with any of the Holders, except that all funds held by a Paying Agent for the payment of the principal of and interest on (and Additional Amounts, if any, with respect to) the Notes, shall be held in trust by it and applied as set forth herein and in the Notes, but need not be segregated from other funds held by it, except as required by law;

(iii)    Each of the Agents shall be protected and shall incur no liability for or in respect of any action taken or omitted to be taken or thing suffered by it in reliance upon any Note, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper party or parties;

(iv)    No Agent shall be under any liability for interest on or investment of any moneys received by it pursuant to any of the provisions of this Indenture or the Notes or the Note Guarantees except as it may agree with the Issuer or any Guarantor in writing;

(v)    The recitals contained herein and in the Notes shall be taken as the statements of the Issuer, and no Agent assumes any responsibility for the correctness of the same.  No Agent makes any representation as to the validity or sufficiency of this Indenture, the Notes or the Note Guarantees or any offering materials.  No Agent shall be accountable for the use or application by the Issuer of any of the Notes or the proceeds thereof;

51

(vi)     Each Agent shall be obligated to perform such duties and only such duties as are herein and in the Notes specifically set forth, and no implied duties or obligations shall be read into this Indenture, the Notes or the Note Guarantees against such Agent.  No Agent shall be under any obligation to take any action hereunder which may tend to involve it in any expense or liability, the payment of which within a reasonable time is not, in its reasonable opinion, assured to it; and

(vii)     No provision of this Indenture shall be construed to relieve any Paying Agent or any Transfer Agent, as applicable, from liability for its own gross negligence or willful misconduct.

Anything in this Section to the contrary notwithstanding, the agreements to hold sums in trust as provided in this Section are subject to the provisions of Section 8.05.

(b)     Any Agent may at any time resign by giving written notice of its resignation mailed to the Issuer and the Trustee specifying the date on which its resignation shall become effective; *provided* that such date shall be at least 60 days after the date on which such notice is given unless the Issuer agrees to accept less notice.  Upon receiving such notice of resignation, the Issuer shall promptly appoint a successor Agent, qualified as aforesaid, by written instrument in duplicate signed on behalf of the Issuer, one copy of which shall be delivered to the resigning Agent and one copy to the successor Agent.  Such resignation shall become effective upon the earlier of (i) the effective date of such resignation or (ii) the acceptance of appointment by the successor Agent as provided in Section 7.14(c).  The Issuer may, at any time and for any reason, and shall, upon any event set forth in the next succeeding sentence, remove an Agent and appoint a successor Agent, qualified as aforesaid, by written instrument in duplicate signed on behalf of the Issuer, one copy of which shall be delivered to the Agent being removed and one copy to the successor Agent.  An Agent shall be removed as aforesaid if it shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver of such Agent or of its property shall be appointed, or any public officer shall take charge or control of such Agent or of its property or affairs for the purpose of rehabilitation, conservation or liquidation.  Any removal of an Agent and any appointment of a successor Agent shall become effective upon acceptance of appointment by the successor Agent as provided in Section 7.14(c). Upon its resignation or removal, the Agent shall be entitled to the payment by the Issuer of its compensation and reimbursement of its reasonable and documented disbursements, advances and expenses (including, without limitation, reasonable and documented fees and expenses of its legal counsel) as set forth in Section 7.14(a)(i).

(c)     Any successor Agent appointed as provided in Section 7.14(b) shall execute and deliver to its predecessor and to the Issuer an instrument accepting such appointment hereunder, and thereupon such successor Agent, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as such Agent hereunder, and such predecessor, upon payment of its compensation and reasonable and documented out-of-pocket expenses (including, without limitation, reasonable and documented fees and expenses of its legal counsel) then unpaid, shall pay over to such successor agent all moneys or other property at the time held by it hereunder, if any.

52

(d)    Any corporation or bank into which any Agent may be merged or converted, or with which any Paying Agent or Transfer Agent may be consolidated, or any corporation or bank resulting from any merger, conversion or consolidation to which an Agent shall be a party, or any corporation or bank succeeding to all or substantially all of the agency business of the Agent (including this transaction) shall be the successor to such Agent hereunder (*provided* that such corporation or bank shall be qualified as aforesaid) without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(e)    Notwithstanding anything to the contrary contained in this Indenture, any Paying Agent may, to the extent it is required to do so by law, deduct or withhold income or other similar taxes from principal or interest payments hereunder without any liability therefor.

ARTICLE 8
DEFEASANCE AND DISCHARGE

Section 8.01.    *Discharge of Issuer's Obligations*.  (a) Subject to paragraph (b), the Issuer's obligations under the Notes and this Indenture, and the Guarantors' obligations under the Note Guarantees, will terminate if:

(i)    either (A) all Notes previously authenticated and delivered (other than (1) destroyed, lost or stolen Notes that have been replaced or (2) Notes that are paid pursuant to Section 4.01 or (3) Notes for whose payment funds in Dollars or U.S. Government Obligations in Dollars have been held in trust and then repaid to the Issuer pursuant to Section 8.05) have been delivered to the Trustee for cancellation and the Issuer has paid all sums payable by it hereunder; or (B) (1) all Notes not theretofore delivered to the Trustee for cancellation (x) have become due and payable, (y) will become due and payable at their Stated Maturity within one year or (z) are to be called for redemption within one year under arrangements reasonably satisfactory to the Trustee, and the Issuer irrevocably deposits in trust with the Trustee, as trust funds solely for the benefit of the Holders, funds in Dollars or U.S. Government Obligations in Dollars or a combination thereof sufficient, in the opinion of an internationally recognized firm of independent public accountants to the extent such amounts consist of U.S. Government Obligations, expressed in a written opinion delivered to the Trustee, without consideration of any reinvestment, to pay principal of and interest on the Notes to maturity or redemption, as the case may be, and to pay all other sums payable by it hereunder; (2) no Default has occurred and is continuing on the date of the deposit; and (3) the deposit will not result in a breach or violation of, or constitute a Default under, this Indenture or any other agreement or instrument to which the Issuer is a party or by which it is bound; and

(ii)    the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel, in each case stating that all conditions precedent provided for herein relating to the satisfaction and discharge of this Indenture have been complied with.

(b)    After satisfying the conditions in clause (a)(i)(A), only the obligations of the Issuer and the Guarantors under Section 7.07 and Section 7.14 will survive. After satisfying the conditions in clause (a)(i)(B), only the obligations of the Issuer and the Guarantors in Article 2 and Sections 3.01, 4.01, 4.02, 7.07, 7.14, 8.05 and 8.06 will survive; *provided* that

53

upon payment of all Notes in full, only the obligations of the Issuer and the Guarantors in Section 7.07 and 7.14 will survive. In either case, the Trustee, upon request, will acknowledge in writing the discharge of the Issuer's and the Guarantors' obligations under the Notes and this Indenture other than the surviving obligations.

Section 8.02.   *Legal Defeasance*.   After the 123rd day following the deposit referred to in clause (i) below, the Issuer will be deemed to have paid and will be discharged from its obligations in respect of the Notes and this Indenture, other than its obligations in Article 2 and Sections 4.02, 7.07, 7.14, 8.05 and 8.06 (*provided* that upon payment of all Notes in full, only the Issuer's and the Guarantors' obligations in Section 7.07 and Section 7.14 will survive), if the following conditions have been satisfied:

(i)      the Issuer has irrevocably deposited in trust with the Trustee, as trust funds solely for the benefit of the Holders, funds in Dollars or U.S. Government Obligations in Dollars or a combination thereof sufficient, in the opinion of an internationally recognized firm of independent public accountants to the extent amounts consist of U.S. Government Obligations, expressed in a written certificate thereof delivered to the Trustee, without consideration of any reinvestment, to pay principal of and interest on the Notes to maturity or redemption, as the case may be, *provided* that any redemption before maturity has been irrevocably provided for under arrangements satisfactory to the Trustee;

(ii)     no Default has occurred and is continuing on the date of the deposit or at the end of the 123 day period following the deposit;

(iii)    the deposit will not result in a breach or violation of, or constitute a Default under, this Indenture or any other agreement or instrument to which the Issuer is a party or by which it is bound;

(iv)     the Issuer has delivered to the Trustee either (x) a ruling received from the Internal Revenue Service to the effect that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the legal defeasance and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case or (y) an Opinion of Counsel, based on a ruling published by the Internal Revenue Service or a change in U.S. federal income tax law after the date of this Indenture, to the same effect as the ruling described in clause (x); and

(v)      the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, in each case stating that all conditions precedent provided for herein relating to the legal defeasance (or in the case of covenant defeasance, covenant defeasance) have been complied with.

Prior to the end of the 123 day period, none of the Issuer's obligations under this Indenture will be discharged.  Thereafter, upon written request, the Trustee will acknowledge in writing the legal defeasance of the Notes.

Section 8.03.   *Covenant Defeasance*.  Following the deposit referred to in Section 8.01(a)(ii), the Issuer's obligations set forth in Section 4.03, Section 4.04, Section 4.05, Section

4.06, Section 4.07, Section 4.08(a), Section 4.08(b), and Section 5.01(a)(ii) will terminate, and the failure to comply with such obligations will no longer constitute an Event of Default under Section 6.01, provided that the following conditions have been satisfied:

(i)        the Issuer has complied with clauses (i), (iii) and (v) of Section 8.02; and

(ii)        the Issuer has delivered to the Trustee an Opinion of Counsel to the effect that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the covenant defeasance and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case.

Except as specifically stated above, none of the Issuer's obligations under this Indenture will be discharged.

Section 8.04.   *Application of Trust Money*.   Subject to Section 8.05, the Trustee will hold in trust the funds in Dollars or U.S. Government Obligations in Dollars deposited with it pursuant to Section 8.01, 8.02 or 8.03, and apply the deposited funds in Dollars and the proceeds from deposited U.S. Government Obligations in Dollars to the payment of principal of and interest on the Notes in accordance with the Notes and this Indenture.   Such Dollar funds and U.S. Government Obligations need not be segregated from other funds except to the extent required by law.

Section 8.05.   *Repayment to Issuer*.   Subject to Section 7.07, 8.01, 8.02 and 8.03, the Trustee and the Paying Agents will promptly pay to the Issuer upon request any excess funds in Dollars held by the Trustee and the Paying Agents at any time and thereupon be relieved from all liability with respect to such funds.   The Trustee or such Paying Agent will pay to the Issuer upon written request any funds in Dollars held for payment with respect to the Notes that remains unclaimed for two years; *provided* that before making such payment the Trustee or such Paying Agent may at the expense of the Issuer publish once in a newspaper of general circulation in New York City, or send to each Holder entitled to such Dollar denominated funds, notice that the funds remains unclaimed and that after a date specified in the notice (at least 30 days after the date of the publication or notice) any remaining unclaimed balance of money will be repaid to the Issuer. After payment to the Issuer, Holders entitled to such funds must look solely to the Issuer for payment, unless applicable law designates another Person, and all liability of the Trustee and the Paying Agents with respect to such funds will cease.

Section 8.06.   *Reinstatement*.   If and for so long as the Trustee is unable to apply any funds in Dollars or U.S. Government Obligations in Dollars held in trust pursuant to Section 8.01, 8.02 or 8.03 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and the Guarantors' obligations under this Indenture and the Notes and the Note Guarantees will be reinstated as though no such deposit in trust had been made.   If the Issuer makes any payment of principal of or interest on any Notes because of the reinstatement of its obligations, it will be subrogated to the rights of the Holders of such Notes to receive such payment from the funds in Dollars or U.S. Government Obligations in Dollars held in trust.

ARTICLE 9
AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 9.01.   *Amendments Without Consent of Holders*.   The Issuer, the Guarantors and the Trustee may waive, consent, amend or supplement this Indenture, the Notes or the Note Guarantees without notice to or the consent of any Noteholder:

(i)      to cure any ambiguity, omission, defect, inconsistency or to correct a manifest error in this Indenture, the Notes or the Note Guarantees;

(ii)     to comply with Section 5.01 and to substitute the Issuer in accordance with Section 9.03;

(iii)    to evidence and provide for the acceptance of an appointment by a successor Trustee;

(iv)     to provide for uncertificated Notes in addition to or in place of Certificated Notes *provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code;

(v)      to provide for any additional Note Guarantee of the Notes or to secure the Notes or confirm and evidence the release, termination or discharge of any Note Guarantee of or Lien securing the Notes when such release, termination or discharge is permitted by this Indenture;

(vi)     to provide for or confirm the issuance of Additional Notes;

(vii)    to add to the covenants of the Issuer or Guarantors for the benefit of the Holders of the Notes;

(viii)   to surrender any right conferred by this Indenture upon the Issuer or the Guarantors;

(ix)     to comply with any requirements of the SEC in connection with any qualification of this Indenture under the U.S. Trust Indenture Act of 1939, as amended;

(x)      to make any other change that does not materially and adversely affect the rights of any Holder; or

(xi)     to conform any provision of this Indenture to the "Description of the Notes" in the Offering Memorandum.

Section 9.02.   *Amendments With Consent of Holders*.   (a) Except as otherwise provided in Article 6 or paragraph (b) of this Section 9.02, the Issuer, the Guarantors and the Trustee may amend this Indenture, the Notes and the Note Guarantees with the written consent of the Holders of at least a majority in aggregate principal amount of the Outstanding Notes, and the Holders of at least a majority in aggregate principal amount of the Outstanding Notes by written

56

notice to the Trustee may waive future compliance by the Issuer and the Guarantors with any provision of this Indenture, the Notes or the Note Guarantees.

(b)      Notwithstanding the provisions of paragraph (a), without the consent of each Holder of an affected Note, an amendment or waiver may not:

(i)      reduce the principal amount of or change the Stated Maturity of any payment of principal or any installment of interest on any Note;

(ii)      reduce the rate of interest or change the method of computing the amount of interest payable on any Note;

(iii)      reduce the amount payable upon the redemption of any Note or change the time at which any Note may be redeemed or, once notice of redemption has been given, the time at which it must thereupon be redeemed, subject to the conditions set forth in this Indenture, which conditions shall not be changed in any matter adverse to Holders, *provided*, *however*, the minimum notice period for such redemption may be changed with the written consent of the Holders of a majority in principal amount of the Outstanding Notes;

(iv)      make any Note payable in currency and place of payment other than that stated in the Note;

(v)      impair the contractual right of any Holder of Notes to receive any principal payment or interest payment on such Holder's Notes, on or after the Stated Maturity thereof, or to institute suit for the enforcement of any such payment;

(vi)      make any change in the percentage of the principal amount of the Notes required for amendments or waivers; or

(vii)      modify or change any provision of this Indenture affecting the ranking of the Notes in a manner adverse to the Holders of the Notes (it being understood that changes in provisions affecting the ability to create Liens over the assets of the Issuer shall not affect the "ranking" of the Notes as that term is used in this subsection (vii)).

(c)      It is not necessary for Holders to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if their consent approves the substance thereof.

(d)      (c) An amendment or waiver becomes effective upon the execution of such amendment or waiver by the Trustee.  After an amendment, supplement or waiver under this Section becomes effective, the Issuer will send to the Holders affected thereby a notice briefly describing the amendment, supplement or their written waiver.  Any failure of the Issuer to send such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amendment to this Indenture or waiver.

Section 9.03.  *Substitution of the Issuer*.  Without the consent of any Holder of Notes, the Issuer may be replaced and substituted, as principal debtor in respect of this Indenture

and the Notes, by (x) either Guarantor or (y) any Subsidiary of a Guarantor (in each case, in that capacity, the "**Substituted Issuer**"); *provided* that the following conditions are satisfied:

(i)      such documents shall be executed by the Substituted Issuer, the Issuer, the Guarantors and the Trustee as may be necessary to give full effect to the substitution, including a supplemental indenture to this Indenture under which the Substituted Issuer assumes all of the obligations of the Issuer under this Indenture and the Notes as if the Substituted Issuer had been named in the Notes and in this Indenture as the principal debtor in respect of the Notes in place of the Issuer (or any previous substitute) and each Guarantor, unless such Guarantor is the Substituted Issuer, or such Guarantor's then-existing Note Guarantee remains in full force and effect (as evidenced by an Officer's Certificate of such Guarantor), unconditionally and irrevocably reaffirms its Note Guarantee (collectively, the "**Substitution Documents**");

(ii)      if the Substituted Issuer is organized in a jurisdiction other than Luxembourg, the Substitution Documents shall contain covenants (a) to ensure that each Holder and beneficial owner of Notes has the benefit of a covenant in terms corresponding to the obligations of the Issuer pursuant to Section 3.01, in respect of the payment of Additional Amounts (but replacing references to Luxembourg with references to the jurisdiction of organization of the Substituted Issuer) and (b) to indemnify the Trustee, any Paying Agent, and each Holder and beneficial owner of Notes against all taxes or duties that (1) arise by reason of a law or regulation in effect or contemplated on the effective date of the substitution that are incurred or levied against the Trustee, such Paying Agent, or such Holder or beneficial owner of Notes, as the case may be, as a result of the substitution and that would not have been so incurred or levied had the substitution not been made, and (2) are imposed on the Trustee, such Paying Agent, or such Holder or beneficial owner of Notes, as the case may be, by any political subdivision or taxing authority of any country in which the Trustee, such Paying Agent, or such Holder or beneficial owner of Notes resides or is subject to any such tax or duty and that would not have been so imposed had the substitution not been made, in each case subject to similar exceptions as set forth in Section 3.01, *mutatis mutandis*; *provided*, that the Trustee, any Paying Agent, or any Holder or beneficial owner of Notes making a claim with respect to such tax indemnity shall provide the Substituted Issuer with notice of such claim, along with supporting documentation, within four weeks of the announcement of the substitution of the Issuer as issuer; and *provided*, *further*, that notwithstanding anything to the contrary in this Section, the Substituted Issuer shall be entitled to make any deduction or withholding, and shall not be required to indemnify the Trustee, any Paying Agent, or any Holder or beneficial owner of Notes for or on account of any taxes or duties, or pay any Additional Amounts with respect to any such deduction or withholding, imposed on or in respect of any Notes, in either case, pursuant to FATCA, any treaty, law, regulation or other official guidance enacted by any jurisdiction implementing FATCA or any intergovernmental agreement or law, regulation or other official guidance promulgated thereunder implementing FATCA;

(iii)      the Issuer will deliver, or cause the delivery, to the Trustee of (a) an Opinion of Counsel in the jurisdiction of organization of the Substituted Issuer to the effect that the Substitution Documents were duly authorized, executed and delivered by the Substituted

58

Issuer, (b) an Opinion of Counsel in the State of New York to the effect that the Substitution Documents constitute valid and binding obligations of the Substituted Issuer, and (c) an Officer's Certificate as to compliance with the provisions described in this Section 9.03;

(iv)    the Substituted Issuer shall appoint a process agent in the Borough of Manhattan in The City of New York to receive service of process on its behalf in relation to any legal action or proceedings arising out of or in connection with the Notes, this Indenture and the Substitution Documents;

(v)    no Event of Default under this Indenture has occurred or is continuing; and

(vi)    the substitution shall comply with all applicable requirements under the laws of the jurisdiction of organization of the Substituted Issuer, Luxembourg and Brazil.

(b)    Upon the execution of the Substitution Documents and compliance with the other conditions set forth in this Section, (i) the Substituted Issuer shall be deemed to be named in this Indenture and the Notes as the principal debtor in place of the Issuer and (ii) the Issuer (or any previous substitute) shall be released from all of its obligations under the Notes and this Indenture and any reference in this Indenture to the Issuer shall from then on be deemed to refer to the Substituted Issuer and any reference to the country in which the Issuer is organized or resident for tax purposes shall from then on be deemed to refer to the country in which the Substituted Issuer is organized or resident for tax purposes.

(c)    Not later than ten Business Days after the execution of the Substitution Documents, the Substituted Issuer shall give written notice thereof to the Holders of Notes.

(d)    Notwithstanding anything to the contrary, this Section 9.03 is not applicable to any consolidation or merger by the Issuer with or into any other Person or the sale, conveyance, transfer or lease by the Issuer, in one transaction or a series of transactions, directly or indirectly, of all or substantially all of its Property (determined on the basis of the consolidated assets of Raízen and its Subsidiaries), which such transaction shall be subject to the provisions of Section 5.01.

Section 9.04.    *Effect of Consent.*    (a) After an amendment, supplement or waiver becomes effective, it will bind every Holder unless it is of the type requiring the consent of each Holder affected.  If the amendment, supplement or waiver is of the type requiring the consent of each Holder affected, the amendment, supplement or waiver will bind each Holder that has consented to it and every subsequent Holder of a Note that evidences the same debt as the Note of the consenting Holder.

(b)    If an amendment, supplement or waiver changes the terms of a Note, the Trustee may require the Holder to deliver it to the Trustee so that the Trustee may place an appropriate notation of the changed terms on the Note and return it to the Holder, or exchange it for a new Note that reflects the changed terms.  The Trustee may also place an appropriate notation on any Note thereafter authenticated.  However, the effectiveness of the amendment, supplement or waiver is not affected by any failure to annotate or exchange Notes in this fashion.

Section 9.05.  *Trustee's Rights and Obligations*.   In signing any amendment, supplement or waiver, the Trustee is entitled to receive, and will be fully protected in relying upon, in addition to the documents required by Section 11.03, an Officer's Certificate and an Opinion of Counsel, each stating that the execution of any amendment, supplement or waiver is authorized or permitted by this Indenture.  If the Trustee has received such an Officer's Certificate and Opinion of Counsel, it shall sign the amendment, supplement or waiver so long as the same does not adversely affect the rights of the Trustee.  The Trustee may, but is not obligated to, execute any amendment, supplement or waiver that affects the Trustee's own rights, duties or immunities under this Indenture.

ARTICLE 10
NOTE GUARANTEES

Section 10.01. *Note Guarantees*.

(a)      Each Guarantor hereby jointly and severally, irrevocably and unconditionally Guarantees, as a primary obligor and not merely as a surety, to each Holder and to the Trustee and its successors and assigns (i) the full and punctual payment when due, whether by acceleration, by redemption or otherwise, of all obligations of the Issuer under this Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, interest on or liquidated damages, if any, in respect of the Notes and all other monetary obligations of the Issuer under this Indenture and the Notes and (ii) the full and punctual performance within applicable grace periods of all other obligations of the Issuer whether for fees, expenses, indemnification or otherwise under this Indenture and the Notes (all the foregoing being hereinafter collectively called the "**Guaranteed Obligations**").   Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from each such Guarantor, and that each such Guarantor shall remain bound under this Article 10 notwithstanding any extension or renewal of any Guaranteed Obligation.

(b)      Each Guarantor waives, to the fullest extent permitted by law, presentation to, demand of payment from and protest to the Issuer of any of the Guaranteed Obligations and also waives notice of protest for nonpayment.  Each Guarantor waives notice of any default under the Notes or the Guaranteed Obligations.  The obligations of each Guarantor hereunder shall not be affected by (i) the failure of any Holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Issuer or any other Person under this Indenture, the Notes or any other agreement or otherwise; (ii) any extension or renewal thereof; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any Holder or the Trustee for the Guaranteed Obligations or any of them; (v) the failure of any Holder or Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (vi) any change in the ownership of such Guarantor.

(c)      Each Guarantor hereby waives, to the fullest extent permitted by law, any right to which it may be entitled to have its obligations hereunder divided among the Guarantors, such that such Guarantor's obligations would be less than the full amount claimed.  Each Guarantor hereby waives, to the fullest extent permitted by law, any right to which it may be

entitled to have the assets of the Issuer first be used and depleted as payment of the Issuer's or such Guarantor's obligations hereunder prior to any amounts being claimed from or paid by such Guarantor hereunder.  Each Guarantor hereby waives any right to which it may be entitled to require that the Issuer be sued prior to an action being initiated against such Guarantor.  Each Guarantor hereby waives the benefits to which it is entitled under Articles 333, 827, 829, 830, 834, 835, 837, 838 and 839 of the Brazilian Civil Code, and Article 794 of the Brazilian Code of Civil Procedure.

(d)    Each Guarantor further agrees that its Note Guarantee herein constitutes a Guarantee of payment, performance and compliance when due (and not a Guarantee of collection) and waives any right to require that any resort be had by any Holder or the Trustee to any security held for payment of the Guaranteed Obligations.

(e)    Except as expressly set forth in Section 10.02 below, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise.  Without limiting the generality of the foregoing, the obligations of each Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of any Holder or the Trustee to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Guarantor or would otherwise operate as a discharge of any Guarantor as a matter of law or equity.

(f)    Each Guarantor agrees that its Note Guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations.  Each Guarantor further agrees that its Note Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest or liquidated damages, if any, on any Guaranteed Obligation is rescinded or must otherwise be restored by any Holder or the Trustee upon the bankruptcy or reorganization of the Issuer or otherwise.

(g)    In furtherance of the foregoing and not in limitation of any other right which any Holder or the Trustee has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Issuer to pay the principal of or interest or liquidated damages, if any, on any Guaranteed Obligation when and as the same shall become due, whether by acceleration, by redemption or otherwise, or to perform or comply with any other Guaranteed Obligation, each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the Paying Agent for the benefit of Holders or the Trustee an amount equal to the sum of (i) the unpaid principal amount of such Guaranteed Obligations, (ii) accrued and unpaid interest on such Guaranteed Obligations and (iii) all other monetary obligations of the Issuer to the Holders and the Trustee.

(h)    Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any Guaranteed Obligations Guaranteed hereby until

payment in full of all Guaranteed Obligations. Each Guarantor further agrees that, as between it, on the one hand, and the Holders and the Trustee, on the other hand, (i) the maturity of the Guaranteed Obligations Guaranteed hereby may be accelerated as provided in Article 6 for the purposes of any Note Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations Guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Guaranteed Obligations as provided in Article 6, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by such Guarantor for the purposes of this Section 10.01.

(i)     Each Guarantor also agrees to pay any and all reasonable and documented costs and expenses (including reasonable and documented attorneys' fees and expenses) incurred by the Trustee in enforcing any rights under this Section 10.01, except to the extent that any such costs or expenses arise as a result of the Trustee's own gross negligence or willful misconduct.

(j)     Upon request of the Trustee, each Guarantor shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture

Section 10.02. *Limitation on Liability*. Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations Guaranteed hereunder by any Guarantor shall not exceed the maximum amount that can be hereby Guaranteed without rendering this Indenture, as it relates to such Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

Section 10.03. *Successors and Assigns*. This Article 10 shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the successors and assigns of the Trustee and the Holders and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Notes and the Note Guarantees shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture.

Section 10.04. *No Waiver*. Neither a failure nor a delay on the part of either the Trustee or the Holders in exercising any right, power or privilege under this Article 10 shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege. The rights, remedies and benefits of the Trustee and the Holders herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which either may have under this Article 10 at law, in equity, by statute or otherwise.

Section 10.05. *Modification*. No modification, amendment or waiver of any provision of this Article 10, nor the consent to any departure by any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Trustee, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on any Guarantor in any case shall entitle such Guarantor to any other or further notice or demand in the same, similar or other circumstances.

Section 10.06. *Notation of Note Guarantee; Non-Impairment*. To evidence its Note Guarantee set forth in Section 10.01, each Guarantor agrees that a notation of such Note Guarantee (the "**Notation of Note Guarantee**") substantially in the form attached to this Indenture as Exhibit A shall be endorsed by at least one Officer of each Guarantor by manual, electronic or facsimile signature on each Note authenticated and delivered by the Trustee and this Indenture shall be executed on behalf of the Guarantors. Each of the Guarantors hereby agrees that its Note Guarantee set forth in Section 10.01 shall remain in full force and effect notwithstanding any failure to endorse on each Note a Notation of Note Guarantee. If an Officer whose signature is on this Indenture or on the Notation of Note Guarantee no longer holds that office at the time the Trustee authenticates the Note on which a Note Guarantee is endorsed, the Note Guarantee shall be valid nevertheless. The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Note Guarantee set forth in this Indenture on behalf of the Guarantors.

ARTICLE 11
MISCELLANEOUS

Section 11.01. *Noteholder Communications; Noteholder Actions*. (a) The rights of Holders to communicate with other Holders with respect to this Indenture or the Notes are as provided by the Trust Indenture Act, and the Issuer and the Trustee shall comply with the requirements of TIA Sections 312(a) and 312(b). Neither the Issuer nor the Trustee will be held accountable by reason of any disclosure of information as to names and addresses of Holders made pursuant to the Trust Indenture Act.

(b)    (i) Any request, demand, authorization, direction, notice, consent to amendment, supplement or waiver or other action provided by this Indenture to be given or taken by a Holder (an "act") may be evidenced by an instrument signed by the Holder delivered to the Responsible Office of the Trustee. The fact and date of the execution of the instrument, or the authority of the person executing it, may be proved in any manner that the Trustee deems sufficient.

(ii)    The Trustee may make reasonable rules for action by or at a meeting of Holders, which will be binding on all the Holders.

(c)    Any act by the Holder of any Note binds that Holder and every subsequent Holder of a Note that evidences the same debt as the Note of the acting Holder, even if no notation thereof appears on the Note. Subject to paragraph (d), a Holder may revoke an act as to its Notes, but only if the Responsible Officer of the Trustee receives the written notice of revocation before the earlier of (i) if applicable, the time the right to deliver an act expires, and (ii) the time the act becomes effective.

(d)    The Issuer may, but is not obligated to, fix a record date for the purpose of determining the Holders entitled to act with respect to any amendment or waiver or in any other regard. If a record date is fixed, those Persons that were Holders at such record date and only those Persons will be entitled to act, or to revoke any previous act, whether or not those Persons continue to be Holders after the record date.

63

(e)     If the Issuer shall solicit from the Holders any request, demand, authorization, direction, notice, consent, waiver or other act, the Issuer may, at its option, in or pursuant to a Board Resolution, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other act, but the Issuer shall have no obligation to do so.  Such record date shall be the record date specified in or pursuant to such Board Resolution, which shall be a date not earlier than the date 30 days prior to the first solicitation of Holders generally in connection therewith and not later than the date such solicitation is completed.  If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other act may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of Outstanding Notes have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other act, and for that purpose the Outstanding Notes shall be computed as of such record date; *provided* that no such authorization, agreement or consent by the Holders on such record date shall be deemed effective unless it shall become effective pursuant to the provisions of this Indenture not later than eleven months after the record date.

(f)     Any request, demand, authorization, direction, notice, consent, waiver or other act of the Holder of any Note shall bind every future Holder of a Note that evidences the same debt as the Note of the acting Holder issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

(g)     Every Holder, by receiving and holding a Note, agrees with the Issuer, the Guarantors, the Trustee and each Agent that none of the Issuer, the Guarantors, the Trustee or any Agent shall be held accountable by reason of the disclosure of any information as to the names and addresses of the Holders, regardless of the source from which such information was derived.

Section 11.02. *Notices*.  (a) Any notice or communication to the parties hereto will be deemed given if in English and in writing when delivered (i) in person, (ii) by an internationally recognized overnight courier service or (iii) by electronic mail with PDF attached and proof of receipt; provided that any notice to the Trustee will be effective only upon receipt by a Responsible Officer of the Trustee.  In each case the notice or communication should be addressed as follows:

*if to the Issuer or the Guarantors*:

Raizen Fuels Finance S.A.
16, Rue Eugène Ruppert, L-2453
Luxembourg, Grand Duchy of Luxembourg
Attention: Board of Directors of Raizen Fuels Finance S.A.
E-mail: Marina.Dalben@raizen.com / tesouraria.corp@raizen.com

*and*

Raízen S.A. and Raízen Energia S.A
Avenida Brigadeiro Faria Lima, 4100, 11th floor
04538-132
São Paulo – SP, Brazil
Attention: Marina Dalben
E-mail: Marina.Dalben@raizen.com / tesouraria.corp@raizen.com

With a copy to:

Simpson Thacher & Bartlett LLP
Av. Juscelino Kubitschek, 1455, 12th floor
São Paulo, SP 04543-011
Brazil
Attention: Grenfel G. Calheiros
E-mail: gcalheiros@stblaw.com

*if to the Trustee, Paying Agent, Registrar and Transfer Agent:*

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: Corporate Trust Administration

The Issuer, the Guarantors or the Trustee by notice to the others may designate additional or different addresses for subsequent notices or communications.

(b)     Except as otherwise expressly provided with respect to published notices, any notice or communication to a Holder of a Certificated Note will be deemed given when mailed to the Holder at its address as it appears on the Register by first class mail or, as to any Global Note registered in the name of the Depositary or its nominee, when given to the Depositary in accordance with its applicable procedures; *provided*, that, at any time when the Notes are listed on the Official List of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market and its rules so require, the Issuer will publish any such notice of communication sent to the Holders in a newspaper having a general circulation in Luxembourg, or alternatively, notice to Holders may be published on the website of the Luxembourg Stock Exchange at www.luxse.com. Such notice will be deemed given on the date of its first publication. Copies of any notice or communication to a Holder, if given by the Issuer, will be mailed to the Trustee and the Agents at the same time. Defect in mailing a notice or communication to any particular Holder will not affect its sufficiency with respect to other Holders.

(c)     Where this Indenture provides for notice, the notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and the waiver will be the equivalent of the notice. Waivers of notice by Holders must be filed with the Trustee, but such filing is not a condition precedent to the validity of any action taken in reliance upon such waivers.

65

(d)     The Trustee shall have the right to accept and act upon instructions, including funds transfer instructions ("**Instructions**") given pursuant to this Indenture and the Notes and delivered using the following communications methods: e-mail, facsimile transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another method or system specified by the Trustee as available for use in connection with its services hereunder (collectively, "**Electronic Means**"); provided, however, that each of the Issuer and the Guarantors shall provide to the Trustee an incumbency certificate listing officers with the authority to provide such Instructions ("**Authorized Signatories**") and containing specimen signatures of such Authorized Signatories, which incumbency certificate shall be amended by the Issuer and/or such Guarantor, as applicable, whenever a person is to be added or deleted from the listing. If the Issuer or any Guarantor, as applicable, elects to give the Trustee Instructions using Electronic Means and the Trustee in its discretion elects to act upon such Instructions, the Trustee's understanding of such Instructions shall be deemed controlling. Each of the Issuer and the Guarantors understands and agrees that the Trustee cannot determine the identity of the actual sender of such Instructions and that the Trustee shall conclusively presume that directions that purport to have been sent by an Authorized Signatory listed on the incumbency certificate provided to the Trustee have been sent by such Authorized Signatory. Each of the Issuer and the Guarantors shall be responsible for ensuring that only Authorized Signatories transmit such Instructions to the Trustee and that the Issuer and the Guarantors and all Authorized Signatories are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords and/or authentication keys upon receipt by the Issuer and any Guarantor, as applicable. The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction. Each of the Issuer and the Guarantors agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Issuer or such Guarantor, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee immediately upon learning of any compromise or unauthorized use of the security procedures.

Section 11.03. *Certificate and Opinion as to Conditions Precedent*. Upon any request or application by the Issuer or the Guarantors to the Trustee to take any action under this Indenture, the Issuer or the applicable Guarantor, as the case may be, will furnish to the Trustee:

(i)     an Officer's Certificate stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(ii)     an Opinion of Counsel stating that all such conditions precedent have been complied with.

66

Section 11.04. *Statements Required in Certificate or Opinion*. Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture must include:

      (i)    a statement that each person signing the certificate or opinion has read the covenant or condition and the related definitions;

      (ii)    a brief statement as to the nature and scope of the examination or investigation upon which the statement or opinion contained in the certificate or opinion is based;

      (iii)    a statement that, in the opinion of each such person, that person has made such examination or investigation as is necessary to enable the person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

      (iv)    a statement as to whether or not, in the opinion of each such person, such condition or covenant has been complied with, *provided* that an Opinion of Counsel may rely on an Officer's Certificate or certificates of public officials with respect to matters of fact.

Section 11.05. *Payment Date Other than a Business Day*. If any payment with respect to a payment of any principal of, premium, if any, or interest on any Note (including any payment to be made on any date fixed for redemption of any Note) is due on a day which is not a Business Day, then the payment need not be made on such date, but may be made on the next Business Day with the same force and effect as if made on such date, and no interest will accrue for the intervening period.

Section 11.06. *Governing Law*. This Indenture, the Notes and the Note Guarantees shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to its choice of law principles. For the avoidance of doubt, the application of the provisions set out in articles 470-1 to 470-19 (both included) of the Luxembourg Companies Law is excluded.

Section 11.07. *Submission to Jurisdiction; Agent for Service*. (a) Each of the Issuer and the Guarantors agrees that any suit, action or proceeding against it brought by any Noteholder or the Trustee arising out of or based upon this Indenture, the Notes or the Note Guarantees may be instituted in any state or Federal court in the Borough of Manhattan in The City of New York, New York, and irrevocably waives, to the extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submits to the non-exclusive jurisdiction of such courts in any suit, action or proceeding.

      (b)    By the execution and delivery of this Indenture or any amendment or supplement hereto, each of the Issuer and the Guarantors (i) acknowledges that it has designated and appointed Cogency Global Inc., currently located at 122 East 42nd Street, 18th Floor, New York, NY, 10168, as its authorized agent upon which process may be served in any suit, action or proceeding with respect to, arising out of, or relating to, the Notes, the Note Guarantees or this Indenture, that may be instituted in any Federal or state court in the State of

New York, The City of New York, the Borough of Manhattan, or brought under Federal or state securities laws or brought by the Trustee (whether in its individual capacity or in its capacity as Trustee hereunder), and acknowledges that Cogency Global Inc. has accepted such designation, (ii) submits to the non-exclusive jurisdiction of any such court in any such suit, action or proceeding, and (iii) agrees that service of process upon Cogency Global Inc. shall be deemed in every respect effective service of process upon the Issuer or such Guarantor, as the case may be, in any such suit, action or proceeding.  Each of the Issuer and the Guarantors further agrees to take any and all action, including the execution and filing of any and all such documents and instruments as may be necessary to continue such designation and appointment of Cogency Global Inc. in full force and effect so long as this Indenture shall be in full force and effect; *provided* that the Issuer and such Guarantor may and shall (to the extent Cogency Global Inc. ceases to be able to be served on the basis contemplated herein), by written notice to the Trustee, designate such additional or alternative agents for service of process under this Section 11.07 that (1) maintains an office located in the Borough of Manhattan, The City of New York in the State of New York, (2) are either (x) counsel for the Issuer or any Guarantor or (y) a corporate service company which acts as agent for service of process for other Persons in the ordinary course of its business and (3) agrees to act as agent for service of process in accordance with this Section 11.07.  Such notice shall identify the name of such agent for process and the address of such agent for process in the Borough of Manhattan, The City of New York, State of New York.  Upon the written request of any Noteholder, the Trustee shall deliver such information to such Noteholder.  Notwithstanding the foregoing, there shall, at all times, be at least one agent for service of process for the Issuer and each Guarantor appointed and acting in accordance with this Section 11.07.

Section 11.08. *Judgment Currency*.  U.S. Dollars are the sole currency of account and payment for all sums payable by the Issuer and the Guarantors under or in connection with the Notes, the Note Guarantees and this Indenture.  Any amount received or recovered in a currency other than U.S. Dollars in respect of the Notes, the Note Guarantees or this Indenture (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Issuer, the Guarantors, any of their respective Significant Subsidiaries or otherwise) by the Trustee or any Holder in respect of any sum expressed to be due to it from the Issuer or any Guarantor will constitute a discharge of the Issuer and the Guarantors only to the extent of the U.S. Dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that U.S. Dollar amount is less than the U.S. Dollar amount expressed to be due to the recipient under any Note, any Note Guarantee or this Indenture, the Issuer and the Guarantors, jointly and severally, will indemnify the recipient against the cost of making any such purchase; and if the amount of U.S. Dollars so purchased is greater than the sum originally due to such recipient, such recipient, if a Holder, will, by accepting a Note, and, if the Trustee, by executing this Indenture, be deemed to have agreed to repay such excess.  For purposes of this indemnity, it will be sufficient for the recipient to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had the actual purchase of U.S. dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. Dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above).

The above indemnity, to the extent permitted by law:

        (1)     constitutes a separate and independent obligation from the other obligations of the Issuer and the Guarantors;

        (2)     will give rise to a separate and independent cause of action;

        (3)     will apply irrespective of any waiver or indulgence granted by the Trustee or any Holder; and

        (4)     will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note or any other judgment.

Section 11.09. *No Adverse Interpretation of Other Agreements*.  This Indenture may not be used to interpret another indenture or loan or debt agreement of the Issuer, a Guarantor or any Subsidiary of the Issuer or Guarantor, and no such indenture or loan or debt agreement may be used to interpret this Indenture.

Section 11.10. *Successors*.  All agreements of the Issuer and each Guarantor in this Indenture, the Notes and the Note Guarantees will bind its successors.  All agreements of the Trustee in this Indenture will bind its successor.

Section 11.11. *Duplicate Originals*.  The parties may sign any number of copies of this Indenture.  This Indenture and any related documents, certificates, directions, notices or other instruments delivered pursuant to or in connection herewith may be executed in any number of counterparts, each of which so executed shall be an original, but all of them together represent the same agreement. Counterparts may be delivered via facsimile, electronic mail (including any electronic signature covered by the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act, the Electronic Signatures and Records Act or other applicable law, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and shall have the same validity, legal effect and admissibility in evidence as an original manual signature. Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any faxed, scanned, or photocopied manual signature, or other electronic signature, of any other party and shall have no duty to investigate, confirm or otherwise verify the validity or authenticity thereof. The exchange of copies of this Indenture and of signature pages in accordance with the foregoing sentence shall constitute effective execution and delivery of this Indenture as to the parties hereto.

Section 11.12. *Separability*.  In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 11.13. *Table of Contents and Headings*.  The Table of Contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and in no way modify or restrict any of the terms and provisions of this Indenture.

Section 11.14. *No Liability of Directors, Officers, Employees, Incorporators, Members and Stockholders*.  No past, present or future director, officer, employee, incorporator, member, partner or shareholder of the Issuer or any Guarantor or their respective Subsidiaries, as such, will have any liability for any obligations of the Issuer or any Guarantor under the Notes, the Note Guarantees or this Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.

Section 11.15. *Waiver of Jury Trial*.   EACH OF THE ISSUER, THE GUARANTORS, THE HOLDERS BY ACCEPTANCE OF THE NOTES AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE NOTE GUARANTEES OR THE TRANSACTION CONTEMPLATED HEREBY.

Section 11.16. *Tax Matters*.  Each of the Issuer, the Guarantors and the Trustee agrees (i) to cooperate and to provide the others with such reasonable information as each may have in its possession to enable the determination of whether any payments pursuant to this Indenture are subject to the withholding requirements described in Section 1471(b) of the Code or otherwise imposed pursuant to Sections 1471 through 1474 of the Code and any regulations, or agreements thereunder or official interpretations thereof ("**Applicable Law**"), and (ii) that the Trustee and each Paying Agent shall be entitled to make any withholding or deduction from payments under this Indenture to the extent necessary to comply with Applicable Law, for which the Trustee and such Paying Agent, as applicable, shall not have any liability.

Section 11.17. *USA Patriot Act.*  The parties hereto acknowledge that in accordance with Section 326 of the USA Patriot Act, the Trustee is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee.  The parties to this Indenture agree that they will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the USA Patriot Act.

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

**RAÍZEN FUELS FINANCE S.A.**
as Issuer

By: _____  _____
Name: Marina Daiben
Title:    Managing Director


By:_____
Name:
Title:

**RAÍZEN S.A.**
as Guarantor

By: _____
Name: Mariana Dalbem
Title:    Authorized Representative

By: _____
Name: Mariana de Oliveira
Title:    Authorized Representative

**RAÍZEN ENERGIA S.A.**
as Guarantor

By: _____
Name: Marina Daibell
Title:  Authorized Representative

By: _____
Name: Mariana de Oliveira
Title:  Authorized Representative

[*Signature Page to 12-Year Notes Indenture*]

**THE BANK OF NEW YORK MELLON**
as Trustee, Registrar, Paying Agent and Transfer
Agent

By: _____

Name:    Glenn J. kunak
Title:     Vice President

**EXHIBIT A**

**[FORM OF FACE OF NOTE]**

**RAIZEN FUELS FINANCE S.A.**

**6.700% Notes Due 2037**

[CUSIP] [ISIN] _____

No.                                                                US$  _____

      RAIZEN FUELS FINANCE S.A., a public limited liability company (*société anonyme*) organized and established under the laws of the Grand Duchy of Luxembourg, having its registered office at 16, Rue Eugène Ruppert, L-2453 Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*Registre de commerce et des sociétés, Luxembourg*) under number B184033, LEI 52990010NH26VC32Q522 (the "**Issuer**," which term includes any successor under the Indenture hereinafter referred to), for value received, promises to pay to _____, or its registered assigns, the principal sum of _____ DOLLARS (US$ _____) [or such other amount as indicated on the Schedule of Increases and Decreases in Global Note attached hereto] on February 25, 2037.

      Interest Rate: 6.700% per annum.

      Interest Payment Dates: February 25 and August 25 of each year, commencing on August 25, 2025.

      Regular Record Dates: February 20 and August 20 of each year (whether or not a Business Day).

      Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which will for all purposes have the same effect as if set forth at this place.

A-1

IN WITNESS WHEREOF, the Issuer has caused this Note to be signed manually, electronically or by facsimile by its duly authorized signatory.

RAIZEN FUELS FINANCE S.A.
as Issuer

By: _____
    Name:
    Title:

Trustee's Certificate of Authentication

This is one of the 6.700% Notes due 2037 described in the Indenture referred to in this Note.

The Bank of New York Mellon, as Trustee

By: _____
    Authorized Officer

Dated:

A-2

[FORM OF REVERSE SIDE OF NOTE]

**RAIZEN FUELS FINANCE S.A.**

**6.700% Notes Due 2037**

1.    *Principal and Interest.*

The Issuer promises to pay the principal of this Note on the Maturity Date.  The Issuer promises to pay interest on the principal amount of this Note on each Interest Payment Date, as set forth on the face of this Note at the rate of 6.700% per annum.   Interest will be payable semiannually (to the Holders of record of the Notes at the close of business on the February 20 or August 20 (whether or not a Business Day) immediately preceding the Interest Payment Date) on each Interest Payment Date, commencing on August 25, 2025.

Interest on this Note will accrue from the most recent date to which interest has been paid on this Note (or, if there is no existing Default in the payment of interest and if this Note is authenticated between a Regular Record Date and the next Interest Payment Date, from such Interest Payment Date) or, if no interest has been paid, from the Issue Date.  Interest will be computed in the basis of a 360 day year of twelve 30 day months. Any payments due on a day that is not a Business Day will be due on the immediately succeeding Business Day and no interest will accrue for the intervening period.

The Issuer will pay interest on overdue principal, premium, if any, and, to the extent lawful, interest at a rate per annum that is 1% per annum in excess of the rate per annum borne by this Note. Any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the second day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least two days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.

Additional Amounts will be paid in respect of any payments of interest or principal so that the amount a Holder receives after applicable deduction or withholding will equal the amount that the Holder would have received in the absence of such deduction or withholding, to the extent described in Section 3.01 of the Indenture.

2.    *Indentures; Note.*

This is one of the Notes issued under an Indenture dated as of February 25, 2025 (as amended or supplemented from time to time, the "**Indenture**"), among the Issuer, Raízen S.A. ("**Raízen**") and Raízen Energia S.A. ("**Raízen Energia**") as the Guarantors, and The Bank of New York Mellon, as Trustee, Registrar, Paying Agent and Transfer Agent.  Capitalized terms used herein are used as defined in the Indenture unless otherwise indicated.  The terms of the Notes include those stated in the Indenture, as may be amended from time to time.  The Notes are subject to all such terms, and Holders are referred to the Indenture for a statement of all such terms.  To

A-3

the extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture will control.

The Notes are general unsecured and unsubordinated obligations of the Issuer, ranking equally in right of payment with all existing and future unsecured unsubordinated obligations of the Issuer.  The Indenture limits the original aggregate principal amount of the Initial Notes to US$1,000,000,000, but Additional Notes may be issued pursuant to the Indenture, and the originally issued Notes and all such Additional Notes shall vote together for all purposes as a single series.

The Note Guarantees are unsecured unsubordinated obligations of Raízen and Raízen Energia, ranking equally in right of payment with all existing and future unsecured unsubordinated obligations of Raízen and Raízen Energia.

3.      *Redemption and Repurchase.*

The Note is subject to redemption for taxation reasons as described in Section 3.03 of the Indenture, redemption at the option of the Issuer or any Guarantor as described in Section 3.02 of the Indenture and redemption following a tender offer or Offer to Purchase as described in Section 3.04 of the Indenture.

The Note is subject to repurchase upon a Change of Control that results in a Rating Decline as described in Section 4.06 of the Indenture.

4.      *Registered Form; Denominations; Transfer; Exchange.*

The Notes are in registered form without coupons in minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof. A Holder may register the transfer or exchange of Notes in accordance with the Indenture. The Trustee may require a Holder to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.  Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to issue, register the transfer of or exchange any Note or certain portions of a Note.

5.      *Defaults and Remedies.*

If an Event of Default, as defined in the Indenture, occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the Outstanding Notes may declare all the Notes to be due and payable.  If a bankruptcy default with respect to the Issuer or a Guarantor occurs and is continuing, the Notes automatically become due and payable.  Holders may not enforce the Indenture or the Notes except as provided in the Indenture. The Trustee may require indemnity satisfactory to it before it enforces the Indenture or the Notes. Subject to certain limitations, Holders of a majority in principal amount of the Notes then Outstanding may direct the Trustee in its exercise of remedies.

6.      *Amendment and Waiver.*

A-4

Subject to certain exceptions, the Indenture and the Notes may be amended, or Default may be waived, with the consent of the Holders of a majority in principal amount of the Outstanding Notes.  Without notice to or the consent of any Holder, the Issuer, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Note Guarantees to, among other things, cure any ambiguity, omission, defect, inconsistency or to correct a manifest error if such amendment or supplement does not adversely affect the interests of the Holders in any material respect.

7.    *Authentication.*

This Note is not valid until the Trustee (or Authenticating Agent) signs the certificate of authentication on this Note.

8.    *Governing Law.*

This Note shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to its choice of law principles. Reference is hereby made to the further provisions of submission to jurisdiction, agent for service, waiver of immunities and judgment currency set forth in the Indenture, which will for all purposes have the same effect as if set forth herein.  For the avoidance of doubt, the application of the provisions set out in articles out in articles 470-1 to 470-19 (both included) of the Luxembourg Companies Law is excluded.

9.    *Abbreviations.*

Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian) and U/G/M/A/ (= Uniform Gifts to Minors Act).

The Issuer will furnish a copy of the Indenture to any Holder upon written request and without charge.

A-5

## FORM OF NOTATION OF NOTE GUARANTEE

For value received, each of the undersigned hereby unconditionally Guarantees the cash payments in U.S. Dollars of principal and interest on this Note (and including Additional Amounts payable thereon, if any) in the amounts and at the times when due, together with interest on the overdue principal and interest, if any, on this Note, if lawful, and the payment of all other obligations of the Issuer under the Indenture or the Notes, to the Holder of this Note and the Trustee, all in accordance with and subject to the terms and conditions of this Note and the Indenture.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture, dated as of February 25, 2025 among Raizen Fuels Finance S.A., as the Issuer, Raízen S.A. and Raízen Energia S.A. as the Guarantors, and The Bank of New York Mellon, as Trustee, Registrar, Paying Agent and Transfer Agent.

The obligations of the undersigned to the Holders and to the Trustee are expressly set forth in Article 10 of the Indenture.  This Note Guarantee constitutes a direct, general and unconditional obligation of the undersigned which will at all times rank at least pari passu with all other present and future senior unsecured obligations of the undersigned, except for such obligations as may be preferred by mandatory provisions of law.

IN WITNESS WHEREOF, the undersigned have caused this Notation of Note Guarantee with respect to the 6.700% Notes due 2037 of Raizen Fuels Finance S.A. to be duly executed.

A-6

Dated: [        ]

RAÍZEN S.A. as Guarantor

By:     _____
        Name:
        Title:


By:     _____
        Name:
        Title:


RAÍZEN ENERGIA S.A. as Guarantor

By:     _____
        Name:
        Title:


By:     _____
        Name:
        Title:

A-7

[FORM OF TRANSFER NOTICE]

FOR VALUE RECEIVED the undersigned registered Holder hereby sell(s), assign(s) and transfer(s) unto

Insert Taxpayer Identification No.

_____

_____

Please print or typewrite name and address including zip code of assignee

_____

the within Note and all rights thereunder, hereby irrevocably constituting and appointing

_____

attorney to transfer said Note on the books of the Issuer with full power of substitution in the premises.

A-8

[THE FOLLOWING PROVISION TO BE INCLUDED ON ALL CERTIFICATES
BEARING A RESTRICTED LEGEND OR REGULATION S LEGEND]

In connection with any transfer of this Note occurring prior to the removal of the [Restricted Legend / Regulation S Legend], the undersigned confirms that such transfer is made without utilizing any general solicitation or general advertising and further as follows:

*Check One*

☐ (1) This Note is being transferred to a "qualified institutional buyer" in compliance with Rule 144A under the U.S. Securities Act of 1933, as amended, and certification in the form of Exhibit E to the Indenture is being furnished herewith.

☐ (2) This Note is being transferred to a Non-U.S. Person in compliance with the exemption from registration under the U.S. Securities Act of 1933, as amended, provided by Regulation S thereunder, and certification in the form of Exhibit D to the Indenture is being furnished herewith.

or

☐ (3) This Note is being transferred other than in accordance with (1) or (2) above and documents are being furnished which comply with the conditions of transfer set forth in this Note and the Indenture.

If none of the foregoing boxes is checked, the Trustee is not obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in the Indenture have been satisfied.

Date:

_____
Seller

By: _____

NOTICE: The signature to this assignment must correspond with the name as written upon the face of the within mentioned instrument in every particular, without alteration or any change whatsoever.

A-9

Signature Guarantee:[1]

By: _____

To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

OPTION OF HOLDER TO ELECT PURCHASE

If you wish to have all of this Note purchased by the Issuer, a Guarantor or a Designated Affiliate, as applicable, pursuant to Section 4.06 of the Indenture, check the box: ☐

If you wish to have a portion of this Note purchased by the Issuer, a Guarantor or a Designated Affiliate, as applicable, pursuant to Section 4.06 of the Indenture, state the amount (in original principal amount) below:

US$_____.

Date:_____

Your Signature:_____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee[1]: _____

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Trustee, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Trustee in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

A-11

SCHEDULE OF INCREASES AND DECREASES IN GLOBAL NOTE[1]

The following increases and decreases in the aggregate principal amount of this Global Note have been made:

| Date of Increase or Decrease | Amount of decrease in original principal amount of this Global Note | Amount of increase in original principal amount of this Global Note | Original principal amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

---

[1] For Global Notes.

A-12

**EXHIBIT B-1**

RESTRICTED LEGEND

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES FOR THE BENEFIT OF THE ISSUER AND THE GUARANTORS THAT THIS NOTE OR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (1) TO THE ISSUER OR THE GUARANTORS, (2) SO LONG AS THIS NOTE IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A) IN ACCORDANCE WITH RULE 144A, (3) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT, (4) PURSUANT TO ANOTHER APPLICABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE) OR (5) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, AND IN EACH OF SUCH CASES IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. AS A CONDITION TO THE REGISTRATION OF TRANSFER OF THIS NOTE PURSUANT TO CLAUSE (4) ABOVE, THE ISSUER, THE GUARANTORS OR THE TRUSTEE MAY REQUIRE DELIVERY OF ANY DOCUMENTATION OR OTHER EVIDENCE THAT IT, IN ITS SOLE DISCRETION, DEEMS NECESSARY OR APPROPRIATE TO EVIDENCE COMPLIANCE WITH THE EXEMPTION REFERRED TO IN SUCH CLAUSE (4) AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, REPRESENTS AND AGREES THAT IT SHALL NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO ABOVE.

THIS LEGEND MAY BE REMOVED SOLELY IN THE DISCRETION AND AT THE DIRECTION OF THE ISSUER OR THE GUARANTORS.

**EXHIBIT B-2**

REGULATION S LEGEND

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER THIS NOTE, PRIOR TO THE DATE THAT IS 40 DAYS AFTER THE LATER OF (1) THE ORIGINAL ISSUE DATE HEREOF AND (2) THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF THIS NOTE), ONLY (A) TO THE ISSUER, (B) UNDER A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE NOTES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER QUALIFIED INSTITUTIONAL BUYER AND TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) THROUGH OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES IN RELIANCE UPON REGULATION S OR (E) UNDER ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUER'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR OTHER TRANSFER PURSUANT TO CLAUSE (E) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, A CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO THE ISSUER.

**EXHIBIT C**

DTC LEGEND

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS A BENEFICIAL INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE ARE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF CEDE & CO. OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL NOTE ARE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE TRANSFER PROVISIONS OF THE INDENTURE.

**EXHIBIT D**

Regulation S Certificate

_____, _____

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: Corporate Trust Administration

Re:    RAIZEN FUELS FINANCE S.A., as issuer (the "**Issuer**")
        6.700% Notes due 2037

Ladies and Gentlemen:

Reference is hereby made to the indenture dated as of February 25, 2025 (the "**Indenture**"), among the Issuer, Raízen S.A. and Raízen Energia S.A., as guarantors, and The Bank of New York Mellon, as trustee (the "**Trustee**"), registrar, transfer agent and paying agent. Terms used in this Certificate shall have the meaning set forth in the Indenture or Regulation S ("**Regulation S**") under the Securities Act of 1933, as amended (the "**Securities Act**"), except as otherwise stated herein.

[*CHECK A OR B AS APPLICABLE*.]

☐  A.  This Certificate relates to our proposed transfer of US$_____ principal amount of the Issuer's 6.700%Notes due 2037 (the "**Notes**") represented by a U.S. Global Note (CUSIP: 75102X AE6) for an equal beneficial interest in the Offshore Global Note (CUSIP: L7909C AG2).  We hereby certify as follows:

1.    The offer and sale of the Notes was not and will not be made to a person in the United States (unless such person is excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(vi) or the account held by it for which it is acting is excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(i) under the circumstances described in Rule 902(h)(3)) and such offer and sale was not and will not be specifically targeted at an identifiable group of U.S. citizens abroad.

2.    Unless the circumstances described in the parenthetical in paragraph 1 above are applicable, either (a) at the time the buy order was originated, the buyer was outside the United States or we and any person acting on our behalf reasonably believed that the buyer was outside the United States or (b) the transaction was executed in, on or through the facilities of a designated offshore securities market, and neither we nor any person acting on our behalf knows that the transaction was pre-arranged with a buyer in the United States;

D-1

3.      Neither we, any of our affiliates, nor any person acting on our or their behalf, has made any directed selling efforts in the United States with respect to the Notes;

4.      The proposed transfer of Notes is not part of a plan or scheme to evade the registration requirements of the Securities Act; and

5.      If we are a dealer or a person receiving a selling concession, fee or other remuneration in respect of the Notes, and the proposed transfer takes place during the first 40 days following the issue date of such Notes, or we are an officer or director of the Issuer or an Initial Purchaser (as defined in the Indenture), we certify that the proposed transfer is being made in accordance with the provisions of Rule 904(b) of Regulation S.

☐ B.    This Certificate relates to our proposed exchange of US$____ principal amount of the Issuer's 6.700% Notes due 2037 (the "**Notes**") represented by a U.S. Global Note (CUSIP: 75102X AE6) for an equal beneficial interest in the Offshore Global Note (CUSIP: L7909C AG2).  We hereby certify as follows:

1.      At the time the offer and sale of the Notes was made to us, either (i) we were not in the United States or (ii) we were excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(vi) or the account held by us for which we were acting was excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(i) under the circumstances described in Rule 902(h)(3); and we were not a member of an identifiable group of U.S. citizens abroad;

2.      Unless the circumstances described in paragraph 1(ii) above are applicable, either (a) at the time our buy order was originated, we were outside the United States or (b) the transaction was executed in, on or through the facilities of a designated offshore securities market, and we did not pre-arrange the transaction in the United States.; and

3.      The proposed exchange of Notes is not part of a plan or scheme to evade the registration requirements of the Securities Act.

You and the Issuer are entitled to rely conclusively upon this Certificate and are irrevocably authorized to produce this Certificate or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

D-2

Very truly yours,

[NAME OF SELLER (FOR TRANSFERS) OR
OWNER (FOR EXCHANGES)]

By:   _____
       Name:
       Title:
       Address

Date:   _____

Signature Guarantee:[1]

By:     _____
        To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

D-4

EXECUTION VERSION

**EXHIBIT E**

Rule 144A Certificate

_____, _____

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: Corporate Trust Administration

Re:    RAIZEN FUELS FINANCE S.A., as issuer (the "**Issuer**")
       6.700% Notes due 2037

Ladies and Gentlemen:

Reference is hereby made to the indenture dated as of February 25, 2025 (the "**Indenture**"), among the Issuer, Raízen S.A. and Raízen Energia S.A., as guarantors, and The Bank of New York Mellon, as trustee (the "**Trustee**"), registrar, transfer agent and paying agent. Terms used in this Certificate shall have the meaning set forth in the Indenture or Rule 144A ("**Rule 144A**") under the Securities Act of 1933, as amended (the "**Securities Act**"), except as otherwise stated herein.

**[*CHECK A OR B AS APPLICABLE.*]**

☐ A.    This Certificate relates to our proposed transfer of US$____ principal amount of the Issuer's 6.700%Notes due 2037 (the "**Notes**") represented by an Offshore Global Note (CUSIP:  L7909C AG2) for an equal beneficial interest in the U.S. Global Note (CUSIP:  75102X AE6).  We hereby certify as follows:

☐ B.    This Certificate relates to our proposed exchange of US$____ principal amount of the Issuer's 6.700% Notes due 2037 (the "**Notes**") represented by an Offshore Global Note (CUSIP:  L7909C AG2) for an equal beneficial interest in the U.S. Global Note (CUSIP:  75102X AE6).  We hereby certify as follows:

We and, if applicable, each account for which we are acting in the aggregate owned and invested more than US$____ in securities of issuers that are not affiliated with us (or such accounts, if applicable), as of _____, 20__, which is a date on or since close of our most recent fiscal year.  We and, if applicable, each account for which we are acting, are a qualified institutional buyer within the meaning of Rule 144A.  If we are acting on behalf of an account, we exercise sole investment discretion with respect to such account.  We are aware that the transfer of Notes to us, or such exchange, as applicable, is being in reliance upon the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A.  Prior to the date of this Certificate we have received such information regarding the Issuer as we have requested pursuant

E-1

to Rule 144A(d)(4) to the extent that the Issuer is not then subject to Section 13 or 15(d) of the Exchange Act, or is not exempt from reporting pursuant to Rule 12g3 2(b) under the Exchange Act or have determined not to request such information.

You and the Issuer are entitled to conclusively rely upon this Certificate and are irrevocably authorized to produce this Certificate or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

Very truly yours,

[NAME OF SELLER (FOR TRANSFERS) OR OWNER (FOR EXCHANGES)]

By: _____
    Name:
    Title:
    Address:

Date: _____

E-2

Signature Guarantee:[1]

By: _____

To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

# EXHIBIT I

## 2054 Notes Indenture

*EXECUTED VERSION*

**RAIZEN FUELS FINANCE S.A.**
**as Issuer**

**RAÍZEN S.A.**
**and**
**RAÍZEN ENERGIA S.A.**
**as Guarantors**

**and**

**THE BANK OF NEW YORK MELLON**
**as Trustee, Registrar, Paying Agent and Transfer Agent**

———————————————

**Indenture**

**Dated as of March 5, 2024**

———————————————

**6.950% Green Notes Due 2054**
**Unconditionally and Irrevocably Guaranteed by**
**Raízen S.A. and Raízen Energia S.A.**

## TABLE OF CONTENTS

**PAGE**

ARTICLE 1 DEFINITIONS AND INCORPORATION BY REFERENCE ................................ 1

Section 1.01.   Definitions ........................................................................... 1
Section 1.02.   Rules of Construction .......................................................... 15

ARTICLE 2 THE NOTES ...................................................................................... 15

Section 2.01.   Form, Dating and Denominations; Legends ........................... 15
Section 2.02.   Execution and Authentication; Additional Notes ................... 16
Section 2.03.   Registrar, Paying Agent, Transfer Agent and Authenticating Agent;
                Paying Agent to Hold Money in Trust ................................... 17
Section 2.04.   Replacement Notes ............................................................. 18
Section 2.05.   Outstanding Notes .............................................................. 18
Section 2.06.   Temporary Notes ................................................................ 19
Section 2.07.   Cancellation ...................................................................... 19
Section 2.08.   CUSIP and ISIN Numbers ................................................... 19
Section 2.09.   Registration, Transfer and Exchange .................................... 19
Section 2.10.   Restrictions on Transfer and Exchange ................................. 22
Section 2.11.   Open Market Purchases ...................................................... 24
Section 2.12.   Trustee's Disclaimer .......................................................... 24

ARTICLE 3 ADDITIONAL AMOUNTS; REDEMPTION ............................................. 24

Section 3.01.   Additional Amounts ............................................................ 24
Section 3.02.   Optional Redemption .......................................................... 27
Section 3.03.   Redemption for Taxation Reasons ........................................ 28
Section 3.04.   Redemption Following Tender Offer ...................................... 28
Section 3.05.   Election to Redeem; Selection of Notes ................................. 29
Section 3.06.   Notice of Redemption ......................................................... 29
Section 3.07.   Deposit of Redemption Price ............................................... 31
Section 3.08.   Effect of Notice of Redemption ........................................... 31

ARTICLE 4 COVENANTS ..................................................................................... 31

Section 4.01.   Payment of Notes ............................................................... 31
Section 4.02.   Maintenance of Office or Agency ......................................... 32
Section 4.03.   Existence ........................................................................... 33
Section 4.04.   Payment of Taxes ............................................................... 33
Section 4.05.   Maintenance of Properties ................................................... 33
Section 4.06.   Repurchases at the Option of the Holders Upon Change of Control ....... 33
Section 4.07.   Limitation on Liens ............................................................. 36
Section 4.08.   Reporting Requirements ...................................................... 36
Section 4.09.   Disclosure of Names and Addresses of Holders ...................... 37
Section 4.10.   Paying Agent and Transfer Agent ......................................... 37

i

*Section 4.11.   Limitation on Issuer.* ................................................................ *38*

ARTICLE 5 CONSOLIDATION, MERGER OR SALE OF ASSETS ...................................... 38

*Section 5.01.   Consolidation, Merger or Sale of Assets* .................................... *38*

ARTICLE 6 DEFAULT AND REMEDIES ........................................................................... 39

*Section 6.01.   Events of Default* ...................................................................... *39*
*Section 6.02.   Acceleration* .............................................................................. *40*
*Section 6.03.   Other Remedies* ......................................................................... *41*
*Section 6.04.   Waiver of Past Defaults* ............................................................ *41*
*Section 6.05.   Control by Majority* .................................................................. *41*
*Section 6.06.   Limitation on Suits* .................................................................... *42*
*Section 6.07.   Rights of Holders to Receive Payment* ....................................... *42*
*Section 6.08.   Collection Suit by Trustee* ......................................................... *42*
*Section 6.09.   Trustee May File Proofs of Claim* .............................................. *42*
*Section 6.10.   Priorities* ................................................................................... *43*
*Section 6.11.   Restoration of Rights and Remedies* .......................................... *43*
*Section 6.12.   Undertaking for Costs* ............................................................... *43*
*Section 6.13.   Rights and Remedies Cumulative.* .............................................. *44*
*Section 6.14.   Delay or Omission Not Waiver; Prescription of Claims* ............. *44*
*Section 6.15.   Waiver of Stay, Extension or Usury Laws* .................................. *44*

ARTICLE 7 THE TRUSTEE ............................................................................................. 44

*Section 7.01.   General* ..................................................................................... *44*
*Section 7.02.   Certain Rights of Trustee* .......................................................... *45*
*Section 7.03.   Individual Rights of Trustee* ...................................................... *47*
*Section 7.04.   Trust Indenture Act* ................................................................... *47*
*Section 7.05.   Trustee's Disclaimer* ................................................................. *47*
*Section 7.06.   Notice of Default* ....................................................................... *48*
*Section 7.07.   Compensation and Indemnity* ..................................................... *48*
*Section 7.08.   Replacement of Trustee.* ............................................................. *49*
*Section 7.09.   Successor Trustee by Merger* ..................................................... *50*
*Section 7.10.   Money Held in Trust* .................................................................. *50*
*Section 7.11.   Force Majeure* ........................................................................... *50*
*Section 7.12.   Corporate Trustee Required; Eligibility; Conflicting Interests* ... *50*
*Section 7.13.   Trustee and Others May Hold Notes* ........................................... *50*
*Section 7.14.   Agents.* ...................................................................................... *51*

ARTICLE 8 DEFEASANCE AND DISCHARGE ................................................................. 53

*Section 8.01.   Discharge of Issuer's Obligations* ............................................. *53*
*Section 8.02.   Legal Defeasance* ...................................................................... *54*
*Section 8.03.   Covenant Defeasance.* ................................................................ *54*
*Section 8.04.   Application of Trust Money* ....................................................... *55*

ii

*Section 8.05.*    *Repayment to Issuer* ................................................................. 55
*Section 8.06.*    *Reinstatement* ............................................................................ 55

ARTICLE 9 AMENDMENTS, SUPPLEMENTS AND WAIVERS ........................................... 56

*Section 9.01.*    *Amendments Without Consent of Holders* ............................... 56
*Section 9.02.*    *Amendments With Consent of Holders* ..................................... 56
*Section 9.03.*    *Substitution of the Issuer* ......................................................... 57
*Section 9.04.*    *Effect of Consent* ...................................................................... 59
*Section 9.05.*    *Trustee's Rights and Obligations* .............................................. 60

ARTICLE 10 NOTE GUARANTEES ............................................................................. 60

*Section 10.01. Note Guarantees* ...................................................................... 60
*Section 10.02. Limitation on Liability* ............................................................ 62
*Section 10.03. Successors and Assigns* ........................................................... 62
*Section 10.04. No Waiver* ............................................................................... 62
*Section 10.05. Modification* ............................................................................ 62
*Section 10.06. Notation of Note Guarantee; Non-Impairment* ....................... 63

ARTICLE 11 MISCELLANEOUS ................................................................................. 63

*Section 11.01. Noteholder Communications; Noteholder Actions* ................... 63
*Section 11.02. Notices* ..................................................................................... 64
*Section 11.03. Certificate and Opinion as to Conditions Precedent* ............... 66
*Section 11.04. Statements Required in Certificate or Opinion* ....................... 67
*Section 11.05. Payment Date Other than a Business Day* ............................... 67
*Section 11.06. Governing Law* ........................................................................ 67
*Section 11.07. Submission to Jurisdiction; Agent for Service* ........................ 67
*Section 11.08. Judgment Currency* ................................................................. 68
*Section 11.09. No Adverse Interpretation of Other Agreements* ..................... 69
*Section 11.10. Successors* ............................................................................... 69
*Section 11.11. Duplicate Originals* ................................................................. 69
*Section 11.12. Separability* ............................................................................. 69
*Section 11.13. Table of Contents and Headings* ............................................. 69
*Section 11.14. No Liability of Directors, Officers, Employees, Incorporators,
                Members and Stockholders* ..................................................... 70
*Section 11.15. Waiver of Jury Trial* ............................................................... 70
*Section 11.16. Tax Matters* ............................................................................ 70
*Section 11.17. USA Patriot Act* ...................................................................... 70

<u>EXHIBITS</u>

EXHIBIT A Form of Note ...................................................................................................... A-1

EXHIBIT B Restricted Legend...............................................................................................B-1

EXHIBIT C DTC Legend.......................................................................................................C-1

EXHIBIT D Regulation S Certificate ................................................................................... D-1

EXHIBIT E Rule 144A Certificate.........................................................................................E-1

INDENTURE, dated as of March 5, 2024, between RAIZEN FUELS FINANCE S.A., a public limited liability company (*société anonyme*) organized and existing under the laws of Luxembourg, having its registered office at 16, Rue Eugène Ruppert, L-2453 Luxembourg, and registered with the Luxembourg Register of Commerce and Companies (*Registre de commerce et des sociétés, Luxembourg*) under number B184033, LEI 52990010NH26VC32Q522, as the issuer (the "**Issuer**"), RAÍZEN S.A. ("**Raízen**") and RAÍZEN ENERGIA S.A. ("**Raízen Energia**") as the Guarantors, and THE BANK OF NEW YORK MELLON as Trustee, Registrar, Paying Agent and Transfer Agent.

## RECITALS

The Issuer has duly authorized the execution and delivery of this Indenture to provide for the issuance of the Issuer's 6.950% Green Notes due 2054 (the "**Notes**"). All things necessary to make this Indenture a valid and binding agreement of the Issuer, in accordance with its terms, have been done, and the Issuer has done all things necessary to make the Notes (in the case of the Additional Notes, when duly authorized), when executed by the Issuer and authenticated and delivered by the Trustee and duly issued by the Issuer, the valid obligations of the Issuer as hereinafter provided.

In addition, each of the Guarantors has duly authorized the execution and delivery of this Indenture as Guarantor. All things necessary to make this Indenture a valid and binding agreement of the Guarantors, in accordance with its terms, have been done, and each Guarantor has done all things necessary to make its Note Guarantee, when the Notes are executed by the Issuer and authenticated and delivered by the Trustee and duly issued by the Issuer, the valid, legal and binding obligation of such Guarantor.

## WITNESSETH

For and in consideration of the premises and the purchase of the Notes by the Holders thereof, the parties hereto covenant and agree, for the equal and proportionate benefit of all Holders, as follows:

## ARTICLE 1
## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01.  *Definitions*.

"**Additional Amounts**" has the meaning assigned to such term in Section 3.01(a).

"**Additional Notes**" means the Issuer's 6.950% Green Notes due 2054 (other than the Initial Notes) issued after the Issue Date in accordance with Section 2.02 hereof, as part of the same series as the Initial Notes.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" (including the terms "controlling," "controlled by" and "under common control with") as to any Person shall mean the possession, directly or indirectly, of the power to direct or cause

the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by contract or otherwise.

"**Agent**" means any Registrar, Paying Agent, Transfer Agent, Authenticating Agent or other agent hereunder, as duly appointed by the Issuer (or by the Trustee in the case of the Authenticating Agent).

"**Agent Member**" means a member of, or a participant in, the Depositary.

"**Applicable GAAP**" means, with respect to the Issuer or any Guarantor, either (i) generally accepted accounting principles in the jurisdiction where such Issuer or Guarantor is organized or incorporated or (ii) International Financial Reporting Standards (IFRS) issued by the International Accounting Standards Board (IASB) and related interpretations, in each case, as in effect from time to time.

"**Applicable Law**" has the meaning assigned to such term in Section 11.16.

"**Authenticating Agent**" refers to the Trustee's designee for authentication of the Notes.

"**Authentication Order**" has the meaning assigned to such term in Section 2.02(c).

"**Authorized Signatories**" has the meaning assigned to such term in Section 11.02.

"**bankruptcy default**" means the Events of Default set forth in Section 6.01(a)(v) and/or (vi).

"**Board of Directors**" means the board of directors or comparable governing body of the Issuer or any Guarantor, as applicable, or any committee thereof duly authorized to act on its behalf.

"**Board Resolution**" means a resolution duly adopted by the Board of Directors, which is certified by the Secretary, Assistant Secretary, a director or another Person performing corporate secretarial functions of the Issuer or a Guarantor, as applicable, and remains in full force and effect as of the date of its certification.

"**Brazil'**" means the Federative Republic of Brazil.

"**Business Day**" means any day other than a Saturday, a Sunday or a legal holiday or a day on which banking institutions or trust companies are authorized or obligated by law to close in The City of New York, Luxembourg or São Paulo, Brazil.

"**Capital Stock**" means, as to any Person, any and all shares, interests, participations, quotas or other equivalents (however designated, whether voting or non-voting) of capital stock or equity interest in such Person, and any and all warrants or rights or options to purchase any of the foregoing, but excluding any debt securities convertible into or exchangeable for any of the foregoing.

"**Central Bank**" means the Central Bank of Brazil (*Banco Central do Brasil*).

2

"**Certificated Note**" means a Note in registered, individual, non-global form without interest coupons.

"**Change of Control**" means an event as a result of which (1) any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), other than one or more Permitted Holders or a group that includes one or more Permitted Holders in which such Permitted Holder or Permitted Holders hold and have voting power over at least a majority of the Voting Stock of Raízen held by such group, becomes the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act) of more than 50% of the total voting power of the Voting Stock of Raízen; or (2) Permitted Holders, directly or indirectly, cease to have the power to direct or cause the direction of the management and policies of Raízen, whether through the ownership of voting securities, by contract or otherwise.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Consolidated Net Worth**" means the total shareholders' equity (including both controlling and non-controlling interests) of Raízen and its Subsidiaries determined on a consolidated basis in accordance with Applicable GAAP.

"**Corporate Trust Office**" means the office of the Trustee at which the corporate trust business of the Trustee is administered, which at the date of this Indenture is located at 240 Greenwich Street, 7th Floor East, New York, New York 10286, Attention: Corporate Trust Administration, or such other address as the Trustee may designate from time to time by notice to the Holders and the Issuer, or the principal corporate trust office of any successor Trustee.

"**Debt**" means, with respect to any Person, without duplication:

(1)      all indebtedness of such Person for borrowed money;

(2)      all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (but excluding trade accounts payable or other short-term obligations to suppliers or customers payable within 360 days, in each case arising in the ordinary course of business);

(3)      all obligations, contingent or otherwise, of such Person in respect of acceptances, letters of credit, financial guaranty insurance policies or similar extensions of credit (excluding (i) trade payables and (ii) other obligations with respect to letters of credit securing obligations (other than obligations described in clauses (1) and (2) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit);

(4)      all obligations of such Person under Hedging Agreements; and

(5)      all Debt of other Persons referred to in clauses (1) through (4) above that is Guaranteed by such Person's Guarantee (other than obligations of other Persons that are customers or suppliers of such Person for which such Person is or becomes so responsible

3

or liable in the ordinary course of business to (but only to) the extent that such Person does not, or is not required to, make payment in respect thereof);

if and to the extent any of the preceding items (other than Guarantees, letters of credit and Hedging Agreements) would appear as a liability upon the balance sheet of the specified Person in accordance with Applicable GAAP; it being understood that leases in effect on the Issue Date that are deemed operating leases under IFRS 16 – Leases will not be deemed "Debt."

The amount of Debt of any Person will be deemed to be:

(1)   with respect to a revolving credit or similar facility, the total amounts of funds borrowed and then outstanding;

(2)   with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation;

(3)   with respect to any Debt issued with original issue discount, the face amount of such Debt less the remaining unamortized portion of the original issue discount of such Debt;

(4)   with respect to any Hedging Agreement, the net amount payable if such Hedging Agreement terminated at that time due to default by such Person reasonably determined by the Issuer on the basis of customary "marked-to-market" methodology; and

(5)   otherwise, the outstanding principal amount thereof.

The principal amount of any Debt or other obligation that is denominated in any currency other than United States dollars (after giving effect to any Hedging Agreement in respect thereof) shall be the amount thereof, as determined pursuant to the foregoing sentence, converted into United States dollars at the Spot Rate in effect on the date of determination.

"**Default**" means an event or condition which upon notice, lapse of time or both would become an Event of Default.

"**Depositary**" means the depositary of each Global Note, which will initially be DTC.

"**Designated Affiliate**" means, at any time, one or more Persons (including, without limitation, a Guarantor) designated by the Issuer to be the purchaser of Notes under an Offer to Purchase.

"**Dollars**" means United States Dollars in immediately available funds.

"**DTC**" means The Depository Trust Company, a New York corporation, and its successors.

"**DTC Legend**" means the legend set forth in Exhibit C.

4

"**Electronic Means**" has the meaning assigned to such term in Section 11.02.

"**Event of Default**" has the meaning assigned to such term in Section 6.01.

"**Excess Additional Amounts**" has the meaning assigned to such term in Section 3.03.

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Expiration Date**" has the meaning assigned to such term in Section 4.06(a)(v).

"**FATCA**" has the meaning assigned to such term in Section 3.01(a)(ix)

"**Fitch**" means Fitch Ratings, Inc., and any successor to its rating agency business.

"**Global Note**" means a Note in registered global form without interest coupons registered in the name of the Depositary (or its nominee) as depositary for the beneficial owners thereof.

"**Guarantee**" means any obligation of a Person to pay the Debt of another Person, including without limitation:

(1)     an obligation to pay or purchase such Debt;

(2)     an obligation to lend money or to purchase or subscribe shares or other securities or to purchase assets or services in order to provide funds for the payment of such Debt; or

(3)     any other agreement to be responsible for such Debt;

*provided, however,* that the term "**Guarantee**" shall not include endorsements for collection or deposit in the ordinary course of business. The term "**Guarantee**" used as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning assigned to such term in Section 10.01(a).

"**Guarantor**" means each of (i) Raízen, (ii) Raízen Energia, and (iii) any other Person Guaranteeing the Issuer's obligations under the Notes and this Indenture.

"**Hedging Agreement**" means, with respect to any Person, all net obligations of such Person in respect of any interest rate protection agreement, any currency or commodity swap, cap or collar agreement, any equity swap or any similar arrangement entered into by such Person providing for the transfer or mitigation of interest rate, currency, commodity price or equity risks either generally or under specific contingencies (but without regard to any notional principal amount relating thereto).

"**Holder**" or "**Noteholder**" means the Person in whose name a Note is registered in the Register maintained by the Registrar.

"**Indenture**" means this indenture, as amended or supplemented from time to time.

"**Initial Notes**" means the US$500,000,000 aggregate principal amount of Notes issued on the date hereof.

"**Initial Purchaser**" or "**Initial Purchasers**" means any initial purchaser or initial purchasers party to a purchase agreement with the Issuer relating to the sale of the Notes or Additional Notes by the Issuer.

"**Instructions**" has the meaning assigned to such term in Section 11.02.

"**Interest Payment Date**" means each March 5 and September 5 of each year, commencing on September 5, 2024.

"**Investment Grade**" means BBB- or higher by S&P, Baa3 or higher by Moody's or BBB- or higher by Fitch, or the equivalent of such global ratings by S&P, Moody's or Fitch.

"**Issue Date**" means the date on which the Notes are originally issued under this Indenture.

"**Issuer**" means the party named as such in the first paragraph of this Indenture or any successor obligor under this Indenture and the Notes pursuant to Sections 5.01 and Section 9.03.

"**Lien**" means, with respect to any Property, any mortgage, pledge, usufruct, fiduciary transfer (*alienação* or *cessão fiduciária*), charge or other encumbrance, lien, security interest or any preferential arrangement (including a securitization) that has the practical effect of creating a security interest on or with respect to such Property; *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"**Low or Nil Tax Jurisdiction**" means a jurisdiction that does not impose income tax or that imposes it at a maximum rate lower than 17%, or whose laws do not allow access to information related to ownership composition or securities ownership or permit the identification of the beneficial owner of income attributed to non-residents.

"**Luxembourg**" means the Grand Duchy of Luxembourg.

"**Luxembourg Companies Law**" means the Luxembourg law of 10 August 1915 on commercial companies, as amended.

"**Material Adverse Effect**" means (i) any material adverse effect on the financial condition, business, properties or results of operations of Raízen and its Subsidiaries taken as a whole and (ii) any material adverse effect on the ability of the Issuer or the Guarantors to perform their respective obligations under this Indenture, the Notes or the Note Guarantees.

"**Maturity Date**" means March 5, 2054.

"**Moody's**" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"**Non-Recourse Debt**" means Debt (or any portion thereof) of a Subsidiary of Raízen (the "**Non-Recourse Debtor**") used to finance (i) the creation, development, construction,

6

improvement or acquisition of projects, Properties or assets and any extensions, renewals or refinancings of such Debt including the cost of the refinancing or (ii) the operations of projects, Properties or assets of such Non-Recourse Debtor or its Subsidiaries; *provided* that the recourse of the lender thereof (including any agent, trustee, receiver or other Person acting on behalf of such entity) in respect of such Debt is limited (other than in respect of the Recourse Amount (as defined herein)) to the Non-Recourse Debtor, any debt securities issued by the Non-Recourse Debtor, the Capital Stock of the Non-Recourse Debtor, and any assets, receivables, inventory, equipment, chattels, contracts, intangibles, rights and any other assets of such Non-Recourse Debtor and its Subsidiaries connected with the projects, properties or assets created, developed, constructed, improved, acquired or operated, as the case may be, in respect of which such Debt has been incurred; *provided, further*, that if such lender additionally has contractual recourse to Raízen or to any Subsidiary of Raízen (other than the Non-Recourse Debtor and its Subsidiaries) for the repayment of any portion of such Debt (such portion, the "**Recourse Amount**"), then the Recourse Amount will not constitute Non-Recourse Debt and the Issuer or the relevant Guarantor, as the case may be, will be deemed to have incurred Debt in an aggregate principal amount equal to the Recourse Amount.

"**Non U.S. Person**" means a Person that is not a U.S. Person under Regulation S.

"**Notation of Note Guarantee**" has the meaning assigned to such term in Section 10.06.

"**Note Guarantee**" means each Guarantee by the Guarantors of the Guaranteed Obligations pursuant to this Indenture and the Notes.

"**Notes**" has the meaning assigned to such term in the Recitals. The Initial Notes and any Additional Notes shall be treated as a single class for all purposes under this Indenture, and unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additional Notes.

"**Offer to Purchase**" has the meaning assigned to such term in Section 4.06(a).

"**Offer to Purchase Payment**" has the meaning assigned to such term in Section 4.06(a).

"**Offer to Purchase Payment Date**" has the meaning assigned to such term in Section 4.06(a)(v).

"**Offering Memorandum**" means the final offering memorandum dated February 28, 2024 prepared by the Issuer in connection with the offering of the Initial Notes.

"**Officer**" means a director, the president or chief executive officer, any vice president, the chief financial officer, the treasurer or any assistant treasurer, or the secretary or any assistant secretary, or any attorney-in-fact of each of the Issuer and the Guarantors, as applicable, or any other Person duly appointed by the shareholders or the Board of Directors of each of the Issuer and the Guarantors, as applicable, to perform corporate duties.

"**Officer's Certificate**" means, with respect to any Person, a certificate signed by the chairman of the board (or equivalent governing body), president, vice-president, chief executive officer, chief operating officer, chief financial officer, chief accounting officer, director or

manager, as applicable, or any treasurer, secretary or authorized signatory or, to the extent applicable, general counsel of such Person.

"**Offshore Global Note**" means a Global Note that bears the Regulation S Legend representing Notes issued and sold pursuant to Regulation S.

"**Opinion of Counsel**" means a written opinion from legal counsel who may be an employee of or counsel to the Issuer, which opinion shall be reasonably acceptable to the Trustee.

"**Outstanding**" has the meaning assigned to such term in Section 2.05.

"**Par Call Date**" has the meaning assigned to such term in Section 3.02(a)

"**Paying Agent**" refers to The Bank of New York Mellon in its capacity as paying agent and its successors, and such other paying agents as the Issuer shall appoint.

"**Permitted Holders**" means each of (i) Royal Dutch Shell PLC and its Affiliates and (ii) Cosan S.A. and its Affiliates (in each case, including any successors and assigns thereof).

"**Permitted Liens**" means:

(1)       any Liens existing on the Issue Date;

(2)       any Liens extending, renewing or replacing (or successive extensions, renewals or replacements of), in whole or in part, any Lien referred to in clauses (1), (3), (4), (10) and (13) hereof; *provided* that the principal amount of Debt secured thereby shall not exceed the principal amount of Debt so secured at the time of such extension, renewal or replacement, except for any increase reflecting premiums, fees and expenses in connection with such extension, renewal or replacement;

(3)       any Liens created solely for the purpose of securing the payment of all or a part of the purchase price (or the cost of construction or improvement, and any related transaction fees and expenses) of assets or Property (including Capital Stock of any Person) acquired, constructed or improved after the Issue Date, including related transaction fees and expenses (or securing Debt incurred to refinance a bridge or other interim financing that is initially incurred for the purpose of financing such acquisition, construction or improvement of such Property or assets, including related transaction fees and expenses); *provided* that (a) the aggregate principal amount of Debt secured by such Liens shall not exceed (but may be less than) the greater of (i) the purchase price of the assets or Property so acquired, constructed or improved, or (ii) the aggregate Debt incurred solely for the acquisition, construction, or improvement of such Property or assets, as the case may be, (b) such Liens shall not encumber any assets or Property other than the assets or Property so acquired, constructed or improved and (c) other than any unimproved real property on which the Property so constructed, or the improvement, is located, such Liens shall attach to such assets or Property within 365 days of the construction, acquisition or improvement of such assets or Property; *provided, further*, that any Lien is permitted to be incurred on the Capital Stock of any Person securing any Debt of that Person that is (i) Non-Recourse

8

Debt and (ii) incurred for purposes of financing the acquisition, construction or improvement of any Property or assets of such Person;

(4)    any Liens securing Debt for the purpose of financing all or part of the cost of the acquisition, construction or development of a project; *provided* that (a) the Lien in respect of such Debt is limited to assets (including Capital Stock of the project entity) or Property of such project, (b) the aggregate principal amount of Debt secured by the Liens will not exceed (but may be less than) the greater of (i) the cost (i.e., purchase price) of the project so acquired, constructed or developed or (ii) the aggregate Debt incurred solely for the acquisition, construction, or improvement of such project, as the case may be, and (c) the Lien is incurred before, or within 365 days after the completion of, that acquisition, construction or development and does not apply to any other Property or assets of Raízen or any Significant Subsidiary;

(5)    any Liens imposed by applicable law incurred in the ordinary course of business, including carriers', warehousemen's and mechanics' liens, statutory landlord's liens, and other similar liens and encumbrances arising in the ordinary course of business, in each case for sums not yet due or being contested in good faith by appropriate proceedings;

(6)    any Liens securing taxes, duties, assessments, fees and other governmental charges or levies, in each case the payment of which is not yet due or is being contested in good faith by appropriate proceedings and for which such adequate reserves or other appropriate provisions, if any, as shall be required by Applicable GAAP shall have been made;

(7)    pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other similar social security legislation, any deposit to secure appeal bonds in proceedings being contested in good faith, good faith deposits in connection with bids, tenders, contracts (other than for the payment of Debt) or leases or deposits for the payment of rent, in each case made in the ordinary course of business;

(8)    customary reservations or retentions of title, minor defects, easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, licenses, restrictions on the use of Property or assets or minor imperfections in title that do not in the aggregate materially impair the value or use of the Property or assets affected thereby, and any leases and subleases of real property that do not in the aggregate materially interfere with the ordinary conduct of the business of the Issuer, any Guarantor or any Significant Subsidiary, and which are made on customary and usual terms applicable to similar properties;

(9)    encumbrances, security deposits or reserves maintained in the ordinary course of business and required by applicable law;

(10)    any Liens (i) granted to secure borrowings directly or indirectly from Banco Nacional de Desenvolvimento Econômico e Social-BNDES, or any other federal, regional or state Brazilian governmental development bank or credit agency (including borrowings from any Brazilian governmental bank with funds provided by Brazilian governmental

regional funds (which shall include, without limitation, Financiadora de Estudos e Projetos – FINEP, *Fundo de Desenvolvimento do Nordeste* – FDNE and *Fundo de Desenvolvimento do Centro Oeste* – FCO)) or (ii) granted to secure borrowings from any international or multilateral development bank, government-sponsored agency, export-import bank or official export-import credit insurer, export-credit agency or commercial bank acting as co-lender in any of the foregoing;

(11)    any Liens in favor of issuers of surety bonds, appeal bonds, bid bonds, tender bonds, letters of credit or similar instruments issued pursuant to the request of and for the account of any of the Issuer or the Guarantors or any of their Subsidiaries in the ordinary course of business (including all bonds required by law, contract or tender rules);

(12)    any Liens securing obligations under any Hedging Agreements, so long as such Hedging Agreements  are entered into for bona fide, non-speculative purposes;

(13)    any Liens existing on any Property or assets of any Person before that Person's acquisition (in whole or in part) by, merger into or consolidation with or sale of assets to any of the Issuer, the Guarantors or any Subsidiary thereof after the Issue Date; *provided* that the Lien is not created in contemplation of or in connection with such acquisition, merger or consolidation and such Lien does not extend to any other property of the Issuer, the Guarantors or any Subsidiary thereof;

(14)    any Liens on inventory, receivables and related assets of any of the Issuer, the Guarantors or any of their Subsidiaries securing the obligations of the Issuer, such Guarantor or such Subsidiary, as applicable, under any lines of credit or working capital or export or import trade finance facility or other trade transaction; *provided* that the aggregate principal amount of Debt incurred that is secured by such receivables that shall fall due in any calendar year shall not exceed 80% of Raízen's consolidated net operating revenues for the most recently concluded period of four consecutive fiscal quarters; *provided, further,* that advance transactions will not be deemed transactions secured by receivables, inventory or related assets for purposes of the above calculations;

(15)    any judgment Lien not giving rise to an Event of Default;

(16)    any interest or title of a lessor under any capitalized lease obligation; *provided* that such Liens do not extend to any Property or assets which is not leased property subject to such capitalized lease obligation;

(17)    any Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Issuer, any Guarantor or any of their Subsidiaries, including rights of offset and set-off;

(18)    any Lien or rights of set-off of any Person with respect to any cash equivalents on deposit account or securities account of the Issuer, any Guarantor or any of their Subsidiaries arising in the ordinary course of business in favor of the bank(s) or security intermediary(ies) with which such accounts are maintained, securing only amounts owing to such bank(s) with respect to cash management and operating account arrangements;

10

(19)    any Liens securing the Notes and the Note Guarantees and all other monetary obligations under this Indenture;

(20)    any Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(21)    any rights of set-off of any Person with respect to any deposit account of the Issuer, any Guarantor or any of their Subsidiaries arising in the ordinary course of business and not constituting a financing transaction;

(22)    Liens securing obligations owed by any Subsidiary of Raízen to Raízen or one or more Subsidiaries of Raízen and/or by Raízen to one or more such Subsidiaries; and

(23)    other Liens securing obligations in an aggregate amount not exceeding the greater of: (i) US$2.8 billion (or the equivalent thereof at the time of determination) and (ii) 20% of the Total Consolidated Assets.

For purposes of determining compliance with Section 4.07, (i) a Lien need not be incurred solely by reference to one category of Permitted Liens described above but is permitted to be incurred in part under any combination thereof and of any other available exemption and (ii) in the event that a Lien (or any portion thereof) meets the criteria of one or more of the categories of Permitted Liens, the Issuer may, in its sole discretion, classify or reclassify such Lien (or any portion thereof) in any manner that complies with the categories of Permitted Liens.

"**Person**" means any individual, corporation, company, association, partnership, limited liability company, joint venture, trust, unincorporated association, governmental authority or any agency or political subdivision thereof or any other entity of whatever nature.

"**Property**" of any Person means any property, rights, revenues, or interest therein, of such Person.

"**principal**" of any Debt means the principal amount of such Debt, (or if such Debt was issued with original issue discount, the face amount of such Debt less the remaining unamortized portion of the original issue discount of such Debt), together with, unless the context otherwise indicates, any premium then payable on such Debt.

"**Rating Agency**" means each of (1) S&P, (2) Moody's and (3) Fitch, or their respective successors.

"**Rating Decline**" means that at any time within 90 days after the date of public notice of a Change of Control, (1) in the event the Notes are assigned an Investment Grade rating by at least two of the Rating Agencies prior to such public notice, the rating assigned to the Notes by any two or more of the Rating Agencies is below an Investment Grade rating; or (2) in the event the Notes are not assigned an Investment Grade rating by at least two of the Rating Agencies prior to such public notice, the rating assigned to the Notes by at least two of the Rating Agencies is decreased by one or more categories (i.e., notches); *provided* that there shall be no Rating Decline to the extent the Notes continue to have an Investment Grade rating by at least one of the Rating

11

Agencies; and *provided, further*, that, in each case, any such Rating Decline is expressly stated by the applicable Rating Agency to have been the result of the Change of Control.

"**Register**" has the meaning assigned to such term in Section 2.09.

"**Registrar**" means The Bank of New York Mellon.

"**Regular Record Date**" for the interest payable on any Interest Payment Date means March 1 or September 1 (whether or not a Business Day) immediately preceding such Interest Payment Date.

"**Regulation S**" means Regulation S under the Securities Act.

"**Regulation S Certificate**" means a certificate substantially in the form of Exhibit D hereto.

"**Regulation S Legend**" means the legend set forth in Exhibit B-2.

"**Relevant Taxing Jurisdiction**" has the meaning assigned to such term in Section 3.01(a).

"**Responsible Officer**" means, with respect to the Trustee, any officer of the Trustee in its Corporate Trust Department who shall have direct responsibility for the administration of this Indenture.

"**Restricted Legend**" means the legend set forth in Exhibit B-1.

"**Rule 144A**" means Rule 144A under the Securities Act.

"**Rule 144A Certificate**" means a certificate substantially in the form of Exhibit E hereto.

"**S&P**" means S&P Global Ratings, a division of S&P Global Inc., and any successor to its rating agency business.

"**SEC**" or "**Commission**" means the U.S. Securities and Exchange Commission, as from time to time constituted, created under the Securities Exchange Act of 1934, or, if at any time after execution of this instrument such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body performing such duties on such date.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Significant Subsidiary**" means, with respect to any Person, any Subsidiary of such Person which at the time of determination had assets which, as of the date of such Person's most recent quarterly consolidated balance sheet, constituted at least 10% of such Person's total assets, determined on the basis of the consolidated assets of such Person and its Subsidiaries as of such date.

"**Spot Rate**" means, for any currency, the spot rate at which that currency is offered for sale against United States dollars as published in The Wall Street Journal on the Business Day

12

immediately preceding the date of determination or, if that rate is not available in that publication, as published in any publicly available source of similar market data, as determined by the Issuer.

"**Stated Maturity**" means (i) with respect to any Debt, the date specified as the fixed date on which the final installment of principal of such Debt is due and payable or (ii) with respect to any scheduled installment of principal of or interest on any Debt, the date specified as the fixed date on which such installment is due and payable as set forth in the documentation governing such Debt, not including any contingent obligation to repay, redeem or repurchase prior to the regularly scheduled date for payment.

"**Subsidiary**" means, with respect to any Person, any other Person more than 50% of the outstanding Voting Stock of which is owned or controlled, directly or indirectly, by such Person and/or by any one or more Subsidiaries of such Person.

"**Substituted Issuer**" has the meaning assigned to such term in Section 9.03(a).

"**Substitution Documents**" has the meaning assigned to such term in Section 9.03(a)(i).

"**Successor Corporation**" has the meaning assigned to such term in Section 5.01(a)(i).

"**Threshold Amount**" has the meaning assigned to such term in Section 6.01(a)(iv).

"**Total Consolidated As**sets" means the total amount of consolidated assets of Raízen and its Subsidiaries prepared in accordance with Applicable GAAP, calculated after giving pro forma effect to any acquisition or disposition of Persons, divisions, lines of businesses, operations or assets by Raízen and its Subsidiaries subsequent to such date and on or prior to the date of determination.

"**Transfer Agent**" refers to The Bank of New York Mellon in its capacity as transfer agent and such other transfer agents as the Issuer shall appoint.

"**Treasury Rate**" means, with respect to any redemption date, the yield determined by Raízen in accordance with the following two paragraphs:

(1)     The Treasury Rate shall be determined by Raízen after 4:15 p.m. (New York City time) (or after such time as yields on U.S. government securities are posted daily by the Board of Governors of the Federal Reserve System), on the third Business Day (solely in New York City) preceding the redemption date based upon the yield or yields for the most recent day that appear after such time on such day in the most recent statistical release published by the Board of Governors of the Federal Reserve System designated as "Selected Interest Rates (Daily) – H.15" (or any successor designation or publication) ("**H.15**") under the caption "U.S. government securities—Treasury constant maturities—Nominal" (or any successor caption or heading) ("**H.15 TCM**"). In determining the Treasury Rate, Raízen shall select, as applicable: (i) the yield for the Treasury constant maturity on H.15 exactly equal to the period from the redemption date to the Par Call Date (the "**Remaining Life**"); or (ii) if there is no such Treasury constant maturity on H.15 exactly equal to the Remaining Life, the following two yields: (x) one yield corresponding to the Treasury constant maturity on H.15 immediately shorter than, and (y) one yield

13

corresponding to the Treasury constant maturity on H.15 immediately longer than, the Remaining Life – and shall interpolate to the Par Call Date on a straight-line basis (using the actual number of days) using such yields and rounding the result to three decimal places; or (iii) if there is no such Treasury constant maturity on H.15 shorter than or longer than the Remaining Life, the yield for the single Treasury constant maturity on H.15 closest to the Remaining Life. For purposes of this paragraph, the applicable Treasury constant maturity or maturities on H.15 shall be deemed to have a maturity date equal to the relevant number of months or years, as applicable, of such Treasury constant maturity from the redemption date.

(2)    If on the third Business Day (solely in New York City) preceding the redemption date H.15 TCM or any successor designation or publication is no longer published, Raízen shall calculate the Treasury Rate based on the rate *per annum* equal to the semi-annual equivalent yield to maturity at 11:00 a.m. (New York City time) on the second Business Day (solely in New York City) preceding such redemption date of the U.S. Treasury security maturing on, or with a maturity that is closest to, the Par Call Date, as applicable. If there is no U.S. Treasury security maturing on the Par Call Date but there are two or more U.S. Treasury securities with a maturity date equally distant from the Par Call Date, one with a maturity date preceding the Par Call Date and one with a maturity date following the Par Call Date, Raízen shall select the U.S. Treasury security with a maturity date preceding the Par Call Date. If there are two or more U.S. Treasury securities maturing on the Par Call Date or two or more U.S. Treasury securities meeting the criteria of the preceding sentence, Raízen shall select from among these two or more U.S. Treasury securities the U.S. Treasury security that is trading closest to par based upon the average of the bid and asked prices for such U.S. Treasury securities at 11:00 a.m., New York City time. In determining the Treasury Rate in accordance with the terms of this paragraph, the semi-annual yield to maturity of the applicable U.S. Treasury security shall be based upon the average of the bid and asked prices (expressed as a percentage of principal amount) at 11:00 a.m., New York City time, of such U.S. Treasury security, and rounded to three decimal places.

"**Trust Indenture Act**" or "**TIA**" means the U.S. Trust Indenture Act of 1939, as amended.

"**Trustee**" means the party named as such in the first paragraph of this Indenture or any successor trustee under this Indenture pursuant to Article 7.

"**U.S. Global Note**" means a Global Note that bears the Restricted Legend representing Notes issued and sold pursuant to Rule 144A.

"**U.S. Government Obligations**" means obligations issued or directly and fully guaranteed or insured by the United States of America or by any agent or instrumentality thereof, *provided* that the full faith and credit of the United States of America is pledged in support thereof.

"**Voting Stock**" of any Person means Capital Stock in such Person having power to vote for the election of directors or similar officials of such Person or otherwise voting with respect to actions of such Person (other than such Capital Stock having such power only by reason of the happening of a contingency).

14

Section 1.02. *Rules of Construction*. Unless the context otherwise requires or except as otherwise expressly provided,

(i) an accounting term not otherwise defined has the meaning assigned to it in accordance with Applicable GAAP;

(ii) "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Section, Article or other subdivision;

(iii) all references to "Dollars" US$ and "$" shall mean the lawful currency of the United States of America;

(iv) all references to Sections or Articles or Exhibits refer to Sections or Articles or Exhibits of or to this Indenture unless otherwise indicated;

(v) references to agreements or instruments, or to statutes or regulations, are to such agreements or instruments, or statutes or regulations, as amended from time to time (or to successor statutes and regulations);

(vi) in the event that a transaction meets the criteria of more than one category of permitted transactions or listed exceptions, the Issuer may classify such transaction as it, in its sole discretion, determines;

(vii) words in the singular include the plural, and in the plural include the singular; and

(viii) the words "execution," "signed," "signature," and words of like import in this Indenture shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf," "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

## ARTICLE 2
## THE NOTES

Section 2.01. *Form, Dating and Denominations; Legends*. (a) The Notes and the Trustee's certificate of authentication will be substantially in the form attached as Exhibit A. The terms and provisions contained in the form of the Notes annexed as Exhibit A constitute, and are hereby expressly made, a part of this Indenture. The Notes may have notations, legends or endorsements required by law, rules of or agreements with national securities exchanges to which the Issuer is subject, or usage. Each Note will be dated the date of its authentication. The

15

Notes will be issuable in minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof.

(b)      (i) Except as otherwise provided in paragraph (c) below, each Initial Note or Additional Note will bear the Restricted Legend or the Regulation S Legend, as the case may be.

(ii)      Each Global Note, whether or not an Initial Note or Additional Note, will bear the DTC Legend.

(iii)      Initial Notes and Additional Notes offered and sold in reliance on Regulation S will be issued as provided herein.

(iv)      Initial Notes and Additional Notes offered and sold in reliance on Rule 144A will be issued as provided herein.

(c)      If the Issuer determines (upon the advice of counsel and such other certifications and evidence as the Issuer may reasonably require) that a Note is eligible for resale pursuant to Rule 144(k) under the Securities Act (or a successor provision) and that the Restricted Legend or the Regulation S Legend, as the case may be, is no longer necessary or appropriate in order to ensure that subsequent transfers of the Note (or a beneficial interest therein) are effected in compliance with the Securities Act, the Issuer may instruct the Trustee in writing to cancel the Note and the Issuer may issue to the Holder thereof (or to its transferee), and the Trustee, upon receipt of an Authentication Order, shall authenticate and deliver a new Note of like tenor and amount, registered in the name of the Holder thereof (or its transferee), that does not bear the Restricted Legend or the Regulation S Legend, as the case may be, and the Trustee will comply with such instruction provided that the Trustee has received an Officer's Certificate and Opinion of Counsel and such other evidence as the Trustee may require to comply with such action.

(d)      By its acceptance of any Note bearing the Restricted Legend or the Regulation S Legend, as the case may be (or any beneficial interest in such a Note), each Holder thereof and each owner of a beneficial interest therein acknowledges the restrictions on transfer of such Note (and any such beneficial interest) set forth in this Indenture and in the Restricted Legend or the Regulation S Legend, as the case may be, and agrees that it will transfer such Note (and any such beneficial interest) only in accordance with this Indenture and such legend.

Section 2.02.   *Execution and Authentication; Additional Notes*.   (a) An Officer shall sign the Notes for the Issuer by manual, electronic or facsimile signature in the name and on behalf of the Issuer.  If an Officer whose signature is on a Note no longer holds that office at the time the Note is authenticated, the Note will still be valid.

(b)      A Note will not be valid until the Trustee or the Authenticating Agent signs the certificate of authentication on the Note by manual, electronic or facsimile signature, with the signature constituting conclusive evidence that the Note has been authenticated under this Indenture.

16

(c)    At any time and from time to time after the execution and delivery of this Indenture, the Issuer may deliver Notes executed by the Issuer to the Trustee or the Authenticating Agent for authentication. The Trustee or the Authenticating Agent will authenticate and deliver:

(i)    Initial Notes for original issue on the Issue Date in the aggregate principal amount of US$500,000,000; and

(ii)    Additional Notes from time to time for original issue in aggregate principal amounts specified by the Issuer, which Additional Notes shall have the same terms and conditions in all respects (including the maturity date) as the Initial Notes, other than the issue date, the issue price and the first Interest Payment Date; *provided* that if the Additional Notes are not fungible with the Initial Notes for U.S. federal income tax purposes, the Additional Notes will have a separate CUSIP or other identifying number. Such Additional Notes shall be treated as a single series with the Initial Notes for all purposes under this Indenture (other than tax purposes, in the case the Additional Notes are not fungible with the Initial Notes for tax purposes), including, without limitation, waivers, amendments, redemptions and offers to purchase, and shall vote together with the Initial Notes as one single series on all matters;

in the case of clauses (i) and (ii) above, after receipt by the Trustee of an order of the Issuer executed by one of its Officers directing the Trustee to authenticate the Notes (the "**Authentication Order**") and specifying:

(i)    the amount of Notes to be authenticated and the date on which the Notes are to be authenticated;

(ii)    whether the Notes are to be Initial Notes or Additional Notes;

(iii)    in the case of Additional Notes, that the issuance of such Additional Notes does not contravene any provision of this Indenture;

(iv)    whether the Notes are to be issued as one or more Global Notes or Certificated Notes; and

(v)    other information the Issuer may determine to include or the Trustee may reasonably request.

(d)    The Trustee shall be fully protected in relying upon the Authentication Order above in authenticating any Notes under this Indenture.

Section 2.03.    *Registrar, Paying Agent, Transfer Agent and Authenticating Agent; Paying Agent to Hold Money in Trust*.  (a) The Issuer may appoint one or more Registrars and one or more Paying Agents or Transfer Agents, and the Trustee may appoint, with a copy of any such appointment to the Issuer, an Authenticating Agent, in which case each reference in this Indenture to the Trustee in respect of the obligations of the Trustee to be performed by the Authenticating Agent shall be deemed to be references to the Authenticating Agent. The terms "**Transfer Agent**" and "**Paying Agent**" include any additional transfer agent or paying agent, as the case may be.

17

The term "**Registrar**" includes any co-Registrar. In each case, the Issuer and the Trustee will enter into an appropriate agreement with the Authenticating Agent implementing the provisions of this Indenture relating to the obligations of the Trustee to be performed by the Authenticating Agent and the related rights. The Registrar shall provide to the Issuer and the Trustee, if the Trustee is not the Registrar, a current copy of the Register from time to time upon written request of the Issuer or the Trustee, as the case may be. The Issuer may act as Registrar or Paying Agent. The Issuer hereby appoints, upon the terms and subject to the conditions herein set forth, The Bank of New York Mellon as Paying Agent, Registrar and Transfer Agent.

(b)     The Issuer will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of the Holders or the Trustee all money held by the Paying Agent for the payment of principal of and interest on the Notes and will promptly notify the Trustee in writing of any Default by the Issuer in making any such payment.  The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee and account for any funds disbursed, and the Trustee may at any time during the continuance of any payment default, upon written request to a Paying Agent, require the Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed.  Upon doing so, the Paying Agent will have no further liability for the money so paid over to the Trustee.

Section 2.04.   *Replacement Notes*.  If a mutilated Note is surrendered to the Trustee or if a Holder claims that its Note has been lost, destroyed or wrongfully taken, the Issuer will issue and the Trustee will authenticate, upon provision of evidence satisfactory to the Trustee that such Note was lost, destroyed or wrongfully taken, a replacement Note of like tenor and principal amount and bearing a number not contemporaneously Outstanding.  Every replacement Note is an additional obligation of the Issuer and entitled to the benefits of this Indenture.  If required by the Trustee or the Issuer, an indemnity must be furnished by the Holder that is sufficient in the judgment of both the Trustee and the Issuer to protect the Issuer and the Trustee from any loss they may suffer if a Note is replaced.  The Issuer and the Trustee may charge the Holder for the expenses of the Issuer and the Trustee in replacing a Note.  In case the mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Issuer in its discretion may pay the Note instead of issuing a replacement Note.

Section 2.05.   *Outstanding Notes*.  (a) Notes that are "**Outstanding**" at any time are all Notes that have been authenticated by the Trustee except for:

(i)     Notes cancelled by the Trustee or delivered to it for cancellation;

(ii)     any Note which has been replaced or paid pursuant to Section 2.04 unless and until the Trustee and the Issuer receive proof satisfactory to them that the replaced Note is held by a protected purchaser; and

(iii)     on or after the Maturity Date or any redemption date or Offer to Purchase Payment Date, those Notes payable or to be redeemed on that date for which the Trustee (or Paying Agent, other than the Issuer or an Affiliate of the Issuer) holds money sufficient to pay all amounts then due thereunder.

18

(b)     A Note does not cease to be Outstanding because the Issuer or one of its Affiliates holds the Note, *provided* that in determining whether the Holders of the requisite principal amount of the Outstanding Notes have given or taken any request, demand, authorization, direction, notice, consent, waiver or other action hereunder, Notes owned by the Issuer or any Affiliate of the Issuer will be disregarded and deemed not to be Outstanding (it being understood that in determining whether the Trustee is protected in relying upon any such request, demand, authorization, direction, notice, consent, waiver or other action, only Notes in respect of which a Responsible Officer of the Trustee has received written notice from the Issuer that such Notes are so owned will be so disregarded).  Notes so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right to so act with respect to such Notes and that the pledgee is not the Issuer or any Affiliate of the Issuer.

Section 2.06.   *Temporary Notes*.  Until definitive Notes are ready for delivery, the Issuer may prepare and the Trustee will authenticate temporary Notes.  Temporary Notes will be substantially in the form of definitive Notes but may have insertions, substitutions, omissions and other variations determined to be appropriate by the Officer executing the temporary Notes, as evidenced by the execution of the temporary Notes.  If temporary Notes are issued, the Issuer will cause definitive Notes to be prepared without unreasonable delay.  After the preparation of definitive Notes, the temporary Notes will be exchangeable for definitive Notes upon surrender of the temporary Notes at the office or agency of the Issuer designated for such purpose pursuant to Section 4.02, without charge to the Holder.  Upon surrender for cancellation of any temporary Notes the Issuer will execute and the Trustee will authenticate and deliver in exchange therefor a like principal amount of definitive Notes of authorized denominations.  Until so exchanged, the temporary Notes will be entitled to the same benefits under this Indenture as definitive Notes.

Section 2.07.   *Cancellation*.  The Issuer at any time may, but shall not be obligated to, deliver to the Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer may have acquired in any manner whatsoever, and may deliver to the Trustee for cancellation any Notes previously authenticated hereunder which the Issuer has not issued and sold.  Any Registrar, Transfer Agent or Paying Agent will forward to the Trustee any Notes surrendered to it for transfer, exchange or payment.  The Trustee will cancel all Notes surrendered for transfer, exchange, payment or cancellation and dispose of them in accordance with its then applicable procedures or the written instructions of the Issuer; *provided* that the Trustee shall not be required to destroy cancelled Notes.  The Issuer may not issue new Notes to replace Notes it has paid in full or delivered to the Trustee for cancellation.

Section 2.08.   *CUSIP and ISIN Numbers*.  The Issuer in issuing the Notes may use "CUSIP" and "ISIN" numbers, and the Trustee will use CUSIP numbers or ISIN numbers in notices of redemption or exchange or in Offers to Purchase as a convenience to Holders, which notices shall state that no representation is made by the Issuer or the Trustee as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption or exchange or Offer to Purchase.  The Issuer shall promptly notify the Trustee in writing of any change in the CUSIP or ISIN numbers.

Section 2.09.   *Registration, Transfer and Exchange*.  (a) The Notes will be issued in registered form only, without coupons, and the Issuer shall cause the Registrar to maintain a

register (the "**Register**") of the Notes, for registering the record ownership of the Notes by the Holders and transfers and exchanges of the Notes.

(b)     (i) Each Global Note will be registered in the name of the Depositary or its nominee and, so long as DTC is serving as the Depositary thereof, will bear the DTC Legend.

(ii)     Each Global Note will be delivered to the Trustee as custodian for the Depositary.  Transfers of a Global Note (but not a beneficial interest therein) will be limited to transfers thereof in whole, but not in part, to the Depositary, its successors or their respective nominees, except as set forth in Section 2.09(b)(iv).

(iii)     Agent Members will have no rights under this Indenture with respect to any Global Note held on their behalf by the Depositary, and the Depositary or its nominee, as the case may be, shall be treated by the Issuer, the Trustee, each Agent and any of their respective agents as the absolute owner and Holder of such Global Note for all purposes whatsoever. Notwithstanding the foregoing, the Depositary or its nominee may grant proxies and otherwise authorize any Person (including any Agent Member and any Person that holds a beneficial interest in a Global Note through an Agent Member) to take any action which a Holder is entitled to take under this Indenture or the Notes, and nothing herein will impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

(iv)     If (x) the Depositary (A) notifies the Issuer that it is unwilling or unable to continue as Depositary for a Global Note and the Depositary fails to appoint a successor depositary within 90 days of the notice or (B) has ceased to be a clearing agency registered under the Exchange Act; (y) subject to the procedures of the Depositary, the Issuer, at its option, notifies the Trustee in writing that the Issuer elects to cause the issuance of Certificated Notes or (z) there has occurred and is continuing a Default or Event of Default and the Issuer or the Trustee has received a request from the Depositary, the Issuer shall promptly exchange each beneficial interest in the Global Note for one or more Certificated Notes in authorized denominations having an equal aggregate principal amount registered in the name of the owner of such beneficial interest, as identified to the Issuer and the Trustee by the Depositary in writing, and the Trustee shall cancel the Global Note.  If the Global Note being exchanged does not bear the Restricted Legend or Regulation S Legend, as the case may be, then the Certificated Notes issued in exchange therefor will not bear the Restricted Legend or Regulation S Legend, as the case may be.  If such Global Note bears the Restricted Legend or Regulation S Legend, as the case may be, then the Certificated Notes issued in exchange therefor will bear the Restricted Legend or Regulation S Legend, as the case may be.

(c)     Each Certificated Note will be registered in the name of the Holder thereof.

(d)     A Holder may transfer a Note (or a beneficial interest therein) to another Person or exchange a Note (or a beneficial interest therein) for another Note or Notes of any authorized denomination by presenting to the Trustee a written request therefor stating the name of the proposed transferee or requesting such an exchange, accompanied by any certification, opinion or other document required by Section 2.10.  The Registrar shall promptly register any transfer

20

or exchange that meets the requirements of this Section by noting the same in the Register maintained by the Registrar for this purpose; *provided* that:

(i)    no transfer or exchange will be effective until it is registered in such Register, and

(ii)    the Trustee and the Registrar, as applicable, will not be required (w) to issue or register the transfer or exchange of any Note for a period of 15 days before a selection of Notes to be redeemed, (x) to register the transfer or exchange any Note so selected for redemption in whole or in part, except, in the case of a partial redemption, that portion of any Note not being redeemed, (y) to register any Note between a Regular Record Date and the corresponding Interest Payment Date, or (z) if a redemption is to occur after a Regular Record Date but on or before the corresponding Interest Payment Date, to register the transfer or exchange of any Note on or after the Regular Record Date and before the date of redemption.  Prior to the registration of any transfer, the Issuer, the Trustee, each Agent and each of their respective agents will treat the Person in whose name the Note is registered as the owner and Holder thereof for all purposes (whether or not the Note is overdue), and will not be affected by notice to the contrary.

From time to time the Issuer will execute and the Trustee will authenticate additional Notes as necessary in order to permit the registration of a transfer or exchange in accordance with this Section.

No service charge will be imposed in connection with any transfer or exchange of any Note, but the Issuer and the Trustee may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than a transfer tax or other similar governmental charge payable upon exchange pursuant to Section 2.09(b)(iv)).

(e)    (i) *Global Note to Global Note*.  If a beneficial interest in a Global Note is transferred or exchanged for a beneficial interest in another Global Note, the Trustee will (x) record a decrease in the principal amount of the Global Note being transferred or exchanged equal to the principal amount of such transfer or exchange and (y) record a like increase in the principal amount of the other Global Note.  Any beneficial interest in one Global Note that is transferred to a Person who takes delivery in the form of an interest in another Global Note, or exchanged for an interest in another Global Note, will, upon transfer or exchange, cease to be an interest in such Global Note and become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer and exchange restrictions, if any, and other procedures applicable to beneficial interests in such other Global Note for as long as it remains such an interest.

(ii)    *Global Note to Certificated Note*.  If a beneficial interest in a Global Note is transferred or exchanged for a Certificated Note, the Trustee will (x) record a decrease in the principal amount of such Global Note equal to the principal amount of such transfer or exchange and (y) deliver one or more new Certificated Notes in authorized denominations having an equal aggregate principal amount to the transferee (in the case of a transfer) or the owner of such beneficial interest (in the case of an exchange), registered

21

in the name of such transferee or owner, as applicable, as provided in writing by the Depositary.

(iii)   *Certificated Note to Global Note*.   If a Certificated Note is transferred or exchanged for a beneficial interest in a Global Note, the Trustee will (x) cancel such Certificated Note, (y) record an increase in the principal amount of such Global Note equal to the principal amount of such transfer or exchange and credit such increase to the account of the Agent Member at the Depositary as instructed in writing by the Holder of the Certificated Notes and (z) in the event that such transfer or exchange involves less than the entire principal amount of the canceled Certificated Note, deliver to the Holder thereof one or more new Certificated Notes in authorized denominations having an aggregate principal amount equal to the untransferred or unexchanged portion of the canceled Certificated Note, registered in the name of the Holder thereof.

(iv)   *Certificated Note to Certificated Note*.   If a Certificated Note is transferred or exchanged for another Certificated Note, the Trustee will (x) cancel the Certificated Note being transferred or exchanged, (y) deliver one or more new Certificated Notes in authorized denominations having an aggregate principal amount equal to the principal amount of such transfer or exchange to the transferee (in the case of a transfer) or the Holder of the canceled Certificated Note (in the case of an exchange), registered in the name of such transferee or Holder, as applicable, and (z) if such transfer or exchange involves less than the entire principal amount of the canceled Certificated Note, deliver to the Holder thereof one or more Certificated Notes in authorized denominations having an aggregate principal amount equal to the untransferred or unexchanged portion of the canceled Certificated Note, registered in the name of the Holder thereof.

Section 2.10.   *Restrictions on Transfer and Exchange*.   (a) The transfer or exchange of any Note (or a beneficial interest therein) may only be made in accordance with this Section and Section 2.09 and, in the case of a Global Note (or a beneficial interest therein), the applicable rules and procedures of the Depositary.   The Trustee shall refuse to register any requested transfer or exchange that does not comply with the preceding sentence.

(b)   Subject to Section 2.10(c), the transfer or exchange of any Note (or a beneficial interest therein) of the type set forth in column A below for a Note (or a beneficial interest therein) of the type set forth opposite column B below may only be made in compliance with the certification requirements (if any) described in the clause of this paragraph set forth opposite column C below.

| A | B | C |
|---|---|---|
| U.S. Global Note | U.S. Global Note | (1) |
| U.S. Global Note | Offshore Global Note | (2) |
| U.S. Global Note | Certificated Note | (3) |
| Offshore Global Note | U.S. Global Note | (4) |

22

| | | |
|---|---|---|
| Offshore Global Note | Offshore Global Note | (1) |
| Offshore Global Note | Certificated Note | (3) |
| Certificated Note | U.S. Global Note | (4) |
| Certificated Note | Offshore Global Note | (2) |
| Certificated Note | Certificated Note | (3) |

(1)     No certification is required.

(2)     The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee a duly completed and executed Regulation S Certificate; *provided* that if the requested transfer or exchange is made by the Holder of a Certificated Note that does not bear the Restricted Legend or Regulation S Legend, then no certification is required.

(3)     The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee (x) a duly completed and executed Rule 144A Certificate or (y) a duly completed and executed Regulation S Certificate, and/or an Opinion of Counsel and such other certifications and evidence as the Issuer may reasonably require in order to determine that the proposed transfer or exchange is being made in compliance with the Securities Act and any applicable securities laws of any state of the United States; *provided* that if the requested transfer or exchange is made by the Holder of a Certificated Note that does not bear the Restricted Legend or the Regulation S Legend, then no certification is required.  In the event that a Certificated Note that does not bear the Restricted Legend or the Regulation S Legend is surrendered for transfer or exchange, upon transfer or exchange the Trustee will deliver a Certificated Note that does not bear the Restricted Legend or the Regulation S Legend.

(4)     The Person requesting the transfer or exchange must deliver or cause to be delivered to the Trustee a duly completed and executed Rule 144A Certificate.

(c)     No certification is required in connection with any transfer or exchange of any Note (or a beneficial interest therein) after such Note is eligible for resale pursuant to Rule 144(k) under the Securities Act (or a successor provision); *provided* that the Issuer has provided the Trustee with an Officer's Certificate and an Opinion of Counsel to that effect, and the Issuer may require from any Person requesting a transfer or exchange in reliance upon this clause an Opinion of Counsel and any other reasonable certifications and evidence in order to support such certificate.

Any Certificated Note delivered in reliance upon this paragraph will not bear the Restricted Legend or the Regulation S Legend, as the case may be.

(d)     The Trustee will retain copies of all certificates, opinions and other documents received in connection with the transfer or exchange of a Note (or a beneficial interest therein),

and the Issuer will have the right to inspect and make copies thereof at any reasonable time upon written notice within a reasonable period of time to the Trustee.

Section 2.11.    *Open Market Purchases*.  The Issuer or its Affiliates may at any time purchase Notes in the open market or otherwise at any price; *provided* that Notes that the Issuer or its Affiliates purchase may, in their respective discretion, be held, resold or cancelled, but will only be held or resold in compliance with applicable requirements or exemptions under the relevant securities laws.

Section 2.12.    *Trustee's Disclaimer*.  (a) The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restriction on transfer imposed under this Indenture or under applicable law with respect to any transfer of interest in any Note (including any transfers between or among participants in the Depositary or beneficial owners of interest in Global Notes) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(b)    The Trustee and the Agents shall have no responsibility or obligation to any beneficial owner of an interest in a Global Note, any Agent Member or other member of, or a participant in, the Depositary or other Person with respect to the accuracy of the records of the Depositary or any nominee or participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any Agent Member or other participant, member, beneficial owner or other Person (other than the Depositary) of any notice (including any notice of redemption or purchase) or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes. All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to or upon the order of the registered Holders (which shall be the Depositary or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through the Depositary, subject to its applicable rules and procedures. The Trustee and Agents may rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its Agent Members and other members, participants and any beneficial owners. The Depositary (or its nominee) may be treated by the Trustee and the Agents as the owner of the Global Note for all purposes whatsoever.

(c)    Neither the Trustee nor any Agent shall have any responsibility or liability for any actions taken or not taken by the Depositary.

ARTICLE 3
ADDITIONAL AMOUNTS; REDEMPTION

Section 3.01.    *Additional Amounts*.  (a) All payments by the Issuer in respect of the Notes or by a Guarantor in respect of its Note Guarantee will be made without withholding or deduction for or on account of any present or future taxes, duties, assessments, fees or other governmental charges of whatever nature (and any fines, penalties or interests related thereto) imposed or levied by or on behalf of Luxembourg, Brazil or any authority therein or thereof or

24

any other jurisdiction or political subdivision thereof from or through which a payment is made or in which the Issuer or a Guarantor (or any successor to the Issuer or Guarantor) is organized or is a resident for tax purposes (a "**Relevant Taxing Jurisdiction**"), unless the Issuer or Guarantor, as applicable, is required by law to deduct or withhold such taxes, duties, assessments, fees or governmental charges.  In that event, the Issuer or Guarantor, as applicable, will make the required deduction or withholding, make payment of the amount so deducted or withheld to the appropriate governmental authority and pay such additional amounts as may be necessary to ensure that the net amounts received by Holders of Notes after such withholding or deduction equal the amounts that would have been received in respect of the Notes in the absence of such withholding or deduction (the "**Additional Amounts**").  However, no Additional Amounts shall be payable:

(i)        to, or to a third party on behalf of, a Holder or beneficial owner where the Holder or beneficial owner is liable for any present or future taxes, duties, assessments, fees or other governmental charges in respect of a Note by reason of the existence of any present or former connection between the Holder or beneficial owner (or between a fiduciary, settlor, beneficiary, partner, member or shareholder of the Holder or beneficial owner, if the Holder or beneficial owner is an estate, a trust, a partnership, a limited liability company or a corporation) and the Relevant Taxing Jurisdiction, including, without limitation, the Holder or beneficial owner (or the Holder's or the beneficial owner's fiduciary, settlor, beneficiary, partner, member or shareholder) being or having been a citizen or resident thereof, being or having been engaged or deemed to be engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, other than the mere holding of the Note or the enforcement of rights and the receipt of payments with respect to the Note;

(ii)        in respect of any present or future tax, duty, assessment, fee or other governmental charge that would not have been so imposed but for the presentation by the Holder or beneficial owner of a Note, where presentation is required, for payment on a date more than 30 days after the date on which such payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later;

(iii)        in respect of any present or future tax, duty, assessment, fee or other governmental charge that would not have been so imposed but for the failure by the Holder or beneficial owner of the Note to comply with any certification, identification or other reporting requirement concerning such Holder's or beneficial owner's nationality, residence, identity or connection with the Relevant Taxing Jurisdiction, if (1) compliance is required by the Relevant Taxing Jurisdiction as a precondition to relief or exemption from, or reduction in the rate of, all or part of the tax, duty, assessment, fee or other governmental charge and (2) the Issuer or Guarantor has given at least 30 days' notice that Holders or beneficial owners will be required to comply with such requirement;

(iv)        in relation to the application of the Luxembourg law of 23 December 2005, as amended from time to time, introducing a 20% withholding tax on certain interest and similar income payments made or deemed to be made for the immediate benefit of individuals resident in Luxembourg;

(v)      in respect of any registration tax, stamp duty or any other similar documentary tax or duty, fixed or ad valorem, in Luxembourg, in connection (i) with the performance by the Issuer of its obligations under the Notes or any Guarantor in respect of its Note Guarantee; or (ii) with the registration of the Notes by the Holder or beneficial owner, or by a third party on his behalf, before the Registration and Estates Department (*Administration de l'enregistrement, des domaines et de la TVA*) in Luxembourg where this registration is not required by law (including for the enforcement of rights and the receipt of payments with respect to the Notes);

(vi)      in respect of any present or future tax, duty, assessment, fee or other governmental charge imposed on a Note presented for payment by or on behalf of a Holder or beneficial owner where the Holder or beneficial owner would have been able to avoid the withholding or deduction by presenting the relevant Note to another Paying Agent;

(vii)      in respect of any estate, inheritance, gift, sales, use, transfer, capital gains, excise or personal property or similar tax, duty, assessment, fee or other governmental charge;

(viii)      in respect of any tax, duty, assessment, fee or other governmental charge that is payable otherwise than by deduction or withholding from payments of principal of, premium, if any, or interest on a Note or by direct payment by the Issuer or a Guarantor in respect of claims made against the Issuer or such Guarantor in respect of such payments on a Note;

(ix)      in respect of any tax, duty, assessment, fee or other governmental charge imposed or withheld pursuant to Sections 1471 through 1474 of the Code, as of the Issue Date (or any amended or successor version), current or future U.S. treasury regulations issued thereunder or any official interpretation thereof, any agreement entered into pursuant to Section 1471(b) of the Code, or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code ("**FATCA**"); or

(x)      in respect of any combination of the above.

(b)      In addition, no Additional Amounts shall be paid with respect to any payment on a Note or Note Guarantee to a Holder who is a fiduciary, a partnership, a limited liability company or other than the sole beneficial owner of that payment to the extent that payment on the Note or Note Guarantee would be required by the laws of the Relevant Taxing Jurisdiction to be included in the income, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, a member of the partnership, an interest holder in the limited liability company or a beneficial owner who would not have been entitled to the Additional Amounts had that beneficiary, settlor, member, interest holder or beneficial owner been the Holder. Except as specifically provided above, neither the Issuer nor any Guarantor shall be required to make any payment with respect to any tax, duty, assessment, fee or other governmental charge imposed by any government or political subdivision or taxing authority thereof or therein.

26

(c)    In the event that Additional Amounts actually paid with respect to the Notes, as described above, are based on rates of deduction or withholding of taxes in excess of the appropriate rate applicable to the Holder of such Notes, and, as a result thereof the Holder is entitled to make a claim for a refund or credit of the excess from the authority imposing the withholding tax, then the Holder shall, by accepting the Notes, be deemed to have assigned and transferred all right, title, and interest to any such claim for a refund or credit of such excess to the Issuer or Guarantor, as the case may be. However, by making such assignment, the Holder or beneficial owner makes no representation or warranty that the Issuer or Guarantor, as the case may be, shall be entitled to receive such claim for refund or credit and incurs no other obligation (including, for the avoidance of doubt, any filing or other action) with respect thereto.

(d)    Any reference in this Indenture or the Notes to principal, premium, if any, interest or any other amount payable in respect of the Notes by the Issuer or the Note Guarantees by the Guarantors will, unless the Additional Amounts are explicitly already named in such context, be deemed also to refer to any Additional Amounts that may be payable with respect to that amount under the obligations referred to in this Section.

(e)    The Issuer or the relevant Guarantor, as the case may be, shall use reasonable efforts to furnish to the Trustee the official receipts (or a copy of the official receipts) evidencing payment of any taxes deducted or withheld from payments in respect of the Notes or the Note Guarantees, as the case may be (or other evidence of payment reasonably satisfactory to the Trustee). Copies of such receipts or other evidence of payment shall be made available to Holders by the Trustee upon written request.

(f)    The foregoing obligations  shall survive termination or discharge of this Indenture, payment of the Notes and/or the resignation or removal of the Trustee or any agent hereunder, and shall apply *mutatis mutandis* to any jurisdiction or political subdivision thereof in which any successor to the Issuer or a Guarantor is organized or is a resident for tax purposes.

Section 3.02.  *Optional Redemption*.

(a)    At any time before  September 5, 2053, which is the date that is six months prior to the maturity of the Notes (the "**Par Call Date**"), the Issuer or any Guarantor may redeem the Notes at its option, in whole or in part, at any time and from time to time, at a redemption price (expressed as a percentage of principal amount and rounded to three decimal places) equal to the greater of:  (i) (a) the sum of the present values of the remaining scheduled payments of principal and interest thereon  discounted to the redemption date (assuming the Notes matured on the Par Call Date) on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 40 basis points, less (b) interest accrued to, but excluding, the date of redemption, and (ii) 100% of the principal amount of the Notes to be redeemed, *plus*, in either case, accrued and unpaid interest thereon to, but excluding, the redemption date.

(b)    On or after the Par Call Date, the Issuer or a Guarantor may redeem the Notes, in whole or in part, at any time and from time to time, at a redemption price equal to 100% of

27

the principal amount of the Notes being redeemed plus accrued and unpaid interest thereon to, but excluding, the redemption date.

      (c)      Raízen's actions and determinations in determining the redemption price shall be conclusive and binding for all purposes, absent manifest error. The Trustee shall have no obligation to calculate or verify any redemption price, make-whole premium or any component thereof.

      Section 3.03.  *Redemption for Taxation Reasons*. If as a result of any change in or amendment to the laws or any applicable treaties (or any rules or regulations promulgated thereunder) of a Relevant Taxing Jurisdiction, or any amendment to or change in official position regarding the application, interpretation or administration of such laws, treaties, rules, or regulations (including a holding by a court of competent jurisdiction), which change or amendment becomes effective or, in the case of a change in official position, is announced on or after the Issue Date (or, if later, the date a Relevant Taxing Jurisdiction becomes a Relevant Taxing Jurisdiction), (i) the Issuer or any successor thereof has or will become obligated to pay Additional Amounts as described above in Section 3.01 with respect to the Notes or (ii) any Guarantor or any successor thereof has or will become obligated to pay Additional Amounts as described above in Section 3.01 with respect to a Note Guarantee in excess of the Additional Amounts such Guarantor or successor, as the case may be, would be obligated to pay if payments in respect of the Note Guarantee were subject to withholding or deduction at a rate of 15% (or a rate of 25% if the Holder of the Notes is resident in a Low or Nil Tax Jurisdiction) (the "**Excess Additional Amounts**"), the Issuer, Guarantor or any successor thereof may, at its option, redeem all, but not less than all, of the Notes, at a redemption price equal to 100% of their principal amount then Outstanding, together with interest accrued to, but excluding, the date fixed for redemption, upon delivery of irrevocable notice of redemption to the Holders not fewer than ten days nor more than 90 days prior to the date fixed for redemption.  No notice of such redemption may be given earlier than 90 days prior to the earliest date on which the Issuer, Guarantor or any successor thereof would, but for such redemption, be obligated to pay such Additional Amounts or Excess Additional Amounts. Notwithstanding the foregoing, the Issuer, Guarantor or any successor thereof shall not have the right so to redeem the Notes unless: (i) the obligation to pay such Additional Amounts or Excess Additional Amounts cannot be avoided by the Issuer or Guarantor (or successor) taking reasonable measures and (ii) the Issuer or Guarantor (or successor) has complied with all necessary regulations to legally effect such redemption; *provided*, *however*, that for this purpose reasonable measures shall not include any change in the Issuer's or any Guarantor's or any successor's jurisdiction of incorporation or organization or location of its principal executive or registered office.

      Section 3.04.  *Redemption Following Tender Offer.* Notwithstanding the provisions of Sections 3.02 or 3.03, in connection with any tender offer for the Notes (including an Offer to Purchase in connection with a Change of Control that results in a Rating Decline made in accordance with the terms of this Indenture), in the event that the Holders of not less than 85% of the aggregate principal amount of the Outstanding Notes validly tender and do not validly withdraw Notes in such tender offer and the Issuer, or any other Person making such offer in lieu of the Issuer, purchases all of the Notes validly tendered and not validly withdrawn by such Holders, then the Issuer or any Guarantor shall have the right, on not less than five nor more than 60 days' prior notice to the Holders (with a copy to the Trustee), to redeem all of the Notes that

28

remain Outstanding at a redemption price equal to the purchase price paid to each other Holder in such tender offer plus, to the extent not included in the purchase price, accrued and unpaid interest and Additional Amounts, if any, on the Notes that remain Outstanding, to, but excluding, the date of redemption.

Section 3.05. *Election to Redeem; Selection of Notes*. (a) In the event that the Issuer, a Guarantor or any successor thereof elects to redeem the Notes, prior to delivery of a notice of redemption to the Holders of the Notes, it will deliver to the Trustee: (1) an Officer's Certificate stating that the Issuer, such Guarantor or such successor, as the case may be, is entitled to redeem the Notes pursuant to the terms hereof and setting forth a statement of facts showing that the condition or conditions precedent to the right of the Issuer, such Guarantor or such successor, as the case may be, so to redeem have occurred or been satisfied; and (2) in respect of a redemption pursuant to Section 3.03, an Opinion of Counsel in the applicable Relevant Taxing Jurisdiction to the effect that (i) the Issuer, such Guarantor or such successor, as applicable, has or will become obligated to pay Additional Amounts or Excess Additional Amounts, as the case may be, (ii) the Issuer, such Guarantor or such successor, as applicable, cannot avoid payment of such Additional Amounts or Excess Additional Amounts, as the case may be, by taking reasonable measures available to it and (iii) all governmental approvals necessary for the Issuer, such Guarantor or such successor, as applicable, to effect the redemption have been obtained and are in full force and effect. The Trustee shall accept such Officer's Certificate and, if required, Opinion of Counsel as sufficient evidence of satisfaction of the conditions precedent described above, in which case, it shall be conclusive and binding upon the Holders of the Notes.

(b)       If less than all the Notes are to be redeemed at any time, selection of Certificated Notes for redemption shall be made by the Trustee in compliance with the requirements governing redemptions of the principal securities exchange, if any, on which the Notes are listed or if such securities exchange has no requirement governing redemption or the Notes are not then listed on a securities exchange, on a pro rata basis by lot (or, in the case of Global Notes, selection of Notes for redemption shall be made by the Depositary in accordance with its applicable procedures). If Notes are redeemed in part, the remaining outstanding amount of any Note must be at least equal to US$200,000 and be an integral multiple of US$1,000.

Section 3.06. *Notice of Redemption*. (a) The Issuer or a Guarantor shall deliver a notice of redemption to each Holder (which, in the case of Global Notes, will be the Depositary) and the Trustee by, in the case of Certificated Notes, first-class mail, postage prepaid, to the address of each Holder as it appears on the register maintained by the Registrar or, in the case of Global Notes by electronic delivery, in each case, at least five days but not more than 60 days prior to the redemption date (or, in the case of a redemption described in Section 3.03, at least ten days but not more than 90 days prior to the redemption date). A notice of redemption pursuant to Sections 3.02 and 3.04 may, at the discretion of the Issuer or Guarantor, be conditional. If such redemption or notice is subject to satisfaction of one or more conditions precedent, such notice shall state that, in the Issuer's or Guarantor's discretion, the redemption date may be delayed until such time (but no more than 60 days after the date of the notice of redemption) as any or all such conditions shall be satisfied (or waived by the Issuer or such Guarantor in its sole discretion) and a new redemption date shall be set by the Issuer or such Guarantor in accordance with applicable Depositary procedures, or such redemption may not occur and such notice may be rescinded in the event that any or all such conditions shall not have

been satisfied (or waived by the Issuer or such Guarantor in its sole discretion) by the redemption date, or by the redemption date as so delayed. A notice of redemption pursuant to Section 3.03 shall be irrevocable.

(b)     Each notice will identify the Notes (including the CUSIP number) to be redeemed and will state:

(1)     the redemption date;

(2)     the amount to be redeemed and the redemption price;

(3)     if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the redemption date upon surrender of a Certificated Note, a new Certificated Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Certificated Note;

(4)     the name and address of the Paying Agent;

(5)     that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(6)     that, unless the Issuer or Guarantor, as applicable, defaults in the payment of the redemption price, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(7)     the paragraph or sub-paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed;

(8)     that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes; and

(9)     any conditions precedent to such redemption.

(c)     At the Issuer's request, the Trustee will give the notice of redemption in the Issuer's name and at its expense; *provided*, *however*, that the Issuer has delivered to the Trustee, at least five days prior to the date notice of redemption is to be delivered to the Holders (or such shorter period as the Trustee shall agree), an Officer's Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph. For so long as the Notes are held by the Depositary, the redemption of the Notes shall be conducted in accordance with the policies and procedures of the Depositary.

(d)     The Issuer or a Guarantor may enter into an arrangement under which a Subsidiary of Raízen may, in lieu of redemption by the Issuer or such Guarantor, redeem any Notes on the terms set forth (and pursuant to provisions described) in this Article 3.

Section 3.07.  *Deposit of Redemption Price*.  Prior to 11:00 A.M. (New York City time) on the Business Day prior to the redemption date, the Issuer, Guarantor or successor thereof will deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption price of, and accrued and unpaid interest, if any, and any premium and Additional Amounts, if any, on, all Notes to be redeemed on that date.  The Trustee or the Paying Agent will promptly return to the Issuer, Guarantor or successor thereof upon written request any money deposited with the Trustee or the Paying Agent by the Issuer, Guarantor or successor thereof in excess of the amounts necessary to pay the redemption price of, and accrued and unpaid interest, if any, and any premium and Additional Amounts, if any, on, all Notes to be redeemed.

Section 3.08.  *Effect of Notice of Redemption*.  Upon surrender of any Note for redemption in accordance with a redemption notice, such Note shall be paid by the Issuer or the Guarantor at the redemption price, together with accrued interest, if any, to (but excluding) the redemption date (subject to the satisfaction of any applicable condition or conditions precedent set forth in such notice) and from and after such date (except in the event of a Default in the payment of the redemption price) such Notes shall cease to bear interest; *provided*, *however*, that installments of interest payable on or prior to the redemption date shall be payable to the Holders of such Notes registered as such at the close of business on the relevant Regular Record Date according to their terms.  If any Note to be redeemed shall not be so paid upon surrender thereof in accordance with the Issuer's or Guarantor's instructions for redemption, the principal shall, until paid, bear interest from the redemption date at the rate borne by the Notes.

ARTICLE 4
COVENANTS

Section 4.01.  *Payment of Notes*.  (a) The Issuer agrees to pay the principal of and interest (including, without limitation, any Additional Amounts, if any) on the Notes on the dates and in the manner provided in the Notes and this Indenture.  Not later than 11:00 A.M. (New York City time) on the Business Day (solely in New York City) immediately prior to the due date of the payment of any principal of or interest on any Notes, or any redemption of the Notes, the Issuer shall deposit with the Paying Agent Dollars in immediately available funds sufficient to pay such amounts, *provided* that if the Issuer or any Affiliate of the Issuer is acting as a Paying Agent, it shall, on or before each due date, segregate and hold in a separate trust fund for the benefit of the Holders a sum of Dollars sufficient to pay such amounts until paid to such Holders or otherwise disposed of as provided in this Indenture.  In each case, the Issuer shall promptly notify the Trustee in writing of its compliance with this Section 4.01.

(b)    Payments made on the Notes will be applied first to interest due and payable on the Notes and then to the reduction of the unpaid principal amount of the Notes.  An installment of principal or interest will be considered paid on the date due if the Trustee (or Paying Agent, other than the Issuer or any Affiliate of the Issuer) holds on that date Dollars designated for and sufficient to pay the installment and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the Holders on that date pursuant to the terms of this Indenture.  If the Issuer or any Affiliate of the Issuer acts as a Paying Agent, an installment of principal or interest will be considered paid on the due date only if paid to the Holders.

31

(c)    Each payment in full of principal, redemption amount, Additional Amounts and/or interest payable in respect of any Note made by or on behalf of the Issuer to or to the order of the Paying Agent in the manner specified in the Notes and this Indenture on the date due shall be valid and effective to satisfy and discharge the obligation of the Issuer to make payment of principal, redemption amount, Additional Amounts and/or interest payable in respect of any Note on such date, *provided*, *however*, that the liability of the Paying Agent hereunder shall not exceed any amounts paid to it by the Issuer, or held by it, on behalf of the Holders under this Indenture; and *provided, further*, that, in the event that there is a default by the Paying Agent in any payment of principal, redemption amount, Additional Amounts and/or interest in respect of any Note in accordance with the Notes and this Indenture, the Issuer shall pay on demand such further amounts as will result in receipt by the Holder of such amounts as would have been received by it had no such default occurred.

(d)    The Issuer agrees to pay interest on overdue principal, and to the extent lawful, overdue installments of interest at the rate per annum specified in the Notes (1% per annum in excess of the rate per annum borne by the Notes).  Any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the second day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least two days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.

(e)    Payments in respect of the Notes represented by the Certificated Notes (including principal, interest and Additional Amounts, if any) will be made at the specified office or agency of one or more Paying Agents in New York City. At the Issuer's option, interest on Certificated Notes may be paid by Dollars check drawn on a bank in New York City and mailed to the Holder of the Certificated Notes at its registered address. Upon written notice from a Holder of at least US$1.0 million in aggregate principal amount of Certificated Notes to the specified office of any Paying Agent not less than 15 days before the due date for any payment in respect of a Certificated Note, such payment may be made by wire transfer to a Dollar account maintained by the payee with a bank in New York City.

(f)    Payments in respect of the Notes represented by the Global Notes (including principal, interest and Additional Amounts, if any) are to be made by wire transfer of immediately available funds in such coin or currency of the United States as at the time of payment will be legal tender for the payment of public and private debts, to the accounts specified by the Depositary in accordance with is applicable procedures.

Section 4.02.    *Maintenance of Office or Agency*.  The Issuer shall maintain in the Borough of Manhattan, the City of New York, an office or agency where Notes may be surrendered for registration of transfer or exchange or for presentation for payment and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture (other than the type contemplated by Section 11.07) may be served.  The Issuer hereby initially designates the Corporate Trust Office of the Trustee as such office of the Issuer.  The Issuer shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Issuer fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands

32

(other than any presentations, surrenders, notices and demands service in accordance with Section 11.07(b)) may be made or served to the Trustee.  At any time that the Notes are listed on the Official List of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market, the Issuer will maintain an office or agent in Luxembourg to serve as Luxembourg transfer agent if and to the extent required by the rules of the Official List of the Luxembourg Stock Exchange.

The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be surrendered or presented for any of such purposes and may from time to time rescind such designations.  The Issuer shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

Section 4.03.  *Existence*.  Each of the Guarantors shall preserve and maintain in full force and effect its existence and the existence of the Significant Subsidiaries in accordance with their respective organizational documents, and the rights, licenses and franchises of each of the Guarantors and the Significant Subsidiaries, except, in each case, where the failure to do so would not, individually or in the aggregate, result in any Material Adverse Effect, *provided* that neither Guarantor is required to preserve any such right, license or franchise, or the existence of the Significant Subsidiaries, if the maintenance or preservation thereof is no longer desirable in the conduct of the business of Raízen and its Subsidiaries taken as a whole in its judgment; and *provided*, *further*, that this Section does not prohibit any transaction otherwise permitted by Section 5.01.

Section 4.04.  *Payment of Taxes*.  Each of the Guarantors will timely file all required tax returns required to be filed by it and pay and discharge (including by payment in installments or through offsetting with tax credits or otherwise) at or before maturity all of its material tax obligations (except where such tax obligations are contested in good faith and by proper proceedings and against which adequate reserves are being maintained to the extent required by Applicable GAAP), except where the failure to do so would not, individually or in the aggregate, result in a Material Adverse Effect.

Section 4.05.  *Maintenance of Properties*.  Each of the Guarantors will cause all properties used or useful in its business or the business of any of the Significant Subsidiaries to be maintained and kept in good condition, repair and working order in the judgment of such Guarantor, ordinary wear and tear excepted, except to the extent that the failure to do so would not, individually or in the aggregate, have a Material Adverse Effect; *provided* that nothing in this Section prevents either Guarantor or any Significant Subsidiary from discontinuing the use, operation or maintenance of any of such properties or disposing of any of them, if such discontinuance or disposal is, in the judgment of such Guarantor, desirable in the conduct of the business of Raizen and its Subsidiaries taken as a whole.

Section 4.06.  *Repurchases at the Option of the Holders Upon Change of Control*.

(a)      If a Change of Control that results in a Rating Decline occurs, not later than 30 days following such an occurrence, the Issuer or any Guarantor, shall make, directly or through a Designated Affiliate, an offer to purchase all of the Outstanding Notes (the "**Offer to Purchase**") at a purchase price (the "**Offer to Purchase Payment**") equal to 101% of the principal amount thereof plus accrued and unpaid interest thereon and Additional Amounts, if

any, to, but excluding, the Offer to Purchase Payment Date (as defined below). An Offer to Purchase shall be made by written offer to the Holders of Notes (a copy of which shall be delivered to the Trustee) at the address of such Holder appearing in the Register or otherwise in accordance with the procedures of the Depositary with the following information:

(i)      a description of the transaction or transactions that constitute the Change of Control;

(ii)      the principal amount of Notes subject to the Offer to Purchase and the Offer to Purchase Payment;

(iii)      that an Offer to Purchase is being made pursuant to this Section 4.06 and that all Notes validly tendered and not validly withdrawn pursuant to such Offer to Purchase will be accepted for payment;

(iv)      that a Holder may tender all or any portion of its Notes pursuant to such Offer to Purchase, subject to the requirement that if a Holder tenders only a portion of its Notes, the remaining Notes must be no less than US$200,000 in principal amount and in integral multiples of US$1,000 in excess thereof;

(v)      an expiration date (the "**Expiration Date**") of the Offer to Purchase, which will be not less than 30 days nor more than 60 days after the date of the Offer to Purchase, and an indicative settlement date for purchase (the "**Offer to Purchase Payment Date**"), which will be not more than five Business Days after the Expiration Date;

(vi)      that any Note not properly tendered will remain Outstanding and continue to accrue interest;

(vii)      that unless the Issuer, Guarantor or Designated Affiliate, as the case may be, defaults in the payment of the Offer to Purchase Payment on the Offer to Purchase Payment Date, interest on all Notes accepted for payment pursuant to the Offer to Purchase will cease to accrue on and after the Offer to Purchase Payment Date;

(viii)      that Holders electing to have any Notes purchased pursuant to an Offer to Purchase will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the Paying Agent specified in the Offer to Purchase at the address specified in the Offer to Purchase (or, in the case of Global Notes, tender such Notes in accordance with the applicable procedures of the Depositary), in each case, on or prior to the Expiration Date;

(ix)      that Holders shall be entitled to withdraw their tendered Notes and their election to require the Issuer, Guarantor or Designated Affiliate, as the case may be, to purchase such Notes; *provided* that the Paying Agent receives, prior to the Expiration Date, a written statement setting forth the name of the Holder of the Notes, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased (or, in the case of Global Notes, a notice of withdrawal of such Notes is delivered in accordance with the applicable procedures of the Depositary); and

34

(x)     that, if any Note was purchased only in part, (x) in the case of a Global Note, appropriate adjustments to the amount and beneficial interests in a Global Note will be made, and (y) in the case of a Certificated Note, a new Certificated Note or Notes in principal amount equal to the unpurchased portion of the original Certificated Note representing the same indebtedness to the extent not purchased will be issued in the name of the Holder of such Certificated Note upon cancellation of the original Certificated Note; provided that each such new Note will be in a principal amount of US$200,000 or an integral multiple of US$1,000 in excess thereof.

The Offer to Purchase shall also contain instructions and any materials necessary to enable Holders to tender Notes pursuant thereto. If (1) notice is given in a manner provided in this Section 4.06 and (2) any Holder fails to receive such notice or a Holder receives such notice but it is defective, such Holder's failure to receive such notice or such defect shall not affect the validity of the Offer to Purchase as to all other Holders that properly received such without defect.

(b)     On the Business Day immediately preceding the Offer to Purchase Payment Date, the Issuer, a Guarantor or a Designated Affiliate shall, to the extent lawful, deposit with such Paying Agent an amount equal to the aggregate Offer to Purchase Payment in respect of all Notes or portions thereof so tendered.  On the Offer to Purchase Payment Date, the Issuer, a Guarantor or a Designated Affiliate shall, to the extent lawful,

(i)     accept for payment for all Notes properly tendered and not withdrawn pursuant to the Offer to Purchase; and;

(ii)     deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate stating that such Notes or portions thereof have been tendered to and purchased by the Issuer, Guarantor or a Designated Affiliate.

(c)     The Paying Agent shall promptly deliver to each Holder the Offer to Purchase Payment for its Notes that have been accepted for payment in the Offer to Purchase, and, in the case of Certificated Notes purchased in part, the Trustee shall promptly authenticate and deliver to each Holder a new Certificated Note equal in principal amount to any unpurchased portion of the Certificated Notes surrendered, if any; *provided* that each such new Certificated Note will be in a principal amount of US$200,000 or an integral multiple of US$1,000 in excess thereof.

(d)     Notwithstanding Section 4.06(a), the Issuer shall not be required to make an Offer to Purchase upon a Change of Control that results in a Rating Decline if (i) a third party makes an offer to purchase in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 4.06 applicable to an Offer to Purchase made by the Issuer, Guarantor or Designated Affiliate and purchases all Notes properly tendered and not withdrawn under such offer, or (ii) a notice of redemption for all Outstanding Notes has been given pursuant to Section 3.02, Section 3.03 or Section 3.04, unless and until there is a Default in payment of the applicable redemption price.  Notwithstanding anything to the contrary contained herein, an Offer to Purchase may be made in advance of a Change of Control, conditioned upon the consummation of such Change of Control and the occurrence of such

35

Rating Decline, if a definitive agreement is in place for the Change of Control at the time the Offer to Purchase is made.

(e)     The Issuer, Guarantor or Designated Affiliate, as applicable, will comply with Rule 14e-1 under the Exchange Act (to the extent applicable) and all other applicable laws in making any Offer to Purchase.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the provisions of this Indenture and paragraph 3 of the Notes shall be deemed to be modified to the extent necessary to permit such compliance.  If the provisions of such securities laws or regulations cannot be complied with as a result of such deemed modifications, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.06 or paragraph 3 of the Notes by virtue thereof.

Section 4.07.   *Limitation on Liens*.  (a) The Guarantors agree that, for so long as any Note remains Outstanding, each Guarantor will not, and will not permit any Significant Subsidiary to, directly or indirectly, incur or permit to exist any Lien of any nature whatsoever securing the payment of Debt on any of its Property, whether owned at the Issue Date or thereafter acquired, other than Permitted Liens, without effectively providing that the Notes or the Note Guarantees, as applicable, are secured equally and ratably with (or, if the obligation to be secured by the Lien is subordinated in right of payment to the Notes or the Note Guarantees, prior to) the obligations so secured for so long as such obligations are so secured.

(b)     Notwithstanding the foregoing, any Lien securing the Notes or the Note Guarantees granted pursuant to this Section 4.07 shall be automatically and unconditionally released and discharged upon the release by the holders of the Debt described in Section 4.07(a) of their Lien on the Property of the relevant Guarantor or any Significant Subsidiary (including any deemed release upon payment in full of all obligations under such Debt) at such time as the holders of all such Debt also release their Lien on the Property of such Guarantor or such Significant Subsidiary or upon any sale, exchange or transfer to any Person that is not an Affiliate of such Guarantor of the Property secured by such Lien, or of all of the Capital Stock held by such Guarantor or any Subsidiary in, or all or substantially all the assets of, any Significant Subsidiary creating such Lien.

Section 4.08.   *Reporting Requirements*.  (a) Raízen shall furnish to the Trustee for delivery to Holders of the Notes, upon their written request thereof:

(i)     as soon as available and in any event no later than 120 days after the last day of its fiscal year (commencing with the fiscal year ending March 31, 2024), its annual audited consolidated financial statements in English as at and for the fiscal year then ended, prepared in accordance with Applicable GAAP, together with the audit report thereon;

(ii)     as soon as available and in any event within 90 days after the end of the first three fiscal quarters of each fiscal year, its quarterly unaudited consolidated financial statements in English prepared in accordance with Applicable GAAP, accompanied by a "limited review" (*revisão limitada*) report thereon; and

(iii)     within ten Business Days after becoming aware of the occurrence of an Event of Default, an Officer's Certificate setting forth the details of the Event of Default, and the action which the Issuer or Guarantor, as applicable, is taking or proposes to take with respect thereto.

(b)     Notwithstanding the foregoing, if Raízen makes available the information described in clauses (i) and (ii) above on its website or the website of a Subsidiary of Raízen, it will be deemed to have satisfied the reporting requirement set forth in clauses (i) and (ii) above.  It is understood that the Trustee shall have no obligation whatsoever to determine whether such information, documents or reports have been delivered as described above or posted on any website.

(c)     For so long as any Notes remain Outstanding, the Issuer will make available to any Noteholder or beneficial owner of an interest in the Notes, or to any prospective purchasers designated by such Noteholder or beneficial owner, upon request of such Noteholder or beneficial owner, information required to be delivered under paragraph (d)(4) of Rule 144A unless, at the time of such request, the Issuer is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, or is exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act.

(d)     Delivery of any such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt thereof shall not constitute actual or constructive notice or knowledge of any information contained therein or determinable for information contained therein, including the Issuer's, any Guarantor's and/or any other Person's compliance with any of the covenants under this Indenture (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

Section 4.09.  *Disclosure of Names and Addresses of Holders*.  Every Holder, by receiving and holding a Note, agrees with the Issuer, the Guarantors and the Trustee that neither the Issuer, nor any Guarantor nor the Trustee nor any Agent shall be held accountable by reason of the disclosure of any information as to the names and addresses of the Holders in accordance with TIA Section 312, regardless of the source from which such information was derived, and that the Trustee shall not be held accountable by reason of mailing any material pursuant to a request made under TIA Section 312(b).

Section 4.10.  *Paying Agent and Transfer Agent*.  (a) The Issuer agrees, for the benefit of the Holders from time to time of the Notes, that, until all of the Notes are no longer Outstanding or until funds in Dollars for the payment of all of the principal of and interest on all Notes (and Additional Amounts, if any) shall have been made available at the Corporate Trust Office, and shall have been returned to the Issuer as provided herein, whichever occurs earlier, there shall at all times be a Paying Agent and Transfer Agent hereunder.  Each of the Paying Agent and the Transfer Agent shall have the respective powers and authority granted to and conferred upon it herein and in the Notes.

(b)     The Issuer hereby initially appoints the Paying Agent and Transfer Agent defined in this Indenture as such.  The Paying Agent shall arrange for the payment, from funds

37

furnished by the Issuer to the Paying Agent pursuant to this Indenture, of the principal of and interest on the Notes (and Additional Amounts, if any, with respect to the Notes).

Section 4.11.  *Limitation on Issuer*. The Guarantors shall own, at all times, directly or indirectly, at least 75% of the Voting Stock of the Issuer.

ARTICLE 5
CONSOLIDATION, MERGER OR SALE OF ASSETS

Section 5.01.  *Consolidation, Merger or Sale of Assets*.  (a) Each of the Issuer and the Guarantors shall not consolidate with or merge with or into any other Person or sell, convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all of its Property (determined on the basis of the consolidated assets of Raízen and its Subsidiaries) to any other Person (other than the Issuer or a Guarantor), unless:

(i)      the Person (if not the Issuer or a Guarantor) formed by such merger or consolidation or the Person (if not the Issuer or a Guarantor) which acquired by sale, conveyance, transfer or lease all or substantially all of the Property of the Issuer or a Guarantor (the "**Successor Corporation**") expressly assumes by supplemental indenture the due and punctual payment of the principal of and interest (and Additional Amounts) on all of the Notes or such Guarantor's Note Guarantee, as applicable, the performance or observance of every covenant of the Issuer or Guarantor, as applicable, and all other obligations of the Issuer or Guarantor, as applicable, under this Indenture and the Notes or such Guarantor's Note Guarantee, as applicable;

(ii)      immediately after giving effect to such transaction, no Event of Default with respect to any Note shall have occurred and be continuing; and

(iii)      the Issuer or such Guarantor, as applicable, or the Successor Corporation, as the case may be, shall deliver to the Trustee an Opinion of Counsel to the effect that such consolidation, merger, sale, conveyance, transfer or lease and such supplemental indenture (if required) comply with these conditions, that such supplemental indenture (if required) has been duly authorized, executed and delivered and constitutes valid and binding obligations of the Successor Corporation and that all conditions precedent herein provided or relating to such transaction and such supplemental indenture (if required) have been complied with.

(b)      Notwithstanding anything to the contrary in the foregoing, the following transactions shall not be subject to Section 5.01(a)(ii):

(i)      any merger or consolidation by the Issuer or any Guarantor with or into any Subsidiary of the Issuer or any Guarantor; and

(ii)      any sale, conveyance, transfer or lease by the Issuer or any Guarantor, in one transaction or in a series of transactions, directly or indirectly, of all or substantially all of its Property (determined on the basis of the consolidated assets of Raízen and its Subsidiaries) to any Subsidiaries of the Issuer or any Guarantor.

(c)    Notwithstanding anything to the contrary in the foregoing, any merger or consolidation, in which the surviving entity is the Issuer or a Guarantor, or sale, conveyance, transfer or lease to the Issuer or a Guarantor will not be subject to this Section 5.01.

(d)    Upon any consolidation, merger, sale, conveyance, transfer or lease in accordance with these conditions, the Successor Corporation shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer or Guarantor, as applicable, under this Indenture and the Notes or such Guarantor's Note Guarantee, as applicable, with the same effect as if the Successor Corporation had been named as the Issuer or the Guarantor of the Notes herein.  No Successor Corporation shall have the right to redeem the Notes unless the Issuer or any Guarantor would have been entitled to redeem the Notes in similar circumstances.

## ARTICLE 6
## DEFAULT AND REMEDIES

Section 6.01.  *Events of Default*.  (a) The occurrence of one or more of the following events shall constitute an "Event of Default":

(i)    the Issuer or a Guarantor fails to pay any interest (including any related Additional Amounts) on any of the Notes when the same becomes due and payable, and such Default continues for a period of 30 days;

(ii)    the Issuer or a Guarantor fails to pay the principal (including premium, if any, and any related Additional Amounts) of any of the Notes when the same becomes due and payable, upon redemption, or otherwise, and in the case of technical or administrative difficulties in the payment of principal, only if such Default persists for a period of more than five Business Days;

(iii)    the Issuer or a Guarantor fails to perform or observe any other covenant or obligation in the Notes or in this Indenture and such Default continues for a period of more than 90 consecutive days after written notice to the Issuer and/or Guarantor, as the case may be, by the Trustee, or to the Issuer or Guarantor and the Trustee by the Holders of 25% or more in aggregate principal amount of the Notes Outstanding;

(iv)    the Issuer, a Guarantor or any of their respective Significant Subsidiaries defaults (A) in the payment when it becomes due and payable (subject to any applicable grace period), whether by acceleration or otherwise, of any Debt in an aggregate principal amount of US$150,000,000 (or its equivalent in any other currency or currencies) (the "**Threshold Amount**"), whether such Debt now exists or shall hereafter be created; or (B) in the performance or observance of any other terms and conditions relating to any such Debt in an aggregate amount in excess of the Threshold Amount if the effect of such Default is to cause such Debt to become due prior to its Stated Maturity;

(v)    the Issuer, a Guarantor or any of their respective Significant Subsidiaries shall: (A) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee, examiner, administrator, liquidator or similar Person of itself or of all or any substantial part of its Property; (B) make a general assignment for the

39

benefit of its creditors; (C) file a petition seeking bankruptcy, insolvency, reorganization in an insolvency or comparable context, *recuperação judicial*, *recuperação extrajudicial,* liquidation, *falência*, dissolution or winding up; or (D) take any corporate action for the purpose of effecting any of the foregoing;

(vi)     an involuntary proceeding or case shall be commenced against the Issuer, a Guarantor or any of their respective Significant Subsidiaries without its application or consent, seeking: (A) its reorganization, liquidation, dissolution or winding up; (B) the appointment of a receiver, custodian, trustee, examiner, administrator, liquidator or similar Person of it or of all or any substantial part of its Property; or (C similar relief in respect of it under any applicable law relating to bankruptcy, insolvency, reorganization, *recuperação judicial*, *recuperação extrajudicial*, liquidation, *falência*, dissolution or winding up, and such proceeding or case shall continue undismissed and unstayed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect, for a period of 90 or more consecutive days;

(vii)     any of this Indenture or the Notes or the Note Guarantees for any reason cease to be in full force and effect in accordance with its terms or the Issuer or a Guarantor shall judicially contest the binding effect or enforceability thereof or shall deny that it has any further liability or obligation thereunder or in respect thereof;

(viii)     a final non-appealable judgment(s) for the payment of money in an amount equal or in excess of the Threshold Amount shall have been entered by a court or courts of competent jurisdiction against the Issuer or a Guarantor and remain unpaid or undischarged for a period (during which execution shall not be effectively stayed) of 60 consecutive days unless (A) covered by an insurance policy or policies issued by reputable and credit-worthy insurance companies or (B) a Permitted Holder has contractually and irrevocably undertaken to indemnify the Issuer or a Guarantor, as applicable, for any potential loss or claim arising therefrom and enforcement proceedings are not being executed against any Property of the Issuer or such Guarantor; or

(ix)     it is or becomes unlawful for the Issuer or a Guarantor to perform or comply with any one or more of its payment obligations under this Indenture or the Notes or the Note Guarantees.

(b)     In the case of any Event of Default referred to in Section 6.01(a)(iv) above, such Event of Default shall be automatically rescinded or annulled if each of the default and/or the acceleration of the Debt referred to therein is remedied or cured by the Issuer, any Guarantor or Significant Subsidiary or waived by the holders of such Debt within 60 days after the default and/or acceleration in respect of such Debt.

Section 6.02.  *Acceleration*.  (a) If an Event of Default, except for a bankruptcy default with respect to the Issuer or any Guarantor, occurs and is continuing under this Indenture, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then Outstanding, by written notice to the Issuer (and to the Trustee if the notice is given by the Holders), may, and the Trustee at the request of such Holders shall, declare the unpaid principal of and accrued interest on the Notes and any other amounts due and payable by the Issuer under

40

this Indenture to be immediately due and payable. Upon a declaration of acceleration, such principal, interest and other amounts will become immediately due and payable. If a bankruptcy default occurs with respect to the Issuer or any Guarantor, the unpaid principal of and accrued interest on the Notes then Outstanding and any other amounts due and payable by the Issuer under this Indenture will become immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

(b)      Subject to the exceptions set forth in Section 6.04, the Holders of a majority in principal amount of the Outstanding Notes by written notice to the Issuer or a Guarantor and to the Trustee may waive all past Defaults and rescind and annul a declaration of acceleration and its consequences if:

(i)      all existing Events of Default, except for the nonpayment of the principal of, premium, if any, and interest on the Notes that have become due solely by the declaration of acceleration, have been cured or waived;

(ii)      the rescission would not conflict with any judgment or decree of a court of competent jurisdiction; and

(iii)      the Issuer or a Guarantor has paid the Trustee its reasonable compensation and reimbursed the Trustee for its reasonable and documented expenses (including the fees and expenses of its counsel), disbursements and advances.

Section 6.03.   *Other Remedies*.   If an Event of Default occurs and is continuing, the Trustee may pursue, in its own name or as trustee of an express trust, any available remedy by proceeding at law or in equity to collect the payment of principal of and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture. The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.

Section 6.04.   *Waiver of Past Defaults*.   Except a Default in the payment of principal, interest, premium, if any, and Additional Amounts, if any, and except as otherwise provided in Section 9.02, the Holders of a majority in principal amount of the Outstanding Notes may, by written notice to the Trustee and to the Issuer or the relevant Guarantor, waive an existing Default and its consequences. Upon such waiver, the Default will cease to exist, and any Event of Default arising therefrom will be deemed to have been cured, but no such waiver will extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05.   *Control by Majority*.   Subject to the obligation to provide indemnity satisfactory to the Trustee, the Holders of a majority in aggregate principal amount of the Outstanding Notes may direct in writing the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, that may involve the Trustee in personal liability, or that the Trustee determines in good faith may be unduly prejudicial to the rights of Holders not joining in the giving of such direction (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders), and the Trustee may take any other

41

action it deems proper that is not inconsistent with any such direction received from Holders.  Prior to taking any action hereunder, the Trustee shall be entitled to indemnification by the Holders satisfactory to it against any costs, losses, liabilities and expenses caused by taking or not taking such action.

Section 6.06.  *Limitation on Suits*.  A Holder may not institute any proceeding, judicial or otherwise, with respect to this Indenture or the Notes, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture or the Notes, unless:

(i)     the Holder has previously given to the Trustee written notice of a continuing Event of Default;

(ii)     Holders of at least 25% in aggregate principal amount of Outstanding Notes have made written request to the Trustee to institute such proceedings in respect of the Event of Default in its own name as Trustee under this Indenture;

(iii)     Holders have offered to the Trustee security or indemnity satisfactory to the Trustee against any costs, liabilities or expenses (including reasonable and documented counsel expenses) to be incurred in compliance with such request;

(iv)     the Trustee within 60 days after its receipt of such notice, request and offer of security or indemnity has failed to institute any such proceeding; and

(v)     during such 60-day period, the Holders of a majority in aggregate principal amount of the Outstanding Notes have not given the Trustee a written direction that, in the opinion of the Trustee, is inconsistent with such written request.

Section 6.07.  *Rights of Holders to Receive Payment*.  Notwithstanding anything to the contrary, the contractual right of a Holder of a Note to receive payment of principal of or interest on its Note on or after the Stated Maturity thereof, or to bring suit for the enforcement of any such payment on or after such dates, in each case as expressly set forth in this Indenture, may not be amended without the consent of that Holder.

Section 6.08.  *Collection Suit by Trustee*.  If an Event of Default in payment of principal or interest specified in clause (i) or (ii) of Section 6.01(a) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust for the whole amount of principal and accrued interest remaining unpaid, together with interest on overdue principal and, to the extent lawful, overdue installments of interest, in each case at the rate specified in the Notes, and such further amount as is sufficient to cover the reasonable and documented costs and expenses of collection, including the reasonable and documented compensation, expenses, disbursements and advances of the Trustee, its agents and legal counsel and any other reasonable and documented amounts due to the Trustee hereunder.

Section 6.09.  *Trustee May File Proofs of Claim*.  The Trustee may file proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due to the Trustee hereunder) and the Holders allowed in any judicial proceedings relating to the Issuer, the Guarantors or their

42

respective creditors or property, and is entitled and empowered to collect, receive and distribute any money, securities or other property payable or deliverable upon conversion or exchange of the Notes or upon any such claims.  Any custodian, receiver, "*síndico*," assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, if the Trustee consents to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable and documented compensation, expenses, disbursements and advances of the Trustee, its agent and counsel, and any other reasonable and documented amounts due to the Trustee hereunder.  Nothing in this Indenture will be deemed to empower the Trustee to authorize or consent to, or accept or adopt on behalf of any Holder, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10.   *Priorities*.  If the Trustee collects any money pursuant to this Article, it shall pay out the money in the following order:

First: to the Trustee and each of the Agents for all amounts due to it hereunder;

Second: to Holders for amounts then due and unpaid for principal of and interest on the Notes, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and interest; and

Third: to the Issuer or any Guarantor or as a court of competent jurisdiction may direct.

The Trustee, upon written notice to the Issuer, may fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

Section 6.11.   *Restoration of Rights and Remedies*.  If the Trustee or any Holder has instituted a proceeding to enforce any right or remedy under this Indenture and the proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to the Holder, then, subject to any determination in the proceeding, the Issuer, the Guarantors, the Trustee and the Holders will be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Issuer, the Guarantors, the Trustee and the Holders will continue as though no such proceeding had been instituted.

Section 6.12.   *Undertaking for Costs*.  In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court may require any party litigant in such suit (other than the Trustee) to file an undertaking to pay the costs of the suit, and the court may assess reasonable costs, including reasonable attorneys' fees, against any party litigant (other than the Trustee) in the suit having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.12 does not apply to a suit by a Holder to enforce payment of principal of or interest on any Note on the respective due dates pursuant to Section 6.07, or a suit by Holders of more than 10% in principal amount of the Outstanding Notes except for any proceeding brought before a Brazilian court, which case the Holder may be required to post a bond to cover legal fees and court expenses.

Section 6.13.  *Rights and Remedies Cumulative*.  No right or remedy conferred or reserved to the Trustee or to the Holders under this Indenture is intended to be exclusive of any other right or remedy, and all such rights and remedies are, to the extent permitted by law, cumulative and in addition to every other right and remedy hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or exercise of any right or remedy hereunder, or otherwise, will not prevent the concurrent assertion or exercise of any other right or remedy.

Section 6.14.  *Delay or Omission Not Waiver; Prescription of Claims*.  No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default will impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein and every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be; *provided*, that claims against the Issuer or the Guarantors for payments under any of the Notes shall be prescribed unless made within a period of ten years or, in the case of interest, a period of five years, from the applicable original date of payment therefor.

Section 6.15.  *Waiver of Stay, Extension or Usury Laws*.  Each of the Issuer and the Guarantors covenants, to the extent that it may lawfully do so, that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive the Issuer or a Guarantor, as the case may be, from paying all or any portion of the principal of, or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or that may affect the covenants or the performance of this Indenture.  Each of the Issuer and the Guarantors hereby expressly waives, to the extent that it may lawfully do so, all benefit or advantage of any such law and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

ARTICLE 7
THE TRUSTEE

Section 7.01.  *General*.  (a) The duties and responsibilities of the Trustee are as set forth herein.  Whether or not expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee is subject to this Article.

(b)    Except during the continuance of an Event of Default, (i) the duties of the Trustee shall be determined solely by the express provisions of this Indenture and the Trustee needs to perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations will be read into this Indenture against the Trustee; and (ii) the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, opinions or orders furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not

44

they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)    In case an Event of Default has occurred and is continuing, the Trustee shall exercise those rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(d)    No provision of this Indenture shall be construed to relieve the Trustee from liability for its own gross negligence or willful misconduct, except that:

(i)    this Section 7.01(d) shall not be construed to limit the effect of Section 7.01(b);

(ii)    the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(iii)    the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority in principal amount of the Outstanding Notes, relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture with respect to the Notes; and

(iv)    no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(e)    Unless otherwise specifically provided herein or in the Notes, any order, certificate, notice, request, direction or other communication from the Issuer or any Guarantor made or given under any provision of this Indenture shall be sufficient if signed by an Officer or any duly authorized attorney-in-fact.

(f)    Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 7.01.

Section 7.02.    *Certain Rights of Trustee*.

(a)    The Trustee may conclusively rely, and will be protected in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper Person.

(b)    Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel conforming to Section 11.03 and the Trustee will not be

45

liable for any action it takes or omits to take in good faith in reliance on such certificate or opinion.

(c)     The Trustee may act and conclusively rely and shall be fully protected in acting and relying in good faith on the opinion or advice of, or information obtained from, any counsel, accountant, appraiser or other expert or adviser, whether retained or employed by the Issuer, the Guarantors or by the Trustee, in relation to any matter arising in the administration of the trusts hereof.

(d)     The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders, unless such Holders have offered to the Trustee security, reasonably satisfactory to it, or indemnity against the reasonable and documented costs, expenses and liabilities (including, without limitation, reasonable and documented fees and expenses of legal counsel) that might be incurred by it in compliance with such request or direction.

(e)     The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within its rights or powers or for any action it takes or omits to take in accordance with the direction of the Holders in accordance with Section 6.05 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture.

(f)     The Trustee may appoint counsel and other advisors of its choice from time to time to provide advice and services arising out of or in connection with the performance by the Trustee of its obligations under this Indenture.  The Trustee may consult with counsel of its choice, and the advice of such counsel or any Opinion of Counsel will be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(g)     The Trustee may act through its agents, attorneys, accountants, experts and such other professionals as the Trustee deems necessary, advisable or appropriate and shall not be responsible for the misconduct or negligence of any agent, attorney, accountant, expert or other such professional appointed with due care.

(h)     No provision of this Indenture will require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties hereunder, or in the exercise of its rights or powers, unless it receives indemnity satisfactory to it against any loss, liability or expense (including, without limitation, reasonable and documented fees and expenses of agents and attorneys).  In no event shall the Trustee be liable for special, indirect punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(i)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be

46

enforceable by, the Trustee in each of its capacities hereunder, each Agent and each agent, custodian and other Person authorized or employed to act hereunder.

(j)      The Trustee may request that each of the Issuer and the Guarantors deliver a certificate setting forth the names of individuals and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture.

(k)      The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and reasonably believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Indenture.

(l)      The Issuer and its Affiliates may from time to time enter into normal banking and trustee relationships with the Trustee and its Affiliates.

(m)      The permissive rights of the Trustee to do things enumerated in this Indenture shall not be construed as a duty to take such action.

(n)      None of the Trustee or any Agent shall have any liability or responsibility with respect to, or obligation or duty to monitor, determine or inquire as to the Issuer's or any Guarantor's compliance with any covenant under this Indenture.

(o)      The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder.

(p)      The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note other evidence of indebtedness or other papers or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer personally or by agent or attorney at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

Section 7.03.  *Individual Rights of Trustee*.  The Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer, the Guarantors or its Affiliates with the same rights it would have if it were not the Trustee.  Any Agent may do the same with like rights.  However, the Trustee is subject to Trust Indenture Act Sections 310(b) and 311.

Section 7.04.  *Trust Indenture Act*.  Notwithstanding anything to the contrary elsewhere in this Indenture, the parties to this Indenture and the Holders of the Notes acknowledge and agree that this Indenture is not qualified under the Trust Indenture Act, Holders are not entitled to any protections thereunder and, except as expressly set forth in this Indenture, the provisions of the Trust Indenture Act are not incorporated by reference in this Indenture.

Section 7.05.  *Trustee's Disclaimer*.  The Trustee (i) makes no representation as to the validity or adequacy of this Indenture, the Notes, any Note Guarantee or any offering materials;

47

(ii) is not accountable for the Issuer's use or application of the proceeds from the Notes; and (iii) is not responsible for any statement in the Notes other than its certificate of authentication.

Section 7.06.  *Notice of Default*.  The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default with respect to the Notes (except a payment Default under Section 6.01(a)(i) or Section 6.01(a)(ii)) unless a Responsible Officer of the Trustee shall have received written notice thereof at the Corporate Trust Office and such notice references the Notes and this Indenture.  If any Default or Event of Default occurs and is continuing and (i) the Trustee has actual knowledge thereof (in the case of a payment Default under Section 6.01(a)(i) or Section 6.01(a)(ii)), or (ii) written notice thereof is delivered to a Responsible Officer of the Trustee, the Trustee will send notice of the Default or Event of Default to each Holder within 60 days after the Trustee is deemed to have knowledge or has received notice thereof, unless the Default or Event of Default has been cured; *provided* that, except in the case of a Default in the payment of the principal of or interest on any Note, the Trustee may withhold the notice if and so long as a committee of trust officers of the Trustee in good faith determines that withholding the notice is in the interest of the Holders.

Section 7.07.  *Compensation and Indemnity*.  (a) Each of the Issuer and the Guarantors will, jointly and severally, pay the Trustee compensation as agreed upon in writing between the Issuer, the Guarantors and the Trustee for their services. The compensation of the Trustee is not limited by any law on compensation of a trustee of an express trust. Each of the Issuer and the Guarantors will, jointly and severally, reimburse the Trustee upon request for all reasonable and documented out-of-pocket expenses, disbursements and advances incurred or made by the Trustee, including the compensation and reasonable and documented expenses of the Trustee's agents and counsel.

(b)      The Issuer and the Guarantors shall, jointly and severally, indemnify the Trustee for, and hold it harmless for, from and against, any damage, loss, claim, liability or expense (including, without limitation, the reasonable and documented fees and expenses of its legal counsel) incurred by it without gross negligence or willful misconduct on its part arising out of or in connection with the acceptance or administration of this Indenture by it and the performance of its duties under this Indenture and the Notes, including the reasonable and documented costs and expenses (legal or otherwise) of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Indenture and the Notes.

(c)      To secure the Issuer's and the Guarantors' payment obligations in this Section, the Trustee will have a lien prior to the Notes on all money or property held or collected by the Trustee, in its capacity as Trustee, except money or property held in trust to pay principal of, and interest (including Additional Amounts) on particular Notes.

(d)      If the Trustee incurs expenses or renders services in connection with an Event of Default as specified herein, the expenses (including, without limitation, the reasonable and documented charges and expenses of its legal counsel per jurisdiction) and the compensation for the services are intended to constitute expenses of administration under any applicable bankruptcy, reorganization, insolvency or similar law now or hereafter in effect.

48

(e)    The provisions of this Section 7.07 shall survive the payment of the Notes and the resignation or removal of the Trustee and/or the termination of this Indenture.

Section 7.08.    *Replacement of Trustee*.  (a) (i) The Trustee may resign at any time by providing at least 30-days written notice to the Issuer.

(ii)    The Holders of a majority in principal amount of the Outstanding Notes may remove the Trustee by providing at least 30-days written notice to the Trustee.

(iii)    If the Trustee is no longer eligible pursuant to Section 7.12, any Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(iv)    The Issuer may remove the Trustee if: (1) the Trustee is no longer eligible pursuant to Section 7.12; (2) the Trustee is adjudged a bankrupt or an insolvent; (3) a receiver or other public officer takes charge of the Trustee or its property; or (4) the Trustee becomes incapable of acting.  In addition, the Issuer may remove the Trustee at any time for any reason to the extent the Issuer has given the Trustee at least 30 days' written notice and as long as no Default or Event of Default has occurred and is continuing.

A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section.

(b)    If the Trustee has been removed by the Holders, Holders of a majority in principal amount of the Outstanding Notes may appoint a successor Trustee with the consent of the Issuer.  Otherwise, if the Trustee resigns or is removed, or if a vacancy exists in the office of Trustee for any reason, the Issuer will promptly appoint a successor Trustee.  If the successor Trustee does not deliver its written acceptance within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee (at the expense of the Issuer), the Issuer or the Holders of a majority in principal amount of the Outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)    Upon delivery by the successor Trustee of a written acceptance of its appointment to the retiring Trustee and to the Issuer, (i) the retiring Trustee will transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.07, (ii) the resignation or removal of the retiring Trustee will become effective, and (iii) the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture.  Upon request of any successor Trustee, the Issuer will execute any and all instruments for fully and vesting in and confirming to the successor Trustee all such rights, powers and trusts.  The Issuer will give notice of any resignation and any removal of the Trustee and each appointment of a successor Trustee to all Holders, and include in the notice the name of the successor Trustee and the address of its Corporate Trust Office.

(d)    Notwithstanding replacement of the Trustee pursuant to this Section, the Issuer's and the Guarantors' obligations in Section 7.07 will continue for the benefit of the retiring Trustee.

49

Section 7.09. *Successor Trustee by Merger*. If the Trustee consolidates with, merges or converts into, or transfers all or substantially all of its corporate trust business (including this transaction) to, another corporation or national banking association, the resulting, surviving or transferee corporation or national banking association without any further act will be the successor Trustee with the same effect as if the successor Trustee had been named as the Trustee in this Indenture.

Section 7.10. *Money Held in Trust*. The Trustee will not be liable for interest on or the investment of any money received by it except as it may agree with the Issuer or any Guarantor in writing. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.11. *Force Majeure*. Notwithstanding any provision herein to the contrary, in no event shall the Trustee or any Agent be liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused by forces beyond its control, including, but not limited to, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like which restrict or prohibit the providing of the services contemplated by this Indenture, inability to obtain material, equipment, or communications or computer facilities, or the failure of equipment or interruption of communications or computer facilities, it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 7.12. *Corporate Trustee Required; Eligibility; Conflicting Interests*. There shall at all times be a Trustee hereunder which shall be eligible to act as Trustee under the Trust Indenture Act and shall have a combined capital and surplus of at least US$25,000,000 and its Corporate Trust Office in The City of New York, New York. If such corporation publishes reports of condition at least annually, pursuant to law or the requirements of Federal, state, territorial or District of Columbia supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article. Neither the Issuer nor any Person directly or indirectly controlling, controlled by, or under common control with the Issuer shall serve as Trustee. If the Trustee acquires any conflicting interest within the meaning of the TIA, it must (i) eliminate such conflict within 90 days, (ii) apply to the SEC for permission to continue as trustee or (iii) resign.

Section 7.13. *Trustee and Others May Hold Notes*. The Trustee or any Agent or any other authorized agent of the Trustee or the Issuer or any Guarantor, or any Affiliate thereof, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer or any Guarantor, or any other obligor on the Notes with the same rights it would have if it were not Trustee, Agent or such other authorized agent.

Section 7.14.    *Agents.*

(a)    Each Agent accepts its respective obligations set forth herein and in the Notes upon the terms and conditions hereof and thereof, including the following, to all of which the Issuer agrees and to all of which the rights of the Holders from time to time of the Notes shall be subject:

(i)    Each Agent shall be entitled to the compensation to be agreed upon with the Issuer and the Guarantors in writing for all services rendered by it, and the Issuer and the Guarantors, jointly and severally, agree promptly to pay such compensation and to reimburse each of the Agents for its reasonable and documented out-of-pocket expenses (including reasonable and documented fees and expenses of its counsel) incurred by it in connection with the services rendered by it hereunder.    Each of the Issuer and the Guarantors, jointly and severally, also agrees to indemnify each of the Agents for, and to hold each of them harmless against, any loss, liability or expense (including, without limitation, reasonable and documented fees and expenses of its legal counsel), incurred out of or in connection with its acting as agent of the Issuer hereunder, except to the extent such loss, liability or expense results from such Agent's own gross negligence or willful misconduct.    The obligations of the Issuer and the Guarantors under this Section 7.14(a)(i) shall survive the payment of the Notes and the resignation or removal of an Agent and/or the termination of this Indenture;

(ii)    In acting under this Indenture and in connection with the Notes, the Agents are each acting solely as agent of the Issuer and do not assume any obligation towards or relationship of agency or trust for or with any of the Holders, except that all funds held by a Paying Agent for the payment of the principal of and interest on (and Additional Amounts, if any, with respect to) the Notes, shall be held in trust by it and applied as set forth herein and in the Notes, but need not be segregated from other funds held by it, except as required by law;

(iii)    Each of the Agents shall be protected and shall incur no liability for or in respect of any action taken or omitted to be taken or thing suffered by it in reliance upon any Note, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper party or parties;

(iv)    No Agent shall be under any liability for interest on or investment of any moneys received by it pursuant to any of the provisions of this Indenture or the Notes or the Note Guarantees except as it may agree with the Issuer or any Guarantor in writing;

(v)    The recitals contained herein and in the Notes shall be taken as the statements of the Issuer, and no Agent assumes any responsibility for the correctness of the same.    No Agent makes any representation as to the validity or sufficiency of this Indenture, the Notes or the Note Guarantees or any offering materials.    No Agent shall be accountable for the use or application by the Issuer of any of the Notes or the proceeds thereof;

51

(vi)     Each Agent shall be obligated to perform such duties and only such duties as are herein and in the Notes specifically set forth, and no implied duties or obligations shall be read into this Indenture, the Notes or the Note Guarantees against such Agent.  No Agent shall be under any obligation to take any action hereunder which may tend to involve it in any expense or liability, the payment of which within a reasonable time is not, in its reasonable opinion, assured to it; and

(vii)     No provision of this Indenture shall be construed to relieve any Paying Agent or any Transfer Agent, as applicable, from liability for its own gross negligence or willful misconduct.

Anything in this Section to the contrary notwithstanding, the agreements to hold sums in trust as provided in this Section are subject to the provisions of Section 8.05.

(b)     Any Agent may at any time resign by giving written notice of its resignation mailed to the Issuer and the Trustee specifying the date on which its resignation shall become effective; *provided* that such date shall be at least 60 days after the date on which such notice is given unless the Issuer agrees to accept less notice.  Upon receiving such notice of resignation, the Issuer shall promptly appoint a successor Agent, qualified as aforesaid, by written instrument in duplicate signed on behalf of the Issuer, one copy of which shall be delivered to the resigning Agent and one copy to the successor Agent.  Such resignation shall become effective upon the earlier of (i) the effective date of such resignation or (ii) the acceptance of appointment by the successor Agent as provided in Section 7.14(c).  The Issuer may, at any time and for any reason, and shall, upon any event set forth in the next succeeding sentence, remove an Agent and appoint a successor Agent, qualified as aforesaid, by written instrument in duplicate signed on behalf of the Issuer, one copy of which shall be delivered to the Agent being removed and one copy to the successor Agent.  An Agent shall be removed as aforesaid if it shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver of such Agent or of its property shall be appointed, or any public officer shall take charge or control of it or of its property or affairs for the purpose of rehabilitation, conservation or liquidation.  Any removal of an Agent and any appointment of a successor Agent shall become effective upon acceptance of appointment by the successor Agent as provided in Section 7.14(c). Upon its resignation or removal, the Agent shall be entitled to the payment by the Issuer of its compensation and reimbursement of its reasonable and documented disbursements, advances and expenses (including, without limitation, reasonable and documented fees and expenses of its legal counsel) as set forth in Section 7.14(a)(i).

(c)     Any successor Agent appointed as provided in Section 7.14(b) shall execute and deliver to its predecessor and to the Issuer an instrument accepting such appointment hereunder, and thereupon such successor Agent, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as such Agent hereunder, and such predecessor, upon payment of its compensation and reasonable and documented out-of-pocket expenses (including, without limitation, reasonable and documented fees and expenses of its legal counsel) then unpaid, shall pay over to such successor agent all moneys or other property at the time held by it hereunder, if any.

52

(d)      Any corporation or bank into which any Agent may be merged or converted, or with which any Paying Agent or Transfer Agent may be consolidated, or any corporation or bank resulting from any merger, conversion or consolidation to which an Agent shall be a party, or any corporation or bank succeeding to all or substantially all of the agency business of the Agent (including this transaction) shall be the successor to such Agent hereunder (*provided* that such corporation or bank shall be qualified as aforesaid) without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(e)      Notwithstanding anything to the contrary contained in this Indenture, any Paying Agent may, to the extent it is required to do so by law, deduct or withhold income or other similar taxes from principal or interest payments hereunder without any liability therefor.

ARTICLE 8
DEFEASANCE AND DISCHARGE

Section 8.01.   *Discharge of Issuer's Obligations*.  (a) Subject to paragraph (b), the Issuer's obligations under the Notes and this Indenture, and the Guarantors' obligations under the Note Guarantees, will terminate if:

(i)      either (A) all Notes previously authenticated and delivered (other than (1) destroyed, lost or stolen Notes that have been replaced or (2) Notes that are paid pursuant to Section 4.01 or (3) Notes for whose payment funds in Dollars or U.S. Government Obligations in Dollars have been held in trust and then repaid to the Issuer pursuant to Section 8.05) have been delivered to the Trustee for cancellation and the Issuer has paid all sums payable by it hereunder; or (B) (1) all Notes not theretofore delivered to the Trustee for cancellation (x) have become due and payable, (y) will become due and payable at their Stated Maturity within one year or (z) are to be called for redemption within one year under arrangements reasonably satisfactory to the Trustee, and the Issuer irrevocably deposits in trust with the Trustee, as trust funds solely for the benefit of the Holders, funds in Dollars or U.S. Government Obligations in Dollars or a combination thereof sufficient, in the opinion of an internationally recognized firm of independent public accountants to the extent such amounts consist of U.S. Government Obligations, expressed in a written opinion delivered to the Trustee, without consideration of any reinvestment, to pay principal of and interest on the Notes to maturity or redemption, as the case may be, and to pay all other sums payable by it hereunder; (2) no Default has occurred and is continuing on the date of the deposit; and (3) the deposit will not result in a breach or violation of, or constitute a Default under, this Indenture or any other agreement or instrument to which the Issuer is a party or by which it is bound; and

(ii)      the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel, in each case stating that all conditions precedent provided for herein relating to the satisfaction and discharge of this Indenture have been complied with.

(b)      After satisfying the conditions in clause (a)(i)(A), only the obligations of the Issuer and the Guarantors under Section 7.07 and Section 7.14 will survive. After satisfying the conditions in clause (a)(i)(B), only the obligations of the Issuer and the Guarantors in Article 2 and Sections 3.01, 4.01, 4.02, 7.07, 7.14, 8.05 and 8.06 will survive; *provided* that

upon payment of all Notes in full, only the obligations of the Issuer and the Guarantors in Section 7.07 and 7.14 will survive. In either case, the Trustee, upon request, will acknowledge in writing the discharge of the Issuer's and the Guarantors' obligations under the Notes and this Indenture other than the surviving obligations.

Section 8.02.  *Legal Defeasance*.    After the 123rd day following the deposit referred to in clause (i) below, the Issuer will be deemed to have paid and will be discharged from its obligations in respect of the Notes and this Indenture, other than its obligations in Article 2 and Sections 4.02, 7.07, 7.14, 8.05 and 8.06 (*provided* that upon payment of all Notes in full, only the Issuer's and the Guarantors' obligations in Section 7.07 and Section 7.14 will survive), if the following conditions have been satisfied:

(i)      the Issuer has irrevocably deposited in trust with the Trustee, as trust funds solely for the benefit of the Holders, funds in Dollars or U.S. Government Obligations in Dollars or a combination thereof sufficient, in the opinion of an internationally recognized firm of independent public accountants to the extent amounts consist of U.S. Government Obligations, expressed in a written certificate thereof delivered to the Trustee, without consideration of any reinvestment, to pay principal of and interest on the Notes to maturity or redemption, as the case may be, *provided* that any redemption before maturity has been irrevocably provided for under arrangements satisfactory to the Trustee;

(ii)      no Default has occurred and is continuing on the date of the deposit or at the end of the 123 day period following the deposit;

(iii)      the deposit will not result in a breach or violation of, or constitute a Default under, this Indenture or any other agreement or instrument to which the Issuer is a party or by which it is bound;

(iv)      the Issuer has delivered to the Trustee either (x) a ruling received from the Internal Revenue Service to the effect that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the legal defeasance and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case or (y) an Opinion of Counsel, based on a ruling published by the Internal Revenue Service or a change in U.S. federal income tax law after the date of this Indenture, to the same effect as the ruling described in clause (x); and

(v)      the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, in each case stating that all conditions precedent provided for herein relating to the legal defeasance (or in the case of covenant defeasance, covenant defeasance) have been complied with.

Prior to the end of the 123 day period, none of the Issuer's obligations under this Indenture will be discharged.  Thereafter, upon written request, the Trustee will acknowledge in writing the legal defeasance of the Notes.

Section 8.03.  *Covenant Defeasance*.  Following the deposit referred to in Section 8.01(a)(ii), the Issuer's obligations set forth in Section 4.03, Section 4.04, Section 4.05, Section

4.06, Section 4.07, Section 4.08(a), Section 4.08(b), and Section 5.01(a)(ii) will terminate, and the failure to comply with such obligations will no longer constitute an Event of Default under Section 6.01, provided that the following conditions have been satisfied:

(i)    the Issuer has complied with clauses (i), (iii) and (v) of Section 8.02; and

(ii)    the Issuer has delivered to the Trustee an Opinion of Counsel to the effect that the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of the covenant defeasance and will be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case.

Except as specifically stated above, none of the Issuer's obligations under this Indenture will be discharged.

Section 8.04. *Application of Trust Money*.  Subject to Section 8.05, the Trustee will hold in trust the funds in Dollars or U.S. Government Obligations in Dollars deposited with it pursuant to Section 8.01, 8.02 or 8.03, and apply the deposited funds in Dollars and the proceeds from deposited U.S. Government Obligations in Dollars to the payment of principal of and interest on the Notes in accordance with the Notes and this Indenture.  Such Dollar funds and U.S. Government Obligations need not be segregated from other funds except to the extent required by law.

Section 8.05. *Repayment to Issuer*.  Subject to Section 7.07, 8.01, 8.02 and 8.03, the Trustee and the Paying Agents will promptly pay to the Issuer upon request any excess funds in Dollars held by the Trustee and the Paying Agents at any time and thereupon be relieved from all liability with respect to such funds.  The Trustee or such Paying Agent will pay to the Issuer upon written request any funds in Dollars held for payment with respect to the Notes that remains unclaimed for two years; *provided* that before making such payment the Trustee or such Paying Agent may at the expense of the Issuer publish once in a newspaper of general circulation in New York City, or send to each Holder entitled to such Dollar denominated funds, notice that the funds remains unclaimed and that after a date specified in the notice (at least 30 days after the date of the publication or notice) any remaining unclaimed balance of money will be repaid to the Issuer. After payment to the Issuer, Holders entitled to such funds must look solely to the Issuer for payment, unless applicable law designates another Person, and all liability of the Trustee and the Paying Agents with respect to such funds will cease.

Section 8.06. *Reinstatement*.  If and for so long as the Trustee is unable to apply any funds in Dollars or U.S. Government Obligations in Dollars held in trust pursuant to Section 8.01, 8.02 or 8.03 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and the Guarantors' obligations under this Indenture and the Notes and the Note Guarantees will be reinstated as though no such deposit in trust had been made.  If the Issuer makes any payment of principal of or interest on any Notes because of the reinstatement of its obligations, it will be subrogated to the rights of the Holders of such Notes to receive such payment from the funds in Dollars or U.S. Government Obligations in Dollars held in trust.

## ARTICLE 9
## AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 9.01.  *Amendments Without Consent of Holders*.  The Issuer, the Guarantors and the Trustee may waive, consent, amend or supplement this Indenture, the Notes or the Note Guarantees without notice to or the consent of any Noteholder:

(i)     to cure any ambiguity, omission, defect, inconsistency or to correct a manifest error in this Indenture, the Notes or the Note Guarantees;

(ii)    to comply with Section 5.01 and to substitute the Issuer in accordance with Section 9.03;

(iii)   to evidence and provide for the acceptance of an appointment by a successor Trustee;

(iv)    to provide for uncertificated Notes in addition to or in place of Certificated Notes *provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code;

(v)     to provide for any additional Note Guarantee of the Notes or to secure the Notes or confirm and evidence the release, termination or discharge of any Note Guarantee of or Lien securing the Notes when such release, termination or discharge is permitted by this Indenture;

(vi)    to provide for or confirm the issuance of Additional Notes;

(vii)   to add to the covenants of the Issuer or Guarantors for the benefit of the Holders of the Notes;

(viii)  to surrender any right conferred by this Indenture upon the Issuer or the Guarantors;

(ix)    to comply with any requirements of the SEC in connection with any qualification of this Indenture under the U.S. Trust Indenture Act of 1939, as amended;

(x)     to make any other change that does not materially and adversely affect the rights of any Holder; or

(xi)    to conform any provision of this Indenture to the "Description of the Notes" in the Offering Memorandum.

Section 9.02.  *Amendments With Consent of Holders*.  (a) Except as otherwise provided in Article 6 or paragraph (b) of this Section 9.02, the Issuer, the Guarantors and the Trustee may amend this Indenture, the Notes and the Note Guarantees with the written consent of the Holders of at least a majority in aggregate principal amount of the Outstanding Notes, and the Holders of at least a majority in aggregate principal amount of the Outstanding Notes by written

notice to the Trustee may waive future compliance by the Issuer and the Guarantors with any provision of this Indenture, the Notes or the Note Guarantees.

(b)     Notwithstanding the provisions of paragraph (a), without the consent of each Holder of an affected Note, an amendment or waiver may not:

(i)     reduce the principal amount of or change the Stated Maturity of any payment of principal or any installment of interest on any Note;

(ii)     reduce the rate of interest or change the method of computing the amount of interest payable on any Note;

(iii)     reduce the amount payable upon the redemption of any Note or change the time at which any Note may be redeemed or, once notice of redemption has been given, the time at which it must thereupon be redeemed, subject to the conditions set forth in this Indenture, which conditions shall not be changed in any matter adverse to Holders, *provided*, *however*, the minimum notice period for such redemption may be changed with the written consent of the Holders of a majority in principal amount of the Outstanding Notes;

(iv)     make any Note payable in currency and place of payment other than that stated in the Note;

(v)     impair the contractual right of any Holder of Notes to receive any principal payment or interest payment on such Holder's Notes, on or after the Stated Maturity thereof, or to institute suit for the enforcement of any such payment;

(vi)     make any change in the percentage of the principal amount of the Notes required for amendments or waivers; or

(vii)     modify or change any provision of this Indenture affecting the ranking of the Notes in a manner adverse to the Holders of the Notes (it being understood that changes in provisions affecting the ability to create Liens over the assets of the Issuer shall not affect the "ranking" of the Notes as that term is used in this subsection (vii)).

(c)     It is not necessary for Holders to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if their consent approves the substance thereof.

(d)     (c) An amendment or waiver becomes effective upon the execution of such amendment or waiver by the Trustee.  After an amendment, supplement or waiver under this Section becomes effective, the Issuer will send to the Holders affected thereby a notice briefly describing the amendment, supplement or their written waiver.  Any failure of the Issuer to send such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amendment to this Indenture or waiver.

Section 9.03.   *Substitution of the Issuer*.  (b) Without the consent of any Holder of Notes, the Issuer may be replaced and substituted, as principal debtor in respect of this Indenture

and the Notes, by (x) either Guarantor or (y) any Subsidiary of a Guarantor (in each case, in that capacity, the "**Substituted Issuer**"); *provided* that the following conditions are satisfied:

(i)     such documents shall be executed by the Substituted Issuer, the Issuer, the Guarantors and the Trustee as may be necessary to give full effect to the substitution, including a supplemental indenture to this Indenture under which the Substituted Issuer assumes all of the obligations of the Issuer under this Indenture and the Notes as if the Substituted Issuer had been named in the Notes and in this Indenture as the principal debtor in respect of the Notes in place of the Issuer (or any previous substitute) and each Guarantor, unless such Guarantor is the Substituted Issuer, or such Guarantor's then-existing Note Guarantee remains in full force and effect (as evidenced by an Officer's Certificate of such Guarantor), unconditionally and irrevocably reaffirms its Note Guarantee (collectively, the "**Substitution Documents**");

(ii)     if the Substituted Issuer is organized in a jurisdiction other than Luxembourg, the Substitution Documents shall contain covenants (a) to ensure that each Holder and beneficial owner of Notes has the benefit of a covenant in terms corresponding to the obligations of the Issuer pursuant to Section 3.01, in respect of the payment of Additional Amounts (but replacing references to Luxembourg with references to the jurisdiction of organization of the Substituted Issuer) and (b) to indemnify the Trustee, any Paying Agent, and each Holder and beneficial owner of Notes against all taxes or duties that (1) arise by reason of a law or regulation in effect or contemplated on the effective date of the substitution that are incurred or levied against the Trustee, such Paying Agent, or such Holder or beneficial owner of Notes, as the case may be, as a result of the substitution and that would not have been so incurred or levied had the substitution not been made, and (2) are imposed on the Trustee, such Paying Agent, or such Holder or beneficial owner of Notes, as the case may be, by any political subdivision or taxing authority of any country in which the Trustee, such Paying Agent, or such Holder or beneficial owner of Notes resides or is subject to any such tax or duty and that would not have been so imposed had the substitution not been made, in each case subject to similar exceptions as set forth in Section 3.01, *mutatis mutandis*; *provided*, that the Trustee, any Paying Agent, or any Holder or beneficial owner of Notes making a claim with respect to such tax indemnity shall provide the Substituted Issuer with notice of such claim, along with supporting documentation, within four weeks of the announcement of the substitution of the Issuer as issuer; and *provided*, *further*, that notwithstanding anything to the contrary in this Section, the Substituted Issuer shall be entitled to make any deduction or withholding, and shall not be required to indemnify the Trustee, any Paying Agent, or any Holder or beneficial owner of Notes for or on account of any taxes or duties, or pay any Additional Amounts with respect to any such deduction or withholding, imposed on or in respect of any Notes, in either case, pursuant to FATCA, any treaty, law, regulation or other official guidance enacted by any jurisdiction implementing FATCA or any intergovernmental agreement or law, regulation or other official guidance promulgated thereunder implementing FATCA;

(iii)     the Issuer will deliver, or cause the delivery, to the Trustee of (a) an Opinion of Counsel in the jurisdiction of organization of the Substituted Issuer to the effect that the Substitution Documents were duly authorized, executed and delivered by the Substituted

58

Issuer, (b) an Opinion of Counsel in the State of New York to the effect that the Substitution Documents constitute valid and binding obligations of the Substituted Issuer, and (c) an Officer's Certificate as to compliance with the provisions described in this Section 9.03;

(iv)    the Substituted Issuer shall appoint a process agent in the Borough of Manhattan in The City of New York to receive service of process on its behalf in relation to any legal action or proceedings arising out of or in connection with the Notes, this Indenture and the Substitution Documents;

(v)    no Event of Default under this Indenture has occurred or is continuing; and

(vi)    the substitution shall comply with all applicable requirements under the laws of the jurisdiction of organization of the Substituted Issuer, Luxembourg and Brazil.

(c)    Upon the execution of the Substitution Documents and compliance with the other conditions set forth in this Section, (i) the Substituted Issuer shall be deemed to be named in this Indenture and the Notes as the principal debtor in place of the Issuer and (ii) the Issuer (or any previous substitute) shall be released from all of its obligations under the Notes and this Indenture and any reference in this Indenture to the Issuer shall from then on be deemed to refer to the Substituted Issuer and any reference to the country in which the Issuer is organized or resident for tax purposes shall from then on be deemed to refer to the country in which the Substituted Issuer is organized or resident for tax purposes.

(d)    Not later than ten Business Days after the execution of the Substitution Documents, the Substituted Issuer shall give written notice thereof to the Holders of Notes.

(e)    Notwithstanding anything to the contrary, this Section 9.03 is not applicable to any consolidation or merger by the Issuer with or into any other Person or the sale, conveyance, transfer or lease by the Issuer, in one transaction or a series of transactions, directly or indirectly, of all or substantially all of its Property (determined on the basis of the consolidated assets of Raízen and its Subsidiaries), which such transaction shall be subject to the provisions of Section 5.01.

Section 9.04.    *Effect of Consent*.    (a) After an amendment, supplement or waiver becomes effective, it will bind every Holder unless it is of the type requiring the consent of each Holder affected.  If the amendment, supplement or waiver is of the type requiring the consent of each Holder affected, the amendment, supplement or waiver will bind each Holder that has consented to it and every subsequent Holder of a Note that evidences the same debt as the Note of the consenting Holder.

(b)    If an amendment, supplement or waiver changes the terms of a Note, the Trustee may require the Holder to deliver it to the Trustee so that the Trustee may place an appropriate notation of the changed terms on the Note and return it to the Holder, or exchange it for a new Note that reflects the changed terms.  The Trustee may also place an appropriate notation on any Note thereafter authenticated.  However, the effectiveness of the amendment, supplement or waiver is not affected by any failure to annotate or exchange Notes in this fashion.

Section 9.05. *Trustee's Rights and Obligations*.  In signing any amendment, supplement or waiver, the Trustee is entitled to receive, and will be fully protected in relying upon, in addition to the documents required by Section 11.03, an Officer's Certificate and an Opinion of Counsel, each stating that the execution of any amendment, supplement or waiver is authorized or permitted by this Indenture.  If the Trustee has received such an Officer's Certificate and Opinion of Counsel, it shall sign the amendment, supplement or waiver so long as the same does not adversely affect the rights of the Trustee.  The Trustee may, but is not obligated to, execute any amendment, supplement or waiver that affects the Trustee's own rights, duties or immunities under this Indenture.

## ARTICLE 10
## NOTE GUARANTEES

Section 10.01. *Note Guarantees*.

(a)    Each Guarantor hereby jointly and severally, irrevocably and unconditionally Guarantees, as a primary obligor and not merely as a surety, to each Holder and to the Trustee and its successors and assigns (i) the full and punctual payment when due, whether by acceleration, by redemption or otherwise, of all obligations of the Issuer under this Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, interest on or liquidated damages, if any, in respect of the Notes and all other monetary obligations of the Issuer under this Indenture and the Notes and (ii) the full and punctual performance within applicable grace periods of all other obligations of the Issuer whether for fees, expenses, indemnification or otherwise under this Indenture and the Notes (all the foregoing being hereinafter collectively called the "**Guaranteed Obligations**").  Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from each such Guarantor, and that each such Guarantor shall remain bound under this Article 10 notwithstanding any extension or renewal of any Guaranteed Obligation.

(b)    Each Guarantor waives, to the fullest extent permitted by law, presentation to, demand of payment from and protest to the Issuer of any of the Guaranteed Obligations and also waives notice of protest for nonpayment.  Each Guarantor waives notice of any default under the Notes or the Guaranteed Obligations.  The obligations of each Guarantor hereunder shall not be affected by (i) the failure of any Holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Issuer or any other Person under this Indenture, the Notes or any other agreement or otherwise; (ii) any extension or renewal thereof; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any Holder or the Trustee for the Guaranteed Obligations or any of them; (v) the failure of any Holder or Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (vi) any change in the ownership of such Guarantor.

(c)    Each Guarantor hereby waives, to the fullest extent permitted by law, any right to which it may be entitled to have its obligations hereunder divided among the Guarantors, such that such Guarantor's obligations would be less than the full amount claimed.  Each Guarantor hereby waives, to the fullest extent permitted by law, any right to which it may be

60

entitled to have the assets of the Issuer first be used and depleted as payment of the Issuer's or such Guarantor's obligations hereunder prior to any amounts being claimed from or paid by such Guarantor hereunder. Each Guarantor hereby waives any right to which it may be entitled to require that the Issuer be sued prior to an action being initiated against such Guarantor. Each Guarantor hereby waives the benefits to which it is entitled under Articles 333, 827, 829, 830, 834, 835, 837, 838 and 839 of the Brazilian Civil Code, and Article 794 of the Brazilian Code of Civil Procedure.

(d)    Each Guarantor further agrees that its Note Guarantee herein constitutes a Guarantee of payment, performance and compliance when due (and not a Guarantee of collection) and waives any right to require that any resort be had by any Holder or the Trustee to any security held for payment of the Guaranteed Obligations.

(e)    Except as expressly set forth in Section 10.02 below, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of any Holder or the Trustee to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Guarantor or would otherwise operate as a discharge of any Guarantor as a matter of law or equity.

(f)    Each Guarantor agrees that its Note Guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations. Each Guarantor further agrees that its Note Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest or liquidated damages, if any, on any Guaranteed Obligation is rescinded or must otherwise be restored by any Holder or the Trustee upon the bankruptcy or reorganization of the Issuer or otherwise.

(g)    In furtherance of the foregoing and not in limitation of any other right which any Holder or the Trustee has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Issuer to pay the principal of or interest or liquidated damages, if any, on any Guaranteed Obligation when and as the same shall become due, whether by acceleration, by redemption or otherwise, or to perform or comply with any other Guaranteed Obligation, each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the Paying Agent for the benefit of Holders or the Trustee an amount equal to the sum of (i) the unpaid principal amount of such Guaranteed Obligations, (ii) accrued and unpaid interest on such Guaranteed Obligations and (iii) all other monetary obligations of the Issuer to the Holders and the Trustee.

(h)    Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any Guaranteed Obligations Guaranteed hereby until

payment in full of all Guaranteed Obligations.  Each Guarantor further agrees that, as between it, on the one hand, and the Holders and the Trustee, on the other hand, (i) the maturity of the Guaranteed Obligations Guaranteed hereby may be accelerated as provided in Article 6 for the purposes of any Note Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations Guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Guaranteed Obligations as provided in Article 6, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by such Guarantor for the purposes of this Section 10.01.

(i)      Each Guarantor also agrees to pay any and all reasonable and documented costs and expenses (including reasonable and documented attorneys' fees and expenses) incurred by the Trustee in enforcing any rights under this Section 10.01, except to the extent that any such costs or expenses arise as a result of the Trustee's own gross negligence or willful misconduct.

(j)      Upon request of the Trustee, each Guarantor shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture

Section 10.02. *Limitation on Liability*.  Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations Guaranteed hereunder by any Guarantor shall not exceed the maximum amount that can be hereby Guaranteed without rendering this Indenture, as it relates to such Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

Section 10.03. *Successors and Assigns*.  This Article 10 shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the successors and assigns of the Trustee and the Holders and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Notes and the Note Guarantees shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture.

Section 10.04. *No Waiver*.  Neither a failure nor a delay on the part of either the Trustee or the Holders in exercising any right, power or privilege under this Article 10 shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege.  The rights, remedies and benefits of the Trustee and the Holders herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which either may have under this Article 10 at law, in equity, by statute or otherwise.

Section 10.05. *Modification*.   No modification, amendment or waiver of any provision of this Article 10, nor the consent to any departure by any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Trustee, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on any Guarantor in any case shall entitle such Guarantor to any other or further notice or demand in the same, similar or other circumstances.

Section 10.06. *Notation of Note Guarantee; Non-Impairment*.  To evidence its Note Guarantee set forth in Section 10.01, each Guarantor agrees that a notation of such Note Guarantee (the "**Notation of Note Guarantee**") substantially in the form attached to this Indenture as Exhibit A shall be endorsed by at least one Officer of each Guarantor by manual, electronic or facsimile signature on each Note authenticated and delivered by the Trustee and this Indenture shall be executed on behalf of the Guarantors.  Each of the Guarantors hereby agrees that its Note Guarantee set forth in Section 10.01 shall remain in full force and effect notwithstanding any failure to endorse on each Note a Notation of Note Guarantee.  If an Officer whose signature is on this Indenture or on the Notation of Note Guarantee no longer holds that office at the time the Trustee authenticates the Note on which a Note Guarantee is endorsed, the Note Guarantee shall be valid nevertheless.  The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Note Guarantee set forth in this Indenture on behalf of the Guarantors.

ARTICLE 11
MISCELLANEOUS

Section 11.01. *Noteholder Communications; Noteholder Actions*.  (a) The rights of Holders to communicate with other Holders with respect to this Indenture or the Notes are as provided by the Trust Indenture Act, and the Issuer and the Trustee shall comply with the requirements of TIA Sections 312(a) and 312(b).  Neither the Issuer nor the Trustee will be held accountable by reason of any disclosure of information as to names and addresses of Holders made pursuant to the Trust Indenture Act.

(b)      (i)  Any request, demand, authorization, direction, notice, consent to amendment, supplement or waiver or other action provided by this Indenture to be given or taken by a Holder (an "act") may be evidenced by an instrument signed by the Holder delivered to the Responsible Office of the Trustee.  The fact and date of the execution of the instrument, or the authority of the person executing it, may be proved in any manner that the Trustee deems sufficient.

(ii)      The Trustee may make reasonable rules for action by or at a meeting of Holders, which will be binding on all the Holders.

(c)      Any act by the Holder of any Note binds that Holder and every subsequent Holder of a Note that evidences the same debt as the Note of the acting Holder, even if no notation thereof appears on the Note.  Subject to paragraph (d), a Holder may revoke an act as to its Notes, but only if the Responsible Officer of the Trustee receives the written notice of revocation before the earlier of (i) if applicable, the time the right to deliver an act expires, and (ii) the time the act becomes effective.

(d)      The Issuer may, but is not obligated to, fix a record date for the purpose of determining the Holders entitled to act with respect to any amendment or waiver or in any other regard. If a record date is fixed, those Persons that were Holders at such record date and only those Persons will be entitled to act, or to revoke any previous act, whether or not those Persons continue to be Holders after the record date.

63

(e)    If the Issuer shall solicit from the Holders any request, demand, authorization, direction, notice, consent, waiver or other act, the Issuer may, at its option, in or pursuant to a Board Resolution, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other act, but the Issuer shall have no obligation to do so.  Such record date shall be the record date specified in or pursuant to such Board Resolution, which shall be a date not earlier than the date 30 days prior to the first solicitation of Holders generally in connection therewith and not later than the date such solicitation is completed.  If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other act may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of Outstanding Notes have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other act, and for that purpose the Outstanding Notes shall be computed as of such record date; *provided* that no such authorization, agreement or consent by the Holders on such record date shall be deemed effective unless it shall become effective pursuant to the provisions of this Indenture not later than eleven months after the record date.

(f)    Any request, demand, authorization, direction, notice, consent, waiver or other act of the Holder of any Note shall bind every future Holder of a Note that evidences the same debt as the Note of the acting Holder issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

(g)    Every Holder, by receiving and holding a Note, agrees with the Issuer, the Guarantors, the Trustee and each Agent that none of the Issuer, the Guarantors, the Trustee or any Agent shall be held accountable by reason of the disclosure of any information as to the names and addresses of the Holders, regardless of the source from which such information was derived.

Section 11.02. *Notices*.  (a) Any notice or communication to the parties hereto will be deemed given if in English and in writing when delivered (i) in person, (ii) by an internationally recognized overnight courier service or (iii) by electronic mail with PDF attached and proof of receipt; provided that any notice to the Trustee will be effective only upon receipt by a Responsible Officer of the Trustee.  In each case the notice or communication should be addressed as follows:

*if to the Issuer or the Guarantors*:

Raizen Fuels Finance S.A.
16, Rue Eugène Ruppert, L-2453
Luxembourg, Grand Duchy of Luxembourg
Attention: Board of Directors of Raizen Fuels Finance S.A.
E-mail: Marina.Dalben@raizen.com / tesouraria.corp@raizen.com

*and*

Raízen S.A. and Raízen Energia S.A
Avenida Brigadeiro Faria Lima, 4100, 11th floor
04538-132
São Paulo – SP, Brazil
Attention: Marina Dalben
E-mail: Marina.Dalben@raizen.com / tesouraria.corp@raizen.com

With a copy to:

Simpson Thacher & Bartlett LLP
Av. Juscelino Kubitschek, 1455, 12th floor
São Paulo, SP 04543-011
Brazil
Attention: Grenfel G. Calheiros
E-mail: gcalheiros@stblaw.com

*if to the Trustee, Paying Agent, Registrar and Transfer Agent:*

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: Corporate Trust Administration

The Issuer, the Guarantors or the Trustee by notice to the others may designate additional or different addresses for subsequent notices or communications.

(b)      Except as otherwise expressly provided with respect to published notices, any notice or communication to a Holder of a Certificated Note will be deemed given when mailed to the Holder at its address as it appears on the Register by first class mail or, as to any Global Note registered in the name of the Depositary or its nominee, when given to the Depositary in accordance with its applicable procedures; *provided*, that, at any time when the Notes are listed on the Official List of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF market and its rules so require, the Issuer will publish any such notice of communication sent to the Holders in a newspaper having a general circulation in Luxembourg, or alternatively, notice to Holders may be published on the website of the Luxembourg Stock Exchange at www.bourse.lu.  Such notice will be deemed given on the date of its first publication.  Copies of any notice or communication to a Holder, if given by the Issuer, will be mailed to the Trustee and the Agents at the same time.  Defect in mailing a notice or communication to any particular Holder will not affect its sufficiency with respect to other Holders.

(c)      Where this Indenture provides for notice, the notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and the waiver will be the equivalent of the notice.  Waivers of notice by Holders must be filed with the Trustee, but such filing is not a condition precedent to the validity of any action taken in reliance upon such waivers.

(d)      The Trustee shall have the right to accept and act upon instructions, including funds transfer instructions ("**Instructions**") given pursuant to this Indenture and the Notes and delivered using the following communications methods: e-mail, facsimile transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another method or system specified by the Trustee as available for use in connection with its services hereunder (collectively, "**Electronic Means**"); provided, however, that each of the Issuer and the Guarantors shall provide to the Trustee an incumbency certificate listing officers with the authority to provide such Instructions ("**Authorized Signatories**") and containing specimen signatures of such Authorized Signatories, which incumbency certificate shall be amended by the Issuer and/or such Guarantor, as applicable, whenever a person is to be added or deleted from the listing. If the Issuer or any Guarantor, as applicable, elects to give the Trustee Instructions using Electronic Means and the Trustee in its discretion elects to act upon such Instructions, the Trustee's understanding of such Instructions shall be deemed controlling. Each of the Issuer and the Guarantors understands and agrees that the Trustee cannot determine the identity of the actual sender of such Instructions and that the Trustee shall conclusively presume that directions that purport to have been sent by an Authorized Signatory listed on the incumbency certificate provided to the Trustee have been sent by such Authorized Signatory. Each of the Issuer and the Guarantors shall be responsible for ensuring that only Authorized Signatories transmit such Instructions to the Trustee and that the Issuer and the Guarantors and all Authorized Signatories are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords and/or authentication keys upon receipt by the Issuer and any Guarantor, as applicable. The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction. Each of the Issuer and the Guarantors agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Issuer or such Guarantor, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee immediately upon learning of any compromise or unauthorized use of the security procedures.

Section 11.03. *Certificate and Opinion as to Conditions Precedent*.   Upon any request or application by the Issuer or the Guarantors to the Trustee to take any action under this Indenture, the Issuer or the applicable Guarantor, as the case may be, will furnish to the Trustee:

(i)      an Officer's Certificate stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(ii)      an Opinion of Counsel stating that all such conditions precedent have been complied with.

66

Section 11.04. *Statements Required in Certificate or Opinion*.  Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture must include:

(i)    a statement that each person signing the certificate or opinion has read the covenant or condition and the related definitions;

(ii)    a brief statement as to the nature and scope of the examination or investigation upon which the statement or opinion contained in the certificate or opinion is based;

(iii)    a statement that, in the opinion of each such person, that person has made such examination or investigation as is necessary to enable the person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(iv)    a statement as to whether or not, in the opinion of each such person, such condition or covenant has been complied with, *provided* that an Opinion of Counsel may rely on an Officer's Certificate or certificates of public officials with respect to matters of fact.

Section 11.05. *Payment Date Other than a Business Day*.  If any payment with respect to a payment of any principal of, premium, if any, or interest on any Note (including any payment to be made on any date fixed for redemption of any Note) is due on a day which is not a Business Day, then the payment need not be made on such date, but may be made on the next Business Day with the same force and effect as if made on such date, and no interest will accrue for the intervening period.

Section 11.06. *Governing Law*.  This Indenture, the Notes and the Note Guarantees shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to its choice of law principles. For the avoidance of doubt, the application of the provisions set out in articles 470-1 to 470-19 (both included) of the Luxembourg Companies Law is excluded.

Section 11.07. *Submission to Jurisdiction; Agent for Service*.  (a) Each of the Issuer and the Guarantors agrees that any suit, action or proceeding against it brought by any Noteholder or the Trustee arising out of or based upon this Indenture, the Notes or the Note Guarantees may be instituted in any state or Federal court in the Borough of Manhattan in The City of New York, New York, and irrevocably waives, to the extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submits to the non-exclusive jurisdiction of such courts in any suit, action or proceeding.

(b)    By the execution and delivery of this Indenture or any amendment or supplement hereto, each of the Issuer and the Guarantors (i) acknowledges that it has designated and appointed Cogency Global Inc., currently located at 122 East 42nd Street, 18th Floor, New York, NY, 10168, as its authorized agent upon which process may be served in any suit, action or proceeding with respect to, arising out of, or relating to, the Notes, the Note Guarantees or this Indenture, that may be instituted in any Federal or state court in the State of

67

New York, The City of New York, the Borough of Manhattan, or brought under Federal or state securities laws or brought by the Trustee (whether in its individual capacity or in its capacity as Trustee hereunder), and acknowledges that Cogency Global Inc. has accepted such designation, (ii) submits to the non-exclusive jurisdiction of any such court in any such suit, action or proceeding, and (iii) agrees that service of process upon Cogency Global Inc. shall be deemed in every respect effective service of process upon the Issuer or such Guarantor, as the case may be, in any such suit, action or proceeding. Each of the Issuer and the Guarantors further agrees to take any and all action, including the execution and filing of any and all such documents and instruments as may be necessary to continue such designation and appointment of Cogency Global Inc. in full force and effect so long as this Indenture shall be in full force and effect; *provided* that the Issuer and such Guarantor may and shall (to the extent Cogency Global Inc. ceases to be able to be served on the basis contemplated herein), by written notice to the Trustee, designate such additional or alternative agents for service of process under this Section 11.07 that (1) maintains an office located in the Borough of Manhattan, The City of New York in the State of New York, (2) are either (x) counsel for the Issuer or any Guarantor or (y) a corporate service company which acts as agent for service of process for other Persons in the ordinary course of its business and (3) agrees to act as agent for service of process in accordance with this Section 11.07. Such notice shall identify the name of such agent for process and the address of such agent for process in the Borough of Manhattan, The City of New York, State of New York. Upon the written request of any Noteholder, the Trustee shall deliver such information to such Noteholder. Notwithstanding the foregoing, there shall, at all times, be at least one agent for service of process for the Issuer and each Guarantor appointed and acting in accordance with this Section 11.07.

Section 11.08. *Judgment Currency*. U.S. Dollars are the sole currency of account and payment for all sums payable by the Issuer and the Guarantors under or in connection with the Notes, the Note Guarantees and this Indenture. Any amount received or recovered in a currency other than U.S. Dollars in respect of the Notes, the Note Guarantees or this Indenture (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Issuer, the Guarantors, any of their respective Significant Subsidiaries or otherwise) by the Trustee or any Holder in respect of any sum expressed to be due to it from the Issuer or any Guarantor will constitute a discharge of the Issuer and the Guarantors only to the extent of the U.S. Dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). If that U.S. Dollar amount is less than the U.S. Dollar amount expressed to be due to the recipient under any Note, any Note Guarantee or this Indenture, the Issuer and the Guarantors, jointly and severally, will indemnify the recipient against the cost of making any such purchase; and if the amount of U.S. Dollars so purchased is greater than the sum originally due to such recipient, such recipient, if a Holder, will, by accepting a Note, and, if the Trustee, by executing this Indenture, be deemed to have agreed to repay such excess. For purposes of this indemnity, it will be sufficient for the recipient to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had the actual purchase of U.S. dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. Dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above).

68

The above indemnity, to the extent permitted by law:

> (1)     constitutes a separate and independent obligation from the other obligations of the Issuer and the Guarantors;

> (2)     will give rise to a separate and independent cause of action;

> (3)     will apply irrespective of any waiver or indulgence granted by the Trustee or any Holder; and

> (4)     will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note or any other judgment.

Section 11.09. *No Adverse Interpretation of Other Agreements*.  This Indenture may not be used to interpret another indenture or loan or debt agreement of the Issuer, a Guarantor or any Subsidiary of the Issuer or Guarantor, and no such indenture or loan or debt agreement may be used to interpret this Indenture.

Section 11.10. *Successors*.  All agreements of the Issuer and each Guarantor in this Indenture, the Notes and the Note Guarantees will bind its successors.  All agreements of the Trustee in this Indenture will bind its successor.

Section 11.11. *Duplicate Originals*.  The parties may sign any number of copies of this Indenture.  This Indenture and any related documents, certificates, directions, notices or other instruments delivered pursuant to or in connection herewith may be executed in any number of counterparts, each of which so executed shall be an original, but all of them together represent the same agreement. Counterparts may be delivered via facsimile, electronic mail (including any electronic signature covered by the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act, the Electronic Signatures and Records Act or other applicable law, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and shall have the same validity, legal effect and admissibility in evidence as an original manual signature. Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any faxed, scanned, or photocopied manual signature, or other electronic signature, of any other party and shall have no duty to investigate, confirm or otherwise verify the validity or authenticity thereof. The exchange of copies of this Indenture and of signature pages in accordance with the foregoing sentence shall constitute effective execution and delivery of this Indenture as to the parties hereto.

Section 11.12. *Separability*.  In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 11.13. *Table of Contents and Headings*.  The Table of Contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and in no way modify or restrict any of the terms and provisions of this Indenture.

Section 11.14. *No Liability of Directors, Officers, Employees, Incorporators, Members and Stockholders*.  No past, present or future director, officer, employee, incorporator, member, partner or shareholder of the Issuer or any Guarantor or their respective Subsidiaries, as such, will have any liability for any obligations of the Issuer or any Guarantor under the Notes, the Note Guarantees or this Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.

Section 11.15. *Waiver of Jury Trial*.   EACH OF THE ISSUER, THE GUARANTORS, THE HOLDERS BY ACCEPTANCE OF THE NOTES AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE NOTE GUARANTEES OR THE TRANSACTION CONTEMPLATED HEREBY.

Section 11.16. *Tax Matters*.  Each of the Issuer, the Guarantors and the Trustee agrees (i) to cooperate and to provide the others with such reasonable information as each may have in its possession to enable the determination of whether any payments pursuant to this Indenture are subject to the withholding requirements described in Section 1471(b) of the Code or otherwise imposed pursuant to Sections 1471 through 1474 of the Code and any regulations, or agreements thereunder or official interpretations thereof ("**Applicable Law**"), and (ii) that the Trustee and each Paying Agent shall be entitled to make any withholding or deduction from payments under this Indenture to the extent necessary to comply with Applicable Law, for which the Trustee and such Paying Agent, as applicable, shall not have any liability.

Section 11.17. *USA Patriot Act.*  The parties hereto acknowledge that in accordance with Section 326 of the USA Patriot Act, the Trustee is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee.  The parties to this Indenture agree that they will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the USA Patriot Act.

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

**RAIZEN FUELS FINANCE S.A.**
as Issuer

By: _____
Name: MARINA DALBEN
Title: MANAGING DIRECTOR

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

**RAÍZEN S.A**
as Guarantor

By: _____

Name: Carlos Alberto Bezerra de Moura

Title: CFO

By: _____

Name: Ricardo Dell Aquila Mussa

Title: CEO

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

**RAÍZEN ENERGIA S.A**
as Guarantor

By: _____

Name: *Carlos Albert Bejme de Louve*
Title: *CFO*

By: _____

Name: *Rodrigo Candosi*
Title: *General Council*

**THE BANK OF NEW YORK MELLON**
as Trustee, Registrar, Paying Agent and Transfer
Agent

By: _____
     Name:  Francine Kincaid
     Title:   Vice President

**EXHIBIT A**

**[FORM OF FACE OF NOTE]**

**RAIZEN FUELS FINANCE S.A.**

**6.950% Green Notes Due 2054**

[CUSIP] [ISIN] _____

No.                                             US$   _____

      RAIZEN FUELS FINANCE S.A., a public limited liability company (*société anonyme*) organized and established under the laws of the Grand Duchy of Luxembourg, having its registered office at 16, Rue Eugène Ruppert, L-2453 Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*Registre de commerce et des sociétés, Luxembourg*) under number B184033, LEI 52990010NH26VC32Q522 (the "**Issuer**," which term includes any successor under the Indenture hereinafter referred to), for value received, promises to pay to _____, or its registered assigns, the principal sum of _____ DOLLARS (US$ _____) [or such other amount as indicated on the Schedule of Increases and Decreases in Global Note attached hereto] on March 5, 2054.

      Interest Rate: 6.950% per annum.

      Interest Payment Dates: March 5 and September 5 of each year, commencing on September 5, 2024.

      Regular Record Dates: March 1 and September 1 of each year (whether or not a Business Day).

      Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which will for all purposes have the same effect as if set forth at this place.

IN WITNESS WHEREOF, the Issuer has caused this Note to be signed manually, electronically or by facsimile by its duly authorized signatory.

RAIZEN FUELS FINANCE S.A.
as Issuer

By: _____
       Name:
       Title:

Trustee's Certificate of Authentication

This is one of the 6.950% Green Notes due 2054 described in the Indenture referred to in this Note.

The Bank of New York Mellon, as Trustee

By: _____
       Authorized Officer

Dated:

A-2

[**FORM OF REVERSE SIDE OF NOTE**]

**RAIZEN FUELS FINANCE S.A.**

**6.950% Green Notes Due 2054**

1.    *Principal and Interest.*

The Issuer promises to pay the principal of this Note on the Maturity Date.  The Issuer promises to pay interest on the principal amount of this Note on each Interest Payment Date, as set forth on the face of this Note at the rate of 6.950% per annum.  Interest will be payable semiannually (to the Holders of record of the Notes at the close of business on the March 1 or September 1 (whether or not a Business Day) immediately preceding the Interest Payment Date) on each Interest Payment Date, commencing on September 5, 2024.

Interest on this Note will accrue from the most recent date to which interest has been paid on this Note (or, if there is no existing Default in the payment of interest and if this Note is authenticated between a Regular Record Date and the next Interest Payment Date, from such Interest Payment Date) or, if no interest has been paid, from the Issue Date.  Interest will be computed in the basis of a 360 day year of twelve 30 day months. Any payments due on a day that is not a Business Day will be due on the immediately succeeding Business Day and no interest will accrue for the intervening period.

The Issuer will pay interest on overdue principal, premium, if any, and, to the extent lawful, interest at a rate per annum that is 1% per annum in excess of the rate per annum borne by this Note. Any interest on principal, premium or interest not paid when due will be paid to the Persons that are Holders on a special record date, which will be the second day preceding the date fixed by the Issuer for the payment of such interest, whether or not such day is a Business Day.  At least two days before a special record date, the Issuer will send to each Holder and to the Trustee a notice that sets forth the special record date, the payment date and the amount of interest to be paid.

Additional Amounts will be paid in respect of any payments of interest or principal so that the amount a Holder receives after applicable deduction or withholding will equal the amount that the Holder would have received in the absence of such deduction or withholding, to the extent described in Section 3.01 of the Indenture.

2.    *Indentures; Note.*

This is one of the Notes issued under an Indenture dated as of March 5, 2024 (as amended or supplemented from time to time, the "**Indenture**"), among the Issuer, Raízen S.A. ("**Raízen**") and Raízen Energia S.A. ("**Raízen Energia**") as the Guarantors, and The Bank of New York Mellon, as Trustee, Registrar, Paying Agent and Transfer Agent.  Capitalized terms used herein are used as defined in the Indenture unless otherwise indicated.  The terms of the Notes include those stated in the Indenture, as may be amended from time to time.  The Notes are subject to all such terms, and Holders are referred to the Indenture for a statement of all such terms.  To the

extent permitted by applicable law, in the event of any inconsistency between the terms of this Note and the terms of the Indenture, the terms of the Indenture will control.

The Notes are general unsecured and unsubordinated obligations of the Issuer, ranking equally in right of payment with all existing and future unsecured unsubordinated obligations of the Issuer.  The Indenture limits the original aggregate principal amount of the Initial Notes to US$500,000,000, but Additional Notes may be issued pursuant to the Indenture, and the originally issued Notes and all such Additional Notes shall vote together for all purposes as a single series.

The Note Guarantees are unsecured unsubordinated obligations of Raízen and Raízen Energia, ranking equally in right of payment with all existing and future unsecured unsubordinated obligations of Raízen and Raízen Energia.

3.      *Redemption and Repurchase.*

The Note is subject to redemption for taxation reasons as described in Section 3.03 of the Indenture, redemption at the option of the Issuer or any Guarantor as described in Section 3.02 of the Indenture and redemption following a tender offer or Offer to Purchase as described in Section 3.04 of the Indenture.

The Note is subject to repurchase upon a Change of Control that results in a Rating Decline as described in Section 4.06 of the Indenture.

4.      *Registered Form; Denominations; Transfer; Exchange.*

The Notes are in registered form without coupons in minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof. A Holder may register the transfer or exchange of Notes in accordance with the Indenture. The Trustee may require a Holder to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture.  Pursuant to the Indenture, there are certain periods during which the Trustee will not be required to issue, register the transfer of or exchange any Note or certain portions of a Note.

5.      *Defaults and Remedies.*

If an Event of Default, as defined in the Indenture, occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the Outstanding Notes may declare all the Notes to be due and payable.  If a bankruptcy default with respect to the Issuer or a Guarantor occurs and is continuing, the Notes automatically become due and payable.  Holders may not enforce the Indenture or the Notes except as provided in the Indenture. The Trustee may require indemnity satisfactory to it before it enforces the Indenture or the Notes. Subject to certain limitations, Holders of a majority in principal amount of the Notes then Outstanding may direct the Trustee in its exercise of remedies.

6.      *Amendment and Waiver.*

Subject to certain exceptions, the Indenture and the Notes may be amended, or Default may be waived, with the consent of the Holders of a majority in principal amount of the Outstanding

A-4

Notes.  Without notice to or the consent of any Holder, the Issuer, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Note Guarantees to, among other things, cure any ambiguity, omission, defect, inconsistency or to correct a manifest error if such amendment or supplement does not adversely affect the interests of the Holders in any material respect.

7.      *Authentication.*

This Note is not valid until the Trustee (or Authenticating Agent) signs the certificate of authentication on this Note.

8.      *Governing Law.*

This Note shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to its choice of law principles. Reference is hereby made to the further provisions of submission to jurisdiction, agent for service, waiver of immunities and judgment currency set forth in the Indenture, which will for all purposes have the same effect as if set forth herein.  For the avoidance of doubt, the application of the provisions set out in articles out in articles 470-1 to 470-19 (both included) of the Luxembourg Companies Law is excluded.

9.      *Abbreviations.*

Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian) and U/G/M/A/ (= Uniform Gifts to Minors Act).

The Issuer will furnish a copy of the Indenture to any Holder upon written request and without charge.

A-5

## FORM OF NOTATION OF NOTE GUARANTEE

For value received, each of the undersigned hereby unconditionally Guarantees the cash payments in U.S. Dollars of principal and interest on this Note (and including Additional Amounts payable thereon, if any) in the amounts and at the times when due, together with interest on the overdue principal and interest, if any, on this Note, if lawful, and the payment of all other obligations of the Issuer under the Indenture or the Notes, to the Holder of this Note and the Trustee, all in accordance with and subject to the terms and conditions of this Note and the Indenture.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture, dated as of March 5, 2024 among Raizen Fuels Finance S.A., as the Issuer, Raízen S.A. and Raízen Energia S.A. as the Guarantors, and The Bank of New York Mellon, as Trustee, Registrar, Paying Agent and Transfer Agent.

The obligations of the undersigned to the Holders and to the Trustee are expressly set forth in Article 10 of the Indenture.  This Note Guarantee constitutes a direct, general and unconditional obligation of the undersigned which will at all times rank at least pari passu with all other present and future senior unsecured obligations of the undersigned, except for such obligations as may be preferred by mandatory provisions of law.

IN WITNESS WHEREOF, the undersigned have caused this Notation of Note Guarantee with respect to the 6.950% Green Notes due 2054 of Raizen Fuels Finance S.A. to be duly executed.

A-6

Dated: [        ]

RAÍZEN S.A. as Guarantor

By:  _____
     Name:
     Title:

By:  _____
     Name:
     Title:

RAÍZEN ENERGIA S.A. as Guarantor

By:  _____
     Name:
     Title:

By:  _____
     Name:
     Title:

A-7

[FORM OF TRANSFER NOTICE]

FOR VALUE RECEIVED the undersigned registered Holder hereby sell(s), assign(s) and transfer(s) unto

Insert Taxpayer Identification No.

_____

_____
Please print or typewrite name and address including zip code of assignee

_____
the within Note and all rights thereunder, hereby irrevocably constituting and appointing

_____

attorney to transfer said Note on the books of the Issuer with full power of substitution in the premises.

A-8

[THE FOLLOWING PROVISION TO BE INCLUDED ON ALL CERTIFICATES
BEARING A RESTRICTED LEGEND OR REGULATION S LEGEND]

In connection with any transfer of this Note occurring prior to the removal of the [Restricted Legend / Regulation S Legend], the undersigned confirms that such transfer is made without utilizing any general solicitation or general advertising and further as follows:

*Check One*

☐    (1) This Note is being transferred to a "qualified institutional buyer" in compliance with Rule 144A under the U.S. Securities Act of 1933, as amended, and certification in the form of Exhibit E to the Indenture is being furnished herewith.

☐    (2) This Note is being transferred to a Non-U.S. Person in compliance with the exemption from registration under the U.S. Securities Act of 1933, as amended, provided by Regulation S thereunder, and certification in the form of Exhibit D to the Indenture is being furnished herewith.

or

☐    (3) This Note is being transferred other than in accordance with (1) or (2) above and documents are being furnished which comply with the conditions of transfer set forth in this Note and the Indenture.

If none of the foregoing boxes is checked, the Trustee is not obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in the Indenture have been satisfied.

Date:

_____
Seller

By:    _____

NOTICE: The signature to this assignment must correspond with the name as written upon the face of the within mentioned instrument in every particular, without alteration or any change whatsoever.

A-9

Signature Guarantee:[1]

By: _____
To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

## OPTION OF HOLDER TO ELECT PURCHASE

If you wish to have all of this Note purchased by the Issuer, a Guarantor or a Designated Affiliate, as applicable, pursuant to Section 4.06 of the Indenture, check the box:  ☐

If you wish to have a portion of this Note purchased by the Issuer, a Guarantor or a Designated Affiliate, as applicable, pursuant to Section 4.06 of the Indenture, state the amount (in original principal amount) below:

US$_____.

Date:_____

Your Signature:_____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee[1]: _____

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Trustee, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Trustee in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

A-11

SCHEDULE OF INCREASES AND DECREASES IN GLOBAL NOTE[1]

The following increases and decreases in the aggregate principal amount of this Global Note have been made:

| Date of Increase or Decrease | Amount of decrease in original principal amount of this Global Note | Amount of increase in original principal amount of this Global Note | Original principal amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

---

[1] For Global Notes.

A-12

**EXHIBIT B-1**

RESTRICTED LEGEND

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES FOR THE BENEFIT OF THE ISSUER AND THE GUARANTORS THAT THIS NOTE OR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (1) TO THE ISSUER OR THE GUARANTORS, (2) SO LONG AS THIS NOTE IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A) IN ACCORDANCE WITH RULE 144A, (3) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT, (4) PURSUANT TO ANOTHER APPLICABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE) OR (5) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, AND IN EACH OF SUCH CASES IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. AS A CONDITION TO THE REGISTRATION OF TRANSFER OF THIS NOTE PURSUANT TO CLAUSE (4) ABOVE, THE ISSUER, THE GUARANTORS OR THE TRUSTEE MAY REQUIRE DELIVERY OF ANY DOCUMENTATION OR OTHER EVIDENCE THAT IT, IN ITS SOLE DISCRETION, DEEMS NECESSARY OR APPROPRIATE TO EVIDENCE COMPLIANCE WITH THE EXEMPTION REFERRED TO IN SUCH CLAUSE (4) AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, REPRESENTS AND AGREES THAT IT SHALL NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO ABOVE.
THIS LEGEND MAY BE REMOVED SOLELY IN THE DISCRETION AND AT THE DIRECTION OF THE ISSUER OR THE GUARANTORS.

**EXHIBIT B-2**

REGULATION S LEGEND

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER THIS NOTE, PRIOR TO THE DATE THAT IS 40 DAYS AFTER THE LATER OF (1) THE ORIGINAL ISSUE DATE HEREOF AND (2) THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF THIS NOTE), ONLY (A) TO THE ISSUER, (B) UNDER A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE NOTES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER QUALIFIED INSTITUTIONAL BUYER AND TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) THROUGH OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES IN RELIANCE UPON REGULATION S OR (E) UNDER ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUER'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR OTHER TRANSFER PURSUANT TO CLAUSE (E) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, A CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO THE ISSUER.

**EXHIBIT C**

DTC LEGEND

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS A BENEFICIAL INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL NOTE ARE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF CEDE & CO. OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL NOTE ARE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE TRANSFER PROVISIONS OF THE INDENTURE.

C-1

**EXHIBIT D**

Regulation S Certificate

_____, _____

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: Corporate Trust Administration

Re:     RAIZEN FUELS FINANCE S.A., as issuer (the "**Issuer**")
        6.950% Green Notes due 2054

Ladies and Gentlemen:

Reference is hereby made to the indenture dated as of March 5, 2024 (the "**Indenture**"), among the Issuer, Raízen S.A. and Raízen Energia S.A., as guarantors, and The Bank of New York Mellon, as trustee (the "**Trustee**"), registrar, transfer agent and paying agent. Terms used in this Certificate shall have the meaning set forth in the Indenture or Regulation S ("**Regulation S**") under the Securities Act of 1933, as amended (the "**Securities Act**"), except as otherwise stated herein.

[*CHECK A OR B AS APPLICABLE*.]

☐ A.   This Certificate relates to our proposed transfer of US$____ principal amount of the Issuer's 6.950% Green Notes due 2054 (the "**Notes**") represented by a U.S. Global Note (CUSIP: [  ]) for an equal beneficial interest in the Offshore Global Note (CUSIP: [  ]).  We hereby certify as follows:

1.   The offer and sale of the Notes was not and will not be made to a person in the United States (unless such person is excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(vi) or the account held by it for which it is acting is excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(i) under the circumstances described in Rule 902(h)(3)) and such offer and sale was not and will not be specifically targeted at an identifiable group of U.S. citizens abroad.

2.   Unless the circumstances described in the parenthetical in paragraph 1 above are applicable, either (a) at the time the buy order was originated, the buyer was outside the United States or we and any person acting on our behalf reasonably believed that the buyer was outside the United States or (b) the transaction was executed in, on or through the facilities of a designated offshore securities market, and neither we nor any person acting on our behalf knows that the transaction was pre-arranged with a buyer in the United States;

3.   Neither we, any of our affiliates, nor any person acting on our or their behalf, has made any directed selling efforts in the United States with respect to the Notes;

4.   The proposed transfer of Notes is not part of a plan or scheme to evade the registration requirements of the Securities Act; and

5.   If we are a dealer or a person receiving a selling concession, fee or other remuneration in respect of the Notes, and the proposed transfer takes place during the first 40 days following the issue date of such Notes, or we are an officer or director of the Issuer or an Initial Purchaser (as defined in the Indenture), we certify that the proposed transfer is being made in accordance with the provisions of Rule 904(b) of Regulation S.

☐ B.   This Certificate relates to our proposed exchange of US$____ principal amount of the Issuer's 6.950% Green Notes due 2054 (the "**Notes**") represented by a U.S. Global Note (CUSIP:  [  ]) for an equal beneficial interest in the Offshore Global Note (CUSIP:  [  ]).  We hereby certify as follows:

1.   At the time the offer and sale of the Notes was made to us, either (i) we were not in the United States or (ii) we were excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(vi) or the account held by us for which we were acting was excluded from the definition of "U.S. person" pursuant to Rule 902(k)(2)(i) under the circumstances described in Rule 902(h)(3); and we were not a member of an identifiable group of U.S. citizens abroad;

2.   Unless the circumstances described in paragraph 1(ii) above are applicable, either (a) at the time our buy order was originated, we were outside the United States or (b) the transaction was executed in, on or through the facilities of a designated offshore securities market, and we did not pre-arrange the transaction in the United States.; and

3.   The proposed exchange of Notes is not part of a plan or scheme to evade the registration requirements of the Securities Act.

You and the Issuer are entitled to rely conclusively upon this Certificate and are irrevocably authorized to produce this Certificate or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

D-2

Very truly yours,

[NAME OF SELLER (FOR TRANSFERS) OR
OWNER (FOR EXCHANGES)]

By: _____
      Name:
      Title:
      Address

Date: _____

Signature Guarantee:[1]

By:  _____
        To be executed by an executive officer

_____

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

D-4

EXECUTION VERSION

**EXHIBIT E**

Rule 144A Certificate

_____, _____

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: Corporate Trust Administration

Re:    RAIZEN FUELS FINANCE S.A., as issuer (the "**Issuer**")
        6.950% Green Notes due 2054

Ladies and Gentlemen:

Reference is hereby made to the indenture dated as of March 5, 2024 (the "**Indenture**"), among the Issuer, Raízen S.A. and Raízen Energia S.A., as guarantors, and The Bank of New York Mellon, as trustee (the "**Trustee**"), registrar, transfer agent and paying agent. Terms used in this Certificate shall have the meaning set forth in the Indenture or Rule 144A ("**Rule 144A**") under the Securities Act of 1933, as amended (the "**Securities Act**"), except as otherwise stated herein.

**[*CHECK A OR B AS APPLICABLE.*]**

☐ A.   This Certificate relates to our proposed transfer of US$____ principal amount of the Issuer's 6.950% Green Notes due 2054 (the "**Notes**") represented by an Offshore Global Note (CUSIP: [  ]) for an equal beneficial interest in the U.S. Global Note (CUSIP: [  ]). We hereby certify as follows:

☐ B.   This Certificate relates to our proposed exchange of US$____ principal amount of the Issuer's 6.950% Green Notes due 2054 (the "**Notes**") represented by an Offshore Global Note (CUSIP: [  ]) for an equal beneficial interest in the U.S. Global Note (CUSIP: [  ]). We hereby certify as follows:

We and, if applicable, each account for which we are acting in the aggregate owned and invested more than US$____ in securities of issuers that are not affiliated with us (or such accounts, if applicable), as of _____, 20__, which is a date on or since close of our most recent fiscal year. We and, if applicable, each account for which we are acting, are a qualified institutional buyer within the meaning of Rule 144A. If we are acting on behalf of an account, we exercise sole investment discretion with respect to such account. We are aware that the transfer of Notes to us, or such exchange, as applicable, is being made in reliance upon the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. Prior to the date of this Certificate we have received such information regarding the Issuer as we have requested pursuant to Rule 144A(d)(4) to the extent that the Issuer is not then subject to Section 13 or 15(d) of the

Exchange Act, or is not exempt from reporting pursuant to Rule 12g3 2(b) under the Exchange Act or have determined not to request such information.

You and the Issuer are entitled to conclusively rely upon this Certificate and are irrevocably authorized to produce this Certificate or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

Very truly yours,

[NAME OF SELLER (FOR TRANSFERS) OR OWNER (FOR EXCHANGES)]

By: _____
      Name:
      Title:
      Address:

Date: _____

E-2

Signature Guarantee:[1]

By: _____
To be executed by an executive officer

---

[1] Signatures must be guaranteed by an "**eligible guarantor institution**" meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Association Medallion Program ("**STAMP**") or such other "**signature guarantee program**" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

## <u>EXHIBIT J</u>

**Excerpts of 2027 Notes Offering Memorandum**

**IMPORTANT NOTICE**

THE OFFERING MEMORANDUM (THE "OFFERING MEMORANDUM") FOLLOWING THIS PAGE IS INTENDED SOLELY FOR (i) QUALIFIED INSTITUTIONAL BUYERS ("QIBs") UNDER RULE 144A OF THE U.S. SECURITIES ACT OF 1933 (AS AMENDED, THE "SECURITIES ACT") AND (ii) NON-U.S. PERSONS LOCATED OUTSIDE OF THE UNITED STATES AND THAT ARE NOT ACQUIRING THE NOTES FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON IN RELIANCE ON REGULATION S OF THE SECURITIES ACT.

IMPORTANT: You must read the following before continuing. The following applies to the offering memorandum following this page, and you are therefore advised to read this carefully before reading, accessing or making any other permitted use of the offering memorandum. In accessing the offering memorandum, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

NOTHING IN THIS ELECTRONIC TRANSMISSION OR IN THE OFFERING MEMORANDUM CONSTITUTES AN OFFER OF SECURITIES IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO. THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OF THE U.S. OR OTHER JURISDICTION AND THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE U.S. OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS (AS DEFINED IN REGULATIONS UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE OR LOCAL SECURITIES LAWS.

THE OFFERING MEMORANDUM MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN WHOLE OR IN PART IN ANY MANNER WHATSOEVER. ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORIZED, AND FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

Confirmation of your Representation: in order to be eligible to view the offering memorandum or make an investment-decision with respect to the securities, investors must be either (1) QIBs within the meaning of Rule144A under the Securities Act or (2) non-U.S. persons (as defined in Regulation S under the Securities Act). The offering memorandum is being sent at your request and by accepting the e-mail and accessing the offering memorandum, you shall be deemed to have represented to us that (1) you and any customer you represent are either (a) QIBs or (b) not a U.S. person and that the electronic mail address that you gave us and to which this e-mail has been delivered is not located in the U.S. and (2) that you consent to delivery of such offering memorandum by electronic transmission and agree to comply with the terms, conditions and restrictions provided herein.

You are reminded that the offering memorandum has been delivered to you on the basis that you are a person into whose possession the offering memorandum may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorized to, deliver the offering memorandum to any other person.

**OFFERING MEMORANDUM**                                     **STRICTLY CONFIDENTIAL**

**U.S.$500,000,000**



**Raízen Fuels Finance S.A.**
*(public limited liability company (société anonyme))*
*(organized and existing under the laws of the Grand Duchy of Luxembourg)*
**5.300% Notes due 2027**
*Unconditionally and irrevocably guaranteed by*
**Raízen Combustíveis S.A. and Raízen Energia S.A.**
*(Incorporated in the Federative Republic of Brazil)*

Raízen Fuels Finance S.A., or the Issuer, a public limited liability company *(société anonyme)*, organized and existing under the laws of the Grand Duchy of Luxembourg, or Luxembourg, is offering U.S.$500,000,000 aggregate principal amount of 5.300% notes due 2027, or the notes. Interest on the notes will accrue at a rate of 5.300% per year. The Issuer will pay interest on the notes in arrears on January 20 and July 20 of each year, commencing on July 20, 2017. The notes will mature on January 20, 2027.

The notes will be unsecured and will rank equally with the other unsecured unsubordinated indebtedness that the Issuer may incur. All of the Issuer's obligations pursuant to the notes and the indenture under which they are issued will be fully and unconditionally guaranteed, on an unsecured basis, by each of Raízen Combustíveis S.A. and Raízen Energia S.A., or the Guarantors.

The Issuer may, at its option, redeem all of the notes at any time or part of the notes from time to time by paying the greater of (i) 100% of the principal amount of the notes plus accrued interest to the date of redemption and (ii) the applicable "make-whole" amount. In case of any partial redemption of notes pursuant to this provision, at least U.S.$100 million in aggregate principal amount of the notes shall remain outstanding (not including any notes held by the Issuer or its affiliates). The notes may also be redeemed, in whole but not in part, at 100% of their principal amount plus accrued interest at any time upon the occurrence of specified events relating to tax law imposed by relevant jurisdictions, as set forth in this offering memorandum. In addition, upon the occurrence of a Change of Control that results in a Ratings Decline (each as defined in "Description of the Notes"), the Issuer will be required to offer to purchase the notes at the price as set forth in this offering memorandum. See "Description of the Notes—Purchase of Notes upon Change of Control Event." The Guarantors' respective guarantees will rank equally in right of payment with the other unsecured unsubordinated indebtedness and guarantees of the Guarantors and effectively subordinated to the liabilities of the Guarantors' subsidiaries and jointly controlled companies. The guarantees will be effectively junior to the secured indebtedness of Guarantors to the extent of such security and to the indebtedness of the Guarantors' non-guarantor subsidiaries and jointly controlled companies. For a detailed description of the notes, see "Description of the Notes."

There is currently no public market for the notes. Application will be made to list the notes on the Official List of the Luxembourg Stock Exchange and to admit the notes to trading on the Euro MTF market of the Luxembourg Stock Exchange, or the Euro MTF. There are no assurances that the notes will be listed on the Official List of the Luxembourg Stock Exchange and admitted to trading on the Euro MTF. The Euro MTF is not a regulated market within the meaning of the provisions of Directive 2004/39/EC on markets in financial instruments, or the MiFID. See "Listing and General Information." The notes will not be admitted to trading on the Euro MTF prior to or on the settlement date.

**Investing in the notes involves risks. See "Risk Factors" beginning on page 17.**

**Issue Price: 100.000% plus accrued interest, if any, from January 20, 2017**

The notes (and the guarantees) have not been, and will not be, registered under the U.S. Securities Act of 1933, as amended, or the Securities Act. The notes may not be offered or sold within the United States or to U.S. persons, except to qualified institutional buyers in reliance on the exemption from registration provided by Rule 144A under the Securities Act, or Rule 144A, and to certain non-U.S. persons in offshore transactions in reliance on Regulation S under the Securities Act, or Regulation S. You are hereby notified that sellers of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. For more information about restrictions on transfer of the notes, see "Transfer Restrictions."

The Initial Purchasers expect to deliver the notes to purchasers in book-entry form through The Depository Trust Company, or DTC, and its participants, including Euroclear Bank S.A./N.V., or Euroclear, and Clearstream Banking, *société anonyme*, or Clearstream, on or about January 20, 2017.

*Joint Book-Running Managers*

**BofA Merrill Lynch     Citigroup     J.P. Morgan     Santander     Bradesco BBI**

The date of this offering memorandum is January 12, 2017.

**TABLE OF CONTENTS**

Page

Presentation of Financial and Certain Other
Information ......................................................v
Forward-Looking Statements ................................. viii
Summary.................................................................1
The Offering...........................................................8
Summary Combined Consolidated Financial and
Other Information ...................................................12
Risk Factors ..........................................................17
Use of Proceeds ....................................................46
The Issuer .............................................................47
Exchange Rates ....................................................48
Capitalization........................................................49
Selected Combined Consolidated Financial and Other
Information ............................................................50
Management's Discussion and Analysis of Financial
Condition and Results of Operations.....................56

Page

Business.................................................................88
Management ..........................................................114
Principal Shareholders...........................................119
Related Party Transactions ....................................122
Description of the Notes ........................................124
Taxation.................................................................145
Plan of Distribution ...............................................153
Transfer Restrictions..............................................160
Legal Matters.........................................................162
Independent Auditors ............................................163
Listing and General Information ............................164
Enforceability of Civil Liabilities..........................165
Index to Financial Statements................................ F-1

Unless otherwise indicated or the context otherwise requires, all references in this offering memorandum to (1) "Raízen Combustíveis" refers to Raízen Combustíveis S.A., the downstream joint venture company; (2) "Raízen Energia" refers to Raízen Energia S.A. (formerly Raízen Energia e Participações S.A.), the upstream joint venture company; (3) "Shell" refers to Shell Brazil Holdings B.V.; (4) "Cosan" refers to Cosan S.A. Indústria e Comércio; and (5) "Raízen," the "Company," "the Raízen joint venture," "we," "our," "ours," "us" or similar terms refer collectively to Raízen Energia S.A. and Raízen Combustíveis S.A. collectively, together with their respective consolidated subsidiaries.

In this offering memorandum, references to the Initial Purchasers are to Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Santander Investment Securities Inc. and Banco Bradesco BBI S.A.

In addition, the term "Brazil" refers to the Federative Republic of Brazil and the phrase "Brazilian government" refers to the federal government of Brazil. The term "Central Bank" refers to the Central Bank of Brazil (*Banco Central do Brasil*). All references to "*real*," "*reais*" or "R$" are to the Brazilian *real*, the official currency of Brazil and all references to "U.S. dollar," "U.S. dollars" or "U.S.$" are to U.S. dollars, the official currency of the United States of America. Unless otherwise stated, all numbers included in this offering memorandum are expressed in *reais*. This offering memorandum contains translations of various *real* amounts into U.S. dollars at specified rates solely for your convenience. You should not construe these translations as representations by us that the *real* amounts actually represent these U.S. dollar amounts or could be converted into U.S. dollars at the rates indicated. Unless otherwise indicated, we have converted the *real* amounts using the U.S. dollar selling rate reported by the Central Bank as of September 30, 2016 of R$3.2462 per U.S.$1.00. For more information, see "Exchange Rates."

We and the Issuer, having made all reasonable inquiries, confirm that the information contained in this offering memorandum with regard to them and us is true and accurate in all material respects, that the opinions and intentions expressed in this offering memorandum are honestly held, and that there are no other facts the omission of which would make this offering memorandum as a whole or any of such information or the expression of any such opinions or intentions misleading in any material respect. We and the Issuer accept responsibility accordingly.

i

**We, the Issuer and the Initial Purchasers have not authorized anyone to provide any information other than that contained in this offering memorandum prepared by us and the Issuer or on our and the Issuer's behalf. We, the Issuer and the Initial Purchasers take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. You should assume that the information in this offering memorandum is accurate only as of the date on the front cover of this offering memorandum, regardless of time of delivery of this offering memorandum or any sale of the notes. Our business, financial condition, results of operations and prospects may change after the date on the front cover of this offering memorandum. None of us, the Issuer, or the Initial Purchasers is making an offer to sell the notes in any jurisdiction where the offer or sale is not permitted.**

_____

The Issuer is relying on exemptions from registration under the Securities Act for offers and sales of securities that do not involve a public offering.  The notes offered are subject to restrictions on transferability and resale and may not be transferred or resold in the United States, except as permitted under the Securities Act and applicable U.S. state securities laws pursuant to registration or exemption from them. By purchasing the notes, you will be deemed to have made the acknowledgements, representations, warranties and agreements described under the heading "Transfer Restrictions."  You should understand that you may be required to bear the financial risks of your investment in the notes for an indefinite period of time.

The Issuer will apply to admit the notes to listing on the Official List of the Luxembourg Stock Exchange, and to trading on the Euro MTF of the Luxembourg Stock Exchange. The Luxembourg Stock Exchange takes no responsibility for the contents of this offering memorandum, makes no representations as to its accuracy or completeness and expressly disclaims any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this offering memorandum.

We and the Issuer have prepared this offering memorandum for use solely in connection with the proposed offering of the notes outside of Brazil.  This offering memorandum is personal to the offeree to whom it has been delivered and does not constitute an offer to any other person or to the public in general to acquire the notes. Distribution of this offering memorandum to any person other than the offeree and those persons, if any, retained to advise that offeree with respect thereto, is unauthorized, and any disclosure of any of its contents without the prior written consent of us and the Issuer is prohibited. Each offeree, by accepting delivery of this offering memorandum, agrees to the foregoing and agrees not to make any photocopies of this offering memorandum in whole or in part.

Neither this offering memorandum nor any other information supplied in connection with the notes should be considered as a recommendation by us, the Issuer or any of the Initial Purchasers that any recipient of this offering memorandum or any other information supplied in connection with the notes should subscribe for or purchase any notes. Each investor contemplating subscribing for or purchasing any notes should make its own independent investigation of the financial condition and affairs, and its own appraisal of the creditworthiness, of us and the Issuer. This offering memorandum does not constitute an offer of, or an invitation by or on behalf of us, the Issuer, any Initial Purchaser or the Trustee (as defined herein) to subscribe or purchase, any of the notes in any jurisdiction where such offer is not permitted. The distribution of this offering memorandum and the offering of the Notes in certain jurisdictions may be restricted by law. Persons into whose possession this offering memorandum comes are required by us, the Issuer, each of the Initial Purchasers and the Trustee to inform themselves about and to observe any such restrictions. None of us, the Issuer, nor any Initial Purchaser represents that this offering memorandum may be lawfully distributed, or that any notes may be lawfully offered, in compliance with any applicable registration or other requirements in any such jurisdiction, or pursuant to an exemption available thereunder, or assumes any responsibility for facilitating any such distribution or offering. In particular, no action has been taken by us, the Issuer or any Initial Purchaser that is intended to permit a public offering of any notes or distribution of this offering memorandum in any jurisdiction where action for that purpose is required. Accordingly, no notes may be offered or sold, directly or indirectly, and neither this offering memorandum nor any advertisement or other offering material may be distributed or published in any jurisdiction, except under circumstances that will result in compliance with any applicable laws and regulations.

Notwithstanding anything set forth herein or in any other document related to the notes, you and each of your employees, representatives or other agents may disclose to any and all persons, without limitation of any kind, the tax treatment and the tax structure of the transaction described herein and all materials of any kind, including any tax analyses that we have provided to you relating to such tax treatment and tax structure.

We and the Issuer have prepared this offering memorandum solely for use in connection with the proposed offering of the notes, and it may only be used for that purpose. The Issuer and the Initial Purchasers reserve the right to reject any offer to purchase, in whole or in part, for any reason, or to sell less than all of the notes offered by this offering memorandum.

This offering memorandum summarizes certain documents and other information and we and the Issuer refer you to them for a more complete understanding of what we and the Issuer discuss in this offering memorandum. In making an investment decision, you must rely on your own examination of our Company and the terms of this offering and the notes, including the merits and risks involved.

Neither the Trustee nor the Initial Purchasers accepts any liability in relation to the information contained in this offering memorandum or any other information provided by us or the Issuer in connection with the Notes.  In addition, no representation, warranty or undertaking, express or implied, is made by any Initial Purchaser or the Trustee as to the accuracy or completeness of the information contained or incorporated in this offering memorandum or any other information provided by us or the Issuer in connection with the notes, and nothing contained herein is or shall be relied upon as a promise or representation by any Initial Purchaser or the Trustee, whether as to the past or to the future.

We, the Issuer and the Initial Purchasers are not making any representation to any purchaser of the notes regarding the legality of an investment in the notes under any investment law or similar laws or regulations. You should not consider any information in this offering memorandum to be advice whether legal, business, accounting or tax. You should consult your own attorney or other professional for any legal, business, accounting or tax advice regarding an investment in the notes.

The notes have not been and will not be issued or placed, distributed, offered or traded in the Brazilian capital markets. The issuance of the notes has not been nor will be registered with the Brazilian Securities Commission (*Comissão de Valores Mobiliários*), or the CVM.  Except for public offerings with restricted placement efforts, as regulated by CVM Instruction No. 476, issued by the CVM on January 16, 2009, as amended, any public offering or distribution, as defined under Brazilian laws and regulations, of securities in Brazil is not legal without prior registration under Law No. 6,385, of December 7, 1976, as amended (*Lei do Mercado de Capitais*), or the Capital Markets Law, and Instruction No. 400, issued by the CVM on December 29, 2003, as amended.  Documents relating to the offering of the notes, as well as information contained therein, may not be distributed to the public in Brazil (as the offering of the notes is not a public offering of securities in Brazil), nor be used in connection with any offering for subscription or sale of the notes to the public in Brazil. The notes will not be offered or sold in Brazil, except in circumstances which do not constitute a public offering, placement, distribution or negotiation of securities in the Brazilian capital markets regulated by Brazilian legislation. Persons wishing to offer or acquire the notes within Brazil should consult with their own counsel as to the applicability of registration requirements or any exemption therefrom.

Neither the U.S. Securities and Exchange Commission, or the SEC, nor any state securities' commission has approved or disapproved of these securities or determined whether this offering memorandum is truthful or complete.  Any representation to the contrary is a criminal offense.

You must comply with all applicable laws and regulations in force in any jurisdiction in which you purchase, offer or sell the notes or possess or distribute this offering memorandum and must obtain any consent, approval or permission required for your purchase, offer or sale of the notes under the laws and regulations in force in any jurisdiction to which you are subject or in which you make such purchases, offers or sales.  None of us, the Issuer, the Initial Purchasers, or its affiliates will have any responsibility therefor.

This offering memorandum has been prepared on the basis that all offers of the notes will be made pursuant to an exemption under Directive 2003/71/EC (as amended), or together with any applicable implementing measures in any Member State of the EEA, the Prospectus Directive, from the requirement to produce a prospectus for offers of the notes.  Accordingly, any person making or intending to make any offer within the EEA of the notes should only do so under circumstances in which no obligation arises for the Initial Purchasers or us to produce a prospectus for that offer.

**Additional Information**

While any notes remain outstanding, the Issuer will make available, upon request, to any holder and any prospective purchaser of notes the information required pursuant to Rule 144A(d)(4)(i) under the Securities Act, during any period in which the Issuer (1) is not subject to, and in compliance with, Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, or the Exchange Act, or (2) becomes exempt from such reporting requirements pursuant to, and in compliance with, Rule 12g3-2(b) of the Exchange Act (as amended from time to time and including any successor provision).

Application will be made to list the notes on the Official List of the Luxembourg Stock Exchange, and to admit the notes to trading on the Euro MTF. See "Listing and General Information." The Issuer will comply with any undertakings that it gives from time to time to the Luxembourg Stock Exchange in connection with the notes, and we will furnish to the Luxembourg Stock Exchange all such information required in connection with the listing of the notes.

## PRESENTATION OF FINANCIAL AND CERTAIN OTHER INFORMATION

All references in this offering memorandum to "*real*," "*reais*" or the symbol "R$" are to the legal currency of Brazil, the Brazilian *real*. All references to "dollar," "U.S. dollars" or the symbol "U.S.$" are to the legal currency of the United States, the U.S. dollar.

Solely for your convenience, we have translated certain amounts included in "Summary," "Summary Combined Consolidated Financial and Other Information," "Capitalization," "Selected Combined Consolidated Financial and Other Information" and elsewhere in this offering memorandum from *reais* into U.S. dollars using the U.S. dollar selling rate reported by the Central Bank as of September 30, 2016 of R$3.2462 per U.S.$1.00. These translations should not be considered representations that any such amounts have been, could have been or could be converted into U.S. dollars at that or at any other exchange rate as of that or any other date.

### Financial Statements and Interim Financial Information

We have included in this offering memorandum (all of which are prepared in accordance with accounting practices adopted in Brazil, or Brazilian GAAP, as issued by the Brazilian Accounting Standards Committee (*Comitê de Pronunciamentos Contábeis*), or the CPC, and the Brazilian Federal Accounting Council (*Conselho Federal de Contabilidade*), and International Financial Reporting Standards, or IFRS, as issued by the International Accounting Standards Board, or the IASB):

- our unaudited combined consolidated interim financial information as of and for the six-month period ended September 30, 2016 (with the corresponding figures for the six-month period ended September 30, 2015 and as of March 31, 2016), prepared in accordance with Technical Pronouncement CPC 21(R1) - Interim Financial Reporting and IAS 34 - Interim Financial Reporting issued by the IASB;

- our audited combined consolidated financial statements as of and for the fiscal year ended March 31, 2016 (with the corresponding figures for the fiscal year ended March 31, 2015), or the March 2016 financial statements; and

- our audited combined consolidated financial statements as of and for the fiscal year ended March 31, 2015 (with the corresponding figures for the fiscal year ended March 31, 2014), or the March 2015 financial statements.

Technical pronouncement CPC 29 – Biological Assets and Agricultural Produce and CPC 27 – Property, Plant and Equipment, equivalent to international standard IAS 41 – Agriculture and IAS 16 – Property, Plant and Equipment, respectively, have been amended to require bearer biological assets (in the case of Raízen Energia, sugarcane roots) to be accounted under the cost model in accordance with CPC 27 and IAS 16 (*i.e.*, cost less accumulated depreciation and impairment loss, if any). The amendments did not change the accounting for consumable biological assets (in the case of Raízen Energia, standing cane (sugarcane before being harvested) which remained within the scope of CPC 29 and IAS 41 (*i.e.*, accounted for at fair value). The amendments apply for periods beginning on or after January 1, 2016, which is effective for Raízen Energia as from the year beginning on April 1, 2016.

Our unaudited combined consolidated interim financial information as of and for the six-month period ended September 30, 2016 give effect to the change in accounting policy introduced by the amendments to the technical pronouncements. Accordingly, we have adjusted and restated, as required by technical pronouncements CPC 23 – Accounting Policies, Changes in Accounting Estimates and Errors and CPC 26 (R1) – Presentation of Financial Statements, the relevant combined consolidated balance sheet information as of March 31, 2016 and the relevant interim financial information in our combined consolidated statements of income and comprehensive income for the three- and six-month periods ended September 30, 2015 and statements of changes in equity and cash flows for the six-month period ended September 30, 2015, presented for comparison purposes.

Neither the March 2016 financial statements nor the March 2015 financial statements have been restated to retrospectively give effect to the amendments to the CPC 27 and CPC 29. Our audited combined consolidated financial statements as of and for the year ending March 31, 2017 (with the corresponding figures for the fiscal year ended March 31, 2016) will reflect these changes in accounting policy.

v

Based on the currently available information, the impacts on: (i) March 2016 financial statements is a reclassification from non-current assets to current assets ranging from R$700 million to R$1,100 million and on costs of products sold and services provided will range from an increase of R$200 million to R$310 million; and (ii) March 2015 financial statements, a reclassification from non-current assets to current assets ranging from R$400 million to R$700 million and on costs of products sold and services provided will range from a decrease of R$400 thousand to R$650 thousand.

See also "Independent Auditors" and "Index to Financial Statements."

**Rounding**

We have made rounding adjustments to reach some of the figures included in this offering memorandum. As a result, numerical figures shown as totals in some tables may not be an arithmetic aggregation of the figures that preceded them.

**Market Data**

We obtained market and competitive position data, including market forecasts, used throughout this offering memorandum from market research, publicly available information and industry publications, as well as internal surveys. We include data from reports prepared by LMC International Ltd., the Central Bank, the Brazilian Institute of Geography and Statistics (*Instituto Brasileiro de Geografia e Estatística*), or IBGE, the São Paulo Stock, Commodities and Futures Exchange (*BM&FBOVESPA S.A. – Bolsa de Valores, Mercadorias e Futuros*), or BM&FBOVESPA, the International Sugar Organization, the Brazilian National Economic and Social Development Bank (*Banco Nacional de Desenvolvimento Econômico e Social*), or BNDES, Bloomberg, the New York Board of Trade, or NYBOT, the Fundação Getúlio Vargas, or FGV, the Agriculture School of the University of São Paulo (*Escola Superior de Agricultura Luiz de Queiroz*), or ESALQ, the New York Stock Exchange, or the NYSE, the London Stock Exchange, the National Agency of Petroleum, Natural Gas and Biofuels (*Agência Nacional do Petróleo, Gás Natural e Biocombustíveis*), or ANP, the Sugarcane Agroindustry Association of the state of São Paulo (*União da Agroindústria Canavieira de São Paulo*), or UNICA, the Counsel of Sugarcane, Sugar and Ethanol Producers of the State of São Paulo (*Conselho dos Produtores de Cana-de-Açúcar, Açúcar e Álcool do Estado de São Paulo*), or CONSECANA, and the National Union of Distributors of Fuels and Lubricants (*Sindicato Nacional das Empresas Distribuidoras de Combustíveis e Lubrificantes*), or Sindicom and the National Electric Energy Agency (Agência Nacional de Energia Elétrica) or ANEEL. We believe that all market data in this offering memorandum is reliable, accurate and complete.

**Special Note Regarding Non-GAAP Financial Measures**

This offering memorandum discloses the following non-GAAP financial measures: (i) Net Debt, as defined by us as current and non-current borrowings, net of cash and cash equivalents, marketable securities, derivative assets or liabilities related to foreign exchange rate risk and interest rate risk and other financial assets (e.g., Brazilian treasury bonds (*Certificado do Tesouro Nacional*, or CTN, related to *Projetos Externos Securitização Agrícola*, or PESA), (ii) EBITDA, as defined by us as our combined consolidated net income plus combined consolidated financial results, combined consolidated income and social contributions taxes and combined consolidated depreciation and amortization included in any of the foregoing expenses and (iii) Net Debt to EBITDA Ratio or Net Debt/EBITDA, as the case may be, as defined by us as the ratio of: (a) the aggregate amount of Net Debt as of the end of the period to (b) EBITDA for the relevant period. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Financial Presentation and Accounting Policies—Critical Accounting Policies and Estimates." We use the definition of EBITDA to be consistent with the definition required for the calculation of financial ratios applicable under the notes. The non-GAAP financial measures described in this offering memorandum are not a substitute for the GAAP measures of earnings, for which our management has responsibility.

Our management believes that disclosure of Net Debt is useful to potential investors as it helps to give them a clearer understanding of our financial liquidity. Net Debt is also used to calculate certain leverage ratios. Our management also believe that EBITDA and Net Debt to EBITDA Ratio or Net Debt/EBITDA, as the case may be, provide useful information to potential investors, financial analysts and the public in their review of our operating performance and their comparison of our operating performance to the operating performance of other companies in the same industry and other industries. However, Net Debt, EBITDA, Net Debt to EBITDA Ratio or Net

Debt/EBITDA, as the case may be, are not measures under IFRS or Brazilian GAAP and should not be considered as a substitute for net income or loss, cash flow from operations or other measures of operating performance or liquidity, or net debt or other measures of indebtedness, in each case, determined in accordance with IFRS or Brazilian GAAP. EBITDA is not intended to represent funds available for dividends or other discretionary uses by us because those funds are required for debt service, capital expenditures, working capital and other commitments and contingencies.

## FORWARD-LOOKING STATEMENTS

This offering memorandum contains estimates and forward-looking statements, principally under "Risk Factors," "Business" and "Management's Discussion and Analysis of Financial Condition and Results of Operations." Some of the matters discussed herein concerning our business and financial performance include estimates and forward-looking statements and, therefore, neither indicate nor are a guarantee future results.

Our estimates and forward-looking statements are mainly based on our current expectations and estimates on projections of future events and operating and financial trends, which affect or may affect our industry, market share, reputation, businesses, financial condition, results of operations, margins, and/or cash flow. Although we believe that these estimates and forward-looking statements are based upon reasonable assumptions, they are subject to several risks and uncertainties, are made in light of information currently available to us and should not be considered a guarantee of the results of operations we may achieve.

Many significant factors in addition to those stated in this offering memorandum may adversely affect our current estimates and forward-looking statements, and whether these estimates or statements may be realized. Our estimates and forward-looking statements may be influenced by the following factors, among others:

- our ability to successfully implement structural changes aimed at generating and maximizing profits;

- economic, political, social and business conditions in Brazil, particularly in the regions of the country in which we are active, notably with respect to inflation, exchange rate fluctuation of the *real,* interest rates fluctuation and the political environment in Brazil following the impeachment of former President Dilma Rousseff;

- our ability to successfully compete in all segments and geographical markets where we currently conduct business or may conduct businesses in the future;

- our ability to fulfill our financial obligations or obtain refinancing;

- our ability to sustain and improve our performance;

- the impact of legislation and new regulations on our business;

- government intervention resulting in changes in the economy, taxes and tariffs affecting the markets in which we operate;

- recruitment, remuneration and retention of our "key employees";

- events and risk perception in relation to corruption allegations involving Petróleo Brasileiro S.A. – Petrobras (Brazil's state-owned oil company, one of the country's largest companies), or Petrobras, and the impacts of such investigation on the Brazilian economy and political outlook as a whole;

- the impact of the economic recession affecting Brazil and the possible fiscal adjustment process which may adversely affect the growth of demand in the Brazilian economy as a whole;

- our ability to obtain labor and supply services at reasonable prices without interruption;

- our capitalization and indebtedness level;

- unavailability of adequate financing to face our needs or inability to make the volume of investment as set out in our business plan within the expected time frame;

- our ability to identify, develop, plan and implement new projects;

- delays, excess or cost increases not foreseen in the implementation of our projects and other issues related to construction and development;

- factors or trends that may affect our business, market share, financial condition, liquidity and results of our operations;

- our capitalization and indebtedness level and our ability to arrange financing and to implement our capital expansion plan; and

- other risk factors discussed under "Risk Factors."

The words "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "expect" and similar words are intended to identify estimates and forward-looking statements. Estimates and forward-looking statements speak only as of the date they were made, and we undertake no obligation to update or to review any estimate and/or forward-looking statement because of new information, future events or other factors. Estimates and forward-looking statements involve risks and uncertainties and are not guarantees of future performance. Our future results may differ materially from those expressed in these estimates and forward-looking statements. In light of the risks and uncertainties described above, the estimates and forward-looking statements discussed in this offering memorandum might not occur, and our future results and our performance may differ materially from those expressed in these forward-looking statements due to, but not limited to, the factors mentioned above. Because of these uncertainties, you should not make any investment decision based on these estimates and forward-looking statements.

***The modification, suspension, cancellation or non-renewal of certain tax benefits which we have been granted could have a material adverse effect on us.***

We benefit from certain tax incentives, benefit programs and special regimes. We cannot assure you that these tax benefits will be maintained or renewed or that we will be able to obtain new tax benefits. If we lose our existing tax benefits, due to our noncompliance with future requirements or if the current tax programs and agreements from which we benefit are modified, suspended, cancelled or not renewed, we could be materially and adversely affected. Moreover, the state tax benefits relating to ICMS from which we benefit may be declared unconstitutional by the Brazilian Supreme Court if they have been granted without the approval of all the States and Federal District through the Brazilian National Council of Fiscal Policy (*Conselho Nacional de Política Fazendária*), or CONFAZ. The Brazilian Supreme Court may grant retroactive or prospective effects to the declaration of unconstitutionality. The foregoing could result in a material adverse effect on us.

***Our insurance coverage may be inadequate to cover all losses and/or liabilities that may be incurred in our operations.***

Our operations are subject to a number of hazards and risks. We maintain insurance at levels that are customary in our industry to protect against these liabilities; however, our insurance may not be adequate to cover all losses or liabilities that might be incurred in our operations. For example, we do not maintain coverage for business interruptions of any nature for our Brazilian operations, including business interruptions caused by labor disruptions. If, for instance, our workers were to strike, the resulting work stoppages could have a material and adverse effect on us. Similarly, we do not insure most of our assets against war or sabotage. Therefore, an attack or an operational incident causing an interruption of our business could have a material and adverse effect on our financial condition or results of operations.  Moreover, we will be subject to the risk that we may not be able to maintain or obtain insurance of the type and amount desired at reasonable rates. If we were to incur a significant liability for which we were not fully insured, it could have a materially adverse effect on our business, financial condition and results of operations.

***We may be unable to implement our growth strategy successfully.***

Our future growth and financial performance will depend, in part, on the successful implementation of our business strategy, including: (i) our ability to attract new clients or increase volume from existing clients in specific markets and locations, (ii) our capacity to finance investments (through indebtedness or otherwise) and (c) our ability to increase our operational capacity and expand our current capacity to supply to new markets. We cannot assure you that we will be able to achieve these objectives successfully or at all. Our failure to achieve any of these objectives as a result of competitive difficulties, cost or restrictions on our ability to invest may limit our ability to implement our growth strategy successfully. We may need to incur additional indebtedness in order to finance new investments to implement our growth strategy. Unfavorable economic conditions in Brazil and in the global credit markets, such as high interest rates on new loans, reduced liquidity or reduced interest of financial institutions in granting loans, may limit our access to new credit. Furthermore, failure to achieve our expected growth may have a material adverse effect on our business, financial conditions, results of operations and our ability to repay our debt obligations.

***Any failure relating to our strategic partnerships may result in additional financial or performance obligations by us, which would reduce our profitability.***

We enter into strategic partnerships, joint ventures, combinations, alliances and collaborations, including, among other things, partnerships with our customers. The success of these and other partnerships depends, in part, on the satisfactory performance of our and our partners' obligations.

If we or our partners do not satisfactorily perform such obligations, our strategic partnerships may fail to perform as expected or to deliver the agreed services. Should this occur, we may be required to make additional investments and provide additional services to guarantee the adequate performance and delivery of the agreed services, or terminate such partnerships prior to their stated maturity. The performance by us of additional obligations with respect to our strategic partnerships may result in the reduction of our profits and material losses to us.

***The Issuer does not have sufficient cash flow from operations to repay the notes.***

The Issuer's principal business activity is to act as a financing company for our activities and operations. The Issuer has no material operational assets, and its only sources of cash flow are returns from its financing activities including any intercompany credit transactions and from capital contributions and other investments by us and our other subsidiaries. Accordingly, the Issuer does not have, and is not expected to have through the maturity date of the notes, sufficient cash flow from its operations to pay amounts due in connection with the notes, and the holders of the notes must rely predominantly on our operations and cash flow to repay amounts due under the notes. If the Issuer does not have sufficient cash flow from its financing activities, and if capital contributions and other investments in the Issuer are not made by us or our subsidiaries, then the holders of the notes would have to rely upon claims against us for payment under the guarantees. In addition, payments under the guarantees are subject to the risks and limitations described under "—Payments on the notes and the guarantees will be junior to the Issuer's and the Guarantors' secured debt obligations and effectively junior to debt obligations of non-guarantor subsidiaries."

***Changes in our credit ratings may adversely affect the value of the notes.***

The credit ratings of the notes reflect certain analysis conducted by credit rating agencies and do not address all material risks relating to an investment in the notes. The ratings assigned to the notes could be lowered, suspended or withdrawn entirely by the rating agencies if, in each rating agency's judgment, circumstances warrant such action. We cannot assure you that such credit ratings will remain in effect for any given period of time.  Actual or anticipated changes or downgrades in our credit ratings, including any announcement that our ratings are under further review for a downgrade, could affect the market value of the notes. In addition, during the period that the guarantees are outstanding, any actual or anticipated changes or downgrades in our credit ratings, including any announcement that its ratings are under further review for a downgrade, could affect the market value of the notes.

***Restrictions on the movement of capital out of Brazil may impair the ability of holders of the notes to receive payments on the notes.***

Brazilian law provides that whenever there is a serious imbalance in Brazil's balance of payments or reasons to foresee a serious imbalance, the Brazilian government may impose temporary restrictions on the remittance to foreign investors of the proceeds of their investments in Brazil. We cannot assure you that mechanisms for the transfer of *reais* and conversion into U.S. dollars will continue to be available at the time we are required to perform our obligations under the notes or the indenture or that a more restrictive control policy, which could affect our ability to make payments under the notes or the indenture in U.S. dollars, will not be instituted in the future. If such financial mechanisms are not available, we may have to rely on a special authorization from the Central Bank to make payments under the notes in U.S. dollars or, alternatively, be required to make such payments with any funds that we hold outside Brazil. We cannot assure you that any such Central Bank approval would be obtained or that such approval would be obtained on a timely basis or that it will have such funds available.

***We may not have the ability to raise the funds necessary to finance any change of control offer required by the indenture governing the notes.***

Upon the occurrence of certain specific change of control events, we will be required to offer to repurchase all outstanding notes at 101% of the principal amount thereof plus accrued and unpaid interest to the date of repurchase. However, it is possible that we will not have sufficient funds at the time of any such change of control event to make the required repurchase of the notes. In addition, our existing and future indebtedness may contain prohibitions on the occurrence of events that would constitute a change of control or require such indebtedness to be repurchased upon a change of control. Moreover, the exercise of the right of the holders of the notes to require us to repurchase the notes upon a change of control event may cause a default under such indebtedness even if the change of control event itself does not. Accordingly, we may not be able to satisfy our obligations to purchase the notes unless we are able to refinance or obtain waivers under such indebtedness. The failure to repurchase the notes upon a change of control event would result in an event of default under the indenture governing the notes. In addition, certain important corporate events, such as leveraged recapitalizations, that would increase the level of our indebtedness may not constitute a change of control event under the indenture governing the notes. Therefore, if an event occurs that does not constitute a change of control event under the indenture, we will not be required to make an offer to repurchase the notes and the holders may be required to continue to hold the notes despite such event.

# EXHIBIT K

**Excerpts of 2032 Notes Offering Memorandum**

## IMPORTANT NOTICE

THIS OFFERING IS AVAILABLE ONLY TO INVESTORS WHO ARE EITHER (i) QUALIFIED INSTITUTIONAL BUYERS ("QIBs"), WITHIN THE MEANING OF RULE 144A UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR (ii) NON-U.S. PERSONS, WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, OUTSIDE THE UNITED STATES.

**IMPORTANT: You must read the following before continuing.** The following applies to the offering memorandum (the "Offering Memorandum") following this page and you are advised to read this carefully before reading, accessing or making any other use of the Offering Memorandum. In accessing the Offering Memorandum, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER OF SECURITIES FOR SALE IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO. THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER JURISDICTION, AND THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE LAWS OF OTHER JURISDICTIONS.

**PROHIBITION OF SALES TO EEA RETAIL INVESTORS.** THE SECURITIES DESCRIBED IN THE OFFERING MEMORANDUM ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN THE EUROPEAN ECONOMIC AREA ("EEA"). FOR THESE PURPOSES, A RETAIL INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT, AS DEFINED IN POINT (11) OF ARTICLE 4(1) OF DIRECTIVE 2014/65/EU (AS AMENDED, "MIFID II"); (II) A CUSTOMER WITHIN THE MEANING OF DIRECTIVE (EU) 2016/97 (AS AMENDED, THE "INSURANCE DISTRIBUTION DIRECTIVE"), WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT, AS DEFINED IN POINT (10) OF ARTICLE 4(1) OF MIFID II; OR (III) NOT A QUALIFIED INVESTOR AS DEFINED IN REGULATION (EU) 2017/1129, AS AMENDED (THE "PROSPECTUS REGULATION"). CONSEQUENTLY, NO KEY INFORMATION DOCUMENT REQUIRED BY REGULATION (EU) NO 1286/2014 (THE "PRIIPS REGULATION") FOR OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO RETAIL INVESTORS IN THE EEA HAS BEEN PREPARED AND THEREFORE OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO ANY RETAIL INVESTOR IN THE EEA MAY BE UNLAWFUL UNDER THE PRIIPS REGULATION.

**PROHIBITION OF SALES TO U.K. RETAIL INVESTORS.** THE SECURITIES DESCRIBED IN THE OFFERING MEMORANDUM ARE NOT INTENDED TO BE

OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE
OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN
THE UNITED KINGDOM ("U.K."). FOR THESE PURPOSES, A RETAIL INVESTOR
MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT, AS DEFINED
IN POINT (8) OF ARTICLE 2 OF REGULATION (EU) NO 2017/565 AS IT FORMS PART
OF DOMESTIC LAW BY VIRTUE OF THE EUROPEAN UNION (WITHDRAWAL) ACT
2018 (THE "EUWA"); (II) A CUSTOMER WITHIN THE MEANING OF THE PROVISIONS
OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (AS AMENDED, THE
"FSMA") AND ANY RULES OR REGULATIONS MADE UNDER THE FSMA TO
IMPLEMENT THE INSURANCE DISTRIBUTION DIRECTIVE, WHERE THAT
CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT, AS DEFINED IN
POINT (8) OF ARTICLE 2(1) OF REGULATION (EU) NO 600/2014 AS IT FORMS PART
OF DOMESTIC LAW BY VIRTUE OF THE EUWA; OR (III) NOT A QUALIFIED
INVESTOR AS DEFINED IN ARTICLE 2 OF THE PROSPECTUS REGULATION AS IT
FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA. CONSEQUENTLY, NO
KEY INFORMATION DOCUMENT REQUIRED BY THE PRIIPS REGULATION AS IT
FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA (THE "U.K. PRIIPS
REGULATION") FOR OFFERING OR SELLING THE SECURITIES OR OTHERWISE
MAKING THEM AVAILABLE TO RETAIL INVESTORS IN THE U.K. HAS BEEN
PREPARED AND THEREFORE OFFERING OR SELLING THE SECURITIES OR
OTHERWISE MAKING THEM AVAILABLE TO ANY RETAIL INVESTOR IN THE U.K.
MAY BE UNLAWFUL UNDER THE U.K. PRIIPS REGULATION.

IN ADDITION, IN THE U.K., THE OFFERING MEMORANDUM AND ANY OTHER
MATERIAL RELATING TO THE SECURITIES DESCRIBED HEREIN ARE ONLY BEING
DISTRIBUTED TO, AND ARE DIRECTED ONLY AT, (I) PERSONS HAVING
PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS FALLING
WITHIN ARTICLE 19(5) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000
(FINANCIAL PROMOTION) ORDER 2005 (THE "ORDER"), OR (II) HIGH NET WORTH
ENTITIES FALLING WITHIN ARTICLE 49(2)(A) TO (D) OF THE ORDER, OR (III)
PERSONS TO WHOM IT WOULD OTHERWISE BE LAWFUL TO DISTRIBUTE THEM
(ALL SUCH PERSONS TOGETHER BEING REFERRED TO AS "RELEVANT PERSONS").
THE SECURITIES ARE ONLY AVAILABLE TO, AND ANY INVITATION, OFFER OR
AGREEMENT TO SUBSCRIBE, PURCHASE OR OTHERWISE ACQUIRE THE
SECURITIES WILL BE ENGAGED IN ONLY WITH, RELEVANT PERSONS. THE
OFFERING MEMORANDUM AND ITS CONTENTS ARE CONFIDENTIAL AND SHOULD
NOT BE DISTRIBUTED, PUBLISHED OR REPRODUCED (IN WHOLE OR IN PART) OR
DISCLOSED BY ANY RECIPIENTS TO ANY OTHER PERSON IN THE U.K. ANY
PERSON IN THE U.K. THAT IS NOT A RELEVANT PERSON SHOULD NOT ACT OR
RELY ON THE OFFERING MEMORANDUM OR ITS CONTENTS.

THE FOLLOWING OFFERING MEMORANDUM MAY NOT BE FORWARDED OR
DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY
MANNER WHATSOEVER. ANY FORWARDING, DISTRIBUTION OR REPRODUCTION
OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORIZED. FAILURE TO
COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE
SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**Confirmation of Your Representation:** In order to be eligible to view the Offering Memorandum or make an investment decision with respect to the securities, investors must be either (i) QIBs or (ii) non-U.S. persons (within the meaning of Regulation S under the Securities Act) in the U.S. This Offering Memorandum is being sent at your request and by accepting the e-mail and accessing the Offering Memorandum you shall be deemed to have represented to us that (i) you and any customers you represent are either (a) QIBs or (b) non-U.S. persons (within the meaning of Regulation S under the Securities Act); and (ii) you consent to delivery of the Offering Memorandum by electronic transmission.

You are reminded that the Offering Memorandum has been delivered to you on the basis that you are a person into whose possession the Offering Memorandum may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorized to, deliver the Offering Memorandum to any other person.

The materials relating to the offering do not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law. If a jurisdiction requires that the offering be made by a licensed broker or dealer and the initial purchasers or any affiliate of the initial purchasers is a licensed broker or dealer in that jurisdiction, the offering shall be deemed to be made by the initial purchasers or such affiliate on behalf of the issuer in such jurisdiction.

The Offering Memorandum has been sent to you in an electronic form. You are reminded that documents transmitted via this medium may be altered or changed during the process of electronic transmission, and, consequently, neither the initial purchasers, nor any person who controls them nor any of their directors, officers, employees nor any of their agents nor any affiliate of any such person, accept any liability or responsibility whatsoever in respect of any difference between the Offering Memorandum distributed to you in electronic form and the hard copy version available to you on request from the initial purchasers.

**OFFERING MEMORANDUM**                                                                  **CONFIDENTIAL**



### Raízen Fuels Finance S.A.
### US$750,000,000 6.250% Notes due 2032
Unconditionally and Irrevocably Guaranteed by
### Raízen S.A. and Raízen Energia S.A.

Raizen Fuels Finance S.A., a public limited liability company (*société anonyme*) organized under the laws of the Grand Duchy of Luxembourg ("Luxembourg"), having its registered office at 16, Rue Eugène Ruppert, L – 2453 Luxembourg and registered with the Luxembourg Trade and Companies' Register (*Registre de commerce et des sociétés, Luxembourg*) under number B184033, LEI 52990010NH26VC32Q522 (the "Issuer"), is offering US$750,000,000 in aggregate principal amount of 6.250% notes due 2032 (the "notes"). All of the Issuer's obligations pursuant to the notes and the indenture under which they will be issued will be fully and unconditionally guaranteed (the "guarantees"), on an unsecured basis, by Raizen S.A., a corporation (*sociedade por ações*) incorporated under the laws of the Federative Republic of Brazil ("Raízen"), and Raizen Energia S.A., a corporation (*sociedade por ações*) incorporated under the laws of the Federative Republic of Brazil ("Raizen Energia") (each, a "Guarantor" and, collectively, the "Guarantors"). The notes will bear interest at the rate of 6.250% per year and will mature on July 8, 2032. Interest on the notes will be payable on January 8 and July 8 of each year, beginning on January 8, 2026. The notes and guarantee will be unsecured and will rank equally in right of payment with the other unsecured unsubordinated indebtedness of the Issuer and the relevant Guarantor, respectively. The notes and the guarantees will be effectively junior to the secured indebtedness of the Issuer and the Guarantors to the extent of the value of the assets securing such indebtedness and structurally subordinated to the indebtedness of the Issuer's and the Guarantors' non-guarantor subsidiaries and jointly controlled companies. See "Description of the Notes."

At any time before May 8, 2032, which is the date that is two months prior to the maturity of the notes (the "Par Call Date"), the Issuer or any Guarantor may redeem the notes at its option, in whole or in part, at any time and from time to time, by paying 100% of the principal amount of the notes *plus* a "make-whole" amount and accrued and unpaid interest and Additional Amounts (as defined herein), if any, to, but excluding, the redemption date. If the redemption date of the notes is on or after the Par Call Date, the redemption price will equal 100% of the principal amount of the notes, *plus* accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date. The notes may also be redeemed by the Issuer or any Guarantor, at its option, in whole but not in part, at 100% of their principal amount *plus* accrued and unpaid interest and Additional Amounts, if any, at any time upon the occurrence of specified tax events, as set forth in this offering memorandum. See "Description of the Notes—Redemption—Redemption for Taxation Reasons." If a Change of Control (as defined herein) that results in a Rating Decline (as defined herein) with respect to the notes occurs, unless the Issuer or any Guarantor has exercised its option to redeem all of the outstanding notes, the Issuer or any Guarantor will be required to offer to purchase the notes at a purchase price equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the purchase date. See "Description of the Notes—Certain Covenants—Purchase of Notes Upon Change of Control Event."

Application will be made to list the notes on the Official List of the Luxembourg Stock Exchange (the "LuxSE") and to admit the notes to trading on the Euro MTF Market of the LuxSE (the "Euro MTF"). There are no assurances that the notes will be listed on the Official List of the LuxSE or admitted to trading on the Euro MTF. See "Listing and General Information."

**Investing in the notes involves risks. See "Risk Factors" beginning on page 29 of this offering memorandum.**

This offering memorandum has been prepared on the basis that any offer of the notes in any member state ("Member State") of the European Economic Area (the "EEA") will be made pursuant to an exemption under Regulation (EU) 2017/1129 of the European Parliament and of the Council of June 14, 2017 on the prospectus to be published when securities are offered to the public or admitted to trading on a regulated market, and repealing Directive 2003/71/EC, as amended (the "Prospectus Regulation"), and under any implementing legislation in each Member State, from the requirement to publish a prospectus for offers of notes. This offering memorandum is not a prospectus for purposes of the Prospectus Regulation, and under any implementing legislation in each Member State, and has not been approved by a competent authority within the meaning of the Prospectus Regulation. This offering memorandum has been prepared on the basis that any offer of the notes in the United Kingdom (the "UK"), will be made pursuant to an exemption from the obligation to publish a prospectus under Section 86 of the Financial Services and Markets Act 2000 (the "FSMA"), in the UK. This offering memorandum is not a prospectus for purposes of the UK Prospectus Regulation (meaning Regulation (EU) 2017/1129 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018 (the "EUWA"), and has not been approved by the UK Financial Conduct Authority (the "FCA").

The notes and the guarantees have not been, and will not be, registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws. The notes may not be offered or sold within the United States or to U.S. persons, except to qualified institutional buyers in reliance on the exemption from registration provided by Rule 144A under the Securities Act ("Rule 144A"), and to certain non-U.S. persons in offshore transactions in reliance on Regulation S under the Securities Act ("Regulation S"). You are hereby notified that sellers of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. For more information about restrictions on transfer of the notes, see "Transfer Restrictions." **Neither the U.S. Securities and Exchange Commission (the "SEC"), nor any state securities commission has approved or disapproved of the notes or the guarantee or determined if this offering memorandum is accurate or complete. Any representation to the contrary is a criminal offense.**

**Issue price of the notes: 98.838% *plus* accrued interest, if any, from  July 8, 2025.**

Delivery of the notes to purchasers in book-entry form through The Depository Trust Company ("DTC"), and its direct and indirect participants, including Clearstream Banking S.A. ("Clearstream"), and Euroclear Bank SA/NV, as operator of the Euroclear System ("Euroclear"), is expected on or about July 8, 2025.

*Global Coordinators and Joint Book Runners*

| BNP PARIBAS | Citigroup | Itau BBA | Morgan Stanley | Santander | SMBC Nikko |
|---|---|---|---|---|---|

*Joint Book Runners*

| BBVA | Bofa Securities | Bradesco BBI | Crédit Agricole CIB | J.P. Morgan | Rabo Securities |
|---|---|---|---|---|---|

The date of this offering memorandum is June 26, 2025.

## TABLE OF CONTENTS

Page

PRESENTATION OF FINANCIAL AND OTHER INFORMATION ......................................... vi

FORWARD-LOOKING STATEMENTS ................................................................. xiii

SUMMARY ...................................................................................... 1

THE OFFERING .................................................................................. 14

SUMMARY FINANCIAL AND OTHER INFORMATION ..................................................... 20

RISK FACTORS .................................................................................. 29

USE OF PROCEEDS ............................................................................... 85

CAPITALIZATION ................................................................................ 86

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
AND RESULTS OF OPERATIONS...................................................................... 88

INDUSTRY ..................................................................................... 116

BUSINESS..................................................................................... 143

REGULATORY OVERVIEW ......................................................................... 178

MANAGEMENT................................................................................... 202

PRINCIPAL SHAREHOLDERS ...................................................................... 216

RELATED PARTY TRANSACTIONS................................................................... 218

DESCRIPTION OF THE NOTES...................................................................... 221

TAXATION..................................................................................... 258

THE ISSUER AND THE GUARANTORS ............................................................... 272

TRANSFER RESTRICTIONS........................................................................ 274

ENFORCEABILITY OF CIVIL LIABILITIES........................................................... 278

PLAN OF DISTRIBUTION ......................................................................... 287

CERTAIN ERISA CONSIDERATIONS ................................................................ 296

LEGAL MATTERS................................................................................ 299

INDEPENDENT AUDITORS......................................................................... 300

LISTING AND GENERAL INFORMATION.............................................................. 301

INDEX TO FINANCIAL STATEMENTS ............................................................... F-1

————————————

**You should rely only on the information contained in this offering memorandum. Neither we nor the initial purchasers have authorized anyone to provide you with different information. Neither we nor the initial purchasers are making an offer of the notes (or the**

1

**related guarantee) in any jurisdiction where the offer is not permitted. You should not assume that the information contained in this offering memorandum is accurate as of any date other than the date on the cover of this offering memorandum.**

Unless otherwise indicated or the context otherwise requires, all references in this offering memorandum to (1) "Raízen," the "Company," "our Company," "we," "our," "ours," "us" or similar terms are to Raízen and its consolidated subsidiaries, which include Raízen Energia and the Issuer; (2) "Cosan" are to Cosan S.A.; (3) "Shell Holding" are to Shell Brazil Holding B.V.; and (4) "Shell" are to Royal Dutch Shell plc. All references in this offering memorandum to our "controlling shareholders" are to Cosan and Shell.

References to the "initial purchasers" are to BNP Paribas Securities Corp., Citigroup Global Markets Inc., Itau BBA USA Securities, Inc., Morgan Stanley & Co. LLC, Santander US Capital Markets LLC, SMBC Nikko Securities America, Inc., BBVA Securities Inc., BofA Securities, Inc., Banco Bradesco BBI S.A., Credit Agricole Securities (USA) Inc., J.P. Morgan Securities LLC, and Rabo Securities USA, Inc.

References to the "Indenture" shall mean the indenture governing the notes, dated as of the issue date of the notes.

This offering memorandum has been prepared by us solely for use in connection with the proposed offering of the notes (and the related guarantees) described in this offering memorandum. This offering memorandum is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire notes (or the related guarantees). Distribution of this offering memorandum to any person other than a prospective investor and any person retained to advise such prospective investor with respect to its purchase is unauthorized, and any disclosure of any of its contents, without our prior written consent, is prohibited. Each prospective investor, by accepting delivery of this offering memorandum, agrees to the foregoing and to make no photocopies of this offering memorandum or any documents referred to in this offering memorandum.

Neither the initial purchasers nor any of their directors, affiliates, advisors or agents make any representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this offering memorandum. Nothing contained in this offering memorandum is, or shall be relied upon as, a promise or representation by the initial purchasers or by any of their directors, affiliates, advisors or agents as to the past or future.

The notes (and the related guarantees) are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom. As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time. See "Plan of Distribution" and "Transfer Restrictions."

In making an investment decision, prospective investors must rely on their own examination of our Company and the terms of this offering, including the merits and risks involved. The contents of this offering memorandum are not, and prospective investors should

not construe anything in this offering memorandum as, legal, business or tax advice. Each prospective investor should consult its own legal, business, tax or other advisors as needed to make its investment decision and to determine whether it is legally permitted to purchase the notes under applicable law.

This offering memorandum contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All such summaries are qualified in their entirety by reference to such documents. Copies of documents referred to in this offering memorandum will be made available to prospective investors upon request to us or the initial purchasers.

Each person receiving this offering memorandum acknowledges that this offering memorandum may not contain all information that would be included in a prospectus if this offering were registered under the Securities Act.

## PROHIBITION OF SALES TO EEA RETAIL INVESTORS

The notes (and the related guarantees) described in this offering memorandum are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the EEA. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU, as amended ("MiFID II"); (ii) a customer within the meaning of Directive 2016/97/EU, as amended (the "Insurance Distribution Directive"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a qualified investor as defined in the Prospectus Regulation. Consequently, no key information document required by Regulation (EU) No. 1286/2014, as amended (the "PRIIPs Regulation"), for offering or selling the notes or otherwise making them available to retail investors in the EEA has been prepared and, therefore, offering or selling the notes or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation. This offering memorandum has been prepared on the basis that any offer of notes in any Member State of the EEA will be made pursuant to an exemption under the Prospectus Regulation, and under any implementing legislation in each Member State, from the requirement to publish a prospectus for offers of notes.

## PROHIBITION OF SALES TO UK RETAIL INVESTORS

The notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the UK. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client, as defined in point (8) of Article 2 of Regulation (EU) No. 2017/565 as it forms part of domestic law by virtue of the EUWA; (ii) a customer within the meaning of the provisions of the FSMA and any rules or regulations made under the FSMA to implement Directive (EU) 2016/97, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of Regulation (EU) No. 600/2014 as it forms part of domestic law by virtue of the EUWA; or (iii) not a qualified investor as defined in Article 2 of the UK Prospectus Regulation as it forms part of domestic law by virtue of the EUWA. Consequently, no key information document required by Regulation (EU) No. 1286/2014 as it forms part of domestic law by virtue of the EUWA (the

"UK PRIIPs Regulation") for offering or selling the notes or otherwise making them available to retail investors in the UK has been prepared and therefore offering or selling the notes or otherwise making them available to any retail investor in the UK may be unlawful under the UK PRIIPs Regulation.

The above selling restriction is in addition to any other selling restrictions set forth in this offering memorandum.

**MiFID PRODUCT GOVERNANCE/
PROFESSIONAL INVESTORS AND ECPS ONLY TARGET MARKET**

Solely for the purposes of the product approval process of the Issuer and the Guarantors (each a "Manufacturer"), the target market assessment in respect of the notes described in this offering memorandum has led to the conclusion that (i) the target market for the notes is eligible counterparties and professional clients only, each as defined in MiFID II; and (ii) all channels for distribution of the notes to eligible counterparties and professional clients are appropriate. Any person subsequently offering, selling or recommending the notes (a "distributor") should take into consideration the Manufacturers' target market assessment; however, and without prejudice to the Issuer's obligations in accordance with MiFID II, a distributor subject to MiFID II is responsible for undertaking its own target market assessment in respect of the notes (by either adopting or refining the manufacturers' target market assessment) and determining appropriate distribution channels.

**NOTICE TO PROSPECTIVE INVESTORS IN LUXEMBOURG**

This offering memorandum has not been approved by and will not be submitted for approval to the Luxembourg Financial Services Authority (*Commission de Surveillance du Secteur Financier*) for purposes of a public offering or sale in Luxembourg. Accordingly, the notes may not be offered or sold to the public in Luxembourg, directly or indirectly, and neither this offering memorandum nor any other offering memorandum, form of application, advertisement or other material related to such notes may be distributed, or otherwise be made available in or from, or published in, Luxembourg except in circumstances where the offer benefits from an exemption to or constitutes a transaction not subject to the requirement to publish a prospectus, in accordance with the Prospectus Regulation and the Luxembourg law of 16 July 2019, on prospectuses for securities.

**NOTICE TO PROSPECTIVE INVESTORS WITHIN BRAZIL**

The offer and sale of the notes and related guarantees have not been and will not be registered with the Brazilian securities commission (*Comissão de Valores Mobiliários*, or "CVM") and, therefore, will not be carried out by any means that would constitute a public offering in Brazil under CVM Resolution No. 160, dated July 13, 2022, as amended ("Resolution 160"), or unauthorized distribution under Brazilian laws and regulations. The notes and related guarantees will be authorized for trading on organized non-Brazilian securities markets and may only be offered to Brazilian professional investors (as defined by applicable CVM regulation), who may only acquire the notes and related guarantees through a non-Brazilian account, with settlement outside Brazil in non-Brazilian currency. The trading of these securities on regulated securities markets in Brazil is prohibited.

**PRESENTATION OF FINANCIAL AND OTHER INFORMATION**

All references in this offering memorandum to "*real*," "*reais*" or "R$" are to the Brazilian *real*, the official currency of Brazil. All references to "U.S. dollars" or "US$" are to U.S. dollars, the official currency of the United States.

As of March 31, 2025, the exchange rate for *reais* into U.S. dollars was R$5.7422 to US$1.00, based on the selling rate as reported by the Central Bank.

Solely for the convenience of the reader, we have translated certain real amounts in this offering memorandum into U.S. dollars at the selling rate as of March 31, 2025 as reported by the Central Bank. These translations (i) should not be considered representations that any such amounts have been, could have been or could be converted into U.S. dollars at that or at any other exchange rate and (ii) do not necessarily represent amounts in accordance with accounting practices adopted in Brazil ("Brazilian GAAP"), as issued by the Comitê de Pronunciamentos Contábeis ("CPC"), or International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board (the "IASB").

**Financial Statements**

*Raízen Financial Statements*

We maintain our books and records in *reais.* Due to our harvest year and corporate production cycle, our fiscal year begins on April 1 of each year and ends on March 31 of the following year.

Our financial information contained in this offering memorandum has been derived from our records and financial statements, and includes our audited individual and consolidated financial statements as of March 31, 2025 and for the year ended March 31, 2024, which includes corresponding figures for the year ended March 31, 2023 (together, our "audited consolidated financial statements").

We have prepared our audited consolidated financial statements in accordance with Brazilian GAAP, as issued by the CPC, and with IFRS, as issued by the IASB.

*Segment Information and Presentation of Segment Financial Data*

As of March 31, 2025, our business was organized into three reporting segments, which corresponded to our principal production processes, products and services:

- **Fuel distribution (previously called "Mobility")**: mainly refers to the trade and sale activities of fossil and renewable fuels and lubricants, through a franchised network of service stations under the Shell brand throughout the national territory and in Latin America, operating in Argentina and Paraguay. Raízen Paraguay S.A. ("Raízen Paraguay") is no longer consolidated by the Company as from December 1, 2024, for additional information see "Business – Our History".

- **Ethanol, Sugar and Bioenergy - ESB (previously segmented as "Sugar" and "Renewables")**: this refers to (a) ethanol and sugar production, sale, origination and trading activities; (b) production and sale of bioenergy; (c) resale and trading of electric power; and (d) production and sale of other renewable products (solar energy and biogas). These activities were aggregated into a single segment, as their products and services come from renewable sources, use similar technologies, and present synergies in their production and distribution process. The combination of these activities results in the portfolio of clean energy and the retirement of carbon credits offered by the Company.

- **Other segments**: refers to: (i) businesses not related to the Company's core business, such as: convenience and proximity store, financial products and services and other port operations, and (ii) results not allocated to specific segments, such as general and administrative expenses of corporate areas, financial results, income tax and social contribution, given that they are not considered part of an operating segment.

For more information on our segments, see note 3 to our audited consolidated financial statements included elsewhere in this offering memorandum.

### *Issuer Financial Statements*

We have not included any financial statements for the Issuer in this offering memorandum. The Issuer does not, and will not, publish financial statements, except for financial statements that it is required to publish under the laws of Luxembourg. In addition, the Issuer will not furnish to the trustee or the holders of the notes any financial statements of, or other reports relating to, the Issuer. The Issuer's obligations under the notes will be fully and unconditionally guaranteed by Raízen and Raízen Energia. The financial condition and results of operations of the Issuer have been fully consolidated in our consolidated financial statements, which consolidate the financial condition and results of operations of Raízen and its subsidiaries (including Raízen Energia and the Issuer). See "Risk Factors—Risks Related to the Notes and the Guarantees and Our Other Indebtedness—Because the Issuer has no operations of its own, holders of the notes must depend on Raízen and its subsidiaries to provide the Issuer with sufficient funds to make payments on the notes when due."

### **Special Note Regarding Non-GAAP Financial Measures**

We present certain non-GAAP financial measures in this offering memorandum: Consolidated EBITDA, Consolidated Adjusted EBITDA, Fuel Distribution Adjusted EBITDA, ESB Adjusted EBITDA, Leverage Ratio and Return on Average Capital Employed ("ROACE") (the "Non-GAAP Financial Measures").

Our management believes that Consolidated EBITDA, Consolidated Adjusted EBITDA, Fuel Distribution Adjusted EBITDA, ESB Adjusted EBITDA, Leverage Ratio and ROACE provide useful information to potential investors, financial analysts and the public in their review of our operating and financial performance and their comparison of our operating and financial performance to the performance of other companies in the same industry and other industries. However, Consolidated EBITDA, Consolidated Adjusted EBITDA, Fuel Distribution Adjusted

EBITDA, ESB Adjusted EBITDA, Leverage Ratio and ROACE are not measures of financial performance under Brazilian GAAP or IFRS. These Non-GAAP Financial Measures should not be considered in isolation and do not represent cash flows for the presented years and should not be considered as substitutes for net income (loss), indicators of operating performance, substitutes for cash flows, indicators of liquidity or a basis for the distribution of dividends. The Non-GAAP Financial Measures do not have a standard meaning and are not necessarily comparable to other similarly titled measures used by other companies due to differences in the method of calculation. The Non-GAAP Financial Measures should be viewed as supplemental to, and not substitutive for, our financial statements included elsewhere in this offering memorandum. Because the Non-GAAP Financial Measures are not prepared in accordance with Brazilian GAAP or IFRS, investors are cautioned not to place undue reliance on this information. For a reconciliation of the Non-GAAP Financial Measures to the most directly comparable IFRS measures, see "Summary Financial and Other Information—Non-GAAP Financial Measures."

### Consolidated EBITDA, Consolidated Adjusted EBITDA, Fuel Distribution Adjusted EBITDA and ESB Adjusted EBITDA and

We calculate Consolidated EBITDA in accordance with CVM Resolution No. 156, dated June 23, 2022 ("CVM Resolution No. 156"). Consolidated EBITDA is calculated as consolidated net income for the year/period plus income tax and social contribution, financial results, and depreciation and amortization expenses. Although EBITDA has a standard meaning under CVM Resolution No. 156, we cannot assure you that other companies, including privately held companies, will adopt this same standard. Therefore, if the standard meaning established by CVM Resolution No. 156 is not adopted by other companies, our Consolidated EBITDA may not be comparable to that of other comparable companies. Our management believes that Consolidated EBITDA reflects our operating performance and provides for information on our ability to comply with obligations and obtain funds for capital expenditures and working capital. We disclose Consolidated EBITDA as this performance metric is frequently used by analysts, investors, creditors and other interested parties in evaluating companies in our sector. However, Consolidated EBITDA has limitations that hinder its use as a liquidity measure as it does not consider certain costs arising from our business, which could significantly affect profit, such as the amount of reinvestment necessary for operating maintenance. Accordingly, Consolidated EBITDA must be used in conjunction with generally accepted accounting measures.

We calculate Consolidated Adjusted EBITDA as Consolidated EBITDA for the year/period adjusted by:

(i) **biological assets fair value variations**: we eliminate the variation in the fair value of biological assets included in the cost of products sold and services provided because they reflect the remeasurement of the generation of results from biological assets in up to two years at market value. According to IAS 41 Agriculture, "the fair value of a biological asset or agricultural produce is its market price less any costs to sell the produce." Therefore, the fair value of a biological asset is an estimation of future net value recoverable of our sugarcane crops and does not impact the results of the current period, but of future years. Biological assets fair value variations are recorded in our ESB segment;

(ii) ***assets from contracts with customers under IFRS-15***: we eliminate the effects of the amortization of advanced bonuses to resellers in the Fuel Distribution segment, which are conditioned upon deadlines and future performance, including the consumption of minimum volumes set forth in the supply agreement. Once contractual conditions are met, the bonuses are amortized and recognized as a reduction in income in our net operating revenue. However, such reduction does not reflect our operating performance;

(iii) ***IFRS-16 Leases***: we eliminate the effects of the amortization of finance lease agreements, which do not reflect our operating performance. Since 2019, when IFRS 16 Leases came into effect, the amortization of finance lease agreements must be recorded as depreciation and amortization expenses, which is a component of the calculation of EBITDA, therefore generating higher EBITDA. We and peers in our industry continue to highlight and eliminate these effects due to their relevance; and

(iv) ***other non-recurring effects involving material gains or losses*** (the "Other Non-Recurring Effects"):

(a) accounting effect (no cash effect) as a result of the reversal of gains on financial instruments linked to future contracts for sugar and ethanol in the year ended March 31, 2025;

(b) provision for losses on certain assets and investments in the ESB segment in the year ended March 31, 2025, as it has a non-recurring effect to our results;

(c) non-recurring expenses related to the restructuring and downsizing of the organizational and administrative structure in Argentina in the year ended March 31, 2025, as it affected our cash flow in the period;

(d) divestment of certain derivatives trading operations in the year ended March 31, 2025, as it has a non-recurring effect to our results;

(e) dilution of ownership in Raízen Paraguay S.A. operations in the year ended March 31, 2025, as it has a non-recurring effect to our results;

(f) expenses related to the simplification of the administrative and operational structure, resulting from the beginning of the asset portfolio review process in the organizational structure in the year ended March 31, 2025, as it affected our cash flow in the period;

(g) accounting effect (no cash effect) as a result of the hedge accounting for debts protecting ethanol exports made in the past by Biosev S.A. (currently, Raízen Centro-Sul S.A.) ("Biosev") in the years ended March 31, 2025, March 31, 2024 and March 31, 2023;

(h) expenses with one-off contingencies related to the government's Zero Litigation (*Litígio Zero*) program, under which the Brazilian government granted participants the benefit to use tax credits to pay interests and fines due under tax proceedings, in the year ended March 31, 2024;

(i)  the result of the impairment loss recognition for the subsidiary Raízen Biomassa S.A., with the corresponding entry recorded in the income statement in the year ended March 31, 2024;

(j)  gain from reversal of provision for loss on investments in logistics in the year ended March 31, 2023;

(k)  additional provision for compensation related to business performance in the year ended March 31, 2023;

(l)  accounting result from the acquisition of Neolubes Indústria de Lubrificantes Ltda., which operates Shell's lubricant manufacturing business in Brazil, on May 1, 2022 (the "Neolubes Acquisition"), in the years ended March 31, 2024 and March 31, 2023;

(m) gains from one-off federal Social Integration Program (*Programa de Integração Social*) ("PIS") and Contribution for Social Security Funding (*Contribuição para o Financiamento da Seguridade Social*) ("COFINS") tax credits and other tax credits in the years ended March 31, 2025, 2024 and 2023;

(n)  impact on inventory from the reduction in PIS and COFINS taxes and state value-added tax ("ICMS") on gasoline in the year ended March 31, 2023; and

(o)  the effect on results from the interruption of activities in our refinery in Argentina for planned maintenance in the year ended March 31, 2023.

We calculate Fuel Distribution Adjusted EBITDA as the Fuel Distribution segment's income before financial results and income tax and social contribution for the year/period adjusted by (i) depreciation and amortization expenses, (ii) assets from contracts with customers under IFRS-15, and (iii) the Other Non-Recurring Effects.

We calculate ESB Adjusted EBITDA as the ESB segment's income before financial results and income tax and social contribution for the year/period adjusted by (i) depreciation and amortization expenses, (ii) biological assets fair value variations, (iii) IFRS-16 Leases, and (iv) the Other Non-Recurring Effects.

We believe that Consolidated Adjusted EBITDA and, with respect to each such segment, Fuel Distribution Adjusted EBITDA and ESB Adjusted EBITDA provide a better understanding of our ability to generate results from our operating assets as they exclude the accounting effects of certain recurring and non-recurring income and expenses.

Consolidated EBITDA, Consolidated Adjusted EBITDA, Fuel Distribution Adjusted EBITDA and ESB Adjusted EBITDA do not represent the cash flow for the periods presented and should not be considered as a basis for distribution of dividends, as substitutes for net operating revenue or as indicators of operating performance or liquidity.

For a reconciliation of our net income for the year to Consolidated EBITDA and Consolidated Adjusted EBITDA and a reconciliation of income before financial results and

x

income tax and social contribution to each of Fuel Distribution Adjusted EBITDA and ESB Adjusted EBITDA, see "Summary Financial and Other Information—Reconciliation of Non-GAAP Financial Measures."

### Leverage Ratio

We calculate Leverage Ratio as the aggregate amount of third-party capital as of the end of the year divided by Consolidated Adjusted EBITDA for the year. Third party capital comprises the sum of current and non-current loans and financing, net of cash and cash equivalents, current and non-current securities, financial investments linked to financing, Brazilian National Treasury Certificates (*Certificado do Tesouro Nacional*, or "CTN") and foreign exchange and interest rate swaps and other derivatives taken out to hedge our indebtedness.

Our management believes that the disclosure of Leverage Ratio is useful to potential investors as it provides them with a clearer understanding of our financial liquidity. However, Leverage Ratio is not a measure of financial performance under Brazilian GAAP or IFRS and should not be used in isolation and should not be considered as an alternative to operating cash flows or as a measure of liquidity. Leverage Ratio does not have a standardized meaning, and our definition of Leverage Ratio may not be comparable with the definition used by other companies.

For the calculation of Leverage Ratio, see "Summary Financial and Other Information—Reconciliation of Non-GAAP Financial Measures."

### ROACE

We calculate ROACE as (i) the sum of (a) income before financial results and income tax and social contribution, (b) biological assets fair value variations, (c) IFRS-16 Leases, except for amortization and depreciation expenses in connection therewith, and (d) the Other Non-Recurring Effects, except for amortization and depreciation expenses in connection therewith; *divided by* (ii) average capital employed. Capital employed is calculated as (i) capital employed – assets (consisting of the sum of current and noncurrent trade accounts receivable, inventories, current and noncurrent recoverable income tax and social contribution, current and noncurrent recoverable taxes, biological assets, property, plant and equipment, intangible assets, other assets, investments, related parties – commercial and administrative transactions and others, and rights of use) minus (ii) capital employed – liabilities (consisting of the sum of suppliers, payroll and related charges payable, income tax and social contribution payable, deferred income tax and social contribution, other liabilities, related parties – commercial and administrative transactions, and current and noncurrent lease liabilities). The average employed capital is the result of the weighted average of the capital employed of the current quarter and the capital employed of the four previous quarters. The weights are given respectively as Q(0)=12.5%, Q(-1)=25.0%, Q(-2)=25.0%, Q(-3)=12.5%, and Q(-4)=25.0%, where Q(0) represents the current quarter, Q(-1) represents the quarter before Q(0), Q(-2) represents the quarter before Q(-1), Q(-3) represents the quarter before Q(-2) and Q(-4) represents the quarter before Q(-3).

Our management believes that disclosure of ROACE is useful to potential investors as it provides them with a clearer understanding of our profitability. However, ROACE is not a measure of financial performance under Brazilian GAAP or IFRS and should not be used in isolation and should not be considered as an alternative to net income or as a measure of operating results. ROACE does not have a standardized meaning, and our definition of ROACE may not be comparable with the definition used by other companies.

For the calculation of ROACE, see "Summary Financial and Other Information—Reconciliation of Non-GAAP Financial Measures."

**Market Data**

We have obtained the market and competitive position data used throughout this offering memorandum, including market forecasts, from internal surveys, market research, publicly available information and industry publications. We have included, in this offering memorandum, information from reports prepared by us, the Central Bank, the B3 S.A. – Bolsa, Brasil, Balcão ("B3"), The Brazilian National Economic and Social Development Bank (*Banco Nacional de Desenvolvimento Econômico e Social*) ("BNDES"), the Getúlio Vargas Foundation (*Fundação Getúlio Vargas*) ("FGV"), the Brazilian Geographical and Statistical Institute (*Instituto Brasileiro de Geografia e Estatística*) ("IBGE"), the Organization for Economic Co-operation and Development ("OECD"), the International Renewable Energy Agency, the Brazilian Association of Biogas and Biomethane (*Associação Brasileira de Biogás e Biometano*), among others, which sources we believe are reliable. Industry publications generally state that the information presented therein has been obtained from sources believed to be reliable, but the accuracy and completeness of the information is not guaranteed. Although we have no reason to believe any of this information is inaccurate in any material respect, neither we, nor the initial purchasers have independently verified this information or make any representation as to the accuracy or completeness of the information. Similarly, our in-house research and estimates, which, while we believe they are reliable, have not been independently verified by the initial purchasers and we cannot assure you that the information is accurate. Nothing in this offering memorandum should be interpreted as a market forecast.

**Rounding**

Certain percentages and other amounts included in this offering memorandum have been rounded for ease of presentation. Any discrepancies between totals and the sums of the amounts listed are due to rounding.

# FORWARD-LOOKING STATEMENTS

This offering memorandum includes forward-looking statements within the meaning of the Securities Act or the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act").

Statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates" and similar expressions are forward-looking statements. Although we believe that these forward-looking statements are based upon reasonable assumptions, these statements are subject to several risks and uncertainties and are made in light of information currently available to us.

Our forward-looking statements may be influenced by numerous factors, including, without limitation, the following:

- delays or unexpected costs in the construction, expansion and operation of our bioenergy parks;

- volatility of supply, demand and the market price for our products;

- the modification, suspension, cancellation or non-renewal of the tax benefits that we have been granted;

- our ability to implement our business strategy, including with respect to our capital expenditure plan and the ability to arrange financing when required and on reasonable terms, as well as the disposal of certain assets in the future. See "Risk Factors—Risks Related to Our Business and Industry—We may from time to time dispose of certain assets, which could adversely impact our financial position or results of operations";

- our ability to successfully compete in all segments and geographical markets where we currently conduct business or may conduct business in the future;

- geopolitical and other challenges and uncertainties, including due to the trade disputes and the new import tariffs imposed by the U.S., ongoing military conflicts between Russia and Ukraine and in the Middle East, including between Israel and Palestine and Iran;

- adverse weather conditions, including those related to climate change events causing physical and transition risks in the markets in which we operate, as well as crop disease and pestilence;

- price of natural gas, ethanol and other fuels, as well as sugar;

- significant disruptions in our production facilities and transportation and logistics services, as well as equipment failure and service interruptions;

- our international operations and ability to implement our expansion strategy in other regions of Brazil and international markets through organic growth, acquisitions, joint ventures or partnerships;

- political instability and economic risk in Latin America (including as a result of government intervention, inflation, new taxes or tariffs and exchange rates), and changes in general economic, political and business conditions in Latin America;

- changes in customer demand;

- changes in our businesses;

- changes in global energy usage;

- appreciation and depreciation of the *real* against the U.S. dollar, which has experienced significant volatility in the last years;

- changes in tax regulations in Brazil, including with respect to changes to the Brazilian tax on financial transactions (*Imposto sobre Operações Financeiras*), or "IOF," currently under discussion between the Brazilian federal government and the Brazilian Congress, or in other countries where we operate;

- other factors that may affect our financial condition, liquidity and results of our operations; and

- other risk factors discussed under "Risk Factors."

Words such as "believe," "should," "may," "might," "could," "seek," "aim," "likely," "will," "estimate," "continue," "anticipate," "intend," "expect" and other similar words used in this offering memorandum are intended to identify estimates and forward-looking statements. Estimates and forward-looking statements speak only as of the date they were made, and we undertake no obligation to update or to review any estimate and/or forward-looking statement because of new information, future events or other factors. Estimates and forward-looking statements involve risks and uncertainties, and are not guarantees of future performance. Our future results may differ materially from those expressed in these estimates and forward-looking statements. In light of the risks and uncertainties described above, the estimates and forward-looking statements discussed in this offering memorandum might not occur, and our future results and our performance may differ materially from those expressed in these forward-looking statements due to, but not limited to, the factors mentioned above. Because of these uncertainties, you should not make any investment decision based on these estimates and forward-looking statements.

with more onerous covenants, such as restrictions on dividends distributions, limitations on the disposal of assets, among others. There can be no assurances that any assets that we could be required to dispose of could be sold or that, if sold, the timing of such sale and the amount of proceeds realized from such sale would be acceptable. If we are unsuccessful in any of these efforts, we may not have sufficient cash to meet our obligations.

If we fail to make any required payment under the agreements governing our indebtedness or fail to comply with restrictive covenants contained in them, we would be in default, and as a result, our debt holders would have the ability to require that we immediately repay our outstanding indebtedness and, as applicable, foreclose against the assets securing their borrowings. If these events occur, we could be forced into bankruptcy or liquidation. The acceleration of our indebtedness under one agreement may permit acceleration of indebtedness under other agreements that contain cross-default and cross-acceleration provisions. If our indebtedness is accelerated, we may not be able to repay our indebtedness or borrow sufficient funds to refinance it. Even if we are able to obtain new financing, it may not be on commercially reasonable terms or on terms that are acceptable to us. Alternatively, such acceleration could require us to sell assets and otherwise curtail operations to pay our creditors. If our debt holders require immediate payment, we may not have sufficient assets to satisfy our obligations under our indebtedness, and the proceeds from asset sales or curtailment of operations might not enable us to pay all of our liabilities.

Any failure to make payments on our indebtedness on a timely basis would likely result in a reduction of our credit rating, which could also harm our ability to incur additional indebtedness. See "—Any downgrade in the ratings of our debt securities, including the notes, would likely result in increased interest and other financial expenses related to our borrowings and debt securities and could reduce our liquidity and adversely affect the market price and marketability of the notes."

***Because the Issuer has no operations of its own, holders of the notes must depend on Raízen and its subsidiaries to provide the Issuer with sufficient funds to make payments on the notes when due.***

The Issuer, a wholly-owned indirect subsidiary of Raízen, on the date hereof, has no operations other than issuing and making payments on the notes and other indebtedness ranking equally with, or subordinated to, the notes, and using the proceeds therefrom as permitted by the documents governing these issuances, including lending the net proceeds of the notes and other indebtedness incurred by the Issuer to Raízen and its subsidiaries. Accordingly, the ability of the Issuer to pay principal, interest and other amounts due on the notes and other indebtedness will depend upon the financial condition and results of operations of Raízen and its subsidiaries that are debtors of the Issuer. In the event of an adverse change in the financial condition or results of operations of Raízen, Raízen Energia and their respective subsidiaries that are debtors of the Issuer, these entities may be unable to service their indebtedness to the Issuer, which would result in the failure of the Issuer to have sufficient funds to repay all amounts due on or with respect to the notes.

**Brazilian bankruptcy law may be less favorable to holders of the notes than bankruptcy and insolvency laws in other jurisdictions.**

If we are unable to pay our indebtedness as it falls due, including our obligations under the guarantee, then we may become subject to insolvency proceedings in Brazil. The bankruptcy law of Brazil currently in effect is significantly different from, and may be less favorable to creditors than, that of certain other jurisdictions. For example, holders of the notes may have limited voting rights at creditors' meetings in the context of a judicial reorganization proceeding. Under Brazilian bankruptcy law, in the event of our bankruptcy or liquidation, all of our debt obligations that are denominated in foreign currency, including the guarantee, will be converted into *reais* at the prevailing exchange rate on the date of declaration of our bankruptcy by the court. The obligations under the guarantee would be considered unsecured in case of a judicial reorganization, extrajudicial reorganization or bankruptcy liquidation, and would be subject to the reorganization plan or, in case of a bankruptcy liquidation, and would rank pari passu with other unsecured and unsubordinated obligations of the Guarantors. In such events, the claims under the guarantees would be paid after labor-related claims, certain tax claims (unless subordinated under applicable law) and secured claims, among others, as provided under Brazilian bankruptcy law.

**The Issuer is organized and existing under Luxembourg law, and Luxembourg law differs from U.S. law and may afford less protection to holders of the notes.**

Holders of the notes may have more difficulty protecting their interests than would security holders of a corporation incorporated in a jurisdiction of the United States. As a Luxembourg company, the Issuer is organized and existing under, and subject to the Luxembourg Companies Law, and other provisions of, Luxembourg law. The Luxembourg Companies Law differs in some material respects from laws generally applicable to U.S. corporations and security holders, including the provisions relating to interested directors, mergers, amalgamations and acquisitions, takeovers, security holder lawsuits and indemnification of directors.

Under Luxembourg law, the duties of directors, managers and officers of a company are generally owed to the company only. Holders of notes issued by Luxembourg companies generally do not have rights to take action against directors, managers or officers of the company, except in limited circumstances. Directors, managers or officers of a Luxembourg company must, in exercising their powers and performing their duties, act in good faith and in the interests of the company as a whole and must exercise due care, skill and diligence. Directors have a duty not to put themselves in a position in which their duties to the company and their personal interests may conflict and are also under a duty to disclose any personal interest in any contract or arrangement with the company or any of its subsidiaries. If a director or officer of a Luxembourg company is found to have breached his or her duties to that company, he or she may be held personally liable to the company in respect of that breach of duty and in accordance with the provisions of the Luxembourg Companies Law. A director or manager may be jointly and severally liable with other directors or managers implicated in the same breach of duty.

## <u>EXHIBIT L</u>

**Excerpts of 2034/2054 Notes Offering Memorandum**

IMPORTANT NOTICE

THIS OFFERING IS AVAILABLE ONLY TO INVESTORS WHO ARE EITHER (i) QUALIFIED
INSTITUTIONAL BUYERS ("QIBs"), WITHIN THE MEANING OF RULE 144A UNDER THE U.S.
SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR (ii) NON-U.S. PERSONS,
WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, OUTSIDE THE UNITED
STATES.

**IMPORTANT: You must read the following before continuing.** The following applies to the offering
memorandum (the "Offering Memorandum") following this page and you are advised to read this carefully before
reading, accessing or making any other use of the Offering Memorandum. In accessing the Offering Memorandum,
you agree to be bound by the following terms and conditions, including any modifications to them any time you
receive any information from us as a result of such access.

NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER OF SECURITIES FOR
SALE IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO. THE SECURITIES HAVE NOT
BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS
OF ANY STATE OF THE UNITED STATES OR OTHER JURISDICTION, AND THE SECURITIES MAY NOT
BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT
OF, U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT
PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE
REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE LAWS OF OTHER
JURISDICTIONS.

**PROHIBITION OF SALES TO EEA RETAIL INVESTORS.** THE SECURITIES DESCRIBED IN THE
OFFERING MEMORANDUM ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE
AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY
RETAIL INVESTOR IN THE EUROPEAN ECONOMIC AREA ("EEA"). FOR THESE PURPOSES, A RETAIL
INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT, AS DEFINED IN
POINT (11) OF ARTICLE 4(1) OF DIRECTIVE 2014/65/EU (AS AMENDED, "MIFID II"); (II) A CUSTOMER
WITHIN THE MEANING OF DIRECTIVE (EU) 2016/97 (AS AMENDED, THE "INSURANCE
DISTRIBUTION DIRECTIVE"), WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A
PROFESSIONAL CLIENT, AS DEFINED IN POINT (10) OF ARTICLE 4(1) OF MIFID II; OR (III) NOT A
QUALIFIED INVESTOR AS DEFINED IN REGULATION (EU) 2017/1129, AS AMENDED (THE
"PROSPECTUS REGULATION"). CONSEQUENTLY, NO KEY INFORMATION DOCUMENT REQUIRED
BY REGULATION (EU) NO 1286/2014 (THE "PRIIPS REGULATION") FOR OFFERING OR SELLING THE
SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO RETAIL INVESTORS IN THE EEA HAS
BEEN PREPARED AND THEREFORE OFFERING OR SELLING THE SECURITIES OR OTHERWISE
MAKING THEM AVAILABLE TO ANY RETAIL INVESTOR IN THE EEA MAY BE UNLAWFUL UNDER
THE PRIIPS REGULATION.

**PROHIBITION OF SALES TO U.K. RETAIL INVESTORS.** THE SECURITIES DESCRIBED IN THE
OFFERING MEMORANDUM ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE
AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY
RETAIL INVESTOR IN THE UNITED KINGDOM ("U.K."). FOR THESE PURPOSES, A RETAIL INVESTOR
MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT, AS DEFINED IN POINT (8) OF
ARTICLE 2 OF REGULATION (EU) NO 2017/565 AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE
OF THE EUROPEAN UNION (WITHDRAWAL) ACT 2018 (THE "EUWA"); (II) A CUSTOMER WITHIN THE
MEANING OF THE PROVISIONS OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (AS
AMENDED, THE "FSMA") AND ANY RULES OR REGULATIONS MADE UNDER THE FSMA TO
IMPLEMENT THE INSURANCE DISTRIBUTION DIRECTIVE, WHERE THAT CUSTOMER WOULD NOT
QUALIFY AS A PROFESSIONAL CLIENT, AS DEFINED IN POINT (8) OF ARTICLE 2(1) OF REGULATION
(EU) NO 600/2014 AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA; OR (III) NOT A
QUALIFIED INVESTOR AS DEFINED IN ARTICLE 2 OF THE PROSPECTUS REGULATION AS IT FORMS
PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA. CONSEQUENTLY, NO KEY INFORMATION
DOCUMENT REQUIRED BY THE PRIIPS REGULATION AS IT FORMS PART OF DOMESTIC LAW BY
VIRTUE OF THE EUWA (THE "U.K. PRIIPS REGULATION") FOR OFFERING OR SELLING THE
SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO RETAIL INVESTORS IN THE U.K. HAS
BEEN PREPARED AND THEREFORE OFFERING OR SELLING THE SECURITIES OR OTHERWISE
MAKING THEM AVAILABLE TO ANY RETAIL INVESTOR IN THE U.K. MAY BE UNLAWFUL UNDER
THE U.K. PRIIPS REGULATION.

IN ADDITION, IN THE U.K., THE OFFERING MEMORANDUM AND ANY OTHER MATERIAL RELATING TO THE SECURITIES DESCRIBED HEREIN ARE ONLY BEING DISTRIBUTED TO, AND ARE DIRECTED ONLY AT, (I) PERSONS HAVING PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS FALLING WITHIN ARTICLE 19(5) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2005 (THE "ORDER"), OR (II) HIGH NET WORTH ENTITIES FALLING WITHIN ARTICLE 49(2)(A) TO (D) OF THE ORDER, OR (III) PERSONS TO WHOM IT WOULD OTHERWISE BE LAWFUL TO DISTRIBUTE THEM (ALL SUCH PERSONS TOGETHER BEING REFERRED TO AS "RELEVANT PERSONS"). THE SECURITIES ARE ONLY AVAILABLE TO, AND ANY INVITATION, OFFER OR AGREEMENT TO SUBSCRIBE, PURCHASE OR OTHERWISE ACQUIRE THE SECURITIES WILL BE ENGAGED IN ONLY WITH, RELEVANT PERSONS. THE OFFERING MEMORANDUM AND ITS CONTENTS ARE CONFIDENTIAL AND SHOULD NOT BE DISTRIBUTED, PUBLISHED OR REPRODUCED (IN WHOLE OR IN PART) OR DISCLOSED BY ANY RECIPIENTS TO ANY OTHER PERSON IN THE U.K. ANY PERSON IN THE U.K. THAT IS NOT A RELEVANT PERSON SHOULD NOT ACT OR RELY ON THE OFFERING MEMORANDUM OR ITS CONTENTS.

THE FOLLOWING OFFERING MEMORANDUM MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER. ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORIZED. FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**Confirmation of Your Representation:** In order to be eligible to view the Offering Memorandum or make an investment decision with respect to the securities, investors must be either (i) QIBs or (ii) non-U.S. persons (within the meaning of Regulation S under the Securities Act) in the U.S. This Offering Memorandum is being sent at your request and by accepting the e-mail and accessing the Offering Memorandum you shall be deemed to have represented to us that (i) you and any customers you represent are either (a) QIBs or (b) non-U.S. persons (within the meaning of Regulation S under the Securities Act); and (ii) you consent to delivery of the Offering Memorandum by electronic transmission.

You are reminded that the Offering Memorandum has been delivered to you on the basis that you are a person into whose possession the Offering Memorandum may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorized to, deliver the Offering Memorandum to any other person.

The materials relating to the offering do not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law. If a jurisdiction requires that the offering be made by a licensed broker or dealer and the initial purchasers or any affiliate of the initial purchasers is a licensed broker or dealer in that jurisdiction, the offering shall be deemed to be made by the initial purchasers or such affiliate on behalf of the issuer in such jurisdiction.

The Offering Memorandum has been sent to you in an electronic form. You are reminded that documents transmitted via this medium may be altered or changed during the process of electronic transmission, and, consequently, neither the initial purchasers, nor any person who controls them nor any of their directors, officers, employees nor any of their agents nor any affiliate of any such person, accept any liability or responsibility whatsoever in respect of any difference between the Offering Memorandum distributed to you in electronic form and the hard copy version available to you on request from the initial purchasers.



**Raizen Fuels Finance S.A.**
**US$1,000,000,000 6.450% Green Notes due 2034**
**US$500,000,000 6.950% Green Notes due 2054**

Unconditionally and Irrevocably Guaranteed by

**Raízen S.A. and Raízen Energia S.A.**

---

Raizen Fuels Finance S.A., a public limited liability company (*société anonyme*) organized under the laws of the Grand Duchy of Luxembourg ("Luxembourg"), having registered office at 16, Rue Eugène Ruppert, L - 2453 Luxembourg and registered with the Luxembourg Trade and Companies' Register (*Registre de commerce et des sociétés, Luxembourg*) under number B184033, LEI 52990010NH26VC32Q522 (the "Issuer"), is offering US$1,000,000,000 in aggregate principal amount of its 6.450% green notes due 2034 (the "ten-year notes") and US$500,000,000 in aggregate principal amount of its 6.950% green notes due 2054 (the "thirty-year notes" and, together with the ten-year notes, the "notes"). All of the Issuer's obligations pursuant to the notes and the indenture under which they are issued will be fully and unconditionally guaranteed (the "guarantees"), on an unsecured basis, by Raízen S.A., a corporation (*sociedade por ações*) incorporated under the laws of the Federative Republic of Brazil ("Raízen"), and Raízen Energia S.A., a corporation (*sociedade por ações*) incorporated under the laws of the Federative Republic of Brazil ("Raízen Energia") (each, a "Guarantor" and, collectively, the "Guarantors"). The ten-year notes will bear interest at the rate of 6.450% per year and will mature on March 5, 2034. The thirty-year notes will bear interest at the rate of 6.950% per year and will mature on March 5, 2054. Interest on the notes will be payable on March 5 and September 5 of each year, beginning on September 5, 2024. The notes and each guarantee will be unsecured and will rank equally in right of payment with the other unsecured unsubordinated indebtedness of the Issuer and the relevant Guarantor, respectively. The notes and the guarantees will be effectively junior to the secured indebtedness of the Issuer and the Guarantors to the extent of the value of the assets securing such indebtedness and structurally subordinated to the indebtedness of the Issuer's and the Guarantors' non-guarantor subsidiaries and jointly controlled companies. See "Description of the Notes." At any time before December 5, 2033, which is the date that is three months prior to the maturity of the ten-year notes (the "Ten-Year Notes Par Call Date"), the Issuer or any Guarantor may redeem the ten-year notes at its option, in whole or in part, at any time and from time to time, by paying 100% of the principal amount of the ten-year notes *plus* a "make-whole" amount and accrued and unpaid interest and Additional Amounts (as defined herein), if any, to, but excluding, the redemption date. If the redemption date of the ten-year notes is on or after the Ten-Year Notes Par Call Date, the redemption price will equal 100% of the principal amount of the ten-year notes, *plus* accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date. At any time before September 5, 2053, which is the date that is six months prior to the maturity of the thirty-year notes (the "Thirty-Year Notes Par Call Date"), the Issuer or any Guarantor may redeem the thirty-year notes at its option, in whole or in part, at any time and from time to time, by paying 100% of the principal amount of the thirty-year notes *plus* a "make-whole" amount and accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date. If the redemption date of the thirty-year notes is on or after the Thirty-Year Notes Par Call Date, the redemption price will equal 100% of the principal amount of the thirty-year notes, *plus* accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date. See "Description of the Notes—Redemption—Optional Redemption." The notes of a series may also be redeemed by the Issuer or any Guarantor, at its option, in whole but not in part, at 100% of their principal amount *plus* accrued and unpaid interest and Additional Amounts, if any, at any time upon the occurrence of specified tax events, as set forth in this offering memorandum. See "Description of the Notes—Redemption—Redemption for Taxation Reasons." If a Change of Control (as defined herein) that results in a Rating Decline (as defined herein) with respect to a series of notes occurs, unless the Issuer or any Guarantor have exercised its option to redeem all of the outstanding notes of such series, the Issuer or any Guarantor will be required to offer to purchase the notes of such series at a purchase price equal to 101% of the principal amount thereof, plus accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the purchase date. See "Description of the Notes—Certain Covenants—Purchase of Notes Upon Change of Control Event."

Application will be made to list the notes on the Official List of the Luxembourg Stock Exchange (the "LuxSE") and to admit the notes to trading on the Euro MTF Market of the LuxSE (the "Euro MTF"). There are no assurances that the notes will be listed on the Official List of the LuxSE or admitted to trading on the Euro MTF. See "Listing and General Information."

**Investing in the notes involves risks. See "Risk Factors" beginning on page 29 of this offering memorandum.**

This offering memorandum has been prepared on the basis that any offer of the notes in any member state ("Member State") of the European Economic Area (the "EEA") will be made pursuant to an exemption under Regulation (EU) 2017/1129 of the European Parliament and of the Council of June 14, 2017 on the prospectus to be published when securities are offered to the public or admitted to trading on a regulated market, and repealing Directive 2003/71/EC, as amended (the "Prospectus Regulation"), and under any implementing legislation in each Member State, from the requirement to publish a prospectus for offers of notes. This offering memorandum is not a prospectus for purposes of the Prospectus Regulation, and under any implementing legislation in each Member State, and has not been approved by a competent authority within the meaning of the Prospectus Regulation. This offering memorandum has been prepared on the basis that any offer of the notes in the United Kingdom (the "UK"), will be made pursuant to an exemption from the obligation to publish a prospectus under Section 86 of the Financial Services and Markets Act 2000 (the "FSMA"), in the UK. This offering memorandum is not a prospectus for purposes of the UK Prospectus Regulation (meaning Regulation (EU) 2017/1129 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018 (the "EUWA"), and has not been approved by the UK Financial Conduct Authority (the "FCA").

The notes and the guarantees have not been, and will not be, registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws. The notes may not be offered or sold within the United States or to U.S. persons, except to qualified institutional buyers in reliance on the exemption from registration provided by Rule 144A under the Securities Act ("Rule 144A"), and to certain non-U.S. persons in offshore transactions in reliance on Regulation S under the Securities Act ("Regulation S"). You are hereby notified that sellers of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. For more information about restrictions on transfer of the notes, see "Transfer Restrictions." **Neither the U.S. Securities and Exchange Commission (the "SEC"), nor any state securities commission has approved or disapproved of the notes or the guarantee or determined if this offering memorandum is accurate or complete. Any representation to the contrary is a criminal offense.**

**Issue price of the ten-year notes: 99.731%** *plus* **accrued interest, if any, from March 5, 2024.**

**Issue price of the thirty-year notes: 98.489%** *plus* **accrued interest, if any, from March 5, 2024.**

Delivery of the notes to purchasers in book-entry form through The Depository Trust Company ("DTC"), and its direct and indirect participants, including Clearstream Banking S.A. ("Clearstream"), and Euroclear Bank S.A./N.V., as operator of the Euroclear System ("Euroclear"), is expected on or about March 5, 2024.

---

*Global Coordinators*

| Citigroup | Itaú BBA | J.P. Morgan | Morgan Stanley |

*Joint Book Runners*

| BNP PARIBAS | BofA Securities | Bradesco BBI | Santander |

The date of this offering memorandum is February 28, 2024.

## TABLE OF CONTENTS

**Page**

PRESENTATION OF FINANCIAL AND OTHER INFORMATION ......................................................v

FORWARD-LOOKING STATEMENTS ............................................................................ xii

SUMMARY ...............................................................................................1

THE OFFERING .........................................................................................16

SUMMARY FINANCIAL AND OTHER INFORMATION ...................................................21

RISK FACTORS .........................................................................................29

USE OF PROCEEDS .....................................................................................70

CAPITALIZATION .......................................................................................71

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
OF OPERATIONS ........................................................................................72

INDUSTRY ..............................................................................................101

BUSINESS ..............................................................................................122

REGULATORY OVERVIEW ..............................................................................156

MANAGEMENT ..........................................................................................174

PRINCIPAL SHAREHOLDERS ...........................................................................185

RELATED PARTY TRANSACTIONS ......................................................................187

DESCRIPTION OF THE NOTES ..........................................................................189

TAXATION .............................................................................................219

THE ISSUER AND THE GUARANTORS ...................................................................230

TRANSFER RESTRICTIONS .............................................................................231

ENFORCEABILITY OF CIVIL LIABILITIES ..............................................................234

PLAN OF DISTRIBUTION ...............................................................................241

CERTAIN ERISA CONSIDERATIONS .....................................................................248

LEGAL MATTERS .......................................................................................250

INDEPENDENT AUDITORS ..............................................................................251

LISTING AND GENERAL INFORMATION .................................................................252

INDEX TO FINANCIAL STATEMENTS ....................................................................253

---

**You should rely only on the information contained in this offering memorandum. Neither we nor the initial purchasers have authorized anyone to provide you with different information. Neither we nor the initial purchasers are making an offer of the notes (or the related guarantee) in any jurisdiction where the offer is not permitted. You should not assume that the information contained in this offering memorandum is accurate as of any date other than the date on the cover of this offering memorandum.**

Unless otherwise indicated or the context otherwise requires, all references in this offering memorandum to (1) "Raízen," the "Company," "our Company," "we," "our," "ours," "us" or similar terms are to Raízen and its consolidated subsidiaries, which include Raízen Energia and the Issuer; (2) "Cosan" are to Cosan S.A.; (3) "Shell

Holding" are to Shell Brazil Holding B.V.; and (4) "Shell" are to Royal Dutch Shell plc. All references in this offering memorandum to our "controlling shareholders" are to Cosan and Shell.

References to the "initial purchasers" are to Citigroup Global Markets Inc., Itau BBA USA Securities, Inc., J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Banco Bradesco BBI S.A., BNP Paribas Securities Corp, BofA Securities, Inc. and Santander US Capital Markets LLC.

This offering memorandum has been prepared by us solely for use in connection with the proposed offering of the notes (and the related guarantees) described in this offering memorandum. This offering memorandum is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire notes (or the related guarantees). Distribution of this offering memorandum to any person other than a prospective investor and any person retained to advise such prospective investor with respect to its purchase is unauthorized, and any disclosure of any of its contents, without our prior written consent, is prohibited. Each prospective investor, by accepting delivery of this offering memorandum, agrees to the foregoing and to make no photocopies of this offering memorandum or any documents referred to in this offering memorandum.

Neither the initial purchasers nor any of their directors, affiliates, advisors or agents make any representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this offering memorandum. Nothing contained in this offering memorandum is, or shall be relied upon as, a promise or representation by the initial purchasers or by any of their directors, affiliates, advisors or agents as to the past or future.

The notes (and the related guarantees) are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom. As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time. See "Plan of Distribution" and "Transfer Restrictions."

In making an investment decision, prospective investors must rely on their own examination of our Company and the terms of this offering, including the merits and risks involved. The contents of this offering memorandum are not, and prospective investors should not construe anything in this offering memorandum as, legal, business or tax advice. Each prospective investor should consult its own legal, business, tax or other advisors as needed to make its investment decision and to determine whether it is legally permitted to purchase the notes under applicable law.

This offering memorandum contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All such summaries are qualified in their entirety by reference to such documents. Copies of documents referred to in this offering memorandum will be made available to prospective investors upon request to us or the initial purchasers.

Each person receiving this offering memorandum acknowledges that this offering memorandum may not contain all information that would be included in a prospectus if this offering were registered under the Securities Act.

## PROHIBITION OF SALES TO EEA RETAIL INVESTORS

The notes (and the related guarantees) described in this offering memorandum are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the EEA. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU, as amended ("MiFID II"); (ii) a customer within the meaning of Directive 2016/97/EU, as amended (the "Insurance Distribution Directive"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a qualified investor as defined in the Prospectus Regulation. Consequently, no key information document required by Regulation (EU) No. 1286/2014, as amended (the "PRIIPs Regulation"), for offering or selling the notes or otherwise making them available to retail investors in the EEA has been prepared and, therefore, offering or selling

the notes or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation. This offering memorandum has been prepared on the basis that any offer of notes in any Member State of the EEA will be made pursuant to an exemption under the Prospectus Regulation, and under any implementing legislation in each Member State, from the requirement to publish a prospectus for offers of notes.

## PROHIBITION OF SALES TO UK RETAIL INVESTORS

The notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the UK. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client, as defined in point (8) of Article 2 of Regulation (EU) No. 2017/565 as it forms part of domestic law by virtue of the EUWA; (ii) a customer within the meaning of the provisions of the FSMA and any rules or regulations made under the FSMA to implement Directive (EU) 2016/97, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of Regulation (EU) No. 600/2014 as it forms part of domestic law by virtue of the EUWA; or (iii) not a qualified investor as defined in Article 2 of the UK Prospectus Regulation as it forms part of domestic law by virtue of the EUWA. Consequently, no key information document required by Regulation (EU) No. 1286/2014 as it forms part of domestic law by virtue of the EUWA (the "UK PRIIPs Regulation") for offering or selling the notes or otherwise making them available to retail investors in the UK has been prepared and therefore offering or selling the notes or otherwise making them available to any retail investor in the UK may be unlawful under the UK PRIIPs Regulation.

The above selling restriction is in addition to any other selling restrictions set forth in this offering memorandum.

## MiFID PRODUCT GOVERNANCE/
## PROFESSIONAL INVESTORS AND ECPS ONLY TARGET MARKET

Solely for the purposes of the product approval process of the Issuer and the Guarantors (each a "Manufacturer"), the target market assessment in respect of the notes described in this offering memorandum has led to the conclusion that (i) the target market for the notes is eligible counterparties and professional clients only, each as defined in MiFID II; and (ii) all channels for distribution of the notes to eligible counterparties and professional clients are appropriate. Any person subsequently offering, selling or recommending the notes (a "distributor") should take into consideration the Manufacturers' target market assessment; however, and without prejudice to the Issuer's obligations in accordance with MiFID II, a distributor subject to MiFID II is responsible for undertaking its own target market assessment in respect of the notes (by either adopting or refining the manufacturers' target market assessment) and determining appropriate distribution channels.

## NOTICE TO PROSPECTIVE INVESTORS IN LUXEMBOURG

This offering memorandum has not been approved by and will not be submitted for approval to the Luxembourg financial sector supervisory authority (*Commission de Surveillance du Secteur Financier*) for purposes of a public offering or sale in Luxembourg. Accordingly, the notes may not be offered or sold to the public in Luxembourg, directly or indirectly, and neither this offering memorandum nor any other offering memorandum, form of application, advertisement or other material related to such notes may be distributed, or otherwise be made available in or from, or published in, Luxembourg except in circumstances where the offer benefits from an exemption to or constitutes a transaction not subject to the requirement to publish a prospectus, in accordance with the Prospectus Regulation and the Luxembourg law of 16 July 2019, on prospectuses for securities.

**NOTICE TO PROSPECTIVE INVESTORS WITHIN BRAZIL**

The offer and sale of the notes and related guarantees have not been and will not be registered with the Brazilian securities commission (*Comissão de Valores Mobiliários*, or "CVM") and, therefore, will not be carried out by any means that would constitute a public offering in Brazil under CVM Resolution No. 160, dated July 13, 2022, as amended ("Resolution 160"), or unauthorized distribution under Brazilian laws and regulations. The notes and related guarantees will be authorized for trading on organized non-Brazilian securities markets and may only be offered to Brazilian professional investors (as defined by applicable CVM regulation), who may only acquire the notes and related guarantees through a non-Brazilian account, with settlement outside Brazil in non-Brazilian currency. The trading of these securities on regulated securities markets in Brazil is prohibited.

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

All references in this offering memorandum to "*real*," "*reais*" or "R$" are to the Brazilian *real*, the official currency of Brazil. All references to "U.S. dollars" or "US$" are to U.S. dollars, the official currency of the United States.

As of December 31, 2023, the exchange rate for *reais* into U.S. dollars was R$4.8413 to US$1.00, based on the selling rate as reported by the Central Bank. As of March 31, 2023, 2022 and 2021, the exchange for *reais* into U.S. dollars rate was, respectively, R$5.0804 to US$1.00, R$4.7378 to US$1.00 and R$5.6973 to US$1.00, in each case, based on the selling rate as reported by the Central Bank.

Solely for the convenience of the reader, we have translated certain real amounts in this offering memorandum into U.S. dollars at the selling rate as of December 31, 2023 as reported by the Central Bank. These translations (i) should not be considered representations that any such amounts have been, could have been or could be converted into U.S. dollars at that or at any other exchange rate and (ii) do not necessarily represent amounts in accordance with accounting practices adopted in Brazil ("Brazilian GAAP"), as issued by the Comitê de Pronunciamentos Contábeis ("CPC"), or International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board (the "IASB").

### Financial Statements

#### *Raízen Financial Statements*

We maintain our books and records in *reais*. Due to our harvest year and corporate production cycle, our fiscal year begins on April 1 of each year and ends on March 31 of the following year.

Our financial information contained in this offering memorandum has been derived from our records and financial statements, and includes our unaudited interim consolidated financial information as of December 31, 2023 and for the nine-month periods ended December 31, 2023 and 2022 (our "interim consolidated financial statements"), our audited individual and consolidated financial statements as of March 31, 2023 and 2022 and for the years ended March 31, 2023 and 2022 and our audited combined consolidated financial statements as of March 31, 2021 and for the year ended March 31, 2021 (together, our "audited consolidated financial statements" and, together with the interim consolidated financial statements, our "consolidated financial statements").

Our audited combined consolidated financial statements as of March 31, 2021 and for the year ended March 31, 2021 include combined financial information of (i) Raízen and its subsidiaries and (ii) Raízen Energia and its subsidiaries. On June 1, 2021, we completed a corporate reorganization as a result of which Raízen became the holder of the entire share capital of Raízen Energia (the "Group Reorganization"). As part of the Group Reorganization, Raízen Combustíveis S.A. changed its corporate name to Raízen S.A. Our audited combined consolidated financial statements as of March 31, 2021 and for the year ended March 31, 2021 have been prepared for the purpose of allowing our investors and management to assess the combined financial position of Raízen and Raízen Energia as a group as of March 31, 2021, and its combined financial performance for the year then ended. Consequently, the combined consolidated financial statements may not be suitable for another purpose.

Our audited consolidated financial statements as of March 31, 2022 and for the year ended March 31, 2022 are not entirely comparable with the audited combined consolidated financial statements for the year ended March 21, 2021, substantially due to (i) the Group Reorganization completed on June 1, 2021 (the results of Raízen Energia for the months of April and May 2021 are not included in the audited consolidated financial statements for the year ended March 31, 2022), and (ii) the acquisitions of (a) Biosev S.A. (currently, Raízen Centro-Sul S.A.) ("Biosev") from Hédera Investimentos e Participações S.A., an investment vehicle of the Louis Dreyfus Company in Brazil ("Hédera"), on August 10, 2021 (the "Biosev Acquisition") and (b) the fuel distribution network in Paraguay from Barcos & Rodados S.A. (currently, Raízen Paraguay S.A.) on November 1, 2021 (the "Barcos y Rodados Acquisition") and (iii) the formation of Raízen GD Next Participações S.A., a joint venture with Gera Energia Brasil S.A. and its subsidiaries (the "Gera Group") for the development of new projects with distributed generation of

renewable power and technological solutions related to efficiently contracting, managing and consuming electric power (the "Gera JV") on January 5, 2022.

Our audited consolidated financial statements for the year ended March 31, 2023 are not entirely comparable with the audited consolidated financial statements as of March 31, 2022 and 2021 and for the years ended March 31, 2022 and 2021, substantially due to (i) the Group Reorganization completed on June 1, 2021 (the results of Raízen Energia for the months of April and May 2021 are not included in the audited consolidated financial statements for the year ended March 31, 2022) and (ii) the Biosev Acquisition and the Barcos y Rodados Acquisition, which were only consolidated as of the dates set forth above, and the acquisitions of Neolubes Indústria de Lubrificantes Ltda., which operates Shell's lubricant manufacturing business in Brazil, on May 1, 2022 (the "Neolubes Acquisition"), and of the fintech Payly Holding Ltda. and its controlled company Payly Instituições de Pagamentos S.A. (together, "Payly") on October 17, 2022.

For additional information regarding acquisitions we completed in the periods under review, see "Business—Our History."

We have prepared our audited consolidated financial statements in accordance with Brazilian GAAP, as issued by the CPC, and with IFRS, as issued by the IASB. We have prepared our interim consolidated financial statements in accordance with International Accounting Standard ("IAS") 34—Interim Financial Reporting, as issued by the IASB, and Brazilian GAAP.

### *Segment Information and Presentation of Segment Financial Data*

As of December 31, 2023, our business was organized into four reporting segments, which corresponded to our principal production processes, products and services:

- **Mobility** (formerly Marketing and Services): includes fossil and renewable fuels and lubricants' trade and sale activities, through a franchised network of service stations under the Shell brand throughout Brazil and in Argentina and Paraguay.

- **Sugar**: includes the production, sale, origination and trading of a variety of sugars from our and third parties' bioenergy projects, such as raw sugar (or very high polarity sugar, or "VHP"), refined sugar and liquid sugar.

- **Renewables**: includes the following activities: (a) ethanol production, sale, origination and trading; (b) bioenergy production and sale; (c) resale and trading of electric power; and (d) production and sale of other renewable products (solar energy and biogas). These activities were aggregated into a single segment as their products and services come from renewable sources, use similar technologies, and present synergies in their production and distribution process. The combination of these activities results in the portfolio of clean energy and retirement of carbon credits we offer. The performance of these activities is assessed on an integrated basis by our management through our operating results.

- **Other**: represents the convenience and proximity stores business and the financial products and services business.

The Other segment was introduced on September 30, 2023. Segment information included in this offering memorandum for periods prior to September 30, 2023 has been determined by retroactively applying the definition of the segments above to the historical consolidated financial information.

For more information on our segments, see note 24 to our interim consolidated financial statements included elsewhere in this offering memorandum.

*Issuer Financial Statements*

We have not included any financial statements for the Issuer in this offering memorandum. The Issuer does not, and will not, publish financial statements, except for financial statements that it is required to publish under the laws of Luxembourg. In addition, the Issuer will not furnish to the trustee or the holders of the notes any financial statements of, or other reports relating to, the Issuer. The Issuer's obligations under the notes will be fully and unconditionally guaranteed by Raízen and Raízen Energia. The financial condition and results of operations of the Issuer have been fully consolidated in our consolidated financial statements, which consolidate the financial condition and results of operations of Raízen and its subsidiaries (including Raízen Energia and the Issuer). See "Risk Factors—Risks Related to the Notes and the Guarantees and Our Other Indebtedness—Because the Issuer has no operations of its own, holders of the notes must depend on Raízen and its subsidiaries to provide the Issuer with sufficient funds to make payments on the notes when due."

## Special Note Regarding Non-GAAP Financial Measures

We present certain non-GAAP financial measures in this offering memorandum: Consolidated EBITDA, Consolidated Adjusted EBITDA, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA, Mobility Adjusted EBITDA, Leverage Ratio and Return on Average Capital Employed ("ROACE") (the "Non-GAAP Financial Measures").

Our management believes that Consolidated EBITDA, Consolidated Adjusted EBITDA, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA, Mobility Adjusted EBITDA, Leverage Ratio and ROACE provide useful information to potential investors, financial analysts and the public in their review of our operating and financial performance and their comparison of our operating and financial performance to the performance of other companies in the same industry and other industries. However, Consolidated EBITDA, Consolidated Adjusted EBITDA, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA, Mobility Adjusted EBITDA, Leverage Ratio and ROACE are not measures of financial performance under Brazilian GAAP or IFRS. These Non-GAAP Financial Measures should not be considered in isolation and do not represent cash flows for the presented years and should not be considered as substitutes for net income (loss), indicators of operating performance, substitutes for cash flows, indicators of liquidity or a basis for the distribution of dividends. The Non-GAAP Financial Measures do not have a standard meaning and are not necessarily comparable to other similarly titled measures used by other companies due to differences in the method of calculation. The Non-GAAP Financial Measures should be viewed as supplemental to, and not substitutive for, our financial statements included elsewhere in this offering memorandum. Because the Non-GAAP Financial Measures are not prepared in accordance with Brazilian GAAP or IFRS, investors are cautioned not to place undue reliance on this information. For a reconciliation of the Non-GAAP Financial Measures to the most directly comparable IFRS measures, see "Summary Financial and Other Information—Non-GAAP Financial Measures."

## *Consolidated EBITDA, Consolidated Adjusted EBITDA, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA and Mobility Adjusted EBITDA*

We calculate Consolidated EBITDA in accordance with CVM Resolution No. 156, dated June 23, 2022 ("CVM Resolution No. 156"). Consolidated EBITDA is calculated as consolidated net income for the year/period plus income tax and social contribution, financial results, and depreciation and amortization expenses. Although EBITDA has a standard meaning under CVM Resolution No. 156, we cannot assure you that other companies, including privately held companies, will adopt this same standard. Therefore, if the standard meaning established by CVM Resolution No. 156 is not adopted by other companies, our Consolidated EBITDA may not be comparable to that of other comparable companies. Our management believes that Consolidated EBITDA reflects our operating performance and provides for information on our ability to comply with obligations and obtain funds for capital expenditures and working capital. We disclose Consolidated EBITDA as this performance metric is frequently used by analysts, investors, creditors and other interested parties in evaluating companies in our sector. However, Consolidated EBITDA has limitations that hinder its use as a liquidity measure as it does not consider certain costs arising from our business, which could significantly affect profit, such as the amount of reinvestment necessary for operating maintenance. Accordingly, Consolidated EBITDA must be used in conjunction with generally accepted accounting measures.

We calculate Consolidated Adjusted EBITDA as Consolidated EBITDA for the year/period adjusted by:

(i) ***asset sales results***: we eliminate asset sales results as they do not derive from our operating results;

(ii) ***biological assets fair value variations***: we eliminate the variation in the fair value of biological assets included in the cost of products sold and services provided because they reflect the remeasurement of the generation of results from biological assets in up to two years at market value. According to IAS 41 Agriculture, "the fair value of a biological asset or agricultural produce is its market price less any costs to sell the produce". Therefore, the fair value of a biological asset is an estimation of future net value recoverable of our sugarcane crops and does not impact the results of the current period, but of future years. Biological assets fair value variations are recorded in our Renewables and Sugar segments;

(iii) ***assets from contracts with customers under IFRS-15***: we eliminate the effects of the amortization of advanced bonuses to resellers in the Mobility segment, which are conditioned upon deadlines and future performance, including the consumption of minimum volumes set forth in the supply agreement. Once contractual conditions are met, the bonuses are amortized and recognized as a reduction in income in our net operating revenue. However, such reduction does not reflect our operating performance;

(iv) ***IFRS-16 Leases***: we eliminate the effects of the amortization of finance lease agreements, which do not reflect our operating performance. Since 2019, when IFRS 16 Leases came into effect, the amortization of finance lease agreements must be recorded as depreciation and amortization expenses, which is a component of the calculation of EBITDA, therefore generating higher EBITDA. We and peers in our industry continue to highlight and eliminate these effects due to their relevance; and

(v) ***other non-recurring effects involving material gains or losses*** (the "Other Non-Recurring Effects"):

(a) accounting effect (no cash effect) as a result of the hedge accounting for debts protecting ethanol exports made in the past by Biosev in the nine months ended December 31, 2023 and the year ended March 31, 2023, as well as other non-recurring expenses and effects related to the Biosev Acquisition in the years ended March 31, 2022 and 2021;

(b) expenses with extraordinary contingencies related to the government's Zero Litigation (*Litígio Zero*) program, under which the Brazilian government granted participants the benefit to use tax credits to pay interests and fines due under tax proceedings, in the nine months ended December 31, 2023;

(c) the result of sugar resale operations partially recognized in the nine months ended December 31, 2023;

(d) gain from reversal of provision for loss on investments in logistics in the years ended March 31, 2022 and 2021;

(e) additional provision for compensation related to business performance in the years ended March 31, 2023 and 2022;

(f) accounting result from the Neolubes Acquisition in the nine months ended December 31, 2023 and the year ended March 31, 2023;

(g) gains from extemporary federal Social Integration Program (*Programa de Integração Social*) ("PIS") and Contribution for Social Security Funding (*Contribuição para o Financiamento da Seguridade Social*) ("COFINS") tax credits and other tax credits in the nine months ended December 31, 2023 and the years ended March 31, 2023, 2022 and 2021;

(h) impact on inventory from the reduction in PIS and COFINS taxes and state value-added tax ("ICMS") on gasoline in the year ended March 31, 2023;

(i)    the effect on results from the interruption of activities in our refinery in Argentina for planned maintenance in the year ended March 31, 2023;

(j)    the effect from the change in the income tax rate in Argentina in the year ended March 31, 2022;

(k)    recognition of expenses with variable compensation pertaining to the previous harvest year in the year ended March 31, 2022;

(l)    extraordinary bad debts provision for passenger transportation in the year ended March 31, 2022;

(m)    impact from atypical currency depreciation on financial instruments not designated as hedge accounting, related to oil products imports in the year ended March 31, 2022; and

(n)    COVID-19-related impact from the revaluation of the fair value of inventories in the year ended March 31, 2021.

We calculate Renewables Adjusted EBITDA as the Renewables segment's income before financial results and income tax and social contribution for the year/period adjusted by (i) depreciation and amortization expenses, (ii) biological assets fair value variations, (iii) IFRS-16 Leases, and (iv) the Other Non-Recurring Effects.

We calculate Sugar Adjusted EBITDA as the Sugar segment's income before financial results and income tax and social contribution for the year/period adjusted by (i) depreciation and amortization expenses, (ii) biological assets fair value variations, (iii) IFRS-16 Leases, and (iv) the Other Non-Recurring Effects.

We calculate Mobility Adjusted EBITDA as the Mobility segment's income before financial results and income tax and social contribution for the year/period adjusted by (i) depreciation and amortization expenses, (ii)  asset sales results, (iii) assets from contracts with customers under IFRS-15, and (iv) the Other Non-Recurring Effects.

We believe that Consolidated Adjusted EBITDA and, with respect to each such segment, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA and Mobility Adjusted EBITDA provide a better understanding of our ability to generate results from our operating assets as they exclude the accounting effects of certain recurring and non-recurring income and expenses.

Consolidated EBITDA, Consolidated Adjusted EBITDA, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA and Mobility Adjusted EBITDA do not represent the cash flow for the periods presented and should not be considered as a basis for distribution of dividends, as substitutes for net operating revenue or as indicators of operating performance or liquidity.

For a reconciliation of our net income for the year/period to Consolidated EBITDA and Consolidated Adjusted EBITDA and a reconciliation of income before financial results and income tax and social contribution to each of Renewables Adjusted EBITDA, Sugar Adjusted EBITDA and Mobility Adjusted EBITDA to, see "Summary Financial and Other Information—Reconciliation of Non-GAAP Financial Measures."

### Leverage Ratio

We calculate Leverage Ratio as the aggregate amount of third-party capital as of the end of the year/period divided by Consolidated Adjusted EBITDA for the year/ period. Third party capital comprises the sum of current and non-current loans and financing, net of cash and cash equivalents, current and non-current securities, financial investments linked to financing, Brazilian National Treasury Certificates (*Certificado do Tesouro Nacional*, or "CTN") and foreign exchange and interest rate swaps and other derivatives taken out to hedge our indebtedness.

Our management believes that disclosure of Leverage Ratio is useful to potential investors as it provides them with a clearer understanding of our financial liquidity. However, Leverage Ratio is not a measure of financial performance under Brazilian GAAP or IFRS and should not be used in isolation and should not be considered as an

alternative to operating cash flows or as a measure of liquidity. Leverage Ratio does not have a standardized meaning, and our definition of Leverage Ratio may not be comparable with the definition used by other companies.

For the calculation of Leverage Ratio, see "Summary Financial and Other Information—Reconciliation of Non-GAAP Financial Measures."

### *ROACE*

We calculate ROACE as (i) the sum of (a) income before financial results and income tax and social contribution, (b) asset sales results, (c) biological assets fair value variations, (d) IFRS-16 Leases, except for amortization and depreciation expenses in connection therewith, and (e) the Other Non-Recurring Effects, except for amortization and depreciation expenses in connection therewith; *divided by* (ii) average capital employed. Capital employed is calculated as (i) capital employed – assets (consisting of the sum of current and noncurrent trade accounts receivable, inventories, current and noncurrent recoverable income tax and social contribution, current and noncurrent recoverable taxes, biological assets, property, plant and equipment, intangible assets, other assets, investments, related parties – commercial and administrative transactions and others, and rights of use) minus (ii) capital employed – liabilities (consisting of the sum of suppliers, payroll and related charges payable, income tax and social contribution payable, deferred income tax and social contribution, other liabilities, related parties – commercial and administrative transactions, and current and noncurrent lease liabilities). The average employed capital is the result of the weighted average of the capital employed of the current quarter and the capital employed of the four previous quarters. The weights are given respectively as Q(0)=12.5%, Q(-1)=25.0%, Q(-2)=25.0%, Q(-3)=12.5%, and Q(-4)=25.0%, where Q(0) represents the current quarter, Q(-1) represents the quarter before Q(0), Q(-2) represents the quarter before Q(-1), Q(-3) represents the quarter before Q(-2) and Q(-4) represents the quarter before Q(-3).

Our management believes that disclosure of ROACE is useful to potential investors as it provides them with a clearer understanding of our profitability. However, ROACE is not a measure of financial performance under Brazilian GAAP or IFRS and should not be used in isolation and should not be considered as an alternative to net income or as a measure of operating results. ROACE does not have a standardized meaning, and our definition of ROACE may not be comparable with the definition used by other companies.

For the calculation of ROACE, see "Summary Financial and Other Information—Reconciliation of Non-GAAP Financial Measures."

### Last Twelve Months ("LTM") Information

This offering memorandum contains certain financial information for the twelve-month period ended December 31, 2023. Financial information for the twelve-month period ended December 31, 2023 has been calculated by adding financial information derived from our income statements for the nine months ended December 31, 2023 to financial information derived from the income statements for the year ended March 31, 2023, and subtracting financial information derived from the income statements for the nine months ended December 31, 2022. The presentation of this information is not made in accordance with IFRS. We present this data as a supplemental measure for investors in assessing our performance. This data is not necessarily indicative of the results that may be expected for the year ending March 31, 2024, and should not be used as the basis for, or prediction of, annualized calculation.

### Market Data

We have obtained the market and competitive position data used throughout this offering memorandum, including market forecasts, from internal surveys, market research, publicly available information and industry publications. We have included, in this offering memorandum, information from reports prepared by us, the Central Bank, the B3, The Brazilian National Economic and Social Development Bank (*Banco Nacional de Desenvolvimento Econômico e Social*) ("BNDES"), the Getúlio Vargas Foundation (*Fundação Getúlio Vargas*) ("FGV"), the Brazilian Geographical and Statistical Institute (*Instituto Brasileiro de Geografia e Estatística*) ("IBGE"), the Organization for Economic Co-operation and Development ("OECD"), the International Renewable

Energy Agency, the Brazilian Association of Biogas and Biomethane (*Associação Brasileira de Biogás e Biometano*), among others, which sources we believe are reliable. Industry publications generally state that the information presented therein has been obtained from sources believed to be reliable, but the accuracy and completeness of the information is not guaranteed. Although we have no reason to believe any of this information is inaccurate in any material respect, neither we, nor the initial purchasers have independently verified this information or make any representation as to the accuracy or completeness of the information. Similarly, our in-house research and estimates, which, while we believe they are reliable, have not been independently verified by the initial purchasers and we cannot assure you that the information is accurate. Nothing in this offering memorandum should be interpreted as a market forecast.

**Rounding**

Certain percentages and other amounts included in this offering memorandum have been rounded for ease of presentation. Any discrepancies between totals and the sums of the amounts listed are due to rounding.

## FORWARD-LOOKING STATEMENTS

This offering memorandum includes forward-looking statements within the meaning of the Securities Act or the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act").

Statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates" and similar expressions are forward-looking statements. Although we believe that these forward-looking statements are based upon reasonable assumptions, these statements are subject to several risks and uncertainties and are made in light of information currently available to us.

Our forward-looking statements may be influenced by numerous factors, including, without limitation, the following:

- delays or unexpected costs in the construction, expansion and operation of our bioenergy parks;

- volatility of supply, demand and the market price for our products;

- the modification, suspension, cancellation or non-renewal of the tax benefits that we have been granted;

- our ability to successfully compete in all segments and geographical markets where we currently conduct business or may conduct business in the future;

- geopolitical and other challenges and uncertainties, including due to the ongoing military conflicts between Russia and Ukraine and between Hamas and Israel;

- adverse weather conditions, including those related to climate change events causing physical and transition risks in the markets in which we operate, as well as crop disease and pestilence;

- price of natural gas, ethanol and other fuels, as well as sugar;

- significant disruptions in our production facilities and transportation and logistics services, as well as equipment failure and service interruptions;

- our international operations and ability to implement our expansion strategy in other regions of Brazil and international markets through organic growth, acquisitions, joint ventures or partnerships;

- our ability to implement our capital expenditure plan, including our ability to arrange financing when required and on reasonable terms;

- political instability and economic risks in Latin America (including as a result of government intervention, inflation, new taxes or tariffs and exchange rates), and changes in general economic, political and business conditions in Latin America;

- changes in customer demand;

- changes in our businesses;

- changes in global energy usage;

- appreciation and depreciation of the *real* against the U.S. dollar, which has experienced significant volatility since the beginning of the COVID-19 pandemic;

- other factors that may affect our financial condition, liquidity and results of our operations; and

- other risk factors discussed under "Risk Factors."

Words such as "believe," "should," "may," "might," "could," "seek," "aim," "likely," "will," "estimate," "continue," "anticipate," "intend," "expect" and other similar words used in this offering memorandum are intended to identify estimates and forward-looking statements. Estimates and forward-looking statements speak only as of the date they were made, and we undertake no obligation to update or to review any estimate and/or forward-looking statement because of new information, future events or other factors. Estimates and forward-looking statements involve risks and uncertainties, and are not guarantees of future performance. Our future results may differ materially from those expressed in these estimates and forward-looking statements. In light of the risks and uncertainties described above, the estimates and forward-looking statements discussed in this offering memorandum might not occur, and our future results and our performance may differ materially from those expressed in these forward-looking statements due to, but not limited to, the factors mentioned above. Because of these uncertainties, you should not make any investment decision based on these estimates and forward-looking statements.

require immediate payment, we may not have sufficient assets to satisfy our obligations under our indebtedness, and the proceeds from asset sales or curtailment of operations might not enable us to pay all of our liabilities.

Any failure to make payments on our indebtedness on a timely basis would likely result in a reduction of our credit rating, which could also harm our ability to incur additional indebtedness. See "—Any downgrade in the ratings of our debt securities, including the notes, would likely result in increased interest and other financial expenses related to our borrowings and debt securities and could reduce our liquidity and adversely affect the market price and marketability of the notes."

***Because the Issuer has no operations of its own, holders of the notes must depend on Raízen and its subsidiaries to provide the Issuer with sufficient funds to make payments on the notes when due.***

The Issuer, a wholly-owned indirect subsidiary of Raízen, on the date hereof, has no operations other than issuing and making payments on the notes and other indebtedness ranking equally with, or subordinated to, the notes, and using the proceeds therefrom as permitted by the documents governing these issuances, including lending the net proceeds of the notes and other indebtedness incurred by the Issuer to Raízen and its subsidiaries. Accordingly, the ability of the Issuer to pay principal, interest and other amounts due on the notes and other indebtedness will depend upon the financial condition and results of operations of Raízen and its subsidiaries that are debtors of the Issuer. In the event of an adverse change in the financial condition or results of operations of Raízen, Raízen Energia and their respective subsidiaries that are debtors of the Issuer, these entities may be unable to service their indebtedness to the Issuer, which would result in the failure of the Issuer to have sufficient funds to repay all amounts due on or with respect to the notes.

***The Guarantors rely, in part, on cash flows from their subsidiaries and jointly controlled companies that do not guarantee the notes to fund their obligations.***

In servicing payments to be made on their respective guarantees of the outstanding debt securities, the Guarantors may rely, in part, on cash flows from their subsidiaries and jointly controlled companies, mainly in the form of dividend payments. The ability of these subsidiaries and jointly controlled entities to make dividend payments to the Guarantors will be affected by, among other factors, the obligations of these entities to their creditors, requirements of Brazilian corporate and other law, and restrictions contained in agreements entered into by or relating to these entities. In the event that these subsidiaries and jointly controlled entities are unable to make dividend payments to the Guarantors due to insufficient cash flows, the Guarantors' liquidity may be adversely affected.

***Payments on the Guarantors' respective guarantees will be junior to each Guarantor's secured debt obligations and effectively junior to debt obligations of each Guarantor's subsidiaries and jointly controlled companies.***

The notes will be fully guaranteed by the Guarantors on an unsecured basis. Each such guarantee will rank equal in right of payment with all of the respective Guarantor's other existing and future senior unsecured indebtedness. Although the guarantees will provide the holders of the notes with a direct, but unsecured claim on the Guarantors' assets and property, payment on the guarantees will be subordinated to secured debt of the Guarantors to the extent the assets and property are securing such debt. Payment on the notes and the guarantees will also be structurally subordinated to the payment of all existing and future liabilities of the Guarantors' subsidiaries and jointly controlled companies (other than the Issuer and Raízen Energia).

Upon any liquidation or reorganization of any Guarantor, any right of the holders of the notes, through enforcement of the relevant guarantee, to participate in the assets of such Guarantor, including the capital stock of its subsidiaries and jointly controlled entities, will be subject to the prior claims of such Guarantor's secured creditors, and to participate in the assets of such Guarantor's subsidiaries and jointly controlled entities will be subject to the prior claims of the creditors of its subsidiaries and jointly controlled entities.

As of December 31, 2023, we had current and non-current loans and financing of R$39,635.0 million, of which R$197.7 million (or 0.5%) was secured and R$1,989.4 million (or 5.0%) was owed by subsidiaries other than the Issuer and Raízen Energia.

officers of a Luxembourg company, in exercising their powers and performing their duties, must act in good faith and in the interests of the company as a whole and must exercise due care, skill and diligence. Directors, managers or officers have a duty not to put themselves in a position in which their duties to the company and their personal interests may conflict, and also are under a duty to disclose any direct or indirect financial interest in any contract or arrangement with the company or any of its subsidiaries. If a director, manager or officer of a Luxembourg company is found to have breached his or her duties to that company, he or she may be held personally liable to the company in respect of that breach of duty.

***Brazilian bankruptcy law may be less favorable to noteholders than bankruptcy and insolvency laws in other jurisdictions.***

If we are unable to pay our indebtedness as it falls due, including our obligations under the guarantee, then we may become subject to insolvency proceedings in Brazil. The bankruptcy law of Brazil currently in effect is significantly different from, and may be less favorable to creditors than, that of certain other jurisdictions. For example, noteholders may have limited voting rights at creditors' meetings in the context of a judicial reorganization proceeding. Under Brazilian bankruptcy law, in the event of our bankruptcy or liquidation, all of our debt obligations that are denominated in foreign currency, including the guarantee, will be converted into *reais* at the prevailing exchange rate on the date of declaration of our bankruptcy by the court. The obligations under the guarantee would be considered unsecured in case of a judicial reorganization, extrajudicial reorganization or bankruptcy liquidation, and would be subject to the reorganization plan or, in case of a bankruptcy liquidation, would be paid according to a statutory order pursuant to Brazilian bankruptcy law.

***The Issuer is incorporated in Luxembourg, and Luxembourg law differs from U.S. law and may afford less protection to holders of the notes.***

Holders of the notes may have more difficulty protecting their interests than would security holders of a corporation incorporated in a jurisdiction of the United States. As a Luxembourg company, the Issuer is incorporated under and subject to the Luxembourg Companies Law, and other provisions of Luxembourg law. The Luxembourg Companies Law differs in some material respects from laws generally applicable to U.S. corporations and security holders, including the provisions relating to interested directors, mergers, amalgamations and acquisitions, takeovers, security holder lawsuits and indemnification of directors.

Under Luxembourg law, the duties of directors, managers and officers of a company are generally owed to the company only. Holders of notes issued by Luxembourg companies generally do not have rights to take action against directors, managers or officers of the company, except in limited circumstances. Directors, managers or officers of a Luxembourg company must, in exercising their powers and performing their duties, act in good faith and in the interests of the company as a whole and must exercise due care, skill and diligence. Directors have a duty not to put themselves in a position in which their duties to the company and their personal interests may conflict and are also under a duty to disclose any personal interest in any contract or arrangement with the company or any of its subsidiaries. If a director or officer of a Luxembourg company is found to have breached his or her duties to that company, he or she may be held personally liable to the company in respect of that breach of duty and in accordance with the provisions of the Luxembourg Companies Law. A director or manager may be jointly and severally liable with other directors or managers implicated in the same breach of duty.

***A finding that a guarantee of the notes was a fraudulent conveyance could result in noteholders losing their legal claim against the relevant Guarantor.***

The Issuer's obligation to make payments on the notes is supported by the guarantees on such notes. In the event that Brazilian or U.S. fraudulent conveyance or similar laws are applied to the guarantees and at the time the Guarantors entered into such guarantees, we:

- were rendered insolvent by reason of our entering into such guarantees;

- were engaged in business or transactions for which the assets remaining with us constituted unreasonably low capital;

**<u>EXHIBIT M</u>**

**Excerpts of 2035 Notes Offering Memorandum**

**IMPORTANT NOTICE**

THIS OFFERING IS AVAILABLE ONLY TO INVESTORS WHO ARE EITHER (i) QUALIFIED INSTITUTIONAL BUYERS ("QIBs"), WITHIN THE MEANING OF RULE 144A UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR (ii) NON-U.S. PERSONS, WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, OUTSIDE THE UNITED STATES.

**IMPORTANT: You must read the following before continuing.** The following applies to the offering memorandum (the "Offering Memorandum") following this page and you are advised to read this carefully before reading, accessing or making any other use of the Offering Memorandum. In accessing the Offering Memorandum, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER OF SECURITIES FOR SALE IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO. THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER JURISDICTION, AND THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE LAWS OF OTHER JURISDICTIONS.

**PROHIBITION OF SALES TO EEA RETAIL INVESTORS.** THE SECURITIES DESCRIBED IN THE OFFERING MEMORANDUM ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN THE EUROPEAN ECONOMIC AREA ("EEA"). FOR THESE PURPOSES, A RETAIL INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT, AS DEFINED IN POINT (11) OF ARTICLE 4(1) OF DIRECTIVE 2014/65/EU (AS AMENDED, "MIFID II"); (II) A CUSTOMER WITHIN THE MEANING OF DIRECTIVE (EU) 2016/97 (AS AMENDED, THE "INSURANCE DISTRIBUTION DIRECTIVE"), WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT, AS DEFINED IN POINT (10) OF ARTICLE 4(1) OF MIFID II; OR (III) NOT A QUALIFIED INVESTOR AS DEFINED IN REGULATION (EU) 2017/1129, AS AMENDED (THE "PROSPECTUS REGULATION"). CONSEQUENTLY, NO KEY INFORMATION DOCUMENT REQUIRED BY REGULATION (EU) NO 1286/2014 (THE "PRIIPS REGULATION") FOR OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO RETAIL INVESTORS IN THE EEA HAS BEEN PREPARED AND THEREFORE OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO ANY RETAIL INVESTOR IN THE EEA MAY BE UNLAWFUL UNDER THE PRIIPS REGULATION.

**PROHIBITION OF SALES TO U.K. RETAIL INVESTORS.** THE SECURITIES DESCRIBED IN THE OFFERING MEMORANDUM ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN THE UNITED KINGDOM ("U.K."). FOR THESE PURPOSES, A RETAIL INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT, AS DEFINED IN POINT (8) OF ARTICLE 2 OF REGULATION (EU) NO 2017/565 AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUROPEAN UNION (WITHDRAWAL) ACT 2018 (THE "EUWA"); (II) A CUSTOMER WITHIN THE MEANING OF THE PROVISIONS OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (AS AMENDED, THE "FSMA") AND ANY RULES OR REGULATIONS MADE UNDER THE FSMA TO IMPLEMENT THE INSURANCE DISTRIBUTION DIRECTIVE, WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT, AS DEFINED IN POINT (8) OF ARTICLE 2(1) OF REGULATION (EU) NO 600/2014 AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA; OR (III) NOT A QUALIFIED INVESTOR AS DEFINED IN ARTICLE 2 OF THE PROSPECTUS REGULATION AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA. CONSEQUENTLY, NO KEY INFORMATION DOCUMENT REQUIRED BY THE PRIIPS REGULATION AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA (THE "U.K. PRIIPS REGULATION") FOR OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO RETAIL INVESTORS IN THE U.K. HAS

BEEN PREPARED AND THEREFORE OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO ANY RETAIL INVESTOR IN THE U.K. MAY BE UNLAWFUL UNDER THE U.K. PRIIPS REGULATION.

IN ADDITION, IN THE U.K., THE OFFERING MEMORANDUM AND ANY OTHER MATERIAL RELATING TO THE SECURITIES DESCRIBED HEREIN ARE ONLY BEING DISTRIBUTED TO, AND ARE DIRECTED ONLY AT, (I) PERSONS HAVING PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS FALLING WITHIN ARTICLE 19(5) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2005 (THE "ORDER"), OR (II) HIGH NET WORTH ENTITIES FALLING WITHIN ARTICLE 49(2)(A) TO (D) OF THE ORDER, OR (III) PERSONS TO WHOM IT WOULD OTHERWISE BE LAWFUL TO DISTRIBUTE THEM (ALL SUCH PERSONS TOGETHER BEING REFERRED TO AS "RELEVANT PERSONS"). THE SECURITIES ARE ONLY AVAILABLE TO, AND ANY INVITATION, OFFER OR AGREEMENT TO SUBSCRIBE, PURCHASE OR OTHERWISE ACQUIRE THE SECURITIES WILL BE ENGAGED IN ONLY WITH, RELEVANT PERSONS. THE OFFERING MEMORANDUM AND ITS CONTENTS ARE CONFIDENTIAL AND SHOULD NOT BE DISTRIBUTED, PUBLISHED OR REPRODUCED (IN WHOLE OR IN PART) OR DISCLOSED BY ANY RECIPIENTS TO ANY OTHER PERSON IN THE U.K. ANY PERSON IN THE U.K. THAT IS NOT A RELEVANT PERSON SHOULD NOT ACT OR RELY ON THE OFFERING MEMORANDUM OR ITS CONTENTS.

THE FOLLOWING OFFERING MEMORANDUM MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER. ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORIZED. FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**Confirmation of Your Representation:** In order to be eligible to view the Offering Memorandum or make an investment decision with respect to the securities, investors must be either (i) QIBs or (ii) non-U.S. persons (within the meaning of Regulation S under the Securities Act) in the U.S. This Offering Memorandum is being sent at your request and by accepting the e-mail and accessing the Offering Memorandum you shall be deemed to have represented to us that (i) you and any customers you represent are either (a) QIBs or (b) non-U.S. persons (within the meaning of Regulation S under the Securities Act); and (ii) you consent to delivery of the Offering Memorandum by electronic transmission.

You are reminded that the Offering Memorandum has been delivered to you on the basis that you are a person into whose possession the Offering Memorandum may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorized to, deliver the Offering Memorandum to any other person.

The materials relating to the offering do not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law. If a jurisdiction requires that the offering be made by a licensed broker or dealer and the initial purchasers or any affiliate of the initial purchasers is a licensed broker or dealer in that jurisdiction, the offering shall be deemed to be made by the initial purchasers or such affiliate on behalf of the issuer in such jurisdiction.

The Offering Memorandum has been sent to you in an electronic form. You are reminded that documents transmitted via this medium may be altered or changed during the process of electronic transmission, and, consequently, neither the initial purchasers, nor any person who controls them nor any of their directors, officers, employees nor any of their agents nor any affiliate of any such person, accept any liability or responsibility whatsoever in respect of any difference between the Offering Memorandum distributed to you in electronic form and the hard copy version available to you on request from the initial purchasers.

**OFFERING MEMORANDUM**                                                    **CONFIDENTIAL**



### Raizen Fuels Finance S.A.
### US$1,000,000,000 5.700% Green Notes due 2035
Unconditionally and Irrevocably Guaranteed by
### Raízen S.A. and Raízen Energia S.A.

Raizen Fuels Finance S.A., a public limited liability company (*société anonyme*) organized under the laws of the Grand Duchy of Luxembourg ("Luxembourg"), having its registered office at 16, Rue Eugène Ruppert, L - 2453 Luxembourg and registered with the Luxembourg Trade and Companies' Register (*Registre de commerce et des sociétés, Luxembourg*) under number B184033, LEI 52990010NH26VC32Q522 (the "Issuer"), is offering US$1,000,000,000 in aggregate principal amount of 5.700% green notes due 2035 (the "notes"). All of the Issuer's obligations pursuant to the notes and the indenture under which they are issued will be fully and unconditionally guaranteed (the "guarantees"), on an unsecured basis, by Raízen S.A., a corporation (*sociedade por ações*) incorporated under the laws of the Federative Republic of Brazil ("Raízen"), and Raízen Energia S.A., a corporation (*sociedade por ações*) incorporated under the laws of the Federative Republic of Brazil ("Raizen Energia") (each, a "Guarantor" and, collectively, the "Guarantors"). The notes will bear interest at the rate of 5.700% per year and will mature on January 17, 2035. There will be a short initial interest period for the notes from and including September 17, 2024, to but, excluding, January 17, 2025. The notes and each guarantee will be unsecured and will rank equally in right of payment with the other unsecured unsubordinated indebtedness of the Issuer and the relevant Guarantor, respectively. The notes and the guarantees will be effectively junior to the secured indebtedness of the Issuer and the Guarantors to the extent of the value of the assets securing such indebtedness and structurally subordinated to the indebtedness of the Issuer's and the Guarantors' non-guarantor subsidiaries and jointly controlled companies. See "Description of the Notes."

At any time before October 17, 2034, which is the date that is three months prior to the maturity of the notes (the "Par Call Date"), the Issuer or any Guarantor may redeem the notes at its option, in whole or in part, at any time and from time to time, by paying 100% of the principal amount of the notes *plus* a "make-whole" amount and accrued and unpaid interest and Additional Amounts (as defined herein), if any, to but, excluding, the redemption date. If the redemption date of the notes is on or after the Par Call Date, the redemption price will equal 100% of the principal amount of the notes, *plus* accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date. See "Description of the Notes—Redemption—Optional Redemption." The notes may also be redeemed by the Issuer or any Guarantor, at its option, in whole but not in part, at 100% of their principal amount *plus* accrued and unpaid interest and Additional Amounts, if any, at any time upon the occurrence of specified tax events, as set forth in this offering memorandum. See "Description of the Notes—Redemption—Redemption for Taxation Reasons." If a Change of Control (as defined herein) that results in a Rating Decline (as defined herein) occurs, unless the Issuer or any Guarantor has exercised its option to redeem all of the outstanding notes, the Issuer or any Guarantor will be required to offer to purchase the notes at a purchase price equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest and Additional Amounts, if any, to but, excluding, the purchase date. See "Description of the Notes—Certain Covenants—Purchase of Notes Upon Change of Control Event."

Application will be made to list the notes on the Official List of the Luxembourg Stock Exchange (the "LuxSE") and to admit the notes to trading on the Euro MTF Market of the LuxSE (the "Euro MTF"). There are no assurances that the notes will be listed on the Official List of the LuxSE or admitted to trading on the Euro MTF. See "Listing and General Information."

**Investing in the notes involves risks. See "Risk Factors" beginning on page 28 of this offering memorandum.**

This offering memorandum has been prepared on the basis that any offer of the notes in any member state ("Member State") of the European Economic Area (the "EEA") will be made pursuant to an exemption under Regulation (EU) 2017/1129 of the European Parliament and of the Council of June 14, 2017 on the prospectus to be published when securities are offered to the public or admitted to trading on a regulated market, and repealing Directive 2003/71/EC, as amended (the "Prospectus Regulation"), and under any implementing legislation in each Member State, from the requirement to publish a prospectus for offers of notes. This offering memorandum is not a prospectus for purposes of the Prospectus Regulation, and under any implementing legislation in each Member State, and has not been approved by a competent authority within the meaning of the Prospectus Regulation. This offering memorandum has been prepared on the basis that any offer of the notes in the United Kingdom (the "UK"), will be made pursuant to an exemption from the obligation to publish a prospectus under Section 86 of the Financial Services and Markets Act 2000 (the "FSMA"), in the UK. This offering memorandum is not a prospectus for purposes of the UK Prospectus Regulation (meaning Regulation (EU) 2017/1129 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018 (the "EUWA"), and has not been approved by the UK Financial Conduct Authority (the "FCA").

The notes and the guarantees have not been, and will not be, registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws. The notes may not be offered or sold within the United States or to U.S. persons, except to qualified institutional buyers in reliance on the exemption from registration provided by Rule 144A under the Securities Act ("Rule 144A"), and to certain non-U.S. persons in offshore transactions in reliance on Regulation S under the Securities Act ("Regulation S"). You are hereby notified that sellers of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. For more information about restrictions on transfer of the notes, see "Transfer Restrictions." **Neither the U.S. Securities and Exchange Commission (the "SEC"), nor any state securities commission has approved or disapproved of the notes or the guarantee or determined if this offering memorandum is accurate or complete. Any representation to the contrary is a criminal offense.**

---

**Issue price of the notes: 98.797% *plus* accrued interest, if any, from September 17, 2024.**

---

Delivery of the notes to purchasers in book-entry form through The Depository Trust Company ("DTC"), and its direct and indirect participants, including Clearstream Banking S.A. ("Clearstream"), and Euroclear Bank SA/NV, as operator of the Euroclear System ("Euroclear"), is expected on or about September 17, 2024.

---

*Global Coordinators*

| Citigroup | Itaú BBA | Morgan Stanley | Santander |
|---|---|---|---|

*Joint Book-Runners*

| BNP PARIBAS | Bradesco BBI | Rabo Securities | SMBC Nikko |
|---|---|---|---|

The date of this offering memorandum is September 12, 2024.

**TABLE OF CONTENTS**

**Page**

PRESENTATION OF FINANCIAL AND OTHER INFORMATION ...................................................................v

FORWARD-LOOKING STATEMENTS ........................................................................................................xi

SUMMARY ................................................................................................................................................1

THE OFFERING .........................................................................................................................................16

SUMMARY FINANCIAL AND OTHER INFORMATION ............................................................................20

RISK FACTORS .........................................................................................................................................28

USE OF PROCEEDS ..................................................................................................................................69

CAPITALIZATION .....................................................................................................................................70

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
OF OPERATIONS ......................................................................................................................................71

INDUSTRY .................................................................................................................................................99

BUSINESS ..................................................................................................................................................121

REGULATORY OVERVIEW ......................................................................................................................154

MANAGEMENT .........................................................................................................................................171

PRINCIPAL SHAREHOLDERS ..................................................................................................................182

RELATED PARTY TRANSACTIONS .........................................................................................................184

DESCRIPTION OF THE NOTES .................................................................................................................186

TAXATION .................................................................................................................................................214

THE ISSUER AND THE GUARANTORS ....................................................................................................225

TRANSFER RESTRICTIONS ......................................................................................................................226

ENFORCEABILITY OF CIVIL LIABILITIES ............................................................................................229

PLAN OF DISTRIBUTION .........................................................................................................................236

CERTAIN ERISA CONSIDERATIONS .......................................................................................................243

LEGAL MATTERS .....................................................................................................................................245

INDEPENDENT AUDITORS .......................................................................................................................246

LISTING AND GENERAL INFORMATION ................................................................................................247

INDEX TO FINANCIAL STATEMENTS .....................................................................................................248

_____

**You should rely only on the information contained in this offering memorandum. Neither we nor the initial purchasers have authorized anyone to provide you with different information. Neither we nor the initial purchasers are making an offer of the notes (or the related guarantee) in any jurisdiction where the offer is not permitted. You should not assume that the information contained in this offering memorandum is accurate as of any date other than the date on the cover of this offering memorandum.**

Unless otherwise indicated or the context otherwise requires, all references in this offering memorandum to (1) "Raízen," the "Company," "our Company," "we," "our," "ours," "us" or similar terms are to Raízen and its consolidated subsidiaries, which include Raízen Energia and the Issuer; (2) "Cosan" are to Cosan S.A.; (3) "Shell

Holding" are to Shell Brazil Holding B.V.; and (4) "Shell" are to Royal Dutch Shell plc. All references in this offering memorandum to our "controlling shareholders" are to Cosan and Shell.

References to the "initial purchasers" are to Citigroup Global Markets Inc., Itau BBA USA Securities, Inc., Morgan Stanley & Co. LLC, Santander US Capital Markets LLC,  BNP Paribas Securities Corp., Bradesco BBI S.A., Rabo Securities USA, Inc., and SMBC Nikko Securities America, Inc.

This offering memorandum has been prepared by us solely for use in connection with the proposed offering of the notes (and the related guarantees) described in this offering memorandum. This offering memorandum is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire notes (or the related guarantees). Distribution of this offering memorandum to any person other than a prospective investor and any person retained to advise such prospective investor with respect to its purchase is unauthorized, and any disclosure of any of its contents, without our prior written consent, is prohibited. Each prospective investor, by accepting delivery of this offering memorandum, agrees to the foregoing and to make no photocopies of this offering memorandum or any documents referred to in this offering memorandum.

Neither the initial purchasers nor any of their directors, affiliates, advisors or agents make any representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this offering memorandum. Nothing contained in this offering memorandum is, or shall be relied upon as, a promise or representation by the initial purchasers or by any of their directors, affiliates, advisors or agents as to the past or future.

The notes (and the related guarantees) are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom. As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time. See "Plan of Distribution" and "Transfer Restrictions."

In making an investment decision, prospective investors must rely on their own examination of our Company and the terms of this offering, including the merits and risks involved. The contents of this offering memorandum are not, and prospective investors should not construe anything in this offering memorandum as, legal, business or tax advice. Each prospective investor should consult its own legal, business, tax or other advisors as needed to make its investment decision and to determine whether it is legally permitted to purchase the notes under applicable law.

This offering memorandum contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All such summaries are qualified in their entirety by reference to such documents. Copies of documents referred to in this offering memorandum will be made available to prospective investors upon request to us or the initial purchasers.

Each person receiving this offering memorandum acknowledges that this offering memorandum may not contain all information that would be included in a prospectus if this offering were registered under the Securities Act.

## PROHIBITION OF SALES TO EEA RETAIL INVESTORS

The notes (and the related guarantees) described in this offering memorandum are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the EEA. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU, as amended ("MiFID II"); (ii) a customer within the meaning of Directive 2016/97/EU, as amended (the "Insurance Distribution Directive"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a qualified investor as defined in the Prospectus Regulation. Consequently, no key information document required by Regulation (EU) No. 1286/2014, as amended (the "PRIIPs Regulation"), for offering or selling the notes or otherwise making them available to retail investors in the EEA has been prepared and, therefore, offering or selling

the notes or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation. This offering memorandum has been prepared on the basis that any offer of notes in any Member State of the EEA will be made pursuant to an exemption under the Prospectus Regulation, and under any implementing legislation in each Member State, from the requirement to publish a prospectus for offers of notes.

## PROHIBITION OF SALES TO UK RETAIL INVESTORS

The notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the UK. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client, as defined in point (8) of Article 2 of Regulation (EU) No. 2017/565 as it forms part of domestic law by virtue of the EUWA; (ii) a customer within the meaning of the provisions of the FSMA and any rules or regulations made under the FSMA to implement Directive (EU) 2016/97, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of Regulation (EU) No. 600/2014 as it forms part of domestic law by virtue of the EUWA; or (iii) not a qualified investor as defined in Article 2 of the UK Prospectus Regulation as it forms part of domestic law by virtue of the EUWA. Consequently, no key information document required by Regulation (EU) No. 1286/2014 as it forms part of domestic law by virtue of the EUWA (the "UK PRIIPs Regulation") for offering or selling the notes or otherwise making them available to retail investors in the UK has been prepared and therefore offering or selling the notes or otherwise making them available to any retail investor in the UK may be unlawful under the UK PRIIPs Regulation.

The above selling restriction is in addition to any other selling restrictions set forth in this offering memorandum.

## MiFID PRODUCT GOVERNANCE/
## PROFESSIONAL INVESTORS AND ECPS ONLY TARGET MARKET

Solely for the purposes of the product approval process of the Issuer and the Guarantors (each a "Manufacturer"), the target market assessment in respect of the notes described in this offering memorandum has led to the conclusion that (i) the target market for the notes is eligible counterparties and professional clients only, each as defined in MiFID II; and (ii) all channels for distribution of the notes to eligible counterparties and professional clients are appropriate. Any person subsequently offering, selling or recommending the notes (a "distributor") should take into consideration the Manufacturers' target market assessment; however, and without prejudice to the Issuer's obligations in accordance with MiFID II, a distributor subject to MiFID II is responsible for undertaking its own target market assessment in respect of the notes (by either adopting or refining the manufacturers' target market assessment) and determining appropriate distribution channels.

## NOTICE TO PROSPECTIVE INVESTORS IN LUXEMBOURG

This offering memorandum has not been approved by and will not be submitted for approval to the Luxembourg Financial Services Authority (*Commission de Surveillance du Secteur Financier*) for purposes of a public offering or sale in Luxembourg. Accordingly, the notes may not be offered or sold to the public in Luxembourg, directly or indirectly, and neither this offering memorandum nor any other offering memorandum, form of application, advertisement or other material related to such notes may be distributed, or otherwise be made available in or from, or published in, Luxembourg except in circumstances where the offer benefits from an exemption to or constitutes a transaction not subject to the requirement to publish a prospectus, in accordance with the Prospectus Regulation and the Luxembourg law of 16 July 2019, on prospectuses for securities.

**NOTICE TO PROSPECTIVE INVESTORS WITHIN BRAZIL**

The offer and sale of the notes and related guarantees have not been and will not be registered with the Brazilian securities commission (*Comissão de Valores Mobiliários*, or "CVM") and, therefore, will not be carried out by any means that would constitute a public offering in Brazil under CVM Resolution No. 160, dated July 13, 2022, as amended ("Resolution 160"), or unauthorized distribution under Brazilian laws and regulations. The notes and related guarantees will be authorized for trading on organized non-Brazilian securities markets and may only be offered to Brazilian professional investors (as defined by applicable CVM regulation), who may only acquire the notes and related guarantees through a non-Brazilian account, with settlement outside Brazil in non-Brazilian currency. The trading of these securities on regulated securities markets in Brazil is prohibited.

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

All references in this offering memorandum to "*real*," "*reais*" or "R$" are to the Brazilian *real*, the official currency of Brazil. All references to "U.S. dollars" or "US$" are to U.S. dollars, the official currency of the United States.

As of June 30, 2024, the exchange rate for *reais* into U.S. dollars was R$5.5589 to US$1.00, based on the selling rate as reported by the Central Bank. As of March 31, 2024, 2023 and 2022, the exchange for *reais* into U.S. dollars rate was, respectively, R$4.9962 to US$1.00, R$5.0804 to US$1.00 and R$4.7378 to US$1.00, in each case, based on the selling rate as reported by the Central Bank.

Solely for the convenience of the reader, we have translated certain real amounts in this offering memorandum into U.S. dollars at the selling rate as of June 30, 2024 as reported by the Central Bank. These translations (i) should not be considered representations that any such amounts have been, could have been or could be converted into U.S. dollars at that or at any other exchange rate and (ii) do not necessarily represent amounts in accordance with accounting practices adopted in Brazil ("Brazilian GAAP"), as issued by the Comitê de Pronunciamentos Contábeis ("CPC"), or International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board (the "IASB").

### Financial Statements

### *Raízen Financial Statements*

We maintain our books and records in *reais*. Due to our harvest year and corporate production cycle, our fiscal year begins on April 1 of each year and ends on March 31 of the following year.

Our financial information contained in this offering memorandum has been derived from our records and financial statements, and includes our individual and consolidated unaudited interim financial information as of June 30, 2024 and for the three-month periods ended June 30, 2024 and 2023 (our "interim consolidated financial statements"), and our audited individual and consolidated financial statements as of March 31, 2024 and 2023 and for the years ended March 31, 2024 and 2023, which includes corresponding figures for the year ended March 31, 2022 (together, our "audited consolidated financial statements" and, together with the interim consolidated financial statements, our "consolidated financial statements").

Our audited consolidated financial statements as of March 31, 2024 are not entirely comparable with the audited consolidated financial statements as of March 31, 2023, substantially due to (i) the corporate reorganization as a result of which Raízen became the sole shareholder of Raízen Energia completed on June 1, 2021 (the "Group Reorganization") (the results of Raízen Energia for the months of April and May 2021 are not included in the audited consolidated financial statements for the year ended March 31, 2022) and (ii) the acquisition of (a) Biosev S.A. (currently, Raízen Centro-Sul S.A.) ("Biosev") from Hédera Investimentos e Participações S.A., on August 10, 2021 (the "Biosev Acquisition"); (b) the fuel distribution network in Paraguay from Barcos & Rodados S.A. (currently, Raízen Paraguay S.A.), on November 1, 2021 (the "Barcos & Rodados Acquisition"); (c) of Neolubes Indústria de Lubrificantes Ltda., which operates Shell's lubricant manufacturing business in Brazil, on May 1, 2022 (the "Neolubes Acquisition"), and (d) the fintech Payly Holding Ltda. and its controlled company Payly Instituições de Pagamentos S.A. (together, "Payly") on October 17, 2022.

For additional information regarding acquisitions we completed in the periods under review, see "Business—Our History."

We have prepared our audited consolidated financial statements in accordance with Brazilian GAAP, as issued by the CPC, and with IFRS, as issued by the IASB. We have prepared our interim consolidated financial statements in accordance with Accounting Pronouncement NBC TG 21 – Interim Financial Reporting, and IAS 34 - Interim Financial Reporting, issued by the IASB as well as for the fair presentation of this information in conformity with the rules issued by CVM applicable to the preparation of the Quarterly Information Form (ITR).

*Segment Information and Presentation of Segment Financial Data*

As of June 30, 2024, our business was organized into four reporting segments, which corresponded to our principal production processes, products and services:

- **Mobility**: refers to the trade and sale activities of fossil and renewable fuels and lubricants, through a franchised network of service stations under the Shell brand throughout the national territory and the broader Latin America region, operating in Argentina and Paraguay.

- **Sugar**: refers to sugar production, sale, origination and trading activities.

- **Renewables**: refers to: (a) ethanol production, sale, origination and trading activities; (b) production and sale of bioenergy; (c) resale and trading of electric power; and (d) production and sale of other renewable products (solar energy and biogas). These activities were aggregated into a single segment, as their products and services come from renewable sources, use similar technologies, and present synergies in their production and distribution process. The combination of these activities results in the portfolio of clean energy and retirement of carbon credits offered by us. The performance of these activities is assessed on an integrated basis by our management through our operating results.

- **Other segments**: refers to convenience and proximity stores business and financial products and services businesses.

During the year ended March 31, 2024, we reassessed our internal organization and the breakdown of our segments, which resulted in the following changes in our reportable segments: (i) new operating segment called "Other segments," which represents the convenience and proximity store businesses and financial products and services businesses; and (ii) allocation of general and administrative expenses related to corporate areas as "Non-segmented." Segment information included in this offering memorandum for years ended prior to March 31, 2024 has been determined by retroactively applying the definition of the segments above to the historical consolidated financial information.

For more information on our segments, see note 4 to our interim consolidated financial statements included elsewhere in this offering memorandum.

*Issuer Financial Statements*

We have not included any financial statements for the Issuer in this offering memorandum. The Issuer does not, and will not, publish financial statements, except for financial statements that it is required to publish under the laws of Luxembourg. In addition, the Issuer will not furnish to the trustee or the holders of the notes any financial statements of, or other reports relating to, the Issuer. The Issuer's obligations under the notes will be fully and unconditionally guaranteed by Raízen and Raízen Energia. The financial condition and results of operations of the Issuer have been fully consolidated in our consolidated financial statements, which consolidate the financial condition and results of operations of Raízen and its subsidiaries (including Raízen Energia and the Issuer). See "Risk Factors—Risks Related to the Notes and the Guarantees and Our Other Indebtedness—Because the Issuer has no operations of its own, holders of the notes must depend on Raízen and its subsidiaries to provide the Issuer with sufficient funds to make payments on the notes when due."

**Special Note Regarding Non-GAAP Financial Measures**

We present certain non-GAAP financial measures in this offering memorandum: Consolidated EBITDA, Consolidated Adjusted EBITDA, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA, Mobility Adjusted EBITDA, Leverage Ratio and Return on Average Capital Employed ("ROACE") (the "Non-GAAP Financial Measures").

Our management believes that Consolidated EBITDA, Consolidated Adjusted EBITDA, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA, Mobility Adjusted EBITDA, Leverage Ratio and ROACE provide

useful information to potential investors, financial analysts and the public in their review of our operating and financial performance and their comparison of our operating and financial performance to the performance of other companies in the same industry and other industries. However, Consolidated EBITDA, Consolidated Adjusted EBITDA, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA, Mobility Adjusted EBITDA, Leverage Ratio and ROACE are not measures of financial performance under Brazilian GAAP or IFRS. These Non-GAAP Financial Measures should not be considered in isolation and do not represent cash flows for the presented years and should not be considered as substitutes for net income (loss), indicators of operating performance, substitutes for cash flows, indicators of liquidity or a basis for the distribution of dividends. The Non-GAAP Financial Measures do not have a standard meaning and are not necessarily comparable to other similarly titled measures used by other companies due to differences in the method of calculation. The Non-GAAP Financial Measures should be viewed as supplemental to, and not substitutive for, our financial statements included elsewhere in this offering memorandum. Because the Non-GAAP Financial Measures are not prepared in accordance with Brazilian GAAP or IFRS, investors are cautioned not to place undue reliance on this information. For a reconciliation of the Non-GAAP Financial Measures to the most directly comparable IFRS measures, see "Summary Financial and Other Information—Non-GAAP Financial Measures."

### *Consolidated EBITDA, Consolidated Adjusted EBITDA, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA and Mobility Adjusted EBITDA*

We calculate Consolidated EBITDA in accordance with CVM Resolution No. 156, dated June 23, 2022 ("CVM Resolution No. 156"). Consolidated EBITDA is calculated as consolidated net income for the year/period plus income tax and social contribution, financial results, and depreciation and amortization expenses. Although EBITDA has a standard meaning under CVM Resolution No. 156, we cannot assure you that other companies, including privately held companies, will adopt this same standard. Therefore, if the standard meaning established by CVM Resolution No. 156 is not adopted by other companies, our Consolidated EBITDA may not be comparable to that of other comparable companies. Our management believes that Consolidated EBITDA reflects our operating performance and provides for information on our ability to comply with obligations and obtain funds for capital expenditures and working capital. We disclose Consolidated EBITDA as this performance metric is frequently used by analysts, investors, creditors and other interested parties in evaluating companies in our sector. However, Consolidated EBITDA has limitations that hinder its use as a liquidity measure as it does not consider certain costs arising from our business, which could significantly affect profit, such as the amount of reinvestment necessary for operating maintenance. Accordingly, Consolidated EBITDA must be used in conjunction with generally accepted accounting measures.

We calculate Consolidated Adjusted EBITDA as Consolidated EBITDA for the year/period adjusted by:

(i) *biological assets fair value variations*: we eliminate the variation in the fair value of biological assets included in the cost of products sold and services provided because they reflect the remeasurement of the generation of results from biological assets in up to two years at market value. According to IAS 41 Agriculture, "the fair value of a biological asset or agricultural produce is its market price less any costs to sell the produce." Therefore, the fair value of a biological asset is an estimation of future net value recoverable of our sugarcane crops and does not impact the results of the current period, but of future years. Biological assets fair value variations are recorded in our Renewables and Sugar segments;

(ii) *assets from contracts with customers under IFRS-15*: we eliminate the effects of the amortization of advanced bonuses to resellers in the Mobility segment, which are conditioned upon deadlines and future performance, including the consumption of minimum volumes set forth in the supply agreement. Once contractual conditions are met, the bonuses are amortized and recognized as a reduction in income in our net operating revenue. However, such reduction does not reflect our operating performance;

(iii) *IFRS-16 Leases*: we eliminate the effects of the amortization of finance lease agreements, which do not reflect our operating performance. Since 2019, when IFRS 16 Leases came into effect, the amortization of finance lease agreements must be recorded as depreciation and amortization expenses, which is a component of the calculation of EBITDA, therefore generating higher EBITDA. We and peers in our industry continue to highlight and eliminate these effects due to their relevance; and

(iv) ***other non-recurring effects involving material gains or losses*** (the "Other Non-Recurring Effects"):

   (a)   accounting effect (no cash effect) as a result of the hedge accounting for debts protecting ethanol exports made in the past by Biosev in the years ended March 31, 2024 and March 31, 2023 as well as other non-recurring expenses and effects related to the Biosev Acquisition in the year ended March 31, 2022;

   (b)   expenses with one-off contingencies related to the government's Zero Litigation (*Litígio Zero*) program, under which the Brazilian government granted participants the benefit to use tax credits to pay interests and fines due under tax proceedings, in the year ended March 31, 2024;

   (c)   the result of the impairment loss recognition for the subsidiary Raízen Biomassa S.A., with the corresponding entry recorded in the income statement in the year ended March 31, 2024;

   (d)   gain from reversal of provision for loss on investments in logistics in the years ended March 31, 2023 and March 31, 2022;

   (e)   additional provision for compensation related to business performance in the years ended March 31, 2023 and March 31, 2022;

   (f)   accounting result from the Neolubes Acquisition in the years ended March 31, 2024 and March 31, 2023;

   (g)   gains from one-off federal Social Integration Program (*Programa de Integração Social*) ("PIS") and Contribution for Social Security Funding (*Contribuição para o Financiamento da Seguridade Social*) ("COFINS") tax credits and other tax credits in the three months ended June 30, 2024 and the years ended March 31, 2024, 2023 and 2022;

   (h)   impact on inventory from the reduction in PIS and COFINS taxes and state value-added tax ("ICMS") on gasoline in the year ended March 31, 2023;

   (i)   the effect on results from the interruption of activities in our refinery in Argentina for planned maintenance in the year ended March 31, 2023;

   (j)   recognition of expenses with variable compensation pertaining to the previous harvest year in the year ended March 31, 2022;

   (k)   extraordinary bad debts provision for passenger transportation in the year ended March 31, 2022; and

   (l)   impact from atypical currency depreciation on financial instruments not designated as hedge accounting, related to oil products imports in the year ended March 31, 2022.

We calculate Renewables Adjusted EBITDA as the Renewables segment's income before financial results and income tax and social contribution for the year/period adjusted by (i) depreciation and amortization expenses, (ii) biological assets fair value variations, (iii) IFRS-16 Leases, and (iv) the Other Non-Recurring Effects.

We calculate Sugar Adjusted EBITDA as the Sugar segment's income before financial results and income tax and social contribution for the year/period adjusted by (i) depreciation and amortization expenses, (ii) biological assets fair value variations, (iii) IFRS-16 Leases, and (iv) the Other Non-Recurring Effects.

We calculate Mobility Adjusted EBITDA as the Mobility segment's income before financial results and income tax and social contribution for the year/period adjusted by (i) depreciation and amortization expenses, (ii) assets from contracts with customers under IFRS-15, and (iii) the Other Non-Recurring Effects.

We believe that Consolidated Adjusted EBITDA and, with respect to each such segment, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA and Mobility Adjusted EBITDA provide a better understanding of our ability to generate results from our operating assets as they exclude the accounting effects of certain recurring and non-recurring income and expenses.

Consolidated EBITDA, Consolidated Adjusted EBITDA, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA and Mobility Adjusted EBITDA do not represent the cash flow for the periods presented and should not be considered as a basis for distribution of dividends, as substitutes for net operating revenue or as indicators of operating performance or liquidity.

For a reconciliation of our net income for the year/period to Consolidated EBITDA and Consolidated Adjusted EBITDA and a reconciliation of income before financial results and income tax and social contribution to each of Renewables Adjusted EBITDA, Sugar Adjusted EBITDA and Mobility Adjusted EBITDA to, see "Summary Financial and Other Information—Reconciliation of Non-GAAP Financial Measures."

*Leverage Ratio*

We calculate Leverage Ratio as the aggregate amount of third-party capital as of the end of the year/period divided by Consolidated Adjusted EBITDA for the year/ period. Third party capital comprises the sum of current and non-current loans and financing, net of cash and cash equivalents, current and non-current securities, financial investments linked to financing, Brazilian National Treasury Certificates (*Certificado do Tesouro Nacional*, or "CTN") and foreign exchange and interest rate swaps and other derivatives taken out to hedge our indebtedness.

Our management believes that disclosure of Leverage Ratio is useful to potential investors as it provides them with a clearer understanding of our financial liquidity. However, Leverage Ratio is not a measure of financial performance under Brazilian GAAP or IFRS and should not be used in isolation and should not be considered as an alternative to operating cash flows or as a measure of liquidity. Leverage Ratio does not have a standardized meaning, and our definition of Leverage Ratio may not be comparable with the definition used by other companies.

For the calculation of Leverage Ratio, see "Summary Financial and Other Information—Reconciliation of Non-GAAP Financial Measures."

*ROACE*

We calculate ROACE as (i) the sum of (a) income before financial results and income tax and social contribution, (b) biological assets fair value variations, (c) IFRS-16 Leases, except for amortization and depreciation expenses in connection therewith, and (d) the Other Non-Recurring Effects, except for amortization and depreciation expenses in connection therewith; *divided by* (ii) average capital employed. Capital employed is calculated as (i) capital employed – assets (consisting of the sum of current and noncurrent trade accounts receivable, inventories, current and noncurrent recoverable income tax and social contribution, current and noncurrent recoverable taxes, biological assets, property, plant and equipment, intangible assets, other assets, investments, related parties – commercial and administrative transactions and others, and rights of use) minus (ii) capital employed – liabilities (consisting of the sum of suppliers, payroll and related charges payable, income tax and social contribution payable, deferred income tax and social contribution, other liabilities, related parties – commercial and administrative transactions, and current and noncurrent lease liabilities). The average employed capital is the result of the weighted average of the capital employed of the current quarter and the capital employed of the four previous quarters. The weights are given respectively as Q(0)=12.5%, Q(-1)=25.0%, Q(-2)=25.0%, Q(-3)=12.5%, and Q(-4)=25.0%, where Q(0) represents the current quarter, Q(-1) represents the quarter before Q(0), Q(-2) represents the quarter before Q(-1), Q(-3) represents the quarter before Q(-2) and Q(-4) represents the quarter before Q(-3).

Our management believes that disclosure of ROACE is useful to potential investors as it provides them with a clearer understanding of our profitability. However, ROACE is not a measure of financial performance under Brazilian GAAP or IFRS and should not be used in isolation and should not be considered as an alternative to net income or as a measure of operating results. ROACE does not have a standardized meaning, and our definition of ROACE may not be comparable with the definition used by other companies.

For the calculation of ROACE, see "Summary Financial and Other Information—Reconciliation of Non-GAAP Financial Measures."

**Last Twelve Months ("LTM") Information**

This offering memorandum contains certain financial information for the twelve-month period ended June 30, 2024. Financial information for the twelve-month period ended June 30, 2024 has been calculated by adding financial information derived from our income statements for the three months ended June 30, 2024 to financial information derived from the income statements for the year ended March 31, 2024, and subtracting financial information derived from the income statements for the three months ended June 30, 2023. The presentation of this information is not made in accordance with IFRS. We present this data as a supplemental measure for investors in assessing our performance. This data is not necessarily indicative of the results that may be expected for the year ending March 31, 2025, and should not be used as the basis for, or prediction of, annualized calculation.

**Market Data**

We have obtained the market and competitive position data used throughout this offering memorandum, including market forecasts, from internal surveys, market research, publicly available information and industry publications. We have included, in this offering memorandum, information from reports prepared by us, the Central Bank, the B3, The Brazilian National Economic and Social Development Bank (*Banco Nacional de Desenvolvimento Econômico e Social*) ("BNDES"), the Getúlio Vargas Foundation (*Fundação Getúlio Vargas*) ("FGV"), the Brazilian Geographical and Statistical Institute (*Instituto Brasileiro de Geografia e Estatística*) ("IBGE"), the Organization for Economic Co-operation and Development ("OECD"), the International Renewable Energy Agency, the Brazilian Association of Biogas and Biomethane (*Associação Brasileira de Biogás e Biometano*), among others, which sources we believe are reliable. Industry publications generally state that the information presented therein has been obtained from sources believed to be reliable, but the accuracy and completeness of the information is not guaranteed. Although we have no reason to believe any of this information is inaccurate in any material respect, neither we, nor the initial purchasers have independently verified this information or make any representation as to the accuracy or completeness of the information. Similarly, our in-house research and estimates, which, while we believe they are reliable, have not been independently verified by the initial purchasers and we cannot assure you that the information is accurate. Nothing in this offering memorandum should be interpreted as a market forecast.

**Rounding**

Certain percentages and other amounts included in this offering memorandum have been rounded for ease of presentation. Any discrepancies between totals and the sums of the amounts listed are due to rounding.

## FORWARD-LOOKING STATEMENTS

This offering memorandum includes forward-looking statements within the meaning of the Securities Act or the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act").

Statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates" and similar expressions are forward-looking statements. Although we believe that these forward-looking statements are based upon reasonable assumptions, these statements are subject to several risks and uncertainties and are made in light of information currently available to us.

Our forward-looking statements may be influenced by numerous factors, including, without limitation, the following:

- delays or unexpected costs in the construction, expansion and operation of our bioenergy parks;

- volatility of supply, demand and the market price for our products;

- the modification, suspension, cancellation or non-renewal of the tax benefits that we have been granted;

- our ability to successfully compete in all segments and geographical markets where we currently conduct business or may conduct business in the future;

- geopolitical and other challenges and uncertainties, including due to the ongoing military conflicts between Russia and Ukraine and between Hamas and Israel;

- adverse weather conditions, including those related to climate change events causing physical and transition risks in the markets in which we operate, as well as crop disease and pestilence;

- price of natural gas, ethanol and other fuels, as well as sugar;

- significant disruptions in our production facilities and transportation and logistics services, as well as equipment failure and service interruptions;

- our international operations and ability to implement our expansion strategy in other regions of Brazil and international markets through organic growth, acquisitions, joint ventures or partnerships;

- our ability to implement our capital expenditure plan, including our ability to arrange financing when required and on reasonable terms;

- political instability and economic risks in Latin America (including as a result of government intervention, inflation, new taxes or tariffs and exchange rates), and changes in general economic, political and business conditions in Latin America;

- changes in customer demand;

- changes in our businesses;

- changes in global energy usage;

- appreciation and depreciation of the *real* against the U.S. dollar, which has experienced significant volatility since the beginning of the COVID-19 pandemic;

- other factors that may affect our financial condition, liquidity and results of our operations; and

- other risk factors discussed under "Risk Factors."

Words such as "believe," "should," "may," "might," "could," "seek," "aim," "likely," "will," "estimate," "continue," "anticipate," "intend," "expect" and other similar words used in this offering memorandum are intended to identify estimates and forward-looking statements. Estimates and forward-looking statements speak only as of the date they were made, and we undertake no obligation to update or to review any estimate and/or forward-looking statement because of new information, future events or other factors. Estimates and forward-looking statements involve risks and uncertainties, and are not guarantees of future performance. Our future results may differ materially from those expressed in these estimates and forward-looking statements. In light of the risks and uncertainties described above, the estimates and forward-looking statements discussed in this offering memorandum might not occur, and our future results and our performance may differ materially from those expressed in these forward-looking statements due to, but not limited to, the factors mentioned above. Because of these uncertainties, you should not make any investment decision based on these estimates and forward-looking statements.

Any future debt may limit our ability to pursue alternatives to fund our other liquidity needs. Any refinancing of our debt could be at higher interest rates and may require us to comply with more onerous covenants, such as restrictions on dividends distributions, limitations on the disposal of assets, among others. There can be no assurances that any assets that we could be required to dispose of could be sold or that, if sold, the timing of such sale and the amount of proceeds realized from such sale would be acceptable. If we are unsuccessful in any of these efforts, we may not have sufficient cash to meet our obligations.

If we fail to make any required payment under the agreements governing our indebtedness or fail to comply with restrictive covenants contained in them, we would be in default, and as a result, our debt holders would have the ability to require that we immediately repay our outstanding indebtedness and, as applicable, foreclose against the assets securing their borrowings. If these events occur, we could be forced into bankruptcy or liquidation. The acceleration of our indebtedness under one agreement may permit acceleration of indebtedness under other agreements that contain cross-default and cross-acceleration provisions. If our indebtedness is accelerated, we may not be able to repay our indebtedness or borrow sufficient funds to refinance it. Even if we are able to obtain new financing, it may not be on commercially reasonable terms or on terms that are acceptable to us. Alternatively, such acceleration could require us to sell assets and otherwise curtail operations to pay our creditors. If our debt holders require immediate payment, we may not have sufficient assets to satisfy our obligations under our indebtedness, and the proceeds from asset sales or curtailment of operations might not enable us to pay all of our liabilities.

Any failure to make payments on our indebtedness on a timely basis would likely result in a reduction of our credit rating, which could also harm our ability to incur additional indebtedness. See "—Any downgrade in the ratings of our debt securities, including the notes, would likely result in increased interest and other financial expenses related to our borrowings and debt securities and could reduce our liquidity and adversely affect the market price and marketability of the notes."

***Because the Issuer has no operations of its own, holders of the notes must depend on Raízen and its subsidiaries to provide the Issuer with sufficient funds to make payments on the notes when due.***

The Issuer, a wholly-owned indirect subsidiary of Raízen, on the date hereof, has no operations other than issuing and making payments on the notes and other indebtedness ranking equally with, or subordinated to, the notes, and using the proceeds therefrom as permitted by the documents governing these issuances, including lending the net proceeds of the notes and other indebtedness incurred by the Issuer to Raízen and its subsidiaries. Accordingly, the ability of the Issuer to pay principal, interest and other amounts due on the notes and other indebtedness will depend upon the financial condition and results of operations of Raízen and its subsidiaries that are debtors of the Issuer. In the event of an adverse change in the financial condition or results of operations of Raízen, Raízen Energia and their respective subsidiaries that are debtors of the Issuer, these entities may be unable to service their indebtedness to the Issuer, which would result in the failure of the Issuer to have sufficient funds to repay all amounts due on or with respect to the notes.

***The Guarantors rely, in part, on cash flows from their subsidiaries and jointly controlled companies that do not guarantee the notes to fund their obligations.***

In servicing payments to be made on their respective guarantees of the outstanding debt securities, the Guarantors may rely, in part, on cash flows from their subsidiaries and jointly controlled companies, mainly in the form of dividend payments. The ability of these subsidiaries and jointly controlled entities to make dividend payments to the Guarantors will be affected by, among other factors, the obligations of these entities to their creditors, requirements of Brazilian corporate and other law, and restrictions contained in agreements entered into by or relating to these entities. In the event that these subsidiaries and jointly controlled entities are unable to make dividend payments to the Guarantors due to insufficient cash flows, the Guarantors' liquidity may be adversely affected.

***Payments on the Guarantors' respective guarantees will be junior to each Guarantor's secured debt obligations and effectively junior to debt obligations of each Guarantor's subsidiaries and jointly controlled companies.***

The notes will be fully guaranteed by the Guarantors on an unsecured basis. Each such guarantee will rank equal in right of payment with all of the respective Guarantor's other existing and future senior unsecured

insolvency proceedings may, subject to legal reservations, have priority in enforcement when compared to the rights of unsecured creditors (including the holders of the notes). For further information with respect to security documents qualifying as financial collateral arrangements in Luxembourg, see "Enforceability of Civil Liabilities—Insolvency Proceedings in the EEA and in Luxembourg."

Holders of the notes may have more difficulty protecting their interests than would security holders of a corporation or limited liability company incorporated in a jurisdiction of the United States. The Issuer is incorporated under and subject to Luxembourg law. Luxembourg law differs in some material respects from laws generally applicable to U.S. corporations and security holders, including the provisions relating to interested directors, mergers, amalgamations and acquisitions, takeovers, security holder lawsuits and indemnification of directors.

Under Luxembourg law, the duties of directors, managers and officers of a company are generally owed to the company only. Holders of notes issued by Luxembourg companies generally do not have rights to take action against directors, managers or officers of the company, except in limited circumstances. Directors, managers or officers of a Luxembourg company, in exercising their powers and performing their duties, must act in good faith and in the interests of the company as a whole and must exercise due care, skill and diligence. Directors, managers or officers have a duty not to put themselves in a position in which their duties to the company and their personal interests may conflict, and also are under a duty to disclose any direct or indirect financial interest in any contract or arrangement with the company or any of its subsidiaries. If a director, manager or officer of a Luxembourg company is found to have breached his or her duties to that company, he or she may be held personally liable to the company in respect of that breach of duty.

### *Brazilian bankruptcy law may be less favorable to holders of the notes than bankruptcy and insolvency laws in other jurisdictions.*

If we are unable to pay our indebtedness as it falls due, including our obligations under the guarantee, then we may become subject to insolvency proceedings in Brazil. The bankruptcy law of Brazil currently in effect is significantly different from, and may be less favorable to creditors than, that of certain other jurisdictions. For example, holders of the notes may have limited voting rights at creditors' meetings in the context of a judicial reorganization proceeding. Under Brazilian bankruptcy law, in the event of our bankruptcy or liquidation, all of our debt obligations that are denominated in foreign currency, including the guarantee, will be converted into *reais* at the prevailing exchange rate on the date of declaration of our bankruptcy by the court. The obligations under the guarantee would be considered unsecured in case of a judicial reorganization, extrajudicial reorganization or bankruptcy liquidation, and would be subject to the reorganization plan or, in case of a bankruptcy liquidation, would be paid according to a statutory order pursuant to Brazilian bankruptcy law.

### *The Issuer is organized and existing under Luxembourg law, and Luxembourg law differs from U.S. law and may afford less protection to holders of the notes.*

Holders of the notes may have more difficulty protecting their interests than would security holders of a corporation incorporated in a jurisdiction of the United States. As a Luxembourg company, the Issuer is organized and existing under, and subject to the Luxembourg Companies Law, and other provisions of, Luxembourg law. The Luxembourg Companies Law differs in some material respects from laws generally applicable to U.S. corporations and security holders, including the provisions relating to interested directors, mergers, amalgamations and acquisitions, takeovers, security holder lawsuits and indemnification of directors.

Under Luxembourg law, the duties of directors, managers and officers of a company are generally owed to the company only. Holders of notes issued by Luxembourg companies generally do not have rights to take action against directors, managers or officers of the company, except in limited circumstances. Directors, managers or officers of a Luxembourg company must, in exercising their powers and performing their duties, act in good faith and in the interests of the company as a whole and must exercise due care, skill and diligence. Directors have a duty not to put themselves in a position in which their duties to the company and their personal interests may conflict and also are under a duty to disclose any personal interest in any contract or arrangement with the company or any of its subsidiaries. If a director or officer of a Luxembourg company is found to have breached his or her duties to that company, he or she may be held personally liable to the company in respect of that breach of duty and in accordance

# EXHIBIT N

**Excerpts of 2037/2054 Notes Offering Memorandum**

*IMPORTANT NOTICE*

THIS OFFERING IS AVAILABLE ONLY TO INVESTORS WHO ARE EITHER (i) QUALIFIED INSTITUTIONAL BUYERS ("QIBs"), WITHIN THE MEANING OF RULE 144A UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR (ii) NON-U.S. PERSONS, WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, OUTSIDE THE UNITED STATES.

**IMPORTANT: You must read the following before continuing.** The following applies to the offering memorandum (the "Offering Memorandum") following this page and you are advised to read this carefully before reading, accessing or making any other use of the Offering Memorandum. In accessing the Offering Memorandum, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER OF SECURITIES FOR SALE IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO. THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER JURISDICTION, AND THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE LAWS OF OTHER JURISDICTIONS.

**PROHIBITION OF SALES TO EEA RETAIL INVESTORS.** THE SECURITIES DESCRIBED IN THE OFFERING MEMORANDUM ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN THE EUROPEAN ECONOMIC AREA ("EEA"). FOR THESE PURPOSES, A RETAIL INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT, AS DEFINED IN POINT (11) OF ARTICLE 4(1) OF DIRECTIVE 2014/65/EU (AS AMENDED, "MIFID II"); (II) A CUSTOMER WITHIN THE MEANING OF DIRECTIVE (EU) 2016/97 (AS AMENDED, THE "INSURANCE DISTRIBUTION DIRECTIVE"), WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT, AS DEFINED IN POINT (10) OF ARTICLE 4(1) OF MIFID II; OR (III) NOT A QUALIFIED INVESTOR AS DEFINED IN REGULATION (EU) 2017/1129, AS AMENDED (THE "PROSPECTUS REGULATION"). CONSEQUENTLY, NO KEY INFORMATION DOCUMENT REQUIRED BY REGULATION (EU) NO 1286/2014 (THE "PRIIPS REGULATION") FOR OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO RETAIL INVESTORS IN THE EEA HAS BEEN PREPARED AND THEREFORE OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO ANY RETAIL INVESTOR IN THE EEA MAY BE UNLAWFUL UNDER THE PRIIPS REGULATION.

**PROHIBITION OF SALES TO U.K. RETAIL INVESTORS.** THE SECURITIES DESCRIBED IN THE OFFERING MEMORANDUM ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN THE UNITED KINGDOM ("U.K."). FOR THESE PURPOSES, A RETAIL INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT, AS DEFINED IN POINT (8) OF ARTICLE 2 OF REGULATION (EU) NO 2017/565 AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUROPEAN UNION (WITHDRAWAL) ACT 2018 (THE "EUWA"); (II) A CUSTOMER WITHIN THE MEANING OF THE PROVISIONS OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (AS AMENDED, THE "FSMA") AND ANY RULES OR REGULATIONS MADE UNDER THE FSMA TO IMPLEMENT THE INSURANCE DISTRIBUTION DIRECTIVE, WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT, AS DEFINED IN POINT (8) OF ARTICLE 2(1) OF REGULATION (EU) NO 600/2014 AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA; OR (III) NOT A QUALIFIED INVESTOR AS DEFINED IN ARTICLE 2 OF THE PROSPECTUS REGULATION AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA. CONSEQUENTLY, NO KEY INFORMATION DOCUMENT REQUIRED BY THE PRIIPS REGULATION AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUWA (THE "U.K. PRIIPS REGULATION") FOR OFFERING OR SELLING THE SECURITIES OR OTHERWISE MAKING THEM AVAILABLE TO RETAIL INVESTORS IN THE U.K. HAS BEEN PREPARED AND THEREFORE OFFERING OR SELLING THE SECURITIES OR OTHERWISE

MAKING THEM AVAILABLE TO ANY RETAIL INVESTOR IN THE U.K. MAY BE UNLAWFUL UNDER
THE U.K. PRIIPS REGULATION.

IN ADDITION, IN THE U.K., THE OFFERING MEMORANDUM AND ANY OTHER MATERIAL RELATING
TO THE SECURITIES DESCRIBED HEREIN ARE ONLY BEING DISTRIBUTED TO, AND ARE DIRECTED
ONLY AT, (I) PERSONS HAVING PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO
INVESTMENTS FALLING WITHIN ARTICLE 19(5) OF THE FINANCIAL SERVICES AND MARKETS ACT
2000 (FINANCIAL PROMOTION) ORDER 2005 (THE "ORDER"), OR (II) HIGH NET WORTH ENTITIES
FALLING WITHIN ARTICLE 49(2)(A) TO (D) OF THE ORDER, OR (III) PERSONS TO WHOM IT WOULD
OTHERWISE BE LAWFUL TO DISTRIBUTE THEM (ALL SUCH PERSONS TOGETHER BEING REFERRED
TO AS "RELEVANT PERSONS"). THE SECURITIES ARE ONLY AVAILABLE TO, AND ANY
INVITATION, OFFER OR AGREEMENT TO SUBSCRIBE, PURCHASE OR OTHERWISE ACQUIRE THE
SECURITIES WILL BE ENGAGED IN ONLY WITH, RELEVANT PERSONS. THE OFFERING
MEMORANDUM AND ITS CONTENTS ARE CONFIDENTIAL AND SHOULD NOT BE DISTRIBUTED,
PUBLISHED OR REPRODUCED (IN WHOLE OR IN PART) OR DISCLOSED BY ANY RECIPIENTS TO
ANY OTHER PERSON IN THE U.K. ANY PERSON IN THE U.K. THAT IS NOT A RELEVANT PERSON
SHOULD NOT ACT OR RELY ON THE OFFERING MEMORANDUM OR ITS CONTENTS.

THE FOLLOWING OFFERING MEMORANDUM MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY
OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER. ANY
FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS
UNAUTHORIZED. FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF
THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**Confirmation of Your Representation:** In order to be eligible to view the Offering Memorandum or make an
investment decision with respect to the securities, investors must be either (i) QIBs or (ii) non-U.S. persons (within
the meaning of Regulation S under the Securities Act) in the U.S. This Offering Memorandum is being sent at your
request and by accepting the e-mail and accessing the Offering Memorandum you shall be deemed to have
represented to us that (i) you and any customers you represent are either (a) QIBs or (b) non-U.S. persons (within
the meaning of Regulation S under the Securities Act); and (ii) you consent to delivery of the Offering
Memorandum by electronic transmission.

You are reminded that the Offering Memorandum has been delivered to you on the basis that you are a person into
whose possession the Offering Memorandum may be lawfully delivered in accordance with the laws of the
jurisdiction in which you are located and you may not, nor are you authorized to, deliver the Offering Memorandum
to any other person.

The materials relating to the offering do not constitute, and may not be used in connection with, an offer or
solicitation in any place where offers or solicitations are not permitted by law. If a jurisdiction requires that the
offering be made by a licensed broker or dealer and the initial purchasers or any affiliate of the initial purchasers is a
licensed broker or dealer in that jurisdiction, the offering shall be deemed to be made by the initial purchasers or
such affiliate on behalf of the issuer in such jurisdiction.

The Offering Memorandum has been sent to you in an electronic form. You are reminded that documents
transmitted via this medium may be altered or changed during the process of electronic transmission, and,
consequently, neither the initial purchasers, nor any person who controls them nor any of their directors, officers,
employees nor any of their agents nor any affiliate of any such person, accept any liability or responsibility
whatsoever in respect of any difference between the Offering Memorandum distributed to you in electronic form and
the hard copy version available to you on request from the initial purchasers.

**OFFERING MEMORANDUM**                                                                     **CONFIDENTIAL**



**Raizen Fuels Finance S.A.**
**US$1,000,000,000 6.700% Notes due 2037**
**US$750,000,000 6.950% Green Notes due 2054**
Unconditionally and Irrevocably Guaranteed by
**Raízen S.A. and Raízen Energia S.A.**

Raizen Fuels Finance S.A., a public limited liability company (*société anonyme*) organized under the laws of the Grand Duchy of Luxembourg ("Luxembourg"), having its registered office at 16, Rue Eugène Ruppert, L – 2453 Luxembourg and registered with the Luxembourg Trade and Companies' Register (*Registre de commerce et des sociétés, Luxembourg*) under number B184033, LEI 52990010NH26VC32Q522 (the "Issuer"), is offering (i) US$1,000,000,000 in aggregate principal amount of 6.700% notes due 2037 (the "2037 notes") and (ii) US$750,000,000 in aggregate principal amount of its 6.950% green notes due 2054 (the "2054 additional notes" and, together with the 2037 notes, the "notes"), which will be additional notes issued under the 2054 Indenture (as defined herein) under which, on March 5, 2024, we initially issued US$500,000,000 aggregate principal amount of 6.950% green notes due 2054 (the "2054 initial notes" and, together with the 2054 additional notes, the "2054 notes") and the 2054 Supplemental Indenture (as defined herein). The 2054 additional notes will become fully fungible with the 2054 initial notes following the termination of certain U.S. selling restrictions as described herein. All of the Issuer's obligations pursuant to the notes and the indenture under which they are issued will be fully and unconditionally guaranteed (the "guarantees"), on an unsecured basis, by Raízen S.A., a corporation (*sociedade por ações*) incorporated under the laws of the Federative Republic of Brazil ("Raízen"), and Raizen Energia S.A., a corporation (*sociedade por ações*) incorporated under the laws of the Federative Republic of Brazil ("Raízen Energia") (each, a "Guarantor" and, collectively, the "Guarantors"). The 2037 notes will bear interest at the rate of 6.700% per year and will mature on February 25, 2037. The 2054 additional notes will bear interest at the rate of 6.950% per year and will mature on March 5, 2054. Interest on the 2037 notes will be payable on February 25 and August 25 of each year, beginning on August 25, 2025. Interest on the 2054 additional notes will be payable on March 5 and September 5 of each year, beginning on March 5, 2025. The notes and each guarantee will be unsecured and will rank equally in right of payment with the other unsecured unsubordinated indebtedness of the Issuer and the relevant Guarantor, respectively. The notes and the guarantees will be effectively junior to the secured indebtedness of the Issuer and the Guarantors to the extent of the value of the assets securing such indebtedness and structurally subordinated to the indebtedness of the Issuer's and the Guarantors' non-guarantor subsidiaries and jointly controlled companies. See "Description of the Notes."

At any time before November 25, 2036, which is the date that is three months prior to the maturity of the 2037 notes (the "2037 Notes Par Call Date"), the Issuer or any Guarantor may redeem the 2037 notes at its option, in whole or in part, at any time and from time to time, by paying 100% of the principal amount of the notes *plus* a "make-whole" amount and accrued and unpaid interest and Additional Amounts (as defined herein), if any, to, but excluding, the redemption date. If the redemption date of the 2037 notes is on or after the 2037 Notes Par Call Date, the redemption price will equal 100% of the principal amount of the 2037 notes, *plus* accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date. At any time before September 5, 2053, which is the date that is six months prior to the maturity of the 2054 notes (the "2054 Notes Par Call Date"), the Issuer or any Guarantor may redeem the 2054 notes at its option, in whole or in part, at any time and from time to time, by paying 100% of the principal amount of the 2054 notes *plus* a "make-whole" amount and accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date. If the redemption date of the 2054 notes is on or after the 2054 Notes Par Call Date, the redemption price will equal 100% of the principal amount of the 2054 notes, *plus* accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the redemption date. See "Description of the Notes—Redemption—Optional Redemption." The notes of a series may also be redeemed by the Issuer or any Guarantor, at its option, in whole but not in part, at 100% of their principal amount *plus* accrued and unpaid interest and Additional Amounts, if any, at any time upon the occurrence of specified tax events, as set forth in this offering memorandum. See "Description of the Notes—Redemption—Redemption for Taxation Reasons." If a Change of Control (as defined herein) that results in a Rating Decline (as defined herein) with respect to a series of notes occurs, unless the Issuer or any Guarantor has exercised its option to redeem all of the outstanding notes of such series, the Issuer or any Guarantor will be required to offer to purchase the notes of such series at a purchase price equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest and Additional Amounts, if any, to, but excluding, the purchase date. See "Description of the Notes—Certain Covenants—Purchase of Notes Upon Change of Control Event."

The 2054 additional notes are expected to trade under the same CUSIP/ISIN numbers as the 2054 initial notes; provided that the 2054 additional notes sold pursuant to Regulation S (as defined herein) under the Securities Act (as defined herein), will have a different CUSIP/ISIN from, and will not be fungible with, the 2054 initial notes sold pursuant to Regulation S under the Securities Act during the period prior to and including the 40th day following the issue date of the 2054 additional notes. After the 40th day following such date, certain selling restrictions with respect to the 2054 additional notes sold pursuant to Regulation S under the Securities Act will terminate and the 2054 additional notes sold pursuant to Regulation S under the Securities Act will become fully fungible with, and have the same CUSIP/ISIN as, the 2054 initial notes sold pursuant to Regulation S under the Securities Act. The 2054 additional notes constitute a further issuance of, and will have identical terms and conditions as the 2054 initial notes, other than the issue date, issue price and initial interest payment date, and will constitute part of the same series as, vote together as a single class with, and be fungible with, the 2054 initial notes. Upon closing of this offering, the aggregate principal amount of 2054 notes, assuming all 2054 additional notes offered hereby are sold, will be US$1,250,000,000.

Application will be made to list the 2037 notes on the Official List of the Luxembourg Stock Exchange (the "LuxSE") and to admit the 2037 notes to trading on the Euro MTF Market of the LuxSE (the "Euro MTF"). There are no assurances that the 2037 notes will be listed on the Official List of the LuxSE or admitted to trading on the Euro MTF. The 2054 initial notes are currently listed on the Official List of the LuxSE and admitted to trading on the Euro MTF. The Issuer will apply to list the 2054 additional notes on the Official List of the LuxSE and to have them admitted to trading on the Euro MTF. There are no assurances that the 2054 additional notes will be listed on the Official List of the LuxSE or admitted to trading on the Euro MTF. See "Listing and General Information."

**Investing in the notes involves risks. See "Risk Factors" beginning on page 29 of this offering memorandum.**

This offering memorandum has been prepared on the basis that any offer of the notes in any member state ("Member State") of the European Economic Area (the "EEA") will be made pursuant to an exemption under Regulation (EU) 2017/1129 of the European Parliament and of the Council of June 14, 2017 on the prospectus to be published when securities are offered to the public or admitted to trading on a regulated market, and repealing Directive 2003/71/EC, as amended (the "Prospectus Regulation"), and under any implementing legislation in each Member State, from the requirement to publish a prospectus for offers of notes. This offering memorandum is not a prospectus for purposes of the Prospectus Regulation, and under any implementing legislation in each Member State, and has not been approved by a competent authority within the meaning of the Prospectus Regulation. This offering memorandum has been prepared on the basis that any offer of the notes in the United Kingdom (the "UK"), will be made pursuant to an exemption from the obligation to publish a prospectus under Section 86 of the Financial Services and Markets Act 2000 (the "FSMA"), in the UK. This offering memorandum is not a prospectus for purposes of the UK Prospectus Regulation (meaning Regulation (EU) 2017/1129 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018 (the "EUWA"), and has not been approved by the UK Financial Conduct Authority (the "FCA").

The notes and the guarantees have not been, and will not be, registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws. The notes may not be offered or sold within the United States or to U.S. persons, except to qualified institutional buyers in reliance on the exemption from registration provided by Rule 144A under the Securities Act ("Rule 144A"), and to certain non-U.S. persons in offshore transactions in reliance on Regulation S under the Securities Act ("Regulation S"). You are hereby notified that sellers of the notes may be relying on the exemption from the provisions of

Section 5 of the Securities Act provided by Rule 144A. For more information about restrictions on transfer of the notes, see "Transfer Restrictions." **Neither the U.S. Securities and Exchange Commission (the "SEC"), nor any state securities commission has approved or disapproved of the notes or the guarantee or determined if this offering memorandum is accurate or complete. Any representation to the contrary is a criminal offense.**

––––––––––––––

**Issue price of the 2037 notes: 99.585%** *plus* **accrued interest, if any, from February 25, 2025.**

**Issue price of the 2054 additional notes: 96.347%** *plus* **accrued interest, from September 5, 2024 to, but excluding February 25, 2025 in the amount of US$24,614,583.33, or US$32.82 per US$1,000 principal amount of the 2054 additional notes, plus accrued interest from February 25, 2025 if settlement occurs after that date.**

––––––––––––––

Delivery of the notes to purchasers in book-entry form through The Depository Trust Company ("DTC"), and its direct and indirect participants, including Clearstream Banking S.A. ("Clearstream"), and Euroclear Bank SA/NV, as operator of the Euroclear System ("Euroclear"), is expected on or about February 25, 2025.

––––––––––––––

*Global Coordinators and Joint Book Runners*

| **Bofa Securities** | **Citigroup** | **Itau BBA** | **J.P. Morgan** | **Morgan Stanley** |

*Joint Book Runners*

| **BNP PARIBAS** | **Bradesco BBI** | **Crédit Agricole CIB** | **Santander** | **SMBC Nikko** |

The date of this offering memorandum is February 20, 2025.

**TABLE OF CONTENTS**

Page

PRESENTATION OF FINANCIAL AND OTHER INFORMATION .................................................vi

FORWARD-LOOKING STATEMENTS ..................................................................................... xiii

SUMMARY .................................................................................................................................1

THE OFFERING .........................................................................................................................14

SUMMARY FINANCIAL AND OTHER INFORMATION .............................................................20

RISK FACTORS ..........................................................................................................................29

USE OF PROCEEDS ...................................................................................................................71

CAPITALIZATION .....................................................................................................................72

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
OF OPERATIONS .......................................................................................................................74

INDUSTRY ...............................................................................................................................103

BUSINESS ...............................................................................................................................126

REGULATORY OVERVIEW .....................................................................................................155

MANAGEMENT ......................................................................................................................173

PRINCIPAL SHAREHOLDERS .................................................................................................184

RELATED PARTY TRANSACTIONS .........................................................................................186

DESCRIPTION OF THE NOTES ...............................................................................................188

TAXATION ..............................................................................................................................219

THE ISSUER AND THE GUARANTORS ...................................................................................230

TRANSFER RESTRICTIONS ....................................................................................................231

ENFORCEABILITY OF CIVIL LIABILITIES ...............................................................................234

PLAN OF DISTRIBUTION ........................................................................................................241

CERTAIN ERISA CONSIDERATIONS ......................................................................................249

LEGAL MATTERS ...................................................................................................................251

INDEPENDENT AUDITORS .....................................................................................................252

LISTING AND GENERAL INFORMATION ...............................................................................253

INDEX TO FINANCIAL STATEMENTS .....................................................................................F-1

_____

**You should rely only on the information contained in this offering memorandum. Neither we nor the initial purchasers have authorized anyone to provide you with different information. Neither we nor the initial purchasers are making an offer of the notes (or the related guarantee) in any jurisdiction where the offer is not permitted. You should not assume that the information contained in this offering memorandum is accurate as of any date other than the date on the cover of this offering memorandum.**

Unless otherwise indicated or the context otherwise requires, all references in this offering memorandum to (1) "Raízen," the "Company," "our Company," "we," "our," "ours," "us" or similar terms are to Raízen and its consolidated subsidiaries, which include Raízen Energia and the Issuer; (2) "Cosan" are to Cosan S.A.; (3) "Shell

1

Holding" are to Shell Brazil Holding B.V.; and (4) "Shell" are to Royal Dutch Shell plc. All references in this offering memorandum to our "controlling shareholders" are to Cosan and Shell.

References to the "initial purchasers" are to BofA Securities, Inc., Citigroup Global Markets Inc., Itau BBA USA Securities, Inc., J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, BNP Paribas Securities Corp., Banco Bradesco BBI S.A., Credit Agricole Securities (USA) Inc., Santander US Capital Markets LLC and SMBC Nikko Securities America, Inc.

References to the "2037 Indenture" shall mean the indenture governing the 2037 notes, to be dated as of the issue date of the 2037 notes. References to the "2054 Indenture" shall mean the indenture governing the 2054 initial notes and the 2054 additional notes, dated as of March 5, 2024. References to the "2054 Supplemental Indenture" shall mean the supplemental indenture pursuant to which the 2054 additional notes will be issued, to be dated as of the issue date of the 2054 additional notes. References to the indentures shall mean the 2037 Indenture, the 2054 Indenture and the 2054 Supplemental Indenture.

This offering memorandum has been prepared by us solely for use in connection with the proposed offering of the notes (and the related guarantees) described in this offering memorandum. This offering memorandum is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire notes (or the related guarantees). Distribution of this offering memorandum to any person other than a prospective investor and any person retained to advise such prospective investor with respect to its purchase is unauthorized, and any disclosure of any of its contents, without our prior written consent, is prohibited. Each prospective investor, by accepting delivery of this offering memorandum, agrees to the foregoing and to make no photocopies of this offering memorandum or any documents referred to in this offering memorandum.

Neither the initial purchasers nor any of their directors, affiliates, advisors or agents make any representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this offering memorandum. Nothing contained in this offering memorandum is, or shall be relied upon as, a promise or representation by the initial purchasers or by any of their directors, affiliates, advisors or agents as to the past or future.

The notes (and the related guarantees) are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom. As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time. See "Plan of Distribution" and "Transfer Restrictions."

In making an investment decision, prospective investors must rely on their own examination of our Company and the terms of this offering, including the merits and risks involved. The contents of this offering memorandum are not, and prospective investors should not construe anything in this offering memorandum as, legal, business or tax advice. Each prospective investor should consult its own legal, business, tax or other advisors as needed to make its investment decision and to determine whether it is legally permitted to purchase the notes under applicable law.

This offering memorandum contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All such summaries are qualified in their entirety by reference to such documents. Copies of documents referred to in this offering memorandum will be made available to prospective investors upon request to us or the initial purchasers.

Each person receiving this offering memorandum acknowledges that this offering memorandum may not contain all information that would be included in a prospectus if this offering were registered under the Securities Act.

**PROHIBITION OF SALES TO EEA RETAIL INVESTORS**

The notes (and the related guarantees) described in this offering memorandum are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the EEA. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU, as amended ("MiFID II"); (ii) a customer within the meaning of Directive 2016/97/EU, as amended (the "Insurance Distribution Directive"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a qualified investor as defined in the Prospectus Regulation. Consequently, no key information document required by Regulation (EU) No. 1286/2014, as amended (the "PRIIPs Regulation"), for offering or selling the notes or otherwise making them available to retail investors in the EEA has been prepared and, therefore, offering or selling the notes or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation. This offering memorandum has been prepared on the basis that any offer of notes in any Member State of the EEA will be made pursuant to an exemption under the Prospectus Regulation, and under any implementing legislation in each Member State, from the requirement to publish a prospectus for offers of notes.

**PROHIBITION OF SALES TO UK RETAIL INVESTORS**

The notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the UK. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client, as defined in point (8) of Article 2 of Regulation (EU) No. 2017/565 as it forms part of domestic law by virtue of the EUWA; (ii) a customer within the meaning of the provisions of the FSMA and any rules or regulations made under the FSMA to implement Directive (EU) 2016/97, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of Regulation (EU) No. 600/2014 as it forms part of domestic law by virtue of the EUWA; or (iii) not a qualified investor as defined in Article 2 of the UK Prospectus Regulation as it forms part of domestic law by virtue of the EUWA. Consequently, no key information document required by Regulation (EU) No. 1286/2014 as it forms part of domestic law by virtue of the EUWA (the "UK PRIIPs Regulation") for offering or selling the notes or otherwise making them available to retail investors in the UK has been prepared and therefore offering or selling the notes or otherwise making them available to any retail investor in the UK may be unlawful under the UK PRIIPs Regulation.

The above selling restriction is in addition to any other selling restrictions set forth in this offering memorandum.

**MiFID PRODUCT GOVERNANCE/
PROFESSIONAL INVESTORS AND ECPS ONLY TARGET MARKET**

Solely for the purposes of the product approval process of the Issuer and the Guarantors (each a "Manufacturer"), the target market assessment in respect of the notes described in this offering memorandum has led to the conclusion that (i) the target market for the notes is eligible counterparties and professional clients only, each as defined in MiFID II; and (ii) all channels for distribution of the notes to eligible counterparties and professional clients are appropriate. Any person subsequently offering, selling or recommending the notes (a "distributor") should take into consideration the Manufacturers' target market assessment; however, and without prejudice to the Issuer's obligations in accordance with MiFID II, a distributor subject to MiFID II is responsible for undertaking its own target market assessment in respect of the notes (by either adopting or refining the manufacturers' target market assessment) and determining appropriate distribution channels.

**NOTICE TO PROSPECTIVE INVESTORS IN LUXEMBOURG**

This offering memorandum has not been approved by and will not be submitted for approval to the Luxembourg Financial Services Authority (*Commission de Surveillance du Secteur Financier*) for purposes of a public offering or sale in Luxembourg. Accordingly, the notes may not be offered or sold to the public in Luxembourg, directly or indirectly, and neither this offering memorandum nor any other offering memorandum, form of application, advertisement or other material related to such notes may be distributed, or otherwise be made available in or from, or published in, Luxembourg except in circumstances where the offer benefits from an

exemption to or constitutes a transaction not subject to the requirement to publish a prospectus, in accordance with the Prospectus Regulation and the Luxembourg law of 16 July 2019, on prospectuses for securities.

**NOTICE TO PROSPECTIVE INVESTORS WITHIN BRAZIL**

The offer and sale of the notes and related guarantees have not been and will not be registered with the Brazilian securities commission (*Comissão de Valores Mobiliários*, or "CVM") and, therefore, will not be carried out by any means that would constitute a public offering in Brazil under CVM Resolution No. 160, dated July 13, 2022, as amended ("Resolution 160"), or unauthorized distribution under Brazilian laws and regulations. The notes and related guarantees will be authorized for trading on organized non-Brazilian securities markets and may only be offered to Brazilian professional investors (as defined by applicable CVM regulation), who may only acquire the notes and related guarantees through a non-Brazilian account, with settlement outside Brazil in non-Brazilian currency. The trading of these securities on regulated securities markets in Brazil is prohibited.

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

All references in this offering memorandum to "*real*," "*reais*" or "R$" are to the Brazilian *real*, the official currency of Brazil. All references to "U.S. dollars" or "US$" are to U.S. dollars, the official currency of the United States.

As of December 31, 2024, the exchange rate for *reais* into U.S. dollars was R$6.1923 to US$1.00, based on the selling rate as reported by the Central Bank. As of March 31, 2024, 2023 and 2022, the exchange for *reais* into U.S. dollars rate was, respectively, R$4.9962 to US$1.00, R$5.0804 to US$1.00 and R$4.7378 to US$1.00, in each case, based on the selling rate as reported by the Central Bank.

Solely for the convenience of the reader, we have translated certain real amounts in this offering memorandum into U.S. dollars at the selling rate as of December 31, 2024 as reported by the Central Bank. These translations (i) should not be considered representations that any such amounts have been, could have been or could be converted into U.S. dollars at that or at any other exchange rate and (ii) do not necessarily represent amounts in accordance with accounting practices adopted in Brazil ("Brazilian GAAP"), as issued by the Comitê de Pronunciamentos Contábeis ("CPC"), or International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board (the "IASB").

### Financial Statements

#### *Raízen Financial Statements*

We maintain our books and records in *reais*. Due to our harvest year and corporate production cycle, our fiscal year begins on April 1 of each year and ends on March 31 of the following year.

Our financial information contained in this offering memorandum has been derived from our records and financial statements, and includes our individual and consolidated unaudited interim financial information as of December 31, 2024 and for the nine months ended December 31, 2024 and 2023 (our "interim consolidated financial statements"), and our audited individual and consolidated financial statements as of March 31, 2024 and 2023 and for the years ended March 31, 2024 and 2023, which includes corresponding figures for the year ended March 31, 2022 (together, our "audited consolidated financial statements" and, together with the interim consolidated financial statements, our "consolidated financial statements").

Our audited consolidated financial statements for the year ended March 31, 2024 are not entirely comparable with the audited consolidated financial statements for the year ended March 31, 2023 or for the year ended March 31, 2022, substantially due to (i) the corporate reorganization as a result of which Raízen became the sole shareholder of Raízen Energia completed on June 1, 2021 (the "Group Reorganization") (the results of Raízen Energia for the months of April and May 2021 are not included in the audited consolidated financial statements for the year ended March 31, 2022) and (ii) the acquisition of (a) Biosev S.A. (currently, Raízen Centro-Sul S.A.) ("Biosev") from Hédera Investimentos e Participações S.A., on August 10, 2021 (the "Biosev Acquisition"); (b) the fuel distribution network in Paraguay from Barcos & Rodados S.A. (currently, Raízen Paraguay S.A. ("Raízen Paraguay")), on November 1, 2021 (the "Barcos & Rodados Acquisition"); (c) of Neolubes Indústria de Lubrificantes Ltda., which operates Shell's lubricant manufacturing business in Brazil, on May 1, 2022 (the "Neolubes Acquisition"), and (d) the fintech Payly Holding Ltda. and its controlled company Payly Instituição de Pagamentos S.A. (together, "Payly") on October 17, 2022.

For additional information regarding acquisitions we completed in the periods under review, see "Business—Our History."

We have prepared our audited consolidated financial statements in accordance with Brazilian GAAP, as issued by the CPC, and with IFRS, as issued by the IASB. We have prepared our interim consolidated financial statements in accordance with Accounting Pronouncement NBC TG 21 – Interim Financial Reporting, and IAS 34 - Interim Financial Reporting, issued by the IASB as well as for the fair presentation of this information in conformity with the rules issued by CVM applicable to the preparation of the Quarterly Information Form (ITR).

*Segment Information and Presentation of Segment Financial Data*

As of December 31, 2024, our business was organized into four reporting segments, which corresponded to our principal production processes, products and services:

- **Mobility**: mainly refers to the trade and sale activities of fossil and renewable fuels and production and distribution of lubricants, through a franchised network of service stations under the Shell brand throughout the national territory and in the broader Latin America region, operating in Argentina and Paraguay.

- **Sugar**: refers to sugar production, sale, origination and trading activities.

- **Renewables**: refers to: (a) ethanol production, sale, origination and trading activities; (b) production and sale of bioenergy; (c) resale and trading of electric power; and (d) production and sale of other renewable products (solar energy and biogas). These activities were aggregated into a single segment, as their products and services come from renewable sources, use similar technologies, and present synergies in their production and distribution process. The combination of these activities results in the portfolio of clean energy and the retirement of carbon credits offered by the Company. The performance of these activities is assessed on an integrated basis by management through our operating results.

- **Other segments**: refers to convenience and proximity stores business and financial products and services businesses.

During the year ended March 31, 2024, we reassessed our internal organization and the breakdown of our segments, which resulted in the following changes in our reportable segments: (i) new operating segment called "Other segments," which represents the convenience and proximity store businesses and financial products and services businesses; and (ii) allocation of general and administrative expenses related to corporate areas as "Non-segmented." Segment information included in this offering memorandum for years ended prior to March 31, 2024 has been determined by retroactively applying the definition of the segments above to the historical consolidated financial information.

For more information on our segments, see note 4 to our interim consolidated financial statements included elsewhere in this offering memorandum.

*Issuer Financial Statements*

We have not included any financial statements for the Issuer in this offering memorandum. The Issuer does not, and will not, publish financial statements, except for financial statements that it is required to publish under the laws of Luxembourg. In addition, the Issuer will not furnish to the trustee or the holders of the notes any financial statements of, or other reports relating to, the Issuer. The Issuer's obligations under the notes will be fully and unconditionally guaranteed by Raízen and Raízen Energia. The financial condition and results of operations of the Issuer have been fully consolidated in our consolidated financial statements, which consolidate the financial condition and results of operations of Raízen and its subsidiaries (including Raízen Energia and the Issuer). See "Risk Factors—Risks Related to the Notes and the Guarantees and Our Other Indebtedness—Because the Issuer has no operations of its own, holders of the notes must depend on Raízen and its subsidiaries to provide the Issuer with sufficient funds to make payments on the notes when due."

**Special Note Regarding Non-GAAP Financial Measures**

We present certain non-GAAP financial measures in this offering memorandum: Consolidated EBITDA, Consolidated Adjusted EBITDA, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA, Mobility Adjusted EBITDA, Leverage Ratio and Return on Average Capital Employed ("ROACE") (the "Non-GAAP Financial Measures").

Our management believes that Consolidated EBITDA, Consolidated Adjusted EBITDA, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA, Mobility Adjusted EBITDA, Leverage Ratio and ROACE provide useful information to potential investors, financial analysts and the public in their review of our operating and financial performance and their comparison of our operating and financial performance to the performance of other companies in the same industry and other industries. However, Consolidated EBITDA, Consolidated Adjusted EBITDA, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA, Mobility Adjusted EBITDA, Leverage Ratio and ROACE are not measures of financial performance under Brazilian GAAP or IFRS. These Non-GAAP Financial Measures should not be considered in isolation and do not represent cash flows for the presented years and should not be considered as substitutes for net income (loss), indicators of operating performance, substitutes for cash flows, indicators of liquidity or a basis for the distribution of dividends. The Non-GAAP Financial Measures do not have a standard meaning and are not necessarily comparable to other similarly titled measures used by other companies due to differences in the method of calculation. The Non-GAAP Financial Measures should be viewed as supplemental to, and not substitutive for, our financial statements included elsewhere in this offering memorandum. Because the Non-GAAP Financial Measures are not prepared in accordance with Brazilian GAAP or IFRS, investors are cautioned not to place undue reliance on this information. For a reconciliation of the Non-GAAP Financial Measures to the most directly comparable IFRS measures, see "Summary Financial and Other Information—Non-GAAP Financial Measures."

### *Consolidated EBITDA, Consolidated Adjusted EBITDA, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA and Mobility Adjusted EBITDA*

We calculate Consolidated EBITDA in accordance with CVM Resolution No. 156, dated June 23, 2022 ("CVM Resolution No. 156"). Consolidated EBITDA is calculated as consolidated net income for the year/period plus income tax and social contribution, financial results, and depreciation and amortization expenses. Although EBITDA has a standard meaning under CVM Resolution No. 156, we cannot assure you that other companies, including privately held companies, will adopt this same standard. Therefore, if the standard meaning established by CVM Resolution No. 156 is not adopted by other companies, our Consolidated EBITDA may not be comparable to that of other comparable companies. Our management believes that Consolidated EBITDA reflects our operating performance and provides for information on our ability to comply with obligations and obtain funds for capital expenditures and working capital. We disclose Consolidated EBITDA as this performance metric is frequently used by analysts, investors, creditors and other interested parties in evaluating companies in our sector. However, Consolidated EBITDA has limitations that hinder its use as a liquidity measure as it does not consider certain costs arising from our business, which could significantly affect profit, such as the amount of reinvestment necessary for operating maintenance. Accordingly, Consolidated EBITDA must be used in conjunction with generally accepted accounting measures.

We calculate Consolidated Adjusted EBITDA as Consolidated EBITDA for the year/period adjusted by:

(i) *biological assets fair value variations*: we eliminate the variation in the fair value of biological assets included in the cost of products sold and services provided because they reflect the remeasurement of the generation of results from biological assets in up to two years at market value. According to IAS 41 Agriculture, "the fair value of a biological asset or agricultural produce is its market price less any costs to sell the produce." Therefore, the fair value of a biological asset is an estimation of future net value recoverable of our sugarcane crops and does not impact the results of the current period, but of future years. Biological assets fair value variations are recorded in our Sugar & Renewables segments;

(ii) *assets from contracts with customers under IFRS-15*: we eliminate the effects of the amortization of advanced bonuses to resellers in the Mobility segment, which are conditioned upon deadlines and future performance, including the consumption of minimum volumes set forth in the supply agreement. Once contractual conditions are met, the bonuses are amortized and recognized as a reduction in income in our net operating revenue. However, such reduction does not reflect our operating performance;

(iii) *IFRS-16 Leases*: we eliminate the effects of the amortization of finance lease agreements, which do not reflect our operating performance. Since 2019, when IFRS 16 Leases came into effect, the amortization of finance lease agreements must be recorded as depreciation and amortization expenses, which is a component of the

calculation of EBITDA, therefore generating higher EBITDA. We and peers in our industry continue to highlight and eliminate these effects due to their relevance; and

(iv) *other non-recurring effects involving material gains or losses* (the "Other Non-Recurring Effects"):

(a) accounting effect (no cash effect) as a result of the reversal of gains on financial instruments linked to future contracts for sugar and ethanol in the nine months ended December 31, 2024;

(b) provision for losses on certain assets and investments in the Renewables segment in the nine months ended December 31, 2024, as it has a non-recurring effect to our results;

(c) non-recurring expenses related to the restructuring and downsizing of the organizational and administrative structure in Argentina in the nine months ended December 31, 2024, as it affected our cash flow in the period;

(d) divestment of certain derivatives trading operations in the nine months ended December 31, 2024, as it has a non-recurring effect to our results;

(e) dilution of ownership in Raízen Paraguay S.A. operations in the nine months ended December 31, 2024, as it has a non-recurring effect to our results;

(f) expenses related to the simplification of the administrative and operational structure, resulting from the beginning of the asset portfolio review process in the organizational structure in the nine months ended December 31, 2024, as it affected our cash flow in the period;

(g) accounting effect (no cash effect) as a result of the hedge accounting for debts protecting ethanol exports made in the past by Biosev in the years ended March 31, 2024 and March 31, 2023 as well as other non-recurring expenses and effects related to the Biosev Acquisition in the year ended March 31, 2022;

(h) expenses with one-off contingencies related to the government's Zero Litigation (*Litígio Zero*) program, under which the Brazilian government granted participants the benefit to use tax credits to pay interests and fines due under tax proceedings, in the year ended March 31, 2024;

(i) the result of the impairment loss recognition for the subsidiary Raízen Biomassa S.A., with the corresponding entry recorded in the income statement in the year ended March 31, 2024;

(j) gain from reversal of provision for loss on investments in logistics in the years ended March 31, 2023 and March 31, 2022;

(k) additional provision for compensation related to business performance in the years ended March 31, 2023 and March 31, 2022;

(l) accounting result from the Neolubes Acquisition in the years ended March 31, 2024 and March 31, 2023;

(m) gains from one-off federal Social Integration Program (*Programa de Integração Social*) ("PIS") and Contribution for Social Security Funding (*Contribuição para o Financiamento da Seguridade Social*) ("COFINS") tax credits and other tax credits in the nine months ended December 31, 2024 and the years ended March 31, 2024, 2023 and 2022;

(n) impact on inventory from the reduction in PIS and COFINS taxes and state value-added tax ("ICMS") on gasoline in the year ended March 31, 2023;

(o)  the effect on results from the interruption of activities in our refinery in Argentina for planned maintenance in the year ended March 31, 2023;

(p)  recognition of expenses with variable compensation pertaining to the previous harvest year in the year ended March 31, 2022;

(q)  extraordinary bad debts provision for passenger transportation in the year ended March 31, 2022; and

(r)  impact from atypical currency depreciation on financial instruments not designated as hedge accounting, related to oil products imports in the year ended March 31, 2022.

We calculate Renewables Adjusted EBITDA as the Renewables segment's income before financial results and income tax and social contribution for the year/period adjusted by (i) depreciation and amortization expenses, (ii) biological assets fair value variations, (iii) IFRS-16 Leases, and (iv) the Other Non-Recurring Effects.

We calculate Sugar Adjusted EBITDA as the Sugar segment's income before financial results and income tax and social contribution for the year/period adjusted by (i) depreciation and amortization expenses, (ii) biological assets fair value variations, (iii) IFRS-16 Leases, and (iv) the Other Non-Recurring Effects.

We calculate Mobility Adjusted EBITDA as the Mobility segment's income before financial results and income tax and social contribution for the year/period adjusted by (i) depreciation and amortization expenses,  (ii) assets from contracts with customers under IFRS-15, and (iii) the Other Non-Recurring Effects.

We believe that Consolidated Adjusted EBITDA and, with respect to each such segment, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA and Mobility Adjusted EBITDA provide a better understanding of our ability to generate results from our operating assets as they exclude the accounting effects of certain recurring and non-recurring income and expenses.

Consolidated EBITDA, Consolidated Adjusted EBITDA, Renewables Adjusted EBITDA, Sugar Adjusted EBITDA and Mobility Adjusted EBITDA do not represent the cash flow for the periods presented and should not be considered as a basis for distribution of dividends, as substitutes for net operating revenue or as indicators of operating performance or liquidity.

For a reconciliation of our net income for the year/period to Consolidated EBITDA and Consolidated Adjusted EBITDA and a reconciliation of income before financial results and income tax and social contribution to each of Renewables Adjusted EBITDA, Sugar Adjusted EBITDA and Mobility Adjusted EBITDA to, see "Summary Financial and Other Information—Reconciliation of Non-GAAP Financial Measures."

### Leverage Ratio

We calculate Leverage Ratio as the aggregate amount of third-party capital as of the end of the year/period divided by Consolidated Adjusted EBITDA for the year/ period. Third party capital comprises the sum of current and non-current loans and financing, net of cash and cash equivalents, current and non-current securities, financial investments linked to financing, Brazilian National Treasury Certificates (*Certificado do Tesouro Nacional*, or "CTN") and foreign exchange and interest rate swaps and other derivatives taken out to hedge our indebtedness.

Our management believes that the disclosure of Leverage Ratio is useful to potential investors as it provides them with a clearer understanding of our financial liquidity. However, Leverage Ratio is not a measure of financial performance under Brazilian GAAP or IFRS and should not be used in isolation and should not be considered as an alternative to operating cash flows or as a measure of liquidity. Leverage Ratio does not have a standardized meaning, and our definition of Leverage Ratio may not be comparable with the definition used by other companies.

For the calculation of Leverage Ratio, see "Summary Financial and Other Information—Reconciliation of Non-GAAP Financial Measures."

***ROACE***

We calculate ROACE as (i) the sum of (a) income before financial results and income tax and social contribution, (b) biological assets fair value variations, (c) IFRS-16 Leases, except for amortization and depreciation expenses in connection therewith, and (d) the Other Non-Recurring Effects, except for amortization and depreciation expenses in connection therewith; *divided by* (ii) average capital employed. Capital employed is calculated as (i) capital employed – assets (consisting of the sum of current and noncurrent trade accounts receivable, inventories, current and noncurrent recoverable income tax and social contribution, current and noncurrent recoverable taxes, biological assets, property, plant and equipment, intangible assets, other assets, investments, related parties – commercial and administrative transactions and others, and rights of use) minus (ii) capital employed – liabilities (consisting of the sum of suppliers, payroll and related charges payable, income tax and social contribution payable, deferred income tax and social contribution, other liabilities, related parties – commercial and administrative transactions, and current and noncurrent lease liabilities). The average employed capital is the result of the weighted average of the capital employed of the current quarter and the capital employed of the four previous quarters. The weights are given respectively as Q(0)=12.5%, Q(-1)=25.0%, Q(-2)=25.0%, Q(-3)=12.5%, and Q(-4)=25.0%, where Q(0) represents the current quarter, Q(-1) represents the quarter before Q(0), Q(-2) represents the quarter before Q(-1), Q(-3) represents the quarter before Q(-2) and Q(-4) represents the quarter before Q(-3).

Our management believes that disclosure of ROACE is useful to potential investors as it provides them with a clearer understanding of our profitability. However, ROACE is not a measure of financial performance under Brazilian GAAP or IFRS and should not be used in isolation and should not be considered as an alternative to net income or as a measure of operating results. ROACE does not have a standardized meaning, and our definition of ROACE may not be comparable with the definition used by other companies.

For the calculation of ROACE, see "Summary Financial and Other Information—Reconciliation of Non-GAAP Financial Measures."

**Last Twelve Months ("LTM") Information**

This offering memorandum contains certain financial information for the twelve months ended December 31, 2024. Financial information for the twelve months ended December 31, 2024 has been calculated by adding financial information derived from our income statements for the nine months ended December 31, 2024 to financial information derived from the income statements for the year ended March 31, 2024, and subtracting financial information derived from the income statements for the nine months ended December 31, 2023. The presentation of this information is not made in accordance with IFRS. We present this data as a supplemental measure for investors in assessing our performance. This data is not necessarily indicative of the results that may be expected for the year ending March 31, 2025, and should not be used as the basis for, or prediction of, annualized results.

**Market Data**

We have obtained the market and competitive position data used throughout this offering memorandum, including market forecasts, from internal surveys, market research, publicly available information and industry publications. We have included, in this offering memorandum, information from reports prepared by us, the Central Bank, the B3 S.A. – Bolsa, Brasil, Balcão ("B3"), The Brazilian National Economic and Social Development Bank (*Banco Nacional de Desenvolvimento Econômico e Social*) ("BNDES"), the Getúlio Vargas Foundation (*Fundação Getúlio Vargas*) ("FGV"), the Brazilian Geographical and Statistical Institute (*Instituto Brasileiro de Geografia e Estatística*) ("IBGE"), the Organization for Economic Co-operation and Development ("OECD"), the International Renewable Energy Agency, the Brazilian Association of Biogas and Biomethane (*Associação Brasileira de Biogás e Biometano*), among others, which sources we believe are reliable. Industry publications generally state that the information presented therein has been obtained from sources believed to be reliable, but the accuracy and completeness of the information is not guaranteed. Although we have no reason to believe any of this information is inaccurate in any material respect, neither we, nor the initial purchasers have independently verified this information or make any representation as to the accuracy or completeness of the information. Similarly, our in-house research

and estimates, which, while we believe they are reliable, have not been independently verified by the initial purchasers and we cannot assure you that the information is accurate. Nothing in this offering memorandum should be interpreted as a market forecast.

**Rounding**

Certain percentages and other amounts included in this offering memorandum have been rounded for ease of presentation. Any discrepancies between totals and the sums of the amounts listed are due to rounding.

## FORWARD-LOOKING STATEMENTS

This offering memorandum includes forward-looking statements within the meaning of the Securities Act or the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act").

Statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates" and similar expressions are forward-looking statements. Although we believe that these forward-looking statements are based upon reasonable assumptions, these statements are subject to several risks and uncertainties and are made in light of information currently available to us.

Our forward-looking statements may be influenced by numerous factors, including, without limitation, the following:

- delays or unexpected costs in the construction, expansion and operation of our bioenergy parks;

- volatility of supply, demand and the market price for our products;

- the modification, suspension, cancellation or non-renewal of the tax benefits that we have been granted;

- our ability to implement our business strategy, including with respect to our capital expenditure plan and the ability to arrange financing when required and on reasonable terms, as well as the disposal of certain assets in the future. See "Risk Factors—Risks Related to Our Business and Industry—We may from time to time dispose of certain assets, which could adversely impact our financial position or results of operations";

- our ability to successfully compete in all segments and geographical markets where we currently conduct business or may conduct business in the future;

- geopolitical and other challenges and uncertainties, including due to the trade disputes, ongoing military conflicts between Russia and Ukraine and between Hamas and Israel;

- adverse weather conditions, including those related to climate change events causing physical and transition risks in the markets in which we operate, as well as crop disease and pestilence;

- price of natural gas, ethanol and other fuels, as well as sugar;

- significant disruptions in our production facilities and transportation and logistics services, as well as equipment failure and service interruptions;

- our international operations and ability to implement our expansion strategy in other regions of Brazil and international markets through organic growth, acquisitions, joint ventures or partnerships;

- political instability and economic risk in Latin America (including as a result of government intervention, inflation, new taxes or tariffs and exchange rates), and changes in general economic, political and business conditions in Latin America;

- changes in customer demand;

- changes in our businesses;

- changes in global energy usage;

- appreciation and depreciation of the *real* against the U.S. dollar, which has experienced significant volatility since the beginning of the COVID-19 pandemic;

- other factors that may affect our financial condition, liquidity and results of our operations; and

- other risk factors discussed under "Risk Factors."

Words such as "believe," "should," "may," "might," "could," "seek," "aim," "likely," "will," "estimate," "continue," "anticipate," "intend," "expect" and other similar words used in this offering memorandum are intended to identify estimates and forward-looking statements. Estimates and forward-looking statements speak only as of the date they were made, and we undertake no obligation to update or to review any estimate and/or forward-looking statement because of new information, future events or other factors. Estimates and forward-looking statements involve risks and uncertainties, and are not guarantees of future performance. Our future results may differ materially from those expressed in these estimates and forward-looking statements. In light of the risks and uncertainties described above, the estimates and forward-looking statements discussed in this offering memorandum might not occur, and our future results and our performance may differ materially from those expressed in these forward-looking statements due to, but not limited to, the factors mentioned above. Because of these uncertainties, you should not make any investment decision based on these estimates and forward-looking statements.

On January 23, 2025, the Company's indirect subsidiary Raízen Centro-Sul S.A. contracted a PPE in the amount of US$100.0 million, equivalent to R$596.0 million. The PPE is subject to interest of six-month Term SOFR plus 1.45% *per annum*, with interest due semi-annually and the principal due on January 27, 2028.

On January 29, 2025, the Company contracted a PPE in the amount of US$85.4 million, equivalent to R$502.0 million, which is subject to interest of six-month Term SOFR plus 1.20% *per annum*, with interest due semi-annually and the principal due on February 4, 2028.

On February 12, 2025, the Company's indirect subsidiary Raízen Centro-Sul Paulista S.A. contracted a PPE in the amount of US$100.0 million, equivalent to R$576.5 million. The PPE is subject to interest of six-month Term SOFR plus 1.50% *per annum*, with interest due semi-annually and the principal due on February 14, 2030.

On February 13, 2025, the Company's indirect subsidiary Raízen Centro-Sul Paulista contracted a PPE in the amount of US$70.0 million, equivalent to R$405.1 million. The PPE is subject to interest of six-month Term SOFR plus 1.55% *per annum*, with interest due semi-annually and the principal due on February 18, 2028.

### Advances on exchange contracts (ACC)

On January 16, 2025, the Company contracted an advance on exchange contracts ("ACC") in the amount of US$50.0 million, equivalent to R$302.8 million, with final maturity on January 11, 2027. The ACC is subject to U.S. dollar exchange rate variations and fixed interest rate of 5.80% per year.

On January 29, 2025, the Company's indirect subsidiary Raízen Centro-Sul Paulista S.A. contracted an ACC in the amount of US$100.0 million, equivalent to R$586.0 million, with final maturity on January 31, 2028. The ACC is subject to U.S. dollar exchange rate variations and fixed interest rate of 5.65% per year.

### Export Credit Note (NCE)

On February 12, 2025, the Company's indirect subsidiary Raízen Centro-Sul S.A. contracted a NCE in the amount of US$ 100.0 million, equivalent to R$577.9 million. The NCE is subject to interest of twelve-month Term SOFR plus 1.30% to 1.55% *per annum*, with interest due yearly and the principal due in three equal installments on February 18, 2028, February 19, 2029 and February 15, 2030.

### The Issuer

The Issuer is a wholly-owned subsidiary of Raízen Energia and is a public limited liability company (*société anonyme*) organized and existing under the laws of Luxembourg, having its registered office at 16, rue Eugène Ruppert, L-2453, Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*Registre de commerce et des sociétés, Luxembourg*) under number B 184.033. See "The Issuer and Guarantors."

––––––––––––––––––

Our principal executive offices are located at Avenida Afonso Arinos de Melo Franco, 222, Block 2, Room 321, in the City of Rio de Janeiro, State of Rio de Janeiro, CEP 22631-455, Brazil. Our telephone number is +55 11 2344-6200. Investors should contact us for any inquiries via the address and telephone number of our principal executive office. Our principal website is www.raizen.com.br. The information contained in, or accessible through, our website is not incorporated into this offering memorandum.

If we fail to make any required payment under the agreements governing our indebtedness or fail to comply with restrictive covenants contained in them, we would be in default, and as a result, our debt holders would have the ability to require that we immediately repay our outstanding indebtedness and, as applicable, foreclose against the assets securing their borrowings. If these events occur, we could be forced into bankruptcy or liquidation. The acceleration of our indebtedness under one agreement may permit acceleration of indebtedness under other agreements that contain cross-default and cross-acceleration provisions. If our indebtedness is accelerated, we may not be able to repay our indebtedness or borrow sufficient funds to refinance it. Even if we are able to obtain new financing, it may not be on commercially reasonable terms or on terms that are acceptable to us. Alternatively, such acceleration could require us to sell assets and otherwise curtail operations to pay our creditors. If our debt holders require immediate payment, we may not have sufficient assets to satisfy our obligations under our indebtedness, and the proceeds from asset sales or curtailment of operations might not enable us to pay all of our liabilities.

Any failure to make payments on our indebtedness on a timely basis would likely result in a reduction of our credit rating, which could also harm our ability to incur additional indebtedness. See "—Any downgrade in the ratings of our debt securities, including the notes, would likely result in increased interest and other financial expenses related to our borrowings and debt securities and could reduce our liquidity and adversely affect the market price and marketability of the notes."

***Because the Issuer has no operations of its own, holders of the notes must depend on Raízen and its subsidiaries to provide the Issuer with sufficient funds to make payments on the notes when due.***

The Issuer, a wholly-owned indirect subsidiary of Raízen, on the date hereof, has no operations other than issuing and making payments on the notes and other indebtedness ranking equally with, or subordinated to, the notes, and using the proceeds therefrom as permitted by the documents governing these issuances, including lending the net proceeds of the notes and other indebtedness incurred by the Issuer to Raízen and its subsidiaries. Accordingly, the ability of the Issuer to pay principal, interest and other amounts due on the notes and other indebtedness will depend upon the financial condition and results of operations of Raízen and its subsidiaries that are debtors of the Issuer. In the event of an adverse change in the financial condition or results of operations of Raízen, Raízen Energia and their respective subsidiaries that are debtors of the Issuer, these entities may be unable to service their indebtedness to the Issuer, which would result in the failure of the Issuer to have sufficient funds to repay all amounts due on or with respect to the notes.

***The Guarantors rely, in part, on cash flows from their subsidiaries and jointly controlled companies that do not guarantee the notes to fund their obligations.***

In servicing payments to be made on their respective guarantees of the outstanding debt securities, the Guarantors may rely, in part, on cash flows from their subsidiaries and jointly controlled companies, mainly in the form of dividend payments. The ability of these subsidiaries and jointly controlled entities to make dividend payments to the Guarantors will be affected by, among other factors, the obligations of these entities to their creditors, requirements of Brazilian corporate and other law, and restrictions contained in agreements entered into by or relating to these entities. In the event that these subsidiaries and jointly controlled entities are unable to make dividend payments to the Guarantors due to insufficient cash flows, the Guarantors' liquidity may be adversely affected.

***Payments on the Guarantors' respective guarantees will be junior to each Guarantor's secured debt obligations and effectively junior to debt obligations of each Guarantor's subsidiaries and jointly controlled companies.***

The notes will be fully guaranteed by the Guarantors on an unsecured basis. Each such guarantee will rank equal in right of payment with all of the respective Guarantor's other existing and future senior unsecured indebtedness. Although the guarantees will provide the holders of the notes with a direct, but unsecured claim on the Guarantors' assets and property, payment on the guarantees will be subordinated to secured debt of the Guarantors to the extent the assets and property are securing such debt. Payment on the notes and the guarantees will also be structurally subordinated to the payment of all existing and future liabilities of the Guarantors' subsidiaries and jointly controlled companies (other than the Issuer and Raízen Energia).

documents qualifying as financial collateral arrangements in Luxembourg, see "Enforceability of Civil Liabilities—Insolvency Proceedings in the EEA and in Luxembourg."

Holders of the notes may have more difficulty protecting their interests than would security holders of a corporation or limited liability company incorporated in a jurisdiction of the United States. The Issuer is incorporated under and subject to Luxembourg law. Luxembourg law differs in some material respects from laws generally applicable to U.S. corporations and security holders, including the provisions relating to interested directors, mergers, amalgamations and acquisitions, takeovers, security holder lawsuits and indemnification of directors.

Under Luxembourg law, the duties of directors, managers and officers of a company are generally owed to the company only. Holders of notes issued by Luxembourg companies generally do not have rights to take action against directors, managers or officers of the company, except in limited circumstances. Directors, managers or officers of a Luxembourg company, in exercising their powers and performing their duties, must act in good faith and in the interests of the company as a whole and must exercise due care, skill and diligence. Directors, managers or officers have a duty not to put themselves in a position in which their duties to the company and their personal interests may conflict, and also are under a duty to disclose any direct or indirect financial interest in any contract or arrangement with the company or any of its subsidiaries. If a director, manager or officer of a Luxembourg company is found to have breached his or her duties to that company, he or she may be held personally liable to the company in respect of that breach of duty.

***Brazilian bankruptcy law may be less favorable to holders of the notes than bankruptcy and insolvency laws in other jurisdictions.***

If we are unable to pay our indebtedness as it falls due, including our obligations under the guarantee, then we may become subject to insolvency proceedings in Brazil. The bankruptcy law of Brazil currently in effect is significantly different from, and may be less favorable to creditors than, that of certain other jurisdictions. For example, holders of the notes may have limited voting rights at creditors' meetings in the context of a judicial reorganization proceeding. Under Brazilian bankruptcy law, in the event of our bankruptcy or liquidation, all of our debt obligations that are denominated in foreign currency, including the guarantee, will be converted into *reais* at the prevailing exchange rate on the date of declaration of our bankruptcy by the court. The obligations under the guarantee would be considered unsecured in case of a judicial reorganization, extrajudicial reorganization or bankruptcy liquidation, and would be subject to the reorganization plan or, in case of a bankruptcy liquidation, would be paid according to a statutory order pursuant to Brazilian bankruptcy law.

***The Issuer is organized and existing under Luxembourg law, and Luxembourg law differs from U.S. law and may afford less protection to holders of the notes.***

Holders of the notes may have more difficulty protecting their interests than would security holders of a corporation incorporated in a jurisdiction of the United States. As a Luxembourg company, the Issuer is organized and existing under, and subject to the Luxembourg Companies Law, and other provisions of, Luxembourg law. The Luxembourg Companies Law differs in some material respects from laws generally applicable to U.S. corporations and security holders, including the provisions relating to interested directors, mergers, amalgamations and acquisitions, takeovers, security holder lawsuits and indemnification of directors.

Under Luxembourg law, the duties of directors, managers and officers of a company are generally owed to the company only. Holders of notes issued by Luxembourg companies generally do not have rights to take action against directors, managers or officers of the company, except in limited circumstances. Directors, managers or officers of a Luxembourg company must, in exercising their powers and performing their duties, act in good faith and in the interests of the company as a whole and must exercise due care, skill and diligence. Directors have a duty not to put themselves in a position in which their duties to the company and their personal interests may conflict and are also under a duty to disclose any personal interest in any contract or arrangement with the company or any of its subsidiaries. If a director or officer of a Luxembourg company is found to have breached his or her duties to that company, he or she may be held personally liable to the company in respect of that breach of duty and in accordance with the provisions of the Luxembourg Companies Law. A director or manager may be jointly and severally liable with other directors or managers implicated in the same breach of duty.

69